ORIGINAL

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - x
VALENTIA VILLETTI and FAIZA JIBRIL, M.D.,

        Plaintiffs,

                  Index No.
                  1:18-cv-10200-VSB-KNF

      -against-

GUIDEPOINT GLOBAL, LLC,

        Defendant.

- - - - - - - - - - - - - - - - - x

        One Battery Park
        New York, New York

        October 1st, 2019
        10:10 a.m.

    EXAMINATION BEFORE TRIAL of
VALENTIA VILLETTI, a Plaintiff herein, taken
by the Defendant, in the above-entitled
action, held at the above time and place,
pursuant to Case Management Order, taken
before SALVATRICE MANNINO, a Shorthand
Reporter and Notary Public within and for the
State of New York.

       MAGNA LEGAL SERVICES
       (866) 624-6221
       www.MagnaLS.com



ORIGINAL

```
 1
 2   A P P E A R A N C E S:
 3       LICHTEN & BRIGHT, P.C.
             Attorneys for Plaintiffs
 4           387 Park Avenue South, 5th Floor
             New York, New York 10016
 5           (646) 588-4872
         BY:  STUART LICHTEN, ESQ.
 6           slichten@lichtenandbright.com
 7
 8
         GORDON REES SCULLY MANSUKHANI, LLC
 9           Attorneys for Defendant
             One Battery Park Plaza
10           New York, New York 10004
             (212) 269-5500
11       BY:  DAVID J. GRECH, ESQ.
             Dgrech@gordanrees.com
12
13
14       G. GUIDEPOINT
             Attorneys for Defendant
15           730 Third Avenue, 11th Floor
             New York, New York 10017
16           (212) 812-9511
         BY:  CATHERINE SMITH, ESQ.
17           Csmith@guidepointglobal.com
18
19
20
21
22
23
24
25
```



```
 1
 2              S T I P U L A T I O N S
 3       IT IS STIPULATED AND AGREED by and between
 4    the attorneys for the respective parties
 5    herein, and in compliance with Rule 221 of the
 6    Uniform Rules for the Trial Courts:
 7       THAT the parties recognize the provision of
 8    Rule 3115 subdivisions (b), (c) and/or (d).
 9    All objections made at a deposition shall be
10    noted by the officer before whom the
11    deposition is taken, and the answer shall be
12    given and the deposition shall proceed subject
13    to the objections and to the right of a person
14    to apply for appropriate relief pursuant to
15    Article 31 of the CPLR;
16       THAT every objection raised during a
17    deposition shall be stated succinctly and
18    framed so as not to suggest an answer to the
19    deponent and, at the request of the
20    questioning attorney, shall include a clear
21    statement as to any defect in form or other
22    basis of error or irregularity.  Except to the
23    extent permitted by CPLR Rule 3115 or by this
24    rule, during the course of the examination
25    persons in attendance shall not make
```



```
 1
 2    statements or comments that interfere with the
 3    questioning.
 4        THAT a deponent shall answer all questions
 5    at a deposition, except (i) to preserve a
 6    privilege or right of confidentiality, (ii) to
 7    enforce a limitation set forth in an order of
 8    a court, or (iii) when the question is plainly
 9    improper and would, if answered, cause
10    significant prejudice to any person.  An
11    attorney shall not direct a deponent not to
12    answer except as provided in CPLR Rule 3115 or
13    this subdivision.  Any refusal to answer or
14    direction not to answer shall be accompanied
15    by a succinct and clear statement on the basis
16    therefore.  If the deponent does not answer a
17    question, the examining party shall have the
18    right to complete the remainder of the
19    deposition.
20        THAT an attorney shall not interrupt the
21    deposition for the purpose of communicating
22    with the deponent unless all parties consent
23    or the communication is made for the purpose
24    of determining whether the question should not
25    be answered on the grounds set forth in
```



1

2    Section 221.2 of these rules, and, in such

3    event, the reason for the communication shall

4    be stated for the record succinctly and

5    clearly.

6        THAT the failure to object to any question

7    or to move to strike any testimony at this

8    examination shall not be a bar or waiver to

9    make such objection or motion at the time of

10   the trial of this action, and is hereby

11   reserved; and

12       THAT this examination may be signed and

13   sworn to by the witness examined herein before

14   any Notary Public, but the failure to do so or

15   to return the original of the examination to

16   the attorney on whose behalf the examination

17   is taken, shall not be deemed a waiver of the

18   rights provided by Rules 3116 and 3117 of the

19   C.P.L.R, and shall be controlled thereby; and

20       THAT the certification and filing of the

21   original of this examination are hereby

22   waived; and

23       THAT the questioning attorney shall provide

24   counsel for the witness examined herein with a

25   copy of this examination at no charge.



Page 6

                    V. VILLETTI

1                   V. VILLETTI

2    V A L E N T I A  V I L L E T T I, the

3    Witness herein, having been first

4    duly sworn by a Notary Public of the

5    State of New York, was examined and

6    testified as follows:

7    EXAMINATION

8    BY MR. GRECH:

9           THE COURT REPORTER:  State

10       your name for the record,

11       please.

12          THE WITNESS:  Valentia

13       Villetti.

14          THE COURT REPORTER:  State

15       your address for the record,

16       please.

17          THE WITNESS:  162 East

18       61st Street, Apartment 1B,

19       New York, New York 10065.

20     Q.  Good morning Ms. Villetti.  My

21    name is David Grech.  I am a Senior

22    Counsel with Gordon and Rees in their

23    employment practice liability group.

24    We represent Guidepoint Global, LLC

25    in this action.



```
 1                    V. VILLETTI
 2          I'm just going to give you a
 3    few instructions before we begin.  If
 4    you have any questions about my
 5    instructions or at any point as we go
 6    along, just let me know, let your
 7    Counsel know.
 8          This is a question-and-answer
 9    session, so we will ask some
10    questions and we may show you some
11    documents regarding your employment
12    in this lawsuit.  This is a
13    deposition, so it is a
14    question-and-answer session.  To
15    questions, we expect answers.
16          If you don't understand a
17    question, I'll do my best to rephrase
18    it.  If you ask me, we'll do so.
19    Your responses must be verbal.  No
20    nodding, no gestures, because the
21    reporter must take down all of your
22    responses for the transcript.
23          On that note, so that the
24    record of transcript is clear, even
25    if you can sort of guess what my
```



MAGNA
LEGAL SERVICES

Page 8

```
1                V. VILLETTI

2    question might be even before I

3    finish it, just for the sake of the

4    transcript, let me finish it and then

5    you can respond.

6         If you need a break at any

7    time, just let us know; let your

8    Counsel know, and we'll accommodate

9    you.  All that we ask is that if

10   there is a question pending at that

11   point, that you answer the question

12   and then we move on, and then we'll

13   take the break.

14        It's also my understanding

15   that we have a hard stop today at

16   2:00, so we're going to do our best

17   to accommodate that and get you out

18   of here at 2:00 and then Counsel and

19   I will discuss where we are at that

20   point, in terms of your deposition.

21   A.   Okay.

22   Q.   Do you have any questions

23   about those preliminaries?

24   A.   No.

25   Q.   Do you know why we are here
```



Page 9

```
 1                V. VILLETTI
 2   today?
 3      A.  Yes.
 4      Q.  Why is that?
 5      A.  For a deposition.
 6      Q.  Okay.  You're suing Guidepoint
 7   Global?
 8      A.  Yes.
 9      Q.  Why?
10      A.  I am suing them because they
11   discriminated against me based on my
12   sex as a woman, and retaliated
13   against my complaint.
14      Q.  Which complaint is that?
15      A.  Complaining about
16   discrimination against my sex as a
17   woman.
18      Q.  Ms. Villetti, what is the
19   highest level of education you've
20   obtained?
21      A.  Bachelor's Degree.
22      Q.  From what institution?
23      A.  Columbia University of
24   New York.
25      Q.  When did you acquire that
```



Page 10

```
 1                    V. VILLETTI
 2     degree?
 3          A.   2012.
 4          Q.   What was your first employment
 5     following your obtaining that degree?
 6          A.   ABR Healthco.
 7          Q.   When did you begin with ABR?
 8          A.   Early 2013.
 9          Q.   How long were you there?
10          A.   Early 2014.
11          Q.   What was your title at ABR?
12          A.   Equity Research Associate.
13          Q.   What were your duties at ABR
14     as an Equity Research Associate?
15          A.   We analyzed pharmaceutical
16     stocks.
17          Q.   There came a point in time
18     when you left ABR?
19          A.   Yes.
20          Q.   What happened next in terms of
21     your employment?
22          A.   I joined Bridgewater
23     Associates.
24          Q.   When did that occur?
25          A.   Early 2014.
```



Page 11

1                    V. VILLETTI

2       Q.   How long were you at

3    Bridgewater?

4       A.   Until late 2014.

5       Q.   What title were you employed

6    by Bridgewater?

7       A.   First as an investment

8    associate and then as a management

9    associate.

10       Q.   For what period of time were

11    you an investment associate?

12       A.   Half that time.

13       Q.   And the remaining half, you

14    were a management associate?

15       A.   Correct.

16       Q.   Is that considered a transfer?

17    a promotion?

18       A.   Just a transfer.

19       Q.   Going back to your education

20    for a moment, what was your degree

21    in?

22       A.   I double majored in

23    physical science and philosophy and

24    minor economics.

25       Q.   Separate and apart from your



Page 12

                    V. VILLETTI

1

2    studies at Columbia, did you have any

3    training that would have helped you

4    perform duties as an equity research

5    associate?

6        A.   No.

7        Q.   Did you have any training that

8    would've helped you perform your

9    duties as an investment associate or

10   a management associate at

11   Bridgewater?

12       A.   Other than their training, no.

13       Q.   What sort of training did you

14   receive at Bridgewater?

15       A.   They provide a course.

16       Q.   A course in what?

17       A.   They provide a course for

18   their investment associates and

19   another one for their in management

20   associates.

21       Q.   So you took each course?

22       A.   Mm-hmm.

23           MR. LICHTEN:  You have to

24        use words.

25       A.   Yes.



Page 13

1          V. VILLETTI

2     Q.  There came a point in time

3  where you left Bridgewater?

4     A.  Yes.

5     Q.  What was your next employment

6  position after that?

7     A.  I returned to ABR Healthco.

8     Q.  In what capacity?

9     A.  As an equity research analyst.

10    Q.  When did that return occur?

11    A.  Early 2015.

12    Q.  That is different from an

13  equity research associate?

14    A.  It's a promotion.

15    Q.  How long did you stay at ABR

16  this second time?

17    A.  Until I was recruited by

18  Guidepoint.

19    Q.  What were your duties as an

20  equity research analyst with ABR?

21    A.  I analyze stocks in the

22  pharmaceutical space.

23    Q.  Similar to the work you've

24  performed, previously?

25    A.  Yes.



Page 14

```
 1                    V. VILLETTI
 2      Q.  Why did you leave ABR in the
 3  first place?
 4      A.  I was recruited by
 5  Bridgewater.
 6      Q.  And why did you leave
 7  Bridgewater?
 8      A.  I was offered a promotion at
 9  ABR Healthco.
10      Q.  What was your compensation at
11  ABR Healthcare in that last position
12  as an analyst?
13      A.  It was in six figures.  I
14  can't recall, exactly.
15      Q.  And how was that compensation
16  broken up?  Was there a base?  Was
17  there commissions?
18      A.  Yes, there was a base and
19  there was a bonus.
20      Q.  What was the bonus based upon?
21      A.  Performance.
22      Q.  How would your performance
23  analyzing stocks be measured?
24      A.  Based on my output of reports.
25      Q.  What point in time did you
```



Page 15

```
 1                  V. VILLETTI
 2   start being recruited by Guidepoint?
 3       A.  Mid 2017.
 4       Q.  So you're at ABR as an analyst
 5   from 2015 through 2017, thereabout?
 6       A.  Right.
 7       Q.  Did you ever receive a bonus
 8   from ABR as an analyst?
 9       A.  Yes.
10       Q.  How many bonuses, if more than
11   one?
12       A.  Two.
13       Q.  And on what occasions?  When
14   did they occur?  Sorry.
15       A.  End of 2015 and end of 2016.
16       Q.  All right.  What was the first
17   inkling that you had that you were
18   being recruited by Guidepoint?
19       A.  I was contacted by a recruiter
20   from Long Ridge Partners.
21       Q.  I'm sorry, which Partners?
22       A.  Long Ridge Partners.
23       Q.  Okay.  And who is that
24   recruiter?
25       A.  His name is Chirag
```



Page 16

                    V. VILLETTI

1                   V. VILLETTI

2    Jethanandani.

3         Q.   What did this recruiter at

4    Long Ridge say to you?

5         A.   He said Guidepoint is looking

6    for a Healthcare Content Specialist.

7         Q.   At that point, did you know

8    what Guidepoint was?

9         A.   I had heard of it.

10        Q.   What have you heard?

11        A.   It was an expert network.

12        Q.   What was your understanding as

13   to what Guidepoint did?

14        A.   Provided experts.

15        Q.   To whom?

16        A.   To any member of institutions.

17        Q.   Experts in what field?

18        A.   A verity of fields.

19        Q.   Had you had any experience in

20   the healthcare field before?

21        A.   Yes, as an investment

22   associate and investment analyst.

23   [sic]

24        Q.   In the pharmaceutical areas?

25        A.   Yes.



Page 17

                    V. VILLETTI
1
2      Q.  Did the recruiter --
3      A.  I should correct that.
4      Q.  Sure.
5      A.  Equity associate and equity
6  analyst.
7      Q.  Sure.  Did the recruiter at
8  Long Ridge -- what else did the
9  recruiter at Long Ridge tell you that
10 Guidepoint was looking for in
11 addition to the Healthcare Content
12 Specialist?
13     A.  Someone to head their efforts
14 in providing Healthcare Content for
15 clients.
16     Q.  Had you worked with Long Ridge
17 before?
18     A.  No.
19     Q.  That you know, how did it come
20 that Long Ridge got your contact
21 information?
22     A.  LinkedIn.
23     Q.  Had you been looking for your
24 next position after -- or to move on
25 from the research analyst position at



Page 18

```
 1                    V. VILLETTI
 2    ABR?
 3         A.  No.
 4         Q.  What did the recruiter from
 5    Long Ridge tell you next?  What would
 6    be your next steps, if you were
 7    listening to this Guidepoint
 8    proposal.
 9         A.  I met with the recruiter.
10         Q.  When did that occur?
11         A.  June, 2017.
12         Q.  What was the content of that
13    meeting?
14         A.  He went over the role.
15         Q.  The role at --
16         A.  At Guidepoint.
17         Q.  Okay.  And what did he
18    describe to you that role to be?
19         A.  Content Specialist and
20    Healthcare.
21         Q.  Did he talk in terms of what
22    he expected in your day-to-day
23    duties?
24         A.  To some extent.
25         Q.  To what extent?
```



Page 19

                        V. VILLETTI

1
2      A.  He provided an overview.
3      Q.  Of what your duties would be
4  at Guidepoint?
5      A.  Yes.
6      Q.  What was included in that
7  overview?
8      A.  Creating content for clients,
9  putting together in-person meetings,
10  attending meetings and conferences,
11  and others I don't recall, exactly.
12      Q.  Had you had any experience
13  creating healthcare content, in this
14  respect?
15      A.  Yes.
16      Q.  And what was that experience?
17      A.  I had experience as an
18  equity associate and an
19  equity analyst.
20      Q.  I'm sorry, can you just
21  explain how analyzing pharmaceutical
22  stocks gives you experience in
23  creating healthcare content?
24      A.  It's the job of an
25  equity analyst or associate to


MAGNA
LEGAL SERVICES

Page 20

                    V. VILLETTI

1

2       provide reports on companies and on

3       the greater pharmaceutical landscape

4       for whatever industries they are

5       covering.

6           Q.  Had you had any experience,

7       prior to meeting with this recruiter

8       in arranging such meetings, as he

9       described?

10          A.  Yes.

11          Q.  In what capacity?

12          A.  It was a part of my job at

13      ABR.

14          Q.  During your first ten year or

15      second or both?

16          A.  Both.

17          Q.  Can you describe how you, say,

18      arranged meetings while you were at

19      ABR?

20          A.  I don't understand the

21      question.

22          Q.  When you were at ABR, one of

23      your responsibilities was to arrange

24      meetings?

25          A.  Yes.



Page 21

1                    V. VILLETTI

2       Q.   What was involved in doing

3    that?

4       A.   We contacted clients and

5    contacted advisors or management

6    teams and arranged meetings.

7       Q.   During your meeting with the

8    recruiter in June of 2017, did he

9    describe to you what would be the

10   next steps -- well, first, did you

11   express an interest in the position

12   at Guidepoint?

13      A.   I wanted to learn more.

14      Q.   What, specifically, did you

15   want to learn?

16      A.   About the team, the company.

17      Q.   Did your recruiter have

18   answers to those questions for you,

19   during your meeting?

20      A.   He provided the name of the

21   person leading the team.

22      Q.   Who was that person?

23      A.   Bouker Pool.

24           MR. LICHTEN:   B-O-U-K-E-R,

25        Pool.



Page 22

                    V. VILLETTI

1

2       Q.  Was it the recruiter's idea

3   that you would contact Mr. Pool?

4       A.  No.  The recruiter arranged

5   everything.

6       Q.  Okay.  What, if anything else,

7   did the recruiter tell you about

8   Mr. Pool's team?

9       A.  That it was a new team.

10      Q.  Did he explain to you what

11  Guidepoint's expectations would be to

12  the Healthcare Content Specialist in

13  the new team?

14      A.  Not in detail.

15      Q.  So you expressed an interest,

16  at least in learning more about the

17  opportunity; the recruiter gave you

18  the name of Bouker Pool, said it was

19  a new team.  Did he give you any

20  other information in response to your

21  question?

22      A.  He suggested that I ask the

23  remainder of my questions from the

24  team when I met them.

25      Q.  So did there come a point in



Page 23

                    V. VILLETTI

1

2    time when you met the team?

3        A.  Yes.

4        Q.  Was that your immediate next

5    step in your Guidepoint process after

6    meeting the recruiter or was there

7    something in between?

8        A.  I don't recall, exactly, but I

9    believe I filed or I filled a form,

10   an application form.

11       Q.  Is that something online or a

12   paper?

13       A.  It was a form that they

14   e-mailed me.

15       Q.  From Guidepoint?

16       A.  Yes.

17       Q.  Who sent you the form?

18       A.  The recruiter.

19       Q.  From Long Ridge?

20       A.  Yes.

21       Q.  You filled out the form and

22   sent it back to the recruiter?

23       A.  Yes.

24       Q.  What happened next in the

25   Guidepoint process?



Page 24

```
1                    V. VILLETTI
2         A.  I met with the team.
3         Q.  At Guidepoint's --
4         A.  At Guidepoint.
5         Q.  -- offices?
6         A.  Yes.
7         Q.  Who did you meet with?
8         A.  As I recall, I met with
9    Priscilla, who is in HR.  I met with
10   Bouker Pool.  I think that was it.
11        Q.  Do you recall when this
12   meeting occurred?
13        A.  Some time after June.
14        Q.  2017?
15        A.  Yes.  It could have been July.
16        Q.  What did you guys discuss in
17   this meeting?
18        A.  The role and the company.
19        Q.  What information did they give
20   you about the company?
21        A.  That it's an expert network.
22        Q.  What information did they give
23   you about the role they're receiving
24   to fill?
25        A.  That it would be head of
```



1              V. VILLETTI

2    healthcare content.

3        Q.   And that head of healthcare

4    content, it was your understanding

5    would be reporting to Mr. Pool?

6        A.   Yes.

7        Q.   What was Mr. Pool's position?

8        A.   He was the Director of

9    Content.

10       Q.   Was Mr. Pool responsible for

11   content across different areas of

12   expertise, other than just

13   healthcare?

14       A.   Yes.

15       Q.   What other areas of content

16   would Mr. Pool have directed?

17       A.   I don't know.

18       Q.   Certainly healthcare?

19       A.   Yes.  Healthcare and other

20   industries.

21       Q.   Okay.  Did Priscilla or

22   Bouker, the team together, did they

23   make you an offer during this June or

24   July, 2017 meeting?

25       A.   No.



Page 26

```
 1              V. VILLETTI
 2      Q.  What was the next step in your
 3  Guidepoint recruitment application
 4  process?
 5      A.  They asked for samples of my
 6  work.
 7      Q.  Mr. Pool and Priscilla asked
 8  for samples?
 9      A.  The recruiter did.
10      Q.  The recruiter is still
11  involved at this point --
12      A.  Yes.
13      Q.  -- as a liaison?
14          Okay.  And you provided those
15  work samples --
16      A.  Yes.
17      Q.  -- to the recruiter?
18          And what was in your work
19  samples?
20      A.  I don't recall, exactly.
21  But, likely, a report, some
22  presentations we put together.
23      Q.  And this would have been for a
24  current employer, a prior employer at
25  the time; do you recall?
```



Page 27

1              V. VILLETTI

2      A.   For ABR.

3      Q.   Okay.  So you sent these work

4  samples to the recruiter.  What

5  happened next in this Guidepoint

6  recruitment of you?

7      A.   I believe they did

8  reference checks.

9      Q.   Did you provide references to

10  the recruiter?

11      A.   Yes, and the application.

12      Q.   Was this part of the form that

13  he asked you to fill out?

14      A.   Yes.

15      Q.   The recruiter advised you that

16  they were likely doing reference

17  checks.  Did the recruiter keep you

18  up to date in any other way about the

19  recruitment process at Guidepoint,

20  after your meeting with Bouker and

21  Priscilla?

22      A.   He said he'd be in touch.

23      Q.   Did he eventually get back in

24  touch with you?

25      A.   Yes.



Page 28

```
 1              V. VILLETTI
 2      Q.  And what did he say?
 3      A.  They were interested in
 4  extending me an offer.
 5      Q.  When did that conversation
 6  occur, where the recruiter said that
 7  Guidepoint was interested in
 8  extending an offer?
 9      A.  I don't recall, exactly.  Some
10  time in July or August.
11      Q.  What else did he say?  Did he
12  say that there was a certain timeline
13  to respond?
14      A.  No.
15      Q.  Did he explain to you what the
16  offer was?
17      A.  I don't recall.
18      Q.  What was your next step with
19  the recruiter or Guidepoint after
20  hearing that they were interested in
21  extending your offer?
22      A.  I eventually received an
23  offer.
24      Q.  From whom?
25      A.  From Guidepoint.
```



Page 29

1                    V. VILLETTI

2        Q.  Not through the recruiter;

3    directly from Guidepoint?

4        A.  Yes.

5        Q.  Who relayed that offer to you?

6        A.  I believe it was Priscilla.

7        Q.  How was that done?

8        A.  By an e-mail.

9        Q.  Do you recall when you

10   received that e-mail?

11       A.  Some time in August.

12       Q.  And what -- did Priscilla

13   explain the offer in that e-mail?

14       A.  It had the salary.  That is

15   what I recall.

16       Q.  Do you recall what the salary

17   component of the offer was?

18       A.  No, but we negotiated it.

19       Q.  Were there any other

20   components of the offer that you

21   recall in Priscilla's e-mail?

22       A.  No.

23       Q.  Were there any bonus

24   components?

25       A.  Yes.



Page 30

```
 1              V. VILLETTI
 2     Q.  Do you recall what the bonus
 3  components were?
 4     A.  No.
 5     Q.  All right.  So, you said that
 6  you negotiated your salary.  Was that
 7  done with Priscilla?
 8     A.  Yes.
 9     Q.  Had the recruiter stepped back
10  at this point?  He was no longer
11  directly involved?
12     A.  No, he was still involved.
13     Q.  All right.  And in what
14  respect?
15     A.  In making sure both parties
16  were happy.
17     Q.  Could you walk us through the
18  negotiations with Priscilla on your
19  salary?  What was your response for
20  the initial salary component of the
21  offer?
22     A.  The discussion largely
23  happened with Chirag.
24     Q.  Through the recruiter?
25     A.  Yes.
```


MAGNA
LEGAL SERVICES

Page 31

```
 1                    V. VILLETTI
 2       Q.  Okay.
 3       A.  We asked for more.  I believe
 4  I had a call with Bouker some time in
 5  that period, and then I received a
 6  new offer.
 7       Q.  And who relayed that new
 8  offer?
 9       A.  Priscilla.
10       Q.  When did that come in?
11       A.  Some time in August.
12       Q.  Was that also by e-mail?
13       A.  Yes.
14       Q.  Do you recall the salary
15  component in that offer?
16       A.  It was a base of 180,
17  discretion bonus of 15, signing bonus
18  of 5.
19       Q.  What was your response to that
20  offer?
21       A.  I accepted the offer.
22       Q.  How did those components of
23  the offer match up with what you were
24  seeking?  Were they what you were
25  seeking?  a little bit less?
```



Page 32

```
 1              V. VILLETTI
 2      A.  I don't know how to answer
 3   that.
 4      Q.  The offer included 180,000
 5   base salary?
 6      A.  Yes.
 7      Q.  What were you seeking in your
 8   negotiations for your base salary?
 9      A.  I was looking at the total
10   package.
11      Q.  What total package were you
12   looking at?
13      A.  Something that would be
14   comparable to what I would have made,
15   had I stayed on the south side.
16      Q.  At what position?
17      A.  At Health Co. or another firm.
18      Q.  Okay.  And what were you
19   making at ABR at that time?
20      A.  I don't recall, exactly, but
21   it would have been comparable.
22      Q.  Six figures with a base and a
23   bonus--
24      A.  Yes.
25      Q.  -- that you received twice?
```


MAGNA
LEGAL SERVICES

Page 33

```
 1                    V. VILLETTI
 2        A.  Yes.
 3        Q.  Do you recall what the
 4   six-figure base was, as an analyst at
 5   ABR?
 6        A.  It was lower than Guidepoint,
 7   but the bonus was much more.
 8        Q.  The base at ABR -- the
 9   six-figure base was lower than the
10   180 component at Guidepoint?
11        A.  I believe so.
12        Q.  Okay.  And we talked about the
13   bonuses you received at ABR.
14        A.  Yeah.
15        Q.  -- one in 2015 and one in
16   2016?
17        A.  Yes.
18        Q.  Do you recall the amount you
19   received in 2015 for a bonus?
20        A.  I don't, exactly.
21        Q.  What about 2016?
22        A.  I can't be sure.
23        Q.  Was it based on a percentage?
24   I know we talked about the criteria
25   for it; it was output and things like
```



Page 34

1              V. VILLETTI

2    that.  Was it based on a percentage

3    of your base?

4       A.  No.

5       Q.  Do you know what it was based

6    upon, other than why you would be

7    entitled to it, how they came to the

8    amount?

9       A.  It was based on performance.

10      Q.  Okay.  So, you did accept the

11   offer as relayed by Priscilla:  The

12   180, the 15 discretionary bonus.  Was

13   that understood to be annual bonus?

14      A.  For the first year, yes.

15      Q.  And what was your

16   understanding of the bonus after the

17   first year?

18      A.  We would discuss it later, but

19   there was room for growth.

20      Q.  In terms of an increase in the

21   bonus amount?

22      A.  Yes.

23      Q.  And you accepted that offer?

24      A.  Yes, but I joined at midpoint

25   in the year.  So this bonus would



Page 35

```
 1                V. VILLETTI
 2   have been for the remainder of the
 3   year.
 4       Q.  Okay.  When did you join
 5   Guidepoint?
 6       A.  September.
 7       Q.  We're in 2017, then?
 8       A.  Yes.
 9       Q.  So it's your understanding
10   upon accepting the offer, that the
11   annual discretionary 15,000 bonus
12   would be prorated for your time in
13   joining?
14       A.  No.  The 15,000 was for the
15   remainder of the year.
16       Q.  Okay.  So it was your -- it
17   was the opposite.  It was your
18   understanding that once you worked a
19   full year at Guidepoint, the bonus
20   would be more than 15?
21       A.  Yes.
22       Q.  Did you receive your $5,000
23   signing bonus?
24       A.  Yes.
25       Q.  And at the end of 2017, did
```



Page 36

```
 1                    V. VILLETTI
 2    you receive a bonus?
 3        A.  I don't recall.
 4        Q.  When was your last day at
 5    Guidepoint?
 6        A.  Some time in March of 2018.
 7        Q.  And had you received any
 8    bonuses from Guidepoint during your
 9    employment?
10        A.  I don't recall.
11        Q.  As long as we're talking about
12    employment -- and we'll get back to
13    Guidepoint -- what did you do in
14    terms of employment, after leaving
15    Guidepoint?
16        A.  I have been working on a
17    startup.
18        Q.  And what's the startup?
19        A.  It is a packaged food startup.
20        Q.  What was the name of the
21    startup?
22        A.  Kioko, K-I-O-K-O.
23        Q.  When did your work at Kioko
24    start?
25        A.  When I left Guidepoint
```



1                    V. VILLETTI

2     full-time.

3        Q.  Had you been working at that

4     startup, prior to March of 2018?

5        A.  No.  I was involved, but not

6     working on it.

7        Q.  So there was some overlap

8     between your work at Guidepoint and

9     your work for this startup?

10       A.  Yes.

11       Q.  When did you start your

12    involvement with Kioko?

13       A.  Before I joined Guidepoint.

14       Q.  About when did that

15    involvement begin?

16       A.  2016.

17       Q.  What is Kioko?  What does it

18    do?

19       A.  They produce packaged foods.

20       Q.  What sorts of foods?

21       A.  Snacks.

22       Q.  What was your involvement with

23    Kioko starting in 2016?

24       A.  I was a cofounder.

25       Q.  Who was or who were the other



Page 38

```
 1                V. VILLETTI

 2    founders of Kioko?

 3       A.   There were a couple of other

 4    people.

 5       Q.   And their names are?

 6       A.   I don't feel comfortable

 7    discussing them.

 8             MR. LICHTEN:  Can we take

 9          a break for a minute?

10             MR. GRECH:  Sure.

11             (Whereupon, the witness and

12          his attorney left the room.)

13             MR. LICHTEN:  The witness

14          is not willing to give those

15          names.  Maybe we can save it

16          for later or ask the judge.

17             MR. GRECH:  Can you make a

18          representation as to why?

19          What's the basis?

20             MR. LICHTEN:  You can ask

21          her.  I don't know why, really.

22             MR. GRECH:  Can you read

23          back last question and answer,

24          please?

25             (Whereupon, the record was
```



Page 39

```
 1              V. VILLETTI
 2      read by the reporter.)
 3      Q.  Ms. Villetti, can you explain
 4   why you do not feel comfortable in
 5   disclosing the names of the other
 6   cofounders of Kioko?
 7      A.  First, because it's irrelevant
 8   and second, because they had
 9   full-time jobs and they may not want
10   to be associated with Kioko, and I
11   have to respect their wishes.
12      Q.  They might not want to be
13   associated with Kioko?
14      A.  Yes.
15      Q.  Is Kioko a public company?
16      A.  No.
17      Q.  Does Kioko have an internet
18   presents?
19      A.  Barely.
20      Q.  Does Kioko sell the packaged
21   foods online?
22      A.  They sell one product now.
23      Q.  What product do they sell?
24      A.  A protein bar.
25              MR. GRECH:  Can we mark
```



MAGNA
LEGAL SERVICES

Page 40

```
 1                V. VILLETTI
 2        that for a ruling on
 3        Plaintiffs' Response to the
 4        question, the other cofounders
 5        of Kioko, and subject to
 6        further discussion with
 7        Counsel, and ultimately the
 8        decision by the Court as to the
 9        relevance of that question.
10     Q.  Ms. Villetti, how did your
11   role with Kioko change, say, in March
12   of 2018?
13     A.  I began focusing on it
14   full time.
15     Q.  What sort of things were you
16   doing full time now for Kioko?
17     A.  I oversaw the RND and
18   operations.
19     Q.  Anything else?
20     A.  No.
21     Q.  Do you still serve in that
22   capacity?
23     A.  Yes.
24     Q.  What sort of compensation do
25   you receive from Kioko?
```



Page 41

```
 1                V. VILLETTI
 2      A.   Nothing.
 3      Q.   Did you inquire any other
 4   employments beginning in or about
 5   March of 2018, after you left
 6   Guidepoint?
 7      A.   I have done some consulting
 8   projects.
 9      Q.   What consulting projects have
10   you done?
11      A.   A paid project for PWC and
12   I've done unpaid work.
13      Q.   What is PWC?
14      A.   It is a large accounting and
15   consulting firm.
16      Q.   What was the paid project that
17   you did for them?
18      A.   You have to be more specific.
19      Q.   You did a paid project for
20   PWC?
21      A.   Yes.
22      Q.   What did you do for PWC?
23      A.   It was a healthcare project.
24      Q.   What were your
25   responsibilities in the healthcare
```



Page 42

```
 1              V. VILLETTI
 2    project for PWC?
 3         A.  I don't know much I'm allowed
 4    to disclose, contractually.
 5         Q.  You had a contract with PWC?
 6         A.  As a contractor, yes.
 7            MR. GRECH:  Just note for
 8         the record, we're probably
 9         going to call for the
10         production of that contract.
11         We'll follow up in writing.
12         Q.  Other than the paid project
13    for PWC, did you perform any other
14    work for compensation after
15    March, 2018?
16         A.  No.
17         Q.  What compensation did you
18    receive from PWC?
19         A.  I had an hourly rate of 200 an
20    hour.
21         Q.  For what period of time did
22    you work on this project for PWC?
23         A.  It was a short project;
24    Less than three months.
25         Q.  And those three months
```



Page 43

                    V. VILLETTI

1
2    occurred when?
3        A.   Earlier this year.
4        Q.   And the project is completed?
5        A.   Yes.
6        Q.   What's the total compensation
7    you've received from PWC?
8        A.   I don't know off the top of my
9    head.
10       Q.   How many hours did you put in
11   on the project?
12       A.   I can't be sure.
13           MR. GRECH:  Mr. Lichten,
14        we would also likely follow up
15        with requests based upon those
16        areas, total compensation from
17        PWC.  We'll follow up in
18        writing.
19           MR. LICHTEN:  Sure.
20       Q.   Ms. Villetti, you've
21   mentioned, I believe, other unpaid
22   work that you've done since March of
23   2018?
24       A.   Yes.
25       Q.   Could you describe that,



Page 44

                    V. VILLETTI

1

2    please?

3        A.   Informal advisory for

4    startups.

5        Q.   How many startups would you

6    say you've advised in the period of,

7    say, March, 2018 to date?

8        A.   Three or four.

9        Q.   How much of your time in that

10   period of March, 2018 to date, have

11   you spent advising the three to four

12   startups?

13       A.   In terms of?

14       Q.   Was it considered a full time?

15   part time?

16       A.   Just advisory work, which is

17   part time.

18       Q.   And you collected

19   unemployment, as well --

20       A.   Yes.

21       Q.   -- after leaving Guidepoint?

22            All right.  Let's go back to

23   Guidepoint:  I believe you said that

24   Mr. Pool would have been your

25   supervisor at Guidepoint?



Page 45

1                    V. VILLETTI

2        A.   Yes.

3        Q.   Who else did you work with at

4   Guidepoint?

5        A.   There was an events team.

6   And I, occasionally, collaborated

7   with Justin Rouise. (Phonetic)

8        Q.   What was Justin's title at

9   Guidepoint?

10       A.   I don't know, but he focused

11   on other industries.

12       Q.   Did you work with anyone in

13   particular in the events team?

14       A.   There were several people.

15       Q.   Who were they?

16       A.   There was Jessica (phonetic),

17   who I briefly worked with because she

18   was on maternity leave; the other

19   girls were Kendall (phonetic),

20   Amrutha (phonetic), and

21   Gabby (phonetic).

22       Q.   These were all members of the

23   events team?

24       A.   Yes, they provided logistics.

25       Q.   Logistics for the conferences?



Page 46

```
 1              V. VILLETTI
 2      A.  For anything we needed.
 3      Q.  And then it would be fair to
 4  say that you were on the
 5  content team?  The content side?
 6      A.  Yes.
 7      Q.  With Bouker?
 8      A.  Yes.
 9      Q.  Anyone else on the Healthcare
10  Content Team?
11      A.  No -- actually,
12  Ashlee Dunston was initially a
13  healthcare content person and we
14  overlapped for some period of time.
15      Q.  Your ten year with Guidepoint
16  overlapped Ashlee's?
17      A.  Yes.
18      Q.  In the same title?
19      A.  I don't know what her title
20  was.
21      Q.  When did Ashlee leave
22  Guidepoint?
23      A.  End of the year.
24      Q.  The end of 2017?
25      A.  Yes.
```



```
1              V. VILLETTI
2      Q.  Under what circumstances?
3      A.  She was fired.
4      Q.  Do you know why?
5      A.  I believe because she was a
6   woman.
7      Q.  And what led you to that
8   belief?
9      A.  Based on my conversations with
10  members of her team.  They were not
11  consulted.
12     Q.  Not consulted about her
13  termination?
14     A.  Yes.
15     Q.  When you were brought on by
16  Guidepoint, was it your understanding
17  that you would be replacing Ashlee or
18  working with Ashlee?
19     A.  There was little to no mention
20  of Ashlee.
21     Q.  In your application and
22  interview process?
23     A.  Yes.
24     Q.  When did you first come to
25  learn of Ashlee?
```



Page 48

                    V. VILLETTI

1

2       A.   When I was at Guidepoint.

3       Q.   When you began employment?

4       A.   Yes.

5       Q.   And she -- Ashlee would have

6    been on the Healthcare Content Team,

7    correct?

8       A.   I don't know her exact role,

9    but whatever responsibilities she

10   had, she also produced healthcare

11   content.

12      Q.   Who were the other members of

13   her team that complained about not

14   being consulted -- "complained" is

15   too strong of a word -- that told you

16   they were not consulted?

17      A.   I don't recall their names.

18      Q.   Were these -- I'm struggling

19   to understand the other members of

20   the Healthcare team.  If it was you

21   and Bouker, and there was some

22   overlap with Ashlee, were there other

23   members of the Healthcare Team at

24   that point?

25      A.   No.  These were people that



Page 49

                    V. VILLETTI
1
2    reported to her, but they were not
3    healthcare content people.
4        Q.   Okay.   So these were
5    subordinates to Ashlee?
6        A.   Yes.
7        Q.   And it was your understanding
8    that they felt they should have been
9    consulted, prior to the company
10   letting Ashlee go?
11       A.   Yes.
12       Q.   Did you have conversations
13   with anyone else at Guidepoint as to
14   termination procedures in this
15   context, consulting with team
16   members?
17       A.   I don't understand your
18   question.
19       Q.   You said that Ashlee's team
20   members said they weren't consulted
21   regarding her termination?
22       A.   Yes.
23       Q.   Was it your understanding that
24   it was Guidepoint's policy to consult
25   with team members prior to



Page 50

```
 1              V. VILLETTI
 2    terminating someone?
 3       A.  I had that impression, yes.
 4       Q.  How did you get that
 5    impression?
 6       A.  Based on conversations with
 7    people that had been at Guidepoint
 8    for longer.
 9       Q.  Such as?
10       A.  I don't recall.
11       Q.  Did you have conversations
12    like that with Bouker?
13       A.  I don't recall.
14       Q.  Did you have conversations
15    like that with Priscilla?
16       A.  I don't recall.
17       Q.  Do you recall any other
18    terminations of other employees
19    during your time at Guidepoint, other
20    than Ashlee?
21       A.  No.
22       Q.  How would you describe your
23    work performance at Guidepoint during
24    your time there?
25       A.  Great.
```



Page 51

V. VILLETTI

1
2      Q.   And what do you base that
3  upon?
4      A.   The feedback from my
5  supervisor, from the advisors, from
6  the clients, and the numbers of
7  attendees of the content I produce,
8  and conferences -- teleconferences.
9      Q.   And how many conferences would
10  you have arranged during your time at
11  Guidepoint?
12      A.   Conferences or
13  teleconferences?
14      Q.   Conferences, in general.
15      A.   I don't know, exactly.
16      Q.   Teleconferences?
17      A.   I don't know, exactly.
18      Q.   If we're talking conferences
19  and telephone conferences, were there
20  also in-person conferences?
21      A.   There were in-person meetings.
22      Q.   In-person meetings, okay.  And
23  how many -- strike that.
24          You would have been
25  responsible for arranging healthcare



Page 52

                        V. VILLETTI

1

2    content in-person meetings?

3        A.  Yes, in selecting the advisors

4    and setting the agenda.

5        Q.  How many in-person meetings

6    did you work on, while you were at

7    Guidepoint?

8        A.  I don't know, exactly.

9        Q.  You've mentioned a Jessica

10   before.  You worked with her,

11   briefly?

12       A.  Yes.

13       Q.  What was the nature of your

14   work with Jessica?

15       A.  She was in events and

16   logistics -- events planning and

17   logistics.

18       Q.  How would events and the

19   content team work together?

20       A.  They provided support in

21   organizing the events.

22       Q.  Did Jessica work on any of the

23   events that you were responsible for?

24       A.  I don't know.

25       Q.  Did you receive logistic



MAGNA
LEGAL SERVICES

Page 53

1                    V. VILLETTI

2     support for the conferences you

3     worked on?

4         A.  Yes.

5         Q.  Do you recall specific members

6     of the logistics team that you worked

7     with?

8         A.  I worked with all of them;

9     various.

10        Q.  Kendall, Amrutha, and Gabby?

11        A.  Yes.

12        Q.  But you don't recall,

13    specifically, working with Jessica?

14        A.  No.

15        Q.  And you mentioned that, at

16    some point, she went out on

17    maternity leave?

18        A.  Yes.

19        Q.  Do you recall when that

20    happened?

21        A.  I don't know.

22        Q.  Did Jessica, ultimately,

23    return to Guidepoint?

24        A.  Yes.

25        Q.  Do you recall when that



Page 54

```
 1                    V. VILLETTI
 2     happened?
 3          A.   No.
 4          Q.   Were you aware of a change in
 5     Jessica's position, while she was on
 6     maternity leave?
 7          A.   Yes.
 8          Q.   What was your knowledge of
 9     that?
10          A.   I was told that she had been
11     demoted.
12          Q.   You were told that she was
13     demoted while out on leave?
14          A.   Yes.
15          Q.   Demoted from what position?
16          A.   I don't know the specifics.
17          Q.   Do you know what position she
18     was demoted to?
19          A.   No.
20          Q.   Who told you that she was
21     demoted?
22          A.   Bouker Pool.
23          Q.   Who would have been
24     responsible for demoting Jessica?
25          A.   Albert (phonetic).
```



MAGNA
LEGAL SERVICES

Page 55

1          V. VILLETTI

2     Q.  Who is Albert?

3     A.  Albert is the CEO of

4  Guidepoint.

5     Q.  This is Albert Sebag, we're

6  talking about?

7     A.  Yes.

8     Q.  S-E-B-A-G?

9     A.  Yes.

10     Q.  What did Bouker tell you about

11  Albert's demotion of Jessica?

12     A.  That she had been demoted

13  while she was on maternity leave and

14  her subordinates had been reassigned

15  to him.

16     Q.  "To him" meaning?

17     A.  To Bouker.

18     Q.  Did you know why Jessica was

19  demoted?

20     A.  No.

21     Q.  When Jessica came back from

22  maternity leave, what were her

23  duties?

24     A.  She provided logistics for

25  events.



Page 56

```
              V. VILLETTI

 1

 2      Q.  Did those duties differ in any

 3   way from the duties she did before

 4   she went out?

 5      A.  I don't know.

 6      Q.  Which subordinates were

 7   reassigned to Bouker?

 8      A.  Gabby, Amrutha, and Kendall.

 9   Actually, there was also

10   Sara (phonetic).  I forgot Sara.

11   There was a fourth person.

12      Q.  Sarah was also on the events

13   team --

14      A.  Yes.

15      Q.  -- at this time?

16         Were these subordinates now on

17   the Healthcare Content Team or they

18   worked for Bouker in other content

19   areas?

20      A.  All content.

21      Q.  Did they work with you on

22   healthcare?

23      A.  Yes.

24      Q.  Did there come a point in time

25   when you and Bouker sought to expand
```



MAGNA
LEGAL SERVICES

1                V. VILLETTI

2    the team?

3        A.  Yes.

4        Q.  Can you tell us what efforts

5    you made to expand the Healthcare

6    Content Team?

7        A.  We worked with

8    Guidepoint's HR, and recruiting

9    disorced [sic] candidates.

10       Q.  What sort of position or

11   positions were you seeking to fill?

12       A.  I was seeking associate for

13   myself, and another healthcare

14   content person.

15       Q.  Was Ashlee gone by this time?

16       A.  I think so.  I'm not sure.

17       Q.  Were you and Bouker leading

18   these --

19       A.  Yes.

20       Q.  -- these efforts to expand the

21   team?

22           Did you have any conversations

23   with Albert about this expansion?

24       A.  No.

25       Q.  Who gave you, sort of, the



Page 58

```
1              V. VILLETTI
2    instructions to expand the team?
3        A.  Bouker Pool.
4        Q.  Do you know whether he
5    received those instructions from
6    anyone else or this was his own
7    initiative?
8        A.  As I understood it, it all
9    came from Albert Sebag.
10       Q.  It's your understanding that
11   you were tasked as being one of the
12   hiring managers for the Healthcare
13   Content Strategist position?
14       A.  Yes.
15       Q.  Who gave you that position or
16   authority, I should say?
17       A.  Bouker Pool.
18       Q.  And it was your understanding
19   that you had authorization to
20   interview and hire whoever you sought
21   fit with Bouker?
22       A.  Yes.
23       Q.  Did there come a point in time
24   where you interviewed a Dr. Jibril?
25       A.  Yes.
```



1                    V. VILLETTI

2        Q.   Who is Dr. Jibril?

3        A.   She was a candidate.

4        Q.   For which position?

5        A.   For Healthcare Content

6   Associate, I believe.  I'm not sure.

7        Q.   What would she have been

8   interviewing or applying for?  The

9   position of your associate or the

10   other Healthcare Content Specialist?

11        A.   The Healthcare Content

12   Specialist, but she would have

13   reported to me.

14        Q.   How did you come to learn of

15   Dr. Jibril?

16        A.   Through Guidepoint HR.

17        Q.   What's Dr. Jibril's

18   background, relevant to her potential

19   candidacy, her disposition?

20        A.   She is extremely qualified as

21   an MD who has also worked for another

22   expert network.

23        Q.   Do you know what Dr. Jibril's

24   specialty is, if any?

25        A.   In?



Page 60

```
 1              V. VILLETTI

 2     Q.  She's a medical doctor?

 3     A.  Yes, she is a medical doctor.

 4   I believe she has a specialty in

 5   OBGYN.

 6     Q.  For which expert network did

 7   Dr. Jibril work?

 8     A.  I don't know the name.

 9     Q.  How did you come to learn

10   of -- strike that.

11         What did HR send you,

12   materials, concerning Dr. Jibril's

13   candidacy?

14     A.  Her resumé.

15     Q.  Anything else?

16     A.  Initially, no.

17     Q.  You reviewed that resumé?

18     A.  Yes.

19     Q.  You talked about it with

20   Bouker?

21     A.  Yes.

22     Q.  What were the next steps you

23   took?

24     A.  They scheduled her for an

25   interview.
```



Page 61

                    V. VILLETTI

1

2      Q.   When did this occur?

3      A.   I'm not sure.

4      Q.   Did you ultimately interview

5  Dr. Jibril?

6      A.   Yes.

7      Q.   Did anyone else interview her?

8      A.   Yes.

9      Q.   Who was that?

10     A.   Bouker Pool and Justin Rouise

11  and Priscilla, I believe.

12     Q.   What role was Justin playing

13  in this interview?

14     A.   He was a member of the

15  content team.

16     Q.   We talked about the, sort of,

17  scheduling of the interview.  Do you

18  recall when the actual interview of

19  Dr. Jibril occurred?

20     A.   No.

21     Q.   Did she have one interview?

22  more than one?

23     A.   I only interviewed her once,

24  but I'm not sure how many interviews

25  she had in total.



MAGNA
LEGAL SERVICES

Page 62

```
 1              V. VILLETTI
 2      Q.  What was your impressions of
 3  Dr. Jibril during your interview with
 4  her?
 5      A.  She was extremely sharp and
 6  knowledgeable and qualified and would
 7  have made a great addition to the
 8  team.
 9      Q.  Did you have an opportunity to
10  talk about her interview with Bouker,
11  Priscilla, and Justin?
12      A.  Yes.
13      Q.  What was Bouker's impression
14  of Dr. Jibril?
15      A.  He had a similar impression to
16  mine and there was a consensus that
17  she was extremely qualified and a
18  great fit.
19      Q.  And Priscilla felt the same
20  way?
21      A.  I did not speak to Priscilla.
22      Q.  Did you speak to Justin
23  about --
24      A.  Yes, Justin and Bouker Pool.
25      Q.  You spoke to Justin and Bouker
```



Page 63

```
 1                  V. VILLETTI
 2    about Dr. Jibril's candidacy?
 3        A.  Yes.
 4        Q.  What did Justin have to say
 5    about Dr. Jibril's candidacy?
 6        A.  He agreed with my assessments.
 7        Q.  What next steps did you take
 8    in terms of Dr. Jibril's candidacy
 9    application for working at Guidepoint
10    after her interview?
11        A.  Someone from HR was handling
12    it, a recruiter, a lateral recruiter.
13    But she did, at some point, produce
14    samples of her work and provided
15    references, I believe.  And I
16    reviewed her work.
17        Q.  This was a lateral recruiter
18    inhouse at Guidepoint?
19        A.  Yes.
20        Q.  And who was that?
21        A.  I don't know his name.
22        Q.  It is a "him"?
23        A.  Yes, I believe.
24        Q.  Was Priscilla also involved,
25    in terms of HR at this point?
```



Page 64

```
 1                V. VILLETTI
 2      A.  Yes.
 3      Q.  What sort of work samples did
 4   you review from Dr. Jibril?
 5      A.  I don't remember.
 6      Q.  You, at some point, were given
 7   a list of her references?
 8      A.  No.
 9      Q.  Were you made aware that she
10   had provided a list of references?
11      A.  Yes.
12      Q.  Did you reach out to any of
13   her references?
14      A.  No, HR was handling that.
15      Q.  Did HR report to you on its
16   research -- sorry -- reaching out to
17   the references for Dr. Jibril?
18      A.  I don't recall.
19      Q.  Okay.  So, you interviewed
20   her, you spoke with the recruiter,
21   there were work samples and
22   references.  What were your next
23   steps concerning Dr. Jibril?
24      A.  Bouker and I agreed that we
25   should extend her an offer.  And we
```



Page 65

1              V. VILLETTI

2    had been designated the hiring

3    managers, so we had the authority to

4    do so.  And it was just a matter of

5    negotiation concerning her salary.

6         Q.  And, again, that designation

7    of you as hiring manager was made by

8    Bouker, correct?

9         A.  Yes.

10        Q.  Do you know who designated

11   Bouker?

12        A.  Albert Sebag.

13        Q.  How did you know that?

14        A.  Bouker relayed that

15   information.

16        Q.  What were the components of

17   the offer that you contemplated to

18   Dr. Jibril?

19        A.  I was not involved with the

20   details.

21        Q.  But you and Bouker agreed that

22   an offer should be made?

23        A.  Yes.

24        Q.  Was an offer ultimately made

25   to Dr. Jibril?



Page 66

```
 1              V. VILLETTI

 2    A.  No.

 3    Q.  Why not?

 4    A.  Because Albert Sebag

 5  intervened.

 6    Q.  How did Mr. Sebag intervene?

 7    A.  He prevented us from extending

 8  her an offer.

 9    Q.  What was Albert's involvement

10  in the Dr. Jibril application, up

11  until this point?

12    A.  Nothing.

13    Q.  At what point in time did he

14  become involved?

15    A.  When we were prepared to

16  extend her an offer, to my knowledge.

17    Q.  To your knowledge, why did

18  Albert prevent Guidepoint from

19  extending an offer to Dr. Jibril?

20    A.  Because he was not a

21  hedge fund guy.

22    Q.  Because Albert is not a

23  hedge fund guy?

24    A.  Because Dr. Jibril is not a

25  hedge fund guy.
```



Page 67

1                    V. VILLETTI

2       Q.   Dr. Jibril has no hedge fund

3    background?

4       A.   Yes.

5       Q.   Albert does?

6       A.   No.

7       Q.   Did you have conversations

8    with Albert about Dr. Jibril's

9    candidacy?

10      A.   No.

11      Q.   How did you come to this

12   conclusion that it was this

13   hedge fund issue that caused Albert

14   to prevent the offer extension?

15      A.   Bouker Pool relayed that

16   information.

17      Q.   Did Bouker have conversations

18   with Albert about Dr. Jibril?

19      A.   Yes.

20      Q.   If Albert doesn't have

21   hedge fund background, why was he

22   concerned whether Dr. Jibril did?

23      A.   I don't know.

24      Q.   Was that a requirement of the

25   position?



Page 68

```
 1                 V. VILLETTI
 2      A.  Not until that point.
 3      Q.  How many other candidates did
 4   you interview for the Healthcare
 5   Content Specialist that you had hoped
 6   to offer Dr. Jibril?
 7      A.  She was the first one.
 8      Q.  Had you interviewed
 9   any -- strike that.
10         Had you received any
11   applications for the position of your
12   associate?
13      A.  Yes.
14      Q.  How many applications have you
15   received or did Guidepoint receive?
16      A.  I don't know.
17      Q.  Did you ever interview anyone
18   for that position?
19      A.  Yes.
20      Q.  Who did you interview for that
21   position?
22      A.  An internal candidate named
23   Liana (phonetic) Yamin.
24      Q.  Do you know the spelling of
25   the last?
```



Page 69

1                    V. VILLETTI

2        A.   I believe it's Y-A-M-I-N.

3        Q.   Ms. Yamin, what was her

4    position at Guidepoint at the time

5    she was applying for your

6    associate position?

7        A.   She was a junior person.  I

8    don't know, exactly, her title.

9        Q.   And you interviewed her for

10   the associate position?

11       A.   Yes.

12       Q.   Did you interview anyone else?

13       A.   Yes.

14       Q.   Who did you interview, other

15   than Ms. Yamin?

16       A.   I don't remember the name.

17   Another internal candidate.

18       Q.   Male or female?

19       A.   Female.

20       Q.   Anyone else?  You had two

21   interviews.  Was there a third?

22       A.   No, not to my knowledge.

23       Q.   Would anyone else have been

24   interviewing someone for your

25   associate position?



MAGNA

LEGAL SERVICES

Page 70

```
 1              V. VILLETTI
 2      A.  HR was helping, so it's
 3   possible that they had.
 4      Q.  Was anyone else present during
 5   your interview with Ms. Yamin?
 6      A.  No.
 7      Q.  The other female candidate, we
 8   can't recall the name, did you
 9   interview her by yourself, as well?
10      A.  Yes.
11      Q.  Did there come a point in time
12   when you extended an offer to either
13   of those candidates for the position?
14      A.  Yes, to Liana.
15      Q.  What was the result of that
16   offer being extended?
17      A.  She transferred from her team
18   to our team.
19      Q.  When did that -- let's start
20   with the transfer:  When did that
21   transfer occur?
22      A.  I don't remember.
23      Q.  Did it occur before or after
24   or during your dialogue with
25   Dr. Jibril?
```



                    V. VILLETTI

1

2        A.  Before.

3        Q.  So at the time that you and

4   Bouker wanted to extend the offer to

5   Dr. Jibril, Ms. Yamin was already on

6   your team?

7        A.  I believe she had left.

8        Q.  She had joined the team and

9   then left, all within that same time

10  period?

11       A.  She had left Guidepoint.

12       Q.  Do you know the circumstances

13  of her departure?

14       A.  She received a better offer

15  elsewhere that had a more competitive

16  salary.

17       Q.  So how long did Ms. Yamin

18  serve as your associate?

19       A.  I don't remember, but a few

20  months.

21       Q.  Was the position you were

22  seeking to put Dr. Jibril in

23  ultimately filled?

24       A.  Yes.

25       Q.  Do you know who it was filled



Page 72

```
 1                    V. VILLETTI
 2    by?  Who took the position?
 3        A.  I don't know the name.
 4        Q.  It's your understanding that
 5    it's one person?
 6        A.  I believe it's multiple people
 7    that were hired.
 8        Q.  And since we are talking about
 9    gender discrimination, do you know
10    the gender or breakdown of the people
11    that were hired?
12        A.  I believe they are men.
13        Q.  All?
14        A.  No.
15        Q.  When you say "multiple," do
16    you have an idea of a number?
17        A.  No.
18        Q.  Is it your understanding that
19    half are men?  majority are men?
20    What is your understanding of the
21    breakdown?
22        A.  I don't know.
23        Q.  Do you know if there are any
24    women that came in to fill that
25    position?
```



Page 73

                              V. VILLETTI

1

2     A.   There may be women on the team

3  now.  I don't know.

4     Q.   Do you know in what capacity

5  that woman is on the team?

6     A.   No.

7     Q.   What leads you to believe that

8  Guidepoint terminated your employment

9  because of your gender?

10     A.   Because of the pattern I

11  noticed at Guidepoint.

12     Q.   What was that pattern?

13     A.   The demotion and firing of

14  women.

15     Q.   When you speak of demotion,

16  you're talking about Ashlee?

17     A.   Yes.

18     Q.   And there was another --

19     A.   No.   Jessica.

20     Q.   I'm sorry; Jessica.   Jessica

21  went out on maternity leave and was

22  demoted?

23     A.   Yes.

24     Q.   And who was the fired woman

25  that we're talking about?



Page 74

                    V. VILLETTI

1

2      A.  Ashlee.

3      Q.  Ashlee, okay.

4      A.  And then my inability to hire

5  Ms. Jibril.

6      Q.  What part of the demotion of

7  Jessica led you to believe that it

8  was based upon her gender?

9      A.  She was on maternity leave.

10     Q.  And what part of Ashlee's

11  firing did you believe was based upon

12  her gender?

13     A.  The fact that it was done

14  without speaking to her subordinates

15  right before the holidays.

16     Q.  We talked about Albert's

17  intervention and not wanting to hire

18  Dr. Jibril because she had no

19  hedge fund experience.  In what

20  capacity does her gender -- in what

21  way does her gender play a role in

22  that?

23     A.  She was not a hedge fund guy.

24     Q.  You had "guy", specifically,

25  before?



```
 1                    V. VILLETTI
 2       A.   Yes.
 3       Q.   Albert is not a hedge fund guy
 4  either, right?
 5       A.   No.
 6       Q.   Were there other hedge fund
 7  guys at Guidepoint?
 8       A.   No.  I don't know at
 9  Guidepoint.  On our team, no.
10       Q.   Who is Rutwik, R-U-T-W-I-K?
11       A.   I don't know what his position
12  is now.
13       Q.   What is your -- who is Rutwik,
14  as far as you know?
15       A.   He was a friend of Albert.
16       Q.   How did you come to know
17  Rutwik?
18       A.   I saw him in the office.
19       Q.   Doing what?
20       A.   I don't know.
21       Q.   Did Rutwik work for
22  Guidepoint?
23       A.   Not to my knowledge.
24       Q.   Do you know what Rutwik's
25  background is?
```



Page 76

                    V. VILLETTI

1

2    A.  He was a hedge fund guy.

3    Q.  What were your dealings with

4    Rutwik, while you were at Guidepoint?

5    A.  I was initially told that he

6    was there as a friend of Albert to

7    provide some consulting services, as

8    I recall.

9    Q.  Who told you that?

10   A.  Bouker Pool.

11   Q.  When did Rutwik first begin

12   his involvement with Guidepoint?

13   A.  I don't know.

14   Q.  Was he still with Guidepoint

15   in March of 2018?

16   A.  Yes.

17   Q.  Did you have an opportunity to

18   work with Rutwik during your time at

19   Guidepoint?

20   A.  Yes.

21   Q.  In what way?

22   A.  He inserted himself into our

23   team.

24   Q.  The Healthcare Content Team?

25   A.  Yes.



```
 1                    V. VILLETTI
 2       Q.   How so?
 3       A.   He began commenting on
 4  teleconferences that we were
 5  planning.
 6       Q.   That you and Bouker were
 7  planning?
 8       A.   That me -- that I was
 9  planning; me and the logistics team.
10       Q.   What were his comments?
11       A.   He had opinions on what we
12  should and shouldn't do.
13       Q.   What were those opinions?
14       A.   I don't recall.
15       Q.   How many conferences would
16  Rutwik have offer his opinions about?
17       A.   I don't remember.
18       Q.   Do you recall having an
19  exchange with Rutwik about his
20  opinions, about your conferences?
21       A.   Many exchanges, yes.
22       Q.   How many exchanges would you
23  say?
24       A.   I don't remember the exact
25  number.
```



Page 78

```
 1                 V. VILLETTI
 2      Q.  Were these in person?
 3      A.  In person and on the phone and
 4   on e-mail.
 5      Q.  Did you agree with his
 6   opinions?  disagree?
 7      A.  I don't remember details.  You
 8   would have to be specific.
 9      Q.  What was the first conference
10   Rutwik offered his opinion about?
11      A.  I don't remember.
12      Q.  What was the last conference
13   Rutwik offered his opinion about?
14      A.  I don't remember.
15      Q.  Do you recall getting into an
16   argument about Rutwik, about his
17   opinions about a conference?
18      A.  Yes.
19      Q.  What conference was that?
20      A.  I don't remember details.
21      Q.  Do you recall one argument or
22   multiple arguments?
23      A.  Multiple arguments.
24      Q.  Do you recall any of the
25   conferences that those multiple
```



```
1              V. VILLETTI
2   arguments were about?
3      A.  I can't remember off the top
4   of my head.
5      Q.  Okay.  Apart from the
6   conference, itself, what was the
7   nature of your arguments with Rutwik?
8      A.  We were told to hear out his
9   views on what we should and shouldn't
10  do, and he increasingly started
11  acting like a manager, when he was
12  not an employee.
13     Q.  Who told you that you should
14  hear his views out?
15     A.  Bouker Pool.
16     Q.  And it's your understanding
17  that was from Albert?
18     A.  Yes.
19     Q.  Was Bouker also functioning
20  under the assumption that he had to
21  hear out Rutwik?
22     A.  I don't know.
23     Q.  Did Rutwik offer his opinions
24  or ask to be heard out, in other
25  teams?
```


MAGNA
LEGAL SERVICES

Page 80

```
 1                V. VILLETTI
 2       A.  Yes.
 3       Q.  And what other teams?
 4       A.  I believe he also interacted
 5   with the data team and sales team.
 6   I don't remember the details.
 7       Q.  How did you learn that he was
 8   interacting with the data team?
 9       A.  I believe it came up in
10   speaking to Bouker.
11       Q.  How did you learn that Rutwik
12   was involved with the sales team?
13       A.  Same.
14       Q.  Through Bouker?
15       A.  Yes.  I should say, business
16   development, not sales.
17       Q.  The business development team?
18       A.  Yes.
19       Q.  Is Bouker still with
20   Guidepoint?
21       A.  No.
22       Q.  What were the circumstances of
23   his separation?
24       A.  He filed a complaint several
25   days after I filed a complaint, and
```



Page 81

```
 1              V. VILLETTI
 2    he was also retaliated against by
 3    Guidepoint.
 4        Q.  What was the nature of
 5    Bouker's complaint?
 6        A.  He complained about Rutwik
 7    creating a hostile environment for
 8    the team.
 9        Q.  For Bouker's team?
10        A.  Yes.
11        Q.  When did Bouker file his
12    complaint?
13        A.  Some time in March.
14        Q.  And when did you file yours?
15        A.  Three or four days before he
16    did.
17        Q.  Who was on the Healthcare
18    Content Team in March of 2018?
19        A.  I was.
20        Q.  Along with Bouker?
21        A.  Bouker was my boss.  He was
22    not a healthcare person.
23        Q.  What about the subordinates
24    that transferred over?  Were they
25    still part of the team?
```



Page 82

```
 1              V. VILLETTI
 2      A.  There was only one; and no,
 3   she had left.
 4      Q.  Was this Ms. Yamin or was this
 5   somebody else?
 6      A.  Ms. Yamin.
 7      Q.  She had left at this point?
 8      A.  Yes.
 9      Q.  So when we're saying
10   Healthcare Content Team in March of
11   2018, we're talking about you?
12      A.  Yes.
13      Q.  So Bouker complained that
14   Rutwik was creating a hostile work
15   environment for you?
16      A.  For me, as well as the
17   logistics teams, which reported to
18   him.
19      Q.  The logistics team also
20   reported to Bouker?
21      A.  Yes.  I should say, the
22   events team, but it's the same thing.
23      Q.  We've been talking
24   interchangeably, the events and
25   logistics team, right?
```


MAGNA
LEGAL SERVICES

Page 83

1              V. VILLETTI

2       A.  Yes.

3       Q.  Jessica was on the

4    events/logistics team; that's who we

5    are talking about?

6       A.  Yes.  And Sara, Gabby,

7    Amrutha.

8       Q.  Right.  These are subordinates

9    that were transferred over?

10      A.  Yes, and Kendall.

11      Q.  And Kendall?

12      A.  Yes.

13      Q.  Was it your opinion that

14   Rutwik created a hostile work

15   environment for you?

16      A.  Yes.

17      Q.  How so?

18      A.  He raised his voice at

19   inappropriate times.  He contacted us

20   on our cells.  He was a menacing

21   figure.

22      Q.  Physically?

23      A.  He would show up in our area.

24      Q.  Had you shared these concerns

25   with Bouker?



Page 84

                    V. VILLETTI

1

2     A.  It had come up in team

3  discussions.

4     Q.  And by "team discussions," you

5  mean a conversation between you and

6  Bouker?

7     A.  As well as the

8  events/logistics team.

9     Q.  In what ways did you learn if

10  Rutwik was creating a hostile work

11  environment for the events team?

12     A.  He was doing something similar

13  to them that I was experiencing.

14     Q.  And witnessing?

15     A.  Yes.

16     Q.  Raising his voice?

17     A.  Yes.

18     Q.  Being a menacing figure?

19     A.  Yes.  Contacting people on

20  their cell phones.

21     Q.  Was the concern there that it

22  was on the cell phone or that was it

23  outside of business hours?

24     A.  Outside of business hours.

25     Q.  Did you have a Guidepoint



Page 85

1                    V. VILLETTI

2    cell phone or did you have a

3    personal cell phone?

4        A.  A personal cell phone.

5        Q.  There was no Guidepoint-issued

6    cell phone?

7        A.  I don't believe so.

8        Q.  So you used your personal

9    cell phone while at Guidepoint, for

10   Guidepoint and personal purposes?

11       A.  I don't remember.

12       Q.  Did you have conversations

13   with anyone in the events team about

14   Rutwik's behavior?

15       A.  In team meetings, yes.

16       Q.  Who shared with you this

17   hostile-work-environment concern with

18   you in the events team?

19       A.  Jessica, Sarah, Gabby, I

20   believe.

21       Q.  And since Bouker had filed a

22   complaint, did you understand that

23   Bouker felt he was subject to the

24   hostile work environment, as well?

25       A.  I don't know.



Page 86

                        V. VILLETTI

1

2      Q.  What was the nature of your

3   complaint, in March of 2018?

4      A.  What do you mean?

5      Q.  How did you make the

6   complaint?

7      A.  I sent an e-mail to Priscilla.

8      Q.  This is Priscilla in HR?

9      A.  Yes.

10     Q.  And when did you send the

11  e-mail?

12     A.  I don't remember the exact

13  date.

14     Q.  It's within March of 2018?

15     A.  Yes.

16     Q.  Prior to Bouker's?

17     A.  Yes.

18     Q.  What do you recall saying to

19  Priscilla in that e-mail?

20     A.  I voiced my concerns around

21  Rutwik's behavior and the treatment

22  of other women at Guidepoint.

23     Q.  What were you referring to

24  when you said, "treatment of other

25  women" in this complaint to



```
 1                V. VILLETTI
 2    Priscilla?
 3        A.   The treatment of Jessica,
 4    Ashlee and Dr. Faiza Jibril.
 5        Q.   What happened with respect to
 6    that complaint, after you sent the
 7    e-mail to Priscilla?
 8        A.   I met with her in her office.
 9        Q.   When did you meet with
10    Priscilla?
11        A.   Shortly after the e-mail.
12        Q.   So we're still in March of
13    2018?
14        A.   I believe so.
15        Q.   What did you and Priscilla
16    talk about in her office at this
17    meeting?
18        A.   I relayed my concerns as
19    expressed in the e-mail about
20    sex-based discrimination at
21    Guidepoint and Rutwik.
22        Q.   Was it your impression that
23    Rutwik was only raising his voice to
24    women?
25        A.   It appeared so.
```



Page 88

                    V. VILLETTI

1

2       Q.  And it was your impression

3   that he was only calling women

4   outside of business hours on their

5   cell phones?

6       A.  I believe so.

7       Q.  What was Priscilla's response

8   after you relayed these concerns

9   during this meeting?

10      A.  I don't remember.

11      Q.  Did she say whether that

12  Guidepoint would start an

13  investigation?

14      A.  She may have.

15      Q.  Was an investigation

16  ultimately conducted?

17      A.  I don't know.

18      Q.  Did Priscilla identify what

19  the next steps would be after your

20  meeting with her?

21      A.  I don't remember.

22      Q.  Did she say, "I'll get back to

23  you at a certain period of time with

24  certain information"?

25      A.  I don't remember.



Page 89

```
 1              V. VILLETTI

 2     Q.  What was the next steps

 3  concerning your complaint after this

 4  meeting with Priscilla?

 5     A.  What do you mean by "next

 6  steps"?

 7     Q.  Did anything else happen

 8  concerning your complaint, the

 9  e-mailed to Priscilla, after your

10  meeting with her in March in her

11  office?

12     A.  I don't know.

13     Q.  Who is James Lukban,

14  L-U-K-B-A-N?

15     A.  I don't remember.

16     Q.  Does he have some connection

17  to Guidepoint or this case?

18     A.  I don't know.

19     Q.  Who is Jenna Applebaum

20  (phonetic)?

21     A.  I don't know.

22     Q.  I'll have to spell this one:

23  Who is Manoj Garg?  M-A-N-O-J; second

24  name, G-A-R-G.

25     A.  He is my former supervisor at
```



Page 90

```
 1              V. VILLETTI
 2   ABR Healthco.
 3       Q.  What is MBO Partners?
 4       A.  I don't know.
 5       Q.  Does MBO Partners have any
 6   correction with PWC?
 7       A.  They may.
 8       Q.  Do you know what that
 9   connection is?
10       A.  I believe they may handle some
11   processing and things like that for
12   them.
13       Q.  Have you had conversation with
14   anyone -- communications with anyone
15   from MBO Partners concerning your
16   work with PWC?
17       A.  Yes.
18       Q.  What sort of communication?
19       A.  Calls and e-mails.
20       Q.  Concerning what?
21       A.  The project I was doing for
22   PWC.
23       Q.  The project we talked about
24   before?
25       A.  Yes.
```



                              V. VILLETTI

1

2        Q.   After March of 2018, and the

3   separation from Guidepoint, have you

4   applied for employment positions?

5        A.   No.

6        Q.   Why not?

7        A.   Because I was focused on the

8   startup.

9        Q.   Kioko?

10       A.   Yes.

11       Q.   Do you recall having

12  conversations with Bouker about your

13  job performance?

14       A.   I may have.

15       Q.   And it's your understanding

16  that your performance was great,

17  correct?

18       A.   Yes.

19       Q.   Do you think Bouker would have

20  shared that assessment?

21       A.   I don't know.

22       Q.   Did Albert?

23       A.   Yes.

24       Q.   What conversations did you

25  have with Albert about your -- what



Page 92

```
 1              V. VILLETTI

 2    communications did you have with

 3    Albert about your job performance?

 4        A.  He had relayed positive

 5    feedback to Bouker Pool, and I also

 6    saw him in the office and he said, "I

 7    listened to one of your calls.  Great

 8    job."

 9        Q.  Do you recall what call --

10    what that was?

11        A.  No.

12        Q.  Do you recall when that

13    positive feedback was relayed to you?

14        A.  No.

15        Q.  Do you recall the content of

16    the call that Albert complimented?

17        A.  No.

18        Q.  Any other communications that

19    made their way to you from Albert

20    about your job performance?

21        A.  About my job performance,

22    specifically?

23        Q.  Correct.

24        A.  No.

25        Q.  How many times have you met in
```



Page 93

```
 1              V. VILLETTI
 2   person with Albert?
 3       A.  As in, been in a meeting with
 4   him?
 5       Q.  As in, been in his physical
 6   presence?
 7       A.  Dozens of times.
 8       Q.  How many meeting would you say
 9   that constitutes?
10       A.  One or two.
11       Q.  What would you have had
12   in-person meetings with Albert about?
13       A.  Well, one was when I was
14   interviewing.
15       Q.  Did Albert interview you?
16       A.  Yes.
17       Q.  I believe we talked earlier
18   that you had met with Priscilla and
19   Bouker, right?  When you were
20   interviewing?
21       A.  Yeah, also Albert.
22       Q.  Was that the same interview or
23   was there a second round with Albert?
24       A.  I don't remember.  It may have
25   been a second round.
```



Page 94

```
 1                V. VILLETTI
 2      Q.  Perhaps, a better way to ask:
 3  How many interviews did you have with
 4  Guidepoint in your application
 5  process?
 6      A.  I really don't remember.  One
 7  or two.
 8      Q.  One included Priscilla and
 9  Bouker?
10      A.  Yes.
11      Q.  Was Albert with them?
12      A.  I don't remember.
13      Q.  You may have had another
14  interview with Albert?
15      A.  Yes.
16      Q.  In person?
17      A.  Yes.
18      Q.  Was anyone else present during
19  that interview?
20      A.  No.
21      Q.  Would your interview with
22  Albert have happened after your
23  interview with Priscilla and Bouker?
24      A.  Likely so.
25      Q.  Do you recall when that
```



Page 95

```
 1                V. VILLETTI
 2    happened?
 3        A.  No.
 4        Q.  What did you and Albert talk
 5    about during your interview?
 6        A.  My resumé and likely some
 7    healthcare topics.
 8        Q.  And you would've had occasion
 9    to have another meeting with Albert
10    during your employment with
11    Guidepoint?
12        A.  I may have been in another
13    meeting that he was in.
14        Q.  What was the nature of that
15    meeting?
16        A.  I don't remember.
17        Q.  When did that occur?
18        A.  I don't remember.
19        Q.  Who else was in attendance?
20        A.  It would have been a group
21    meeting.
22        Q.  With the healthcare team?
23        A.  And others.
24        Q.  The events team?
25        A.  I don't remember.
```



Page 96

```
 1                V. VILLETTI
 2     Q.  Bouker?
 3     A.  Don't remember.
 4     Q.  Other than this meeting and
 5  the interview with Albert, had you
 6  had any other in-person meetings with
 7  Albert?
 8     A.  No other meetings.
 9     Q.  Tell me about the
10  Boston conference.
11     A.  What would you like to know?
12     Q.  What was the topic or topics
13  to be discussed at the Boston
14  conference?
15     A.  I don't remember the
16  specifics.
17     Q.  Do you recall when the -- when
18  I say "Boston conference," you know
19  what I'm talking about right?
20     A.  The Boston Client Meeting.
21     Q.  Alright.  When did this occur?
22     A.  Some time in March.
23     Q.  Of 2018?
24     A.  Yes.
25     Q.  How many client meetings did
```



1                    V. VILLETTI

2    you attend in person when you were at

3    Guidepoint?

4         A.   I don't remember.

5         Q.   One?  two?  dozens?  hundreds?

6         A.   Dozens or less -- a dozen or

7    less.

8         Q.   And I misspoke before if I

9    said conference.  What is the

10   difference between a conference and a

11   client meeting at Guidepoint?

12        A.   I can't speak, generally.  I

13   can speak specifics.

14        Q.   For the healthcare team?

15        A.   So, conference meetings were

16   client meetings with experts that

17   were held adjacent to conferences.

18        So there would be a medical

19   conference and there would be a

20   meeting adjacent to it that we would

21   hold with a number of clients and an

22   advisor.

23        A client meeting would have

24   been be meeting organized

25   independently of any medical



Page 98

```
 1                V. VILLETTI
 2    conference.
 3        Q.  So that was what was to happen
 4    in Boston in March of 2018, was a
 5    client meeting, separate and apart
 6    from a conference with an advisor?
 7        A.  Yes.  This meeting had an
 8    advisor, but it was not related to a
 9    conference.
10        Q.  Okay.  And you worked out of
11    Guidepoint's New York City offices,
12    correct?
13        A.  Yes.
14        Q.  In the dozen or less client
15    meetings that you attended at
16    Guidepoint, how many were outside of
17    New York City?
18        A.  I don't remember.
19        Q.  You attended the one in
20    Boston, though?
21        A.  Yes.  And there were others
22    outside of New York.
23        Q.  That you did attend?
24        A.  Yes.
25        Q.  Outside of New York City or
```



Page 99

1              V. VILLETTI

2    outside of New York State?

3         A.   New York State.

4         Q.   What states did you travel to

5    attend Guidepoint Client Meetings,

6    other than Massachusetts?

7         A.   I could recall one in

8    California.

9         Q.   And this was also a client

10   meeting?

11        A.   This was a conference.

12        Q.   Okay.  Anywhere else?

13        A.   I don't remember off the top

14   of my head.

15        Q.   Did you have to seek anyone's

16   approval to attend the Boston Client

17   Meeting?

18        A.   I was approached about the

19   Boston Client Meeting.

20        Q.   By who?

21        A.   By a member of the sales team.

22        Q.   That's the same Business

23   Development Team we were talking

24   about before?

25        A.   Yes.



Page 100

```
 1                V. VILLETTI
 2      Q.  Who on that team approached
 3   you?
 4      A.  I don't remember his name.
 5      Q.  What did you guys talk about
 6   concerning the Boston Client Meeting?
 7      A.  That they were trying to sign
 8   on BlackRock as a client and wanted
 9   to have a meeting in Boston to move
10   them.
11      Q.  What is BlackRock?
12      A.  That is a financial
13   institution.
14      Q.  What did you understand your
15   role to be in blooming BlackRock?
16      A.  I was to set up and attend the
17   meeting.
18      Q.  Would this have been something
19   you spoke about with Bouker?
20      A.  Yes, Bouker and Mike
21   Ferrari (phonetic), the head of
22   Business Development, were both
23   aware.
24      Q.  Was Mike Ferrari the
25   business development team member that
```



Page 101

1                   V. VILLETTI

2    you spoke with or it was someone

3    else?

4        A.  Someone else.

5        Q.  Someone on his team?

6        A.  Yes.

7        Q.  Did Bouker or Mike attend the

8    Boston meeting?

9        A.  No.

10       Q.  Did anyone else from

11   Guidepoint attend the Boston meeting?

12       A.  Yes.

13       Q.  Who?

14       A.  I don't remember.

15       Q.  One person?  more than one?

16       A.  One or two.

17       Q.  Do you recall what teams they

18   represented?

19       A.  I don't remember.

20       Q.  Were you the only one from the

21   Healthcare Content Team?

22       A.  Yes.

23       Q.  Was anyone else from

24   Business Development there?

25       A.  I don't remember.



Page 102

                          V. VILLETTI

1

2        Q.   Would you have had to have

3   sort Bouker's authorization to attend

4   the client meeting in Boston?

5        A.   Yes.

6        Q.   Did you?

7        A.   Yes.

8        Q.   And what did Bouker say?

9        A.   "Yes.  Help Mike Ferrari."

10       Q.   Approved?

11       A.   Yes.

12       Q.   At some point in time, you

13  learned that Albert did not want you

14  at the Boston conference; is that

15  correct -- the Boston meeting?

16       A.   Yes.

17       Q.   And how did you learn of that?

18       A.   He called my cell phone that

19  morning.

20       Q.   While you were in Boston?

21       A.   Yes.

22       Q.   How long was the Boston Client

23  Meeting intended to last?

24       A.   Just a day.

25       Q.   So he called you that morning?



```
 1                    V. VILLETTI
 2      A.  Yes.
 3      Q.  Did you take the call?  Did it
 4  go to voicemail?
 5      A.  I took the call.
 6      Q.  Okay.  And what did Albert say
 7  on that call?
 8      A.  He yelled at me that I should
 9  be in New York and I should leave the
10  meeting as soon as it's over and
11  return to New York.
12      Q.  Had Albert ever called you on
13  your cell phone before?
14      A.  No.
15      Q.  What did you say in response
16  to Albert when he said that you
17  should be in New York and you need to
18  leave the meeting as soon as
19  possible?
20      A.  "Okay."
21      Q.  And did you?
22      A.  Yes.
23      Q.  Had you flown up to Boston or
24  driven?  How did you get there?
25      A.  I don't remember.
```



Page 104

                    V. VILLETTI

1

2     Q.  How did you get home?

3     A.  I don't remember.

4     Q.  At Guidepoint, did you need to

5  submit expense reports for your

6  traveling?

7     A.  Yes.

8     Q.  Did you submit an expense

9  report for the Boston Client Meeting?

10    A.  I'm sure I did.

11    Q.  Was it paid?

12    A.  Bouker would have approved it.

13    Q.  Do you recall being reimbursed

14  for your expenses for the Boston

15  trip?

16    A.  Yes.

17    Q.  So, Albert says, "You should

18  be in New York.  I want you to leave

19  the Boston meeting as soon as you

20  can."  And you say, "okay".

21        Did you have any other

22  conversations with Albert about the

23  Boston Client Meeting?

24    A.  Beyond the phone call?

25    Q.  Yes.



1                    V. VILLETTI

2      A.   No.

3      Q.   E-mail?

4      A.   Yes.

5      Q.   What did you say to Albert by

6   e-mail?

7      A.   He repeated what he had said

8   on the phone, and I said, "okay".

9      Q.   In the call or the e-mail, did

10  Albert explain why you should be in

11  New York City and that you needed to

12  leave the Boston meeting?

13     A.   I don't recall.

14     Q.   Did you share with Albert that

15  you had talks with Business

16  Development and Bouker about you

17  attending the Boston meeting?

18     A.   Yes.

19     Q.   And what did you tell him?

20     A.   That the trip had been

21  approved.

22     Q.   What was Albert's response to

23  that?

24     A.   I don't remember.

25     Q.   You mentioned another trip to



Page 106

                    V. VILLETTI

1

2   California, correct?

3       A.  Yes.

4       Q.  And that was for a conference?

5       A.  Yes.

6       Q.  Would you have had to seek

7   anyone's approval to attend that

8   conference?

9       A.  Bouker Pool.

10      Q.  I'm assuming you flew to

11  California?

12      A.  Yes.

13      Q.  When did the California

14  conference occur, in relation to the

15  Boston meeting?

16      A.  Before.

17      Q.  Do you recall when it

18  occurred?

19      A.  No.

20      Q.  Did you have any conversations

21  with Albert about your attendance at

22  the California conference?

23      A.  No.

24      Q.  What was the nature of the

25  California conference?



```
 1                 V. VILLETTI
 2      A.  I don't remember.
 3      Q.  Are you seeking reinstatement
 4   with Guidepoint?
 5      A.  Yes.
 6      Q.  Why?
 7      A.  I like my job and I'm good at
 8   it.
 9      Q.  Who is running the
10   Healthcare Content Team now?
11      A.  I believe Rutwik.
12      Q.  So you would want to go back
13   and work with Rutwik?
14      A.  Yes.
15      Q.  And you would want to go back
16   and work for Albert?
17      A.  Yes.
18          MR. GRECH:  It's 12:00
19       now.  I could keep going, but
20       if anyone needs a break -- a
21       five-minute break?
22          MR. LICHTEN:  How much
23       longer do you think you have?
24          MR. GRECH:  Until 2:00.
25          MR. LICHTEN:  So I think w
```



Page 108

                        V. VILLETTI

1

2        should just go now, right?  Do

3        you need a break?

4              THE WITNESS:  No.

5              MS. SMITH:  I need a

6        break.

7              MR. GRECH:  Okay.  Let's

8        take five minutes.

9              (Whereupon, a recess was

10       taken at this time.)

11             MR. GRECH:  Can you read

12       back the last question and

13       answer, please?

14             (Whereupon, the record was

15       read by the reporter.)

16       Q.  Ms. Villetti, have you

17   experienced hostile work environments

18   in any of your other places of

19   employment?

20       A.  No.

21       Q.  Any gender discrimination in

22   any of your other places of

23   employment?

24       A.  No.

25       Q.  Have you ever commenced a



```
 1                    V. VILLETTI
 2    litigation against a prior employer?
 3       A.  No.
 4       Q.  As cofounder of Kioko, do you
 5    have, say, an ownership interest in
 6    the company?
 7       A.  Yes.
 8       Q.  Do you earn a portion of
 9    profits?
10       A.  There are no profits, but yes.
11       Q.  Just asking, how are you
12    supporting yourself in the time
13    period between the Guidepoint
14    separation and to date?
15       A.  Savings.
16       Q.  We talked about Justin Rouise
17    before, remember?
18       A.  Yes.
19       Q.  Did he work with Rutwik?
20       A.  I don't know.
21       Q.  Did you have talks with Justin
22    about Rutwik?
23       A.  Possibly.
24       Q.  What would you have talked
25    about?
```



Page 110

```
                    V. VILLETTI
1
2        A.  His behavior and demeanor.
3        Q.  Rutwik's yelling and calling
4    people and menacing behaviors?
5        A.  Yes.
6        Q.  And you spoke about that with
7    Justin?
8        A.  Perhaps, yes.
9        Q.  Did Justin have a similar
10   impression of Rutwik?
11       A.  I don't know.
12       Q.  Did Justin tell you he was --
13   that Rutwik was doing the same things
14   to him?
15       A.  I don't recall.
16       Q.  And, again, what was Justin's
17   title at Guidepoint?
18       A.  I don't know.
19       Q.  Would he have reported to
20   Bouker?
21       A.  Yes.
22       Q.  So when Bouker says, I'm
23   complaining on behalf of my team, is
24   he also complaining on behalf of
25   Justin?
```



```
 1              V. VILLETTI
 2      A.  I don't know.
 3      Q.  But you understood Bouker's
 4 complains to be on behalf of his
 5 team, correct?
 6      A.  Yes.
 7      Q.  And his team would have been
 8 you?
 9      A.  Yes.
10      Q.  And maybe at that time
11 Ms. Yamin?
12      A.  No.  Ms. Yamin was gone.
13      Q.  Gone?  Okay.  On behalf of the
14 events and logistics team?
15      A.  Yes.
16      Q.  And on behalf of Justin?
17      A.  I don't know, but, yes,
18 likely.
19      Q.  Were there any other
20 individuals or teams that Bouker
21 would have been responsible for?
22      A.  I don't believe so.
23      Q.  Any male members of the
24 events/logistics team at the time?
25      A.  No.
```



Page 112

```
 1              V. VILLETTI
 2     Q.  What did Justin do?
 3     A.  He produced content for other
 4   sectors, including consumer and tech.
 5     Q.  So is there a consumer
 6   contents team or is there just an
 7   other content team at your time
 8   there?
 9     A.  There was one content team.
10   People just covered different
11   verticals.
12     Q.  Was there a vertical for
13   consumer and tech or was there
14   healthcare and then everything else?
15     A.  I don't know.
16     Q.  Do you know if Guidepoint
17   consulted with any members of your
18   team, prior to termination?
19     A.  I don't know.
20     Q.  Did anyone consult with you,
21   prior to Guidepoint separating from
22   Bouker?
23     A.  No.  I don't remember.
24     Q.  When did Bouker separate from
25   Guidepoint?
```



```
 1                  V. VILLETTI
 2      A.  The same day I did.
 3      Q.  Do you know if anyone else was
 4  consulted regarding Bouker's
 5  termination?
 6      A.  I don't know.
 7      Q.  Who terminated Bouker?
 8      A.  I believe Albert.
 9      Q.  And who made the decision to
10  terminate your employment with
11  Guidepoint?
12      A.  I was told about the decision
13  by Priscilla.  I don't know who made
14  the decision.
15      Q.  How did Priscilla tell you
16  about that decision?
17      A.  She called me into her office.
18      Q.  When did this occur?
19      A.  I don't remember the exact
20  date.
21      Q.  After your e-mail to
22  Priscilla?
23      A.  Yes.
24      Q.  After your meeting with
25  Priscilla about your e-mail?
```



Page 114

```
 1              V. VILLETTI
 2      A.   Yes.
 3      Q.   Some time in March of 2018?
 4      A.   Likely, yes.
 5      Q.   What did you and Priscilla
 6  talk about during that meeting?
 7      A.   We talked about the sex
 8  discrimination that I was observing
 9  at Guidepoint.
10      Q.   Was this in the meeting in
11  which she conveyed the decision to
12  terminate?
13      A.   No.
14      Q.   So you had sent Priscilla an
15  e-mail?
16      A.   Yes.
17      Q.   And you had a meeting with
18  Priscilla about the e-mail?
19      A.   Yes.
20      Q.   Some time after that,
21  Priscilla calls you in that office?
22      A.   A few days after, yes.
23      Q.   So in that meeting a few days
24  after, what did you and Priscilla
25  talk about?
```



```
 1                    V. VILLETTI
 2        A.   She simply relayed that I was
 3   being terminated.
 4        Q.   Do you have an Employment
 5   Contract with Guidepoint?
 6        A.   I believe I did.
 7        Q.   Did you understand that to be
 8   at-will employment?
 9        A.   Yes.
10        Q.   Did Priscilla share with you
11   any reasons for the termination?
12        A.   I don't remember.
13        Q.   Did you ask her why you were
14   being terminated?
15        A.   I may have.
16        Q.   What did you ask her?
17        A.   I don't remember.
18        Q.   Did Priscilla give you an idea
19   of when your last, effective date of
20   employment would be?
21        A.   I believe it was that day.
22        Q.   Do you recall what day of the
23   week that was?
24        A.   No.
25        Q.   How were you paid by
```



Page 116

```
                    V. VILLETTI
 1
 2    Guidepoint?  Was it every two weeks?
 3    once a month?
 4        A.  I believe every two weeks,
 5    direct deposit.
 6        Q.  Were you paid for all the work
 7    that you had done for Guidepoint?
 8        A.  Yes.
 9        Q.  Did you discuss anything else
10    with Priscilla in that meeting?
11        A.  Which meeting?
12        Q.  The meeting in which you were
13    terminated.
14        A.  No.  She said it had been a
15    pleasure to work with me.
16        Q.  What did you do after you had
17    this meeting with Priscilla?
18        A.  I believe it was at the end of
19    the day, so I packed my stuff and
20    left.
21        Q.  Did you talk about this with
22    Bouker?
23            MR. LICHTEN:  That day?
24            MR. GRECH:  Fair.
25        Q.  After your meeting with
```



MAGNA
LEGAL SERVICES

```
 1                    V. VILLETTI
 2   Priscilla, the end of the day you
 3   packed up.  That day, did you speak
 4   with Bouker?
 5        A.  I don't think so.
 6        Q.  Did there come a point in time
 7   that you did speak with Bouker about
 8   your termination?
 9        A.  I believe I called him maybe a
10   few weeks after.
11        Q.  That was the first time you
12   spoke to Bouker about your
13   termination?
14        A.  Yes.
15        Q.  And he had already been
16   terminated at that point, as well?
17        A.  We were terminated
18   simultaneously.
19        Q.  Right.  So when did you learn
20   that Bouker had also been terminated?
21        A.  When I walked back to my desk
22   to pack my things, Justin had
23   informed me that Bouker had also been
24   terminated.
25        Q.  Did you talk with Justin about
```



MAGNA
LEGAL SERVICES

Page 118

```
 1                   V. VILLETTI
 2     your termination?
 3         A.  Not in detail, no.
 4         Q.  What did you talk about with
 5     Justin?
 6         A.  That day?
 7         Q.  About your termination that
 8     day, yes.
 9         A.  I just told him that I've been
10     terminated.
11         Q.  What did he say?
12         A.  "That is awful."
13         Q.  Did Justin give you a reason
14     or his understanding of the reason
15     why Bouker was terminated?
16         A.  No.
17         Q.  And you mentioned you had a
18     desk in Guidepoint's office?
19         A.  Yes.
20         Q.  Did Justin also have a desk?
21         A.  Yes.
22         Q.  Was it near yours?
23         A.  Yes.
24         Q.  Was it near Bouker's?
25         A.  Yes.
```


MAGNA ▶
LEGAL SERVICES

```
1                    V. VILLETTI
2        Q.   Other than Justin that day,
3    did you speak with anyone else at
4    Guidepoint about your termination?
5        A.   No.
6        Q.   Between that day and your talk
7    with Bouker a few weeks later, did
8    you speak with anyone else at
9    Guidepoint about your termination?
10       A.   No.
11       Q.   And I'm sorry, you called
12   Bouker or he called you?
13       A.   I don't remember.
14       Q.   You guys spoke on the phone a
15   few weeks after you were both
16   terminated?
17       A.   Yes.
18       Q.   And what did you talk about?
19       A.   Just that we've both been
20   terminated and asked him how he was
21   doing.
22       Q.   Okay.  Did Bouker share with
23   you any reasons why he felt he was
24   terminated?
25       A.   Yes.  He was terminated in
```



Page 120

                    V. VILLETTI

1

2    retaliation for the letter he

3    submitted under the Discrimination

4    and Harassment Policy at Guidepoint.

5       Q.  Bouker said that to you in

6    this conversation?

7       A.  I was aware of the letter,

8    yes.

9       Q.  Bouker said, "I was fired in

10   retaliation from my letter"?

11      A.  Yes.

12      Q.  Did you talk with Bouker about

13   the reasons you felt you were

14   terminated?

15      A.  I believe so, yes.

16      Q.  What did you share those

17   reasons -- what were those reasons

18   that you shared with Bouker?

19      A.  That I had filed a complaint

20   about sex-based discrimination at

21   Guidepoint and because I'm a woman.

22      Q.  Did Bouker sue Guidepoint?

23      A.  I don't know.

24         MR. GRECH:  Off the record

25      for a second, please.



Page 121

1                    V. VILLETTI

2              (Whereupon, a discussion was

3         held off the record.)

4         Q.  Ms. Villetti, had you ever

5    complained about Bouker Pool to

6    Guidepoint?

7         A.  Yes.

8         Q.  What was the nature of that

9    complaint?

10        A.  He had long absences from the

11   office.

12        Q.  Did you have a set schedule at

13   Guidepoint, when you were expected to

14   be in the office?

15        A.  Yes.

16        Q.  What was that schedule?

17        A.  I don't remember the

18   specifics.

19        Q.  You were Monday through

20   Friday?

21        A.  Yes.

22        Q.  9:00 to 5:00?  10:00 to 6:00?

23        A.  Something along those lines.

24        Q.  And I'm sure because of the

25   type of work that you did, you would



Page 122

```
 1              V. VILLETTI
 2    have work outside of those hours too,
 3    as well?
 4        A.  Lots of work outside those
 5    hours.
 6        Q.  You're not collecting overtime
 7    at Guidepoint?
 8        A.  No.
 9        Q.  What were -- what hours were
10    Bouker -- during which hours was
11    Bouker expected to be at Guidepoint?
12        A.  I don't know.
13        Q.  But you observed his long
14    absences from the office?
15        A.  Yes.
16        Q.  And why was that of certain?
17        A.  What do you mean?
18        Q.  You had made a complaint about
19    it?
20        A.  Yes.
21        Q.  To whom?
22        A.  To Priscilla and to
23    John Campanella (phonetic) who is
24    CFO.
25        Q.  And Priscilla is HR that we
```



1                 V. VILLETTI

2    talked about before?

3      A.  Yes.

4      Q.  How did you make this

5    complaint about Bouker to Priscilla

6    and John?

7      A.  In, mostly, verbal

8    discussions.

9      Q.  When did these discussions

10   occur?

11     A.  I don't remember.

12     Q.  What did you tell them?

13     A.  That Bouker was frequently

14   absent in the office and he had long

15   vacations.

16     Q.  Did you take vacations when

17   were you at Guidepoint?

18     A.  I don't recall doing so.  I

19   may have.

20     Q.  I'm assuming the point here

21   was that Bouker's absence was

22   affecting your work; is that correct?

23     A.  Affecting the teams work.

24     Q.  How so?

25     A.  The team was lacking



Page 124

```
 1                V. VILLETTI
 2    leadership.
 3        Q.  Who was on the team at the
 4    time of Bouker's extended absence?
 5        A.  Myself, Justin Rouise,
 6    Jessica, and then Kendall, Gabby,
 7    Sara and Amrutha.
 8        Q.  So we're talking content and
 9    we're talking logistics?
10        A.  Yes.
11        Q.  And Justin would have fallen
12    under the contents team, although not
13    healthcare?
14        A.  Yes.
15        Q.  Did you have talks with any of
16    those other team members about
17    Bouker's long absences?
18        A.  Justin.
19        Q.  What did you talk about with
20    Justin concerning Bouker's absences?
21        A.  That it was not great for the
22    team.
23        Q.  Did you have any other reason
24    to complain about Bouker to Priscilla
25    and John, other than this attendance
```



```
 1                    V. VILLETTI
 2   and absence issue?
 3        A.  I don't remember.
 4        Q.  Did you complain about Bouker
 5   to anyone else at Guidepoint for any
 6   other reason?
 7        A.  I don't remember.
 8        Q.  What, if anything, did
 9   Priscilla and John say to you in
10   response to this complaint about
11   Bouker's long absences?
12        A.  I don't recall.
13        Q.  Do you recall any changes in
14   Bouker's attendance after this
15   meeting or this conversation?
16        A.  I don't believe so.
17        Q.  Do you recall Bouker's
18   attendance being affected by these
19   long absences through, say, March of
20   2018?
21        A.  Yes.
22        Q.  Did you confer with Bouker
23   about work-related issues while he
24   was on these long absences?
25        A.  I would say, we tried to get a
```



Page 126

                    V. VILLETTI

1
2    hold of him.
3        Q.  You tried, meaning it was not
4    always successfully?
5        A.  Yes.
6        Q.  Was he supposed to be
7    available to you by cell phone or
8    e-mail?
9        A.  He had expressed that he would
10   try to be available, but he was
11   sometimes off the grid.
12       Q.  On how many occasions do you
13   recall Bouker being off the grid?
14       A.  Several occasions.
15       Q.  While at Guidepoint, were you
16   excepted to maintain a call schedule?
17       A.  What do you mean?
18       Q.  How did you reach out to
19   potential clients?
20       A.  How did I reach out to
21   clients?
22       Q.  Yes.  Was there an expectation
23   that you made a certain number of
24   calls or certain number of e-mails
25   per day?



1                    V. VILLETTI

2       A.  There was no certain number or

3   metric, no.

4       Q.  Would you have had a call

5   scheduled with Guidepoint that Bouker

6   managed for you?

7       A.  The calls went into a schedule

8   as we scheduled them, which was then

9   communicated with the clients, so we

10  can RSVP.

11      Q.  Was Bouker responsible for

12  managing that call schedule or did it

13  sort of just happen on its own?

14      A.  We had weekly meetings where

15  we discussed what everyone was doing.

16      Q.  And who had these weekly

17  meetings?

18      A.  The logistics and contents

19  team.

20      Q.  So Bouker is running these

21  meetings?

22      A.  Yes.

23      Q.  What did you discuss about the

24  calls or call scheduling during these

25  meeting?



MAGNA
LEGAL SERVICES

Page 128

                    V. VILLETTI

1

2        A.   We discussed potential topics,

3    potential advisors, the scheduling

4    timeframe, and who would be assigned

5    to cover them from the logistics

6    team.

7        Q.   We had talked about your

8    e-mail to Priscilla about Rutwik and

9    the hostile work environment.  Have

10   you made any other complaints about

11   similar matters while you were at

12   Guidepoint?

13       A.   About Rutwik or about --

14       Q.   Let's start with Rutwik.  Have

15   you made any other complaints about

16   Rutwik, other than your e-mail to

17   Priscilla?

18       A.   Yes.

19       Q.   And what was that?  How was

20   that complaint made?

21       A.   I had verbally complained to

22   Bouker Pool and to Priscilla.

23       Q.   Was this before or after your

24   e-mail to Priscilla about Rutwik?

25       A.   Before.


MAGNA
LEGAL SERVICES

1                    V. VILLETTI

2         Q.   And this was to Bouker and

3    Priscilla together or separate?

4         A.   Separate.

5         Q.   Was there anyone else that you

6    made verbal complaints about Rutwik

7    to?

8         A.   We had discussions about him

9    in the team.

10        Q.   Would Rutwik attend the team

11   meetings?

12        A.   Not generally, no.

13        Q.   On occasion, he would?

14        A.   He may have sat in one or two.

15        Q.   Probably not the ones you were

16   complaining about him, though?

17        A.   Likely not.

18        Q.   What did you explain in

19   conversation to Bouker and Priscilla

20   about Rutwik and your concerns with

21   him?

22        A.   That his role was unclear and

23   that he seemed to overstep

24   boundaries, frequently.

25        Q.   What sort of boundaries would



Page 130

                    V. VILLETTI

1

2  Rutwik overstep?

3      A.   Boundaries of professional

4  conduct and his role as an advisor,

5  not as a manager.

6      Q.   What, if anything, did Bouker

7  or Priscilla say to you in these

8  conversations about Rutwik?

9      A.   Bouker agreed.  I don't recall

10  what the conversation with Priscilla

11  would have been.  Likely, that she

12  would look into it.

13      Q.   And these would have been

14  separate conversations with Bouker,

15  separate from Priscilla about Rutwik?

16      A.   Yes.

17      Q.   Did you ever speak to Rutwik,

18  himself, about this behavior of

19  overstepping boundaries?

20      A.   Yes.

21      Q.   How did you have those

22  communications with Rutwik?

23      A.   I politely voiced by concerns

24  both by e-mail and in person.

25      Q.   To Rutwik?



1                      V. VILLETTI

2      A.  Yes.

3      Q.  Do you recall when you would

4  have spoken to Rutwik in person about

5  your concerns about his behavior?

6      A.  I don't exactly know.

7      Q.  On how many occasions would

8  you have spoken to Rutwik about this

9  issue?

10      A.  Two or three times, at least.

11      Q.  And you also sent him e-mails

12  about this issue?

13      A.  Yes, I consider that a part of

14  the two to three times.

15      Q.  Okay.  So two to three total

16  in-person conversations and e-mails?

17      A.  Yes.

18      Q.  Do you recall when you would

19  have sent an e-mail to Rutwik?

20      A.  I don't remember, exactly.

21      Q.  Would this have been e-mailed

22  directly to Rutwik or copied to

23  someone else?

24      A.  Directly to Rutwik.

25      Q.  Speaking first about the



Page 132

```
                      V. VILLETTI
 1
 2    in-person meetings, what was Rutwik's
 3    response when you raised these
 4    concerns with him?
 5        A.  He said that he was the boss
 6    of me and everyone else there.
 7        Q.  Okay.  Did he say anything
 8    else?
 9        A.  I am to do what he tells me to
10    bleeping do, when he tells me to
11    bleeping do it.
12        Q.  Does the bleeping start with
13    an F?
14        A.  Yes.
15        Q.  Would Rutwik often speak in
16    profanities in the office?
17        A.  When he lost his temper.
18        Q.  How often would Rutwik lose
19    his temper?
20        A.  I don't know.
21        Q.  Did he lose it with you?
22        A.  Yes.
23        Q.  On what occasions?
24        A.  On several occasions.
25        Q.  Had he used profane language
```



```
 1                   V. VILLETTI
 2    with you, other than this instance
 3    that we've just talked about?
 4         A.  He may have.
 5         Q.  Do you recall when?
 6         A.  No.
 7         Q.  In what circumstance?
 8         A.  In-person conversations.
 9         Q.  And so the communication that
10    he was the boss of you and everyone
11    and you were to do what he bleeping
12    says, that was in person?
13         A.  Yes.
14         Q.  Okay.  And what was your
15    response to that?
16         A.  I believe I was in shock, so
17    I'm not sure what I responded.
18         Q.  After Rutwik had made that
19    communication to you, did you follow
20    up with anyone about your concerns
21    with his role and seeking clarity on
22    that?
23         A.  Yes.
24         Q.  Who did you speak with?
25         A.  Bouker.
```



Page 134

                    V. VILLETTI

1

2     Q.  And what did you and Bouker

3   talk about concerning Rutwik's role?

4     A.  That neither of us really knew

5   what he was doing there.

6     Q.  Did Bouker tell you he would

7   look into it?  What was supposed to

8   be the next steps with that concern?

9     A.  I imagine so.

10     Q.  You imagine that he would have

11   said that?

12     A.  I imagine he would have looked

13   into it.

14     Q.  And it's your understanding

15   that Rutwik is still at Guidepoint

16   today?

17     A.  Yes.

18     Q.  Okay.  So we have talked about

19   some complaints about Rutwik.  Let's

20   now focus about, sort of, other

21   component of your complaint to

22   Priscilla in the e-mail, which was

23   hostile work environment or maybe

24   even gender-based discrimination.

25          Did you have any other



```
 1                    V. VILLETTI
 2    complaints of gender-based
 3    discrimination while at Guidepoint?
 4       A.  What do you mean?
 5       Q.  In your e-mail to Priscilla,
 6    you spoke about the treatment of the
 7    play on maternity leave, you talked
 8    about termination, and you talked
 9    about Dr. Jibril?
10       A.  Yes.
11       Q.  Prior to that, had you voiced
12    any gender-based discrimination
13    complaints to anyone at Guidepoint?
14       A.  Yes, to Bouker Pool.
15       Q.  Okay.  And when did you do
16    that?
17       A.  I did it when each of those
18    incidents occurred.  I complained
19    when Jessica was on maternity leave
20    and they did what they did -- when
21    Guidepoint what they did.
22            I complained when they fired
23    Ashlee.  And I complained when they
24    wouldn't allow me to hirer
25    Dr. Jibril.
```



MAGNA ›
LEGAL SERVICES

Page 136

                        V. VILLETTI

1

2      Q.  So you made these complaints,

3    sort of, contemporaneously to Bouker?

4      A.  Yes.

5      Q.  All right.  Let's talk about

6    Jessica first:  What was Bouker's

7    response when you voiced your

8    concerns about Jessica?

9      A.  That he agreed.

10     Q.  With what?

11     A.  With the fact that she was

12   being mistreated because she was on

13   maternity leave.

14     Q.  And did Bouker tell you he

15   would take any steps after you shared

16   that complaint with him --

17     A.  I don't remember.

18     Q.  -- concerning Jessica?

19     A.  I don't remember.

20     Q.  Well, Jessica came back,

21   right?

22     A.  She did.

23     Q.  Then she was still on a team

24   that reported to Bouker?

25     A.  Yes.



Page 137

```
 1                    V. VILLETTI
 2       Q.  Did she experience any
 3   decrease in compensation that you are
 4   aware of?
 5       A.  I heard that she had not been
 6   given her bonus or it had been
 7   reduced.
 8       Q.  And you talked with Bouker
 9   about your concerns about Ashlee?
10       A.  Yes.
11       Q.  What was his response to those
12   concerns?
13       A.  That it was entirely Albert's
14   decision.
15       Q.  To terminate Ashlee?
16       A.  In each of those instances.
17       Q.  So stepping back, it was
18   Albert's -- Bouker told you that it
19   was Albert's decision to demote
20   Jessica?
21       A.  Yes, he was in meetings when
22   that was discussed.
23       Q.  Bouker was in meetings,
24   presumingly, with Albert when this
25   was discussed?
```



Page 138

                    V. VILLETTI

1

2      A.  Yes.

3      Q.  And Bouker also shared with

4   you that it was Albert's decision to

5   terminate Ashlee?

6      A.  Yes.

7      Q.  Did Bouker share with you

8   Albert's reasons?

9      A.  They told me I was to take

10   over everything from Ashlee.  That is

11   all I knew.

12      Q.  So when you had spoken to

13   Bouker about your concerns about

14   Ashlee's termination, one of Bouker's

15   responses to you was that you were

16   going to take over Ashlee's work; is

17   that correct?

18      A.  Yes.  They said that they

19   would fire her as soon as I was ready

20   to take over everything, and I voiced

21   a great discomfort with that.

22      Q.  Who told you that they were

23   going to fire Ashlee as soon as you

24   were ready?

25      A.  Bouker Pool.



1                    V. VILLETTI

2        Q.   And Bouker said they would

3    fire Ashlee as soon as you were

4    ready?

5        A.   Yes.   Albert would fire Ashlee

6    as soon as I was ready to take over.

7        Q.   Did you understand what they

8    meant by "ready to take over"?

9        A.   Yes.

10       Q.   What was your understanding?

11       A.   That I had a good grasp on the

12   conferences and teleconferences, part

13   of what she was handling when I got

14   there.

15       Q.   When did you feel you required

16   that good grasp?

17       A.   A few months after I got

18   there.

19       Q.   And when was Ashlee let go?

20       A.   I believe in December.

21       Q.   Around the holidays, right,

22   you had said?

23       A.   Yes.

24       Q.   And you also spoke with Bouker

25   about your concerns about Dr. Jibril?



Page 140

                    V. VILLETTI

1

2      A.  Yes.

3      Q.  And it was your belief that an

4  offer was not extended because of

5  Dr. Jibril's gender?

6      A.  Yes.

7      Q.  And you shared that with

8  Bouker?

9      A.  Yes.

10     Q.  And what did Bouker say?

11     A.  He agreed with that

12  assessment.

13     Q.  Based upon what you said

14  before, I'm assuming Bouker also said

15  that it was Albert's decision not to

16  hire Dr. Jibril?

17     A.  Correct.

18     Q.  What else, if anything, did

19  Bouker say at that time about the

20  decision not to hire Dr. Jibril?

21     A.  That he was upset about the

22  decision.

23     Q.  Bouker was upset?

24     A.  Yes, because Dr. Jibril would

25  have made a fantastic addition to the



```
 1              V. VILLETTI
 2    team.
 3        Q.   Who coined the term "hedge
 4    fund guy"?  Was that a Bouker term?
 5        A.   Albert term.
 6        Q.   That's an Albert term?  Does
 7    Albert use that term with you about
 8    describing people?
 9        A.   I haven't had that
10    conversation with him.  It was
11    discussed with Bouker Pool.
12        Q.   That Albert would describe
13    certain people as or not a hedge fund
14    guy?
15        A.   Yes.
16        Q.   So you spoke with Bouker about
17    your concerns about Jessica, Ashlee,
18    and Dr. Jibril?
19        A.   Yes.
20        Q.   Did you speak with anyone else
21    about those concerns, other than
22    Bouker?
23        A.   With Justin.
24        Q.   Okay.  About those three
25    instances, you spoke about it with
```



Page 142

```
 1                V. VILLETTI
 2   Justin?
 3       A.  I believe so, yes.
 4       Q.  Okay.  And when did you speak
 5   with Justin?  Let's take Jessica
 6   first.
 7       A.  When it was occurring.
 8       Q.  Okay.  When she was out on
 9   leave?
10       A.  Yes.
11       Q.  How was that communication
12   made known to you when Ashlee [sic]
13   was out on leave when she would be
14   demoted on her maternity?
15       A.  Jessica.
16       Q.  Jessica told you?
17       A.  No, you're mixing up Jessica
18   and Ashlee.
19       Q.  Oh, I'm sorry.  How was the
20   communication made known to you that
21   Jessica would be demoted when Jessica
22   was out?
23       A.  Bouker Pool communicated that.
24       Q.  And around that time, you had
25   a conversation with Justin?
```



```
 1                    V. VILLETTI
 2       A.  Yes.
 3       Q.  Okay.  What did you and Justin
 4   talk about concerning Jessica?
 5       A.  That we were uneasy with how
 6   they were handling that.
 7       Q.  And Justin was also uneasy?
 8       A.  I believe so.
 9       Q.  Did you share with him your
10   impression that this was because
11   Jessica was on maternity leave?
12       A.  It was clear that it was
13   because Jessica was on
14   maternity leave.
15       Q.  And you made that clear
16   assumption known to Justin?
17       A.  Yes.
18       Q.  Did he share that assumption?
19       A.  Yes.  It was relayed by Bouker
20   that that was the reason.
21       Q.  Bouker believed that Jessica
22   was demoted because she took
23   maternity leave?
24       A.  Bouker heard that from Albert.
25       Q.  Other than Jessica, how many
```



Page 144

```
               V. VILLETTI
 1
 2    employees went out on maternity leave
 3    while you were at Guidepoint?
 4        A.   There was also someone named
 5    Alyssa (phonetic), I believe, or
 6    Alisa (phonetic).   She was doing
 7    PR market work for Guidepoint.
 8        Q.   And you worked for Guidepoint
 9    around the same time as Alyssa or
10    Alisa?
11        A.   Yes.
12        Q.   And you understand that she
13    went out on maternity leave?
14        A.   Yes.
15        Q.   Did she come back?
16        A.   She did and then left.
17        Q.   Does Jessica still work for
18    Guidepoint?
19        A.   I don't believe so.   I think
20    she left shortly after we did.
21        Q.   "We" meaning you and Bouker?
22        A.   Correct.
23        Q.   Did you have any conversations
24    with Jessica about her maternity
25    leave and demotion?
```



Page 145

                    V. VILLETTI

1

2      A.  No.  We had very little time

3   in person.

4      Q.  And why was that?

5      A.  She was mostly working

6   remotely.  I believe she was in

7   Philadelphia, where her husband was.

8   So she would come to the office one

9   day or two days a week.

10      Q.  Did you have occasion to work

11   with Alyssa or Alisa?

12      A.  We met a couple of times.

13      Q.  What was your impression of

14   her?

15      A.  What do you mean?

16      Q.  In Guidepoint.

17      A.  Her impression?

18      Q.  What was your impression?  She

19   was in the PR department?

20      A.  Yes.

21      Q.  And you met her a few times?

22      A.  Yes.

23      Q.  What was your impression about

24   her?

25      A.  She was smart, competent, good



Page 146

```
 1                V. VILLETTI
 2    at her job.
 3        Q.   Would there have been a
 4    PR team or PR Department that Alyssa
 5    or Alisa reported to?
 6        A.   I believe she was in charge of
 7    PR, and there were others reporting
 8    to her.
 9        Q.   And you also spoke with Justin
10    about -- I'm going to try to get it
11    right -- about Ashlee, right?
12        A.   Yes.
13        Q.   About Ashlee's termination?
14        A.   Yes.
15        Q.   And it was your belief that
16    Ashlee was terminated because of her
17    gender?
18        A.   Yes.
19        Q.   And you shared that with
20    Justin?
21        A.   Yes.
22        Q.   What was his response?
23        A.   I believe he agreed.
24        Q.   And you also spoke with Justin
25    about Dr. Jibril?
```



Page 147

1                    V. VILLETTI

2        A.   Yes.

3        Q.   Justin interviewed Dr. Jibril,

4    right?

5        A.   Yes.

6        Q.   And you shared your concerns

7    with Justin that Dr. Jibril -- that

8    an offer was not extended to

9    Dr. Jibril because of her gender?

10       A.   Yes.

11       Q.   What was Justin's opinion?

12       A.   He agreed.

13       Q.   Does Justin still work for

14   Guidepoint?

15       A.   I believe so.

16       Q.   Okay.  So you've had

17   conversations with Bouker and Justin

18   about your concerns of

19   gender discrimination.  Did you speak

20   with anyone else?

21       A.   I don't remember.  I may have.

22       Q.   Was there a reporting

23   procedure at Guidepoint about

24   discrimination complaints?

25       A.   I'm sure there was.



Page 148

                    V. VILLETTI

1

2       Q.  Was there an employee manual

3   policy?

4       A.  Yes.

5       Q.  Did you receive a copy of it?

6       A.  I believe so.

7       Q.  Do you recall anything in

8   there about the reporting procedures

9   for discrimination complaint?

10      A.  I don't remember.

11      Q.  Can you tell me what buy-side

12  or sell-side experience is in your

13  field, in the healthcare field?

14      A.  The buy-side manages money and

15  the sell-side does not.

16      Q.  Was either one of those

17  buy-side or sell-side experience a

18  requirement for the position you were

19  looking to put Dr. Jibril in?

20      A.  I believe it was preferred,

21  but not required.

22      Q.  Which experience?

23      A.  Either.

24      Q.  Was there a job description

25  for the position that Dr. Jibril was



```
1                    V. VILLETTI
2    going to fill?
3        A.  I believe so.
4        Q.  Did you have a role in
5    drafting the job description?
6        A.  I believe so.
7        Q.  And it's your recollection
8    that it was a preference for either
9    buy-side or sell-side experience?
10       A.  Yes, a preference, not a
11   requirement.
12       Q.  Did you speak with Dr. Jibril
13   about buy-side or sell-side
14   experience?
15       A.  Likely so.
16       Q.  At her interview did
17   Dr. Jibril have either?
18       A.  She did not.
19       Q.  I believe we spoke earlier
20   about hires to fill the position that
21   you had wanted for Dr. Jibril,
22   correct?
23       A.  Yes.
24       Q.  And there were multiple hires?
25       A.  I believe so.
```



Page 150

```
 1                 V. VILLETTI
 2      Q.  Did they have buy-side or
 3   sell-side experience?
 4      A.  I believe so, but I'm not
 5   sure.
 6      Q.  When would those hires have
 7   been made?
 8      A.  After Bouker and I had left.
 9      Q.  So how is it that you know the
10   experience about the hires post your
11   termination?
12      A.  I had looked at the website.
13      Q.  You are seeking monetary
14   damages from Guidepoint; is that
15   correct?
16      A.  That is correct.
17      Q.  What amount?
18      A.  It is my backpay.
19      Q.  What do you understand the
20   amount of your backpay of the claim
21   to be?
22      A.  My salary, plus bonus.
23      Q.  Running from what period of
24   time?
25      A.  From the time I was hired
```


MAGNA
LEGAL SERVICES

```
 1              V. VILLETTI
 2  until now.
 3     Q.  And do you have a sense of
 4  what that amount might be?
 5     A.  I don't off the top of my
 6  head.
 7     Q.  Okay.
 8         MR. GRECH:  I need to take
 9      a five minute break to find a
10      document.
11         MR. LICHTEN:  Okay.
12         (Whereupon, a recess was
13      taken at this time.)
14         MR. GRECH:  Can you mark
15      that as Defendant's Exhibit A,
16      please.
17         (Whereupon, Defendant
18      Guidepoint Global, LLC's First
19      Set of Interrogatories was marked
20      as  Defendant's Exhibit A for
21      identification as of this date.)
22     Q.  Ms. Villetti, we're showing
23  you what's been marked as Defendant's
24  Exhibit A. (Handing)
25     A.  Okay.
```



Page 152

```
                    V. VILLETTI

 1

 2      Q.  If you could take a moment to

 3   look at that document, which I will

 4   represent to you is Defendant's First

 5   Set of Interrogatories to Plaintiff

 6   in this action.

 7      A.  Okay.

 8      Q.  Have you had the chance to

 9   look at the document?

10      A.  This document?

11      Q.  Yes.

12      A.  Have I seen it before?

13      Q.  That's a great question.  Have

14   you ever seen that document before?

15      A.  I may have.  I don't remember.

16   Yes, I think I have.  I don't know.

17         MR. GRECH:  Can you mark

18      this as Defendant's Exhibit B,

19      please.

20         (Whereupon, Plaintiffs'

21      Response to Defendants First Set

22      of Interrogatories was marked as

23      Defendant's Exhibit B for

24      identification as of this date.)

25      Q.  Ms. Villetti, we are now
```



Page 153

```
1                    V. VILLETTI
2      showing you what's been marked as
3      Defendant's Exhibit B, which we will
4      represent is Plaintiff' response to
5      Defendant's first set of
6      interrogatories as received from your
7      Counsel by my office.
8              If you could take a moment,
9      just look at Exhibit B and see if you
10     recognize that document.
11         A.  Okay.
12         Q.  Do you recognize Exhibit B?
13         A.  No.
14         Q.  Do you recognize Exhibit A?
15         A.  I believe so.
16         Q.  Do you recognize Exhibit A to
17     be Guidepoint's interrogatories to
18     you in this litigation?
19         A.  Yes.
20         Q.  Did you participate in the
21     crafting of the responses to those
22     interrogatories?
23         A.  Yes.
24         Q.  Are those responses reflected
25     in Exhibit B?
```



Page 154

```
                    V. VILLETTI
 1
 2      A.  The responses I gave?
 3      Q.  Yes.
 4      A.  These are your objections.
 5      Q.  No, Exhibit B should be --
 6      A.  Oh yes, okay yes, yes.
 7      Q.  Plaintiffs' Exhibit B?
 8      A.  Yes.
 9      Q.  And have you seen Exhibit B
10   before today?
11      A.  I believe so, yes.
12      Q.  And since these work as sort
13   of question and answer, if I can
14   refer you to in Exhibit A,
15   Interrogatory Number 1, on Page 5.
16      A.  (The witness complies).
17      Q.  And then in Exhibit B,
18   Plaintiffs' Response, Page 1,
19   Response 1.
20      A.  (The witness complies.)  Okay.
21      Q.  And I believe we had talked
22   before about a Jenna Applebaum.  Do
23   you see Ms. Applebaum's name in
24   Response 1?
25      A.  Yes.
```


MAGNA
LEGAL SERVICES

Page 155

```
 1              V. VILLETTI

 2      Q.   Does that refresh your

 3   recollection as to who Ms. Applebaum

 4   might be?

 5      A.   No.

 6      Q.   I believe we had some of

 7   the same concerns with Mr. Lukban; is

 8   that correct?  Do you know who

 9   Mr. Lukban is?

10      A.   Was he in HR?  He sounds

11   familiar.

12      Q.   Familiar in terms of

13   Guidepoint HR?

14      A.   I don't know.

15      Q.   Ms. Villetti, if I could have

16   you look at Interrogatory 11 on

17   Page 9, and then Plaintiffs'

18   Response, Response Number 11, it's

19   the third page in.

20      A.   (The witness complies.)

21      Q.   Interrogatory 11:  Inquires

22   this to each and every measure of

23   damages sought in the complaint and

24   Plaintiffs' Response at 11 in

25   Exhibit B is, "Valletti is owned
```



Page 156

```
              V. VILLETTI
 1
 2   $334,000 in backpay."  There is
 3   another amount for Plaintiff Jibril.
 4        "Plaintiffs are also seeking
 5   reinstatement, punitive damages,
 6   attorney's fees, costs,
 7   disbursements, and interest.
 8   Plaintiffs are not seeking
 9   compensation for medical and
10   emotional distress."
11        Do you see that Ms. Villetti?
12   A.   Yes.
13   Q.   Is that a fair statement of
14   the damages you were seeking in this
15   case?
16   A.   Yes.
17   Q.   Can you explain how you arrive
18   at the $334,000 in backpay?
19   A.   It's the calculation of what I
20   would have made, had I been at
21   Guidepoint.
22   Q.   And you're also seeking
23   reinstatement?  We discussed that
24   before?
25   A.   Yes.
```



```
 1                    V. VILLETTI
 2        Q.  And you're also seeking
 3   punitive damages?
 4        A.  Yes.
 5        Q.  Do you know what punitive
 6   damages are?
 7        A.  Do I know what I'm seeking or
 8   what they are?
 9        Q.  Yes, in general, do you know
10   what punitive damages are?  What is
11   your understanding of what
12   punitive damages are?
13        A.  It's damages owed by the
14   company, in response to their
15   actions.
16        Q.  Okay, and punitive having a
17   punishment context to --
18        A.  Yes.
19        Q.  And in what respect do you
20   think that Guidepoint should be
21   assessed punitive damages in this
22   case?
23        A.  Because of their mistreatment
24   of women on basis of gender,
25   repeatedly.
```



Page 158

                    V. VILLETTI

1

2       Q.   When we say repeatedly, we've

3    talked about Jessica and Ashlee and

4    Dr. Jibril, correct?

5       A.   Yes.

6       Q.   Are there other instances of

7    mistreatment of women at Guidepoint?

8       A.   There may be, yes.

9       Q.   That you are aware of?

10      A.   Yes.

11      Q.   What are they?

12      A.   The person I referred to

13    earlier, who is involved with PR and

14    marketing, who was on maternity

15    leave, also left Guidepoint feeling

16    that she had been pressured because

17    she was on maternity leave.

18      Q.   Alyssa or Alisa?

19      A.   Yes.

20      Q.   Anyone else?

21      A.   There was someone in HR whose

22    name I don't recall.  We can get back

23    to you on that.

24      Q.   That you understood to also

25    have experienced gender



MAGNA
LEGAL SERVICES

1                    V. VILLETTI

2     discrimination at Guidepoint?

3        A.  Yes.

4        Q.  Ms. Villetti, do you know the

5     individual sitting to my right?

6        A.  Yes.

7        Q.  Who is she?

8        A.  She is Counsel for Guidepoint.

9        Q.  Do you know her as

10    Catherine Smith?

11       A.  Yes.

12       Q.  Was Ms. Smith Counsel for

13    Guidepoint for your entire

14    employment?

15       A.  I believe so.

16       Q.  We talked early about your

17    looking at Guidepoint's website.  Was

18    Guidepoint's management team

19    portrayed on the website?

20       A.  Likely so, yes.

21       Q.  Speaking now for the time you

22    were there, who were the members of

23    Guidepoint's management team?

24       A.  My recollections are there was

25    Albert Sebag as CEO; there was



Page 160

```
                    V. VILLETTI
 1
 2    John Campanella, CFO; there was
 3    Mike Ferrari as head of development;
 4    and then there was a
 5    Stacey (phonetic), I don't know what
 6    she -- she's business development and
 7    sales; and then Catherine Smith was
 8    legal.
 9        Q.  Is Priscilla the head of HR?
10        A.  Yes.
11        Q.  Ms. Villetti, if I could ask
12    you to look, again, back and forth in
13    Exhibit A, Page 11, Number 23, and
14    your Plaintiffs' Response is -- Item
15    23, the last page of the document.
16        A.  Mm-hmm.
17        Q.  Interrogatory 23:  "Identify
18    all individuals with knowledge
19    relating to any effort made by
20    Guidepoint to recruit you for
21    employment."
22            At 23, Plaintiffs object, but
23    then notwithstanding the objections
24    respond Villetti, Craig,
25    Jethanandani, Jibril, Lukban, and
```



Page 161

```
 1              V. VILLETTI
 2   Applebaum; do you see that?
 3       A.   Yes.
 4       Q.   Mr. Craig mentioned in that
 5   response, the recruiter that we
 6   talked about before?
 7       A.   Yes, Chirag.
 8       Q.   Chirag.
 9            MR. GRECH:   Mark this as
10       Exhibit C, please.
11            (Whereupon, Defendant
12       Guidepoint Global, LLC's First
13       Set of Requests for Admission to
14       Plaintiffs Valerie Villetti and
15       Faiza Jibril, M.D. was marked as
16       Defendant's Exhibit C for
17       identification as of this date.)
18       Q.   Ms. Villetti, we're showing
19   you what's been marked as Defendant's
20   Exhibit C for the purposes of today's
21   deposition (handing).
22            I'm going to represent to you
23   that it's Guidepoint's request for
24   Admission to Plaintiffs in this case,
25   as indicated in the caption, the
```



**MAGNA**
LEGAL SERVICES

Page 162

                    V. VILLETTI

1

2    first page.

3         Ms. Villetti, if I can just

4    ask you to review that document.

5    A.  Okay.

6    Q.  Do you recognize that

7    document?

8    A.  I've seen it before, yes.

9         MR. GRECH:  You can mark

10        this as Exhibit D, please.

11        (Whereupon, Plaintiffs'

12        Response to Defendant's First Set

13        of Requests for Admissions was

14        marked as Defendant's Exhibit D

15        for identification as of this

16        date.)

17   Q.  Ms. Villetti, we are now

18   showing you what's been marked as

19   Defendant's Exhibit D (handing).

20        For the purposes of today's

21   deposition, I'll represent to you

22   that it's Plaintiffs' Response to

23   Defendant's First Set of Requests for

24   Admissions, as received by my office

25   from your Counsel.



```
 1              V. VILLETTI
 2         If you can just take moment to
 3    look at that document, please.
 4         A.  Okay.
 5         Q.  Do you recognize Exhibit D?
 6         A.  Yes.
 7         Q.  Did you participate in the
 8    preparation of the responses included
 9    in Exhibit D?
10         A.  Yes.
11         Q.  Exhibits C and D sort of work
12    the same as A and B.  If I could ask
13    you to look at Exhibit C, Page 5,
14    Number 26, along with Plaintiffs'
15    Response, which is at the last page
16    of that document, Number 26.
17         A.  (The witness complies.)
18         Q.  A request for Admission from
19    Defendant Number 26 asks, "Following
20    the decision not to hire Jibril,
21    Guidepoint hired approximately 15
22    individuals to create content of
23    either buy-side or sell-side
24    experience and Plaintiffs' Response
25    is, at 26, "admit".  Do you see that,
```



Page 164

                    V. VILLETTI

1

2    Ms. Villetti?

3       A.  Yes.

4       Q.  First, does that refresh your

5    recollection as to how many

6    individuals were hired to fill the

7    position that you wanted Dr. Jibril

8    to fill?

9       A.  Yes.

10       Q.  Is it your testimony that all

11    of those 15 are men?

12       A.  I don't know.

13       Q.  Do you know what the gender

14    composition of those 15 individuals

15    are?

16       A.  No.

17       Q.  Ms. Villetti, when you were

18    employed by Guidepoint, was there an

19    investigation done of the Healthcare

20    Content team?

21       A.  Could you define

22    "investigation"?

23       Q.  Did you meet with Priscilla as

24    part of an investigation by

25    Guidepoint of the Healthcare team?



```
 1                  V. VILLETTI
 2        A.   I met with Priscilla following
 3    my complaint.
 4        Q.   Is that the meeting that you
 5    have discussed before after you sent
 6    the e-mail to Priscilla?
 7        A.   Yes.
 8        Q.   After that e-mail complaint,
 9    do you know if Priscilla met with
10    anyone else?
11        A.   I don't know.
12        Q.   Do you know if she met with
13    Bouker?
14        A.   I don't know.
15        Q.   Did you ever meet with
16    Ms. Smith?
17        A.   No.
18        Q.   Did you meet with anyone other
19    than Priscilla, regarding your
20    complaint?
21        A.   No.
22        Q.   Ms. Villetti, if you could
23    look back at Exhibit C, Page 3.
24        A.   Okay.
25        Q.   Are you aware of any colleague
```



Page 168

                         V. VILLETTI

1
2    remotely to be one of the reasons why
3    she was demoted?
4        A.  No.
5        Q.  When you made your complaint
6    to Priscilla, and we talked about
7    Rutwik, were you also complaining
8    about Albert?
9        A.  Yes.
10       Q.  In what respect?
11       A.  In respect to him calling me
12   when I was in Boston.
13       Q.  Okay.  And that is in keeping
14   with your complaint about what --
15   hostile work environment?
16       A.  Yes.
17       Q.  And in what way did Albert's
18   calling you at the client meeting
19   involvement make it a hostile work
20   environment for you?
21       A.  I did not report to Albert.
22   Albert did not have to approve my
23   travel.  That was all done by my
24   supervisor, Bouker Pool, who had
25   already done all of those.


MAGNA
LEGAL SERVICES

                    V. VILLETTI

1

2      Q.   Was there anything in your

3   conversations with Albert about your

4   attendance in Boston that made you

5   feel that he was acting that way

6   because of your gender?

7      A.   He was very disrespectful and

8   demeaning.

9      Q.   Had you heard of occasions

10   where other specialists had there

11   attendance at meetings questioned?

12      A.   No.

13      Q.   Did you have conversations

14   with other specialists about

15   attending meetings?

16      A.   I may have.  I don't recall.

17      Q.   When you got back from Boston,

18   did you speak with anyone and say,

19   "Albert just did this to me; has

20   anyone else experience this?"

21      A.   Yes.

22      Q.   Who did you speak to?

23      A.   I spoke with Bouker, with

24   Priscilla, and with Justin.

25      Q.   Okay.  And let's start with



Page 170

```
 1                    V. VILLETTI
 2    Justin, first.   In his role that
 3    you're aware of, would he have also
 4    traveled to attend client meetings
 5    and conferences?
 6        A.  Yes.
 7        Q.  And you shared with him what
 8    Albert had said to you about your
 9    trip to Boston?
10        A.  Yes.
11        Q.  And what was Justin's
12    response?
13        A.  I don't recall.
14        Q.  Correct me if I'm wrong:
15    Would there have been occasion for
16    Bouker to also travel for conferences
17    and meetings?
18        A.  I don't know.
19        Q.  Did you share with Bouker what
20    Albert had said to you about your
21    trip to Boston?
22        A.  Yes.
23        Q.  What did Bouker say in
24    response?
25        A.  He said that he had run into
```



```
 1              V. VILLETTI
 2   Albert while they were both skiing,
 3   and Albert had been unhappy to see
 4   him on the slopes, and that he likely
 5   called me to put his anger and
 6   frustration on me.
 7      Q.  Okay.  So Albert and Bouker
 8   were skiing somewhere together or not
 9   together, somewhere, at the same
10   time?
11      A.  Yes.
12      Q.  Bouker's impression was that
13   Albert was upset to see him skiing --
14      A.  That's what he had said.
15      Q.  -- and not at work?
16      A.  Yes.
17      Q.  And that it was Bouker's
18   impression that he took that anger --
19   Albert took the anger at Bouker out
20   on you?
21      A.  Yes.
22      Q.  Has Albert ever done that
23   before?
24      A.  Apparently so.
25      Q.  To you?
```



Page 172

```
 1                V. VILLETTI
 2      A.  To others.
 3      Q.  Who?
 4      A.  I don't know, but I also had a
 5  conversation with Priscilla.
 6      Q.  About the conversations with
 7  Albert about Boston?
 8      A.  About that and Albert's known
 9  outbursts.
10      Q.  Okay.  But you certainly
11  talked to Priscilla about the Boston
12  exchange?
13      A.  Yes.
14      Q.  What did you tell Priscilla?
15      A.  What had occurred.
16      Q.  I can't imagine Priscilla's
17  role calls for her to travel to
18  client meetings or conferences; is
19  that correct?
20      A.  Yes.
21      Q.  Did she share with you any
22  other stories of specialists being
23  called back for meetings or told that
24  they weren't approved to go to
25  meetings, anything like that?
```



MAGNA
LEGAL SERVICES

Page 173

```
 1                 V. VILLETTI

 2      A.  No.

 3      Q.  What response did she have for

 4  you, at all, about your sharing this

 5  with her?

 6      A.  She said that the response may

 7  have had something to do with Albert

 8  being frustrated in some other area.

 9      Q.  Why would Albert be upset with

10  Bouker for skiing, that you know?

11      A.  That's me speculating about

12  Albert's state of mine.

13      Q.  Don't speculate.  How was the

14  healthcare team performing during

15  this time period?

16      A.  We had increased our output as

17  it had been requested by Rutwik.  So

18  we were producing more calls, and

19  this was despite the faculty

20  shortages where we weren't allowed to

21  hire people, and I didn't have an

22  associate anymore.

23      Q.  Because Ms. Yamin left?

24      A.  Yes.

25      Q.  Was there any effort to
```



Page 174

```
 1              V. VILLETTI
 2    replace her?
 3        A.  Yes.
 4        Q.  What happened with those
 5    efforts?
 6        A.  We hadn't hired someone yet.
 7        Q.  At the time of your
 8    termination?
 9        A.  Yes.
10        Q.  Well, how is it that you were
11    interviewing for a position to be
12    filled by Dr. Jibril and then it was
13    ultimately filled by 15 people?
14        A.  You would have to ask Rutwik
15    about that.
16        Q.  Was it your understanding that
17    the work that Dr. Jibril would
18    perform could be performed by one
19    person or she would have been the
20    first of many to follow?
21        A.  The first of many to follow.
22        Q.  Was there a communication from
23    management that they wanted an
24    increase in the number of
25    conferences?
```



1           V. VILLETTI

2      A.   Yes.

3      Q.   And who made that

4  communication?

5      A.   Bouker.

6      Q.   And he shared that with you?

7      A.   I don't understand the

8  question.

9      Q.   Bouker understood that

10  management wanted an increase in

11  conferences; is that correct?

12      A.   Correct.

13      Q.   Did Bouker tell you that?

14      A.   Yes.  He told all of us.

15      Q.   In what circumstances did he

16  tell you this?

17      A.   In a group meeting.

18      Q.   What was your understanding as

19  to how management wanted the

20  conferences to increase?

21      A.   We were to -- at what point,

22  because it changed?

23      Q.   Did it have anything to do

24  with the need to hire an associate

25  and the position that Dr. Jibril



Page 176

```
 1                    V. VILLETTI
 2    would fill?
 3       A.  Yes.
 4       Q.  So at that point, when you
 5    decided we should hire an associate
 6    and we should hire another content
 7    specialist, were there communications
 8    from management that the conference
 9    number should increase?
10       A.  If by "conference number," you
11    mean general output, yes.
12       Q.  Okay.  What else is included
13    in general output?
14       A.  Teleconferences.
15       Q.  Okay.  So when I say
16    "conferences," you understand that to
17    mean in-person conferences?
18       A.  Yes.
19       Q.  Was the understanding that
20    management wanted an increase in just
21    telephone conferences or all
22    conferences?
23       A.  All.
24       Q.  Was there a particular number
25    that they wanted per week, per month,
```



1                    V. VILLETTI

2  from the healthcare team?

3     A.  No.  There were no metrics.

4     Q.  But the interviewing and the

5  application for the associate and

6  Dr. Jibril was part of that effort to

7  meet the increase in output?

8     A.  Yes.

9     Q.  If you had hired Dr. Jibril,

10  how many more candidates would you

11  have looked to hire for your team?

12     A.  We didn't have a set number at

13  that point.  We just knew that the

14  people would be expanding.

15     Q.  But you certainly weren't

16  going to stop at one?

17     A.  No.

18     Q.  Was it going to be ten?

19  twenty?

20     A.  We have not discussed that,

21  so.

22     Q.  So there was an overlap with

23  your work and Ashlee's; is that

24  correct?

25     A.  Yes.



Page 178

```
                    V. VILLETTI
 1
 2      Q.   What was your impression of
 3   how Ashlee performed her work?
 4      A.   She was experienced and
 5   knowledgeable.
 6      Q.   And did you interact with
 7   Ashlee or did you sort of keep your
 8   clients and matters separate?
 9      A.   No, I was instructed to talk
10   to her and learn whatever I could.
11      Q.   What were your impressions of
12   Ashlee, sort of as a colleague?
13      A.   She was friendly and helpful.
14      Q.   Did you express a concern
15   about not meeting with Ashlee during
16   your interview process?
17      A.   Yes.
18      Q.   Why was that a concern?
19      A.   I felt I was mislead.
20      Q.   In what respect?
21      A.   I was told that this was a new
22   team.
23      Q.   You were told that the
24   Healthcare Content Team was a new
25   team?
```



MAGNA
LEGAL SERVICES

Page 179

1                    V. VILLETTI

2        A.  Yes.

3        Q.  Who told you that?

4        A.  Several people during the

5   interview process.

6        Q.  Bouker?

7        A.  Sure.

8        Q.  Priscilla?

9        A.  Sure.

10       Q.  And were you brought in as a

11  Senior Content Strategist, correct?

12       A.  Yes.  I was practically the

13  head of healthcare content.

14       Q.  And you were mislead in that

15  it was not a new team?

16       A.  Yes, and that there was

17  someone performing that function.

18       Q.  Ashlee?

19       A.  Yes.

20       Q.  And if I recall what we

21  discussed earlier, it was your

22  understanding that once you got a

23  good grasp, you were to take over for

24  Ashlee?

25       A.  Yes.



Page 180

                    V. VILLETTI

1

2      Q.  So then why would Ashlee have

3   interviewed you?

4      A.  Because she had been there for

5   a long time with experience, and knew

6   what would go into being a good

7   content specialist for healthcare.

8      Q.  And it was your impression

9   that she had what it took to be a

10  good content specialist for

11  healthcare?

12     A.  Yes.

13     Q.  Was that Bouker's opinion?

14     A.  I don't know.

15         MR. LICHTEN:  Could we go

16      off the record for a second,

17      please?

18         (Whereupon, a discussion was

19      held off the record.)

20         MR. GRECH:  It's 1:57.  I

21      understand that Ms. Villetti is

22      here today with a hard stop at

23      2:00, which we are going to

24      respect.  I have a couple of

25      discreet questions that I would



Page 181

```
 1                   V. VILLETTI
 2       like to ask you now we will end
 3       at 2:00.
 4            There may be another line
 5       of questioning that I will
 6       reserve time to perhaps call
 7       you for another deposition or
 8       not.  I will speak to your
 9       Counsel about that, but I do
10       want to respect your 2:00 hard
11       stop today.
12       Q.  Ms. Villetti, if I can ask you
13   to look back at one of the exhibits
14   we had marked, Exhibit B, and
15   particularly we had looked at it
16   before, Item 11 or Response 11.
17            In that, your Interrogatory
18   Response is that, you, Villetti, are
19   owned $334,000 in backpay; do you see
20   that?
21       A.  Yes.
22       Q.  We've talked about backpay
23   before.  What is your understanding
24   of -- it's really a legal concept --
25   of backpay?
```



MAGNA
LEGAL SERVICES

Page 182

                    V. VILLETTI

1

2       A.  On the basis that I was

3   dismissed due to discrimination and

4   retaliation, I am owed the money I

5   would have made, have I still been in

6   the position.

7       Q.  So backpay as a concept would

8   mean that a Plaintiff if terminated

9   from an unlawful reason would be

10  entitled to his or her compensation

11  from the date of that termination to

12  date or resolution?

13      A.  As I understand it.

14      Q.  Does your understanding of

15  backpay include anything else, about

16  obligations upon a Plaintiff to be

17  entitled to backpay?

18      A.  I don't know.

19      Q.  Do you understand that a

20  plaintiff must seek to mitigate

21  damages; are you familiar with that

22  expression?

23      A.  No.

24      Q.  Is it your understanding that

25  a plaintiff must seek subsequent



```
 1              V. VILLETTI
 2   employment in order to be entitled to
 3   the full amount of backpay?
 4       A.  I don't know.
 5       Q.  Have you sought subsequent
 6   employment since being terminated by
 7   Guidepoint?
 8       A.  I have been employed.
 9       Q.  For Kioko?
10       A.  Yes.
11       Q.  And we talked earlier -- have
12   you submitted applications to any
13   other employer?
14       A.  No.
15       Q.  And you worked for PWC for the
16   project?
17       A.  Yes.
18           MR. GRECH:  I wanted to
19       just, in this remaining moment,
20       talk more about Alyssa or
21       Alisa.
22           For one, I'd like to -- if
23       we can just leave a blank in
24       there for clarification, if
25       it's Alyssa or Alisa.
```



Page 184

```
 1                V. VILLETTI

 2              THE WITNESS:  Yes.

 3   (INSERT)_____

 4        Q.  She was also out on maternity

 5   leave?

 6        A.  Yes.

 7        Q.  How did you come to learn that

 8   she was experiencing gender-based

 9   discrimination?

10        A.  She left Guidepoint after I

11   did when she returned her maternity

12   leave, and I spoke with her,

13   subsequently.

14        Q.  What did you and Alyssa speak

15   about concerning your impression that

16   she was perhaps subject to

17   gender-based discrimination?

18        A.  We spoke about Guidepoint's

19   pattern of discrimination against

20   women.

21        Q.  And Alyssa ultimately left

22   Guidepoint?

23        A.  Yes.

24        Q.  Where is Alyssa now?

25        A.  I don't know.
```



Page 185

V. VILLETTI

1

2      Q.   Did Alyssa give you any

3   examples of this pattern that she was

4   experiencing or had observed, rather?

5      A.   No.  We discussed her,

6   specifically.

7      Q.   Okay.  And in what respect did

8   Alyssa feel that she was the subject

9   of gender-based discrimination?

10     A.   You'd have to ask her, but

11  what I recall from the conversation

12  is that she felt that when she

13  returned, the position had changed

14  and there were new constraints that

15  would interfere with her ability to

16  also be a mother to her child.

17     Q.   And it was your understanding

18  that Alyssa was the head of the

19  PR Department?

20     A.   Yes.

21     Q.   Okay.

22          MR. GRECH:  All right.

23      It's 2:01, so I would like to

24      stop now subject to what we

25      talked about earlier.  I do



Page 186

```
 1                    V. VILLETTI
 2        want to respect Ms. Villetti's
 3        hard stop of 2:00.   Thank you.
 4            THE WITNESS:   Thank you.
 5            MR. LICHTEN:   Thank you.
 6          (Time noted:   2:01 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 187

1

2                    INSTRUCTIONS TO WITNESS

3

4          Please read your deposition over

5    carefully and make any necessary corrections.

6    You should state the reason in the appropriate

7    space on the errata sheet for any corrections

8    that are made.

9          After doing so, please sign the

10   errata sheet and date it.

11         You are signing same subject to the

12   changes you have noted on the errata sheet,

13   which will be attached to your deposition.

14         It is imperative that you return the

15   original errata sheet to the deposing attorney

16   within thirty (30) days of receipt of the

17   deposition transcript by you.  If you fail to

18   do so, the deposition transcript may be deemed

19   to be accurate and may be used in court.

20

21

22

23

24

25



Page 188

```
 1
 2            I N D E X   O F   W I T N E S S E S
 3   WITNESS:   VALENTIA VILLETTI
 4   EXAMINATION BY                     PAGE
 5   MR. GRECH                          6
 6
               I N D E X   O F   E X H I B I T S
 7
     EXHIBIT           DESCRIPTION        PAGE
 8
 9   A                 Defendant          151*
10                     Guidepoint Global,
11                     LLC's First Set of
12                     Interrogatories
13   B                 Plaintiffs'        152*
14                     Response to
15                     Defendants First
16                     Set of
17                     Interrogatories
18   C                 Defendant          161*
19                     Guidepoint Global,
20                     LLC's First Set of
21                     Requests for
22                     Admission to
23                     Plaintiffs Valerie
24                     Villetti and Faiza
25                     Jibril, M.D.
```



Page 189

```
 1
 2    D                   Plaintiffs'         162*
 3                        Response to
 4                        Defendant's First
 5                        Set of Requests
 6                        for Admissions
 7
 8      (*Indicates exhibit(s) retained by counsel)
 9
10             I N D E X   R E Q U E S T S
11    DESCRIPTION                          PAGE
12    contract                             42
13    total compensation from PWC          43
14    Alyssa or Alisa                      184
15
16
17    PAGE    LINE    QUESTIONING ATTORNEY
18    39      25      MR. GRECH
19
20
21
22
23
24
25
```



Page 190

```
 1

 2                  – – – – – –

                    E R R A T A

 3                  – – – – – –

 4    PAGE   LINE   CHANGE

 5    ____   ____   _____

 6    ____   ____   _____

 7    ____   ____   _____

 8    ____   ____   _____

 9    ____   ____   _____

10    ____   ____   _____

11    ____   ____   _____

12    ____   ____   _____

13    ____   ____   _____

14    ____   ____   _____

15    ____   ____   _____

16    ____   ____   _____

17    ____   ____   _____

18    ____   ____   _____

19    ____   ____   _____

20    ____   ____   _____

21    ____   ____   _____

22    ____   ____   _____

23    ____   ____   _____

24    ____   ____   _____

25    ____   ____   _____
```



1

2                    A C K N O W L E D G E M E N T

3      STATE OF NEW YORK)

4                          :SS

5      COUNTY OF _____)

6         I, VALENTIA VILLETTI, hereby certify that I

7      have read the transcript of my testimony taken

8      under oath on October 1st, 2019, that the

9      transcript is a true, complete and correct

10     record of what was asked, answered and said

11     during my testimony under oath, and that the

12     answers on the record as given by me are true

13     and correct, except for the corrections or

14     changes in form or substance, if any, noted in

15     the attached Errata Sheet.

16

17     _____

18     VALENTIA VILLETTI

19

20     Signed and subscribed to

21     before me, this _____ day

22     of _____, _____.

23

24     _____

25     Notary Public



Page 192

1

2                    C E R T I F I C A T E

3        I, SALVATRICE MANNINO, a shorthand reporter

4    and Notary Public within and for the State of

5    New York, do hereby certify:

6        That the Witness(es) whose testimony is

7    hereinbefore set forth was duly sworn by me,

8    and the foregoing transcript is a true record

9    of the testimony given by such Witness(es).

10        I further certify that I am not related to

11    any of the parties to this action by blood or

12    marriage, and that I am in no way interested

13    in the outcome of this matter.

14

15

16

17

18

19

20

21        *Salvatrice Mannino*

22

23

24                    Salvatrice Mannino, a Court

                    Reporter and Notary Public

25                    Date: October 11th, 2019



Page 193

```
 1
 2                        LAWYER'S NOTES
 3     PAGE/LINE    NOTE
 4     _____    _____
 5     _____    _____
 6     _____    _____
 7     _____    _____
 8     _____    _____
 9     _____    _____
10     _____    _____
11     _____    _____
12     _____    _____
13     _____    _____
14     _____    _____
15     _____    _____
16     _____    _____
17     _____    _____
18     _____    _____
19     _____    _____
20     _____    _____
21     _____    _____
22     _____    _____
23     _____    _____
24     _____    _____
25     _____    _____
```

