UNITED STATES DISTRICT COURT
SOUTHER DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

VALENTIA VILLETTI and FAIZA JIBRIL, M.D.,

        Plaintiffs,

                  Index No.
                  18 Civ. 10200 (VSB)
     -against-

GUIDEPOINT GLOBAL, LLC,

        Defendant.

- - - - - - - - - - - - - - - - - - x

              One Battery Park Plaza
              New York, New York

              November 14, 2019
              2:16 p.m.


    CONTINUED EXAMINATION BEFORE TRIAL of

VALENTIA VILLETTI, a Plaintiff herein, taken

by DAVID J. GRECH, in the above-entitled

action, held at the above time and place,

pursuant to Order, taken before LEAH MILLER, a

Shorthand Reporter and Notary Public within

and for the State of New York.



            MAGNA LEGAL SERVICES
             (866)624-6221
             www.MagnaLS.com



Page 2

APPEARANCES:

LICHTEN & BRIGHT, P.C.
    Attorneys for Plaintiffs
    387 Park Avenue South
    5th Floor
    New York, New York 10016
    646-588-4872
BY:  STUART LICHTEN, ESQ.
    slichten@lichtenandbright.com


GORDON & REES SCULLY MANSUKHANI
    Attorneys for Defendant
    One Battery Park Plaza
    28th Floor
    New York, New York 10004
    212-453-0702
BY:  DAVID J. GRECH, ESQ.
    dgrech@gordanrees.com


GUIDEPOINT GLOBAL, LLC
    Attorneys for Defendant
    675 Avenue of the Americas
    2nd Floor
    New York, New York 10010
    212-812-9511
BY:  CATHERINE SMITH, ESQ.
    csmith@guidepoint.com


ALSO PRESENT:

DAHN LEVINE - LAW FIRM ASSOCIATE

Page 3

STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

        IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

        IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court and that a copy of this examination shall be furnished without charge to the attorney representing the witness testifying herein.

Page 4

                V. VILLETTI

V A L E N T I A   V I L L E T T I, the Witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION

BY MR. GRECH:

        Q. State your name for the record, please.

        A. Valentia Villetti.

        Q. State your address for the record, please.

        A. 162 East 61st Street, Unit 1B, New York, New York 10065.

        Q. Good afternoon, Ms. Villetti.

        A. Good afternoon.

        Q. It's been a while.  So I'm just going to go through our instructions again.  Same rules apply.  If you have any questions about the instructions or as we go along, just ask me, ask Stuart, and we will stop and address it.

                Again, David Grech with the law

Page 5

                V. VILLETTI

firm of Gordon & Rees.  We represent Guidepoint Global in this action.

        As far as the instructions, you know, this is, again, a question-and-answer session.  So we are going to ask you some questions.

        We may show you some -- we showed you some documents last time. We may show you some more documents today regarding your employment with Guidepoint and this lawsuit.

        If you don't understand any of those questions we might ask you, please ask me to rephrase it, and I will do my best to do so.

        Your responses must be verbal. No nodding, no gestures.  Because the reporter must take down all of your responses for the transcript.

        On that point, so that the record and the transcript is clear, even if you can, sort of, guess what the rest of my question might be, just for the sake of the purity of the



Page 6

V. VILLETTI

1  transcript, just let me finish the
2  question and then you can respond.
3      If you need a break at any time,
4  just let us know, let me know, let
5  Mr. Lichten know, and we will
6  accommodate that.  All that we would
7  ask is that if there is a question
8  pending at that point, that you answer
9  the question and then we will move on
10 and take your break.
11     Do you have any questions about
12 the questions --
13     A. No.
14     Q. -- about the instructions,
15 rather.  Okay.  All right.
16     MR. GRECH:  Could we mark
17 this as H, please?
18         - - -
19     (Whereupon, Defendant's
20 Exhibit H, an employee agreement,
21 was marked for identification.)
22         - - -
23     Q. Ms. Villetti, I'm showing you
24 what's been marked as Defendant's
25

Page 7

V. VILLETTI

1  Exhibit H for purposes of these
2  depositions.  If you could just take a
3  moment to look at Exhibit H.  And let
4  us know when you have had that
5  opportunity (handing).
6      A. (Witness complied).
7      Q. You had a chance to look at H?
8      A. Yes.
9      Q. Do you know what H is?
10     A. Yes.
11     Q. You recognize it?
12     A. Yes.
13     Q. And what is it?
14     A. It's the employment agreement
15 that I signed with Guidepoint.
16     Q. And this was the agreement you
17 signed effective September 11, 2017?
18     A. Correct.
19     Q. And on the last page of the
20 agreement, it was signed on behalf of
21 Guidepoint by Albert Sebag?
22     A. Yes.
23     Q. Ms. Villetti, if we could turn
24 to page 2 of the employment agreement,
25

Page 8

V. VILLETTI

1  specifically Article 5, Section A,
2  nondisclosure.
3      And, Ms. Villetti, were you
4  aware that during your employment with
5  Guidepoint and for a period thereafter,
6  you would be prohibited from disclosing
7  certain information as set forth in
8  Article 5?
9      A. Yes.
10     Q. And were you aware during the
11 course of your employment and for some
12 time thereafter, your use of
13 proprietary information of Guidepoint
14 would be limited, as provided in this
15 contract?
16     A. Yes.
17     Q. On page three, Article 7, same
18 question:  You are aware during the
19 course of your employment with
20 Guidepoint and for two years
21 thereafter, you're under an obligation
22 not to disparage Guidepoint?
23     A. Yes.
24     Q. Do you recall a conversation you
25

Page 9

V. VILLETTI

1  had with Dr. Jibril after your
2  termination from Guidepoint?
3      A. You would have to be more
4  specific.
5      Q. Immediately after your
6  termination from Guidepoint, your first
7  conversation with Dr. Jibril after your
8  termination from Guidepoint.
9      A. I can't recall the specifics.
10     Q. You recall speaking to her about
11 Albert and his girlfriend?
12     A. I can't recall.
13     Q. Do you recall speaking to her
14 about the hierarchy of the company?
15     A. I can't recall.
16     Q. Do you recall speaking to her at
17 that point about how the hierarchy of
18 the company mistreated women?
19     A. I don't recall.
20     Q. One of your allegations in this
21 case is that Guidepoint, as a company,
22 mistreated you based upon your gender,
23 correct?
24     A. Correct.
25



Page 10

1           V. VILLETTI
2      Q. And specifically Mr. Sebag?
3      A. Yes.
4      Q. Mr. Sebag signed your employment
5 agreement on behalf of the company,
6 correct?
7      A. Yes.
8      Q. In September 2017, when he
9 signed that agreement, did he express
10 to you anything that you might
11 interpret as being discriminatory
12 against women?
13      A. I don't understand the question.
14      Q. September 2017 --
15      A. Uh-huh.
16      Q. -- when you're first coming on
17 board to Guidepoint --
18      A. Yes.
19      Q. -- did Mr. Sebag do anything
20 that made you feel that he had animus
21 towards women?
22      A. I don't recall.
23      Q. Okay.
24      MR. GRECH:  Can we mark this
25 as I, please?

Page 11

1           V. VILLETTI
2           - - -
3      (Whereupon, Defendant's
4 Exhibit I, employment policies,
5 was marked for identification.)
6           - - -
7      (Whereupon, Defendant's
8 Exhibit J, a receipt for employee
9 handbook, was marked for
10 identification.)
11           - - -
12      Q. Ms. Villetti, we are showing you
13 what's been marked --
14           - - -
15      (Whereupon, a discussion was
16 held off the record.)
17           - - -
18      Q. We are showing you what's been
19 marked as Defendant's Exhibits both I
20 and J for the purposes of these
21 depositions.  If you could just -- and
22 they work together.
23      So if you could just look at I
24 and J together and let me know when you
25 have had a chance to do so (handing).

Page 12

1           V. VILLETTI
2      A. (Witness complied).
3      Q. Have you had a chance to review
4 Exhibit I?
5      A. Yes.
6      Q. And do you recognize it?
7      A. Yes.
8      Q. And what is it?
9      A. It's an employment handbook.
10      Q. Is it Guidepoint's employment
11 handbook?
12      A. It appears so, yes.
13      Q. Do you recall receiving this
14 handbook when you were employed by
15 Guidepoint?
16      A. Not exactly.  But, yes, I'm sure
17 I did.
18      Q. Okay.  And if we can look at
19 Exhibit J.  Take a moment to look at J.
20      A. (Witness complied).
21      Q. Do you recognize J?
22      A. Yes.
23      Q. What's J?
24      A. It's a receipt for the employee
25 handbook.

Page 13

1           V. VILLETTI
2      Q. It's an acknowledgement that you
3 received the employee handbook?
4      A. Yes, correct.
5      Q. Okay.  And in -- the text in
6 Exhibit J, the receipt, you see the
7 caution there that I understand that
8 Guidepoint is an at-will employer.  And
9 as such, employment with Guidepoint is
10 not for a fixed term or definite period
11 and may be terminated at the will of
12 either party with or without cause and
13 without prior notice.
14      Do you see that?
15      A. Yes.
16      Q. And you were aware when you came
17 on board with Guidepoint that your
18 employment was at will?
19      A. Yes.
20      Q. And do you recall your testimony
21 during the first part of your
22 deposition where one of your concerns
23 had been that an employee was let go
24 without consulting with her team; do
25 you remember that?



Page 14

V. VILLETTI

1
2      A. Yes.
3      Q. Was that included in any of the
4  guidance given to you in the employee
5  handbook that your termination was
6  dependant upon consulting with your
7  team?
8      A. No.
9      Q. If you could go back to Exhibit
10  I, please, the employment policies.
11  And specifically, it's page 11 of the
12  document, the section entitled
13  procedures for reporting harassment or
14  discrimination.
15      Do you see that section?
16      A. Yes.
17      Q. Paragraph 1 reads Guidepoint
18  encourages but does not require
19  individuals who believe they are being
20  harassed or are subjected to
21  discrimination or who are aware of such
22  conduct to promptly tell the offender
23  that his or her behavior is unwelcome
24  and then ask that it's stopped.
25      Do you see that?

Page 15

V. VILLETTI

1
2      A. Yes.
3      Q. And you're aware of that
4  procedure when you worked at
5  Guidepoint?
6      A. I can't recall.
7      Q. You can't recall if you were
8  aware of it?
9      A. At the time, yes.
10      Q. You cannot recall if you were
11  aware at the time?
12      A. Yes.
13      Q. Okay.  Thank you.
14      And you have made allegations of
15  gender discrimination here, correct?
16      A. Yes.
17      Q. And who would be the offenders
18  of the gender discrimination that's
19  against you at Guidepoint?
20      A. It would be Mr. Sebag and Rutwik
21  Ghodadra.
22          - - -
23      (Whereupon, a discussion was
24  held off the record.)
25          - - -

Page 16

V. VILLETTI

1
2      Q. And did you ever tell Mr. Rutwik
3  that certain behavior of his you had
4  considered harassing or discriminatory?
5      A. Yes.
6      Q. And did you ever tell Mr. Sebag
7  the same thing?  Did you tell him that
8  you had considered any of his conduct
9  harassing or discriminatory?
10      A. I didn't have the chance.
11      Q. And why did you not?
12      A. The CEO's often not in the
13  office.  And when he is, he is not
14  readily available to employees.  So I
15  did that through my supervisor.
16      Q. And who was your supervisor
17  again?
18      A. Bouker Pool.
19      Q. So you told Mr. Pool that
20  certain conduct of Mr. Sebag you
21  considered harassing or discriminatory?
22      A. Yes.
23      Q. And do you recall what you
24  specifically reported to Bouker; what
25  was the conduct that you complained

Page 17

V. VILLETTI

1
2  about about Mr. Sebag?
3      A. We had several conversations
4  about this as it pertained to Ashlee,
5  as it pertained to Jessica, as well as
6  about Dr. Jibril, and then myself, when
7  I came back from Boston.
8      Q. And you considered Mr. Sebag's
9  conduct towards you during the Boston
10  trip and thereafter discriminatory or
11  harassing?
12      A. Yes.
13      Q. In what respects?
14      A. I felt that his behavior would
15  not have been the same had I been a
16  man.
17      Q. And what behavior was he
18  engaging in with you that made you come
19  to that conclusion?
20      A. He called me on my cell and was
21  very demeaning.
22      Q. And was this the call when you
23  were in Boston when he called you on
24  your cell?
25      A. Yes.



Page 18

V. VILLETTI

1
2    Q. Okay.  And in what ways was his
3  conversation demeaning to you?
4    A. He was loud and had a very
5  condescending tone and did not give me
6  any opportunity to explain the context,
7  just talked down at me.
8    Q. And it's your belief that he
9  would not have had such conversations
10 were you a man?
11   A. Yes.
12   Q. Had you ever had the occasion to
13 listen to Mr. Sebag talk to a male
14 employee under similar circumstances?
15   A. No.
16   Q. And why, again, was Mr. Sebag
17 concerned about your presence in
18 Boston?
19   A. You would have to ask him.
20   Q. What did he express to you was
21 his concern about why you were in
22 Boston?
23   A. That I was -- I had not
24 consulted him prior to the trip.
25   Q. And you recall your testimony

Page 19

V. VILLETTI

1
2  last time of concerns you believe
3  Mr. Sebag had about Mr. Pool's
4  vacationing and absences?
5    A. Yes.
6    Q. Were you ever witness to
7  Mr. Sebag counseling Mr. Pool about his
8  vacations and absences?
9    A. No.
10   Q. Did Mr. Pool share any of that
11 with you; that Albert had said certain
12 things to him about absences or
13 vacations?
14   A. Yes.
15   Q. And what did Bouker say?
16   A. Bouker said that while he was on
17 the ski slope, he encountered
18 Mr. Sebag.  And Mr. Sebag expressed a
19 great deal of frustration with him
20 being on the slope and asked him what
21 he was doing there.  To which he
22 responded he was on vacation.  And
23 Mr. Sebag expressed that he had not
24 authorized it.  And Bouker said that he
25 had.  And they went back and forth.

Page 20

V. VILLETTI

1
2    Q. In this conversation that Bouker
3  had with you relating this exchange
4  with Albert, did Bouker express to you
5  he felt demeaned during this
6  conversation?
7    A. No.
8    Q. Or that Mr. Sebag was
9  condescending to him?
10   A. No.
11   Q. Did Bouker tell you that Albert
12 raised his voice to him on the slopes?
13   A. I don't recall.
14   Q. If we could look back at Exhibit
15 I, the second paragraph in procedures
16 for reporting harassment and
17 discrimination.  It's on page 11.
18       The paragraph reads whether or
19 not an individual chooses to confront
20 the offender directly, the individual
21 should promptly notify his or her
22 supervisor or human resources and
23 submit an employee complaint form,
24 which can be found on Guidepoint's
25 internet and in human resources at any

Page 21

V. VILLETTI

1
2  time.
3      Do you see that, Ms. Villetti?
4    A. Yes.
5    Q. Were you aware of the existence
6  of such an employee complaint form when
7  you were with Guidepoint?
8    A. No.
9    Q. Did you ever submit an employee
10 complaint form to your supervisor?
11   A. No.
12   Q. And your supervisor would have
13 been Bouker?
14   A. Yes.
15   Q. Did you ever submit an employee
16 complaint form to HR?
17   A. No.
18   Q. You did make a complaint to HR,
19 though, right?
20   A. Yes.
21   Q. And if you see the next section,
22 it's an investigation of complaints
23 section.
24     You see that section?
25   A. Yes.



Page 22

```
 1              V. VILLETTI
 2      Q. And what is your knowledge of
 3  the investigation of your complaint to
 4  HR?
 5      A. I don't know.
 6      Q. You don't know what your
 7  knowledge is of the complaint?
 8      A. I don't know what the extent of
 9  the investigation was, if any.
10      Q. Was your complaint investigated?
11      A. I don't know.
12      Q. Who did you make the complaint
13  to?
14      A. Priscilla.
15      Q. Separate and apart from your
16  complaint, when you were at Guidepoint,
17  were you ever asked to participate in
18  an investigation?
19      A. I can't recall.
20          MR. GRECH: Could we mark
21      this as K?
22                -  -  -
23          (Whereupon, Defendant's
24      Exhibit K, an e-mail exchange,
25      was marked for identification.)
```

Page 23

```
 1              V. VILLETTI
 2                -  -  -
 3      Q. Ms. Villetti, we are showing you
 4  what's been marked as Defendant's
 5  Exhibit K. If you could take a moment
 6  to look at that, please (handing).
 7      A. (Witness complied).
 8      Q. Ms. Villetti, you have had a
 9  chance to review Exhibit K?
10      A. Yes.
11      Q. Do you recognize it?
12      A. Yes.
13      Q. And what is it?
14      A. It's an e-mail complaint that I
15  sent to Priscilla requesting a meeting
16  to discuss what I perceived to be
17  continuous mistreatment of women at
18  Guidepoint.
19      Q. And Exhibit K is an e-mail
20  exchange or e-mail chain between you
21  and Priscilla?
22      A. Yes.
23      Q. And it -- the first e-mail in
24  time in Exhibit K is your e-mail to
25  Priscilla dated March 12, 2018 at
```

Page 24

```
 1              V. VILLETTI
 2  9:23 a.m.; is that correct?
 3      A. Yes.
 4      Q. And this is what you are deeming
 5  your complaint, correct?
 6      A. Yes.
 7      Q. And thereafter, there is an
 8  exchange between you and Priscilla,
 9  correct?
10      A. Yes.
11      Q. All right. So if we could look
12  first at your first e-mail on
13  March 12th. In the second paragraph,
14  you make reference to over the past
15  several months that you had brought
16  management issues and toxic work
17  environment in our team to the
18  attention of both you, meaning
19  Priscilla and John.
20          Who is John?
21      A. John Campanella who is the CFO.
22      Q. So over the past several months,
23  when was the first time you brought
24  management issues and toxic work
25  environment to Priscilla's attention?
```

Page 25

```
 1              V. VILLETTI
 2      A. I don't recall the specifics.
 3  But I had several conversations with
 4  her about this.
 5      Q. Had you documented your concerns
 6  prior to this e-mail?
 7      A. In writing, no.
 8      Q. And when did you first speak
 9  with John about management issues and
10  toxic work environment?
11      A. I don't recall the exact dates.
12      Q. Did you document any of those
13  complaints to John?
14      A. In writing, no.
15      Q. Did you document it in any other
16  way?
17      A. No. I had spoken conversations
18  with him.
19      Q. With John and Priscilla?
20      A. Yes.
21      Q. Predating this e-mail complaint?
22      A. Yes.
23      Q. And at the time you were writing
24  this e-mail, what management issues did
25  you have in mind?
```



Page 26

V. VILLETTI

1
2    A. I think one of the main concerns
3 I had at the time was that Rutwik, who
4 was not even an employee of Guidepoint,
5 was appearing to take a management role
6 at my team.  And we had not had any
7 communication from HR otherwise about
8 him being an employee or us reporting
9 to him otherwise.
10    Q. And how did you know that Rutwik
11 was or was not a Guidepoint employee?
12    A. He was a consultant in the
13 system.
14    Q. Were there other consultants in
15 the system at the time?
16    A. I don't know.  I wasn't
17 interacting with them.
18    Q. And a consultant is not an
19 employee?
20    A. I don't know.
21    Q. In what ways was Rutwik
22 attempting to take management of your
23 team?
24    A. He felt he could dictate what
25 each member of the team was to do, when

Page 27

V. VILLETTI

1
2 they were do it.  And he felt he could
3 call us, e-mail us at all hours
4 demanding things, pull us into
5 meetings.
6    Q. Was Rutwik behaving the same way
7 toward Bouker?
8    A. No.
9    Q. Was Rutwik behaving that way
10 toward anyone other than yourself?
11    A. To my knowledge, he was also
12 doing that to Jessica.
13    Q. Anyone else?
14    A. I don't know.
15    Q. What about Justin?
16    A. Not to my knowledge.
17    Q. Any other management issues that
18 were of concern to you on March 12,
19 2018?
20    A. There were issues with Bouker
21 being absent frequently.  And, you
22 know, the lack of clarification
23 surrounding my performance metrics,
24 which I had sought clarification on.  I
25 saw that as a management failing.

Page 28

V. VILLETTI

1
2    Q. Any other management issues?  We
3 will discuss them in detail.  But were
4 there any more on the list?
5    A. Our inability to hire the staff
6 needed to perform our job.
7    Q. And you had communicated your
8 concern about Bouker's absences with
9 Priscilla before?
10    A. Yes.
11    Q. And you had communicated them --
12 your concern about Bouker's absences
13 with John before?
14    A. I don't know.
15    Q. And what was your concern about
16 Bouker's absences?
17    A. I felt that his frequent
18 absences created a leadership vacuum
19 and led to chaos.
20    Q. All right.  We talked about the
21 management issue, focused on Rutwik.
22       In what way, if any, did that
23 demonstrate to you discrimination based
24 on your gender?
25    A. I don't understand the question.

Page 29

V. VILLETTI

1
2    Q. We talked about Rutwik dictating
3 what team members were going to do and
4 calling them and e-mailing them and
5 calling meetings, right?
6    A. Yes.
7    Q. What, if any, part of that made
8 you feel he was doing that to you
9 because you were a woman?
10    A. He was doing that to me and to
11 Jessica.
12    Q. Okay.
13    A. And not to anyone else.
14    Q. Who else was on the team to do
15 that to?
16    A. There was Justin.  There was
17 Bouker.
18    Q. And what did you mean by toxic
19 work environment in your complaint?
20    A. Rutwik's presence, for one.
21    Q. How long had Rutwik been there
22 at this time?
23    A. For several months, as I recall.
24    Q. Any other components of the
25 toxic work environment other than



Page 30

V. VILLETTI

1  Rutwik's presence?
2      A. I can't recall.
3      Q. And you talked briefly earlier
4  about performance metrics.  And you
5  specifically mentioned that next or you
6  said you sought clarification on your
7  performance metrics and bonus structure
8  repeatedly since last December with no
9  resolve.
10      And what was your specific
11  concern there?
12      A. I was not given any guidelines
13  or structure about how my performance
14  was being measured or my bonus was
15  being decided.
16      Q. And last December would have
17  been 2017, correct?
18      A. Correct.
19      Q. And when did you start with
20  Guidepoint?
21      A. In September.
22      Q. So had you ever received a bonus
23  from Guidepoint?
24      A. I believe so.  There was one
25

Page 31

V. VILLETTI

1  bonus which came for 2017, for the end.
2      Q. And what was your understanding
3  of what your performance metrics were?
4      A. I don't have an understanding of
5  it.
6      Q. Who did you expect to give you
7  that understanding?
8      A. I sought it from multiple
9  sources.  No one gave me a clear
10  understanding.
11      Q. Did you seek it from Bouker?
12      A. Yes.
13      Q. And the result was?
14      A. I don't think he knew.
15      Q. But he was your supervisor?
16      A. Yes.
17      Q. Did you seek it from Rutwik?
18      A. I don't recall.
19      Q. Did you seek it from John?
20      A. Yes.
21      Q. And in what way?  Did you talk
22  to him, call him, e-mail about your
23  performance metrics?
24      A. In-person meeting.
25

Page 32

V. VILLETTI

1      Q. Okay.  And what did you and John
2  talk about concerning your performance
3  metrics?
4      A. I sought clarification.
5      Q. And John's response was?
6      A. He didn't provide any
7  clarification.
8      Q. What was John's role with the
9  company again?
10      A. CFO.
11      Q. Did you speak to Albert about
12  your performance metrics?
13      A. No.
14      Q. Other than Bouker and John, did
15  you speak with anyone else about your
16  performance metrics?
17      A. Priscilla.
18      Q. Okay.  And when did you and
19  Priscilla talk about your performance
20  metrics?
21      A. I don't recall the specifics.
22      Q. Was it an in-person
23  conversation?
24      A. Yes.
25

Page 33

V. VILLETTI

1      Q. And you asked her for
2  clarification on your performance
3  metrics?
4      A. Yes.
5      Q. And what was her response?
6      A. She didn't provide any
7  clarification.
8      Q. Okay.  Do you feel that the lack
9  of clarification on your performance
10  metrics was based in any way on your
11  gender?
12      A. I don't know.
13      Q. What was your bonus structure
14  when you were at Guidepoint?
15      A. There was no structure.
16      Q. You received a bonus based upon
17  2017?
18      A. Yes.
19      Q. How much was the bonus?
20      A. I don't remember.  You can find
21  it in the numbers.
22      Q. What was it based upon?
23      A. It was an agreed-upon amount
24  prior to my joining the firm.
25



Page 34

V. VILLETTI

1
2     Q. And who made the agreement?
3     A. Bouker and Priscilla.
4     Q. We also talked about an
5  inability to hire staff.
6        And your complaint continues
7  furthermore, I have performed under a
8  staff shortage and the routine absence
9  by my manager.
10       I assume we are talking about
11 Bouker here?
12    A. Yes.
13    Q. Including his most three-week
14 break.
15       And what staff shortage were you
16 experiencing as reflected in your March
17 complaint?
18    A. My associate Liana Yamin had
19 left at that point.  And I was also
20 instructed to increase the output of
21 the healthcare content and
22 simultaneously unable to hire people to
23 do so.
24    Q. And in what way did this staff
25 shortage reflect, in your opinion,

Page 35

V. VILLETTI

1
2  gender discrimination by Guidepoint?
3     A. Well, I was taught that I had a
4  mandate and I was able to hire.  But
5  when I wanted to hire Dr. Jibril, I was
6  prevented from doing so.
7     Q. And was there anything about
8  Ms. Yamin's departure that would lead
9  you to the conclusion that it was based
10 on gender discrimination?
11    A. No.  She left for another role.
12 Because she wouldn't get a pay increase
13 that was -- that would have been
14 required for her to stay.
15    Q. Okay.  In the next paragraph,
16 you say that instead, after talking
17 about some acknowledgements, that you
18 have endured being continuously
19 dismissed and belittled.
20       Do you see that?
21    A. Yes.
22    Q. And who dismissed and belittled
23 you?
24    A. Rutwik and Albert.
25    Q. Rutwik in the same ways we have

Page 36

V. VILLETTI

1
2  discussed before?
3     A. Yes.
4     Q. And Albert on the call when you
5  were at Boston?
6     A. Yes.
7     Q. Was Albert dismissive or
8  belittling of you at any other time
9  other than his call to you when you
10 were at Boston?
11    A. No.  I don't recall.
12    Q. The same paragraph, we are
13 continuing on, your complaint reads the
14 increasing aggression, abusive
15 language, and unjustified deterioration
16 of my role has led to serious anxiety,
17 stress-induced physical pain, and
18 difficulty sleeping for me.
19       Do you see that?
20    A. Yes.
21    Q. And who was being increasingly
22 aggressive toward you?
23    A. Rutwik.
24    Q. And Rutwik would use abusive
25 language with you?

Page 37

V. VILLETTI

1
2     A. Yes.
3     Q. How so?  I mean, do you have an
4  example?
5     A. Yes.  When he shouted at me I am
6  the boss of you and boss of everybody
7  else here, there were several F bombs.
8     Q. Gotcha.
9        Is that the way Rutwik speaks
10 normally?
11    A. No.
12    Q. Had you ever heard Rutwik drop F
13 bombs when speaking with someone else?
14    A. No.
15    Q. Did Albert ever use abusive
16 language?
17    A. Arguably, on the call that he
18 made to me.
19    Q. There is a, sort of, broad
20 interpretation of abusive language.
21       Did Albert utter any profanities
22 to you on the call?
23    A. No.  But his tone was hostile
24 and demeaning.
25    Q. Okay.  In what way was Albert's



Page 38

V. VILLETTI

1
2  tone on the call then abusive?
3      A. He shouted at me that I was not
4  to speak and he was to talk at me
5  essentially.
6      Q. And this was during the
7  telephone call while you were in
8  Boston?
9      A. Yes.
10     Q. Okay.  And had Albert ever
11 displayed aggression toward you?
12     A. No.  I didn't interact with
13 Albert.
14     Q. Other than the call in Boston?
15     A. Yes.  And another interaction I
16 had with him in a kitchen.
17     Q. Okay.  Was he aggressive or
18 abusive in that interaction?
19     A. No.
20     Q. In what ways was Rutwik
21 aggressive with you?
22     A. As I mentioned before, he felt
23 he could call us, e-mail, pull us into
24 meetings, yell at us of what we should
25 do or shouldn't do.

Page 39

V. VILLETTI

1
2      Q. And you also experienced a
3  deterioration of your role?
4      A. Yes.
5      Q. In what way?
6      A. When Albert called me, he said
7  that I was not allowed to travel
8  anymore for my role and I was
9  essentially not allowed to do anything
10 without his explicit permission.  And
11 being the head of healthcare content,
12 that had not been a part of the
13 arrangement when I took the job.
14     Q. And do you go into that in more
15 detail in this next paragraph here
16 where you say Albert effectively
17 changed my role abruptly and taken over
18 my leadership over the conferences?
19     A. Yes.
20     Q. And now seemingly any agency
21 over teleconferences, barred me from
22 traveling, which is essential for me to
23 perform my job.
24     Do you see that?
25     A. Yes.

Page 40

V. VILLETTI

1
2      Q. How many trips had you taken for
3  Guidepoint during your tenure there?
4      A. I don't recall the specifics.
5      Q. Do you have an estimate?
6      A. Three, I believe.
7      Q. Including Boston?
8      A. Yes.
9      Q. Did you take any trips to -- for
10 Guidepoint work after Boston?
11     A. No.
12            - - -
13      (Whereupon, a discussion was
14 held off the record.)
15            - - -
16     Q. And here your complaint was that
17 Albert had abruptly taken away your
18 leadership of the conferences, correct?
19     A. Yes.
20     Q. And in what ways were you
21 established as a leader of conferences?
22     A. That was a part of my role.
23     Q. What role did Bouker have with
24 the conferences?
25     A. Bouker just approved things at

Page 41

V. VILLETTI

1
2  the late stage of a decision.
3      Q. Did Rutwik have any role at the
4  conferences?
5      A. No.
6      Q. And when we -- and we talked
7  about this last time; conferences
8  versus teleconferences.
9      When we say conferences here,
10 these are events that you would travel
11 to?
12     A. Not just travel to.  Some were
13 in New York.  It was in-person
14 meetings.
15     Q. In-person meetings, thank you.
16     Separate and apart from a
17 teleconference, correct?
18     A. Yes.
19     Q. Okay.  And so you would also
20 have leadership over healthcare content
21 teleconferences?
22     A. Yes.
23     Q. How many teleconferences would
24 you have conducted while you were at
25 Guidepoint?



Page 42

```
            V. VILLETTI
1
2       A. Many.
3       Q. Was there a frequency in which
4   they occurred?  Was it once a week?  A
5   couple times a -- how many -- how would
6   you say in terms of frequency?
7       A. It varied from once a week to
8   three times a week.
9       Q. And Boston was an in-person
10  conference, correct, it wasn't a
11  teleconference?
12      A. Yes.
13      Q. Did you have any teleconferences
14  for Guidepoint after your Boston trip?
15      A. Yes.
16      Q. How many?
17      A. I don't recall exactly.
18  Probably two or three.
19      Q. Did you have to seek Albert's
20  approval for those two to three
21  teleconferences?
22      A. I had to seek Rutwik's.
23      Q. Had you had to seek Rutwik's
24  approval prior to these two to three
25  conferences?
```

Page 43

```
            V. VILLETTI
1
2       A. Approval, no.
3       Q. What did you have to seek from
4   Rutwik?
5       A. I didn't have to seek anything.
6   I was told that I should consult him.
7       Q. And who told you you should
8   consult with Rutwik about
9   teleconferences?
10      A. Bouker.
11      Q. And when did Bouker tell you
12  that?
13      A. Around the time he showed up.
14      Q. Pre Boston or post Boston?
15      A. Pre Boston.
16      Q. After your telephone call with
17  Albert when you were in Boston, did you
18  have any other communications with
19  Albert?
20      A. No.
21      Q. Going on in your complaint, you
22  see the paragraph that starts I was
23  sought out and recruited?
24      A. Yes.
25      Q. You were sought out and
```

Page 44

```
            V. VILLETTI
1
2   recruited in 2017 to serve as a subject
3   matter expert who would lead the HLC --
4       What does HLC stand for?
5       A. Healthcare.
6       Q. -- portion of the business in my
7   group.  And I accepted this position in
8   good faith.  I was also told I was
9   joining a start-up where I would help
10  build the team.
11      This has all proved to be highly
12  misleading.  And I have since observed
13  my own employment trajectory following
14  a familiar pattern at Guidepoint.
15      Do you see that portion of your
16  complaint?
17      A. Yes.
18      Q. And who communicated to you that
19  you were, by joining Guidepoint,
20  joining a start-up?
21      A. Bouker.
22      Q. And when did he do that?
23      A. When I was being interviewed.
24      Q. In what respects did Bouker tell
25  you Guidepoint was a start-up?
```

Page 45

```
            V. VILLETTI
1
2       A. He never said Guidepoint was a
3   start-up.  He said the content team was
4   like a start-up, hence the quotation
5   marks.
6       Q. Okay.  How many other content
7   teams were at Guidepoint when you were
8   interviewing?
9       A. We were the content team.
10      Q. If that team was a start-up,
11  what other teams were there?
12      A. At Guidepoint as a whole?
13      Q. Correct.
14      A. As I recall, there was the main
15  business line, which was one-on-one
16  client calls.  There was a data team.
17  There was a surveys team.
18      Q. And was it your impression that
19  those other teams were established and
20  not, quote, start-ups?
21      A. Yes.
22      Q. And here you say that your
23  employment trajectory is following a
24  familiar pattern at Guidepoint.
25      What was -- first, what was the
```



Page 46

V. VILLETTI

1  trajectory?
2
3      A. That I was brought on under the
4  premise that I was going to be
5  effectively a leader in that particular
6  segment of the business. And then over
7  a period of time, my role gradually
8  deteriorated.
9      Q. Deteriorated in the way that we
10 have talked about before?
11     A. Yes.
12     Q. And what was the familiar
13 pattern at Guidepoint that you were
14 referencing here?
15     A. The familiar pattern is how they
16 treated women.
17     Q. And which women did you have in
18 mind when you wrote familiar pattern?
19     A. Ashlee and Jessica.
20     Q. Which makes sense. Because then
21 you start talking about Ashlee in your
22 complaint, right?
23     A. Yes.
24     Q. And here you say you spoke with
25 Ashlee's team following her departure,

Page 47

V. VILLETTI

1
2  correct?
3      A. Yes.
4      Q. And that no one had -- that the
5  team had informed you that no one had
6  sought their opinion and notified them
7  and Ashlee was, in fact, a great
8  leader.
9      Do you see that?
10     A. Yes.
11     Q. And who was -- who were the
12 members of Ashlee's team that you spoke
13 with?
14     A. I don't recall their names.
15     Q. How many people?
16     A. I talked to three or four of
17 them.
18     Q. Men? Women?
19     A. Women.
20     Q. All women?
21     A. Yes.
22     Q. And then your complaint
23 continues and you talk about Jessica.
24 We have talked about Jessica before,
25 correct?

Page 48

V. VILLETTI

1
2      A. Yes.
3      Q. And your complaint also talks
4  about Faiza. And that's Dr. Jibril,
5  correct?
6      A. Yes.
7      Q. You said you were not permitted
8  to discuss or defend the choice, the
9  choice being to hire Dr. Jibril, and
10 that you don't believe Albert even met
11 her.
12     As you sit here today, do you
13 know whether Dr. Jibril ever met with
14 Albert?
15     A. Not to my knowledge.
16     Q. You interviewed Dr. Jibril,
17 correct?
18     A. Yes.
19     Q. Did anyone else interview
20 Dr. Jibril?
21     A. Yes.
22     Q. Who?
23     A. Bouker Pool, Justin Ruiz,
24 Priscilla, and there was another guy in
25 HR that I don't remember the name of.

Page 49

V. VILLETTI

1
2  James, James something.
3      Q. That you know, is Priscilla
4  still an employee of Guidepoint?
5      A. Currently?
6      Q. Yes.
7      A. I believe so.
8      Q. Other than Dr. Jibril, had you
9  made any other recommendations for hire
10 at Guidepoint?
11     A. No.
12     Q. You talked about your associate
13 leaving, right?
14     A. Yes.
15     Q. Were there efforts to replace
16 her?
17     A. Yes.
18     Q. And what were those efforts?
19     A. We -- I created a listing for
20 the job. It was to be posted
21 internally and externally.
22     Q. Did that lead to any interviews?
23     A. I was supposed to interview
24 people. But it never happened.
25     Q. Did anyone else interview anyone



Page 50

V. VILLETTI

1 to fill the position of your associate?
2
3     A. My associate specifically, no.
4     Q. So was there ever an occasion
5 where you would have recommended
6 someone to replace your departing
7 associate?
8     A. No.
9     Q. The last paragraph in your
10 complaint, you said that you appreciate
11 the rapport between yourself and
12 Priscilla and genuinely hope that we
13 can find an amicable resolution here.
14     Do you see that?
15     A. Yes.
16     Q. You have a good relationship
17 with Priscilla?
18     A. Very good relationship.
19     Q. And you felt comfortable
20 bringing this complaint to her
21 attention?
22     A. Yes.
23     Q. And she was head of HR at that
24 point, so the proper person to bring
25 the complaint to?

Page 51

V. VILLETTI

1
2     A. Yes.
3     Q. If you could just turn back to
4 the first page --
5         - - -
6     (Whereupon, a discussion was
7     held off the record.)
8         - - -
9     Q. -- Exhibit K.  And here there's
10 Priscilla's reply, where she asks does
11 3 o'clock work for you today -- to
12 discuss today.  And then your response:
13 Yes, I will come by your office at that
14 time.  Thank you.
15     Do you see that?
16     A. Yes.
17     Q. And you ultimately had a meeting
18 with Priscilla about your complaint?
19     A. Yes.
20     Q. During that meeting, did
21 Priscilla tell you what the next steps
22 would be concerning your complaint?
23     A. I don't recall.
24     Q. Were any steps taken regarding
25 your complaint following your meeting

Page 52

V. VILLETTI

1 with Priscilla?
2     A. I don't know.
3     Q. Did anyone else speak to you
4 concerning your complaint after your
5 March 12th meeting with Priscilla?
6     A. I may have spoken to Priscilla
7 again about it.
8     Q. You had another meeting with
9 Priscilla?
10     A. I believe so.
11     Q. And when did that occur?
12     A. I don't know exactly.
13     Q. After March 12th, though?
14     A. Yes.
15     Q. Okay.  Was it just that one more
16 meeting?
17     A. I believe so.
18     Q. And do you recall what you
19 talked about with Priscilla at that
20 second meeting?
21     A. I don't recall.
22     Q. Other than Priscilla, did you
23 speak about your complaint with anyone
24 else?
25

Page 53

V. VILLETTI

1
2     A. No.
3     MR. GRECH:  Can you mark
4 this as L, please?
5         - - -
6     (Whereupon, Defendant's
7     Exhibit L, an e-mail exchange,
8     was marked for identification.)
9         - - -
10     Q. Ms. Villetti, we are showing you
11 what's been marked as Defendant's
12 Exhibit L.  If you could take a moment
13 to look that over, please (handing).
14     A. Okay.
15     Q. Have you had a chance to look at
16 Exhibit L?
17     A. Yes.
18     Q. Do you recognize it?
19     A. Yes.
20     Q. What is it?
21     A. It is an e-mail from my boss,
22 Bouker Pool, to Priscilla regarding
23 Rutwik's inappropriate behavior and him
24 leading to a threatening and hostile
25 work environment.



Page 54

V. VILLETTI

1
2    Q. Had you seen this e-mail before
3  today?
4    A. Yes.
5    Q. And what were the circumstances
6  of you seeing this e-mail before today?
7    A. The day my boss was filing this,
8  he called me and he read the e-mail to
9  me. And just said I want you to be
10  aware I'm filing this complaint.
11    Q. It was your understanding that
12  Bouker called you and read the contents
13  of this e-mail before he clicked send
14  to Priscilla?
15    A. I don't know the timing.
16    Q. Did Bouker communicate to you
17  that this is an e-mail I'm about to
18  send or that I have sent to Priscilla?
19    A. I don't recall.
20    Q. But he read you the contents of
21  what he explained was an e-mail
22  complaint?
23    A. Yes.
24    Q. And it appears to be that
25  complaint here?

Page 55

V. VILLETTI

1
2    A. Yes.
3    Q. And why did Bouker tell you he
4  wanted you to know?
5    A. As a member of his team, he
6  would communicate something like that.
7    Q. And Bouker read to you. And you
8  see now that he reported to Priscilla
9  that he was compelled to elevate the
10  matter to a formal notification to HR,
11  because members of his team, both
12  verbally and via written communiqué,
13  are complaining of threatening language
14  and actions creating a hostile work
15  environment.
16    Do you see that?
17    A. Yes.
18    Q. This is all in reference to
19  Rutwik?
20    A. Yes.
21    Q. Is any of Bouker's complaint
22  here based upon Albert's actions or is
23  it all Rutwik?
24    MR. LICHTEN: I'm going to
25    object, because it's speculating.

Page 56

V. VILLETTI

1
2    But you can answer.
3    A. I don't know.
4    Q. When Bouker called you to say
5  this is the content of my e-mail
6  complaint, did he tell you who he was
7  complaining about?
8    A. I don't recall.
9    Q. In the first paragraph, it
10  mentions Rutwik by name?
11    A. Yes.
12    Q. Is Albert mentioned anywhere in
13  this e-mail?
14    A. Doesn't appear to be.
15    Q. When you spoke to Bouker about
16  the e-mail, did he say I'm filing the
17  complaint about Albert?
18    A. I don't recall him mentioning
19  that.
20    Q. Who were the members of Bouker's
21  team on March 16, 2018?
22    A. Would have been me, Justin,
23  Jessica, and the four girls that
24  reported to Jessica prior to being
25  transferred to reporting to Bouker.

Page 57

V. VILLETTI

1
2    Q. And we talked about that on your
3  first day, right?
4    A. Yes.
5    Q. Had you sent any written
6  communications to Bouker about your
7  hostile work environment complaints
8  concerning Rutwik?
9    A. I'm sorry?
10    Q. Sure.
11    Did you send Bouker anything in
12  writing complaining that Rutwik was
13  creating a hostile work environment?
14    A. I believe I had complained about
15  Rutwik's behavior several times to
16  Bouker.
17    Q. In writing?
18    A. I don't recall the specifics,
19  but likely so.
20    MR. GRECH: We will review
21    the production from plaintiffs.
22    But to the extent that it's not
23    in there, we are calling for the
24    production of any written
25    communiqué from Ms. Villetti to



Page 58

V. VILLETTI

1
2    Bouker complaining about the
3    hostile work environment created
4    by Rutwik.  I'll follow up in
5    writing.
6        Q. Ms. Villetti, were you aware of
7    any other written communications by any
8    other members of your team to Bouker
9    about a hostile work environment?
10       A. I wasn't aware.  And also I
11   don't have access to my Guidepoint
12   e-mail.
13       Q. Sure.
14       A. -- inbox.
15       Q. Sure, understood.
16         At the time you were employed by
17   Guidepoint, do you recall receiving a
18   written communication from any of these
19   team members about Rutwik creating a
20   hostile work environment?
21       A. I can't recall.
22       Q. Did you have communications with
23   Justin -- strike that.
24         Did you have conversations with
25   Justin about Rutwik creating a hostile

Page 59

V. VILLETTI

1
2    work environment?
3        A. As my teammate, I would imagine
4    so.
5        Q. Do you recall specifically
6    whether you did?
7        A. I don't recall the specifics,
8    but I likely did.
9        Q. And did you have conversations
10   with Jessica about Rutwik creating a
11   hostile work environment?
12       A. I believe it was discussed in a
13   team meeting.
14       Q. And when was this team meeting?
15       A. Sometime after the Boston trip.
16       Q. And who was at the meeting?
17       A. Actually, strike that.
18         Sometime before or after the
19   Boston meeting, but in that period.
20       Q. Sometime early March of 2018?
21       A. I would say around then.  It was
22   one of the last team meetings we had
23   prior to me being let go.
24       Q. Okay.  And who was at the
25   meeting?

Page 60

V. VILLETTI

1
2        A. It would have been the team.
3        Q. You, Bouker, Justin, and
4    Jessica?
5        A. And the --
6        Q. Four girls --
7        A. -- four girls.
8        Q. -- that had reported to Jessica
9    but then reported to Bouker?
10       A. Yes.
11       Q. All right.  And what was
12   discussed during that -- well, was
13   Rutwik at the meeting?
14       A. I don't believe so, no.
15       Q. And what about hostile work
16   environment was discussed at this team
17   meeting?
18       A. I don't recall the specifics.
19   But I remember a conversation
20   surrounding his behavior towards the
21   various team members.
22       Q. And in that meeting, Bouker
23   shared with the team that he felt
24   Rutwik was creating a hostile work
25   environment?

Page 61

V. VILLETTI

1
2        A. I don't recall.
3        Q. Who on the team mentioned their
4    concern about Rutwik's behavior during
5    this team meeting?
6        A. Jessica, as well as the other
7    girls, the four girls.
8        Q. Did Bouker?
9        A. No.
10       Q. Did Justin?
11       A. No, not to my knowledge.
12       Q. When Bouker called you to tell
13   you about this e-mail, did you tell him
14   that you had, a few days prior, done
15   the same thing?
16       A. I may have.  I don't remember.
17       Q. Before you sent your e-mail to
18   Priscilla, did you speak with Bouker --
19       A. No.
20       Q. -- about your e-mail?
21       A. No.
22       Q. In the last paragraph in
23   Bouker's e-mail, it says he's informed
24   to his direct reports that he has filed
25   a formal complaint, so they are aware



Page 62

V. VILLETTI

1
2  he's advocating on their behalf for a
3  positive work environment.
4      Do you see that?
5      A. Yes.
6      Q. Did Bouker have any direct
7  reports other than the team members
8  that we talked about?
9      A. I don't -- not to my knowledge.
10  I don't know.
11      Q. During the team meeting, did
12  Bouker say to the team all right, I'm
13  going to report this to Priscilla?
14      A. I don't remember.
15      Q. Did you tell the team that you
16  were going to report to Priscilla?
17      A. No.
18      Q. Before sending the e-mail to
19  Priscilla, did you tell anyone that you
20  were going to file a complaint?
21      A. No.
22      Q. Did anyone in human resources
23  approach you about Bouker's complaint?
24      A. I don't remember.  But it's
25  possible that the follow-up meeting I

Page 63

V. VILLETTI

1
2  had with Priscilla discussed that.
3      Q. The second meeting we talked
4  about after your complaint?
5      A. Yes.
6      Q. Do you know if anyone
7  communicated with Rutwik concerning
8  Bouker's complaint?
9      A. I don't know.
10      Q. Do you know if anyone
11  communicated with Justin about Bouker's
12  complaint?
13      A. I don't know.
14      Q. What about Jessica?
15      A. I don't know.
16      MR. GRECH:  Can we mark this
17  as M, please?
18          - - -
19      (Whereupon, Defendant's
20  Exhibit M, an e-mail exchange,
21  was marked for identification.)
22          - - -
23      Q. Ms. Villetti, we are showing you
24  what's been marked as Defendant's
25  Exhibit M.  If you could take a moment

Page 64

V. VILLETTI

1
2  to look at that, please (handing).
3      A. (Witness complied).
4      Q. Ms. Villetti, have you had a
5  chance to look at Exhibit M?
6      A. Yes.
7      Q. Do you recognize it?
8      A. Yes.
9      Q. And what is it?
10      A. It is an e-mail communication
11  regarding the Boston trip between
12  myself and Albert.
13      Q. And this would have been around
14  the time you had a telephone
15  conversation with Albert about Boston?
16      A. Yes.  It appears it was right
17  before and then right after.
18      Q. Okay.  If you could look at page
19  1 of Exhibit M, Albert's March 1st
20  e-mail at 12:04 p.m.
21      Can you see that?
22      A. Yes.
23      Q. From now on, your focus is one
24  hundred percent on teleconferences.
25  Someone else will take over in-person

Page 65

V. VILLETTI

1
2  events.  Clear?
3      Do you see that?
4      A. Yes.
5      Q. Who took over the in-person
6  events after this e-mail communication?
7      A. I don't know.
8      Q. Was there any in-person events
9  held after March 1st but before your
10  separation from Guidepoint?
11      A. I don't recall.
12      Q. And Albert told you that your
13  focus would be 100 percent on
14  teleconferences, correct?
15      A. Yes.
16      Q. And in what way did that make
17  you feel he was taking over your agency
18  over telephone conferences?
19      A. I don't believe he was taking
20  over my agency over teleconferences.
21      Q. Can you look back at your e-mail
22  to Priscilla, second page of that
23  exhibit, first full paragraph, there is
24  a parenthetical on the third line.  Now
25  seemingly any agency overtake



17  (Pages 62 to 65)

Page 66

```
1              V. VILLETTI
2    teleconferences.
3        A. Well, I was primarily referring
4    to -- so if you read the full sentence
5    there, Albert has effectively changed
6    my role, abruptly taken away my
7    leadership over the conferences, and
8    now seemingly any agency over
9    teleconferences.
10       So that's discussing a full
11   range of events that occurred.
12       Q. And by agency over telephone
13   conferences in your e-mail to
14   Priscilla, you mean your leadership or
15   control over teleconferences?
16       A. Sure.
17       Q. Okay.  And back to the e-mail
18   from Albert where he says your focus is
19   one hundred percent on teleconferences,
20   in that statement itself, was there
21   anything in there that led you to
22   believe you would have a deteriorated
23   role concerning teleconferences?
24       A. This was in conjunction with
25   Rutwik's overreach into the
```

Page 67

```
1              V. VILLETTI
2    teleconferences.
3        Q. The statement to Priscilla about
4    you seemingly losing agency over
5    teleconferences, that was meant to
6    reflect Rutwik's resurging that role?
7        A. Yes.  It wasn't just referencing
8    the call and e-mail from Albert, it was
9    referencing the interference from
10   Rutwik.
11       Q. Okay.  And there is at least two
12   e-mails in this exchange with Albert
13   where he sends you nothing but question
14   marks.
15       Do you see that?
16       A. Yes.
17       Q. And Albert was your boss at the
18   time, correct, one of your bosses?
19       A. Albert was my boss's boss.
20       Q. Right.
21       So I would imagine seeing an
22   e-mail like that from Albert would have
23   caused some anxiety, correct?
24       A. Yes.  It's unstable.
25       Q. Right.
```

Page 68

```
1              V. VILLETTI
2        Is there anything in this
3    exchange, other than maybe causing
4    anxiety about seeing this sort of
5    e-mail from your boss's boss, that
6    would have made you think that Albert
7    was acting this way because you are a
8    woman, in this exchange, Exhibit M?
9        A. I don't know.  I haven't seen
10   his exchanges with other women or men.
11       Q. Did you talk to Bouker about his
12   e-mail communications with Albert?
13       A. Did I talk to Bouker --
14       Q. About Bouker's e-mail
15   communications with Albert?
16       A. No.
17       Q. Bouker never said to you, in
18   effect, Albert can be pretty nasty in
19   e-mails or something like that?
20       A. No.
21       Q. This March 1st exchange with
22   Albert, did you speak with Albert again
23   about Boston?
24       A. No.  I wasn't afforded the
25   opportunity to.
```

Page 69

```
1              V. VILLETTI
2        Q. And did you seek out that
3    opportunity?
4        A. I was told that there would be a
5    meeting arranged.
6        Q. This would be a meeting between
7    you and Albert?
8        A. Yes.
9        Q. And who told you that there
10   would be a meeting?
11       A. I believe Albert did.
12       Q. And how did he tell you that?
13       A. On the call.
14       Q. So March 1st, you had both
15   e-mail and telephone communications
16   with Albert?
17       A. Yes.
18       Q. And during one of those
19   telephone communications, Albert told
20   you that, essentially, when you got
21   back to New York, you would have a
22   meeting?
23       A. Yes.
24       Q. And did he give you an idea of
25   when that meeting would occur?
```



Page 70

V. VILLETTI

1
2     A. No.
3     Q. Did he give you a sense of
4  anyone else might be attending that
5  meeting?
6     A. No.
7     Q. And did that meeting ultimately
8  ever occur?
9     A. No.
10     Q. When you returned to New York,
11  did you inquire about having the
12  meeting?
13     A. I may have.
14     Q. And who did you ask?
15     A. I would have asked Daniella
16  likely who was the scheduler.
17     Q. And what response did Daniella
18  give you?
19     A. I don't know.
20     Q. Did you speak with Bouker about
21  your exchange with Albert concerning
22  Boston?
23     A. Yes.
24     Q. And how did you have that
25  communication with Bouker?

Page 71

V. VILLETTI

1
2     A. I had a conversation with him
3  when he was back.
4     Q. When Bouker returned to the
5  office?
6     A. Yes.
7     Q. And when did that occur?
8     A. Sometime after the Boston trip.
9     Q. Anything more specific?
10     A. I don't remember details.
11     Q. And you spoke with Bouker in
12  person?
13     A. Yes.  Yes, I spoke to him in
14  person.
15     Q. And what did you tell Bouker
16  about your exchange with Albert
17  concerning Boston?
18     A. Actually, I also spoke to him by
19  e-mail I believe.
20     Q. Okay.  So you had communications
21  with Bouker about your experiences with
22  Albert concerning the Boston trip,
23  correct?
24     A. Yes.
25     Q. And what did you express to

Page 72

V. VILLETTI

1
2  Bouker?
3     A. That Albert didn't seem to have
4  the context for the trip.
5     Q. As to why your presence was
6  necessary?
7     A. Yes.
8     Q. And in your 11:28 a.m. e-mail in
9  Exhibit M, you attempted to give him
10  that context?
11     A. Yes.
12     Q. And his reply was still from now
13  on your focus is a hundred percent on
14  teleconferences, correct?
15     A. Yes.
16     Q. When you spoke to Bouker about
17  your exchange with Albert, did you
18  express to Bouker any concerns that
19  Albert's conduct reflected gender
20  discrimination?
21     A. Could you --
22     Q. Sure.
23        You and Albert had this e-mail
24  exchange March 1st?
25     A. Yes.

Page 73

V. VILLETTI

1
2     Q. Sometime thereafter, you talked
3  to Bouker about it?
4     A. Yes.
5     Q. When you talked to Bouker about
6  it, did you tell Bouker I think Albert
7  did this to me because I'm a woman or
8  something to that effect?
9     A. I don't recall.
10     Q. Do you have a last name for
11  Daniella?
12     A. No.
13     Q. And she is a scheduler?
14     A. She was an assistant/scheduler.
15     Q. Whose assistant was she?
16     A. I don't know.  I imagine
17  Albert's.
18     Q. Other than Daniella, did you
19  speak with anyone else about having a
20  meeting with Albert?
21     A. I don't remember.
22     Q. Did you -- before you sent the
23  e-mail to Priscilla, did you speak with
24  Priscilla about your exchange with
25  Albert on Boston?



Page 74

V. VILLETTI

1
2      A. Yes.
3      Q. Okay.  When did you speak with
4  Priscilla?
5      A. I spoke with her immediately
6  after I spoke with Albert.
7      Q. And how did you speak with
8  Priscilla?
9      A. On the phone.
10     Q. And what did you tell Priscilla?
11     A. I just told her what had
12  occurred.
13     Q. And what did Priscilla have to
14  say in response?
15     A. That it was not uncommon for
16  Albert to misplace his anger.
17     Q. Do you know what she meant by
18  that?
19     A. I don't.
20     Q. Was it your understanding that
21  Albert was angry at someone other than
22  yourself?
23     A. Yes.  At Bouker.
24     Q. And Albert was, at least in
25  Priscilla's opinion, taking it out on

Page 75

V. VILLETTI

1  you?
2      A. Yes.
3      Q. And why would Albert have been
4  mad at Bouker?
5      A. Because he was skiing.
6      Q. When you were in Boston, where
7  was Bouker?
8      A. Bouker was skiing.
9      Q. Coincidentally with Albert; was
10  that the same ski trip?
11     A. Yes.
12         MR. GRECH:  N, please.
13             -  -  -
14         (Whereupon, Defendant's
15         Exhibit N, an e-mail exchange,
16         was marked for identification.)
17             -  -  -
18     Q. Ms. Villetti, we are showing you
19  what's been marked as Defendant's N.
20  If you could take a moment to look at
21  that, please (handing).
22     A. (Witness complied).
23     Q. Ms. Villetti, have you ever seen
24  Defendant's Exhibit N before?

Page 76

V. VILLETTI

1
2      A. Yes.
3      Q. You have, okay.
4         And under what circumstances?
5      A. My attorney showed me a copy.
6      Q. Prior to your attorney showing
7  you a copy, had you ever seen the
8  e-mail exchange depicted in Exhibit N
9  before?
10     A. No.
11     Q. Were you aware that that e-mail
12  exchange had occurred?
13     A. No.
14     Q. This being your second time
15  seeing it, what do you understand
16  Exhibit N to be?
17     A. Jessica seems to have some issue
18  with me and she is discussing that with
19  Bouker.
20     Q. Was Jessica a supervisor of
21  yours or were you considered on the
22  same level?
23     A. The same level.
24     Q. And Jessica's concern here to
25  Bouker is first about reportedly your

Page 77

V. VILLETTI

1
2  absence from the office?
3      A. Appears so.
4      Q. And she said I'm sure you have
5  also noticed, to Bouker, that she's
6  barely done any work too.
7         Would Jessica have had any way
8  to review your work?
9      A. No.
10     Q. Would Bouker?
11     A. Yes.
12     Q. Jessica continues:  Ms. Villetti
13  has also taken upon herself to plan to
14  attend just about any and all
15  healthcare events.  And this e-mail was
16  March 1st.
17         MR. LICHTEN:  Is it
18  March 1st?
19         MR. GRECH:  I'm sorry.
20  Forgive me.  February 28th.
21         Thank you, Stuart.
22     Q. This statement is in an e-mail
23  dated February 28th.
24         Either when you first saw
25  Exhibit N or now, which healthcare



Page 78

V. VILLETTI

1
2 events did you think Jessica was
3 referring to?
4    A. I don't know.
5    Q. Was the Boston trip coming up
6 shortly after this February 28th
7 e-mail?
8    A. Yes.
9    Q. And in the e-mail, Jessica says
10 she just left at 3:00 p.m. today to
11 take a flight to Boston for this one
12 lunch meeting at 12:00 p.m. tomorrow.
13    You see that?
14    A. Yes.
15    Q. Was this lunch meeting in Boston
16 the same subject of your e-mail
17 exchange with Albert?
18    A. Yes.
19    Q. Who is Nick Smith?
20    A. He would have been a Guidepoint
21 employee in Boston.
22    Q. Guidepoint has a Boston office
23 or had a Boston office in
24 February 2018?
25    A. I believe so.

Page 79

V. VILLETTI

1
2    Q. What other Guidepoint employees
3 were at the Boston meeting?
4    A. I don't remember.
5    Q. Was it just you?
6    A. No.  There was one or two other
7 people.
8    Q. And you don't remember who they
9 were?
10    A. No.
11    Q. Were those one to two others
12 from the New York office or the Boston
13 office?
14    A. The Boston office.
15    Q. And Jessica continues, just to
16 keep Bouker in the loop, Ms. Villetti
17 completely demoralized Justin in front
18 of the whole team.  It was uncalled for
19 and rude.  And I think it really hurt
20 Justin.
21    Do you see that?
22    A. Yes.
23    Q. Is that Justin Ruiz?
24    A. Yes.
25    Q. Do you know what Jessica is

Page 80

V. VILLETTI

1
2 referring to there?
3    A. No idea.
4    Q. Have you ever had an exchange
5 with Justin where you felt you were
6 rude to him?
7    A. Justin is one of my best
8 friends.
9    Q. Still?
10    A. Yes.
11    Q. Did Justin ever come to you and
12 say you were rude and demoralized him
13 in front of Guidepoint employees?
14    A. Never.
15    Q. You maintain a friendship with
16 Justin today?
17    A. Yes.
18    Q. When was the last time you spoke
19 to Justin?
20    A. He recently got engaged, so I
21 congratulated him for that.
22    Q. And when did you congratulate
23 him?
24    A. Sometime in the last couple of
25 weeks.

Page 81

V. VILLETTI

1
2    Q. And you have maintained
3 communications with Justin since your
4 separation from Guidepoint?
5    A. Periodically, yes.
6    Q. And Justin is still with
7 Guidepoint?
8    A. I believe so.
9    Q. In what capacity?
10    A. He is creating content.
11    Q. Healthcare content?
12    A. No.
13    Q. Do you know what kind of
14 content?
15    A. When I was there, he covered a
16 variety of sectors; consumer, tech,
17 gaming, other areas.
18    Q. And Bouker replies to this
19 e-mail from Jessica saying thanks,
20 disappointed, but not surprised.
21    Do you see that?
22    A. Yes.
23    Q. Before February 28th of 2018,
24 had Bouker ever brought to you concerns
25 that employees had thought you had been



Page 82

V. VILLETTI

1
2  rude or demoralizing to them?
3      A. I don't recall.
4      Q. Did you have conversations with
5  anyone at Guidepoint about you being
6  rude or demoralizing to other
7  employees?
8      A. I don't recall having any
9  conversations with anyone about that.
10     Q. Do you recall having
11 conversations in which you were rude or
12 demoralizing to an employee?
13     A. I can't think of specific
14 instances.  But I know that if I had
15 done such a thing, I would have
16 apologized for it.
17     Q. And Bouker says that he will
18 deal with it.
19     Did Bouker bring this concern of
20 Jessica's to your attention?
21     A. No.
22     Q. And Jessica's reply is can I
23 suggest we slap her with a PIP and
24 please take away her privilege to
25 travel, at least temporarily, until she

Page 83

V. VILLETTI

1
2  gets her performance up.
3      Do you see that?
4      A. Yes.
5      Q. Ms. Villetti, do you know what a
6  PIP is?
7      A. No.
8      Q. Have you ever heard of a
9  performance improvement plan?
10     A. Yes.
11     Q. Okay.  Do they do performance
12 improvement plans at Guidepoint?
13     A. Not to my knowledge.
14     Q. Were you ever placed on a
15 performance improvement plan at
16 Guidepoint?
17     A. No.
18     Q. Was there ever a threat to place
19 you on a performance improvement plan
20 at Guidepoint?
21     A. No.
22     Q. Would Jessica have the authority
23 to put you on a performance improvement
24 plan?
25     A. No.

Page 84

V. VILLETTI

1
2      Q. Would Bouker?
3      A. Yes.
4      Q. Would Jessica have had the
5  authority to take away your travel
6  privileges?
7      A. No.
8      Q. Would Bouker?
9      A. Yes.
10     Q. And here Jessica's condition is
11 until you get your performance up.
12     Do you see that?
13     A. Yes.
14     Q. How was your performance in late
15 February, early March of 2018?
16     A. It was -- I was performing well.
17     Q. And Bouker's reply is how do we
18 document this and do the right way.
19     Do you see that?
20     A. Yes.
21     Q. And it appears --
22     MR. LICHTEN:  That's not a
23 reply to --
24     MR. GRECH:  I'm sorry.  Fair
25 enough.

Page 85

V. VILLETTI

1
2      Q. The next e-mail that appears on
3  this Exhibit N is an e-mail from Bouker
4  to Priscilla.
5      Do you see that?
6      A. Yes.
7      Q. And here it's forwarding the
8  prior exchange?
9      A. Yes.
10     Q. And this is Bouker asking
11 Priscilla how do we document this and
12 do the right way.
13     Do you see that?
14     A. Yes.
15     Q. Did you ever have any
16 conversations with Priscilla about
17 Jessica's concerns?
18     A. No.
19     Q. Did you ever have any
20 conversations with Priscilla about you
21 being placed on a performance
22 improvement plan?
23     A. No.
24     Q. Did you ever have any
25 conversations with Priscilla about your



Page 86

V. VILLETTI

1   performance?
2   A. No.
3   Q. That you are aware of, were any
4   of Jessica's concerns ever documented
5   as Bouker requested?
6   A. I don't know.
7   Q. And this is the same Jessica
8   that you felt was mistreated based upon
9   her gender, correct?
10  A. Yes.
11  MR. GRECH:  O.
12          -  -  -
13      (Whereupon, Defendant's
14      Exhibit O, an e-mail exchange,
15      was marked for identification.)
16          -  -  -
17      (Whereupon, a recess was
18      taken at this time.)
19          -  -  -
20  Q. Ms. Villetti, can you just look
21  back at Exhibit M, please, the e-mail
22  exchange with Albert?
23  A. Yes.
24  Q. Page 2 in that exchange,

Page 87

V. VILLETTI

1   Bates-stamped page 16, there is an
2   e-mail from Albert to you and Priscilla
3   dated March 1st at 11:11 a.m.
4       You see that?
5   A. Yes.
6   Q. And Albert writes that -- I see
7   he misspelled your name there --
8   Valentina, Valentia, will be finishing
9   up meetings in Boston and will be in
10  the New York office tomorrow to work on
11  teleconferences.  The goal is 1.5 to 2
12  teleconferences per week in healthcare.
13      Do you see that?
14  A. Yes.
15  Q. Did you meet that goal when you
16  returned from Boston?
17  A. Yes.
18  Q. Did you understand that to be
19  one of your performance metrics?
20  A. At that moment, yes.
21  Q. Okay.  And we had talked before
22  about your difficulties in getting
23  clarification on your performance
24  metrics, right?

Page 88

V. VILLETTI

1   A. Yes.
2   Q. What other performance metrics
3   were you given?
4   A. I wasn't given any.
5   Q. And when we were talking about
6   Exhibit N, which was Jessica's e-mail,
7   right?
8   A. Yes.
9   Q. And she had said we have to get
10  Valentia's performance up.
11      Do you recall that?
12  A. Yes.
13  Q. And you had said your
14  performance was good, right?
15  A. Yes.
16  Q. And how were you measuring your
17  performance at that point?
18  A. How was I measuring my own
19  performance?
20  Q. Correct.  To come to the opinion
21  that it was good.
22  A. The numbers spoke for
23  themselves.
24  Q. And what numbers in particular?

Page 89

V. VILLETTI

1   A. The number of attendees I had on
2   my teleconferences and the feedback I
3   was getting from the teleconferences.
4   Q. When Albert said the goal is 1.5
5   to 2 teleconferences per week in
6   healthcare, was that meant to measure
7   your performance or the entire team?
8   A. I don't know.  I took it to mean
9   mine.
10  Q. And how many teleconferences
11  were you conducting per week before the
12  Boston trip?
13  A. I would say it averaged to
14  around there.
15  Q. 1.5 to 2?
16  A. Per week, yeah.
17  Q. Ms. Villetti, I'm going to show
18  you what's been marked as Defendant's
19  Exhibit O (handing).
20      Have you had a chance to look at
21  Defendant's O -- please take a chance
22  to look at -- please take an
23  opportunity to look at Defendant's O.
24  A. Yes.



Page 90

V. VILLETTI
1
2    Q. All right. Do you recognize it?
3    A. No.
4    Q. Have you ever seen it before?
5    A. No.
6    Q. What does it appear to be?
7    A. It appears to be a letter from
8 Jessica complaining about me on the day
9 I was fired.
10   Q. And this is the same Jessica
11 that had the e-mail we talked about
12 before?
13   A. Yes.
14   Q. And the same Jessica you felt
15 that was mistreated because of her
16 gender?
17   A. Yes. Those two things are not
18 related.
19   Q. And she wrote an e-mail to
20 Priscilla on March 19th, which was the
21 date of your termination, correct?
22   A. Yes.
23   Q. And the e-mail reads I cannot
24 work with Valentia anymore. She leaves
25 early, comes in late practically every

Page 91

V. VILLETTI
1
2 day. She has every excuse in the book
3 for why she's not doing her work. She
4 creates so much more drama among the
5 team. She is just so awful to work
6 with.
7    I am begging you to please let
8 this woman go. I am practically doing
9 all of her work as it is. If she
10 doesn't leave soon, I can guarantee a
11 lot of my team will quit.
12   Do you at least see where it
13 says that there?
14   A. Yes.
15   Q. Okay. Had Jessica ever raised
16 with you her concerns about your
17 leaving early?
18   A. Jessica was not even working
19 primarily in the New York office.
20   Q. And where --
21   A. So I interacted with her maybe
22 once a week, twice a week.
23   Q. And how would you have those
24 interactions? Were they in-person in
25 the office?

Page 92

V. VILLETTI
1
2    A. Not really.
3    Q. And how --
4    A. I had one in-person meeting with
5 her a week when she was in the office
6 with the team.
7    Q. Did Jessica have any authority
8 to set your schedule?
9    A. Absolutely not.
10   Q. Who did?
11   A. Bouker.
12   Q. And Albert?
13   A. By extension, yes.
14   Q. Anybody else?
15   A. Not to my knowledge.
16   Q. Did Jessica ever raise any
17 concerns with you about you're not
18 doing your work?
19   A. After I returned from Boston,
20 there was quite a bit of chaos in the
21 team. She was bickering with me as
22 well as with everyone else. And I was
23 just told that she was quote, unquote
24 freaking out.
25   Q. And who else was Jessica having

Page 93

V. VILLETTI
1
2 these exchanges with other than
3 yourself?
4    A. She was freaking out at everyone
5 on the team.
6    Q. Everyone on the team?
7    A. Yes.
8    Q. And who coined the phrase
9 freaking out for Jessica?
10   A. I don't remember who initiated
11 it. But I heard that phrase several
12 times.
13   Q. And what was your understanding
14 as to why Jessica was freaking out?
15   A. I was told that she had been
16 subject to Albert's wrath before. And
17 that when Albert would zoom on a group,
18 she would freak out.
19   Q. Did Jessica explain to you how
20 she had been subject to Albert's wrath
21 before?
22   A. I don't recall.
23   Q. Who told you that Jessica had
24 been subject to Albert's wrath before?
25   A. It came up in conversations



1              V. VILLETTI
2    around the office.
3        Q. With whom?
4        A. I can't tell you.
5        Q. What were the circumstances in
6    which Jessica had previously
7    experienced Albert's wrath?
8        A. I don't know the specifics.
9        Q. Did you understand Jessica's
10   concern to be since Albert got mad at
11   you in Boston that he was then going to
12   take it out on the team?
13       A. Yes.  Albert was not just mad at
14   me.  He was also mad at Bouker.
15       Q. For catching him skiing?
16       A. Yes.
17       Q. So he was mad at the two heads
18   of the team?
19       A. Appears so.
20       Q. And there was freaking out among
21   the team members that there would be
22   fallout from that?
23       A. One would imagine.
24       Q. Did any of those conversations
25   where there was team chaos after Boston

1              V. VILLETTI
2    focus specifically on your work?
3        A. No.  There was a team meeting
4    where we discussed everyone's role and
5    how the expectation was for everyone to
6    produce more.
7        Q. And is this the same team
8    meeting when we were talking about your
9    e-mail with Albert?
10       A. Sorry?
11       Q. Correct me if I'm wrong.  After
12   -- when we were talking about the
13   e-mail exchange with Albert in
14   Boston --
15       A. Yes.
16       Q. -- you said you had
17   conversations with team members after
18   that, correct?
19       A. Yes.
20       Q. Is this the same team meeting?
21       A. Possibly.
22       Q. Had you ever been accused of
23   creating drama among the team?
24       A. No.
25       Q. Were you aware that Jessica

1              V. VILLETTI
2    eventually asked Priscilla to fire you?
3        A. No.
4        Q. Did Priscilla ever bring these
5    concerns of Jessica to your attention?
6        A. I don't recall.
7        Q. And you see Jessica's statement,
8    I'm practically doing all of her work
9    as it is?
10       You at least see that statement?
11       A. Yes.
12       Q. Okay.  Were there instances in
13   which Jessica was doing your work?
14       A. No.  Jessica could not do my
15   work.
16       Q. And why not?
17       A. She is not a healthcare
18   specialist.
19       Q. And what role did Jessica fill?
20       A. She was a logistics and events
21   manager.
22       Q. Was it ever brought to your
23   attention that anyone else other than
24   Jessica was doing your work?
25       A. No.

1              V. VILLETTI
2        Q. And you see here where Jessica
3    says if she, meaning you, doesn't leave
4    soon, Jessica can guarantee a lot of my
5    team will quit.
6        Who was part of Jessica's team
7    at that point?
8        A. I assume she is referencing the
9    four girls who technically reported to
10   Bouker.
11       Q. Had any of those girls come to
12   you with complaints about your conduct?
13       A. No.
14       Q. And who were these four girls?
15       A. There was Sarah, Amrutha, Gabby,
16   and Kendall.  None of whom are still
17   there.
18       MR. LICHTEN:  Are they older
19   than 18?
20       THE WITNESS:  Yes.
21       MR. LICHTEN:  So then can we
22   refer to them as women?
23       MR. GRECH:  That's fair.
24       Q. The four women on Jessica's
25   team?



Page 98

```
                 V. VILLETTI
1          A. Yes.
2          Q. Other than the women themselves,
3   had anyone brought a complaint on their
4   behalf to you?
5          A. Not that I recall, no.
6          Q. Jessica said they would quit.
7   And you said they are not there
8   anymore.
9          So why are they not there
10  anymore?
11         A. They have either quit or been
12  fired.
13         Q. Okay.  Sarah, what happened to
14  Sarah?
15         A. I don't know the specifics.
16         Q. Did she quit or was she fired?
17         A. I believe she quit.
18         Q. Do you know why?
19         A. No.
20         Q. Amrutha?
21         A. I don't know.
22         Q. Did she quit or was she fired?
23         A. Don't know.
24         Q. Gabby?
25
```

Page 99

```
                 V. VILLETTI
1          A. Don't know.
2          Q. But not there anymore?
3          A. No.
4          Q. You don't know whether Gabby
5   quit or was terminated?
6          A. No.
7          Q. What about Kendall?
8          A. Don't know.  She is not there.
9          Q. Is Jessica still there?
10         A. No.
11         Q. Is there an events team that you
12  are aware of?
13         A. Yes.
14         Q. Do you recall when we were
15  talking about your e-mail complaint to
16  Priscilla and you had a meeting with
17  her that day?
18         A. Yes.
19         Q. And you had a second meeting
20  with her that you remember?
21         A. Yes.
22         Q. Do you recall when that second
23  meeting was?
24         A. No.
25
```

Page 100

```
                 V. VILLETTI
1          Q. Do you recall what you talked
2   about during that second meeting with
3   Priscilla?
4          A. No.
5          Q. Did you talk about this
6   complaint from Jessica?
7          A. Not to my recollection.
8          Q. Did you talk about work
9   distribution within your team?
10         A. I don't recall the specifics of
11  the conversation.
12         Q. Did you talk about concerns over
13  your attendance?
14         A. Not that I recall.
15         Q. Did you talk about any concerns
16  about you're creating drama in the
17  team?
18         A. Not that I recall.
19         Q. Did Priscilla tell you during
20  this meeting that there was a concern
21  that team members were going to quit?
22         A. Not that I recall.
23         MR. GRECH:  P, Exhibit P.
24              -   -   -
25
```

Page 101

```
                 V. VILLETTI
1          (Whereupon, Defendant's
2   Exhibit P, plaintiff's October
3   27, 2018 letter was marked for
4   identification.)
5              -   -   -
6          Q. Ms. Villetti, we are showing you
7   what's been marked as Defendant's
8   Exhibit P, as in Peter, for the
9   purposes of this deposition.  You can
10  just take an opportunity to look at
11  that (handing).
12         A. Yes.
13         Q. Have you ever seen Exhibit P
14  before?
15         A. Yes.
16         Q. And when did you see Exhibit P
17  before?
18         A. Sometime after it was filed.
19         Q. Okay.  And this was a letter
20  sent by Mr. Lichten to the EEOC?
21         A. Appears to be, yes.
22         Q. And you see the reference in
23  there, first paragraph, second
24  sentence, to a companion charging
25
```



Page 102

```
 1              V. VILLETTI
 2   parties case?
 3       A. Uh-huh.
 4       Q. Do you know who that companion
 5   party is?
 6       A. That would be Dr. Jibril.
 7       Q. Okay.  And at what point did you
 8   and Dr. Jibril decide you would be
 9   companion parties in this litigation?
10       A. Sometime after I filed.
11       Q. After you filed what?
12       A. My complaint with the EEOC.
13       Q. Do you know whether your counsel
14   received a case file from the EEOC in
15   response to this request?
16       A. I don't know.
17          MR. GRECH:  To the extent it
18       hasn't been produced, we are
19       going to follow up with a request
20       in writing for the EEOC case
21       file.
22          MR. LICHTEN:  Okay.
23       Anything I got I turned over.
24          MR. GRECH:  Okay.
25          MR. LICHTEN:  I don't know
```

Page 103

```
 1              V. VILLETTI
 2   if I got one.
 3          MR. GRECH:  All right.  We
 4       will follow up in writing.
 5       Q.
 6              -  -  -
 7       (Whereupon, Defendant's
 8       Exhibit Q, a 1040 form, was
 9       marked for identification.)
10              -  -  -
11       Q. Ms. Villetti, we are showing you
12   what's been marked as Defendant's
13   Exhibit Q for this deposition
14   (handing).
15          Do you recognize that document?
16       A. Yes.
17       Q. What is it?
18       A. It is my 2018 tax filing.
19       Q. And when were you separated from
20   Guidepoint?
21       A. March of 2018.
22       Q. Did Guidepoint provide you with
23   a W-2 form for the time that you worked
24   for them in 2018?
25       A. Yes.
```

Page 104

```
 1              V. VILLETTI
 2       Q. And here you identify your
 3   occupation as an entrepreneur; is that
 4   correct?
 5       A. Yes.
 6       Q. In what respects did you operate
 7   as an entrepreneur in 2018?
 8       A. I was working on the company
 9   that I discussed before producing
10   protein bars.
11       Q. That's KIOKO?
12       A. Yes.
13       Q. Did you serve as an entrepreneur
14   in any other respects in 2018 or than
15   of KIOKO?
16       A. No.
17       Q. And if, Ms. Villetti, you could
18   look at the last page of Exhibit Q.
19   It's a 1099-G form.
20          Do you see that?
21       A. Yes.
22       Q. Does this reflect your
23   unemployment compensation?
24       A. Yes.
25       Q. And that amount was $10,005.
```

Page 105

```
 1              V. VILLETTI
 2       Do you see that?
 3       A. Yes.
 4       Q. Is that an accurate reflection
 5   of the unemployment compensation you
 6   received in 2018?
 7       A. Yes.
 8       Q. And was that compensation given
 9   to you as a result of your termination
10   from Guidepoint?
11       A. Yes.
12       Q. And, Ms. Villetti, if you could
13   turn to the second page of the 1040
14   form, the main form?
15       A. Yes.
16       Q. Line Item 1, where it asks you
17   to list your wages, salaries, tips, et
18   cetera --
19       A. Yes.
20       Q. -- on the W-2 Form.
21          Can you see that amount?
22       A. Yes.
23       Q. $56,359?
24       A. Yes.
25       Q. And where did you acquire those
```

V. VILLETTI

1
2   wages, salaries, and tips in 2018?
3       A. Guidepoint.
4       Q. When you submitted your 2018 tax
5   return, did it have a W-2 from
6   Guidepoint attached to it?
7       A. Yes.
8       Q. Did it have any other 1099s in
9   addition to the 1099-G from New York
10  State Department of Labor Unemployment?
11      A. No.
12      Q. Ms. Villetti, if you could look
13  at Form 1040, Schedule 1. It's the
14  third page of Exhibit Q.
15      A. Yes.
16      Q. Line Item 17, additional income.
17      You see that?
18      A. Yes.
19      Q. It's showing a loss of $19,835.
20      You see that?
21      A. Yes.
22      Q. And this is for rental real
23  estate, royalties, partnerships,
24  S-corporations, trusts, et cetera?
25      A. Yes.

V. VILLETTI

1
2       Q. Can you explain the loss of
3   $19,835 you experienced in 2009 -- 2018
4   in that category?
5       A. KIOKO is an S-corporation.
6   Those are operating losses.
7       Q. That you claim on your personal
8   tax returns?
9       A. Yes.
10      Q. And do you see in Line Item 17,
11  they request any attachment of Schedule
12  E?
13      A. Yes.
14      Q. Did your 2018 tax returns -- was
15  it accompanied by a Schedule E?
16      A. Yes.
17          MR. GRECH: I'm going to
18      call for production of the
19      Schedule E.
20      Q. The $19,835 loss, that was
21  attributed solely to KIOKO as an
22  S-corporation?
23      A. KIOKO is the product. Yes. The
24  corporation is called Kenko.
25      Q. I'm sorry.

V. VILLETTI

1
2       The corporation is called what?
3       A. Kenko, K-E-N-K-O.
4       Q. And KIOKO is the name of the
5   product?
6       A. Yes.
7       Q. That's the protein bar?
8       A. Yes.
9       Q. So it's Kenko as the
10  S-corporation?
11      A. Yes.
12      Q. And what is your status with
13  Kenko?
14      A. I'm the CEO.
15      Q. Okay. The 19,835 loss, that's
16  attributable solely to the Kenko
17  operating losses, correct?
18      A. Yes.
19      Q. There are no rental real estate
20  associated with that?
21      A. No.
22      Q. Royalties?
23      A. No.
24      Q. Partnerships?
25      A. No.

V. VILLETTI

1
2       Q. Trusts?
3       A. No.
4       Q. And you still work as the CEO of
5   Kenko today?
6       A. Yes.
7       Q. And have there been any changes
8   to your compensation as CEO of Kenko
9   since our last meeting?
10      A. No.
11      Q. Kenko is still not profitable?
12      A. No.
13      Q. Are there any other officers of
14  Kenko?
15      A. Yes. There is a CFO and a COO.
16      Q. And last time we had some
17  concern about the other founders of
18  Kenko, correct?
19      A. Yes.
20      Q. Are those other founders the
21  other officers?
22      A. One of them is.
23          MR. GRECH: To the extent
24      that there are confidentiality
25      concerns, we are going to respect



Page 110

V. VILLETTI

1  that. And we are going to ask
2  for an identification in writing
3  subject to confidentiality, as
4  the court directed.
5       We will follow up in writing
6  with a request for the
7  identification of the officers of
8  Kenko.
9       THE WITNESS: Yes.
10      Q. Does Kenko have any other
11  employees?
12      A. No.
13      Q. Does Kenko have an IT
14  department?
15      A. No.
16      Q. Does it sell its product on a
17  website?
18      A. Yes. It's on Amazon Prime.
19      Q. How is the product manufactured?
20      A. There is a packaging -- there is
21  a co-packer in Los Angeles.
22      Q. And Kenko -- did Kenko make
23  sales of the KIOKO bars in 2018?
24      A. Yes.

Page 111

V. VILLETTI

1       Q. And do you have a sense of the
2  numbers, units sold?
3       A. Not off the top of my head.
4       Q. How long has Kenko been in
5  operation?
6       A. Kenko was incorporated in 2016.
7       Q. Does Kenko have any business
8  other than the sale of the KIOKO bars?
9       A. Not currently, no.
10      Q. Did it at any point?
11      A. No.
12      Q. Is there plans for it to have
13  other businesses but the KIOKO bars?
14      A. Yes.
15      Q. And what are those other
16  businesses?
17      A. Other nutritional products.
18      Q. And how far away is Kenko from
19  offering these other nutritional
20  products in terms of time?
21      A. We are still in R&D. I couldn't
22  say.
23      Q. Would those also be available on
24  Amazon Prime?

Page 112

V. VILLETTI

1       A. Possibly. Or it will be
2  directly on our own website.
3       Q. So you suffered $19,835 in
4  operating losses attributed to Kenko in
5  2018?
6       A. Yes.
7       Q. And those -- and what were the
8  makeup of those losses?
9       A. There is quite a bit of
10  promotional and sampling and R&D in the
11  early stages of a food company.
12      Q. And would the 19,835 reflect
13  your expenses associated with those?
14      A. Yes.
15      Q. Promotions and sampling?
16      A. It would be sampling, R&D,
17  marketing.
18      Q. Did Kenko file its own tax
19  return in 2018?
20      A. Yes.
21      Q. Does Dr. Jibril have any
22  affiliation with Kenko?
23      A. No.
24      MR. GRECH: I'm going to

Page 113

V. VILLETTI

1  take a five-minute break.
2       - - -
3       (Whereupon, a recess was
4  taken.)
5       - - -
6       MR. GRECH: And with that,
7  Ms. Villetti, we are going to
8  conclude your deposition. And I
9  just want to thank you for your
10  time for appearing and your
11  answering our questions.
12      THE WITNESS: Thank you.
13      (Time noted: 4:48 p.m.)

Page 114

1
2       INSTRUCTIONS TO WITNESS
3
4       Please read your deposition over
5 carefully and make any necessary corrections.
6 You should state the reason in the appropriate
7 space on the errata sheet for any corrections
8 that are made.
9       After doing so, please sign the
10 errata sheet and date it.
11       You are signing same subject to the
12 changes you have noted on the errata sheet,
13 which will be attached to your deposition.
14       It is imperative that you return the
15 original errata sheet to the deposing attorney
16 within thirty (30) days of receipt of the
17 deposition transcript by you.  If you fail to
18 do so, the deposition transcript may be deemed
19 to be accurate and may be used in court.
20
21
22
23
24
25

Page 116

1
2    A C K N O W L E D G E M E N T
3 STATE OF NEW YORK)
4        :SS
5 COUNTY OF _____)
6    I, VALENTIA VILLETTI, hereby certify that I
7 have read the transcript of my testimony taken
8 under oath on NOVEMBER 14, 2019, that the
9 transcript is a true, complete and correct
10 record of what was asked, answered and said
11 during my testimony under oath, and that the
12 answers on the record as given by me are true
13 and correct, except for the corrections or
14 changes in form or substance, if any, noted in
15 the attached Errata Sheet.
16
17 _____
18 VALENTIA VILLETTI
19
20 Signed and subscribed to
21 before me, this _____ day
22 of _____, _____.
23
24 _____
25 Notary Public

Page 115

1
2      - - - - - -
       E R R A T A
3      - - - - - -
4 PAGE  LINE  CHANGE
5 _____ ____ _____
6 _____ ____ _____
7 _____ ____ _____
8 _____ ____ _____
9 _____ ____ _____
10 _____ ____ _____
11 _____ ____ _____
12 _____ ____ _____
13 _____ ____ _____
14 _____ ____ _____
15 _____ ____ _____
16 _____ ____ _____
17 _____ ____ _____
18 _____ ____ _____
19 _____ ____ _____
20 _____ ____ _____
21 _____ ____ _____
22 _____ ____ _____
23 _____ ____ _____
24 _____ ____ _____
25

Page 117

1
2    I N D E X   O F   W I T N E S S E S
3 WITNESS:  VALENTIA VILLETTI
4 EXAMINATION BY      PAGE
5 MR. GRECH       4
6
7    I N D E X   O F   E X H I B I T S
8 EXHIBIT    DESCRIPTION    PAGE
9 H      EMPLOYEE AGREEMENT  6
   I      EMPLOYMENT    11
10      POLICIES
   J      RECEIPT FOR    11
11      EMPLOYEE HANDBOOK
   K      E-MAIL EXCHANGE   22
   L      E-MAIL EXCHANGE   53
12    M      E-MAIL EXCHANGE   63
   N      E-MAIL EXCHANGE   75
13    O      E-MAIL EXCHANGE   86
   P      PLAINTIFF'S    101
14      OCTOBER 27, 2018
15      LETTER
   Q      1040 FORM    103
16
17
     I N D E X   O F   R E Q U E S T S
18
   DESCRIPTION      PAGE
19
   ANY WRITTEN COMMUNIQUÉ FROM    57
20 PLAINTIFF TO BOUKER COMPLAINING
   ABOUT HOSTILE WORK ENVIRONMENT
21 CREATED BY RUTWIK
   EEOC CASE FILE    102
22 SCHEDULE E ATTACHMENT    107
   IDENTIFICATION OF THE OFFICERS OF   110
23 KENKO IN WRITING SUBJECT TO
   CONFIDENTIALITY
24
25



Page 118

```
1
2          C E R T I F I C A T E
3      I, LEAH MILLER, a shorthand reporter and
4   Notary Public within and for the State of
5   New York, do hereby certify:
6      That the Witness(es) whose testimony is
7   hereinbefore set forth was duly sworn by me,
8   and the foregoing transcript is a true record
9   of the testimony given by such Witness(es).
10     I further certify that I am not related to
11  any of the parties to this action by blood or
12  marriage, and that I am in no way interested
13  in the outcome of this matter.
14
15
16
17
18
19
20
21
22          Leah Miller, a Court
            Reporter and Notary Public
23
24
25
```

Page 119

```
1
2          LAWYER'S NOTES
3   PAGE/LINE  NOTE
4   _____   _____
5   _____   _____
6   _____   _____
7   _____   _____
8   _____   _____
9   _____   _____
10  _____   _____
11  _____   _____
12  _____   _____
13  _____   _____
14  _____   _____
15  _____   _____
16  _____   _____
17  _____   _____
18  _____   _____
19  _____   _____
20  _____   _____
21  _____   _____
22  _____   _____
23  _____   _____
24  _____   _____
25  _____   _____
```



**A**

able 35:4
above-entitled 1:17
abruptly 39:17
  40:17 66:6
absence 34:8 77:2
absences 19:4,8,12
  28:8,12,16,18
absent 27:21
Absolutely 92:9
abusive 36:14,24
  37:15,20 38:2,18
accepted 44:7
access 58:11
accommodate 6:7
accompanied
  107:15
accurate 105:4
  114:19
accused 95:22
acknowledgement
  13:2
acknowledgements
  35:17
acquire 105:25
acting 68:7
action 1:18 5:3
  118:11
actions 55:14,22
addition 106:9
additional 106:16
address 4:12,23
administer 3:16
advocating 62:2
affiliation 112:23
afforded 68:24
afternoon 4:16,17
agency 39:20 65:17
  65:20,25 66:8,12
  67:4
aggression 36:14
  38:11
aggressive 36:22
  38:17,21
AGREED 3:4,9,13

agreed-upon 33:24
agreement 6:21
  7:15,17,21,25
  10:5,9 34:2 117:9
Albert 7:22 9:12
  19:11 20:4,11
  32:12 35:24 36:4
  36:7 37:15,21
  38:10,13 39:6,16
  40:17 43:17,19
  48:10,14 56:12,17
  64:12,15 65:12
  66:5,18 67:8,12
  67:17,19,22 68:6
  68:12,15,18,22,22
  69:7,11,16,19
  70:21 71:16,22
  72:3,17,23 73:6
  73:20,25 74:6,16
  74:21,24 75:4,10
  78:17 86:23 87:3
  87:7 89:5 92:12
  93:17 94:10,13
  95:9,13
Albert's 37:25
  42:19 55:22 64:19
  72:19 73:17 93:16
  93:20,24 94:7
allegations 9:21
  15:14
allowed 39:7,9
Amazon 110:19
  111:25
Americas 2:16
amicable 50:13
amount 33:24
  104:25 105:21
Amrutha 97:15
  98:21
Angeles 110:22
anger 74:16
angry 74:21
animus 10:20
answer 6:9 56:2
answered 116:10
answering 113:12

answers 116:12
anxiety 36:16 67:23
  68:4
Anybody 92:14
anymore 39:8
  90:24 98:9,11
  99:3
apart 22:15 41:16
apologized 82:16
appear 56:14 90:6
appearing 26:5
  113:11
appears 12:12
  54:24 64:16 77:3
  84:21 85:2 90:7
  94:19 101:22
apply 4:20
appreciate 50:10
approach 62:23
appropriate 114:6
approval 42:20,24
  43:2
approved 40:25
areas 81:17
Arguably 37:17
arranged 69:5
arrangement 39:13
Article 8:2,9,18
Ashlee 17:4 46:19
  46:21 47:7
Ashlee's 46:25
  47:12
asked 19:20 22:17
  33:2 70:15 96:2
  116:10
asking 85:10
asks 51:10 105:16
assistant 73:15
assistant/scheduler
  73:14
associate 2:22
  34:18 49:12 50:2
  50:3,7
associated 108:20
  112:14
assume 34:10 97:8

attached 106:6
  114:13 116:15
attachment 107:11
  117:22
attempted 72:9
attempting 26:22
attend 77:14
attendance 100:14
attendees 89:2
attending 70:4
attention 24:18,25
  50:21 82:20 96:5
  96:23
attorney 3:20 76:5
  76:6 114:15
attorneys 2:4,10,16
  3:5
attributable 108:16
attributed 107:21
  112:5
at-will 13:8
authority 83:22
  84:5 92:7
authorized 3:15
  19:24
available 16:14
  111:24
Avenue 2:4,16
averaged 89:14
aware 8:5,11,19
  13:16 14:21 15:3
  15:8,11 21:5
  54:10 58:6,10
  61:25 76:11 86:4
  95:25 99:13
awful 91:5
a.m 24:2 72:8 87:4

**B**

B 117:7
back 14:9 17:7
  19:25 20:14 51:3
  65:21 66:17 69:21
  71:3 86:22
bar 108:7
barely 77:6

barred 39:21
bars 104:10 110:24
  111:9,14
based 9:23 28:23
  33:11,17,23 35:9
  55:22 86:9
Bates-stamped
  87:2
Battery 1:11 2:10
begging 91:7
behalf 7:21 10:5
  62:2 98:5
behaving 27:6,9
behavior 14:23
  16:3 17:14,17
  53:23 57:15 60:20
  61:4
belief 18:8
believe 14:19 19:2
  30:25 40:6 48:10
  49:7 52:11,18
  57:14 59:12 60:14
  65:19 66:22 69:11
  71:19 78:25 81:8
  98:18
belittled 35:19,22
belittling 36:8
best 5:16 80:7
bickering 92:21
bit 92:20 112:10
blood 118:11
board 10:17 13:17
bombs 37:7,13
bonus 30:8,15,23
  31:2 33:14,17,20
book 91:2
boss 37:6,6 53:21
  54:7 67:17,19
  68:5
bosses 67:18
boss's 67:19 68:5
Boston 17:7,9,23
  18:18,22 36:5,10
  38:8,14 40:7,10
  42:9,14 43:14,14
  43:15,17 59:15,19



64:11,15 68:23
70:22 71:8,17,22
73:25 75:7 78:5
78:11,15,21,22,23
79:3,12,14 87:10
87:17 89:13 92:19
94:11,25 95:14
**Bouker** 16:18,24
19:15,16,24 20:2
20:4,11 21:13
27:7,20 29:17
31:12 32:15 34:3
34:11 40:23,25
43:10,11 44:21,24
48:23 53:22 54:12
54:16 55:3,7 56:4
56:15,25 57:6,11
57:16 58:2,8 60:3
60:9,22 61:8,12
61:18 62:6,12
68:11,13,17 70:20
70:25 71:4,11,15
71:21 72:2,16,18
73:3,5,6 74:23
75:5,8,9 76:19,25
77:5,10 79:16
81:18,24 82:17,19
84:2,8 85:3,10
86:6 92:11 94:14
97:10 117:20
**Bouker's** 28:8,12
28:16 55:21 56:20
61:23 62:23 63:8
63:11 68:14 84:17
**break** 6:4,11 34:14
113:2
**briefly** 30:4
**BRIGHT** 2:3
**bring** 50:24 82:19
96:4
**bringing** 50:20
**broad** 37:19
**brought** 24:15,23
46:3 81:24 96:22
98:4
**build** 44:10

**business** 44:6 45:15
46:6 111:8
**businesses** 111:14
111:17

**C**

**C** 2:2 116:2 118:2,2
**call** 17:22 27:3
31:23 36:4,9
37:17,22 38:2,7
38:14,23 43:16
67:8 69:13 107:18
**called** 17:20,23
39:6 54:8,12 56:4
61:12 107:24
108:2
**calling** 29:4,5 57:23
**calls** 45:16
**Campanella** 24:21
**capacity** 81:9
**carefully** 114:5
**case** 9:22 102:2,14
102:20 117:21
**catching** 94:15
**category** 107:4
**CATHERINE** 2:18
**cause** 13:12
**caused** 67:23
**causing** 68:3
**caution** 13:7
**cell** 17:20,24
**CEO** 108:14 109:4
109:8
**CEO's** 16:12
**certain** 8:8 16:3,20
19:11
**certification** 3:7
**certify** 116:6 118:5
118:10
**cetera** 105:18
106:24
**CFO** 24:21 32:11
109:15
**chain** 23:20
**chance** 7:8 11:25
12:3 16:10 23:9

53:15 64:5 89:21
89:22
**CHANGE** 115:4
**changed** 39:17 66:5
**changes** 109:7
114:12 116:14
**chaos** 28:19 92:20
94:25
**charge** 3:19
**charging** 101:25
**choice** 48:8,9
**chooses** 20:19
**circumstances**
18:14 54:5 76:4
94:5
**Civ** 1:6
**claim** 107:7
**clarification** 27:22
27:24 30:7 32:5,8
33:3,8,10 87:24
**clear** 5:22 31:10
65:2
**clicked** 54:13
**client** 45:16
**Coincidentally**
75:10
**coined** 93:8
**come** 17:18 51:13
80:11 88:21 97:11
**comes** 90:25
**comfortable** 50:19
**coming** 10:16 78:5
**communicate**
54:16 55:6
**communicated**
28:7,11 44:18
63:7,11
**communication**
26:7 58:18 64:10
65:6 70:25
**communications**
43:18 57:6 58:7
58:22 68:12,15
69:15,19 71:20
81:3
**communiqué** 55:12

57:25
**COMMUNIQUÉ**
117:19
**companion** 101:25
102:4,9
**company** 9:15,19
9:22 10:5 32:10
104:8 112:12
**compelled** 55:9
**compensation**
104:23 105:5,8
109:8
**complained** 16:25
57:14
**complaining** 55:13
56:7 57:12 58:2
90:8 117:20
**complaint** 20:23
21:6,10,16,18
22:3,7,10,12,16
23:14 24:5 25:21
29:19 34:6,17
36:13 40:16 43:21
44:16 46:22 47:22
48:3 50:10,20,25
51:18,22,25 52:5
52:24 54:10,22,25
55:21 56:6,17
61:25 62:20,23
63:4,8,12 98:4
99:16 100:7
102:12
**complaints** 21:22
25:13 57:7 97:12
**complete** 116:9
**completely** 79:17
**complied** 7:7 12:2
12:20 23:7 64:3
75:23
**components** 29:24
**concern** 18:21
27:18 28:8,12,15
30:12 61:4 76:24
82:19 94:10
100:21 109:17
**concerned** 18:17

**concerning** 32:3
51:22 52:5 57:8
63:7 66:23 70:21
71:17,22
**concerns** 13:22
19:2 25:5 26:2
72:18 81:24 85:17
86:5 91:16 92:17
96:5 100:13,16
109:25
**conclude** 113:9
**conclusion** 17:19
35:9
**condescending**
18:5 20:9
**condition** 84:10
**conduct** 14:22 16:8
16:20,25 17:9
72:19 97:12
**conducted** 41:24
**conducting** 89:12
**conference** 42:10
**conferences** 39:18
40:18,21,24 41:4
41:7,9 42:25
65:18 66:7,13
**confidentiality**
109:24 110:4
117:23
**confront** 20:19
**congratulate** 80:22
**congratulated**
80:21
**conjunction** 66:24
**considered** 16:4,8
16:21 17:8 76:21
**consult** 43:6,8
**consultant** 26:12
26:18
**consultants** 26:14
**consulted** 18:24
**consulting** 13:24
14:6
**consumer** 81:16
**content** 34:21
39:11 41:20 45:3



45:6,9 56:5 81:10
81:11,14
**contents** 54:12,20
**context** 18:6 72:4
72:10
**CONTINUED** 1:15
**continues** 34:6
47:23 77:12 79:15
**continuing** 36:13
**continuous** 23:17
**continuously** 35:18
**contract** 8:16
**control** 66:15
**conversation** 8:25
9:8 18:3 20:2,6
32:24 60:19 64:15
71:2 100:12
**conversations** 17:3
18:9 25:3,17
58:24 59:9 82:4,9
82:11 85:16,20,25
93:25 94:24 95:17
**COO** 109:15
**copy** 3:18 76:5,7
**corporation** 107:24
108:2
**correct** 7:19 9:24
9:25 10:6 13:4
15:15 24:2,5,9
30:18,19 40:18
41:17 42:10 45:13
47:2,25 48:5,17
65:14 67:18,23
71:23 72:14 86:10
88:21 90:21 95:11
95:18 104:4
108:17 109:18
116:9,13
**corrections** 114:5,7
116:13
**counsel** 102:13
**counseling** 19:7
**COUNTY** 116:5
**couple** 42:5 80:24
**course** 8:12,20
**court** 1:2 3:18

110:5 114:19
118:22
**covered** 81:15
**co-packer** 110:22
**created** 28:18
49:19 58:3 117:21
**creates** 91:4
**creating** 55:14
57:13 58:19,25
59:10 60:24 81:10
95:23 100:17
**csmith@guidepo...**
2:19
**currently** 49:5
111:10

─────────
**D**

**D** 116:2 117:2,7,17
**DAHN** 2:22
**Daniella** 70:15,17
73:11,18
**data** 45:16
**date** 90:21 114:10
**dated** 23:25 77:23
87:4
**dates** 25:11
**David** 1:17 2:12
4:25
**day** 54:7 57:3 90:8
91:2 99:18 116:21
**days** 61:14 114:16
**deal** 19:19 82:18
**December** 30:9,17
**decide** 102:8
**decided** 30:16
**decision** 41:2
**deemed** 114:18
**deeming** 24:4
**defend** 48:8
**Defendant** 1:9 2:10
2:16
**Defendant's** 6:20
6:25 11:3,7,19
22:23 23:4 53:6
53:11 63:19,24
75:15,20,25 86:14

89:19,22,24 101:2
101:8 103:7,12
**definite** 13:10
**demanding** 27:4
**demeaned** 20:5
**demeaning** 17:21
18:3 37:24
**demonstrate** 28:23
**demoralized** 79:17
80:12
**demoralizing** 82:2
82:6,12
**departing** 50:6
**department** 106:10
110:15
**departure** 35:8
46:25
**dependant** 14:6
**depicted** 76:8
**deposing** 114:15
**deposition** 3:14
13:22 101:10
103:13 113:9
114:4,13,17,18
**depositions** 7:3
11:21
**DESCRIPTION**
117:8,18
**detail** 28:3 39:15
**details** 71:10
**deteriorated** 46:8,9
66:22
**deterioration** 36:15
39:3
**dgrech@gordanr...**
2:13
**dictate** 26:24
**dictating** 29:2
**difficulties** 87:23
**difficulty** 36:18
**direct** 61:24 62:6
**directed** 110:5
**directly** 20:20
112:3
**disappointed** 81:20
**disclosing** 8:7

**discrimination**
14:14,21 15:15,18
20:17 28:23 35:2
35:10 72:20
**discriminatory**
10:11 16:4,9,21
17:10
**discuss** 23:16 28:3
48:8 51:12
**discussed** 36:2
59:12 60:12,16
63:2 95:4 104:9
**discussing** 66:10
76:18
**discussion** 11:15
15:23 40:13 51:6
**dismissed** 35:19,22
**dismissive** 36:7
**disparage** 8:23
**displayed** 38:11
**distribution** 100:10
**DISTRICT** 1:2,2
**document** 14:12
25:12,15 84:18
85:11 103:15
**documented** 25:5
86:5
**documents** 5:9,10
**doing** 19:21 27:12
29:8,10 35:6 91:3
91:8 92:18 96:8
96:13,24 114:9
**Dr** 9:2,8 17:6 35:5
48:4,9,13,16,20
49:8 102:6,8
112:22
**drama** 91:4 95:23
100:17
**drop** 37:12
**duly** 4:3 118:7

─────────
**E**

**E** 2:2,2 4:2,2
107:12,15,19
115:2 116:2,2,2
117:2,2,2,7,7,17

117:17,17,22
118:2,2
**earlier** 30:4
**early** 59:20 84:15
90:25 91:17
112:12
**East** 4:14
**EEOC** 101:21
102:12,14,20
117:21
**effect** 3:17 68:18
73:8
**effective** 7:18
**effectively** 39:16
46:5 66:5
**efforts** 49:15,18
**either** 13:12 77:24
98:12
**elevate** 55:9
**employed** 12:14
58:16
**employee** 6:21 11:8
12:24 13:3,23
14:4 18:14 20:23
21:6,9,15 26:4,8
26:11,19 49:4
78:21 82:12 117:9
117:11
**employees** 16:14
79:2 80:13 81:25
82:7 110:12
**employer** 13:8
**employment** 5:11
7:15,25 8:5,12,20
10:4 11:4 12:9,10
13:9,18 14:10
44:13 45:23 117:9
**encountered** 19:17
**encourages** 14:18
**endured** 35:18
**engaged** 80:20
**engaging** 17:18
**entire** 89:8
**entitled** 14:12
**entrepreneur** 104:3
104:7,13



environment 24:17
24:25 25:10 29:19
29:25 53:25 55:15
57:7,13 58:3,9,20
59:2,11 60:16,25
62:3 117:20
errata 114:7,10,12
114:15 116:15
ESQ 2:6,12,18
essential 39:22
essentially 38:5
39:9 69:20
established 40:21
45:19
estate 106:23
108:19
estimate 40:5
et 105:17 106:24
events 41:10 65:2,6
65:8 66:11 77:15
78:2 96:20 99:12
eventually 96:2
everybody 37:6
everyone's 95:4
exact 25:11
exactly 12:16 42:17
52:13
examination 1:15
3:18 4:7 117:4
examined 4:5
example 37:4
exchange 20:3
22:24 23:20 24:8
53:7 63:20 67:12
68:3,8,21 70:21
71:16 72:17,24
73:24 75:16 76:8
76:12 78:17 80:4
85:8 86:15,23,25
95:13 117:11,12
117:12,13,13
exchanges 68:10
93:2
excuse 91:2
exhibit 6:21 7:2,4
11:4,8 12:4,19

13:6 14:9 20:14
22:24 23:5,9,19
23:24 51:9 53:7
53:12,16 63:20,25
64:5,19 65:23
68:8 72:9 75:16
75:25 76:8,16
77:25 85:3 86:15
86:22 88:7 89:20
100:24 101:3,9,14
101:17 103:8,13
104:18 106:14
117:8
Exhibits 11:19
existence 21:5
expect 31:7
expectation 95:5
expenses 112:14
experienced 39:2
94:7 107:3
experiences 71:21
experiencing 34:16
expert 44:3
explain 18:6 93:19
107:2
explained 54:21
explicit 39:10
express 10:9 18:20
20:4 71:25 72:18
expressed 19:18,23
extension 92:13
extent 22:8 57:22
102:17 109:23
externally 49:21
e-mail 22:24 23:14
23:19,20,23,24
24:12 25:6,21,24
27:3 31:23 38:23
53:7,21 54:2,6,8
54:13,17,21 56:5
56:13,16 58:12
61:13,17,20,23
62:18 63:20 64:10
64:20 65:6,21
66:13,17 67:8,22
68:5,12,14 69:15

71:19 72:8,23
73:23 75:16 76:8
76:11 77:15,22
78:7,9,16 81:19
85:2,3 86:15,22
87:3 88:7 90:11
90:19,23 95:9,13
99:16 117:11,12
117:12,13,13
e-mailing 29:4
e-mails 67:12 68:19

F

F 37:7,12 117:2,7
117:17 118:2
fact 47:7
fail 114:17
failing 27:25
fair 84:24 97:23
faith 44:8
Faiza 1:4 48:4
fallout 94:22
familiar 44:14
45:24 46:12,15,18
far 5:4 111:19
February 77:20,23
78:6,24 81:23
84:15
feedback 89:3
feel 10:20 29:8 33:9
65:17
felt 17:14 20:5
26:24 27:2 28:17
38:22 50:19 60:23
80:5 86:9 90:14
file 62:20 102:14,21
112:19 117:21
filed 61:24 101:19
102:10,11
filing 3:6 54:7,10
56:16 103:18
fill 50:2 96:19
find 33:21 50:13
finish 6:2
finishing 87:9
fire 96:2

fired 90:9 98:13,17
98:23
firm 2:22 5:2 33:25
first 4:3 9:7 10:16
13:21 23:23 24:12
24:12,23 25:8
45:25 51:4 56:9
57:3 65:23 76:25
77:24 101:24
five-minute 113:2
fixed 13:10
flight 78:11
Floor 2:5,11,17
focus 64:23 65:13
66:18 72:13 95:2
focused 28:21
follow 58:4 102:19
103:4 110:6
following 44:13
45:23 46:25 51:25
follows 4:6
follow-up 62:25
food 112:12
force 3:16
foregoing 118:8
Forgive 77:20
form 3:10 20:23
21:6,10,16 103:8
103:23 104:19
105:14,14,20
106:13 116:14
117:15
formal 55:10 61:25
forth 8:8 19:25
118:7
forwarding 85:7
found 20:24
founders 109:17,20
four 47:16 56:23
60:6,7 61:7 97:9
97:14,24
freak 93:18
freaking 92:24 93:4
93:9,14 94:20
frequency 42:3,6
frequent 28:17

frequently 27:21
friends 80:8
friendship 80:15
front 79:17 80:13
frustration 19:19
full 65:23 66:4,10
furnished 3:19
further 3:9,13
118:10
furthermore 34:7

G

G 116:2
Gabby 97:15 98:25
99:5
gaming 81:17
gender 9:23 15:15
15:18 28:24 33:12
35:2,10 72:19
86:10 90:16
genuinely 50:12
gestures 5:18
getting 87:23 89:4
Ghodadra 15:21
girlfriend 9:12
girls 56:23 60:6,7
61:7,7 97:9,11,14
give 18:5 31:7
69:24 70:3,18
72:9
given 14:4 30:13
88:4,5 105:8
116:12 118:9
Global 1:8 2:15 5:3
go 4:19,22 13:23
14:9 39:14 59:23
91:8
goal 87:12,16 89:5
going 4:19 5:7 29:3
43:21 46:4 55:24
62:13,16,20 89:18
94:11 100:22
102:19 107:17
109:25 110:2
112:25 113:8
good 4:16,17 44:8



50:16,18 88:15,22
**Gordon** 2:9 5:2
**Gotcha** 37:8
**gradually** 46:7
**great** 19:19 47:7
**Grech** 1:17 2:12
4:8,25 6:17 10:24
22:20 53:3 57:20
63:16 75:13 77:19
84:24 86:12 97:23
100:24 102:17,24
103:3 107:17
109:23 112:25
113:7 117:5
**group** 44:7 93:17
**guarantee** 91:10
97:4
**guess** 5:23
**guidance** 14:4
**guidelines** 30:13
**Guidepoint** 1:8
2:15 5:3,12 7:16
7:22 8:6,14,21,23
9:3,7,9,22 10:17
12:15 13:8,9,17
14:17 15:5,19
21:7 22:16 23:18
26:4,11 30:21,24
33:15 35:2 40:3
40:10 41:25 42:14
44:14,19,25 45:2
45:7,12,24 46:13
49:4,10 58:11,17
65:10 78:20,22
79:2 80:13 81:4,7
82:5 83:12,16,20
103:20,22 105:10
106:3,6
**Guidepoint's** 12:10
20:24
**guy** 48:24

**H**

**H** 6:18,21 7:2,4,8
7:10 117:7,9
**handbook** 11:9

12:9,11,14,25
13:3 14:5 117:11
**handing** 7:6 11:25
23:6 53:13 64:2
75:22 89:20
101:12 103:14
**happened** 49:24
98:14
**harassed** 14:20
**harassing** 16:4,9,21
17:11
**harassment** 14:13
20:16
**head** 39:11 50:23
111:4
**heads** 94:17
**healthcare** 34:21
39:11 41:20 44:5
77:15,25 81:11
87:13 89:7 96:17
**heard** 37:12 83:8
93:11
**held** 1:18 11:16
15:24 40:14 51:7
65:9
**help** 44:9
**hereinbefore** 118:7
**hierarchy** 9:15,18
**highly** 44:11
**hire** 28:5 34:5,22
35:4,5 48:9 49:9
**HLC** 44:3,4
**hope** 50:12
**hostile** 37:23 53:24
55:14 57:7,13
58:3,9,20,25
59:11 60:15,24
117:20
**hours** 27:3
**HR** 21:16,18 22:4
26:7 48:25 50:23
55:10
**human** 20:22,25
62:22
**hundred** 64:24
66:19 72:13

**hurt** 79:19

**I**

**idea** 69:24 80:3
**identification** 6:22
11:5,10 22:25
53:8 63:21 75:17
86:16 101:5 103:9
110:3,8 117:22
**identify** 104:2
**imagine** 59:3 67:21
73:16 94:23
**immediately** 9:6
74:5
**imperative** 114:14
**impression** 45:18
**improvement** 83:9
83:12,15,19,23
85:22
**inability** 28:5 34:5
**inappropriate**
53:23
**inbox** 58:14
**included** 14:3
**Including** 34:13
40:7
**income** 106:16
**incorporated** 111:7
**increase** 34:20
35:12
**increasing** 36:14
**increasingly** 36:21
**Index** 1:6
**individual** 20:19,20
**individuals** 14:19
**information** 8:8,14
**informed** 47:5
61:23
**initiated** 93:10
**inquire** 70:11
**instances** 82:14
96:12
**instructed** 34:20
**instructions** 4:19
4:21 5:4 6:15
114:2

**interact** 38:12
**interacted** 91:21
**interacting** 26:17
**interaction** 38:15
38:18
**interactions** 91:24
**interested** 118:12
**interference** 67:9
**internally** 49:21
**internet** 20:25
**interpret** 10:11
**interpretation**
37:20
**interview** 48:19
49:23,25
**interviewed** 44:23
48:16
**interviewing** 45:8
**interviews** 49:22
**investigated** 22:10
**investigation** 21:22
22:3,9,18
**in-person** 31:25
32:23 41:13,15
42:9 64:25 65:5,8
91:24 92:4
**issue** 28:21 76:17
**issues** 24:16,24
25:9,24 27:17,20
28:2
**Item** 105:16 106:16
107:10

**J**

**J** 1:17 2:12 11:8,20
11:24 12:19,19,21
12:23 13:6 117:10
**James** 49:2,2
**Jessica** 17:5 27:12
29:11 46:19 47:23
47:24 56:23,24
59:10 60:4,8 61:6
63:14 76:17,20
77:7,12 78:2,9
79:15,25 81:19
83:22 84:4 86:8

90:8,10,14 91:15
91:18 92:7,16,25
93:9,14,19,23
94:6 95:25 96:5
96:13,14,19,24
97:2,4 98:7 99:10
100:7
**Jessica's** 76:24
82:20,22 84:10
85:17 86:5 88:7
94:9 96:7 97:6,24
**Jibril** 1:4 9:2,8 17:6
35:5 48:4,9,13,16
48:20 49:8 102:6
102:8 112:22
**job** 28:6 39:13,23
49:20
**John** 24:19,20,21
25:9,13,19 28:13
31:20 32:2,15
**John's** 32:6,9
**joining** 33:25 44:9
44:19,20
**Justin** 27:15 29:16
48:23 56:22 58:23
58:25 60:3 61:10
63:11 79:17,20,23
80:5,7,11,16,19
81:3,6

**K**

**K** 22:21,24 23:5,9
23:19,24 51:9
116:2 117:11
**keep** 79:16
**Kendall** 97:16 99:8
**Kenko** 107:24
108:3,9,13,16
109:5,8,11,14,18
110:9,11,14,23,23
111:5,7,8,19
112:5,19,23
117:23
**kind** 81:13
**KIOKO** 104:11,15
107:5,21,23 108:4



110:24 111:9,14
**kitchen** 38:16
**knew** 31:15
**know** 5:5 6:5,5,6
7:5,10 11:24 22:5
22:6,8,11 26:10
26:16,20 27:14,22
28:14 33:13 48:13
49:3 52:3,13
54:15 55:4 56:3
62:10 63:6,9,10
63:13,15 65:7
68:9 70:19 73:16
74:17 78:4 79:25
81:13 82:14 83:5
86:7 89:9 94:8
98:16,19,22,24
99:2,5,9 102:4,13
102:16,25
**knowledge** 22:2,7
27:11,16 48:15
61:11 62:9 83:13
92:15
**K-E-N-K-O** 108:3

**L**

**L** 3:2 4:2,2,2 53:4,7
53:12,16 116:2
117:12
**Labor** 106:10
**lack** 27:22 33:9
**language** 36:15,25
37:16,20 55:13
**late** 41:2 84:14
90:25
**law** 2:22 4:25
**lawsuit** 5:12
**LAWYER'S** 119:2
**lead** 35:8 44:3
49:22
**leader** 40:21 46:5
47:8
**leadership** 28:18
39:18 40:18 41:20
66:7,14
**leading** 53:24

**Leah** 1:19 118:3,22
**leave** 91:10 97:3
**leaves** 90:24
**leaving** 49:13 91:17
**led** 28:19 36:16
66:21
**left** 34:19 35:11
78:10
**LEGAL** 1:24
**letter** 90:7 101:4,20
117:15
**level** 76:22,23
**LEVINE** 2:22
**Liana** 34:18
**Lichten** 2:3,6 6:6
55:24 77:17 84:22
97:18,21 101:21
102:22,25
**limited** 8:15
**line** 45:15 65:24
105:16 106:16
107:10 115:4
**list** 28:4 105:17
**listen** 18:13
**listing** 49:19
**litigation** 102:9
**LLC** 1:8 2:15
**logistics** 96:20
**long** 29:21 111:5
**look** 7:4,8 11:23
12:18,19 20:14
23:6 24:11 53:13
53:15 64:2,5,18
65:21 75:21 86:21
89:21,23,24
101:11 104:18
106:12
**loop** 79:16
**Los** 110:22
**losing** 67:4
**loss** 106:19 107:2
107:20 108:15
**losses** 107:6 108:17
112:5,9
**lot** 91:11 97:4
**loud** 18:4

**lunch** 78:12,15

**M**

**M** 63:17,20,25 64:5
64:19 66:8 72:9
86:22 116:2
117:12
**mad** 75:5 94:10,13
94:14,17
**MAGNA** 1:24
**main** 26:2 45:14
105:14
**maintain** 80:15
**maintained** 81:2
**makeup** 112:9
**male** 18:13
**man** 17:16 18:10
**management** 24:16
24:24 25:9,24
26:5,22 27:17,25
28:2,21
**manager** 34:9
96:21
**mandate** 35:4
**MANSUKHANI**
2:9
**manufactured**
110:20
**March** 23:25 24:13
27:18 34:16 52:6
52:14 56:21 59:20
64:19 65:9 68:21
69:14 72:24 77:16
77:18 84:15 87:4
90:20 103:21
**mark** 6:17 10:24
22:20 53:3 63:16
**marked** 6:22,25
11:5,9,13,19
22:25 23:4 53:8
53:11 63:21,24
75:17,20 86:16
89:19 101:4,8
103:9,12
**marketing** 112:18
**marks** 45:5 67:14

**marriage** 118:12
**matter** 44:3 55:10
118:13
**mean** 29:18 37:3
66:14 89:9
**meaning** 24:18
97:3
**meant** 67:5 74:17
89:7
**measure** 89:7
**measured** 30:15
**measuring** 88:17
88:19
**meet** 87:16
**meeting** 23:15
31:25 51:17,20,25
52:6,9,17,21
59:13,14,16,19,25
60:13,17,22 61:5
62:11,25 63:3
69:5,6,10,22,25
70:5,7,12 73:20
78:12,15 79:3
92:4 95:3,8,20
99:17,20,24 100:3
100:21 109:9
**meetings** 27:5 29:5
38:24 41:14,15
59:22 87:10
**member** 26:25 55:5
**members** 29:3
47:12 55:11 56:20
58:8,19 60:21
62:7 94:21 95:17
100:22
**men** 47:18 68:10
**mentioned** 30:6
38:22 56:12 61:3
**mentioning** 56:18
**mentions** 56:10
**met** 48:10,13
**metrics** 27:23 30:5
30:8 31:4,24 32:4
32:13,17,21 33:4
33:11 87:20,25
88:3

**Miller** 1:19 118:3
118:22
**mind** 25:25 46:18
**mine** 89:10
**misleading** 44:12
**misplace** 74:16
**misspelled** 87:8
**mistreated** 9:19,23
86:9 90:15
**mistreatment**
23:17
**moment** 7:4 12:19
23:5 53:12 63:25
75:21 87:21
**months** 24:15,22
29:23
**move** 6:10
**multiple** 31:9
**M.D** 1:4

**N**

**N** 2:2 3:2 4:2 75:13
75:16,20,25 76:8
76:16 77:25 85:3
88:7 116:2,2
117:2,2,7,13,17
**name** 4:9 48:25
56:10 73:10 87:8
108:4
**names** 47:14
**nasty** 68:18
**necessary** 72:6
114:5
**need** 6:4
**needed** 28:6
**never** 45:2 49:24
68:17 80:14
**New** 1:2,11,11,21
2:5,5,11,11,17,17
4:5,15,15 41:13
69:21 70:10 79:12
87:11 91:19 106:9
116:3 118:5
**Nick** 78:19
**nodding** 5:18
**nondisclosure** 8:3



**normally** 37:10
**Notary** 1:20 4:4
  116:25 118:4,22
**NOTE** 119:3
**noted** 113:14
  114:12 116:14
**NOTES** 119:2
**notice** 13:13
**noticed** 77:5
**notification** 55:10
**notified** 47:6
**notify** 20:21
**November** 1:12
  116:8
**number** 89:2
**numbers** 33:22
  88:23,25 111:3
**nutritional** 111:18
  111:20

———— O ————

**O** 3:2 86:12,15
  89:20,22,24 116:2
  117:2,7,13,17
**oath** 3:16 116:8,11
**object** 55:25
**objections** 3:10
**obligation** 8:22
**observed** 44:12
**occasion** 18:12 50:4
**occupation** 104:3
**occur** 52:12 69:25
  70:8 71:7
**occurred** 42:4
  66:11 74:12 76:12
**October** 101:3
  117:14
**offender** 14:22
  20:20
**offenders** 15:17
**offering** 111:20
**office** 16:13 51:13
  71:5 77:2 78:22
  78:23 79:12,13,14
  87:11 91:19,25
  92:5 94:2

**officer** 3:15
**officers** 109:13,21
  110:8 117:22
**okay** 6:16 10:23
  12:18 13:5 15:13
  18:2 29:12 32:2
  32:19 33:9 35:15
  37:25 38:10,17
  41:19 45:6 52:16
  53:14 59:24 64:18
  66:17 67:11 71:20
  74:3 76:3 83:11
  87:22 91:15 96:12
  98:14 101:20
  102:7,22,24
  108:15
**older** 97:18
**once** 42:4,7 91:22
**one-on-one** 45:15
**operate** 104:6
**operating** 107:6
  108:17 112:5
**operation** 111:6
**opinion** 34:25 47:6
  74:25 88:21
**opportunity** 7:6
  18:6 68:25 69:3
  89:24 101:11
**Order** 1:19
**original** 114:15
**outcome** 118:13
**output** 34:20
**overreach** 66:25
**overtake** 65:25
**o'clock** 51:11

———— P ————

**P** 2:2,2 3:2 100:24
  100:24 101:3,9,14
  101:17 117:14
**packaging** 110:21
**page** 7:20,25 8:18
  14:11 20:17 51:4
  64:18 65:22 86:25
  87:2 104:18
  105:13 106:14

  115:4 117:4,8,18
**PAGE/LINE** 119:3
**pain** 36:17
**paragraph** 14:17
  20:15,18 24:13
  35:15 36:12 39:15
  43:22 50:9 56:9
  61:22 65:23
  101:24
**parenthetical** 65:24
**Park** 1:11 2:4,10
**part** 13:21 29:7
  39:12 40:22 97:6
**participate** 22:17
**particular** 46:5
  88:25
**parties** 3:6 102:2,9
  118:11
**partnerships**
  106:23 108:24
**party** 13:12 102:5
**pattern** 44:14
  45:24 46:13,15,18
**pay** 35:12
**pending** 6:9
**people** 34:22 47:15
  49:24 79:7
**perceived** 23:16
**percent** 64:24
  65:13 66:19 72:13
**perform** 28:6 39:23
**performance** 27:23
  30:5,8,14 31:4,24
  32:3,13,17,20
  33:3,10 83:2,9,11
  83:15,19,23 84:11
  84:14 85:21 86:2
  87:20,24 88:3,11
  88:15,18,20 89:8
**performed** 34:7
**performing** 84:16
**period** 8:6 13:10
  46:7 59:19
**Periodically** 81:5
**permission** 39:10
**permitted** 48:7

**person** 50:24 71:12
  71:14
**personal** 107:7
**pertained** 17:4,5
**Peter** 101:9
**phone** 74:9
**phrase** 93:8,11
**physical** 36:17
**PIP** 82:23 83:6
**place** 1:18 83:18
**placed** 83:14 85:21
**Plaintiff** 1:16
  117:20
**plaintiffs** 1:5 2:4
  57:21
**plaintiff's** 101:3
  117:14
**plan** 77:13 83:9,15
  83:19,24 85:22
**plans** 83:12 111:13
**Plaza** 1:11 2:10
**please** 4:10,13 5:15
  6:18 10:25 14:10
  23:6 53:4,13
  63:17 64:2 75:13
  75:22 82:24 86:22
  89:22,23 91:7
  114:4,9
**point** 5:21 6:9 9:18
  34:19 50:24 88:18
  97:7 102:7 111:11
**policies** 11:4 14:10
  117:10
**Pool** 16:18,19 19:7
  19:10 48:23 53:22
**Pool's** 19:3
**portion** 44:6,15
**position** 44:7 50:2
**positive** 62:3
**possible** 62:25
**Possibly** 95:21
  112:2
**post** 43:14
**posted** 49:20
**practically** 90:25
  91:8 96:8

**Pre** 43:14,15
**Predating** 25:21
**premise** 46:4
**presence** 18:17
  29:20 30:2 72:5
**PRESENT** 2:21
**pretty** 68:18
**prevented** 35:6
**previously** 94:6
**primarily** 66:3
  91:19
**Prime** 110:19
  111:25
**prior** 13:13 18:24
  25:6 33:25 42:24
  56:24 59:23 61:14
  76:6 85:8
**Priscilla** 22:14
  23:15,21,25 24:8
  24:19 25:19 28:9
  32:18,20 34:3
  48:24 49:3 50:12
  50:17 51:18,21
  52:2,6,7,10,20,23
  53:22 54:14,18
  55:8 61:18 62:13
  62:16,19 63:2
  65:22 66:14 67:3
  73:23,24 74:4,8
  74:10,13 85:4,11
  85:16,20,25 87:3
  90:20 96:2,4
  99:17 100:4,20
**Priscilla's** 24:25
  51:10 74:25
**privilege** 82:24
**privileges** 84:6
**Probably** 42:18
**procedure** 15:4
**procedures** 14:13
  20:15
**produce** 95:6
**produced** 102:18
**producing** 104:9
**product** 107:23
  108:5 110:17,20



**production** 57:21
57:24 107:18
**products** 111:18,21
**profanities** 37:21
**profitable** 109:11
**prohibited** 8:7
**promotional**
112:11
**Promotions** 112:16
**promptly** 14:22
20:21
**proper** 50:24
**proprietary** 8:14
**protein** 104:10
108:7
**proved** 44:11
**provide** 32:7 33:7
103:22
**provided** 8:15
**Public** 1:20 4:4
116:25 118:4,22
**pull** 27:4 38:23
**purity** 5:25
**purposes** 7:2 11:20
101:10
**pursuant** 1:19
**put** 83:23
**P.C** 2:3
**p.m** 1:13 64:20
78:10,12 113:14

**Q**

**question** 3:11 5:24
6:3,8,10 8:19
10:13 28:25 67:13
**questions** 4:21 5:7
5:14 6:12,13
113:12
**question-and-ans...**
5:6
**quit** 91:11 97:5
98:7,12,17,18,23
99:6 100:22
**quite** 92:20 112:10
**quotation** 45:4
**quote** 45:20 92:23

**R**

**R** 2:2 115:2,2
117:17 118:2
**raise** 92:16
**raised** 20:12 91:15
**range** 66:11
**rapport** 50:11
**read** 54:8,12,20
55:7 66:4 114:4
116:7
**readily** 16:14
**reads** 14:17 20:18
36:13 90:23
**real** 106:22 108:19
**really** 79:19 92:2
**reason** 114:6
**recall** 8:25 9:10,11
9:13,14,16,17,20
10:22 12:13 13:20
15:6,7,10 16:23
18:25 20:13 22:19
25:2,11 29:23
30:3 31:19 32:22
36:11 40:4 42:17
45:14 47:14 51:23
52:19,22 54:19
56:8,18 57:18
58:17,21 59:5,7
60:18 61:2 65:11
73:9 82:3,8,10
88:12 93:22 96:6
98:6 99:15,23
100:2,11,15,19,23
**receipt** 11:8 12:24
13:6 114:16
117:10
**received** 13:3 30:23
33:17 102:14
105:6
**receiving** 12:13
58:17
**recess** 86:18 113:4
**recognize** 7:12 12:6
12:21 23:11 53:18
64:7 90:2 103:15

**recollection** 100:8
**recommendations**
49:9
**recommended** 50:5
**record** 4:9,13 5:22
11:16 15:24 40:14
51:7 116:10,12
118:8
**recruited** 43:23
44:2
**Rees** 2:9 5:2
**refer** 97:22
**reference** 24:14
55:18 101:23
**referencing** 46:14
67:7,9 97:8
**referring** 66:3 78:3
80:2
**reflect** 34:25 67:6
104:22 112:13
**reflected** 34:16
72:19
**reflection** 105:4
**regarding** 5:11
51:24 53:22 64:11
**related** 90:18
118:10
**relating** 20:3
**relationship** 50:16
50:18
**remember** 13:25
33:21 48:25 60:19
61:16 62:14,24
71:10 73:21 79:4
79:8 93:10 99:21
**rental** 106:22
108:19
**repeatedly** 30:9
**rephrase** 5:15
**replace** 49:15 50:6
**replies** 81:18
**reply** 51:10 72:12
82:22 84:17,23
**report** 62:13,16
**reported** 16:24
55:8 56:24 60:8,9

97:9
**reportedly** 76:25
**reporter** 1:20 5:19
118:3,22
**reporting** 14:13
20:16 26:8 56:25
**reports** 61:24 62:7
**represent** 5:2
**representing** 3:20
**request** 102:15,19
107:11 110:7
**requested** 86:6
**requesting** 23:15
**require** 14:18
**required** 35:14
**reserved** 3:11
**resolution** 50:13
**resolve** 30:10
**resources** 20:22,25
62:22
**respect** 109:25
**respective** 3:5
**respects** 17:13
44:24 104:6,14
**respond** 6:3
**responded** 19:22
**response** 32:6 33:6
51:12 70:17 74:14
102:15
**responses** 5:17,20
**rest** 5:24
**result** 31:14 105:9
**resurping** 67:6
**return** 106:5
112:20 114:14
**returned** 70:10
71:4 87:17 92:19
**returns** 107:8,14
**review** 12:3 23:9
57:20 77:8
**right** 6:16 21:19
24:11 28:20 29:5
46:22 49:13 57:3
60:11 62:12 64:16
64:17 67:20,25
84:18 85:12 87:25

88:8,15 90:2
103:3
**role** 26:5 32:9
35:11 36:16 39:3
39:8,17 40:22,23
41:3 46:7 66:6,23
67:6 95:4 96:19
**routine** 34:8
**royalties** 106:23
108:22
**rude** 79:19 80:6,12
82:2,6,11
**Ruiz** 48:23 79:23
**rules** 4:20
**Rutwik** 15:20 16:2
26:3,10,21 27:6,9
28:21 29:2,21
31:18 35:24,25
36:23,24 37:9,12
38:20 41:3 43:4,8
55:19,23 56:10
57:8,12 58:4,19
58:25 59:10 60:13
60:24 63:7 67:10
117:21
**Rutwik's** 29:20
30:2 42:22,23
53:23 57:15 61:4
66:25 67:6
**R&D** 111:22
112:11,17

**S**

**S** 2:2 3:2,2 117:2,2
117:2,7,17,17
**sake** 5:25
**salaries** 105:17
106:2
**sale** 111:9
**sales** 110:24
**sampling** 112:11,16
112:17
**Sarah** 97:15 98:14
98:15
**saw** 27:25 77:24
**saying** 81:19



**says** 61:23 66:18
78:9 82:17 91:13
97:3
**schedule** 92:8
106:13 107:11,15
107:19 117:22
**scheduler** 70:16
73:13
**SCULLY** 2:9
**sealing** 3:6
**Sebag** 7:22 10:2,4
10:19 15:20 16:6
16:20 17:2 18:13
18:16 19:3,7,18
19:18,23 20:8
**Sebag's** 17:8
**second** 20:15 24:13
52:21 63:3 65:22
76:14 99:20,23
100:3 101:24
105:13
**section** 8:2 14:12
14:15 21:21,23,24
**sectors** 81:16
**see** 13:6,14 14:15
14:25 21:3,21,24
35:20 36:19 39:24
43:22 44:15 47:9
50:14 51:15 55:8
55:16 62:4 64:21
65:3 67:15 78:13
79:21 81:21 83:3
84:12,19 85:5,13
87:5,7,14 91:12
96:7,10 97:2
101:17,23 104:20
105:2,21 106:17
106:20 107:10
**seeing** 54:6 67:21
68:4 76:15
**seek** 31:12,18,20
42:19,22,23 43:3
43:5 69:2
**seemingly** 39:20
65:25 66:8 67:4
**seen** 54:2 68:9

75:24 76:7 90:4
101:14
**segment** 46:6
**sell** 110:17
**send** 54:13,18
57:11
**sending** 62:18
**sends** 67:13
**sense** 46:20 70:3
111:2
**sent** 23:15 54:18
57:5 61:17 73:22
101:21
**sentence** 66:4
101:25
**Separate** 22:15
41:16
**separated** 103:19
**separation** 65:10
81:4
**September** 7:18
10:8,14 30:22
**serious** 36:16
**serve** 44:2 104:13
**SERVICES** 1:24
**session** 5:6
**set** 8:8 92:8 118:7
**share** 19:10
**shared** 60:23
**sheet** 114:7,10,12
114:15 116:15
**shortage** 34:8,15,25
**shorthand** 1:20
118:3
**shortly** 78:6
**shouted** 37:5 38:3
**show** 5:8,10 89:18
**showed** 5:9 43:13
76:5
**showing** 6:24 11:12
11:18 23:3 53:10
63:23 75:19 76:6
101:7 103:11
106:19
**sign** 114:9
**signed** 3:14,17 7:16

7:18,21 10:4,9
116:20
**signing** 114:11
**similar** 18:14
**simultaneously**
34:22
**sit** 48:12
**ski** 19:17 75:11
**skiing** 75:6,9 94:15
**slap** 82:23
**sleeping** 36:18
**slichten@lichten-**
2:7
**slope** 19:17,20
**slopes** 20:12
**Smith** 2:18 78:19
**sold** 111:3
**solely** 107:21
108:16
**soon** 91:10 97:4
**sorry** 57:9 77:19
84:24 95:10
107:25
**sort** 5:23 37:19
68:4
**sought** 27:24 30:7
31:9 32:5 43:23
43:25 47:6
**sources** 31:10
**South** 2:4
**SOUTHER** 1:2
**space** 114:7
**speak** 25:8 32:12
32:16 38:4 52:4
52:24 61:18 68:22
70:20 73:19,23
74:3,7
**speaking** 9:11,14
9:17 37:13
**speaks** 37:9
**specialist** 96:18
**specific** 9:5 30:11
71:9 82:13
**specifically** 8:2
10:2 14:11 16:24
30:6 50:3 59:5

95:2
**specifics** 9:10 25:2
32:22 40:4 57:18
59:7 60:18 94:8
98:16 100:11
**speculating** 55:25
**spoke** 46:24 47:12
56:15 71:11,13,18
72:16 74:5,6
80:18 88:23
**spoken** 25:17 52:7
**SS** 116:4
**staff** 28:5 34:5,8,15
34:24
**stage** 41:2
**stages** 112:12
**stand** 44:4
**start** 30:20 46:21
**starts** 43:22
**start-up** 44:9,20,25
45:3,4,10
**start-ups** 45:20
**state** 1:21 4:4,9,12
106:10 114:6
116:3 118:4
**statement** 66:20
67:3 77:22 96:7
96:10
**STATES** 1:2
**status** 108:12
**stay** 35:14
**steps** 51:21,24
**STIPULATED** 3:4
3:9,13
**stop** 4:23
**stopped** 14:24
**Street** 4:14
**stress-induced**
36:17
**strike** 58:23 59:17
**structure** 30:8,14
33:14,16
**Stuart** 2:6 4:23
77:21
**subject** 44:2 78:16
93:16,20,24 110:4

114:11 117:23
**subjected** 14:20
**submit** 20:23 21:9
21:15
**submitted** 106:4
**subscribed** 116:20
**substance** 116:14
**suffered** 112:4
**suggest** 82:23
**supervisor** 16:15
16:16 20:22 21:10
21:12 31:16 76:20
**supposed** 49:23
**sure** 12:16 57:10
58:13,15 66:16
72:22 77:4
**surprised** 81:20
**surrounding** 27:23
60:20
**surveys** 45:17
**sworn** 3:15,17 4:4
118:7
**system** 26:13,15
**S-corporation**
107:5,22 108:10
**S-corporations**
106:24

---

**T**

**T** 3:2,2 4:2,2,2
115:2 116:2 117:2
117:7,17 118:2,2
**take** 5:19 6:11 7:3
12:19 23:5 26:5
26:22 40:9 53:12
63:25 64:25 75:21
78:11 82:24 84:5
89:22,23 94:12
101:11 113:2
**taken** 1:16,19 39:17
40:2,17 51:24
66:6 77:13 86:19
113:5 116:7
**talk** 18:13 31:22
32:3,20 38:4
47:23 68:11,13



100:6,9,13,16
**talked** 18:7 28:20
29:2 30:4 34:4
41:6 46:10 47:16
47:24 49:12 52:20
57:2 62:8 63:3
73:2,5 87:22
90:11 100:2
**talking** 34:10 35:16
46:21 88:6 95:8
95:12 99:16
**talks** 48:3
**taught** 35:3
**tax** 103:18 106:4
107:8,14 112:19
**team** 13:24 14:7
24:17 26:6,23,25
29:3,14 44:10
45:3,9,10,16,17
46:25 47:5,12
55:5,11 56:21
58:8,19 59:13,14
59:22 60:2,16,21
60:23 61:3,5 62:7
62:11,12,15 79:18
89:8 91:5,11 92:6
92:21 93:5,6
94:12,18,21,25
95:3,7,17,20,23
97:5,6,25 99:12
100:10,18,22
**teammate** 59:3
**teams** 45:7,11,19
**tech** 81:16
**technically** 97:9
**teleconference**
41:17 42:11
**teleconferences**
39:21 41:8,21,23
42:13,21 43:9
64:24 65:14,20
66:2,9,15,19,23
67:2,5 72:14
87:12,13 89:3,4,6
89:11
**telephone** 38:7

43:16 64:14 65:18
66:12 69:15,19
**tell** 14:22 16:2,6,7
20:11 43:11 44:24
51:21 55:3 56:6
61:12,13 62:15,19
69:12 71:15 73:6
74:10 94:4 100:20
**temporarily** 82:25
**tenure** 40:3
**term** 13:10
**terminated** 13:11
99:6
**termination** 9:3,7,9
14:5 90:21 105:9
**terms** 42:6 111:21
**testified** 4:5
**testifying** 3:20
**testimony** 13:20
18:25 116:7,11
118:6,9
**text** 13:5
**thank** 15:13 41:15
51:14 77:21
113:10,13
**thanks** 81:19
**thing** 16:7 61:15
82:15
**things** 19:12 27:4
40:25 90:17
**think** 26:2 31:15
68:6 73:6 78:2
79:19 82:13
**third** 65:24 106:14
**thirty** 114:16
**thought** 81:25
**threat** 83:18
**threatening** 53:24
55:13
**three** 8:18 40:6
42:8,18,20,24
47:16
**three-week** 34:13
**time** 1:18 3:11 5:9
6:4 8:13 15:9,11
19:2 21:2 23:24

24:23 25:23 26:3
26:15 29:22 36:8
41:7 43:13 46:7
51:14 58:16 64:14
67:18 76:14 80:18
86:19 103:23
109:16 111:21
113:11,14
**times** 42:5,8 57:15
93:12
**timing** 54:15
**tips** 105:17 106:2
**today** 5:11 48:12
51:11,12 54:3,6
78:10 80:16 109:5
**told** 16:19 43:6,7
44:8 65:12 69:4,9
69:19 74:11 92:23
93:15,23
**tomorrow** 78:12
87:11
**tone** 18:5 37:23
38:2
**top** 111:4
**toxic** 24:16,24
25:10 29:18,25
**trajectory** 44:13
45:23 46:2
**transcript** 5:20,22
6:2 114:17,18
116:7,9 118:8
**transferred** 56:25
**travel** 39:7 41:10
41:12 82:25 84:5
**traveling** 39:22
**treated** 46:16
**trial** 1:15 3:12
**trip** 17:10 18:24
42:14 59:15 64:11
71:8,22 72:4
75:11 78:5 89:13
**trips** 40:2,9
**true** 116:9,12 118:8
**trusts** 106:24 109:2
**turn** 7:24 51:3
105:13

**turned** 102:23
**twice** 91:22
**two** 8:21 42:18,20
42:24 67:11 79:6
79:11 90:17 94:17

_____
U
**U** 3:2 117:17
**Uh-huh** 10:15
102:3
**ultimately** 51:17
70:7
**unable** 34:22
**uncalled** 79:18
**uncommon** 74:15
**understand** 5:13
10:13 13:7 28:25
76:15 87:19 94:9
**understanding**
31:3,5,8,11 54:11
74:20 93:13
**understood** 58:15
**unemployment**
104:23 105:5
106:10
**Unit** 4:14
**UNITED** 1:2
**units** 111:3
**unjustified** 36:15
**unquote** 92:23
**unstable** 67:24
**unwelcome** 14:23
**use** 8:13 36:24
37:15
**utter** 37:21

_____
V
**V** 4:1,2,2 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1

32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1
**vacation** 19:22
**vacationing** 19:4
**vacations** 19:8,13
**vacuum** 28:18
**Valentia** 1:4,16
4:11 87:9 90:24
116:6,18 117:3
**Valentia's** 88:11
**Valentina** 87:9
**varied** 42:7
**variety** 81:16
**various** 60:21
**verbal** 5:17
**verbally** 55:12
**versus** 41:8
**Villetti** 1:4,16 4:1
4:11,16 5:1 6:1,24
7:1,24 8:1,4 9:1





MAGNA
LEGAL SERVICES

10:1 11:1,12 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1,3
22:1 23:1,3,8 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1,10 54:1
55:1 56:1 57:1,25
58:1,6 59:1 60:1
61:1 62:1 63:1,23
64:1,4 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1,19
75:24 76:1 77:1
77:12 78:1 79:1
79:16 80:1 81:1
82:1 83:1,5 84:1
85:1 86:1,21 87:1
88:1 89:1,18 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1,7
102:1 103:1,11
104:1,17 105:1,12
106:1,12 107:1
108:1 109:1 110:1
111:1 112:1 113:1
113:8 116:6,18
117:3
**voice** 20:12
**VSB** 1:6

---
**W**
---
**W** 116:2 117:2
**wages** 105:17 106:2
**waived** 3:8

**want** 54:9 113:10
**wanted** 35:5 55:4
**wasn't** 26:16 42:10
58:10 67:7 68:24
88:5
**way** 25:16 27:6,9
28:22 31:22 33:11
34:24 37:9,25
39:5 46:9 65:16
68:7 77:7 84:18
85:12 118:12
**ways** 18:2 26:21
35:25 38:20 40:20
**website** 110:18
112:3
**week** 42:4,7,8
87:13 89:6,12,17
91:22,22 92:5
**weeks** 80:25
**went** 19:25
**witness** 3:20 4:3 7:7
12:2,20 19:6 23:7
64:3 75:23 97:20
110:10 113:13
114:2 117:3
**Witness(es)** 118:6,9
**woman** 29:9 68:8
73:7 91:8
**women** 9:19 10:12
10:21 23:17 46:16
46:17 47:18,19,20
68:10 97:22,24
98:3
**work** 11:22 24:16
24:24 25:10 29:19
29:25 40:10 51:11
53:25 55:14 57:7
57:13 58:3,9,20
59:2,11 60:15,24
62:3 77:6,8 87:11
90:24 91:3,5,9
92:18 95:2 96:8
96:13,15,24 100:9
109:4 117:20
**worked** 15:4
103:23

**working** 91:18
104:8
**wouldn't** 35:12
**wrath** 93:16,20,24
94:7
**writes** 87:7
**writing** 25:7,14,23
57:12,17 58:5
102:20 103:4
110:3,6 117:23
**written** 55:12 57:5
57:24 58:7,18
117:19
**wrong** 95:11
**wrote** 46:18 90:19
**www.MagnaLS.c...**
1:25
**W-2** 103:23 105:20
106:5

---
**X**
---
**x** 1:3,10 117:2,7,7
117:17

---
**Y**
---
**Yamin** 34:18
**Yamin's** 35:8
**yeah** 89:17
**years** 8:21
**yell** 38:24
**York** 1:2,11,11,21
2:5,5,11,11,17,17
4:5,15,15 41:13
69:21 70:10 79:12
87:11 91:19 106:9
116:3 118:5

---
**Z**
---
**zoom** 93:17

---
**$**
---
**$10,005** 104:25
**$19,835** 106:19
107:3,20 112:4
**$56,359** 105:23

---
**1**
---
**1** 14:17 64:19
105:16 106:13
**1B** 4:14
**1st** 64:19 65:9
68:21 69:14 72:24
77:16,18 87:4
**1.5** 87:12 89:5,16
**100** 65:13
**10004** 2:11
**10010** 2:17
**10016** 2:5
**10065** 4:15
**101** 117:14
**102** 117:21
**10200** 1:6
**103** 117:15
**1040** 103:8 105:13
106:13 117:15
**107** 117:22
**1099s** 106:8
**1099-G** 104:19
106:9
**11** 7:18 14:11 20:17
117:9,10
**11:11** 87:4
**11:28** 72:8
**110** 117:22
**12** 23:25 27:18
**12th** 24:13 52:6,14
**12:00** 78:12
**12:04** 64:20
**14** 1:12 116:8
**16** 56:21 87:2
**162** 4:14
**17** 106:16 107:10
**18** 1:6 97:19
**19th** 90:20
**19,835** 108:15
112:13

---
**2**
---
**2** 7:25 86:25 87:12
89:6,16
**2nd** 2:17
**2:16** 1:13

**2009** 107:3
**2016** 111:7
**2017** 7:18 10:8,14
30:18 31:2 33:18
44:2
**2018** 23:25 27:19
56:21 59:20 78:24
81:23 84:15 101:4
103:18,21,24
104:7,14 105:6
106:2,4 107:3,14
110:24 112:6,20
117:14
**2019** 1:12 116:8
**212-453-0702** 2:12
**212-812-9511** 2:18
**22** 117:11
**27** 101:4 117:14
**28th** 2:11 77:20,23
78:6 81:23

---
**3**
---
**3** 51:11
**3:00** 78:10
**30** 114:16
**387** 2:4

---
**4**
---
**4** 117:5
**4:48** 113:14

---
**5**
---
**5** 8:2,9
**5th** 2:5
**53** 117:12
**57** 117:19

---
**6**
---
**6** 117:9
**61st** 4:14
**63** 117:12
**646-588-4872** 2:6
**675** 2:16

---
**7**
---
**7** 8:18



**75** 117:13

_____

**8**

**86** 117:13
**866)624-6221** 1:24

_____

**9**

**9:23** 24:2

