Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- x
VALENTIA VILLETTI and FAIZA JIBRIL, M.D.,

                        Plaintiffs,        Case No.:
                                  1:18-cv-10200-VSB-KNF

        -against-

GUIDEPOINT GLOBAL, LLC,

                        Defendant.
----------------------------------------- x
                        One Battery Park Plaza
                        New York, New York

                        October 3, 2019
                        10:05 p.m.


     EXAMINATION BEFORE TRIAL of the

Plaintiff, FAIZA JABRIL, taken by the

Defendant in the above-entitled action, held

at the above time and place, pursuant to Case

Management Plan, taken before Stephen P.

Sudano, a shorthand reporter and Notary

Public within and for the State of New York.

**********************************************
                Magna Legal Services
                  (866) 624-6221
                  www.MagnaLS.com



Page 2

2  A P P E A R A N C E S :
3
4      LICHTEN & BRIGHT, P.C.
          Attorneys for Plaintiffs
5        387 Park Avenue South
          New York, New York 10016
6
      BY:  STUART LICHTEN, ESQ.
7
8
9      GORDON REES SCULLY MANSUKHANI, LLP
          Attorneys for Defendant
10       1 Battery Park Plaza, 28th Floor
          New York, New York 10004
11
      BY:  DAVID GRECH, ESQ.
12
13
14  ALSO PRESENT:
15  Catherine Smith, Esq., general counsel for
16  Guidepoint Global, LLC.
17
18
19
20
21
22
23
24
25

Page 3

2      S T I P U L A T I O N S :
3  IT IS HEREBY STIPULATED AND AGREED by and
4  between the attorneys for the respective
5  parties herein, that filing, sealing and
6  certification, and the same are, hereby
7  waived.
8
9  IT IS FURTHER STIPULATED AND AGREED that all
10  objections except as to the form of the
11  question, shall be reserved to the time of
12  the trial.
13
14  IT IS FURTHER STIPULATED AND AGREED that the
15  within deposition may be signed and sworn to
16  by an officer authorized to administer an
17  oath, with the same force and effect as if
18  signed and sworn to before the Court.
19              xxxxx
20
21
22
23
24
25

Page 4

2      F A I Z A   J I B R I L, the witness herein,
3  having been first duly sworn before a Notary
4  Public of the State of New York, was examined
5  and testified as follows:
6  EXAMINATION BY
7  MR. GRECH:
8      THE REPORTER:  Please state your
9  name for the record.
10      THE WITNESS:  Faiza Jibril.
11      THE REPORTER:  Do you presently
12  reside at 1191 Ocean Avenue, PH4,
13  Brooklyn, New York 11230?
14      THE WITNESS:  Yes.
15  Q.  Good morning, Dr. Jibril.
16  A.  Good morning.
17  Q.  My name is David Grech.  I'm with
18  the firm Gordon, Rees, Scully, Mansukhani,
19  and I'm senior counsel in their employment
20  group, and we represent Guidepoint Global,
21  LLC.
22      I'm just going to give you a few
23  instructions before we begin.  If you have
24  any questions about my instructions, just
25  stop me and let me know, and I'll try to

Page 5

1      F. JIBRIL, M.D.
2  better explain them.
3  A.  Okay.
4  Q.  This is a deposition.  The
5  expectation is that I ask questions with
6  answers from you.  The questions will be
7  about the underlying lawsuit as against
8  Guidepoint.  If you don't understand not
9  only just my instructions but any of the
10  questions that I might ask as we go along,
11  please say so, ask me to rephrase it, and I
12  will attempt to do so.
13      We have a reporter with us here
14  today, so I would ask that your responses be
15  verbalized.  No nodding or gestures because
16  the reporter must take down your responses
17  to create a record.
18      On that note, so that record is
19  clear, if you can sort of guess where my
20  question might be going or the end of it
21  might be, I'll just ask you for the sake of
22  the record, again, for me to finish it, and
23  then you can respond.
24      If you need a break at any time,
25  please just let me, let your counsel know,



Page 6

```
1            F. JIBRIL, M.D.
2   and we'll accommodate you.  The only
3   condition on that is that if there's a
4   question pending at that point, we'd just
5   ask you to answer it and then we would take
6   your break.
7        A.  Okay.
8        Q.  Do you have any questions about
9   those instructions?
10       A.  No.
11       Q.  Do you have any instructions about
12  this process at all?
13       A.  No.
14       Q.  Do you know why we're here today?
15       A.  Yes.
16       Q.  Okay.
17           Why do you believe we're here
18  today?
19       A.  We're here to -- as part of the
20  proceedings in the lawsuit Ms. Valletti and
21  I versus Guidepoint Global.
22       Q.  Okay.
23           So you're suing Guidepoint Global.
24       A.  Yes.
25       Q.  Okay.
```

Page 7

```
1            F. JIBRIL, M.D.
2            Why are you suing Guidepoint
3   Global?
4        A.  Failure to hire or hiring
5   discrimination.
6        Q.  Okay.
7            So it's your position that
8   Guidepoint failed to hire you?
9        A.  Yes.
10       Q.  And Ms. Valletti has separate but
11  related claims.
12       A.  Yes.
13       Q.  Why do you feel that Guidepoint
14  failed to hire you?
15       A.  Based on my gender.
16       Q.  Okay.
17           What gives you that belief?
18       A.  I believe that I was a
19  well-qualified candidate for the position.
20  The hiring managers at the time,
21  Ms. Valletti and Bouker Pool were
22  recommending me to be hired.
23       Q.  Dr. Jibril, have you ever been
24  deposed before?
25       A.  No.
```

Page 8

```
1            F. JIBRIL, M.D.
2        Q.  Have you ever been party to a
3   lawsuit before?
4        A.  Divorce and custody proceedings.
5        Q.  Okay.
6            Separate and apart from divorce
7   and custody proceedings, have you ever been
8   party to a lawsuit?
9        A.  No.
10       Q.  And I'm referring to as a doctor.
11  You're an M.D.?
12       A.  Yes.
13       Q.  Can you tell us where you went to
14  medical school?
15       A.  I did my undergraduate at
16  University of East Anglia and subsequently
17  received my medical degree at ABU.
18       Q.  What does ABU stand for?
19       A.  Ahmadu Bayero University.
20       Q.  Could you spell that for the
21  reporter?
22       A.  A-H-M-A-D-U B-A-Y-E-R-U [sic].
23       Q.  And so you earned your medical
24  degree from ABU.
25       A.  Yes.
```

Page 9

```
1            F. JIBRIL, M.D.
2        Q.  And where is ABU located?
3        A.  Zaria, Nigeria.
4        Q.  And when did you graduate from ABU
5   with your M.D.?
6        A.  2012.
7        Q.  And what was the next step in the
8   course of your medical education/profession
9   after graduation in 2012?
10       A.  So I did some training in
11  obstetrics and gynecology at -- the name of
12  the hospital is New Somerset Hospital in
13  Cape Town.
14       Q.  South Africa?
15       A.  Yes.
16       Q.  So you trained at New Somerset
17  Hospital beginning in 2012, around about?
18       A.  Around about.
19       Q.  And how long did that training
20  last?
21       A.  A year.
22       Q.  Okay.
23           And after your training in Cape
24  Town, what was the next step in your medical
25  education career?
```



Page 10

```
1              F. JIBRIL, M.D.
2      A.  I moved to the United States and
3  shortly thereafter started working for my
4  current employer, The Expert Institute.
5      Q.  And -- I'm sorry, you moved to the
6  United States.
7          Where were you born?
8      A.  I was worn in Egypt.
9      Q.  Had you lived in Africa since
10  birth through medical school?
11      A.  No, I -- my family traveled quite
12  a lot, but I did most of my primary and
13  secondary education in the UK, Scotland and
14  England.
15      Q.  And forgive me.  The school you
16  mentioned before ABU, what was that school?
17      A.  University of East Anglia.
18      Q.  And where is that located?
19      A.  In Norwich, England.
20      Q.  So schooling in Europe, UK, and
21  Scotland, Nigeria for medical school?
22      A.  Yes.
23      Q.  South Africa for training?
24      A.  Yes.
25      Q.  And that brings you to 2013:
```

Page 11

```
1              F. JIBRIL, M.D.
2  Moved to the United States.
3      A.  Yes.
4      Q.  And you now at that point started
5  work for which entity?
6      A.  The Expert Institute.
7      Q.  And in what capacity did you begin
8  working at Expert Institute?  In around
9  about 2013.
10      A.  Initially, I worked part-time as
11  part of the content team.  I was working on
12  marketing material.
13      Q.  Okay.
14          And at some point, did your
15  position at Expert Institute change?
16      A.  Yes.
17      Q.  And when did it first change?
18      A.  About four months into my
19  employment around April of 2013.
20      Q.  I'm sorry.  When you were working
21  for Expert Institute, where were you
22  located?
23      A.  In Brooklyn -- I'm sorry.  Can I
24  clarify?  You mean where was the company, or
25  where did I live?
```

Page 12

```
1              F. JIBRIL, M.D.
2      Q.  Fair question because it was an
3  awkward question from me.
4          Where were you working when you
5  worked for Expert Institute?
6      A.  I was working at their
7  headquarters.
8      Q.  Okay.
9          And where is they're headquarters
10  located?
11      A.  At the time, it was 75 Maiden
12  Lane.
13      Q.  In Manhattan?
14      A.  Yes.
15      Q.  And were you living in Brooklyn at
16  that time?
17      A.  Yes.
18      Q.  Okay.  Thank you.
19          And Expert Institute has its
20  headquarters in New York City.  Does it have
21  other officers?
22      A.  Yes.
23      Q.  Okay.
24          Is it nationwide?  International?
25      A.  International.
```

Page 13

```
1              F. JIBRIL, M.D.
2      Q.  Is it sort of in the same sphere
3  as Guidepoint?  Doing the same sort of work?
4      A.  No.  So our clients are attorneys,
5  law firms, litigators.
6      Q.  You have a CLE department?
7      A.  Some of our, um, webinars can be
8  used for CLE credit depending on which
9  state.  We're not accredited for all states.
10      Q.  Understood.  Okay.
11          So then bringing -- going back to
12  April 2013, you're at Expert Institute for
13  about four months.  You said your role there
14  had changed?
15      A.  Yes.
16      Q.  How did your role change?
17      A.  It expanded to working in the
18  research team.
19      Q.  Were you still part-time at this
20  point?
21      A.  I was now full-time.
22      Q.  And you were now part of the
23  research team?
24      A.  Yes.
25      Q.  And what was your compensation
```



Page 14

1          F. JIBRIL, M.D.
2    starting in April 2013 when you became
3    full-time?
4        A.   $50,000 a year.
5        Q.   Was that total or is that base?
6        A.   Total.
7        Q.   Okay.
8            So how long did you work full-time
9    as part of Expert Institute's research team?
10       A.   Um, roughly three years with
11   promotions along the way.
12       Q.   Could you walk us through those
13   promotions, you know, in sequence?
14       A.   Yep.
15       Q.   And when they occurred?
16       A.   Sure.  So the rest of 2013, I was
17   an associate on the research team.  I was
18   promoted to senior medical research
19   associate by the end of 2013.
20           In 2014, I was overseeing the
21   entire department.
22       Q.   And which department is this, the
23   research --
24       A.   Medical research team.
25       Q.   Medical research team.

Page 15

1          F. JIBRIL, M.D.
2            And this is research to develop
3    content for these presentations?
4        A.   Part of it, but a diminishing part
5    of it.  The majority of my responsibilities
6    was screening, vetting, and connecting our
7    clients with medical experts for their
8    cases.  I was still developing content for
9    webinars.
10       Q.   And when you say experts for their
11   cases, we're talking about expert witnesses
12   for litigation and things of that nature?
13       A.   Correct.
14       Q.   All right, so that's in 2013.
15           How long did you serve in that
16   capacity overseeing the medical research
17   department?
18       A.   I would say up in the end of 2016.
19       Q.   Okay.
20           And what happened then?
21       A.   I was promoted to a customer --
22   account management role, so being more
23   client-facing, helping the sales team win
24   new business.
25       Q.   Forgive me.  Going back to your

Page 16

1          F. JIBRIL, M.D.
2    promotion to associate in the research
3    department or from associate to senior
4    medical research associate:  How did that
5    affect your compensation at Expert?
6        A.   The first promotion, I think my
7    base salary increased from $50- to $60-
8    with --
9        Q.   This is at senior -- when you
10   became senior medical research associate?
11       A.   Correct.
12       Q.   Okay.
13           And I'm sorry.  You're going to
14   say?
15       A.   And there were quarterly bonuses
16   based on performance totaling around $5,000
17   by the end of 2014.
18       Q.   $5,000 total for the year or for
19   quarter?
20       A.   For the year.
21       Q.   And did you earn that bonus for
22   2014?
23       A.   Yes.
24       Q.   Okay.
25           And then if I have this right, you

Page 17

1          F. JIBRIL, M.D.
2    were promoted to a capacity where you were
3    overseeing the entire medical research
4    department in 2014?
5        A.   Yes.
6        Q.   Did that come with a change in
7    your compensation?
8        A.   Yes, by that point, I was earning
9    $70,000.
10       Q.   Any bonus structure associated
11   with that?
12       A.   Again, quarterly bonuses.
13       Q.   The same amounts, $5,000?
14       A.   Uh-huh.
15       Q.   And did you earn a bonus in your
16   role as overseeing medical research
17   department?
18       A.   And just to clarify that role --
19       Q.   Please.
20       A.   -- was associate director of
21   medical research.
22       Q.   And you held that beginning in
23   2014?
24       A.   2016.
25       Q.   Through 2016 or starting in 2016?



Page 18

```
1            F. JIBRIL, M.D.
2     A.  Starting in 2016, that's when my
3  title changed to associate director.
4     Q.  Okay.
5        And you helped -- was there a
6  point when you were in the medical research
7  department overseeing work there but not in
8  the title of associate director?
9     A.  Yes, informally.
10    Q.  Okay.
11    A.  As the team grew.
12    Q.  Okay.
13       So at the end of -- you were
14 senior medical research associate until the
15 end of 2013?
16    A.  2014.
17    Q.  Until the end of 2014, okay.
18       And then in 2014, you were
19 overseeing the medical research department?
20    A.  Yes.
21    Q.  Informally at first?
22    A.  Informally at first and --
23    Q.  And then -- I'm sorry.
24    A.  And then my title changed to
25 associate director.
```

Page 19

```
1            F. JIBRIL, M.D.
2     Q.  Okay.
3        And when --
4     A.  Of medical research.
5     Q.  And when did that formal title
6  change occur?
7     A.  I believe toward the end of 2016.
8     Q.  Okay.
9        So from 2014 through the end of
10 2016, you were overseeing the medical
11 research department.  But then at the end of
12 2016, you were the named associate director
13 of medical research?
14    A.  Yes.
15    Q.  And then when did you take on the
16 title of account manager?
17    A.  It was never a formal title.  I
18 just started doing it, essentially, helping
19 our business development team, and I did
20 that as my sole responsibility for the
21 beginning part of 2017.
22    Q.  Did that affect your compensation?
23    A.  No.
24    Q.  So you were still at $70,000?
25    A.  Yes.
```

Page 20

```
1            F. JIBRIL, M.D.
2     Q.  Okay.
3        What happened next in your career
4  at Expert?
5     A.  At around -- around April of 2017,
6  I formally moved to the business development
7  team.
8     Q.  Did that come with a change in
9  compensation?
10    A.  It did.  So my base salary stayed
11 the same, but I then was earning commissions
12 based on my performance.
13    Q.  Okay.
14       How long did you stay part of the
15 business development team, which started in
16 April 2017?
17    A.  I am still currently on the
18 business development team.
19    Q.  Okay.
20       Do you have a title?
21    A.  My current title is vice president
22 of enterprise.
23    Q.  And what's your current
24 compensation as vice president of enterprise
25 for Expert?
```

Page 21

```
1            F. JIBRIL, M.D.
2     A.  It will be, or should be, about
3  $333,000 by end of year.
4     Q.  By end of 2019?
5     A.  Yes.
6     Q.  And I'm sorry.  You said, "should
7  be"?  Why is that?
8     A.  If I hit all my quotas.
9     Q.  The commissions?
10    A.  Exactly.
11    Q.  Do you have a base?
12    A.  Yes.
13    Q.  What's your base?
14    A.  Current base is $140,000.
15    Q.  So from 2017 to date, you're part
16 of the business development team?
17    A.  Yes, but I did not enter the role
18 of vice president until the beginning of
19 2019, so January of 2019.
20    Q.  Thank you.  That was going to be
21 my next question.
22    A.  That is when my base was increased
23 to $140,000.
24    Q.  Could you just walk us through
25 April 2017 through your promotion to vice
```



Page 22

```
 1           F. JIBRIL, M.D.
 2  president and then --
 3           (Whereupon, an employee of Gordon
 4      & Rees, LLP entered the room, and a
 5      discussion was held off the record at
 6      this time.)
 7      Q.  From 2017 -- could you walk us
 8  through 2017 in April to January 2019, any
 9  changes in compensation --
10      A.  Yes.
11      Q.  -- or titles?
12      A.  So I started on the business
13  development team Q2 of 2017, so right around
14  April.  Um, from April to June, I met my
15  performance quota, and so my base was
16  increased to $87,500.
17      Q.  So based on meeting that quota,
18  you would have earned a bonus --
19      A.  So --
20      Q.  -- prior?
21      A.  Initially, I -- I didn't earn a
22  bonus --
23      Q.  Okay.
24      A.  -- so by base compensation was
25  $87 --
```

Page 23

```
 1           F. JIBRIL, M.D.
 2      Q.  Okay.
 3      A.  -500.
 4           THE REPORTER:  Wait, wait, wait.
 5      Can you repeat your base?
 6      A.  My base, when I first joined the
 7  business development team was $70,000.  It
 8  was increased June of 2017 to $87,500.
 9      Q.  Thank you.
10           And correct me if I'm wrong.  I
11  thought you said because you had met your
12  quotas, that your base was increased
13  $87,500; is that correct?
14      A.  Correct.
15      Q.  And was your base at $70-
16  accompanied by performance-based bonuses?
17      A.  No, not at that time --
18      Q.  Okay.
19      A.  -- because it was a trial period,
20  essentially --
21      Q.  Okay.
22      A.  -- to see if the business
23  development role would be a good fit.
24      Q.  All right.
25           So it sounds like it was a good
```

Page 24

```
 1           F. JIBRIL, M.D.
 2  fit?  And then in June 2017, your base was
 3  increased to $87,500.
 4      A.  Correct.
 5      Q.  Were there any commissions
 6  associated with that?
 7      A.  Not at that time.
 8      Q.  All right, so that's your base.
 9      A.  Yes.
10      Q.  All right.
11           What happened next in your
12  progression in compensation at Expert?
13      A.  So I continued to meet my
14  performance quotas.  Um, I received a
15  performance bonus of about $10,000 that
16  year.
17      Q.  In 2017?
18      A.  In 2017.
19      Q.  Okay.
20      A.  And then in 2018, I began earning
21  commissions for my sales.
22      Q.  And your base was then -- was your
23  base then still $87,5-?
24      A.  Yes, my base --
25      Q.  So --
```

Page 25

```
 1           F. JIBRIL, M.D.
 2      A.  Sorry.  Go ahead.
 3      Q.  No, no.  Go ahead.
 4      A.  My base stayed $87,5- until, I
 5  believe, June of 2018.
 6      Q.  And from the beginning of 2018
 7  through June of 2018, your base was $87,5-
 8  plus commissions.
 9      A.  Yes.
10      Q.  And then what happened in June of
11  2018?
12      A.  My base was increased to $100,000.
13      Q.  Also with the opportunity for
14  commissions?
15      A.  With the opportunity for
16  commissions.
17      Q.  Okay.
18           How long did you stay at the
19  $100,000-plus-commissions level?
20      A.  Until January of 2019.
21      Q.  And was that when you were
22  promoted to VP?
23      A.  Correct.
24      Q.  And your base then increased to
25  $140-?
```



Page 26

```
1              F. JIBRIL, M.D.
2      A.  Yes.
3      Q.  Also with the opportunity for
4  commissions?
5      A.  Yes.
6      Q.  Would you believe might lead to
7  approximately $200,000 in bonuses for this
8  year?
9      A.  Correct.
10     Q.  It's a good year.
11     A.  Yeah.
12     Q.  Okay.
13         So at what part in time did you
14 seek employment with Guidepoint?
15     A.  Toward the end of 2017, I believe,
16 a recruiter reached out to me from
17 Guidepoint.
18     Q.  Okay.
19         And who was that recruiter?
20     A.  I don't recall his name.
21     Q.  James?
22     A.  Yes, James Lipkin [sic].
23     Q.  Lukban?
24     A.  Lukban.
25     Q.  L-U-K-B-A-N.
```

Page 27

```
1              F. JIBRIL, M.D.
2      A.  Thank you.
3      Q.  So James reached out to you.  You
4  understood that he was from Guidepoint?
5      A.  Yes.
6      Q.  And what did James have to say?
7      A.  He reached out to me on LinkedIn
8  and said that there was a role for content
9  manager or content strategist that would
10 appear to be a good fit for my background.
11         I had an initial conversation with
12 him, and he then scheduled an in-person
13 meeting, interview, with several employees
14 of Guidepoint.
15     Q.  Now, were you looking to change
16 employment at this point?
17     A.  No, but I was open to
18 opportunities.
19     Q.  Okay.
20         And you said these conversations
21 with James were the end of 2017?
22     A.  I believe so.
23     Q.  And you went into Guidepoint for
24 an in-person interview?
25     A.  Yes.
```

Page 28

```
1              F. JIBRIL, M.D.
2      Q.  And when did that happened?
3      A.  Again, I think it was around the
4  end of 2017, beginning of 2018.
5      Q.  And this was in Guidepoint's
6  offices?
7      A.  Yeah.
8      Q.  New York City offices?
9      A.  Yes.
10     Q.  And who did you meet with?
11     A.  I met with Valentia Valletti;
12 Bouker Pool; James, the recruiter; and two
13 other employees of that team.
14     Q.  Do you remember their names?
15     A.  I don't.
16     Q.  How did that interview go?
17     A.  I thought it went very well.  I
18 was very interested in the role.  I did make
19 it clear that I didn't have financial
20 industry experience.  I was told that
21 wouldn't be an issue given my other
22 experience and background.
23     Q.  Well, how did the issue of
24 financial experience come up?  Was it a
25 requirement?  A preference?  How did come
```

Page 29

```
1              F. JIBRIL, M.D.
2  up?
3      A.  I was told that it was not a
4  requirement, which is why they had reached
5  out to me, but it came up because I said
6  that my only concern in the role, the only
7  thing that would limit me was the fact that
8  I did not have buy side or sell side
9  experience.
10     Q.  And who in the group responded to
11 you on that issue, on the buy side/sell side
12 experience?
13     A.  I believe I spoke with all the
14 interviewers about that, and they all told
15 me the same, that it wasn't an issue for
16 them.
17     Q.  And what do you understand buy
18 side/sell side to be?  Experience in those.
19     A.  Financial terms.  My understanding
20 is Guidepoint's employees -- sorry.
21 Customer, clients, are financial industry
22 analysts who are looking to due diligence,
23 potential investments, and those are terms
24 associated.
25         And my understanding was from my
```



Page 30

```
1            F. JIBRIL, M.D.
2    interviews that that would be experience
3    that I would gain along the role and that it
4    wasn't essential to starting in the role.
5        Q.   So your understanding was that you
6    didn't need to have that walking in the
7    door; you would sort of develop that in the
8    role.
9        A.   Correct.
10       Q.   Did you have talks about what the
11   compensation for this content strategist
12   position would be?
13       A.   I did with James, the recruiter.
14   I told him what I was currently making and
15   what I would leave for.
16       Q.   And you were currently making
17   $87,5-?
18       A.   Yes.
19       Q.   And did you have those
20   conversations with James before the
21   interview?
22       A.   I had it with him during the phone
23   interview, phone screening, to make sure
24   that, you know, we weren't wasting each
25   other's time and again at the end of the
```

Page 31

```
1            F. JIBRIL, M.D.
2    four interviews that I had with the hiring
3    manager and then the two employees.
4        Q.   I'm sorry.  You had four in-person
5    interviews?
6        A.   Correct, all in quick successions.
7        Q.   Okay.
8        A.   Same day.
9        Q.   Oh, same -- all right, so let's
10   walk through that again.
11       So it's the end of 2017, early
12   2018.  You go into Guidepoint for
13   interviews?
14       A.   Yes.
15       Q.   With Ms. Valletti, Mr. Pool,
16   Mr. Lukban, and two others?
17       A.   Two other employees, yes.
18       Q.   Were they all at the same time, or
19   did you meet with them separately?
20       A.   All in succession.
21       Q.   Okay.
22       So can you walk us through sort of
23   the first interview?  Who did you meet with
24   first?
25       A.   The first interview was an
```

Page 32

```
1            F. JIBRIL, M.D.
2    employee of the content team.  She was a
3    direct report to Valentia, and she told me a
4    little bit more about the day-to-day of her
5    role.  I discussed my background with her,
6    why I was interested in the role.
7        The second employee had, um, sort
8    of a tangential role as compared to
9    Valentia.  His background was less on the
10   medical health care side of things and more
11   on the products.  I think he talked to me
12   about wearable technology.
13       Q.   Okay.
14       If I said Ms. Yamin, Leona Yamin,
15   does that refresh your recollection as to
16   who may have met with?
17       A.   Actually, I just don't recall the
18   name.
19       Q.   Okay.
20       If I said the name Justin Ruiz,
21   does that refresh your recollection about
22   who you might have met with?
23       A.   Potentially.  I really couldn't
24   say with certainty.
25       Q.   Okay.  All right.
```

Page 33

```
1            F. JIBRIL, M.D.
2        So your first interview as with a
3    female employee who was a direct report to
4    Ms. Valletti.
5        A.   Yes.
6        Q.   The second interview was with a
7    male employee, worked with content but not
8    necessarily health care.
9        A.   Yes.
10       Q.   And he talked to you about
11   wearable technology.
12       A.   Yes.
13       Q.   Okay.
14       And then who did you meet with?
15       A.   Then I met with Valentia.
16       Q.   So that was your third interview
17   that day.
18       A.   Yes.
19       Q.   How long are these interviews
20   lasting?
21       A.   The first two, probably not much
22   longer than 30 minutes, 45 minutes.  The
23   interview with Valentia was about just over
24   an hour, I think.
25       Q.   Okay.
```



Page 34

F. JIBRIL, M.D.
1
2       And what did you and Valentia talk
3   about?
4       A.   Talked about the role.  We talked
5   about why they were potentially interested
6   in me specifically.  She talked about her
7   vision for the team.
8       I have to note that the two
9   interviews before her spoke very highly of
10  her and how she was very enthusiastic and
11  bringing a lot of expertise to the role, so
12  it -- it was a productive conversation.
13      Q.   And just curious:  How would that
14  have come up, you know, if the interviewers
15  were asking you questions about your
16  background, that they would have talked
17  about the third person you were going to
18  interviewer that day?
19      A.   I asked.  I asked about the team
20  dynamics.
21      Q.   Okay.
22      A.   I definitely wanted to find out
23  about -- about the company itself, what it
24  would be like to work there, so I asked just
25  as many questions as they asked me.

Page 35

F. JIBRIL, M.D.
1
2       Q.   Okay.
3       So you were asking about the team
4   and the personnel on the team.
5       A.   Yes.
6       Q.   Okay.
7       Would this have been a position
8   where you would have reported to
9   Ms. Valletti?
10      A.   Correct.
11      Q.   And did she make that clear to you
12  in this interview?
13      A.   Yes.
14      Q.   What, if anything, did
15  Ms. Valletti share with you during the
16  interview about her hiring authority?
17      A.   She let me know that she was the
18  hiring manager, that Bouker was also part of
19  the decision making process, but that he was
20  deferring to her to make a decision.
21      I also just addressed that with
22  Bouker in my interview with him.  I asked
23  him about --
24      Q.   And I'm sorry.  That would have
25  been your fourth?  You would have

Page 36

F. JIBRIL, M.D.
1
2   interviewed with Bouker next?
3       A.   Yes.
4       Q.   So that's your fourth interview?
5       A.   Yes.
6       Q.   I'm sorry.
7       And then if you could tell us
8   where you were going to go then.  You
9   addressed that with Bouker?
10      A.   Yes, so at the end of my interview
11  with Bouker, he certainly that said that,
12  you know, hiring decision was Valentina's.
13      I asked about next steps, if there
14  was anyone else that I would be interviewing
15  with.  And he said, "No, the only person
16  more senior than me would be the CEO,
17  Albert," and that he wouldn't be part of the
18  decision.
19      Q.   Okay.
20      So your battery of interviews
21  ended.  What were your next steps in your
22  candidacy with Guidepoint?
23      A.   Just to be complete, I did have
24  one last touch point with James --
25      Q.   Sure.

Page 37

F. JIBRIL, M.D.
1
2       A.   -- the recruiter where we
3   discussed salary, and he made it clear that,
4   um, the next step would be someone from
5   HR -- he made it clear that the next step
6   would be HR reaching out about an offer.
7       Q.   And when you had a conversation
8   with James about salary what amounts or
9   ranges were you talking about?
10      A.   We were talking about $140- to
11  $160-.
12      Q.   And that would be base?
13      A.   Yes.
14      Q.   All right.
15      Did they take about any bonuses
16  associated with that?
17      A.   No, but I did know that Valentia
18  earned bonuses.
19      Q.   And how did you learn that?
20      A.   Though my interview.
21      Q.   With her?
22      A.   Yes.
23      Q.   Was it your understanding that you
24  also would be earning bonuses, or there was
25  at least that potential?



10  (Pages 34 to 37)

Page 38

```
1              F. JIBRIL, M.D.
2       A.  My inference was that there was a
3   potential.
4       Q.  Had you met Ms. Valletti before
5   this?
6       A.  No, the interview was my first
7   time meeting her.
8       Q.  All right.
9           So you had conversations with
10  James where he told you the salary range for
11  the position would be $140- to $160-?
12      A.  Well, he asked me what my salary
13  expectations --
14      Q.  Oh, okay.
15          And you said $140- to $160-.
16      A.  And he said that that was -- yes,
17  and he said that would be within the range.
18      Q.  Okay.
19          Was there any other follow-up had
20  with James --
21      A.  Yes.
22      Q.  -- about the position?
23          What was that follow-up?
24      A.  I sent thank you emails to the
25  interviewers.  He asked me for writing
```

Page 39

```
1              F. JIBRIL, M.D.
2   samples, which I provided him.
3       Q.  References?
4       A.  And references.
5           My references were interviewed.
6       Q.  How many references?
7       A.  Two.
8       Q.  And when you say they were
9   interviewed, what do you mean?
10      A.  They spoke with James.
11      Q.  James reached out to your
12  references?
13      A.  Yes.
14          (Whereupon, a discussion was held
15          off the record at this time.)
16      Q.  After you provided your references
17  to James and he -- you understood he spoke
18  with your references, what was the next step
19  in your candidacy with Guidepoint?
20      A.  My expectation was that I would
21  hear back with an offer.
22      Q.  And did that in fact happen?
23      A.  No.
24      Q.  What did you hear from Guidepoint
25  after providing James your references?
```

Page 40

```
1              F. JIBRIL, M.D.
2       A.  Radio silence for a few weeks.  I
3   did send him a follow-up email, asked if
4   there was any additional information that he
5   needed from me.  I didn't hear back until
6   February.
7       Q.  Of 2018.
8       A.  Yes.
9       Q.  So James responds to you in
10  February of 2018?
11      A.  Yes.
12      Q.  And what does James say?
13      A.  He asked me for my availability
14  for a call.  We scheduled a phone call, and
15  he lets me know that I would not be offered
16  the position.  He said that Bouker and
17  Valentia, to quote him directly, went to bat
18  for me but that Albert, the CEO, vetoed me
19  being employed.
20      Q.  Had you met Albert?
21      A.  No.
22      Q.  Had you ever spoken to Albert?
23      A.  No.
24      Q.  Did James tell you why Albert
25  vetoed extending an offer to you?
```

Page 41

```
1              F. JIBRIL, M.D.
2       A.  I don't believe he did.
3       Q.  Did you have any conversations
4   with James after that?
5       A.  No, but during that same
6   conversation, he mentioned that there might
7   be some other roles at the company that
8   might be a good fit for me, and he also
9   mentioned that he knew a recruiter at
10  another company that might be interested in
11  hiring me.
12      Q.  So there were other roles at
13  Guidepoint that James had in mind for you?
14      A.  Yes.
15      Q.  And I guess he had a colleague
16  doing the same sort of work in another
17  company that he was going to refer you to?
18      A.  Yes.
19      Q.  Did he refer you to another
20  recruiter?
21      A.  No.
22      Q.  Did he have any follow-up with you
23  about other potential roles at Guidepoint?
24      A.  No.
25      Q.  How many times have you applied
```



Page 42

```
1              F. JIBRIL, M.D.
2   for employment with Guidepoint?
3        A.  I think -- I didn't apply for this
4   role.  Um, I applied for a role I think back
5   in 2014.
6        Q.   So that was in the application to
7   Guidepoint in 2014?
8        A.   Yes.
9        Q.   And what role was that for?
10       A.   Research analyst.
11       Q.   And what happened with that
12  application?
13       A.   I don't believe I heard back.
14       Q.   And then you were in the process
15  of -- or applying to become the content
16  strategist in the end of 2017, early 2018?
17       A.   Yes.
18       Q.   So that's the second application
19  to Guidepoint?
20       A.   Yes, call it that.
21       Q.   Have you had any other
22  applications for employment with Guidepoint?
23       A.   I think late in 2018 -- it might
24  have been early 2019 -- another recruiter
25  reached out to me from Guidepoint about a
```

Page 43

```
1              F. JIBRIL, M.D.
2   role on the business development team, and
3   then -- and -- and she was an employee of
4   Guidepoint.
5            And then later that same year, a
6   third-party recruiter reached out to me.  He
7   didn't make mention of the company
8   initially, um, but I believe it was the same
9   role, reached out to me about it.
10       Q.   Okay.
11           So who from Guidepoint reached out
12  to you late 2018, early 2019?
13       A.   Off the top of my head, I couldn't
14  tell you.
15       Q.   Jenna?
16       A.   That sounds familiar.
17       Q.   And Jenna let you know that
18  Guidepoint was looking to place someone in a
19  business development role?
20       A.   Yes.
21       Q.   And then around the same time, you
22  heard from a third-party recruiter?
23       A.   Yes.
24       Q.   With information that led you to
25  believe that it was for the same role?
```

Page 44

```
1              F. JIBRIL, M.D.
2        A.   Yes.
3        Q.   And what happened with that role?
4        A.   So I actually had a phone
5   interview with him and --
6        Q.   I'm sorry.  With whom, the
7   third-party recruiter?
8        A.   With the third-party recruiter.
9        Q.   And who was that?
10       A.   I can't recall his name.
11       Q.   Do you recall who he worked for?
12       A.   No.
13       Q.   About when would you have had this
14  phone interview with a third-party
15  recruiter?
16       A.   It was in May of this year, I
17  believe.
18       Q.   May of 2019?
19       A.   Yes.
20       Q.   Okay.
21           And what did you talk about during
22  that interview?
23       A.   We talked in very general terms
24  about the role, what it involved.  And then
25  when we got pretty specific about, you know,
```

Page 45

```
1              F. JIBRIL, M.D.
2   who it was for, he said that Guidepoint was
3   the employer, and I told him that, "I've
4   already had this conversation with someone."
5        Q.   Okay.
6            So you were able to confirm with
7   the third-party recruiter that he was
8   seeking employees for Guidepoint.
9        A.   Yes.
10       Q.   And you told him that you had
11  already spoken with who we believe to be
12  Jenna --
13       A.   Yes.
14       Q.   -- at Guidepoint?
15       A.   Uh-huh.
16       Q.   Okay.
17           And what did the recruiter have to
18  say in response to that?
19       A.   He said, "If someone at Guidepoint
20  has already reached out to you, than the
21  conversation a moot."
22       Q.   Okay.
23           Did you have any other further
24  conversations -- well, strike that.
25           Did you have any other further
```



Page 46

```
 1           F. JIBRIL, M.D.
 2    conversations with that third-party
 3    recruiter about this position?
 4        A.  No.
 5        Q.  Did you have any further
 6    conversations with Guidepoint about this
 7    position?
 8        A.  No.
 9        Q.  So the last communication you
10    would have had about this business
11    development team would have been with the
12    third-party recruiter?
13        A.  Yes.
14        Q.  You never spoke with Jenna again?
15        A.  No, I gave her my availability for
16    a phone interview and then did not hear
17    back.
18        Q.  Had Jenna asked for your
19    availability for a phone interview?
20        A.  Yes, I believe we may have
21    scheduled one, and she missed it.
22        Q.  And when was that supposed to have
23    occurred?
24        A.  I can't recall off the top of my
25    head.  It was before I heard from the
```

Page 47

```
 1           F. JIBRIL, M.D.
 2    third-party recruiter.
 3        Q.  Would we still be in May of 2019?
 4    April of --
 5        A.  I think it was much earlier than
 6    that.
 7        Q.  Okay.
 8         So you were scheduled to speak
 9    with the Guidepoint recruiter before you
10    ultimately spoke with the third-party
11    recruiter.
12        A.  Yes.
13        Q.  After you spoke with the
14    third-party recruiter, did you follow up
15    with Guidepoint and give your availability
16    for a phone interview again?
17        A.  No.
18        Q.  Was your communication with the
19    third-party recruiter sort of the end of the
20    process for that position?
21        A.  Yes.
22        Q.  All right.
23         So if that's your third -- I don't
24    know about application, but third
25    interaction with Guidepoint, has there been
```

Page 48

```
 1           F. JIBRIL, M.D.
 2    a fourth?
 3        A.  No.
 4        Q.  When you were talking with the
 5    third-party recruiter and Guidepoint about
 6    the business development team, were you
 7    looking to leave Expert?
 8        A.  I'm always open to hearing about
 9    other opportunities.
10        Q.  Did you have occasion to talk to
11    either Guidepoint or the third-party
12    recruiter about the compensation for the
13    business development team role?
14        A.  No.
15        Q.  Okay.
16         If we could just go back to your
17    talks with James about the vetoing of the
18    offer to you.  Did you have talks with James
19    about any other roles at Guidepoint?
20        A.  No, he alluded to other roles that
21    might be a good fit, but that was the final
22    time I spoke with him.  There was no
23    follow-up.
24        Q.  Final time you spoke with James at
25    all?
```

Page 49

```
 1           F. JIBRIL, M.D.
 2        A.  Yes.
 3        Q.  After James told you that an offer
 4    would not be extended, did you speak to
 5    anyone else at Guidepoint about the content
 6    strategist position?
 7        A.  A few months later, I did --
 8    Valentia reached out to me.  She was no
 9    longer at Guidepoint.
10        Q.  So this would be a few months
11    after February 2018?
12        A.  Yes, I believe it was around June.
13        Q.  June of 2018, Valentia reaches out
14    to you?
15        A.  I believe so.
16        Q.  How so?
17        A.  She messaged me on LinkedIn.
18        Q.  Had you ever directly communicated
19    with Valentia before?
20        A.  No, other than my interview,
21    post-interview email.
22        Q.  You sent her a thank you email.
23        A.  Yes.
24        Q.  Had you had any communications
25    since that until your June 28 [sic]
```



Page 50

```
 1              F. JIBRIL, M.D.
 2   LinkedIn --
 3       A.  No.
 4       Q.  June 2018 LinkedIn connection.
 5   Okay.
 6          What did Valentia tell you in the
 7   June 2018 connection?
 8       A.  She said she had been meaning to
 9   reach out to me and asked for my
10   availability for a call.
11       Q.  And you knew at that time she
12   wasn't with Guidepoint?
13       A.  I only knew because I looked at
14   her LinkedIn profile and saw she had left.
15       Q.  Did Valentia give you a reason why
16   she wanted to speak with you?
17       A.  Not at that time.
18       Q.  Did you eventually set a time to
19   speak with her?
20       A.  Yes.
21       Q.  Okay.
22          And what was that?
23       A.  So she told me that she had been
24   fired from Guidepoint, she and Bouker Pool
25   shortly after my interview.  She sided
```

Page 51

```
 1              F. JIBRIL, M.D.
 2   that -- she told me that she had written a
 3   formal complaint about gender discrimination
 4   at the company and sited my lack of hiring
 5   as an example of it.
 6       Q.  And how did you have this
 7   conversation with Valentia?
 8       A.  Over the phone.
 9       Q.  And when did this phone
10   conversation occur?
11       A.  About a week after she reached out
12   to me.
13       Q.  So we might still be in June of
14   2018?
15       A.  Possibly.
16       Q.  What else did Valentia have to say
17   about Guidepoint in that call?
18       A.  Um, she told me that there were a
19   lot of problems at Guidepoint, um, with
20   gender-based discrimination.
21       Q.  Had you experienced anything
22   related to gender-based discrimination in
23   your dealings with Guidepoint?
24       A.  I had very limited interaction.
25   It was that one day that I was at the
```

Page 52

```
 1              F. JIBRIL, M.D.
 2   office.
 3       Q.  Okay.
 4          Anything in your application for
 5   research analyst that would have led you to
 6   believe that the decision was gender-based?
 7       A.  Well, I never heard back about
 8   that application.
 9       Q.  Anything in the conversations
10   about the business development team role
11   that would lead you to believe that it was
12   gender-based?
13       A.  No.
14       Q.  Okay.
15          So Valentia told you that she was
16   let go from Guidepoint.  She had made a
17   complaint.  She cited again gender-based
18   discrimination problems.
19          What else did Valentia have to
20   say?
21       A.  I think at that time she told me
22   that she was taking legal action in the form
23   of an EEOC filing.
24       Q.  And on what basis did she say she
25   was filing with the EEOC?
```

Page 53

```
 1              F. JIBRIL, M.D.
 2       A.  Gender discrimination.
 3       Q.  Prior to speaking with Valentia,
 4   did you ever consider filing a charge
 5   yourself?
 6       A.  I -- I -- I didn't consider filing
 7   a charge, but I did consider reaching out to
 8   the hiring managers or HR for more
 9   description or a better explanation as to
10   why I was not hired.
11       Q.  You would have sought an
12   explanation as to why Albert vetoed the
13   extension of the offer?
14       A.  Yes.
15       Q.  Did you ultimately do that, reach
16   out to HR?
17       A.  No.
18       Q.  Or the hiring managers?
19       A.  No.
20       Q.  All right.
21          So Valentia tells you she's
22   considering legal action, likely an EEOC
23   filing, and what's the next thing you guys
24   talk about?
25       A.  She tells me that I'm mentioned in
```



Page 54

```
1              F. JIBRIL, M.D.
2    her complaint and that she believed that the
3    decision not to hire me was directly because
4    of my gender.
5          She, I believe, had already spoken
6    with an employment discrimination attorney
7    at that time, and we met and decided to
8    retain an attorney together.
9       Q.  All right.
10         So after you spoke with Valentia
11   over the phone in June, you then had an
12   in-person meeting with her?
13      A.  Yes.
14      Q.  And when did that occur?
15      A.  Around September of the same year.
16      Q.  Between June and September of
17   2018, had you had communications with
18   Valentia?
19      A.  Yes.
20      Q.  Okay.
21         And what were the nature of those
22   communications?
23      A.  Discussing the case against
24   Guidepoint.
25      Q.  Prior to speaking with Valentia in
```

Page 55

```
1              F. JIBRIL, M.D.
2    June of 2018, did you have any reason to
3    believe that the vetoing of the extension of
4    the offer to you was gender-based?
5       A.  I had a feeling.  My references
6    were interviewed.  And my understanding,
7    that is a final step.  Bouker and Valentia
8    as good as told me that I was hired during
9    the interview process as did James.  My
10   references told me that the conversation
11   that they had with James was very positive.
12   And I -- I wouldn't believe that they would
13   speak to my references if there wasn't a
14   real consideration of me as a candidate.
15         When James told me that I was not
16   hired, he made it very clear that it was a
17   decision by Albert, not the hiring managers.
18      Q.  Did your references say that James
19   spoke to them about the buy side/sell side
20   issue?
21      A.  No.
22      Q.  Do you know how many content
23   strategist positions Guidepoint was looking
24   to fill when it was interviewing you?
25      A.  I was told that there was one open
```

Page 56

```
1              F. JIBRIL, M.D.
2    position.  I asked very specifically about
3    the structure of the team, how many people
4    were being hired, why the position was open.
5       Q.  And who did you ask those
6    questions of?
7       A.  Valentia and Bouker.
8       Q.  And Valentia and Bouker told you
9    that it was one position?
10      A.  Yes.
11      Q.  So it would be a surprise to you
12   if I told you they hired 15 people for that
13   position.
14      A.  I did know that before today.
15      Q.  So better question:  Was it a
16   surprise when you learned that 15 people
17   were hired for that position?
18      A.  Not necessarily.  I think that
19   with Bouker and Valentia no longer at the
20   firm, surely there was some restructuring
21   and reorganizing.
22      Q.  I know you're not with Guidepoint,
23   but do you have any idea of the gender
24   makeup to the 15 content strategists that
25   were ultimately hired?
```

Page 57

```
1              F. JIBRIL, M.D.
2       A.  No.
3       Q.  Do you think they're all men?
4       A.  I don't know.
5       Q.  Did you ultimately file a charge
6    with the EEOC?
7       A.  I did.
8       Q.  And what was the basis of that
9    charge?
10      A.  Failure to hire based on gender.
11      Q.  And what was the determination at
12   the EEOC?
13      A.  (No verbal response given.)
14      Q.  Strike that.
15         What happened with the filing of
16   your EEOC charge?
17      A.  I believe that they chose not to
18   take action.
19      Q.  And what did you next do in terms
20   of pursuing you legal rights against
21   Guidepoint after you learned the EEOC was
22   not going to take further action?
23      A.  I retained an attorney,
24   Mr. Lichten.
25      Q.  And a complaint was filed, and
```



MAGNA
LEGAL SERVICES

Page 58

```
1              F. JIBRIL, M.D.
2    we're here today.
3        A.  Yes.
4        Q.  Okay.
5            Did you speak with Bouker after
6    you learned that the offer was not going to
7    be extended?
8        A.  No.
9        Q.  Other than James and Valentia, did
10   you speak to anyone else at Guidepoint after
11   you learned that the officer was not going
12   to be extended?
13       A.  No, other than the recruiter that
14   reached out to me.
15       Q.  Sorry, right.
16       A.  Yes.
17       Q.  About the content strategist
18   position.
19       A.  No, I did not speak with anyone
20   else.
21       Q.  But we talked about your
22   application for the business development
23   team.
24       A.  Yes.
25       Q.  Which occurred later.
```

Page 59

```
1              F. JIBRIL, M.D.
2        A.  Yes.
3            MR. GRECH:  Okay.
4            Let me just take a five-minute
5        break.  I got to get a document.
6            (Whereupon, a recess was taken at
7        this time.)
8            (Whereupon, three black-and-white
9        documents were marked as Defendant's
10       Exhibits E, F, AND G for identification
11       as of this date.)
12       Q.  Dr. Jibril, showing you what's
13   been marked for today's purposes as
14   Defendant's Exhibit E (handing).
15       A.  (Perusing.)
16       Q.  And I'm also going to show you
17   what's been marked as Defendant's F
18   (handing.)
19       A.  (Perusing.)
20       Q.  I'm sorry.  If we could start with
21   F first.  If you could just take a moment to
22   look at Exhibit F and let me know when
23   you've had that opportunity.
24       A.  (Perusing.)
25            Okay, yep.
```

Page 60

```
1              F. JIBRIL, M.D.
2        Q.  And do you recognize
3    Defendant's F?
4        A.  Yes.
5        Q.  And what is it?
6        A.  Guidepoint Global, LLC.
7        Q.  Defendant's F is?
8        A.  You're asking for the defendants
9    on Exhibit F?
10       Q.  No, I'm sorry.  I'm sorry.
11           The document that's been marked as
12   Defendant's Exhibit F, what is that
13   document?
14       A.  That is the EEOC filing, Charge of
15   Discrimination.
16       Q.  And you recognize that as a Charge
17   of Discrimination?
18       A.  Yes.
19       Q.  Is that your Charge of
20   Discrimination?
21       A.  Yes.
22       Q.  The charge alleges discrimination
23   based on sex; is that correct?
24       A.  Yes.
25       Q.  And the particulars given in the
```

Page 61

```
1              F. JIBRIL, M.D.
2    charge are -- I'll just read it:
3            "In December 2017, a recruiter
4    from Guidepoint Global, LLC contacted me
5    regarding the position of health care
6    content strategist.
7            "After several days of interviews
8    and discussions, the company's hiring
9    managers for the position told me that they
10   wanted to hire me.
11           "Chief Executive officer, Albert
12   Sebag, without ever meeting me, vetoed my
13   appointment.  The company informed me of its
14   decision on February 1, 2018.  A male was
15   ultimately hired for the position.
16           "I believe the company did not
17   offer me the position because of my sex."
18           First, is that an accurate reading
19   of the charge?
20       A.  Yes.
21       Q.  And you swore to that charge.
22       A.  Yes.
23       Q.  And this charge was filed July 9th
24   of 2018; is that correct?
25       A.  Yes.
```



Page 62

F. JIBRIL, M.D.

1  
2     Q.   Why did you wait from February 1st
3  to July 9th to file a charge with the EEOC?
4     A.   I was not sure, 100 percent
5  certain, that I was not offered the position
6  because of my sex.  It was not until the
7  hiring manager, Valentia, reached out to me
8  in June to tell me that was the case.
9     Q.   Okay.
10          And just going through the
11  particulars of your charge here, the
12  recruiter referenced in there, that's James?
13     A.   Yes.
14     Q.   The company's hiring managers,
15  those would have been Valentia and Bouker?
16     A.   Yes.
17     Q.   The allegation there that, "CEO,
18  Albert Sebag, without even meeting me,
19  vetoed my appointment," you learned that
20  from James?
21     A.   Yes.
22     Q.   The company informed you of its
23  decision on February 1, 2018.  That would
24  have been through James?
25     A.   Yes.

Page 63

F. JIBRIL, M.D.

1  
2     Q.   The next allegation is that a male
3  was ultimately hired for the position; is
4  that correct?
5     A.   That was to my -- to my knowledge
6  at the time, yes.
7     Q.   And who gave you that knowledge?
8     A.   Valentia.
9     Q.   When did she give you that
10  knowledge?
11     A.   When I spoke with her in June.
12     Q.   When did you learn that they
13  ultimately hired 15 people?
14     A.   When that was included in one of
15  the documents as part of this proceeding.
16     Q.   In the litigation.
17     A.   Yes.
18     Q.   And the final allegation is you
19  believe the company did not offer you the
20  position because of your sex.
21     A.   Yes.
22     Q.   Did you change that belief when
23  you learned that they hired 15 people?
24     A.   No.
25     Q.   Why not?

Page 64

F. JIBRIL, M.D.

1  
2     A.   Because at the time I was
3  interviewing for a position that was open to
4  one person.
5     Q.   And if you had thought that you
6  were -- offer was voted because of your
7  gender, why would you have even entertained
8  the thought of the business development team
9  position?
10     A.   Again, I had a preliminary
11  conversation with the recruiter.  She did
12  not follow up with me.  Not sure why.  But
13  I'm always open to listening to other
14  opportunities.
15     Q.   If a recruiter from Guidepoint
16  called you today, would you entertain that
17  offer?
18     A.   I would speak with the recruiter,
19  yes.  I speak with multiple recruiters from
20  multiple companies pretty regularly.
21     Q.   Are you looking to leave Expert?
22     A.   Not actively, no.
23     Q.   So the same position, you'll
24  listen to opportunities?
25     A.   Yes.

Page 65

F. JIBRIL, M.D.

1  
2     Q.   And I believe you had said earlier
3  that you retained counsel after you learned
4  the decision from the EEOC?
5     A.   No.  Before.
6     Q.   Okay.
7          And Ms. Valletti has the same
8  counsel?
9     A.   Yes.
10     Q.   At the time you spoke to
11  Ms. Valletti in June of 2018, did she
12  indicated that she had already retained
13  counsel?
14     A.   I believe so.  I believe that she
15  had already retained counsel to file the
16  EEOC complaint.
17     Q.   And we spoke earlier about
18  swearing to the charge.  At the bottom
19  left-hand corner, where it says charging
20  party's signature, doctor, is that your
21  signature?
22     A.   Yes.
23     Q.   And the language used in the
24  particulars section, who drafted that
25  language?



Page 66

```
1              F. JIBRIL, M.D.
2      A.  Myself and my attorney,
3  Mr. Lichten.
4      Q.  So you filed this charge, and
5  ultimately you heard from the EEOC that it
6  wasn't going to pursue it any further.
7      A.  Yes.
8      Q.  All right.
9          So if we could now look at
10  Defendant's E.
11      A.  (Perusing.)
12      Q.  And Dr. Jibril, if you could just
13  take a moment to review that and let us know
14  if you're familiar with it.
15      A.  (Perusing.)
16          Yes, I'm familiar with this
17  document.
18      Q.  All right.
19          So Dr. Jibril, you're familiar
20  with Defendant's Exhibit E?
21      A.  Yes.
22      Q.  And what do you recognize that to
23  be?
24      A.  This is the Complaint filed by
25  myself and Ms. Valletti against Guidepoint
```

Page 67

```
1              F. JIBRIL, M.D.
2  Global.
3      Q.  And in Paragraph 1, the allegation
4  is that you've brought this action to remedy
5  discrimination on the basis of sex; is that
6  correct?
7      A.  Yes.
8      Q.  If, Dr. Jibril, we could refer to
9  Paragraph 8, it's Page 2.
10      A.  (Perusing.)
11      Q.  There, the allegation is in
12  December 2017, Guidepoint actively recruited
13  Jibril for the position of health care
14  content strategist.  Do you see that
15  allegation?
16      A.  Yes.
17      Q.  Do you agree with that allegation?
18      A.  Yes.
19      Q.  And this was the recruitment for
20  the health care content position that we
21  were talking about before?
22      A.  Yes.
23      Q.  Were you actively being recruited
24  by others at -- during that time in
25  December 2017?
```

Page 68

```
1              F. JIBRIL, M.D.
2      A.  Yes.
3      Q.  What others were actively
4  recruiting you at that time?
5      A.  Um, there was a law firm that
6  was -- had reached out to me.
7      Q.  Which firm was that?
8      A.  I don't recall the name.
9      Q.  Reached out to you to fill what
10  role?
11      A.  It was a business development
12  role.
13      Q.  And where was the firm located?
14      A.  In New Jersey.
15      Q.  And did you pursue that
16  recruitment?
17      A.  I had initial conversations but no
18  in-person interview.
19      Q.  Who did you have initial
20  conversations with?
21      A.  The recruiter.
22      Q.  And who was the recruiter?
23      A.  Anna Kogut.
24      Q.  And who does -- who did Ms. Kogut
25  work for?
```

Page 69

```
1              F. JIBRIL, M.D.
2      A.  I don't remember the name of the
3  law firm.
4      Q.  But she was the recruiter for the
5  firm?
6      A.  Yeah, she worked in the HR
7  department.
8      Q.  And you had initial conversations
9  with Ms. Kogut about the position at the
10  firm.
11      A.  Yes.
12      Q.  Okay.
13          And when did you have those
14  initial conversations?
15      A.  Probably before James had reached
16  out to me.
17      Q.  And what did you talk about with
18  Ms. Kogut?
19      A.  She told me about the opening to
20  see if it would be a good fit for me.  I was
21  not interested at the time.
22      Q.  But you were still willing to
23  listen to opportunities?
24      A.  Yes.
25      Q.  And what made you determine that
```



Page 70

```
1              F. JIBRIL, M.D.
2   it was not a good fit?
3        A.   The job was located in New Jersey,
4   and I did not want to commute.
5        Q.   So did it proceed beyond any of
6   the initial conversations with Ms. Kogut?
7        A.   No.
8        Q.   And you gave her the sense that it
9   was not going to be something you would
10  pursue?
11       A.   Yes.
12       Q.   Was any other entity actively
13  recruiting you in or around December of
14  2017?
15       A.   Not in December.
16       Q.   When, then?
17       A.   Throughout the year.
18       Q.   Throughout 2017?
19       A.   Throughout 2017.
20       Q.   Okay.
21            So other than this law firm and
22  Guidepoint, who else was recruiting you in
23  2017?
24       A.   I heard from various employers.
25       Q.   And obviously you didn't take
```

Page 71

```
1              F. JIBRIL, M.D.
2   those positions, but how far along -- what
3   was the furthest you have gotten along in
4   those processes?
5        A.   The furthest was with Guidepoint.
6        Q.   Had you had interviews with other
7   entities regarding a new position?
8        A.   Phone screenings.  No in-person
9   interviews.
10       Q.   And who did you have phone
11  screenings with?
12       A.   Recruiters.
13       Q.   Which recruiters?
14       A.   I couldn't tell you their names.
15       Q.   Other than Guidepoint and the law
16  firm, how many phone screenings with
17  recruiters did you have in 2017?
18       A.   I would say about four.
19       Q.   And there was nothing in the talks
20  with Ms. Kogut that led you to believe the
21  position was not going to be offered because
22  of a gender reason, right?
23       A.   No.
24       Q.   It was commuting.
25       A.   Yes.
```

Page 72

```
1              F. JIBRIL, M.D.
2        Q.   Was there anything that was shared
3   with you in the phone screening with the
4   other four recruiters that gave you the
5   sense that those employers would have been
6   making decisions on a gender basis?
7        A.   No.
8        Q.   So those processes didn't proceed
9   past the phone screening with the recruiter.
10       A.   Correct.
11       Q.   And what areas were these
12  positions?
13       A.   One that I recall specifically was
14  a language translation service.
15       Q.   And in what position?
16       A.   Business development.
17       Q.   Okay.
18            I believe you had said four.  Do
19  you recall any of the other three?
20       A.   No, not specifically.
21       Q.   Would these have all been in
22  business development positions?
23       A.   Mostly, yes.
24       Q.   Did you have conversations with
25  any of these four recruiters about
```

Page 73

```
1              F. JIBRIL, M.D.
2   compensation levels?
3        A.   No.
4        Q.   Did you have conversations with
5   Ms. Kogut about a compensation level?
6        A.   No.
7        Q.   Dr. Jibril, could you turn to
8   Allegation 13?  It's on Page 3.
9        A.   (Perusing.)
10       Q.   Paragraph 13 reads:
11            "In December 2017, lateral
12  recruiter, James Lukban, contacted Jibril to
13  see if she would be interested in the
14  position of health care content strategist.
15            "On January 22nd" -- it says 1018,
16  but I assume it's 2018 -- "after several
17  days of interviews and discussions, Lukban
18  informed Jibril that," quote, "as a final
19  step in the process, Guidepoint wished to
20  conduct a reference check.  Later that day,
21  Jibril provided the requested references."
22            Do you see that, Dr. Jibril?
23       A.   Yes.
24       Q.   And that allegation is true?
25       A.   Yes.
```



Page 74

```
1           F. JIBRIL, M.D.
2      Q.  The allegation here about several
3  days of interviews, did you go to Guidepoint
4  on more than one day for interviews?
5           MR. LICHTEN:  I object.
6           It doesn't say several days of
7      interviews.
8           It's several days of interviews
9      and discussions.
10          MR. GRECH:  Fair.
11     Q.  You see where it says, "several
12 days of interview and discussions"?
13     A.  Yes.
14     Q.  Did you have several days of
15 interviews with Guidepoint or one?
16     A.  I had one initial conversation
17 with a recruiter, so that would be one day.
18 I had a subsequent conversation with the HR
19 department to schedule an in-person meeting.
20 On January 22nd, I attended four in-person
21 interviews.  And I had subsequent
22 discussions with James Lukban regarding my
23 references and additional information that
24 he asked for.
25     Q.  Fair enough.
```

Page 75

```
1           F. JIBRIL, M.D.
2       So you visited Guidepoint one
3  time.
4      A.  Yes.
5      Q.  Okay.
6          And it says here that, "Later that
7  day, Jibril provided the requested
8  references."  Those are references we
9  discussed earlier?
10     A.  Yes.
11     Q.  And it's your understanding that
12 James reached out to those references?
13     A.  Yes.
14     Q.  And you spoke with those
15 references thereafter?
16     A.  Yes.
17     Q.  Who were those references?
18     A.  I was requested to provide a
19 current client.  Her name was Lisa Van
20 Essendelft.
21          I'll spell that:
22 E-S-S-E-N-D-E-L-F-T.
23          And the other reference requested
24 was the direct supervisor.  I gave our vice
25 president of business development and
```

Page 76

```
1           F. JIBRIL, M.D.
2  account management.  His name is Dave Glynn,
3  G-L-Y-N-N.
4      Q.  Is and Mr. Glynn worked at Expert
5  at that time?
6      A.  At Expert Institute?  Yes.
7      Q.  And you're okay with giving an
8  Expert employee as a reference in your job
9  search to leave Expert?
10     A.  It was requested, and I was
11 confidant at the time that I was being
12 offered the position.
13     Q.  And you spoke with Lisa about her
14 talks with James?
15     A.  Yes.
16     Q.  And you spoke with Dave about his
17 talks with James.
18     A.  Yes.
19     Q.  Do you still work with Dave?
20     A.  I do.
21     Q.  Do you still work with Lisa?
22     A.  Yes.
23     Q.  When you spoke with Lisa about her
24 talks with James, did Lisa give you any
25 reason to reconsider your application to
```

Page 77

```
1           F. JIBRIL, M.D.
2  Guidepoint?
3      A.  No.
4      Q.  Did Lisa give you any reason to
5  consider that perhaps as a woman you
6  shouldn't be applying to Guidepoint?
7      A.  No.
8      Q.  When you spoke with Dave, did he
9  give you any reason to reconsider your
10 application at Guidepoint?
11     A.  Only that he did not want me to
12 leave The Expert Institute.
13     Q.  Sure.
14          Did he give you any reason to
15 believe that as a woman you should not be
16 applying to Guidepoint?
17     A.  No.
18     Q.  Allegation 14:  "Guidepoint
19 designated Valletti and her supervisor,
20 director of content strategist, Bouker Pool,
21 as the company's hiring managers for the
22 position of health care content strategist,
23 which meant that Valletti and Pool possessed
24 full and final authorization to hire a
25 candidate for the position.  Valletti and
```



Page 78

1             F. JIBRIL, M.D.
2    Pool decided to hire Jibril."
3            Do you see that allegation,
4    doctor?
5        A.   Yes.
6        Q.   And do you agree with that
7    allegation?
8        A.   Yes.
9        Q.   And you understood Pool to be
10   Valletti's supervisor.
11       A.   Yes.
12       Q.   Buy your testimony earlier was
13   that Valletti was the ultimate authority on
14   your hire?
15       A.   Yes.
16       Q.   And that Bouker would defer to
17   her.
18       A.   Yes.
19       Q.   And Valletti and Bouker told you
20   that.
21       A.   Yes.
22       Q.   It says here that Valletti and
23   Pool decided to hire you.
24       A.   Yes.
25       Q.   Is that correct?

Page 79

1             F. JIBRIL, M.D.
2            Um, how did they communicate to
3    you that they had made the decision to hire
4    you?
5        A.   They let me know at the end of my
6    interview that the HR department would be
7    reaching out to me for final steps.
8        Q.   Well, if there were final steps to
9    take, was it your understanding that you had
10   been hired?
11       A.   My understanding was pending a
12   reference check, than an offer would be
13   extended.
14       Q.   And Lisa said she spoke with James
15   at Guidepoint?
16       A.   Yes.
17       Q.   Did Lisa say she spoke with anyone
18   else at Guidepoint?
19       A.   No.
20       Q.   And Dave spoke with James.
21       A.   Yes.
22       Q.   Did Dave say he spoke with anyone
23   else at Guidepoint?
24       A.   No.
25       Q.   If you could look, the next page

Page 80

1             F. JIBRIL, M.D.
2    is Paragraph 15.
3        A.   (Perusing.)
4        Q.   "Guidepoint chief executive
5    officer, Albert Sebag, without ever meeting
6    Jibril, voted her hire.  Guidepoint
7    ultimately hired a man for that position."
8    Do you see that allegation, doctor?
9        A.   Yes.
10       Q.   And do you agree with that
11   allegation?
12       A.   Yes.
13       Q.   And it was James that told you
14   that Albert had vetoed your hire?
15       A.   Yes.
16       Q.   And you had never met Albert.
17       A.   Yes.
18       Q.   And to this day, you've never met
19   Albert.
20       A.   Yes.
21       Q.   Have you ever spoken with Albert?
22       A.   No.
23       Q.   Any communications with Mr. Sebag
24   at all?
25       A.   No.

Page 81

1             F. JIBRIL, M.D.
2        Q.   And who told you that Guidepoint
3    ultimately hired a man for that position?
4        A.   Valentia.
5        Q.   During your June 2018 call?
6        A.   I believe so.
7        Q.   And you, again, came to learn
8    later that there were multiple people hired
9    for that position?
10       A.   Yes.
11       Q.   Did Valentia identify the man that
12   was hired for the position as alleged in
13   Paragraph 15?
14       A.   I believe she did.
15       Q.   And who was that person?
16       A.   I don't recall.  I believe she
17   told me that it was someone who had a
18   personal connection to Albert Sebag.
19       Q.   And that person was hired for the
20   position that you were applying for.
21       A.   Yes.
22       Q.   Paragraph 16:  In a meeting on
23   March 12, 2018 -- "In a memorandum dated
24   March 12, 2018, Valletti detailed her
25   allegations of discrimination to the



Page 82

```
1          F. JIBRIL, M.D.
2   director of human resources, Priscilla
3   Gulino.  Valletti included the company's
4   failure to hire Jibril, who Valletti
5   described as extremely qualified female
6   candidate, following a severe personal
7   intervention by Sebag.  Valletti stated that
8   Guidepoint refused to allow her to discuss
9   or defend the choice of Jibril."
10         Do you see that, doctor?
11     A.  Yes.
12     Q.  Do you agree with those
13  allegations?
14     A.  Yes.
15     Q.  And this memorandum, was this the
16  complaint that Ms. Valletti was talking to
17  you about on your call?
18     A.  No, this was an email that she had
19  sent I believe to the HR department when she
20  was still at Guidepoint.
21     Q.  Okay.
22         So the memorandum mentioned in
23  Paragraph 16 you understand to be an email
24  from Valentia to HR.
25     A.  Yes.
```

Page 83

```
1          F. JIBRIL, M.D.
2     Q.  And Valletti let you know that
3   there was also a complaint?
4     A.  I believe she told me that there
5   was an EEOC complaint, yes.
6     Q.  Valletti told you that she had
7   filed an EEOC complaint?
8     A.  Yes.
9     Q.  In your talking with Valletti in
10  June of 2018, did she mention something
11  along the lines of a severe personal
12  intervention by Sebag?
13     A.  Yes.
14     Q.  And how did she describe that
15  intervention?
16     A.  She said that when he learned
17  that, um, they had planned to hire a female
18  candidate for the role, he immediately began
19  to complain and say that it would not
20  happen.
21     Q.  And who did he make those
22  complaints to?
23     A.  Valentia and Bouker.
24     Q.  And you interviewed in person with
25  four people when you visited Guidepoint?
```

Page 84

```
1          F. JIBRIL, M.D.
2     A.  Yes.
3     Q.  And two of them are woman?
4     A.  Yes.
5     Q.  Including Ms. Valletti.
6     A.  Yes.
7     Q.  Who told you that Albert told her
8   that he would not hire a female.
9     A.  Yes.
10     Q.  There -- and it also alleges that
11  Valletti stated that "Guidepoint refuses to
12  allow her to discuss or defend the choice of
13  Jibril."  Do you see that?
14     A.  Yes.
15     Q.  Do you believe that allegation?
16     A.  I do.
17     Q.  Do you recall your testimony
18  earlier where James said that Valletti and
19  Pool had gone to bat for you?
20     A.  Yes.
21     Q.  And how would you reconcile that
22  testimony with that allegation?
23     A.  I wasn't there, but that is the
24  exact language that James communicated to me
25  on that phone call.  He said that they went
```

Page 85

```
1          F. JIBRIL, M.D.
2   to bat for me for the decision to hire me.
3     Q.  Did you ever have occasion to meet
4   Ms. Gulino?
5     A.  No.
6     Q.  If you could look at Page 8,
7   doctor.
8     A.  (Perusing.)
9     Q.  Paragraph D.  Section D.
10     A.  (Perusing.)
11     Q.  Here, the plaintiff's, being you
12  and Ms. Valletti, ask for direction to
13  defendant to place Plaintiff's in the
14  position they would have continued to occupy
15  but for Defendant's discriminatory and
16  retaliatory treatment of them and make them
17  whole for all earnings they would have
18  received but for Defendant's discriminatory
19  and retaliatory treatment including but not
20  limited to wages, bonuses, pensions, and
21  other lost benefits.  Do you see that?
22     A.  Yes.
23     Q.  And do you agree with that request
24  for relief?
25     A.  I do.
```



Page 86

F. JIBRIL, M.D.

1
2     Q.   Would you accept an employment
3  position from Guidepoint if one were offered
4  to you today?
5     A.   Yes.
6     Q.   Why?
7     A.   Because I think that I would be a
8  great fit for that role.
9     Q.   And if that role offered $140,000
10  base with no chance for bonus, you would
11  accept that position?
12     A.   Yes.
13     Q.   Why?
14     A.   Because it is a role that uses my
15  experience very well and broadens what I do.
16  One of the reasons why I was interested in
17  the role was being able to have access to
18  financial industry clients.
19     Q.   Walk me through how your daily
20  functions at Expert differ from what you
21  understood the health care content
22  strategist to be.
23     A.   Well, currently at the Expert
24  Institute, what I do is business
25  development.  I'm prospecting and pitching

Page 87

F. JIBRIL, M.D.

1
2  clients.  Very limited usage of my health
3  care background.
4           The role that I was interviewing
5  for was health care content strategist,
6  which is how I started my career at The
7  Expert Institute using health care knowledge
8  and applying it in a different way.
9     Q.   And your base at Expert is now
10  $140-.
11     A.   Yes.
12     Q.   And you understood the salary
13  range for the position you were interviewing
14  at Guidepoint to be between $140- and $160-.
15     A.   Yes.
16     Q.   And at Expert, you're entitled to
17  bonuses that might raise your compensation
18  is to $333,000.
19     A.   Yes.
20     Q.   And it was your understanding that
21  you would not be earning bonuses when you
22  first began at Guidepoint.
23     A.   That wasn't explicitly discussed,
24  but I was willing to take a role for base
25  pay.

Page 88

F. JIBRIL, M.D.

1
2     Q.   Valentia told you that she earned
3  bonuses.
4     A.   Yes.
5     Q.   And it was your understanding that
6  bonuses might be in your future if you
7  joined Guidepoint.
8     A.   Yes.
9     Q.   And the position you were
10  interviewing for was subordinate to
11  Ms. Valletti.
12     A.   Yes.
13     Q.   In the allegation here to make you
14  whole for all earnings you would have
15  received but for Defendant's discriminatory
16  treatment, Dr. Jibril, how have you been
17  damaged financially by Guidepoint's refusal
18  to hire you?
19     A.   At the time that I was
20  interviewing with Guidepoint, my salary was
21  $87,500, so the role at Guidepoint would
22  have been a significant increase in that.
23           There was a period of time where I
24  would demonstrate a loss.  By June of that
25  year, I did receive a raise to $100,000, so

Page 89

F. JIBRIL, M.D.

1
2  that's where the damages would end, at that
3  point.
4     Q.   And then your base increased to
5  $140- at Expert.
6     A.   Yes, the following year.
7     Q.   Dr. Jibril, I'm going to show you
8  what's been marked as Defendant's Exhibit G
9  (handing).
10     A.   (Perusing.)
11     Q.   Doctor, if you could just review
12  Defendant's G and let us know when you've
13  had an opportunity to do that.
14     A.   (Perusing.)
15           Yes.
16     Q.   You've had an opportunity to
17  review G?
18     A.   I have.
19     Q.   Do you recognize G?
20     A.   I have not seen this document
21  before.
22     Q.   I'll represent to you that it's a
23  letter my office received from your counsel
24  as part of this litigation.
25           Doctor, if I could refer you to



F. JIBRIL, M.D.

that bulleted list, 3B.

A. Uh-huh.

Q. "Valletti has lost $165,000 in backpay damages, and Jibril has lost $61,900 in backpay damages. Plaintiffs are also seeking damages for emotional distresses, punitive damages, attorney fees, costs, and disbursements."

You see that doctor?

A. Yes.

Q. Doctor, were your damages as of February 20, 2019, the date of this letter, $61,900?

A. I believe so.

Q. And how did you calculate that?

A. Lost earnings between the time when my salary was $87,500 up until the time six months later it was increased to $100,000, and then the subsequent six months before it was increased again to $140-.

Q. So as of the date of this February 20, 2019, letter you're already in a position as VP at Expert?

A. No -- yes, I was.

F. JIBRIL, M.D.

Q. And you have a base of $140-.

A. Yes.

Q. And do you know what compensation level for the position at Guidepoint was used to calculate the $61,900?

A. I believe it was based on salary $140- to $160,000.

Q. And you agree with that calculation, $61,900?

A. Yes.

Q. And that would have been the difference between what you would have earned at Guidepoint in or about February of 2018 to date?

A. Yes.

Q. Less what you have earned at Expert.

A. Yes.

Q. As reflected in your promotions in that period of time.

A. Correct.

Q. I'm going to show -- doctor, I'm going to show you what's been previously marked as Defendant's Exhibits A and B

F. JIBRIL, M.D.

(handing). They work together, so we could look at them together. If you could just look at them sort of at the same time and let us know when you've had a chance to do that, please.

A. Okay (perusing).

I have had an opportunity to take a look at the exhibits.

Q. Okay.

And in speaking first about Exhibit A, do you recognize Exhibit A?

A. Yes.

Q. And what do you recognize Exhibit A to be?

A. This is the defendant's first set of interrogatories.

Q. Have you seen this document before today?

A. Yes.

Q. Same questions about Exhibit B: Do you recognize Exhibit B?

A. Yes.

Q. And what do you recognize Exhibit B to be?

F. JIBRIL, M.D.

A. The plaintiffs' response to the defendant's interrogatories.

Q. And have you seen Exhibit B before?

A. Yes.

Q. And you understand Exhibit B to be your answer to the questions in Exhibit A as part of this litigation.

A. Yes.

Q. Doctor, if you could turn in Exhibit A to Page 7, Interrogatory Number 5.

A. (Perusing.)

Q. Interrogatory Number 5 asks with respect to you employment history for the five years prior to your employment with Guidepoint to the present identify (A) your employer's and the date during which you were employed, (B) your supervisors, and (C) any person performing any evaluation, formal/informal of your work performance.

Do you see that.

A. Yes.

Q. And I think we have done a good job of covering your employment during that

MAGNA LEGAL SERVICES

Page 94

```
1              F. JIBRIL, M.D.
2   time period.
3          Doctor, who is your current
4   supervisor at Expert?
5       A.  Joaquin Santos.
6       Q.  And what is Mr. Santos' position?
7       A.  He's a senior vice president of
8   business development.
9       Q.  Do you have any other supervisors
10  other than Mr. Santos?
11      A.  No.
12      Q.  And going sort of back in time
13  before you become vice president of
14  enterprise and you are on the business
15  development team, who was your supervisor
16  then?
17      A.  Dave Glynn.
18      Q.  Did you have any other supervisors
19  at the time?
20      A.  No.
21      Q.  And what was Dave's title at that
22  time?
23      A.  Vice president of business
24  development.
25      Q.  Did you have a different manager
```

Page 95

```
1              F. JIBRIL, M.D.
2   when you had started performing more of the
3   account management roles?
4       A.  No.
5       Q.  Sorry.  Did you have a different
6   supervisor?
7       A.  I didn't.
8       Q.  Was it still Mr. Glynn?
9       A.  Yes.
10      Q.  And when you were the associate
11  director of the medical research department,
12  who was your supervisor then?
13      A.  Zachary Baretto, Z-A-C-H-A-R-Y
14  B-A-R-E-T-T-O.
15      Q.  And what was Mr. Baretto's title
16  at that time?
17      A.  Vice president of research.
18      Q.  And in your position as senior
19  medical research associate, who was your
20  supervisor then?
21      A.  Zachary Baretto.
22      Q.  Was he still -- was he at that
23  time VP of research?
24      A.  Yes.
25      Q.  And when you first began at
```

Page 96

```
1              F. JIBRIL, M.D.
2   Expert, who was your supervisor?
3       A.  Michael Morgenstern.
4       Q.  And what was Mr. Morgenstern's
5   tile then?
6       A.  Then, it was vice president of
7   marketing.
8       Q.  Now, did these supervisors have
9   occasion to perform evaluations of your work
10  performance?
11      A.  The only supervisor that gave me
12  evaluations was Zachary Baretto in my role
13  on the research team.
14      Q.  Sort of beginning of your tenure
15  at Expert?
16      A.  When I became full-time at Expert
17  Institute.
18      Q.  And do you recall the content of
19  those evaluations?
20      A.  Yes, they were largely positive.
21      Q.  Do you have copies of those
22  evaluations?
23      A.  No.
24      Q.  Doctor, if you could look at
25  Interrogatory Number 7.
```

Page 97

```
1              F. JIBRIL, M.D.
2       A.  (Perusing.)
3       Q.  Interrogatory 7 asks if you have
4   made an application or inquiry for
5   employment to any person or entity since
6   your separation or rejection of employment
7   from Guidepoint, and then it's asked that
8   Plaintiffs identify certain factors,
9   elements.
10         Doctor, we spoke about your
11  conversations for the Guidepoint business
12  development team in the spring of this year,
13  correct?
14      A.  Yes.
15      Q.  And we talked about your
16  recruitment by others in 2017; is that
17  correct?
18      A.  Yes.
19      Q.  Could you walk us through any
20  applications for employment you have made in
21  2018?
22      A.  I did not make any applications.
23      Q.  Did you receive inquiries for
24  employment during 2018?
25      A.  Yes.
```



Page 98

```
1              F. JIBRIL, M.D.
2       Q.   And how many inquiries?
3       A.   I think roughly four.
4       Q.   And who were those received from?
5       A.   I can't recall all the employers.
6  The one that does come to mind is the
7  translation and interpretation service.
8       Q.   So is there some overlap between
9  this and the 2017 recruiters we talked about
10 before?
11      A.   I'm sorry.  You're referring to
12 2018?
13      Q.   Just 2018 --
14      A.   Okay.
15      Q.   -- alone.
16      A.   Then no.
17      Q.   So in 2018, you receive no
18 inquiries for employment.
19      A.   I did speak with Anna Kogut at the
20 end of 2018.
21      Q.   And Anna, is that the law firm?
22      A.   Yes.
23      Q.   Is that the same position we
24 talked about before?
25      A.   Yes.
```

Page 99

```
1              F. JIBRIL, M.D.
2       Q.   All right.
3            So are those 2017 recruiter talks
4  really 2018, or was there some overlap?
5       A.   No, I spoke with her in 2018 and
6  2017.
7       Q.   For the same position?
8       A.   Yes, though higher ranking.
9       Q.   What was the difference in the
10 positions that Ms. Kogut was bringing to
11 your attorney?
12      A.   Seniority.  This would be a
13 position -- the second time she reached out
14 to me would be a position that was directly
15 reporting to the COO.
16      Q.   So when Ms. -- you and Ms. Kogut
17 spoke in 2017, it was about one position,
18 and when you spoke in 2018, it was about a
19 more senior position?
20      A.   Yes.
21      Q.   And how did those talks about the
22 senior position go?
23      A.   They were -- they went a lot
24 further this time.  I interviewed in person
25 at their New Jersey office.
```

Page 100

```
1              F. JIBRIL, M.D.
2       Q.   And this position would still
3  require you to commute to New Jersey?
4       A.   Yes, although they did inform me
5  that they were opening a Manhattan office,
6  so that would be a potential.
7       Q.   Okay.
8            And who did you interview with at
9  the law firm?
10      A.   The COO, the, um, firm
11 administrator, and the recruiter.
12      Q.   Ms. Kogut?
13      A.   Yes.
14      Q.   And do you recall the name of the
15 COO?
16      A.   I don't.
17      Q.   Do you recall the name of the firm
18 admin?
19      A.   I don't.
20      Q.   And when did you have this
21 interview?
22      A.   It was right before the holidays
23 in December of 2018.
24      Q.   And what was the result of
25 those -- that interview.
```

Page 101

```
1              F. JIBRIL, M.D.
2       A.   They extended an offer.
3       Q.   And what was the nature of the
4  offer?
5       A.   I believe it was a base -- the
6  initial offer was $180- base, and after
7  negotiation, it was $210- base.  Bonus
8  potential was not defined.
9       Q.   And when was the officer extended?
10      A.   In December.
11      Q.   And what would this title have
12 been?
13      A.   I believe it would have been
14 director of business development.
15      Q.   And you would have reported
16 directly to COO?
17      A.   Yes.
18      Q.   And they're initial officer was
19 $180-?
20      A.   Yes.
21      Q.   Were you represented by another
22 recruiter in these negotiations, or you're
23 representing yourself?
24      A.   I represented myself.
25      Q.   And you negotiated up to $210-?
```



Page 102

```
1              F. JIBRIL, M.D.
2      A.  Yes.
3      Q.  And they ultimately did not accept
4  that offer, correct?
5      A.  They did -- oh, I did not.
6      Q.  Sorry.
7          You ultimately did not accept that
8  offer, correct?
9      A.  Yes.
10     Q.  And why not?
11     A.  When I reached out to the CEO,
12 CTO, and CMO of my current employer to let
13 them know there was a very attractive offer
14 on the table for me, they were very sad to
15 see me go.  We had a lunch meeting, and we
16 discussed my future at the company.
17         Given that I'm one of the more
18 tenured employees, we discussed the future
19 of the company, and they raised my salary
20 and title.  And though it was significantly
21 less in base, um, I enjoy my work, and I saw
22 a potential in a new role that they gave me,
23 so I decided to stay.
24     Q.  So that is what led to your
25 January 2019 promotion to vice president and
```

Page 103

```
1              F. JIBRIL, M.D.
2  the bump in base salary?
3      A.  Correct.
4      Q.  Okay.
5          And I assume you ultimately
6  declined the offer from the firm?
7      A.  Yes.
8      Q.  In 2018, did you receive any other
9  inquiries for employment other than that law
10 firm?
11     A.  Yes, but, again, I can't recall
12 and none of those discussions went beyond
13 initial phone screenings.
14     Q.  Again, we're talking just 2018.
15     A.  Yes.
16     Q.  And how many inquiries would you
17 say in 2018?
18     A.  Roughly four.
19     Q.  All right.
20         Let's talk about 2019, then.  Had
21 you made any applications for employment in
22 2019?
23     A.  Two recruiters from -- on behalf
24 of Guidepoint reached out to me.
25     Q.  And we talked about that earlier.
```

Page 104

```
1              F. JIBRIL, M.D.
2      A.  Yea.
3      Q.  Right.
4      A.  And a recruiter from LinkedIn
5  reached out about a business development
6  role.
7      Q.  And correct me if I'm wrong.  Were
8  there two recruiters from Guidepoint, or is
9  it one Guidepoint and the third party?
10     A.  One Guidepoint and one third-party
11 recruiter.
12     Q.  And they ended up talk about the
13 same position.
14     A.  Yes.
15     Q.  Okay.
16         And the recruiter from LinkedIn,
17 what did they, he or she, reach out to you
18 about?
19     A.  She reached out about a business
20 development role, as well.
21     Q.  Okay.
22         Where was that role?
23     A.  At their headquarters in
24 Manhattan.
25     Q.  And this was an in-house
```

Page 105

```
1              F. JIBRIL, M.D.
2  recruiter?
3      A.  Yes.
4      Q.  And what sort of business?
5      A.  So it was gaining -- reaching out
6  to corporate clients, not on the member side
7  of things.
8      Q.  And I'm sorry.  In what capacity
9  to corporate clients?
10     A.  So LinkedIn has an arm of their
11 business where they're reaching out to
12 corporations selling their services.
13     Q.  Oh, I see.  All right.  So the
14 recruiter was from LinkedIn.
15     A.  Oh, yes.
16     Q.  Okay.  It wasn't --
17     A.  She reached out to me on LinkedIn,
18 but the role was at --
19     Q.  I see.
20     A.  -- LinkedIn.
21     Q.  A communication through LinkedIn
22 about LinkedIn.
23     A.  Yes.
24     Q.  Okay.
25         That was a position to be at
```

Page 106

```
1              F. JIBRIL, M.D.
2  LinkedIn.
3       A.  Yes.
4       Q.  Okay.
5            Did you have talks with that
6  recruiter about that potential compensation?
7       A.  Yes.
8       Q.  And what was that compensation?
9       A.  I told her what my potential
10  earnings for 2019 was, and we immediately
11  saw that the role was not a good fit.
12       Q.  It wouldn't have matched your
13  compensation at Expert?
14       A.  Exactly.
15       Q.  So 2019, we've talked about
16  Guidepoint.  We've talked about LinkedIn.
17  Any other employment opportunities in 2019?
18       A.  No.
19       Q.  Interrogatory 8:  If you've
20  received any offers of employment since the
21  date of your separation or rejection of
22  employment from Guidepoint, and then it asks
23  to identify in more specificity.
24            So Dr. Jibril, your -- we'll call
25  it rejection of employment from Guidepoint
```

Page 107

```
1              F. JIBRIL, M.D.
2  was in February of 2018, correct?
3       A.  Yes.
4       Q.  And what offers for employment
5  have you received since February of 2018?
6       A.  The one that we discussed at the
7  end of 2018 from the law firm.
8       Q.  Doctor, if you could look at
9  Interrogatory 10.
10       A.  (Perusing.)
11       Q.  State whether you have received
12  any unemployment benefits, Social Security
13  benefits, disability benefits, workers'
14  compensation benefits, or any other types of
15  government benefits since the date of your
16  separation from Guidepoint.  If so, identify
17  the type of benefit, the date the benefit
18  was received and the total amount of the
19  benefit.  Do you see that question?
20       A.  Yes.
21       Q.  Dr. Jibril, you've had no break in
22  employment since school, correct?
23       A.  Yes.
24       Q.  Okay.
25            Continuing onto Interrogatory 11:
```

Page 108

```
1              F. JIBRIL, M.D.
2  Doctor, it asks, with respect to each and
3  every measure of damages sought in the
4  Complaint, including but not limited to
5  economic losses, emotional pain and
6  suffering, and punitive damages, and then
7  again it asks for identity of certain
8  specifications.
9            With this question, if I could
10  also ask you to refer to Exhibit B, which
11  are Plaintiffs' responses to the
12  interrogatories, specifically Response 11,
13  and that is responsive to Question 11.
14            And at -- do you have Response 11?
15       A.  Yes.
16       Q.  And in Response 11, it reads:
17  "Valletti is owed $334,000 in backpay, and
18  Jibril is owed $48,000 in backpay.
19  Plaintiffs are also seeking reinstatement,
20  punitive damage, attorneys' fees, costs,
21  disbursements, and interests.
22            "Plaintiffs are not seeking
23  compensation for mental and emotional
24  distress." Do you see that?
25       A.  Yes.
```

Page 109

```
1              F. JIBRIL, M.D.
2       Q.  And do you agree with that
3  response?
4       A.  Yes.
5       Q.  And how are we calculating $48,000
6  in backpay now?
7       A.  The numbers are the same.  I was
8  earning $87,500 at the time when I was
9  rejected the role at Guidepoint, and up
10  until June or July of 2018, I was making
11  $87,500; that was increased to $100,000, and
12  then again by the end of the year, $140-.
13       Q.  And if I could ask you:  At the
14  time we're looking at this Exhibit B to also
15  refer back to Exhibit G.
16       A.  (Perusing.)
17       Q.  And in Exhibit G, we talked about
18  the calculation of your damages at $61,900,
19  correct?
20       A.  Yes.
21       Q.  And could you explain to us the
22  difference in the calculation reflected in
23  Exhibit G and then reflected in Exhibit B?
24       A.  One may be an error, but the
25  calculations for backpay are based on my
```

Page 110

```
1              F. JIBRIL, M.D.
2    salary at the various times between the
3    rejection and to this date.
4         Q.   Your salary at Expert has also
5    increased during that period of time,
6    correct?
7         A.   Correct, and so there is a cut-off
8    point for the damages.
9         Q.   And what do you understand that
10   cut-off point to be?
11        A.   January of 2019 when my base pay
12   was increased to $140,000.
13        Q.   So your backpay period would be
14   from February 2018 to January of 2019?
15        A.   Yes.
16        Q.   What is your understanding of the
17   request here for punitive damages?
18        A.   I'm sorry.  Could you clarify that
19   question?
20        Q.   Do you understand what punitive
21   damages are?
22        A.   Yes.
23        Q.   What are punitive damages?
24        A.   Damages assessed on a defendant
25   based on discriminatory behavior in this
```

Page 111

```
1              F. JIBRIL, M.D.
2    instance or other negligence in other types
3    of litigation.
4         Q.   And do you believe the conduct
5    you've alleged against Guidepoint warrants
6    the imposition of punitive damages?
7         A.   I do.
8         Q.   How so?
9         A.   I think that denying someone
10   employment based on their sex is
11   unacceptable and illegal.
12        Q.   And it was Ms. Valletti that told
13   you that she believed you were not extended
14   the offer because of your gender, correct?
15        A.   Correct.
16        Q.   And it was Ms. Valletti that told
17   you that it was ultimately a man that was
18   fired for that position; is that correct?
19        A.   Correct.
20        Q.   And you later learned that it was
21   15 individuals hired for that position.
22        A.   Yes.
23        Q.   And you understood that at the
24   time Ms. Valletti was terminated, Mr. Pool
25   was also terminated; is that correct?
```

Page 112

```
1              F. JIBRIL, M.D.
2         A.   Yes.
3         Q.   In Exhibit B, Dr. Jibril, can you
4    turn to the first page, Response 1?
5         A.   (Perusing.)
6         Q.   Do you see Response 1?
7         A.   Yes.
8         Q.   Certain names are listed there?
9         A.   Yes.
10        Q.   Do you know who Jessica Kagan
11   Trupia [phonetic] is?
12        A.   No.
13        Q.   Do you know who Jenna Applebaum
14   is?
15        A.   No.
16        Q.   Ashley Dunston is?
17        A.   No.
18        Q.   Have you come to learn of any
19   other individuals that have applied for
20   employment with Guidepoint?
21        A.   No.
22        Q.   In your talks with Ms. Valletti,
23   did she say that in her application for
24   employment with Guidepoint, she experienced
25   gender-based discrimination?
```

Page 113

```
1              F. JIBRIL, M.D.
2         A.   No.
3         Q.   Do you have any idea of the senior
4    management structure at Guidepoint?
5         A.   I do not.
6         Q.   Would it surprise you to learn
7    that there are two female members of that
8    senior management team?
9         A.   How many members total are there?
10        Q.   Five.
11        A.   Okay.
12             I -- I was not aware of the
structure.
14        Q.   If I make the representation that
15   two of the five members of Guidepoint senior
16   management team are female, would that come
17   as a surprise to you?
18        A.   Yes.
19        Q.   And why would that be surprising?
20        A.   Given what I know about the
21   company and its treatment of female
22   employees, at least during the time that
23   Valentia was employed and the time that I
24   was interviewing.
25        Q.   So Valentia shared with you her
```



Page 114

```
1              F. JIBRIL, M.D.
2   impressions of how she was treating,
3   correct?
4       A.  Correct.
5       Q.  Did Valentia share with you of how
6   any other female employees were treated?
7       A.  Yes.
8       Q.  And which employees?
9       A.  She made mention of the person who
10  preceded her in her role.  She said that
11  that employee was terminated during
12  maternity leave or their role was severely
13  diminished when they returned from maternity
14  leave.  And she made reference of other
15  individuals who had been treated unfairly on
16  the basis of their sex.
17      Q.  When did Ms. Valletti share this
18  with you?
19      A.  In June of 2017.
20      Q.  Or was it --
21      A.  Sorry.  2018, yes.
22      Q.  And did just provide any more
23  details other than the employee on maternity
24  leave, these other individuals that she
25  believes were discriminated against?
```

Page 115

```
1              F. JIBRIL, M.D.
2       A.  Yes, I think there were more than
3   just two examples.  She let me know that
4   there was conduct by some of the senior
5   management that was problematic in regards
6   to treatment of female employees, displays
7   of, you know, interpersonal relationships in
8   the office.  Things of that nature.
9       Q.  And Ms. Valletti shared all of
10  this with you on that call of June of 2018?
11      A.  Yes, or if not all during that
12  call, then subsequent conversations.
13      Q.  When you later met with her in
14  person?
15      A.  Yes.
16          MR. GRECH:  Take a five-minute
17      break, please?
18          (Whereupon, a recess was taken at
19      this time.)
20      Q.  Dr. Jibril, before the break, you
21  had mentioned that Ms. Valletti shared with
22  you some concerns she had about senior
23  management at Guidepoint; is that correct?
24      A.  Yes.
25      Q.  And what concerns did Ms. Valletti
```

Page 116

```
1              F. JIBRIL, M.D.
2   share with you?
3       A.  She said that female employees
4   were treated unfairly, including the
5   employee that we mentioned whose employment
6   was -- status was reduced after coming back
7   from maternity leave.
8           She also told me that the CEO was
9   in a relationship with one of the employees
10  and would bring her, the secretary, to
11  business trips inappropriately, and, um, act
12  inappropriately in the office, which made
13  people uncomfortable, herself included.
14      Q.  And you had no personal knowledge
15  of this employee on maternity leave, right?
16      A.  No.
17      Q.  And you had no personal knowledge
18  of any secretaries at Guidepoint, correct?
19      A.  No.
20      Q.  Did Ms. Valletti tell you who the
21  secretary was?
22      A.  She probably did mention her name,
23  but I don't recall it.
24      Q.  Are there any allegations in your
25  complaint about Mr. Sebag's relationship
```

Page 117

```
1              F. JIBRIL, M.D.
2   with the secretary or acting
3   inappropriately?
4       A.  I don't believe so.
5       Q.  Ms. Valletti believed this was
6   further evidence of gender discrimination at
7   Guidepoint?
8       A.  I think it's further evidence of
9   improper conduct.
10      Q.  Is it further evidence of gender
11  discrimination?
12      A.  I think you could argue that, yes.
13      Q.  Are you arguing that?
14      A.  Yes.
15      Q.  But you've never met Mr. Sebag.
16      A.  No.
17      Q.  You have no knowledge of his
18  relationships with anybody.
19      A.  No.
20      Q.  Or taking anyone on business
21  trips.
22      A.  Correct.
23      Q.  Anything else that Ms. Valletti
24  shared with you in terms of senior
25  management and interpersonal relationships
```



Page 118

```
1           F. JIBRIL, M.D.
2   that she felt was evidence of gender
3   discrimination?
4       A.   She felt that she was treated
5   unfairly by Mr. Sebag.
6       Q.   How so?
7       A.   That he would have outbursts in
8   her presence at her frequently.
9       Q.   And Ms. Valletti shared this with
10  you in June 2018?
11      A.   Yes, and in subsequent
12  conversations.
13      Q.   I'm assuming she didn't share any
14  of this during her interview, correct?
15      A.   Correct.
16      Q.   This would have been something you
17  would have wanted to know when you're asking
18  about this new employer and this team?
19      A.   Yes, cultural fit is important.
20      Q.   And knowing this, at least knowing
21  this through Ms. Valletti, you're still of
22  the opinion that you would like to work for
23  Guidepoint?
24      A.   Yes.
25      Q.   We spoke earlier about what you
```

Page 119

```
1           F. JIBRIL, M.D.
2   had planned your response to be when you
3   learned that your offer had been vetoed and
4   that you had thought about reaching out to
5   HR, correct?
6       A.   Yes.
7       Q.   But you did not ultimately do
8   that.
9       A.   Correct.
10      Q.   What were you going to ask HR?
11      A.   I would have asked for specific
12  feedback on my candidacy, what was lacking,
13  and why the decision was made to interview a
14  current client of mine and a current direct
15  supervisor of mine for a role that I was not
16  ultimately going to be offered.
17      Q.   And this would have been response
18  to you learning of the veto in February
19  2018.
20      A.   Yes.
21      Q.   At that point, did you believe
22  that officer wasn't extended because you
23  were a woman?
24      A.   I had no idea why it wasn't
25  extended at that time.
```

Page 120

```
1           F. JIBRIL, M.D.
2       Q.   When did you first get that idea?
3       A.   When Valentia, the hiring manager,
4   told me I was not hired because of my sex.
5       Q.   And that happened in June.
6       A.   Yes.
7       Q.   In your conversations with
8   Ms. Valletti in June of 2018, did she ask
9   you to essentially join her lawsuit against
10  Guidepoint?
11      A.   No, she did not.
12      Q.   But you ultimately did, both, sue
13  Guidepoint.
14      A.   Yes.
15      Q.   And you both submitted charges to
16  the EEOC.
17      A.   Yes.
18      Q.   Do you still speak with
19  Ms. Valletti today?
20      A.   Yes.
21      Q.   How frequently?
22      A.   Maybe once every few months as
23  relates to the litigation.
24      Q.   Do you have occasion to speak with
25  Ms. Valletti outside of talks of the
```

Page 121

```
1           F. JIBRIL, M.D.
2   litigation?
3       A.   No.
4       Q.   Do you consider her a friend?
5       A.   By -- I would say yes, we're
6   friendly.
7       Q.   Do you go out on social events
8   together?
9       A.   No.
10      Q.   Have dinner together?
11      A.   No.
12      Q.   Meet for coffee?
13      A.   Yes, we have.
14      Q.   And this has been between
15  February 2018 and date --
16      A.   Yes.
17      Q.   Strike that.
18         Has this been since June 2018 to
19  present?
20      A.   Correct.  Yes.
21      Q.   Dr. Jibril, if I could ask you to
22  look at -- back at Defendant's Exhibit B for
23  a moment.
24      A.   (Perusing.)
25      Q.   And specifically Response Number
```



Page 122

```
 1              F. JIBRIL, M.D.
 2    11.
 3        A.  (Perusing.)
 4            Yes.
 5        Q.   The description of the damages for
 6    which Plaintiffs are seeking relief.  We
 7    discussed reinstatement.  We discussed
 8    punitive damages.  It also itemizes
 9    attorneys' fees.  Do you see that?
10        A.   Yes.
11        Q.   And have you incurred attorneys'
12    fees as a result of this litigation?
13        A.   Not yet.
14        Q.   Why not yet?
15            MR. LICHTEN:  I'd object.
16            What is the relevance of the
17        agreement with her attorney?
18            MR. GRECH:  You're seeking
19        attorneys' fees in damages.
20            MR. LICHTEN:  Yeah, under the
21        Lodestar -- it doesn't really matter
22        when they first actually paid and what
23        they actually owe.  That's not how fees
24        are calculated in this case.
25            MR. GRECH:  That's in your
```

Page 123

```
 1              F. JIBRIL, M.D.
 2        application for fees should you
 3        prevail.
 4            MR. LICHTEN:  Correct.
 5            MR. GRECH:  Okay.
 6            MR. LICHTEN:  That's all we're
 7        asking for.
 8            MR. GRECH:  Okay.
 9        Q.   Dr. Jibril, is it your
10    understanding that your attorneys' fees
11    would be paid by Guidepoint should you
12    prevail in this lawsuit?
13        A.   That's what we are seeking.
14        Q.   How soon after you spoke with
15    Ms. Valletti in June of 2018 did you file
16    your charge with the EEOC?
17        A.   It was a few weeks later.
18        Q.   Did you get the impression from
19    Ms. Valletti -- strike that.
20            What did Ms. Valletti say to you,
21    if anything, about her charge with the EEOC
22    at that time?
23        A.   She let me know that immediately
24    upon raising to HR her concerns about
25    gender-based discrimination, she was
```

Page 124

```
 1              F. JIBRIL, M.D.
 2    terminated from employment.
 3        Q.   Okay.
 4            And you ultimately filed a charge
 5    of discrimination with the Equal Employment
 6    Opportunity Commission.
 7        A.   Yes.
 8        Q.   Did Ms. Valletti tell you that she
 9    had done the same?
10        A.   Yes.
11        Q.   And she told you that in June of
12    2018?
13        A.   Yes.
14        Q.   So it had already been done,
15    presumably.
16        A.   Yes.
17        Q.   Did she tell you when she did it?
18        A.   No.
19        Q.   And we spoke earlier that your
20    charge was -- the EEOC decided not to
21    further pursue your charge; is that correct?
22        A.   Yes.
23        Q.   And did you have talks with
24    Ms. Valletti about that?
25        A.   Yes.
```

Page 125

```
 1              F. JIBRIL, M.D.
 2        Q.   And did you know what came of
 3    Ms. Valletti's charge with the EEOC?
 4        A.   No.  Actually, I don't.
 5        Q.   Okay.
 6            Did you have conversations with
 7    Ms. Valletti about joining in a lawsuit with
 8    her against Guidepoint at that time?
 9        A.   Yes.
10        Q.   Why?
11        A.   Because I had been denied
12    employment based on my sex.
13        Q.   We've talked about a number of
14    recruiter reaching out to you, a number of
15    applications, some offers.
16            Prior to speaking with Valentia in
17    June of 2018, what in your experience with
18    Guidepoint made you think that their
19    decision was gender-based?
20        A.   I really, prior to speaking with
21    Valentia, was perplexed.  I had no idea why
22    they had chosen not to move forward.  I
23    thought potentially it might be based on my
24    gender, but I didn't -- I had no concrete
25    answers from anyone.
```

MAGNA >
LEGAL SERVICES

Page 126

```
1              F. JIBRIL, M.D.
2      Q.  Did anyone you interviewed with
3  for that position let you know that they
4  were interviewing other applicants?
5      A.  No.
6      Q.  Did you sit with other applicants
7  in the lobby that day?
8      A.  No.
9      MR. GRECH:  Take a 30-second
10  break, please.
11      (Whereupon, a recess was taken at
12  this time.)
13      MR. GRECH:  Dr. Jibril, thank you.
14      And with that, we've concluded
15  your deposition.
16      THE WITNESS:  Thank you.
17      (Time noted: 12:50 p.m.)
18
19  _____
20      Faiza Jibril
21  Subscribed and sworn to before me
22  this _____ day of _____, 20__.
23
24  _____
25      Notary Public
```

Page 128

```
2          C E R T I F I C A T E
3      I, STEPHEN P. SUDANO, a Notary Public in
4  and for the State of New York, do hereby
5  certify:
6      THAT the witness, FAIZA JIBRIL, whose
7  testimony is herein before set forth, was
8  duly sworn by me; and
9      THAT the within transcript is a true
10  record of the testimony given by said
11  witness.
12      I further certify that I am not related,
13  either by blood or marriage, to any of the
14  parties to this action; and
15      THAT I am in no way interested in the
16  outcome of this matter.
17      IN WITNESS WHEREOF, I have hereunto set
18  my hand this 3rd of October 2019.
19
20
21
22
  _____
23      STEPHEN P. SUDANO
24
25
```

Page 127

```
2              I N D E X
3  WITNESS           EXAMINATION BY        PAGE
4  Faiza Jibril      Mr. Grech        4
5
6              EXHIBITS
7  DEFENDANT'S       DESCRIPTION           PAGE
8  E        Nine-page        59
         black-and-white
9        Complaint
10  F       One-page        59
         black-and-white Charge
11       of Discrimination
12  G        One-page letter from    59
         Plaintiffs' Counsel
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 129

```
2          ERRATA SHEET
3  CASE NAME:  VALENTIA VILLETTI and FAIZA
   JIBRIL, M.D. V. GUIDEPOINT GLOBAL, LLC
4
   DATE OF DEPOSITION:  October 3, 2019
5
   WITNESS' NAME:  Faiza Jibril
6
   PAGE/LINE CORRECTIONS (NOW READS/SHOULD READ/REASON)
7  _____  _____
8  _____  _____
9  _____  _____
10  _____  _____
11  _____  _____
12  _____  _____
13  _____  _____
14  _____  _____
15  _____  _____
16  _____  _____
17  _____  _____
18
            _____
19             Faiza Jibril
20  SUBSCRIBED AND SWORN TO BEFORE ME
21  THIS _____ DAY OF _____, 20___.
22
   _____  _____
23  NOTARY PUBLIC     MY COMMISSION
24  EXPIRES:
25
```



**A**

able 45:6 86:17
above-entitled 1:14
ABU 8:17,18,24 9:2
9:4 10:16
accept 86:2,11
102:3,7
access 86:17
accommodate 6:2
accompanied 23:16
account 15:22
19:16 76:2 95:3
accredited 13:9
accurate 61:18
act 116:11
acting 117:2
action 1:14 52:22
53:22 57:18,22
67:4 128:14
actively 64:22
67:12,23 68:3
70:12
additional 40:4
74:23
addressed 35:21
36:9
admin 100:18
administer 3:16
administrator
100:11
affect 16:5 19:22
Africa 9:14 10:9,23
agree 67:17 78:6
80:10 82:12 85:23
91:9 109:2
AGREED 3:3,9,14
agreement 122:17
ahead 25:2,3
Ahmadu 8:19
Albert 36:17 40:18
40:20,22,24 53:12
55:17 61:11 62:18
80:5,14,16,19,21
81:18 84:7
allegation 62:17

63:2,18 67:3,11
67:15,17 73:8,24
74:2 77:18 78:3,7
80:8,11 84:15,22
88:13
allegations 81:25
82:13 116:24
alleged 81:12 111:5
alleges 60:22 84:10
allow 82:8 84:12
alluded 48:20
amount 107:18
amounts 17:13
37:8
analyst 42:10 52:5
analysts 29:22
Anglia 8:16 10:17
Anna 68:23 98:19
98:21
answer 6:5 93:8
answers 5:6 125:25
anybody 117:18
apart 8:6
appear 27:10
Applebaum 112:13
applicants 126:4,6
application 42:6,12
42:18 47:24 52:4
52:8 58:22 76:25
77:10 97:4 112:23
123:2
applications 42:22
97:20,22 103:21
125:15
applied 41:25 42:4
112:19
apply 42:3
applying 42:15
77:6,16 81:20
87:8
appointment 61:13
62:19
approximately
26:7
April 11:19 13:12
14:2 20:5,16

21:25 22:8,14,14
47:4
areas 72:11
argue 117:12
arguing 117:13
arm 105:10
Ashley 112:16
asked 34:19,19,24
34:25 35:22 36:13
38:12,25 40:3,13
46:18 50:9 56:2
74:24 97:7 119:11
asking 34:15 35:3
60:8 118:17 123:7
asks 93:14 97:3
106:22 108:2,7
assessed 110:24
associate 14:17,19
16:2,3,4,10 17:20
18:3,8,14,25
19:12 95:10,19
associated 17:10
24:6 29:24 37:16
assume 73:16 103:5
assuming 118:13
attempt 5:12
attended 74:20
attorney 54:6,8
57:23 66:2 90:8
99:11 122:17
attorneys 2:4,9 3:4
13:4 108:20 122:9
122:11,19 123:10
attractive 102:13
authority 35:16
78:13
authorization
77:24
authorized 3:16
availability 40:13
46:15,19 47:15
50:10
Avenue 2:5 4:12
aware 113:12
awkward 12:3
A-H-M-A-D-U

8:22

**B**

B 4:2 91:25 92:21
92:22,25 93:4,7
93:19 108:10
109:14,23 112:3
121:22
back 13:11 15:25
39:21 40:5 42:4
42:13 46:17 48:16
52:7 94:12 109:15
116:6 121:22
background 27:10
28:22 32:5,9
34:16 87:3
backpay 90:5,6
108:17,18 109:6
109:25 110:13
Baretto 95:13,21
96:12
Baretto's 95:15
base 14:5 16:7
20:10 21:11,13,14
21:22 22:15,24
23:5,6,12,15 24:2
24:8,22,23,24
25:4,7,12,24
37:12 86:10 87:9
87:24 89:4 91:2
101:5,6,7 102:21
103:2 110:11
based 7:15 16:16
20:12 22:17 57:10
60:23 91:7 109:25
110:25 111:10
125:12,23
basis 52:24 57:8
67:5 72:6 114:16
bat 40:17 84:19
85:2
battery 1:8 2:10
36:20
Bayero 8:19
began 24:20 83:18
87:22 95:25

beginning 9:17
17:22 19:21 21:18
25:6 28:4 96:14
behalf 103:23
behavior 110:25
belief 7:17 63:22
believe 6:17 7:18
19:7 25:5 26:6,15
27:22 29:13 41:2
42:13 43:8,25
44:17 45:11 46:20
49:12,15 52:6,11
54:5 55:3,12
57:17 61:16 63:19
65:2,14,14 71:20
72:18 77:15 81:6
81:14,16 82:19
83:4 84:15 90:15
91:7 101:5,13
111:4 117:4
119:21
believed 54:2
111:13 117:5
believes 114:25
benefit 107:17,15
107:19
benefits 85:21
107:12,13,13,14
107:15
better 5:2 53:9
56:15
beyond 70:5 103:12
birth 10:10
bit 32:4
black-and-white
59:8 127:8,10
blood 128:13
bonus 16:21 17:10
17:15 22:18,22
24:15 86:10 101:7
bonuses 16:15
17:12 23:16 26:7
37:15,18,24 85:20
87:17,21 88:3,6
born 10:7
bottom 65:18



**Bouker** 7:21 28:12
35:18,22 36:2,9
36:11 40:16 50:24
55:7 56:7,8,19
58:5 62:15 77:20
78:16,19 83:23
**break** 5:24 6:6 59:5
107:21 115:17,20
126:10
**BRIGHT** 2:4
**bring** 116:10
**bringing** 13:11
34:11 99:10
**brings** 10:25
**broadens** 86:15
**Brooklyn** 4:13
11:23 12:15
**brought** 67:4
**bulleted** 90:2
**bump** 103:2
**business** 15:24
19:19 20:6,15,18
21:16 22:12 23:7
23:22 43:2,19
46:10 48:6,13
52:10 58:22 64:8
68:11 72:16,22
75:25 86:24 94:8
94:14,23 97:11
101:14 104:5,19
105:4,11 116:11
117:20
**buy** 29:8,11,17
55:19 78:12
**B-A-R-E-T-T-O**
95:14
**B-A-Y-E-R-U** 8:22

————————

**C**

**C** 2:2 93:19 128:2,2
**calculate** 90:16
91:6
**calculated** 122:24
**calculating** 109:5
**calculation** 91:10
109:18,22

**calculations** 109:25
**call** 40:14,14 42:20
50:10 51:17 81:5
82:17 84:25
106:24 115:10,12
**called** 64:16
**candidacy** 36:22
39:19 119:12
**candidate** 7:19
55:14 77:25 82:6
83:18
**capacity** 11:7 15:16
17:2 105:8
**Cape** 9:13,23
**care** 32:10 33:8
61:5 67:13,20
73:14 77:22 86:21
87:3,5,7
**career** 9:25 20:3
87:6
**case** 1:4,15 54:23
62:8 122:24 129:3
**cases** 15:8,11
**Catherine** 2:15
**CEO** 36:16 40:18
62:17 102:11
116:8
**certain** 62:5 97:8
108:7 112:8
**certainly** 36:11
**certainty** 32:24
**certification** 3:6
**certify** 128:5,12
**chance** 86:10 92:5
**change** 11:15,17
13:16 17:6 19:6
20:8 27:15 63:22
**changed** 13:14 18:3
18:24
**changes** 22:9
**charge** 53:4,7 57:5
57:9,16 60:14,16
60:19,22 61:2,19
61:21,23 62:3,11
65:18 66:4 123:16
123:21 124:4,20

124:21 125:3
127:10
**charges** 120:15
**charging** 65:19
**check** 73:20 79:12
**chief** 61:11 80:4
**choice** 82:9 84:12
**chose** 57:17
**chosen** 125:22
**cited** 52:17
**City** 12:20 28:8
**claims** 7:11
**clarify** 11:24 17:18
110:18
**CLE** 13:6,8
**clear** 5:19 28:19
35:11 37:3,5
55:16
**client** 75:19 119:14
**clients** 13:4 15:7
29:21 86:18 87:2
105:6,9
**client-facing** 15:23
**CMO** 102:12
**coffee** 121:12
**colleague** 41:15
**come** 17:6 20:8
28:24,25 34:14
98:6 112:18
113:16
**coming** 116:6
**Commission** 124:6
129:23
**commissions** 20:11
21:9 24:5,21 25:8
25:14,16 26:4
**communicate** 79:2
**communicated**
49:18 84:24
**communication**
46:9 47:18 105:21
**communications**
49:24 54:17,22
80:23
**commute** 70:4
100:3

**commuting** 71:24
**companies** 64:20
**company** 11:24
34:23 41:7,10,17
43:7 51:4 61:13
61:16 62:22 63:19
102:16,19 113:21
**company's** 61:8
62:14 77:21 82:3
**compared** 32:8
**compensation**
13:25 16:5 17:7
19:22 20:9,24
22:9,24 24:12
30:11 48:12 73:2
73:5 87:17 91:4
106:6,8,13 107:14
108:23
**complain** 83:19
**complaint** 51:3
52:17 54:2 57:25
65:16 66:24 82:16
83:3,5,7 108:4
116:25 127:9
**complaints** 83:22
**complete** 36:23
**concern** 29:6
**concerns** 115:22,25
123:24
**concluded** 126:14
**concrete** 125:24
**condition** 6:3
**conduct** 73:20
111:4 115:4 117:9
**confidant** 76:11
**confirm** 45:6
**connecting** 15:6
**connection** 50:4,7
81:18
**consider** 53:4,6,7
77:5 121:4
**consideration**
55:14
**considering** 53:22
**contacted** 61:4
73:12

**content** 11:11 15:3
15:8 27:8,9 30:11
32:2 33:7 42:15
49:5 55:22 56:24
58:17 61:6 67:14
67:20 73:14 77:20
77:22 86:21 87:5
96:18
**continued** 24:13
85:14
**Continuing** 107:25
**conversation** 27:11
34:12 37:7 41:6
45:4,21 51:7,10
55:10 64:11 74:16
74:18
**conversations**
27:20 30:20 38:9
41:3 45:24 46:2,6
52:9 68:17,20
69:8,14 70:6
72:24 73:4 97:11
115:12 118:12
120:7 125:6
**COO** 99:15 100:10
100:15 101:16
**copies** 96:21
**corner** 65:19
**corporate** 105:6,9
**corporations**
105:12
**correct** 15:13 16:11
23:10,13,14 24:4
25:23 26:9 30:9
31:6 35:10 60:23
61:24 63:4 67:6
72:10 78:25 91:22
97:13,17 102:4,8
103:3 104:7 107:2
107:22 109:19
110:6,7 111:14,15
111:18,19,25
114:3,4 115:23
116:18 117:22
118:14,15 119:5,9
121:20 123:4



124:21
**CORRECTIONS**
129:6
**costs** 90:8 108:20
**counsel** 2:15 4:19
5:25 65:3,8,13,15
89:23 127:12
**course** 9:8
**Court** 1:2 3:18
**covering** 93:25
**create** 5:17
**credit** 13:8
**CTO** 102:12
**cultural** 118:19
**curious** 34:13
**current** 10:4 20:21
20:23 21:14 75:19
94:3 102:12
119:14,14
**currently** 20:17
30:14,16 86:23
**custody** 8:4,7
**customer** 15:21
29:21
**cut-off** 110:7,10

**D**

**D** 85:9,9 127:2
**daily** 86:19
**damage** 108:20
**damaged** 88:17
**damages** 89:2 90:5
90:6,7,8,12 108:3
108:6 109:18
110:8,17,21,23,24
111:6 122:5,8,19
127:7
**date** 21:15 59:11
90:13,22 91:15
93:18 106:21
107:15,17 110:3
121:15 129:4
**dated** 81:23
**Dave** 76:2,16,19
77:8 79:20,22
94:17
**Dave's** 94:21

**David** 2:11 4:17
**day** 31:8 33:17
34:18 51:25 73:20
74:4,17 75:7
80:18 126:7,22
129:21
**days** 61:7 73:17
74:3,6,8,12,14
**day-to-day** 32:4
**dealings** 51:23
**December** 61:3
67:12,25 70:13,15
73:11 100:23
101:10
**decided** 54:7 78:2
78:23 102:23
124:20
**decision** 35:19,20
36:12,18 52:6
54:3 55:17 61:14
62:23 65:4 79:3
85:2 119:13
125:19
**decisions** 72:6
**declined** 103:6
**defend** 82:9 84:12
**defendant** 1:7,14
2:9 85:13 110:24
**defendants** 60:8
**defendant's** 59:9
59:14,17 60:3,7
60:12 66:10,20
85:15,18 88:15
89:8,12 91:25
92:16 93:3 121:22
127:7
**defer** 78:16
**deferring** 35:20
**defined** 101:8
**definitely** 34:22
**degree** 8:17,24
**demonstrate** 88:24
**denied** 125:11
**denying** 111:9
**department** 13:6
14:21,22 15:17

16:3 17:4,17 18:7
18:19 19:11 69:7
74:19 79:6 82:19
95:11
**depending** 13:8
**deposed** 7:24
**deposition** 3:15 5:4
126:15 129:4
**describe** 83:14
**described** 82:5
**description** 53:9
122:5 127:7
**designated** 77:19
**detailed** 81:24
**details** 114:23
**determination**
57:11
**determine** 69:25
**develop** 15:2 30:7
**developing** 15:8
**development** 19:19
20:6,15,18 21:16
22:13 23:7,23
43:2,19 46:11
48:6,13 52:10
58:22 64:8 68:11
72:16,22 75:25
86:25 94:8,15,24
97:12 101:14
104:5,20
**differ** 86:20
**difference** 91:13
99:9 109:22
**different** 87:8
94:25 95:5
**diligence** 29:22
**diminished** 114:13
**diminishing** 15:4
**dinner** 121:10
**direct** 32:3 33:3
75:24 119:14
**direction** 85:12
**directly** 40:17
49:18 54:3 99:14
101:16
**director** 17:20 18:3

18:8,25 19:12
77:20 82:2 95:11
101:14
**disability** 107:13
**disbursements** 90:9
108:21
**discriminated**
114:25
**discrimination** 7:5
51:3,20,22 52:18
53:2 54:6 60:15
60:17,20,22 67:5
81:25 112:25
117:6,11 118:3
123:25 124:5
127:11
**discriminatory**
85:15,18 88:15
110:25
**discuss** 82:8 84:12
**discussed** 32:5 37:3
75:9 87:23 102:16
102:18 107:6
122:7,7
**Discussing** 54:23
**discussion** 22:5
39:14
**discussions** 61:8
73:17 74:9,12,22
103:12
**displays** 115:6
**distress** 108:24
**distresses** 90:7
**DISTRICT** 1:2,2
**divorce** 8:4,6
**doctor** 8:10 65:20
78:4 80:8 82:10
85:7 89:11,25
90:10,12 91:23
93:11 94:3 96:24
97:10 107:8 108:2
**document** 59:5
60:11,13 66:17
89:20 92:18
**documents** 59:9
63:15

**doing** 13:3 19:18
41:16
**door** 30:7
**Dr** 4:15 7:23 59:12
66:12,19 67:8
73:7,22 88:16
89:7 106:24
107:21 112:3
115:20 121:21
123:9 126:13
**drafted** 65:24
**due** 29:22
**duly** 4:3 128:8
**Dunston** 112:16
**dynamics** 34:20

**E**

**E** 2:2,2 59:10,14
66:10,20 127:2,8
128:2,2
**earlier** 47:5 65:2,17
75:9 78:12 84:18
103:25 118:25
124:19
**early** 31:11 42:16
42:24 43:12
**earn** 16:21 17:15
22:21
**earned** 8:23 22:18
37:18 88:2 91:14
91:17
**earning** 17:8 20:11
24:20 37:24 87:21
109:8
**earnings** 85:17
88:14 90:17
106:10
**East** 8:16 10:17
**economic** 108:5
**education** 9:25
10:13
**education/profes...**
9:8
**EEOC** 52:23,25
53:22 57:6,12,16
57:21 60:14 62:3



65:4,16 66:5 83:5
83:7 120:16
123:16,21 124:20
125:3
**effect** 3:17
**Egypt** 10:8
**either** 48:11 128:13
**elements** 97:9
**email** 40:3 49:21,22
82:18,23
**emails** 38:24
**emotional** 90:7
108:5,23
**employed** 40:19
93:19 113:23
**employee** 22:3 32:2
32:7 33:3,7 43:3
76:8 114:11,23
116:5,15
**employees** 27:13
28:13 29:20 31:3
31:17 45:8 102:18
113:22 114:6,8
115:6 116:3,9
**employer** 10:4 45:3
102:12 118:18
**employers** 70:24
72:5 98:5
**employer's** 93:18
**employment** 4:19
11:19 26:14 27:16
42:2,22 54:6 86:2
93:15,16,25 97:5
97:6,20,24 98:18
103:9,21 106:17
106:20,22,25
107:4,22 111:10
112:20,24 116:5
124:2,5 125:12
**ended** 36:21 104:12
**England** 10:14,19
**enjoy** 102:21
**enter** 21:17
**entered** 22:4
**enterprise** 20:22,24
94:14

**entertain** 64:16
**entertained** 64:7
**enthusiastic** 34:10
**entire** 14:21 17:3
**entities** 71:7
**entitled** 87:16
**entity** 11:5 70:12
97:5
**Equal** 124:5
**ERRATA** 129:2
**error** 109:24
**Esq** 2:6,11,15
**Essendelft** 75:20
**essential** 30:4
**essentially** 19:18
23:20 120:9
**Europe** 10:20
**evaluation** 93:20
**evaluations** 96:9,12
96:19,22
**events** 121:7
**eventually** 50:18
**evidence** 117:6,8,10
118:2
**exact** 84:24
**Exactly** 21:10
106:14
**EXAMINATION**
1:12 4:6 127:3
**examined** 4:4
**example** 51:5
**examples** 115:3
**executive** 61:11
80:4
**Exhibit** 59:14,22
60:9,12 66:20
89:8 92:12,12,15
92:21,22,25 93:4
93:7,8,12 108:10
109:14,15,17,23
109:23 112:3
121:22
**exhibits** 59:10
91:25 92:9 127:6
**expanded** 13:17
**expectation** 5:5

39:20
**expectations** 38:13
**experience** 28:20
28:22,24 29:9,12
29:18 30:2 86:15
125:17
**experienced** 51:21
112:24
**expert** 10:4 11:6,8
11:15,21 12:5,19
13:12 14:9 15:11
16:5 20:4,25
24:12 48:7 64:21
76:4,6,8,9 77:12
86:20,23 87:7,9
87:16 89:5 90:24
91:18 94:4 96:2
96:15,16 106:13
110:4
**expertise** 34:11
**experts** 15:7,10
**EXPIRES** 129:24
**explain** 5:2 109:21
**explanation** 53:9
53:12
**explicitly** 87:23
**extended** 49:4 58:7
58:12 79:13 101:2
101:9 111:13
119:22,25
**extending** 40:25
**extension** 53:13
55:3
**extremely** 82:5
**E-S-S-E-N-D-E-...**
75:22

---

**F**

**F** 4:2 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1

30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1,10
59:17,21,22 60:1
60:3,7,9,12 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1
127:10 128:2
**fact** 29:7 39:22
**factors** 97:8
**failed** 7:8,14
**failure** 7:4 57:10
82:4
**Fair** 12:2 74:10,25
**Faiza** 1:3,13 4:10
126:19 127:4
128:6 129:3,5,19
**familiar** 43:16
66:14,16,19

**family** 10:11
**far** 71:2
**February** 40:6,10
49:11 61:14 62:2
62:23 90:13,23
91:14 107:2,5
110:14 119:18
121:15
**feedback** 119:12
**feel** 7:13
**feeling** 55:5
**fees** 90:8 108:20
122:9,12,19,23
123:2,10
**felt** 118:2,4
**female** 33:3 82:5
83:17 84:8 113:7
113:16,21 114:6
115:6 116:3
**file** 57:5 62:3 65:15
123:15
**filed** 57:25 61:23
66:4,24 83:7
124:4
**filing** 3:5 52:23,25
53:4,6,23 57:15
60:14
**fill** 55:24 68:9
**final** 48:21,24 55:7
63:18 73:18 77:24
79:7,8
**financial** 28:19,24
29:19,21 86:18
**financially** 88:17
**find** 34:22
**finish** 5:22
**fired** 50:24 111:18
**firm** 4:18 56:20
68:5,7,13 69:3,5
69:10 70:21 71:16
98:21 100:9,10,17
103:6,10 107:7
**firms** 13:5
**first** 4:3 11:17 16:6
18:21,22 23:6
31:23,24,25 33:2



33:21 38:6 59:21
61:18 87:22 92:11
92:16 95:25 112:4
120:2 122:22
**fit** 23:23 24:2 27:10
41:8 48:21 69:20
70:2 86:8 106:11
118:19
**five** 93:16 113:10
113:15
**five-minute** 59:4
115:16
**Floor** 2:10
**follow** 47:14 64:12
**following** 82:6 89:6
**follows** 4:5
**follow-up** 38:19,23
40:3 41:22 48:23
**force** 3:17
**forgive** 10:15 15:25
**form** 3:10 52:22
**formal** 19:5,17 51:3
**formally** 20:6
**formal/informal**
93:21
**forth** 128:7
**forward** 125:22
**four** 11:18 13:13
31:2,4 71:18 72:4
72:18,25 74:20
83:25 98:3 103:18
**fourth** 35:25 36:4
48:2
**frequently** 118:8
120:21
**friend** 121:4
**friendly** 121:6
**full** 77:24
**full-time** 13:21
14:3,8 96:16
**functions** 86:20
**further** 3:9,14
45:23,25 46:5
57:22 66:6 99:24
117:6,8,10 124:21
128:12

**furthest** 71:3,5
**future** 88:6 102:16
102:18

---
**G**
---
**G** 59:10 89:8,12,17
89:19 109:15,17
109:23 127:12
**gain** 30:3
**gaining** 105:5
**gender** 7:15 51:3
53:2 54:4 56:23
57:10 64:7 71:22
72:6 111:14 117:6
117:10 118:2
125:24
**gender-based**
51:20,22 52:6,12
52:17 55:4 112:25
123:25 125:19
**general** 2:15 44:23
**gestures** 5:15
**give** 4:22 47:15
50:15 63:9 76:24
77:4,9,14
**given** 28:21 57:13
60:25 102:17
113:20 128:10
**gives** 7:17
**giving** 76:7
**Global** 1:6 2:16
4:20 6:21,23 7:3
60:6 61:4 67:2
129:3
**Glynn** 76:2,4 94:17
95:8
**go** 5:10 25:2,3
28:16 31:12 36:8
48:16 52:16 74:3
99:22 102:15
121:7
**going** 4:22 5:20
13:11 15:25 16:13
21:20 34:17 36:8
41:17 57:22 58:6
58:11 59:16 62:10

66:6 70:9 71:21
89:7 91:23,24
94:12 119:10,16
**good** 4:15,16 23:23
23:25 26:10 27:10
41:8 48:21 55:8
69:20 70:2 93:24
106:11
**Gordon** 2:9 4:18
22:3
**gotten** 71:3
**government** 107:15
**graduate** 9:4
**graduation** 9:9
**great** 86:8
**Grech** 2:11 4:7,17
59:3 74:10 115:16
122:18,25 123:5,8
126:9,13 127:4
**grew** 18:11
**group** 4:20 29:10
**guess** 5:19 41:15
**Guidepoint** 1:6
2:16 4:20 5:8 6:21
6:23 7:2,8,13 13:3
26:14,17 27:4,14
27:23 31:12 36:22
39:19,24 41:13,23
42:2,7,19,22,25
43:4,11,18 45:2,8
45:14,19 46:6
47:9,15,25 48:5
48:11,19 49:5,9
50:12,24 51:17,19
51:23 52:16 54:24
55:23 56:22 57:21
58:10 60:6 61:4
64:15 66:25 67:12
70:22 71:5,15
73:19 74:3,15
75:2 77:2,6,10,16
77:18 79:15,18,23
80:4,6 81:2 82:8
82:20 83:25 84:11
86:3 87:14,22
88:7,20,21 91:5

91:14 93:17 97:7
97:11 103:24
104:8,9,10 106:16
106:22,25 107:16
109:9 111:5
112:20,24 113:4
113:15 115:23
116:18 117:7
118:23 120:10,13
123:11 125:8,18
129:3
**Guidepoint's** 28:5
29:20 88:17
**Gulino** 82:3 85:4
**guys** 53:23
**gynecology** 9:11
**G-L-Y-N-N** 76:3

---
**H**
---
**hand** 128:18
**handing** 59:14,18
89:9 92:2
**happen** 39:22
83:20
**happened** 15:20
20:3 24:11 25:10
28:2 42:11 44:3
57:15 120:5
**head** 43:13 46:25
**headquarters** 12:7
12:9,20 104:23
**health** 32:10 33:8
61:5 67:13,20
73:14 77:22 86:21
87:2,5,7
**hear** 39:21,24 40:5
46:16
**heard** 42:13 43:22
46:25 52:7 66:5
70:24
**hearing** 48:8
**held** 1:14 17:22
22:5 39:14
**helped** 18:5
**helping** 15:23
19:18

**hereunto** 128:17
**higher** 99:8
**highly** 34:9
**hire** 7:4,8,14 54:3
57:10 61:10 77:24
78:2,14,23 79:3
80:6,14 82:4
83:17 84:8 85:2
88:18
**hired** 7:22 53:10
55:8,16 56:4,12
56:17,25 61:15
63:3,13,23 79:10
80:7 81:3,8,12,19
111:21 120:4
**hiring** 7:4,20 31:2
35:16,18 36:12
41:11 51:4 53:8
53:18 55:17 61:8
62:7,14 77:21
120:3
**history** 93:15
**hit** 21:8
**holidays** 100:22
**hospital** 9:12,12,17
**hour** 33:24
**HR** 37:5,6 53:8,16
69:6 74:18 79:6
82:19,24 119:5,10
123:24
**human** 82:2

---
**I**
---
**idea** 56:23 113:3
119:24 120:2
125:21
**identification** 59:10
**identify** 81:11
93:17 97:8 106:23
107:16
**identity** 108:7
**illegal** 111:11
**immediately** 83:18
106:10 123:23
**important** 118:19
**imposition** 111:6



**impression** 123:18
**impressions** 114:2
**improper** 117:9
**inappropriately**
  116:11,12 117:3
**included** 63:14
  82:3 116:13
**including** 84:5
  85:19 108:4 116:4
**increase** 88:22
**increased** 16:7
  21:22 22:16 23:8
  23:12 24:3 25:12
  25:24 89:4 90:19
  90:21 109:11
  110:5,12
**incurred** 122:11
**indicated** 65:12
**individuals** 111:21
  112:19 114:15,24
**industry** 28:20
  29:21 86:18
**inference** 38:2
**inform** 100:4
**informally** 18:9,21
  18:22
**information** 40:4
  43:24 74:23
**informed** 61:13
  62:22 73:18
**initial** 27:11 68:17
  68:19 69:8,14
  70:6 74:16 101:6
  101:18 103:13
**initially** 11:10
  22:21 43:8
**inquiries** 97:23
  98:2,18 103:9,16
**inquiry** 97:4
**instance** 111:2
**Institute** 10:4 11:6
  11:8,15,21 12:5
  12:19 13:12 76:6
  77:12 86:24 87:7
  96:17
**Institute's** 14:9

**instructions** 4:23
  4:24 5:9 6:9,11
**interaction** 47:25
  51:24
**interested** 28:18
  32:6 34:5 41:10
  69:21 73:13 86:16
  128:15
**interests** 108:21
**International** 12:24
  12:25
**interpersonal**
  115:7 117:25
**interpretation** 98:7
**interrogatories**
  92:17 93:3 108:12
**Interrogatory**
  93:12,14 96:25
  97:3 106:19 107:9
  107:25
**intervention** 82:7
  83:12,15
**interview** 27:13,24
  28:16 30:21,23
  31:23,25 33:2,6
  33:16,23 35:12,16
  35:22 36:4,10
  37:20 38:6 44:5
  44:14,22 46:16,19
  47:16 49:20 50:25
  55:9 68:18 74:12
  79:6 100:8,21,25
  118:14 119:13
**interviewed** 36:2
  39:5,9 55:6 83:24
  99:24 126:2
**interviewer** 34:18
**interviewers** 29:14
  34:14 38:25
**interviewing** 36:14
  55:24 64:3 87:4
  87:13 88:10,20
  113:24 126:4
**interviews** 30:2
  31:2,5,13 33:19
  34:9 36:20 61:7

71:6,9 73:17 74:3
  74:4,7,8,15,21
**investments** 29:23
**involved** 44:24
**in-house** 104:25
**in-person** 27:12,24
  31:4 54:12 68:18
  71:8 74:19,20
**issue** 28:21,23
  29:11,15 55:20
**itemizes** 122:8

─────────
         **J**
─────────
**J** 4:2
**JABRIL** 1:13
**James** 26:21,22
  27:3,6,21 28:12
  30:13,20 36:24
  37:8 38:10,20
  39:10,11,17,25
  40:9,12,24 41:4
  41:13 48:17,18,24
  49:3 55:9,11,15
  55:18 58:9 62:12
  62:20,24 69:15
  73:12 74:22 75:12
  76:14,17,24 79:14
  79:20 80:13 84:18
  84:24
**January** 21:19 22:8
  25:20 73:15 74:20
  102:25 110:11,14
**Jenna** 43:15,17
  45:12 46:14,18
  112:13
**Jersey** 68:14 70:3
  99:25 100:3
**Jessica** 112:10
**Jibril** 1:3 4:10,15
  5:1 6:1 7:1,23 8:1
  9:1 10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1

28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1,12 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1,12
  66:19 67:1,8,13
  68:1 69:1 70:1
  71:1 72:1 73:1,7
  73:12,18,21,22
  74:1 75:1,7 76:1
  77:1 78:1,2 79:1
  80:1,6 81:1 82:1,4
  82:9 83:1 84:1,13
  85:1 86:1 87:1
  88:1,16 89:1,7
  90:1,5 91:1 92:1
  93:1 94:1 95:1
  96:1 97:1 98:1
  99:1 100:1 101:1
  102:1 103:1 104:1
  105:1 106:1,24
  107:1,21 108:1,18
  109:1 110:1 111:1
  112:1,3 113:1
  114:1 115:1,20
  116:1 117:1 118:1
  119:1 120:1 121:1
  121:21 122:1
  123:1,9 124:1
  125:1 126:1,13,19
  127:4 128:6 129:3
  129:5,19
**Joaquin** 94:5
**job** 70:3 76:8 93:25
**join** 120:9
**joined** 23:6 88:7
**joining** 125:7
**July** 61:23 62:3

109:10
**June** 22:14 23:8
  24:2 25:5,7,10
  49:12,13,25 50:4
  50:7 51:13 54:11
  54:16 55:2 62:8
  63:11 65:11 81:5
  83:10 88:24
  109:10 114:19
  115:10 118:10
  120:5,8 121:18
  123:15 124:11
  125:17
**Justin** 32:20

─────────
         **K**
─────────
**Kagan** 112:10
**knew** 41:9 50:11,13
**know** 4:25 5:25
  6:14 14:13 30:24
  34:14 35:17 36:12
  37:17 40:15 43:17
  44:25 47:24 55:22
  56:14,22 57:4
  59:22 66:13 79:5
  83:2 89:12 91:4
  92:5 102:13
  112:10,13 113:20
  115:3,7 118:17
  123:23 125:2
  126:3
**knowing** 118:20,20
**knowledge** 63:5,7
  63:10 87:7 116:14
  116:17 117:17
**Kogut** 68:23,24
  69:9,18 70:6
  71:20 73:5 98:19
  99:10,16 100:12

─────────
         **L**
─────────
**L** 3:2 4:2
**lack** 51:4
**lacking** 119:12
**Lane** 12:12
**language** 65:23,25



72:14 84:24
largely 96:20
lasting 33:20
late 42:23 43:12
lateral 73:11
law 13:5 68:5 69:3
  70:21 71:15 98:21
  100:9 103:9 107:7
lawsuit 5:7 6:20 8:3
  8:8 120:9 123:12
  125:7
lead 26:6 52:11
learn 37:19 63:12
  81:7 112:18 113:6
learned 56:16
  57:21 58:6,11
  62:19 63:23 65:3
  83:16 111:20
  119:3
learning 119:18
leave 30:15 48:7
  64:21 76:9 77:12
  114:12,14,24
  116:7,15
led 43:24 52:5
  71:20 102:24
left 50:14
left-hand 65:19
legal 1:19 52:22
  53:22 57:20
Leona 32:14
letter 89:23 90:13
  90:23 127:12
let's 31:9 103:20
level 25:19 73:5
  91:5
levels 73:2
Lichten 2:4,6 57:24
  66:3 74:5 122:15
  122:20 123:4,6
limit 29:7
limited 51:24 85:20
  87:2 108:4
lines 83:11
LinkedIn 27:7
  49:17 50:2,4,14

104:4,16 105:10
  105:14,17,20,21
  105:22 106:2,16
Lipkin 26:22
Lisa 75:19 76:13,21
  76:23,24 77:4
  79:14,17
list 90:2
listed 112:8
listen 64:24 69:23
listening 64:13
litigation 15:12
  63:16 89:24 93:9
  111:3 120:23
  121:2 122:12
litigators 13:5
little 32:4
live 11:25
lived 10:9
living 12:15
LLC 1:6 2:16 4:21
  60:6 61:4 129:3
LLP 2:9 22:4
lobby 126:7
located 9:2 10:18
  11:22 12:10 68:13
  70:3
Lodestar 122:21
long 9:19 14:8
  15:15 20:14 25:18
  33:19
longer 33:22 49:9
  56:19
look 59:22 66:9
  79:25 85:6 92:3,4
  92:9 96:24 107:8
  121:22
looked 50:13
looking 27:15
  29:22 43:18 48:7
  55:23 64:21
  109:14
loss 88:24
losses 108:5
lost 85:21 90:4,5,17
lot 10:12 34:11

51:19 99:23
Lukban 26:23,24
  31:16 73:12,17
  74:22
lunch 102:15
L-U-K-B-A-N
  26:25

———————

M
Magna 1:19
Maiden 12:11
majority 15:5
makeup 56:24
making 30:14,16
  35:19 72:6 109:10
male 33:7 61:14
  63:2
man 80:7 81:3,11
  111:17
management 1:16
  15:22 76:2 95:3
  113:4,8,16 115:5
  115:23 117:25
manager 19:16
  27:9 31:3 35:18
  62:7 94:25 120:3
managers 7:20
  53:8,18 55:17
  61:9 62:14 77:21
Manhattan 12:13
  100:5 104:24
Mansukhani 2:9
  4:18
March 81:23,24
marked 59:9,13,17
  60:11 89:8 91:25
marketing 11:12
  96:7
marriage 128:13
matched 106:12
material 11:12
maternity 114:12
  114:13,23 116:7
  116:15
matter 122:21
  128:16

mean 11:24 39:9
meaning 50:8
meant 77:23
measure 108:3
medical 8:14,17,23
  9:8,24 10:10,21
  14:18,24,25 15:7
  15:16 16:4,10
  17:3,16,21 18:6
  18:14,19 19:4,10
  19:13 32:10 95:11
  95:19
meet 24:13 28:10
  31:19,23 33:14
  85:3 121:12
meeting 22:17
  27:13 38:7 54:12
  61:12 62:18 74:19
  80:5 81:22 102:15
member 105:6
members 113:7,9
  113:15
memorandum
  81:23 82:15,22
men 57:3
mental 108:23
mention 43:7 83:10
  114:9 116:22
mentioned 10:16
  41:6,9 53:25
  82:22 115:21
  116:5
messaged 49:17
met 22:14 23:11
  28:11 32:16,22
  33:15 38:4 40:20
  54:7 80:16,18
  115:13 117:15
Michael 96:3
mind 41:13 98:6
mine 119:14,15
minutes 33:22,22
missed 46:21
moment 59:21
  66:13 121:23
months 11:18

13:13 49:7,10
  90:19,20 120:22
moot 45:21
Morgenstern 96:3
Morgenstern's
  96:4
morning 4:15,16
move 125:22
moved 10:2,5 11:2
  20:6
multiple 64:19,20
  81:8
M.D 1:3 5:1 6:1 7:1
  8:1,11 9:1,5 10:1
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1 100:1
  101:1 102:1 103:1
  104:1 105:1 106:1



107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 129:3

**N**

**N** 2:2 3:2 127:2
**name** 4:9,17 9:11
26:20 32:18,20
44:10 68:8 69:2
75:19 76:2 100:14
100:17 116:22
129:3,5
**named** 19:12
**names** 28:14 71:14
112:8
**nationwide** 12:24
**nature** 15:12 54:21
101:3 115:8
**necessarily** 33:8
56:18
**need** 5:24 30:6
**needed** 40:5
**negligence** 111:2
**negotiated** 101:25
**negotiation** 101:7
**negotiations** 101:22
**never** 19:17 46:14
52:7 80:16,18
117:15
**new** 1:2,9,9,18 2:5
2:5,10,10 4:4,13
9:12,16 12:20
15:24 28:8 68:14
70:3 71:7 99:25
100:3 102:22
118:18 128:4
**Nigeria** 9:3 10:21
**Nine-page** 127:8
**nodding** 5:15
**Norwich** 10:19
**Notary** 1:17 4:3
126:24 128:3

129:23
**note** 5:18 34:8
**noted** 126:17
**number** 93:12,14
96:25 121:25
125:13,14
**numbers** 109:7

**O**

**O** 3:2
**oath** 3:17
**object** 74:5 122:15
**objections** 3:10
**obstetrics** 9:11
**obviously** 70:25
**occasion** 48:10 85:3
96:9 120:24
**occupy** 85:14
**occur** 19:6 51:10
54:14
**occurred** 14:15
46:23 58:25
**Ocean** 4:12
**October** 1:10
128:18 129:4
**offer** 37:6 39:21
40:25 48:18 49:3
53:13 55:4 58:6
61:17 63:19 64:6
64:17 79:12 101:2
101:4,6 102:4,8
102:13 103:6
111:14 119:3
**offered** 40:15 62:5
71:21 76:12 86:3
86:9 119:16
**offers** 106:20 107:4
125:15
**office** 52:2 89:23
99:25 100:5 115:8
116:12
**officer** 3:16 58:11
61:11 80:5 101:9
101:18 119:22
**officers** 12:21
**offices** 28:6,8

**oh** 31:9 38:14 102:5
105:13,15
**okay** 5:3 6:7,16,22
6:25 7:6,16 8:5
9:22 11:13 12:8
12:18,23 13:10
14:7 15:19 16:12
16:24 18:4,10,12
18:17 19:2,8 20:2
20:13,19 22:23
23:2,18,21 24:19
25:17 26:12,18
27:19 31:7,21
32:13,19,25 33:13
33:25 34:21 35:2
35:6 36:19 38:14
38:18 43:10 44:20
45:5,16,22 47:7
48:15 50:5,21
52:3,14 54:20
58:4 59:3,25 62:9
65:6 69:12 70:20
72:17 75:5 76:7
82:21 92:7,10
98:14 100:7 103:4
104:15,21 105:16
105:24 106:4
107:24 113:11
123:5,8 124:3
125:5
**once** 120:22
**One-page** 127:10
127:12
**open** 27:17 48:8
55:25 56:4 64:3
64:13
**opening** 69:19
100:5
**opinion** 118:22
**opportunities**
27:18 48:9 64:14
64:24 69:23
106:17
**opportunity** 25:13
25:15 26:3 59:23
89:13,16 92:8

124:6
**other's** 30:25
**outbursts** 118:7
**outcome** 128:16
**outside** 120:25
**overlap** 98:8 99:4
**overseeing** 14:20
15:16 17:3,16
18:7,19 19:10
**owe** 122:23
**owed** 108:17,18

**P**

**P** 1:16 2:2,2 3:2
128:3,22
**page** 67:9 73:8
79:25 85:6 93:12
112:4 127:3,7
**PAGE/LINE** 129:6
**paid** 122:22 123:11
**pain** 108:5
**Paragraph** 67:3,9
73:10 80:2 81:13
81:22 82:23 85:9
**Park** 1:8 2:5,10
**part** 6:19 11:11
13:22 14:9 15:4,4
19:21 20:14 21:15
26:13 35:18 36:17
63:15 89:24 93:9
**particulars** 60:25
62:11 65:24
**parties** 3:5 128:14
**party** 8:2,8 104:9
**party's** 65:20
**part-time** 11:10
13:19
**pay** 87:25 110:11
**pending** 6:4 79:11
**pensions** 85:20
**people** 56:3,12,16
63:13,23 81:8
83:25 116:13
**percent** 62:4
**perform** 96:9
**performance** 16:16

20:12 22:15 24:14
24:15 93:21 96:10
**performance-bas...**
23:16
**performing** 93:20
95:2
**period** 23:19 88:23
91:21 94:2 110:5
110:13
**perplexed** 125:21
**person** 34:17 36:15
64:4 81:15,19
83:24 93:20 97:5
99:24 114:9
115:14
**personal** 81:18
82:6 83:11 116:14
116:17
**personnel** 35:4
**perusing** 59:15,19
59:24 66:11,15
67:10 73:9 80:3
85:8,10 89:10,14
92:7 93:13 97:2
107:10 109:16
112:5 121:24
122:3
**phone** 30:22,23
40:14 44:4,14
46:16,19 47:16
51:8,9 54:11 71:8
71:10,16 72:3,9
84:25 103:13
**phonetic** 112:11
**PH4** 4:12
**pitching** 86:25
**place** 1:15 43:18
85:13
**Plaintiff** 1:13
**plaintiffs** 1:4 2:4
90:6 93:2 97:8
108:11,19,22
122:6 127:12
**plaintiff's** 85:11,13
**Plan** 1:16
**planned** 83:17



119:2
**Plaza** 1:8 2:10
**please** 4:8 5:11,25
  17:19 92:6 115:17
  126:10
**plus** 25:8
**point** 6:4 11:4,14
  13:20 17:8 18:6
  27:16 36:24 89:3
  110:8,10 119:21
**Pool** 7:21 28:12
  31:15 50:24 77:20
  77:23 78:2,9,23
  84:19 111:24
**position** 7:7,19
  11:15 30:12 35:7
  38:11,22 40:16
  46:3,7 47:20 49:6
  56:2,4,9,13,17
  58:18 61:5,9,15
  61:17 62:5 63:3
  63:20 64:3,9,23
  67:13,20 69:9
  71:7,21 72:15
  73:14 76:12 77:22
  77:25 80:7 81:3,9
  81:12,20 85:14
  86:3,11 87:13
  88:9 90:24 91:5
  94:6 95:18 98:23
  99:7,13,14,17,19
  99:22 100:2
  104:13 105:25
  111:18,21 126:3
**positions** 55:23
  71:2 72:12,22
  99:10
**positive** 55:11
  96:20
**possessed** 77:23
**Possibly** 51:15
**post-interview**
  49:21
**potential** 29:23
  37:25 38:3 41:23
  100:6 101:8

102:22 106:6,9
**potentially** 32:23
  34:5 125:23
**preceded** 114:10
**preference** 28:25
**preliminary** 64:10
**presence** 118:8
**present** 2:14 93:17
  121:19
**presentations** 15:3
**presently** 4:11
**president** 20:21,24
  21:18 22:2 75:25
  94:7,13,23 95:17
  96:6 102:25
**presumably** 124:15
**pretty** 44:25 64:20
**prevail** 123:3,12
**previously** 91:24
**primary** 10:12
**prior** 22:20 53:3
  54:25 93:16
  125:16,20
**Priscilla** 82:2
**probably** 33:21
  69:15 116:22
**problematic** 115:5
**problems** 51:19
  52:18
**proceed** 70:5 72:8
**proceeding** 63:15
**proceedings** 6:20
  8:4,7
**process** 6:12 35:19
  42:14 47:20 55:9
  73:19
**processes** 71:4 72:8
**productive** 34:12
**products** 32:11
**profile** 50:14
**progression** 24:12
**promoted** 14:18
  15:21 17:2 25:22
**promotion** 16:2,6
  21:25 102:25
**promotions** 14:11

14:13 91:20
**prospecting** 86:25
**provide** 75:18
  114:22
**provided** 39:2,16
  73:21 75:7
**providing** 39:25
**Public** 1:18 4:4
  126:24 128:3
  129:23
**punitive** 90:8 108:6
  108:20 110:17,20
  110:23 111:6
  122:8
**purposes** 59:13
**pursuant** 1:15
**pursue** 66:6 68:15
  70:10 124:21
**pursuing** 57:20
**P.C** 2:4
**p.m** 1:10 126:17

---

### Q

**qualified** 82:5
**quarter** 16:19
**quarterly** 16:15
  17:12
**question** 3:11 5:20
  6:4 12:2,3 21:21
  56:15 107:19
  108:9,13 110:19
**questions** 4:24 5:5
  5:6,10 6:8 34:15
  34:25 56:6 92:21
  93:8
**quick** 31:6
**quite** 10:11
**quota** 22:15,17
**quotas** 21:8 23:12
  24:14
**quote** 40:17 73:18
**Q2** 22:13

---

### R

**R** 2:2 4:2 128:2
**Radio** 40:2

**raise** 87:17 88:25
**raised** 102:19
**raising** 123:24
**range** 38:10,17
  87:13
**ranges** 37:9
**ranking** 99:8
**reach** 50:9 53:15
  104:17
**reached** 26:16 27:3
  27:7 29:4 39:11
  42:25 43:6,9,11
  45:20 49:8 51:11
  58:14 62:7 68:6,9
  69:15 75:12 99:13
  102:11 103:24
  104:5,19 105:17
**reaches** 49:13
**reaching** 37:6 53:7
  79:7 105:5,11
  119:4 125:14
**read** 61:2
**reading** 61:18
**reads** 73:10 108:16
**READS/SHOULD**
  129:6
**READ/REASON**
  129:6
**real** 55:14
**really** 32:23 99:4
  122:21 125:20
**reason** 50:15 55:2
  71:22 76:25 77:4
  77:9,14
**reasons** 86:16
**recall** 26:20 32:17
  44:10,11 46:24
  68:8 72:13,19
  81:16 84:17 96:18
  98:5 100:14,17
  103:11 116:23
**receive** 88:25 97:23
  98:17 103:8
**received** 8:17 24:14
  85:18 88:15 89:23
  98:4 106:20 107:5

107:11,18
**recess** 59:6 115:18
  126:11
**recognize** 60:2,16
  66:22 89:19 92:12
  92:14,22,24
**recollection** 32:15
  32:21
**recommending**
  7:22
**reconcile** 84:21
**reconsider** 76:25
  77:9
**record** 4:9 5:17,18
  5:22 22:5 39:15
  128:10
**recruited** 67:12,23
**recruiter** 26:16,19
  28:12 30:13 37:2
  41:9,20 42:24
  43:6,22 44:7,8,15
  45:7,17 46:3,12
  47:2,9,11,14,19
  48:5,12 58:13
  61:3 62:12 64:11
  64:15,18 68:21,22
  69:4 72:9 73:12
  74:17 99:3 100:11
  101:22 104:4,11
  104:16 105:2,14
  106:6 125:14
**recruiters** 64:19
  71:12,13,17 72:4
  72:25 98:9 103:23
  104:8
**recruiting** 68:4
  70:13,22
**recruitment** 67:19
  68:16 97:16
**reduced** 116:6
**Rees** 2:9 4:18 22:4
**refer** 41:17,19 67:8
  89:25 108:10
  109:15
**reference** 73:20
  75:23 76:8 79:12



114:14
**referenced** 62:12
**references** 39:3,4,5 39:6,12,16,18,25 55:5,10,13,18 73:21 74:23 75:8 75:8,12,15,17
**referring** 8:10 98:11
**reflected** 91:20 109:22,23
**refresh** 32:15,21
**refusal** 88:17
**refused** 82:8
**refuses** 84:11
**regarding** 61:5 71:7 74:22
**regards** 115:5
**regularly** 64:20
**reinstatement** 108:19 122:7
**rejected** 109:9
**rejection** 97:6 106:21,25 110:3
**related** 7:11 51:22 128:12
**relates** 120:23
**relationship** 116:9 116:25
**relationships** 115:7 117:18,25
**relevance** 122:16
**relief** 85:24 122:6
**remedy** 67:4
**remember** 28:14 69:2
**reorganizing** 56:21
**repeat** 23:5
**rephrase** 5:11
**report** 32:3 33:3
**reported** 35:8 101:15
**reporter** 1:17 4:8 4:11 5:13,16 8:21 23:4
**reporting** 99:15
**represent** 4:20 89:22
**representation** 113:14
**represented** 101:21 101:24
**representing** 101:23
**request** 85:23 110:17
**requested** 73:21 75:7,18,23 76:10
**require** 100:3
**requirement** 28:25 29:4
**research** 13:18,23 14:9,17,18,23,24 14:25 15:2,16 16:2,4,10 17:3,16 17:21 18:6,14,19 19:4,11,13 42:10 52:5 95:11,17,19 95:23 96:13
**reserved** 3:11
**reside** 4:12
**resources** 82:2
**respect** 93:15 108:2
**respective** 3:4
**respond** 5:23
**responded** 29:10
**responds** 40:9
**response** 45:18 57:13 93:2 108:12 108:14,16 109:3 112:4,6 119:2,17 121:25
**responses** 5:14,16 108:11
**responsibilities** 15:5
**responsibility** 19:20
**responsive** 108:13
**rest** 14:16
**restructuring** 56:20
**result** 100:24 122:12
**retain** 54:8
**retained** 57:23 65:3 65:12,15
**retaliatory** 85:16 85:19
**returned** 114:13
**review** 66:13 89:11 89:17
**right** 15:14 16:25 22:13 23:24 24:8 24:10 31:9 32:25 37:14 38:8 47:22 53:20 54:9 58:15 66:8,18 71:22 99:2 100:22 103:19 104:3 105:13 116:15
**rights** 57:20
**role** 13:13,16 15:22 17:16,18 21:17 23:23 27:8 28:18 29:6 30:3,4,8 32:5 32:6,8 34:4,11 42:4,4,9 43:2,9,19 43:25 44:3,24 48:13 52:10 68:10 68:12 83:18 86:8 86:9,14,17 87:4 87:24 88:21 96:12 102:22 104:6,20 104:22 105:18 106:11 109:9 114:10,12 119:15
**roles** 41:7,12,23 48:19,20 95:3
**room** 22:4
**roughly** 14:10 98:3 103:18
**Ruiz** 32:20

**S**

**S** 2:2 3:2,2
**sad** 102:14
**sake** 5:21
**salary** 16:7 20:10 37:3,8 38:10,12 87:12 88:20 90:18 91:7 102:19 103:2 110:2,4
**sales** 15:23 24:21
**samples** 39:2
**Santos** 94:5,6,10
**saw** 50:14 102:21 106:11
**says** 65:19 73:15 74:11 75:6 78:22
**schedule** 74:19
**scheduled** 27:12 40:14 46:21 47:8
**school** 8:14 10:10 10:15,16,21 107:22
**schooling** 10:20
**Scotland** 10:13,21
**screening** 15:6 30:23 72:3,9
**screenings** 71:8,11 71:16 103:13
**Scully** 2:9 4:18
**sealing** 3:5
**search** 76:9
**Sebag** 61:12 62:18 80:5,23 81:18 82:7 83:12 117:15 118:5
**Sebag's** 116:25
**second** 32:7 33:6 42:18 99:13
**secondary** 10:13
**secretaries** 116:18
**secretary** 116:10 116:21 117:2
**section** 65:24 85:9
**Security** 107:12
**see** 23:22 67:14 69:20 73:13,22 74:11 78:3 80:8 82:10 84:13 85:21 90:10 93:22 102:15 105:13,19 107:19 108:24 112:6 122:9
**seek** 26:14
**seeking** 45:8 90:7 108:19,22 122:6 122:18 123:13
**seen** 89:20 92:18 93:4
**sell** 29:8
**selling** 105:12
**send** 40:3
**senior** 4:19 14:18 16:3,9,10 18:14 36:16 94:7 95:18 99:19,22 113:3,8 113:15 115:4,22 117:24
**Seniority** 99:12
**sense** 70:8 72:5
**sent** 38:24 49:22 82:19
**separate** 7:10 8:6
**separately** 31:19
**separation** 97:6 106:21 107:16
**September** 54:15 54:16
**sequence** 14:13
**serve** 15:15
**service** 72:14 98:7
**services** 1:19 105:12
**set** 50:18 92:16 128:7,17
**severe** 82:6 83:11
**severely** 114:12
**sex** 60:23 61:17 62:6 63:20 67:5 111:10 114:16 120:4 125:12
**share** 35:15 114:5 114:17 116:2 118:13
**shared** 72:2 113:25 115:9,21 117:24 118:9

**SHEET** 129:2
**shorthand** 1:17
**shortly** 10:3 50:25
**show** 59:16 89:7
  91:23,24
**showing** 59:12
**sic** 8:22 26:22 49:25
**side** 29:8,8,11,18
  32:10 55:19 105:6
**sided** 50:25
**side/sell** 29:11,18
  55:19
**signature** 65:20,21
**signed** 3:15,18
**significant** 88:22
**significantly**
  102:20
**silence** 40:2
**sit** 126:6
**sited** 51:4
**six** 90:19,20
**Smith** 2:15
**social** 107:12 121:7
**sole** 19:20
**Somerset** 9:12,16
**soon** 123:14
**sorry** 10:5 11:20,23
  16:13 18:23 21:6
  25:2 29:20 31:4
  35:24 36:6 44:6
  58:15 59:20 60:10
  60:10 95:5 98:11
  102:6 105:8
  110:18 114:21
**sort** 5:19 13:2,3
  30:7 31:22 32:7
  41:16 47:19 92:4
  94:12 96:14 105:4
**sought** 53:11 108:3
**sounds** 23:25 43:16
**South** 2:5 9:14
  10:23
**SOUTHERN** 1:2
**speak** 47:8 49:4
  50:16,19 55:13
  58:5,10,19 64:18

64:19 98:19
  120:18,24
**speaking** 53:3
  54:25 92:11
  125:16,20
**specific** 44:25
  119:11
**specifically** 34:6
  56:2 72:13,20
  108:12 121:25
**specifications**
  108:8
**specificity** 106:23
**spell** 8:20 75:21
**sphere** 13:2
**spoke** 29:13 34:9
  39:10,17 46:14
  47:10,13 48:22,24
  54:10 55:19 63:11
  65:10,17 75:14
  76:13,16,23 77:8
  79:14,17,20,22
  97:10 99:5,17,18
  118:25 123:14
  124:19
**spoken** 40:22 45:11
  54:5 80:21
**spring** 97:12
**stand** 8:18
**start** 59:20
**started** 10:3 11:4
  19:18 20:15 22:12
  87:6 95:2
**starting** 14:2 17:25
  18:2 30:4
**state** 1:18 4:4,8
  13:9 107:11 128:4
**stated** 82:7 84:11
**states** 1:2 10:2,6
  11:2 13:9
**status** 116:6
**stay** 20:14 25:18
  102:23
**stayed** 20:10 25:4
**step** 9:7,24 37:4,5
  39:18 55:7 73:19

**Stephen** 1:16 128:3
  128:22
**steps** 36:13,21 79:7
  79:8
**STIPULATED** 3:3
  3:9,14
**stop** 4:25
**strategist** 27:9
  30:11 42:16 49:6
  55:23 58:17 61:6
  67:14 73:14 77:20
  77:22 86:22 87:5
**strategists** 56:24
**strike** 45:24 57:14
  121:17 123:19
**structure** 17:10
  56:3 113:4,13
**STUART** 2:6
**submitted** 120:15
**subordinate** 88:10
**Subscribed** 126:21
  129:20
**subsequent** 74:18
  74:21 90:20
  115:12 118:11
**subsequently** 8:16
**succession** 31:20
**successions** 31:6
**Sudano** 1:17 128:3
  128:22
**sue** 120:12
**suffering** 108:6
**suing** 6:23 7:2
**supervisor** 75:24
  77:19 78:10 94:4
  94:15 95:6,12,20
  96:2,11 119:15
**supervisors** 93:19
  94:9,18 96:8
**supposed** 46:22
**sure** 14:16 30:23
  36:25 62:4 64:12
  77:13
**surely** 56:20
**surprise** 56:11,16
  113:6,17

**surprising** 113:19
**swearing** 65:18
**swore** 61:21
**sworn** 3:15,18 4:3
  126:21 128:8
  129:20

**T**

**T** 3:2,2 128:2,2
**table** 102:14
**take** 5:16 6:5 19:15
  37:15 57:18,22
  59:4,21 66:13
  70:25 79:9 87:24
  92:8 115:16 126:9
**taken** 1:13,16 59:6
  115:18 126:11
**talk** 34:2 44:21
  48:10 53:24 69:17
  103:20 104:12
**talked** 32:11 33:10
  34:4,4,6,16 44:23
  58:21 97:15 98:9
  98:24 103:25
  106:15,16 109:17
  125:13
**talking** 15:11 37:9
  37:10 48:4 67:21
  82:16 83:9 103:14
**talks** 30:10 48:17
  48:18 71:19 76:14
  76:17,24 99:3,21
  106:5 112:22
  120:25 124:23
**tangential** 32:8
**team** 11:11 13:18
  13:23 14:9,17,24
  14:25 15:23 18:11
  19:19 20:7,15,18
  21:16 22:13 23:7
  28:13 32:2 34:7
  34:19 35:3,4 43:2
  46:11 48:6,13
  52:10 56:3 58:23
  64:8 94:15 96:13
  97:12 113:8,16

118:18
**technology** 32:12
  33:11
**tell** 8:13 36:7 40:24
  43:14 50:6 62:8
  71:14 116:20
  124:8,17
**tells** 53:21,25
**tenure** 96:14
**tenured** 102:18
**terminated** 111:24
  111:25 114:11
  124:2
**terms** 29:19,23
  44:23 57:19
  117:24
**testified** 4:5
**testimony** 78:12
  84:17,22 128:7,10
**thank** 12:18 21:20
  23:9 27:2 38:24
  49:22 126:13,16
**thing** 29:7 53:23
**things** 15:12 32:10
  105:7 115:8
**think** 16:6 28:3
  32:11 33:24 42:3
  42:4,23 47:5
  52:21 56:18 57:3
  86:7 93:24 98:3
  111:9 115:2 117:8
  117:12 125:18
**third** 33:16 34:17
  47:23,24 104:9
**third-party** 43:6,22
  44:7,8,14 45:7
  46:2,12 47:2,10
  47:14,19 48:5,11
  104:10
**thought** 23:11
  28:17 64:5,8
  119:4 125:23
**three** 14:10 59:8
  72:19
**tile** 96:5
**time** 1:15 3:11 5:24



7:20 12:11,16
22:6 23:17 24:7
26:13 30:25 31:18
38:7 39:15 43:21
48:22,24 50:11,17
50:18 52:21 54:7
59:7 63:6 64:2
65:10 67:24 68:4
69:21 75:3 76:5
76:11 88:19,23
90:17,18 91:21
92:4 94:2,12,19
94:22 95:16,23
99:13,24 109:8,14
110:5 111:24
113:22,23 115:19
119:25 123:22
125:8 126:12,17
**times** 41:25 110:2
**title** 18:3,8,24 19:5
19:16,17 20:20,21
94:21 95:15
101:11 102:20
**titles** 22:11
**today** 5:14 6:14,18
56:14 58:2 64:16
86:4 92:19 120:19
**today's** 59:13
**told** 28:20 29:3,14
30:14 32:3 38:10
45:3,10 49:3
50:23 51:2,18
52:15,21 55:8,10
55:15,25 56:8,12
61:9 69:19 78:19
80:13 81:2,17
83:4,6 84:7,7 88:2
106:9 111:12,16
116:8 120:4
124:11
**top** 43:13 46:24
**total** 14:5,6 16:18
107:18 113:9
**totaling** 16:16
**touch** 36:24
**Town** 9:13,24

**trained** 9:16
**training** 9:10,19,23
10:23
**transcript** 128:9
**translation** 72:14
98:7
**traveled** 10:11
**treated** 114:6,15
116:4 118:4
**treating** 114:2
**treatment** 85:16,19
88:16 113:21
115:6
**trial** 1:12 3:12
23:19
**trips** 116:11 117:21
**true** 73:24 128:9
**Trupia** 112:11
**try** 4:25
**turn** 73:7 93:11
112:4
**two** 28:12 31:3,16
31:17 33:21 34:8
39:7 84:3 103:23
104:8 113:7,15
115:3
**type** 107:17
**types** 107:14 111:2

### U

**U** 3:2
**Uh-huh** 17:14
45:15 90:3
**UK** 10:13,20
**ultimate** 78:13
**ultimately** 47:10
53:15 56:25 57:5
61:15 63:3,13
66:5 80:7 81:3
102:3,7 103:5
111:17 119:7,16
120:12 124:4
**um** 13:7 14:10
22:14 24:14 32:7
37:4 42:4 43:8
51:18,19 68:5

79:2 83:17 100:10
102:21 116:11
**unacceptable**
111:11
**uncomfortable**
116:13
**undergraduate**
8:15
**underlying** 5:7
**understand** 5:8
29:17 82:23 93:7
110:9,20
**understanding**
29:19,25 30:5
37:23 55:6 75:11
79:9,11 87:20
88:5 110:16
123:10
**understood** 13:10
27:4 39:17 78:9
86:21 87:12
111:23
**unemployment**
107:12
**unfairly** 114:15
116:4 118:5
**United** 1:2 10:2,6
11:2
**University** 8:16,19
10:17
**usage** 87:2
**uses** 86:14

### V

**V** 129:3
**Valentia** 1:3 28:11
32:3,9 33:15,23
34:2 37:17 40:17
49:8,13,19 50:6
50:15 51:7,16
52:15,19 53:3,21
54:10,18,25 55:7
56:7,8,19 58:9
62:7,15 63:8 81:4
81:11 82:24 83:23
88:2 113:23,25

114:5 120:3
125:16,21 129:3
**Valentina's** 36:12
**Valletti** 6:20 7:10
7:21 28:11 31:15
33:4 35:9,15 38:4
65:7,11 66:25
77:19,23,25 78:13
78:19,22 81:24
82:3,4,7,16 83:2,6
83:9 84:5,11,18
85:12 88:11 90:4
108:17 111:12,16
111:24 112:22
114:17 115:9,21
115:25 116:20
117:5,23 118:9,21
120:8,19,25
123:15,19,20
124:8,24 125:7
**Valletti's** 78:10
125:3
**Van** 75:19
**various** 70:24
110:2
**verbal** 57:13
**verbalized** 5:15
**versus** 6:21
**veto** 119:18
**vetoed** 40:18,25
53:12 61:12 62:19
80:14 119:3
**vetoing** 48:17 55:3
**vetting** 15:6
**vice** 20:21,24 21:18
21:25 75:24 94:7
94:13,23 95:17
96:6 102:25
**VILLETTI** 1:3
129:3
**vision** 34:7
**visited** 75:2 83:25
**voted** 64:6 80:6
**VP** 25:22 90:24
95:23

### W

**wages** 85:20
**wait** 23:4,4,4 62:2
**waived** 3:7
**walk** 14:12 21:24
22:7 31:10,22
86:19 97:19
**walking** 30:6
**want** 70:4 77:11
**wanted** 34:22 50:16
61:10 118:17
**warrants** 111:5
**wasn't** 29:15 30:4
50:12 55:13 66:6
84:23 87:23
105:16 119:22,24
**wasting** 30:24
**way** 14:11 87:8
128:15
**wearable** 32:12
33:11
**webinars** 13:7 15:9
**week** 51:11
**weeks** 40:2 123:17
**well-qualified** 7:19
**went** 8:13 27:23
28:17 40:17 84:25
99:23 103:12
**weren't** 30:24
**we'll** 6:2 106:24
**we're** 6:14,17,19
13:9 15:11 58:2
103:14 109:14
121:5 123:6
**we've** 106:15,16
125:13 126:14
**WHEREOF**
128:17
**willing** 69:22 87:24
**win** 15:23
**wished** 73:19
**witness** 4:2,10,14
126:16 127:3
128:6,11,17 129:5
**witnesses** 15:11



woman 77:5,15
  84:3 119:23
work 11:5 13:3
  14:8 18:7 34:24
  41:16 68:25 76:19
  76:21 92:2 93:21
  96:9 102:21
  118:22
worked 11:10 12:5
  33:7 44:11 69:6
  76:4
workers 107:13
working 10:3 11:8
  11:11,20 12:4,6
  13:17
worn 10:8
wouldn't 28:21
  36:17 55:12
  106:12
writing 38:25
written 51:2
wrong 23:10 104:7
www.MagnaLS.c...
  1:20

**X**

x 1:3,8 127:2
xxxxx 3:19

**Y**

Yamin 32:14,14
Yea 104:2
Yeah 26:11 28:7
  69:6 122:20
year 9:21 14:4
  16:18,20 21:3
  24:16 26:8,10
  43:5 44:16 54:15
  70:17 88:25 89:6
  97:12 109:12
years 14:10 93:16
yep 14:14 59:25
York 1:2,9,9,18 2:5
  2:5,10,10 4:4,13
  12:20 28:8 128:4

**Z**

Z 4:2
Zachary 95:13,21
  96:12
Zaria 9:3
Z-A-C-H-A-R-Y
  95:13

**$**

$10,000 24:15
$100,000 25:12
  88:25 90:20
  109:11
$100,000-plus-co...
  25:19
$140 25:25 37:10
  38:11,15 87:10,14
  89:5 90:21 91:2,8
  109:12
$140,000 21:14,23
  86:9 110:12
$160 37:11 38:11
  38:15 87:14
$160,000 91:8
$165,000 90:4
$180 101:6,19
$200,000 26:7
$210 101:7,25
$333,000 21:3
  87:18
$334,000 108:17
$48,000 108:18
  109:5
$5,000 16:16,18
  17:13
$50 16:7
$50,000 14:4
$60 16:7
$61,900 90:5,14
  91:6,10 109:18
$70 23:15
$70,000 17:9 19:24
  23:7
$87 22:25
$87,5 24:23 25:4,7
  30:17

$87,500 22:16 23:8
  23:13 24:3 88:21
  90:18 109:8,11

**1**

1 2:10 61:14 62:23
  67:3 112:4,6
1st 62:2
1:18-cv-10200-V...
  1:5
10 107:9
10:05 1:10
100 62:4
10004 2:10
10016 2:5
1018 73:15
11 107:25 108:12
  108:13,14,16
  122:2
11230 4:13
1191 4:12
12 81:23,24
12:50 126:17
13 73:8,10
14 77:18
15 56:12,16,24
  63:13,23 80:2
  81:13 111:21
16 81:22 82:23

**2**

2 67:9
20 90:13,23 126:22
  129:21
2012 9:6,9,17
2013 10:25 11:9,19
  13:12 14:2,16,19
  15:14 18:15
2014 14:20 16:17
  16:22 17:4,23
  18:16,17,18 19:9
  42:5,7
2016 15:18 17:24
  17:25,25 18:2
  19:7,10,12
2017 19:21 20:5,16

21:15,25 22:7,8
  22:13 23:8 24:2
  24:17,18 26:15
  27:21 28:4 31:11
  42:16 61:3 67:12
  67:25 70:14,18,19
  70:23 71:17 73:11
  97:16 98:9 99:3,6
  99:17 114:19
2018 24:20 25:5,6,7
  25:11 28:4 31:12
  40:7,10 42:16,23
  43:12 49:11,13
  50:4,7 51:14
  54:17 55:2 61:14
  61:24 62:23 65:11
  73:16 81:5,23,24
  83:10 91:15 97:21
  97:24 98:12,13,17
  98:20 99:4,5,18
  100:23 103:8,14
  103:17 107:2,5,7
  109:10 110:14
  114:21 115:10
  118:10 119:19
  120:8 121:15,18
  123:15 124:12
  125:17
2019 1:10 21:4,19
  21:19 22:8 25:20
  42:24 43:12 44:18
  47:3 90:13,23
  102:25 103:20,22
  106:10,15,17
  110:11,14 128:18
  129:4
22nd 73:15 74:20
28 49:25
28th 2:10

**3**

3 1:10 73:8 129:4
3B 90:2
3rd 128:18
30 33:22
30-second 126:9

387 2:5

**4**

4 127:4
45 33:22

**5**

5 93:12,14
500 23:3
59 127:8,10,12

**6**

624-6221 1:20

**7**

7 93:12 96:25 97:3
75 12:11

**8**

8 67:9 85:6 106:19
866 1:20

**9**

9th 61:23 62:3

