**ORIGINAL**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - x
VALENTIA VILLETTI and FAIZA JIBRIL, M.D.,

        Plaintiffs,

                    Index No.
                    1:18-cv-10200-VSB-KNF

      -against-

GUIDEPOINT GLOBAL, LLC,

        Defendant.

- - - - - - - - - - - - - - - - x

          One Battery Park
          New York, New York

          October 1st, 2019
          10:10 a.m.

    EXAMINATION BEFORE TRIAL of
VALENTIA VILLETTI, a Plaintiff herein, taken
by the Defendant, in the above-entitled
action, held at the above time and place,
pursuant to Case Management Order, taken
before SALVATRICE MANNINO, a Shorthand
Reporter and Notary Public within and for the
State of New York.

        MAGNA LEGAL SERVICES
          (866) 624-6221
          www.MagnaLS.com



```
 1
 2   A P P E A R A N C E S:
 3        LICHTEN & BRIGHT, P.C.
               Attorneys for Plaintiffs
 4             387 Park Avenue South, 5th Floor
               New York, New York 10016
 5             (646) 588-4872
          BY:  STUART LICHTEN, ESQ.
 6             slichten@lichtenandbright.com
 7
 8
          GORDON REES SCULLY MANSUKHANI, LLC
 9             Attorneys for Defendant
               One Battery Park Plaza
10             New York, New York 10004
               (212) 269-5500
11        BY:  DAVID J. GRECH, ESQ.
               Dgrech@gordanrees.com
12
13
14        G. GUIDEPOINT
               Attorneys for Defendant
15             730 Third Avenue, 11th Floor
               New York, New York 10017
16             (212) 812-9511
          BY:  CATHERINE SMITH, ESQ.
17             Csmith@guidepointglobal.com
18
19
20
21
22
23
24
25
```



```
 1
 2                 S T I P U L A T I O N S
 3      IT IS STIPULATED AND AGREED by and between
 4   the attorneys for the respective parties
 5   herein, and in compliance with Rule 221 of the
 6   Uniform Rules for the Trial Courts:
 7      THAT the parties recognize the provision of
 8   Rule 3115 subdivisions (b), (c) and/or (d).
 9   All objections made at a deposition shall be
10   noted by the officer before whom the
11   deposition is taken, and the answer shall be
12   given and the deposition shall proceed subject
13   to the objections and to the right of a person
14   to apply for appropriate relief pursuant to
15   Article 31 of the CPLR;
16      THAT every objection raised during a
17   deposition shall be stated succinctly and
18   framed so as not to suggest an answer to the
19   deponent and, at the request of the
20   questioning attorney, shall include a clear
21   statement as to any defect in form or other
22   basis of error or irregularity.  Except to the
23   extent permitted by CPLR Rule 3115 or by this
24   rule, during the course of the examination
25   persons in attendance shall not make
```



1
2  statements or comments that interfere with the
3  questioning.
4      THAT a deponent shall answer all questions
5  at a deposition, except (i) to preserve a
6  privilege or right of confidentiality, (ii) to
7  enforce a limitation set forth in an order of
8  a court, or (iii) when the question is plainly
9  improper and would, if answered, cause
10  significant prejudice to any person.  An
11  attorney shall not direct a deponent not to
12  answer except as provided in CPLR Rule 3115 or
13  this subdivision.  Any refusal to answer or
14  direction not to answer shall be accompanied
15  by a succinct and clear statement on the basis
16  therefore.  If the deponent does not answer a
17  question, the examining party shall have the
18  right to complete the remainder of the
19  deposition.
20      THAT an attorney shall not interrupt the
21  deposition for the purpose of communicating
22  with the deponent unless all parties consent
23  or the communication is made for the purpose
24  of determining whether the question should not
25  be answered on the grounds set forth in



1

2    Section 221.2 of these rules, and, in such

3    event, the reason for the communication shall

4    be stated for the record succinctly and

5    clearly.

6        THAT the failure to object to any question

7    or to move to strike any testimony at this

8    examination shall not be a bar or waiver to

9    make such objection or motion at the time of

10   the trial of this action, and is hereby

11   reserved; and

12       THAT this examination may be signed and

13   sworn to by the witness examined herein before

14   any Notary Public, but the failure to do so or

15   to return the original of the examination to

16   the attorney on whose behalf the examination

17   is taken, shall not be deemed a waiver of the

18   rights provided by Rules 3116 and 3117 of the

19   C.P.L.R, and shall be controlled thereby; and

20       THAT the certification and filing of the

21   original of this examination are hereby

22   waived; and

23       THAT the questioning attorney shall provide

24   counsel for the witness examined herein with a

25   copy of this examination at no charge.



Page 6

1                    V. VILLETTI

2    V A L E N T I A   V I L L E T T I, the

3    Witness herein, having been first

4    duly sworn by a Notary Public of the

5    State of New York, was examined and

6    testified as follows:

7    EXAMINATION

8    BY MR. GRECH:

9              THE COURT REPORTER:  State

10        your name for the record,

11        please.

12              THE WITNESS:  Valentia

13        Villetti.

14              THE COURT REPORTER:  State

15        your address for the record,

16        please.

17              THE WITNESS:  162 East

18        61st Street, Apartment 1B,

19        New York, New York 10065.

20    Q.  Good morning Ms. Villetti.  My

21    name is David Grech.  I am a Senior

22    Counsel with Gordon and Rees in their

23    employment practice liability group.

24    We represent Guidepoint Global, LLC

25    in this action.



Page 7

                         V. VILLETTI

1
2        I'm just going to give you a
3  few instructions before we begin.  If
4  you have any questions about my
5  instructions or at any point as we go
6  along, just let me know, let your
7  Counsel know.
8            This is a question-and-answer
9  session, so we will ask some
10 questions and we may show you some
11 documents regarding your employment
12 in this lawsuit.  This is a
13 deposition, so it is a
14 question-and-answer session.  To
15 questions, we expect answers.
16           If you don't understand a
17 question, I'll do my best to rephrase
18 it.  If you ask me, we'll do so.
19 Your responses must be verbal.  No
20 nodding, no gestures, because the
21 reporter must take down all of your
22 responses for the transcript.
23           On that note, so that the
24 record of transcript is clear, even
25 if you can sort of guess what my



Page 8

```
                    V. VILLETTI
 1
 2    question might be even before I
 3    finish it, just for the sake of the
 4    transcript, let me finish it and then
 5    you can respond.
 6          If you need a break at any
 7    time, just let us know; let your
 8    Counsel know, and we'll accommodate
 9    you.  All that we ask is that if
10    there is a question pending at that
11    point, that you answer the question
12    and then we move on, and then we'll
13    take the break.
14          It's also my understanding
15    that we have a hard stop today at
16    2:00, so we're going to do our best
17    to accommodate that and get you out
18    of here at 2:00 and then Counsel and
19    I will discuss where we are at that
20    point, in terms of your deposition.
21    A.  Okay.
22    Q.  Do you have any questions
23    about those preliminaries?
24    A.  No.
25    Q.  Do you know why we are here
```



Page 9

```
 1                    V. VILLETTI
 2   today?
 3      A.  Yes.
 4      Q.  Why is that?
 5      A.  For a deposition.
 6      Q.  Okay.  You're suing Guidepoint
 7   Global?
 8      A.  Yes.
 9      Q.  Why?
10      A.  I am suing them because they
11   discriminated against me based on my
12   sex as a woman, and retaliated
13   against my complaint.
14      Q.  Which complaint is that?
15      A.  Complaining about
16   discrimination against my sex as a
17   woman.
18      Q.  Ms. Villetti, what is the
19   highest level of education you've
20   obtained?
21      A.  Bachelor's Degree.
22      Q.  From what institution?
23      A.  Columbia University of
24   New York.
25      Q.  When did you acquire that
```


MAGNA
LEGAL SERVICES

Page 10

```
 1                    V. VILLETTI
 2    degree?
 3        A.  2012.
 4        Q.  What was your first employment
 5    following your obtaining that degree?
 6        A.  ABR Healthco.
 7        Q.  When did you begin with ABR?
 8        A.  Early 2013.
 9        Q.  How long were you there?
10        A.  Early 2014.
11        Q.  What was your title at ABR?
12        A.  Equity Research Associate.
13        Q.  What were your duties at ABR
14    as an Equity Research Associate?
15        A.  We analyzed pharmaceutical
16    stocks.
17        Q.  There came a point in time
18    when you left ABR?
19        A.  Yes.
20        Q.  What happened next in terms of
21    your employment?
22        A.  I joined Bridgewater
23    Associates.
24        Q.  When did that occur?
25        A.  Early 2014.
```



Page 11

1                    V. VILLETTI

2       Q.   How long were you at

3   Bridgewater?

4       A.   Until late 2014.

5       Q.   What title were you employed

6   by Bridgewater?

7       A.   First as an investment

8   associate and then as a management

9   associate.

10      Q.   For what period of time were

11  you an investment associate?

12      A.   Half that time.

13      Q.   And the remaining half, you

14  were a management associate?

15      A.   Correct.

16      Q.   Is that considered a transfer?

17  a promotion?

18      A.   Just a transfer.

19      Q.   Going back to your education

20  for a moment, what was your degree

21  in?

22      A.   I double majored in

23  physical science and philosophy and

24  minor economics.

25      Q.   Separate and apart from your



Page 12

```
 1              V. VILLETTI
 2    studies at Columbia, did you have any
 3    training that would have helped you
 4    perform duties as an equity research
 5    associate?
 6        A.   No.
 7        Q.   Did you have any training that
 8    would've helped you perform your
 9    duties as an investment associate or
10    a management associate at
11    Bridgewater?
12        A.   Other than their training, no.
13        Q.   What sort of training did you
14    receive at Bridgewater?
15        A.   They provide a course.
16        Q.   A course in what?
17        A.   They provide a course for
18    their investment associates and
19    another one for their in management
20    associates.
21        Q.   So you took each course?
22        A.   Mm-hmm.
23           MR. LICHTEN:  You have to
24        use words.
25        A.   Yes.
```



Page 13

```
 1                    V. VILLETTI
 2      Q.  There came a point in time
 3  where you left Bridgewater?
 4      A.  Yes.
 5      Q.  What was your next employment
 6  position after that?
 7      A.  I returned to ABR Healthco.
 8      Q.  In what capacity?
 9      A.  As an equity research analyst.
10      Q.  When did that return occur?
11      A.  Early 2015.
12      Q.  That is different from an
13  equity research associate?
14      A.  It's a promotion.
15      Q.  How long did you stay at ABR
16  this second time?
17      A.  Until I was recruited by
18  Guidepoint.
19      Q.  What were your duties as an
20  equity research analyst with ABR?
21      A.  I analyze stocks in the
22  pharmaceutical space.
23      Q.  Similar to the work you've
24  performed, previously?
25      A.  Yes.
```



Page 14

```
 1                V. VILLETTI
 2      Q.  Why did you leave ABR in the
 3  first place?
 4      A.  I was recruited by
 5  Bridgewater.
 6      Q.  And why did you leave
 7  Bridgewater?
 8      A.  I was offered a promotion at
 9  ABR Healthco.
10      Q.  What was your compensation at
11  ABR Healthcare in that last position
12  as an analyst?
13      A.  It was in six figures.  I
14  can't recall, exactly.
15      Q.  And how was that compensation
16  broken up?  Was there a base?  Was
17  there commissions?
18      A.  Yes, there was a base and
19  there was a bonus.
20      Q.  What was the bonus based upon?
21      A.  Performance.
22      Q.  How would your performance
23  analyzing stocks be measured?
24      A.  Based on my output of reports.
25      Q.  What point in time did you
```



```
 1                    V. VILLETTI
 2   start being recruited by Guidepoint?
 3        A.   Mid 2017.
 4        Q.   So you're at ABR as an analyst
 5   from 2015 through 2017, thereabout?
 6        A.   Right.
 7        Q.   Did you ever receive a bonus
 8   from ABR as an analyst?
 9        A.   Yes.
10        Q.   How many bonuses, if more than
11   one?
12        A.   Two.
13        Q.   And on what occasions?  When
14   did they occur?  Sorry.
15        A.   End of 2015 and end of 2016.
16        Q.   All right.  What was the first
17   inkling that you had that you were
18   being recruited by Guidepoint?
19        A.   I was contacted by a recruiter
20   from Long Ridge Partners.
21        Q.   I'm sorry, which Partners?
22        A.   Long Ridge Partners.
23        Q.   Okay.  And who is that
24   recruiter?
25        A.   His name is Chirag
```



Page 16

                    V. VILLETTI

1                    V. VILLETTI

2    Jethanandani.

3        Q.   What did this recruiter at

4    Long Ridge say to you?

5        A.   He said Guidepoint is looking

6    for a Healthcare Content Specialist.

7        Q.   At that point, did you know

8    what Guidepoint was?

9        A.   I had heard of it.

10       Q.   What have you heard?

11       A.   It was an expert network.

12       Q.   What was your understanding as

13   to what Guidepoint did?

14       A.   Provided experts.

15       Q.   To whom?

16       A.   To any member of institutions.

17       Q.   Experts in what field?

18       A.   A verity of fields.

19       Q.   Had you had any experience in

20   the healthcare field before?

21       A.   Yes, as an investment

22   associate and investment analyst.

23   [sic]

24       Q.   In the pharmaceutical areas?

25       A.   Yes.



Page 17

1                    V. VILLETTI

2      Q.   Did the recruiter --

3      A.   I should correct that.

4      Q.   Sure.

5      A.   Equity associate and equity

6   analyst.

7      Q.   Sure.  Did the recruiter at

8   Long Ridge -- what else did the

9   recruiter at Long Ridge tell you that

10  Guidepoint was looking for in

11  addition to the Healthcare Content

12  Specialist?

13     A.   Someone to head their efforts

14  in providing Healthcare Content for

15  clients.

16     Q.   Had you worked with Long Ridge

17  before?

18     A.   No.

19     Q.   That you know, how did it come

20  that Long Ridge got your contact

21  information?

22     A.   LinkedIn.

23     Q.   Had you been looking for your

24  next position after -- or to move on

25  from the research analyst position at



Page 18

```
 1                    V. VILLETTI
 2      ABR?
 3          A.   No.
 4          Q.   What did the recruiter from
 5      Long Ridge tell you next?  What would
 6      be your next steps, if you were
 7      listening to this Guidepoint
 8      proposal.
 9          A.   I met with the recruiter.
10          Q.   When did that occur?
11          A.   June, 2017.
12          Q.   What was the content of that
13      meeting?
14          A.   He went over the role.
15          Q.   The role at --
16          A.   At Guidepoint.
17          Q.   Okay.  And what did he
18      describe to you that role to be?
19          A.   Content Specialist and
20      Healthcare.
21          Q.   Did he talk in terms of what
22      he expected in your day-to-day
23      duties?
24          A.   To some extent.
25          Q.   To what extent?
```



1           V. VILLETTI

2      A.  He provided an overview.

3      Q.  Of what your duties would be

4  at Guidepoint?

5      A.  Yes.

6      Q.  What was included in that

7  overview?

8      A.  Creating content for clients,

9  putting together in-person meetings,

10  attending meetings and conferences,

11  and others I don't recall, exactly.

12      Q.  Had you had any experience

13  creating healthcare content, in this

14  respect?

15      A.  Yes.

16      Q.  And what was that experience?

17      A.  I had experience as an

18  equity associate and an

19  equity analyst.

20      Q.  I'm sorry, can you just

21  explain how analyzing pharmaceutical

22  stocks gives you experience in

23  creating healthcare content?

24      A.  It's the job of an

25  equity analyst or associate to



Page 20

                    V. VILLETTI

1    provide reports on companies and on

2    the greater pharmaceutical landscape

3    for whatever industries they are

4    covering.

5        Q.  Had you had any experience,

6    prior to meeting with this recruiter

7    in arranging such meetings, as he

8    described?

9        A.  Yes.

10       Q.  In what capacity?

11       A.  It was a part of my job at

12   ABR.

13       Q.  During your first ten year or

14   second or both?

15       A.  Both.

16       Q.  Can you describe how you, say,

17   arranged meetings while you were at

18   ABR?

19       A.  I don't understand the

20   question.

21       Q.  When you were at ABR, one of

22   your responsibilities was to arrange

23   meetings?

24       A.  Yes.



Page 21

```
 1              V. VILLETTI
 2      Q.  What was involved in doing
 3   that?
 4      A.  We contacted clients and
 5   contacted advisors or management
 6   teams and arranged meetings.
 7      Q.  During your meeting with the
 8   recruiter in June of 2017, did he
 9   describe to you what would be the
10   next steps -- well, first, did you
11   express an interest in the position
12   at Guidepoint?
13      A.  I wanted to learn more.
14      Q.  What, specifically, did you
15   want to learn?
16      A.  About the team, the company.
17      Q.  Did your recruiter have
18   answers to those questions for you,
19   during your meeting?
20      A.  He provided the name of the
21   person leading the team.
22      Q.  Who was that person?
23      A.  Bouker Pool.
24          MR. LICHTEN:  B-O-U-K-E-R,
25       Pool.
```



Page 22

                    V. VILLETTI

1
2      Q.  Was it the recruiter's idea
3   that you would contact Mr. Pool?
4      A.  No.  The recruiter arranged
5   everything.
6      Q.  Okay.  What, if anything else,
7   did the recruiter tell you about
8   Mr. Pool's team?
9      A.  That it was a new team.
10     Q.  Did he explain to you what
11  Guidepoint's expectations would be to
12  the Healthcare Content Specialist in
13  the new team?
14     A.  Not in detail.
15     Q.  So you expressed an interest,
16  at least in learning more about the
17  opportunity; the recruiter gave you
18  the name of Bouker Pool, said it was
19  a new team.  Did he give you any
20  other information in response to your
21  question?
22     A.  He suggested that I ask the
23  remainder of my questions from the
24  team when I met them.
25     Q.  So did there come a point in



Page 23

```
 1                 V. VILLETTI
 2     time when you met the team?
 3         A.  Yes.
 4         Q.  Was that your immediate next
 5     step in your Guidepoint process after
 6     meeting the recruiter or was there
 7     something in between?
 8         A.  I don't recall, exactly, but I
 9     believe I filed or I filled a form,
10     an application form.
11         Q.  Is that something online or a
12     paper?
13         A.  It was a form that they
14     e-mailed me.
15         Q.  From Guidepoint?
16         A.  Yes.
17         Q.  Who sent you the form?
18         A.  The recruiter.
19         Q.  From Long Ridge?
20         A.  Yes.
21         Q.  You filled out the form and
22     sent it back to the recruiter?
23         A.  Yes.
24         Q.  What happened next in the
25     Guidepoint process?
```



Page 24

                              V. VILLETTI

1

2       A.  I met with the team.

3       Q.  At Guidepoint's --

4       A.  At Guidepoint.

5       Q.  -- offices?

6       A.  Yes.

7       Q.  Who did you meet with?

8       A.  As I recall, I met with

9  Priscilla, who is in HR.  I met with

10  Bouker Pool.  I think that was it.

11       Q.  Do you recall when this

12  meeting occurred?

13       A.  Some time after June.

14       Q.  2017?

15       A.  Yes.  It could have been July.

16       Q.  What did you guys discuss in

17  this meeting?

18       A.  The role and the company.

19       Q.  What information did they give

20  you about the company?

21       A.  That it's an expert network.

22       Q.  What information did they give

23  you about the role they're receiving

24  to fill?

25       A.  That it would be head of



Page 25

```
 1                    V. VILLETTI
 2    healthcare content.
 3        Q.  And that head of healthcare
 4    content, it was your understanding
 5    would be reporting to Mr. Pool?
 6        A.  Yes.
 7        Q.  What was Mr. Pool's position?
 8        A.  He was the Director of
 9    Content.
10        Q.  Was Mr. Pool responsible for
11    content across different areas of
12    expertise, other than just
13    healthcare?
14        A.  Yes.
15        Q.  What other areas of content
16    would Mr. Pool have directed?
17        A.  I don't know.
18        Q.  Certainly healthcare?
19        A.  Yes.  Healthcare and other
20    industries.
21        Q.  Okay.  Did Priscilla or
22    Bouker, the team together, did they
23    make you an offer during this June or
24    July, 2017 meeting?
25        A.  No.
```



Page 26

```
 1              V. VILLETTI
 2      Q.  What was the next step in your
 3  Guidepoint recruitment application
 4  process?
 5      A.  They asked for samples of my
 6  work.
 7      Q.  Mr. Pool and Priscilla asked
 8  for samples?
 9      A.  The recruiter did.
10      Q.  The recruiter is still
11  involved at this point --
12      A.  Yes.
13      Q.  -- as a liaison?
14          Okay.  And you provided those
15  work samples --
16      A.  Yes.
17      Q.  -- to the recruiter?
18          And what was in your work
19  samples?
20      A.  I don't recall, exactly.
21  But, likely, a report, some
22  presentations we put together.
23      Q.  And this would have been for a
24  current employer, a prior employer at
25  the time; do you recall?
```



Page 27

1                    V. VILLETTI

2        A.   For ABR.

3        Q.   Okay.  So you sent these work

4    samples to the recruiter.  What

5    happened next in this Guidepoint

6    recruitment of you?

7        A.   I believe they did

8    reference checks.

9        Q.   Did you provide references to

10   the recruiter?

11       A.   Yes, and the application.

12       Q.   Was this part of the form that

13   he asked you to fill out?

14       A.   Yes.

15       Q.   The recruiter advised you that

16   they were likely doing reference

17   checks.  Did the recruiter keep you

18   up to date in any other way about the

19   recruitment process at Guidepoint,

20   after your meeting with Bouker and

21   Priscilla?

22       A.   He said he'd be in touch.

23       Q.   Did he eventually get back in

24   touch with you?

25       A.   Yes.



Page 28

```
 1              V. VILLETTI
 2      Q.  And what did he say?
 3      A.  They were interested in
 4   extending me an offer.
 5      Q.  When did that conversation
 6   occur, where the recruiter said that
 7   Guidepoint was interested in
 8   extending an offer?
 9      A.  I don't recall, exactly.  Some
10   time in July or August.
11      Q.  What else did he say?  Did he
12   say that there was a certain timeline
13   to respond?
14      A.  No.
15      Q.  Did he explain to you what the
16   offer was?
17      A.  I don't recall.
18      Q.  What was your next step with
19   the recruiter or Guidepoint after
20   hearing that they were interested in
21   extending your offer?
22      A.  I eventually received an
23   offer.
24      Q.  From whom?
25      A.  From Guidepoint.
```



MAGNA
LEGAL SERVICES

1                    V. VILLETTI

2        Q.   Not through the recruiter;

3    directly from Guidepoint?

4        A.   Yes.

5        Q.   Who relayed that offer to you?

6        A.   I believe it was Priscilla.

7        Q.   How was that done?

8        A.   By an e-mail.

9        Q.   Do you recall when you

10   received that e-mail?

11       A.   Some time in August.

12       Q.   And what -- did Priscilla

13   explain the offer in that e-mail?

14       A.   It had the salary.  That is

15   what I recall.

16       Q.   Do you recall what the salary

17   component of the offer was?

18       A.   No, but we negotiated it.

19       Q.   Were there any other

20   components of the offer that you

21   recall in Priscilla's e-mail?

22       A.   No.

23       Q.   Were there any bonus

24   components?

25       A.   Yes.



Page 30

                    V. VILLETTI

1

2      Q.  Do you recall what the bonus

3   components were?

4      A.  No.

5      Q.  All right.  So, you said that

6   you negotiated your salary.  Was that

7   done with Priscilla?

8      A.  Yes.

9      Q.  Had the recruiter stepped back

10   at this point?  He was no longer

11   directly involved?

12      A.  No, he was still involved.

13      Q.  All right.  And in what

14   respect?

15      A.  In making sure both parties

16   were happy.

17      Q.  Could you walk us through the

18   negotiations with Priscilla on your

19   salary?  What was your response for

20   the initial salary component of the

21   offer?

22      A.  The discussion largely

23   happened with Chirag.

24      Q.  Through the recruiter?

25      A.  Yes.



Page 31

```
 1              V. VILLETTI

 2      Q.  Okay.

 3      A.  We asked for more.  I believe

 4  I had a call with Bouker some time in

 5  that period, and then I received a

 6  new offer.

 7      Q.  And who relayed that new

 8  offer?

 9      A.  Priscilla.

10      Q.  When did that come in?

11      A.  Some time in August.

12      Q.  Was that also by e-mail?

13      A.  Yes.

14      Q.  Do you recall the salary

15  component in that offer?

16      A.  It was a base of 180,

17  discretion bonus of 15, signing bonus

18  of 5.

19      Q.  What was your response to that

20  offer?

21      A.  I accepted the offer.

22      Q.  How did those components of

23  the offer match up with what you were

24  seeking?  Were they what you were

25  seeking?  a little bit less?
```



Page 32

```
 1              V. VILLETTI
 2      A.  I don't know how to answer
 3   that.
 4      Q.  The offer included 180,000
 5   base salary?
 6      A.  Yes.
 7      Q.  What were you seeking in your
 8   negotiations for your base salary?
 9      A.  I was looking at the total
10   package.
11      Q.  What total package were you
12   looking at?
13      A.  Something that would be
14   comparable to what I would have made,
15   had I stayed on the south side.
16      Q.  At what position?
17      A.  At Health Co. or another firm.
18      Q.  Okay.  And what were you
19   making at ABR at that time?
20      A.  I don't recall, exactly, but
21   it would have been comparable.
22      Q.  Six figures with a base and a
23   bonus--
24      A.  Yes.
25      Q.  -- that you received twice?
```



Page 33

```
 1                    V. VILLETTI
 2      A.  Yes.
 3      Q.  Do you recall what the
 4  six-figure base was, as an analyst at
 5  ABR?
 6      A.  It was lower than Guidepoint,
 7  but the bonus was much more.
 8      Q.  The base at ABR -- the
 9  six-figure base was lower than the
10  180 component at Guidepoint?
11      A.  I believe so.
12      Q.  Okay.  And we talked about the
13  bonuses you received at ABR.
14      A.  Yeah.
15      Q.  -- one in 2015 and one in
16  2016?
17      A.  Yes.
18      Q.  Do you recall the amount you
19  received in 2015 for a bonus?
20      A.  I don't, exactly.
21      Q.  What about 2016?
22      A.  I can't be sure.
23      Q.  Was it based on a percentage?
24  I know we talked about the criteria
25  for it; it was output and things like
```



MAGNA
LEGAL SERVICES

Page 34

```
 1              V. VILLETTI
 2    that.  Was it based on a percentage
 3    of your base?
 4         A.  No.
 5         Q.  Do you know what it was based
 6    upon, other than why you would be
 7    entitled to it, how they came to the
 8    amount?
 9         A.  It was based on performance.
10         Q.  Okay.  So, you did accept the
11    offer as relayed by Priscilla:  The
12    180, the 15 discretionary bonus.  Was
13    that understood to be annual bonus?
14         A.  For the first year, yes.
15         Q.  And what was your
16    understanding of the bonus after the
17    first year?
18         A.  We would discuss it later, but
19    there was room for growth.
20         Q.  In terms of an increase in the
21    bonus amount?
22         A.  Yes.
23         Q.  And you accepted that offer?
24         A.  Yes, but I joined at midpoint
25    in the year.  So this bonus would
```



```
 1                    V. VILLETTI
 2    have been for the remainder of the
 3    year.
 4         Q.   Okay.   When did you join
 5    Guidepoint?
 6         A.   September.
 7         Q.   We're in 2017, then?
 8         A.   Yes.
 9         Q.   So it's your understanding
10    upon accepting the offer, that the
11    annual discretionary 15,000 bonus
12    would be prorated for your time in
13    joining?
14         A.   No.   The 15,000 was for the
15    remainder of the year.
16         Q.   Okay.   So it was your -- it
17    was the opposite.   It was your
18    understanding that once you worked a
19    full year at Guidepoint, the bonus
20    would be more than 15?
21         A.   Yes.
22         Q.   Did you receive your $5,000
23    signing bonus?
24         A.   Yes.
25         Q.   And at the end of 2017, did
```



Page 36

                    V. VILLETTI

1    you receive a bonus?

2        A.  I don't recall.

3        Q.  When was your last day at

4    Guidepoint?

5        A.  Some time in March of 2018.

6        Q.  And had you received any

7    bonuses from Guidepoint during your

8    employment?

9        A.  I don't recall.

10       Q.  As long as we're talking about

11   employment -- and we'll get back to

12   Guidepoint -- what did you do in

13   terms of employment, after leaving

14   Guidepoint?

15       A.  I have been working on a

16   startup.

17       Q.  And what's the startup?

18       A.  It is a packaged food startup.

19       Q.  What was the name of the

20   startup?

21       A.  Kioko, K-I-O-K-O.

22       Q.  When did your work at Kioko

23   start?

24       A.  When I left Guidepoint



1                    V. VILLETTI

2     full-time.

3          Q.   Had you been working at that

4     startup, prior to March of 2018?

5          A.   No.   I was involved, but not

6     working on it.

7          Q.   So there was some overlap

8     between your work at Guidepoint and

9     your work for this startup?

10         A.   Yes.

11         Q.   When did you start your

12    involvement with Kioko?

13         A.   Before I joined Guidepoint.

14         Q.   About when did that

15    involvement begin?

16         A.   2016.

17         Q.   What is Kioko?   What does it

18    do?

19         A.   They produce packaged foods.

20         Q.   What sorts of foods?

21         A.   Snacks.

22         Q.   What was your involvement with

23    Kioko starting in 2016?

24         A.   I was a cofounder.

25         Q.   Who was or who were the other



Page 38

```
 1                V. VILLETTI
 2    founders of Kioko?
 3        A.   There were a couple of other
 4    people.
 5        Q.   And their names are?
 6        A.   I don't feel comfortable
 7    discussing them.
 8             MR. LICHTEN:  Can we take
 9        a break for a minute?
10             MR. GRECH:  Sure.
11             (Whereupon, the witness and
12        his attorney left the room.)
13             MR. LICHTEN:  The witness
14        is not willing to give those
15        names.  Maybe we can save it
16        for later or ask the judge.
17             MR. GRECH:  Can you make a
18        representation as to why?
19        What's the basis?
20             MR. LICHTEN:  You can ask
21        her.  I don't know why, really.
22             MR. GRECH:  Can you read
23        back last question and answer,
24        please?
25             (Whereupon, the record was
```



MAGNA
LEGAL SERVICES

Page 39

1              V. VILLETTI

2        read by the reporter.)

3        Q.   Ms. Villetti, can you explain

4    why you do not feel comfortable in

5    disclosing the names of the other

6    cofounders of Kioko?

7        A.   First, because it's irrelevant

8    and second, because they had

9    full-time jobs and they may not want

10   to be associated with Kioko, and I

11   have to respect their wishes.

12       Q.   They might not want to be

13   associated with Kioko?

14       A.   Yes.

15       Q.   Is Kioko a public company?

16       A.   No.

17       Q.   Does Kioko have an internet

18   presents?

19       A.   Barely.

20       Q.   Does Kioko sell the packaged

21   foods online?

22       A.   They sell one product now.

23       Q.   What product do they sell?

24       A.   A protein bar.

25            MR. GRECH:   Can we mark


MAGNA
LEGAL SERVICES

Page 40

```
1                V. VILLETTI

2         that for a ruling on

3         Plaintiffs' Response to the

4         question, the other cofounders

5         of Kioko, and subject to

6         further discussion with

7         Counsel, and ultimately the

8         decision by the Court as to the

9         relevance of that question.

10    Q.  Ms. Villetti, how did your

11  role with Kioko change, say, in March

12  of 2018?

13    A.  I began focusing on it

14  full time.

15    Q.  What sort of things were you

16  doing full time now for Kioko?

17    A.  I oversaw the RND and

18  operations.

19    Q.  Anything else?

20    A.  No.

21    Q.  Do you still serve in that

22  capacity?

23    A.  Yes.

24    Q.  What sort of compensation do

25  you receive from Kioko?
```



Page 41

1                    V. VILLETTI

2       A.   Nothing.

3       Q.   Did you inquire any other

4    employments beginning in or about

5    March of 2018, after you left

6    Guidepoint?

7       A.   I have done some consulting

8    projects.

9       Q.   What consulting projects have

10   you done?

11      A.   A paid project for PWC and

12   I've done unpaid work.

13      Q.   What is PWC?

14      A.   It is a large accounting and

15   consulting firm.

16      Q.   What was the paid project that

17   you did for them?

18      A.   You have to be more specific.

19      Q.   You did a paid project for

20   PWC?

21      A.   Yes.

22      Q.   What did you do for PWC?

23      A.   It was a healthcare project.

24      Q.   What were your

25   responsibilities in the healthcare



Page 42

```
 1                    V. VILLETTI

 2    project for PWC?

 3        A.  I don't know much I'm allowed

 4    to disclose, contractually.

 5        Q.  You had a contract with PWC?

 6        A.  As a contractor, yes.

 7            MR. GRECH:  Just note for

 8         the record, we're probably

 9         going to call for the

10         production of that contract.

11         We'll follow up in writing.

12        Q.  Other than the paid project

13    for PWC, did you perform any other

14    work for compensation after

15    March, 2018?

16        A.  No.

17        Q.  What compensation did you

18    receive from PWC?

19        A.  I had an hourly rate of 200 an

20    hour.

21        Q.  For what period of time did

22    you work on this project for PWC?

23        A.  It was a short project;

24    Less than three months.

25        Q.  And those three months
```



MAGNA
LEGAL SERVICES

Page 43

                            V. VILLETTI

1

2    occurred when?

3        A.   Earlier this year.

4        Q.   And the project is completed?

5        A.   Yes.

6        Q.   What's the total compensation

7    you've received from PWC?

8        A.   I don't know off the top of my

9    head.

10       Q.   How many hours did you put in

11   on the project?

12       A.   I can't be sure.

13            MR. GRECH:  Mr. Lichten,

14        we would also likely follow up

15        with requests based upon those

16        areas, total compensation from

17        PWC.  We'll follow up in

18        writing.

19            MR. LICHTEN:  Sure.

20       Q.   Ms. Villetti, you've

21   mentioned, I believe, other unpaid

22   work that you've done since March of

23   2018?

24       A.   Yes.

25       Q.   Could you describe that,



Page 44

```
 1              V. VILLETTI
 2    please?
 3       A.  Informal advisory for
 4    startups.
 5       Q.  How many startups would you
 6    say you've advised in the period of,
 7    say, March, 2018 to date?
 8       A.  Three or four.
 9       Q.  How much of your time in that
10    period of March, 2018 to date, have
11    you spent advising the three to four
12    startups?
13       A.  In terms of?
14       Q.  Was it considered a full time?
15    part time?
16       A.  Just advisory work, which is
17    part time.
18       Q.  And you collected
19    unemployment, as well --
20       A.  Yes.
21       Q.  -- after leaving Guidepoint?
22          All right.  Let's go back to
23    Guidepoint:  I believe you said that
24    Mr. Pool would have been your
25    supervisor at Guidepoint?
```



Page 45

1                    V. VILLETTI

2       A.  Yes.

3       Q.  Who else did you work with at

4   Guidepoint?

5       A.  There was an events team.

6   And I, occasionally, collaborated

7   with Justin Rouise. (Phonetic)

8       Q.  What was Justin's title at

9   Guidepoint?

10      A.  I don't know, but he focused

11  on other industries.

12      Q.  Did you work with anyone in

13  particular in the events team?

14      A.  There were several people.

15      Q.  Who were they?

16      A.  There was Jessica (phonetic),

17  who I briefly worked with because she

18  was on maternity leave; the other

19  girls were Kendall (phonetic),

20  Amrutha (phonetic), and

21  Gabby (phonetic).

22      Q.  These were all members of the

23  events team?

24      A.  Yes, they provided logistics.

25      Q.  Logistics for the conferences?



Page 46

```
 1              V. VILLETTI
 2      A.  For anything we needed.
 3      Q.  And then it would be fair to
 4  say that you were on the
 5  content team?  The content side?
 6      A.  Yes.
 7      Q.  With Bouker?
 8      A.  Yes.
 9      Q.  Anyone else on the Healthcare
10  Content Team?
11      A.  No -- actually,
12  Ashlee Dunston was initially a
13  healthcare content person and we
14  overlapped for some period of time.
15      Q.  Your ten year with Guidepoint
16  overlapped Ashlee's?
17      A.  Yes.
18      Q.  In the same title?
19      A.  I don't know what her title
20  was.
21      Q.  When did Ashlee leave
22  Guidepoint?
23      A.  End of the year.
24      Q.  The end of 2017?
25      A.  Yes.
```



MAGNA
LEGAL SERVICES

Page 47

1                    V. VILLETTI

2        Q.   Under what circumstances?

3        A.   She was fired.

4        Q.   Do you know why?

5        A.   I believe because she was a

6    woman.

7        Q.   And what led you to that

8    belief?

9        A.   Based on my conversations with

10   members of her team.   They were not

11   consulted.

12       Q.   Not consulted about her

13   termination?

14       A.   Yes.

15       Q.   When you were brought on by

16   Guidepoint, was it your understanding

17   that you would be replacing Ashlee or

18   working with Ashlee?

19       A.   There was little to no mention

20   of Ashlee.

21       Q.   In your application and

22   interview process?

23       A.   Yes.

24       Q.   When did you first come to

25   learn of Ashlee?



Page 48

```
 1              V. VILLETTI

 2      A.  When I was at Guidepoint.

 3      Q.  When you began employment?

 4      A.  Yes.

 5      Q.  And she -- Ashlee would have

 6  been on the Healthcare Content Team,

 7  correct?

 8      A.  I don't know her exact role,

 9  but whatever responsibilities she

10  had, she also produced healthcare

11  content.

12      Q.  Who were the other members of

13  her team that complained about not

14  being consulted -- "complained" is

15  too strong of a word -- that told you

16  they were not consulted?

17      A.  I don't recall their names.

18      Q.  Were these -- I'm struggling

19  to understand the other members of

20  the Healthcare team.  If it was you

21  and Bouker, and there was some

22  overlap with Ashlee, were there other

23  members of the Healthcare Team at

24  that point?

25      A.  No.  These were people that
```



Page 49

```
 1                    V. VILLETTI
 2    reported to her, but they were not
 3    healthcare content people.
 4         Q.  Okay.  So these were
 5    subordinates to Ashlee?
 6         A.  Yes.
 7         Q.  And it was your understanding
 8    that they felt they should have been
 9    consulted, prior to the company
10    letting Ashlee go?
11         A.  Yes.
12         Q.  Did you have conversations
13    with anyone else at Guidepoint as to
14    termination procedures in this
15    context, consulting with team
16    members?
17         A.  I don't understand your
18    question.
19         Q.  You said that Ashlee's team
20    members said they weren't consulted
21    regarding her termination?
22         A.  Yes.
23         Q.  Was it your understanding that
24    it was Guidepoint's policy to consult
25    with team members prior to
```



Page 50

```
 1              V. VILLETTI
 2    terminating someone?
 3       A.  I had that impression, yes.
 4       Q.  How did you get that
 5    impression?
 6       A.  Based on conversations with
 7    people that had been at Guidepoint
 8    for longer.
 9       Q.  Such as?
10       A.  I don't recall.
11       Q.  Did you have conversations
12    like that with Bouker?
13       A.  I don't recall.
14       Q.  Did you have conversations
15    like that with Priscilla?
16       A.  I don't recall.
17       Q.  Do you recall any other
18    terminations of other employees
19    during your time at Guidepoint, other
20    than Ashlee?
21       A.  No.
22       Q.  How would you describe your
23    work performance at Guidepoint during
24    your time there?
25       A.  Great.
```



Page 51

```
 1                  V. VILLETTI
 2      Q.   And what do you base that
 3   upon?
 4      A.   The feedback from my
 5   supervisor, from the advisors, from
 6   the clients, and the numbers of
 7   attendees of the content I produce,
 8   and conferences -- teleconferences.
 9      Q.   And how many conferences would
10   you have arranged during your time at
11   Guidepoint?
12      A.   Conferences or
13   teleconferences?
14      Q.   Conferences, in general.
15      A.   I don't know, exactly.
16      Q.   Teleconferences?
17      A.   I don't know, exactly.
18      Q.   If we're talking conferences
19   and telephone conferences, were there
20   also in-person conferences?
21      A.   There were in-person meetings.
22      Q.   In-person meetings, okay.  And
23   how many -- strike that.
24           You would have been
25   responsible for arranging healthcare
```



Page 52

```
 1                    V. VILLETTI
 2    content in-person meetings?
 3       A.  Yes, in selecting the advisors
 4    and setting the agenda.
 5       Q.  How many in-person meetings
 6    did you work on, while you were at
 7    Guidepoint?
 8       A.  I don't know, exactly.
 9       Q.  You've mentioned a Jessica
10    before.  You worked with her,
11    briefly?
12       A.  Yes.
13       Q.  What was the nature of your
14    work with Jessica?
15       A.  She was in events and
16    logistics -- events planning and
17    logistics.
18       Q.  How would events and the
19    content team work together?
20       A.  They provided support in
21    organizing the events.
22       Q.  Did Jessica work on any of the
23    events that you were responsible for?
24       A.  I don't know.
25       Q.  Did you receive logistic
```



Page 53

```
 1              V. VILLETTI
 2   support for the conferences you
 3   worked on?
 4      A.  Yes.
 5      Q.  Do you recall specific members
 6   of the logistics team that you worked
 7   with?
 8      A.  I worked with all of them;
 9   various.
10      Q.  Kendall, Amrutha, and Gabby?
11      A.  Yes.
12      Q.  But you don't recall,
13   specifically, working with Jessica?
14      A.  No.
15      Q.  And you mentioned that, at
16   some point, she went out on
17   maternity leave?
18      A.  Yes.
19      Q.  Do you recall when that
20   happened?
21      A.  I don't know.
22      Q.  Did Jessica, ultimately,
23   return to Guidepoint?
24      A.  Yes.
25      Q.  Do you recall when that
```



Page 54

```
 1                V. VILLETTI
 2    happened?
 3       A.  No.
 4       Q.  Were you aware of a change in
 5    Jessica's position, while she was on
 6    maternity leave?
 7       A.  Yes.
 8       Q.  What was your knowledge of
 9    that?
10       A.  I was told that she had been
11    demoted.
12       Q.  You were told that she was
13    demoted while out on leave?
14       A.  Yes.
15       Q.  Demoted from what position?
16       A.  I don't know the specifics.
17       Q.  Do you know what position she
18    was demoted to?
19       A.  No.
20       Q.  Who told you that she was
21    demoted?
22       A.  Bouker Pool.
23       Q.  Who would have been
24    responsible for demoting Jessica?
25       A.  Albert (phonetic).
```



Page 55

1            V. VILLETTI

2      Q.  Who is Albert?

3      A.  Albert is the CEO of

4  Guidepoint.

5      Q.  This is Albert Sebag, we're

6  talking about?

7      A.  Yes.

8      Q.  S-E-B-A-G?

9      A.  Yes.

10     Q.  What did Bouker tell you about

11 Albert's demotion of Jessica?

12     A.  That she had been demoted

13 while she was on maternity leave and

14 her subordinates had been reassigned

15 to him.

16     Q.  "To him" meaning?

17     A.  To Bouker.

18     Q.  Did you know why Jessica was

19 demoted?

20     A.  No.

21     Q.  When Jessica came back from

22 maternity leave, what were her

23 duties?

24     A.  She provided logistics for

25 events.



Page 56

```
1                V. VILLETTI

2       Q.  Did those duties differ in any

3    way from the duties she did before

4    she went out?

5       A.  I don't know.

6       Q.  Which subordinates were

7    reassigned to Bouker?

8       A.  Gabby, Amrutha, and Kendall.

9    Actually, there was also

10   Sara (phonetic).  I forgot Sara.

11   There was a fourth person.

12      Q.  Sarah was also on the events

13   team --

14      A.  Yes.

15      Q.  -- at this time?

16          Were these subordinates now on

17   the Healthcare Content Team or they

18   worked for Bouker in other content

19   areas?

20      A.  All content.

21      Q.  Did they work with you on

22   healthcare?

23      A.  Yes.

24      Q.  Did there come a point in time

25   when you and Bouker sought to expand
```



Page 57

                    V. VILLETTI

1

2    the team?

3        A.   Yes.

4        Q.   Can you tell us what efforts

5    you made to expand the Healthcare

6    Content Team?

7        A.   We worked with

8    Guidepoint's HR, and recruiting

9    disorced [sic] candidates.

10       Q.   What sort of position or

11   positions were you seeking to fill?

12       A.   I was seeking associate for

13   myself, and another healthcare

14   content person.

15       Q.   Was Ashlee gone by this time?

16       A.   I think so.  I'm not sure.

17       Q.   Were you and Bouker leading

18   these --

19       A.   Yes.

20       Q.   -- these efforts to expand the

21   team?

22            Did you have any conversations

23   with Albert about this expansion?

24       A.   No.

25       Q.   Who gave you, sort of, the



Page 58

```
 1              V. VILLETTI
 2   instructions to expand the team?
 3      A.  Bouker Pool.
 4      Q.  Do you know whether he
 5   received those instructions from
 6   anyone else or this was his own
 7   initiative?
 8      A.  As I understood it, it all
 9   came from Albert Sebag.
10      Q.  It's your understanding that
11   you were tasked as being one of the
12   hiring managers for the Healthcare
13   Content Strategist position?
14      A.  Yes.
15      Q.  Who gave you that position or
16   authority, I should say?
17      A.  Bouker Pool.
18      Q.  And it was your understanding
19   that you had authorization to
20   interview and hire whoever you sought
21   fit with Bouker?
22      A.  Yes.
23      Q.  Did there come a point in time
24   where you interviewed a Dr. Jibril?
25      A.  Yes.
```



1                    V. VILLETTI

2     Q.  Who is Dr. Jibril?

3     A.  She was a candidate.

4     Q.  For which position?

5     A.  For Healthcare Content

6  Associate, I believe.  I'm not sure.

7     Q.  What would she have been

8  interviewing or applying for?  The

9  position of your associate or the

10  other Healthcare Content Specialist?

11     A.  The Healthcare Content

12  Specialist, but she would have

13  reported to me.

14     Q.  How did you come to learn of

15  Dr. Jibril?

16     A.  Through Guidepoint HR.

17     Q.  What's Dr. Jibril's

18  background, relevant to her potential

19  candidacy, her disposition?

20     A.  She is extremely qualified as

21  an MD who has also worked for another

22  expert network.

23     Q.  Do you know what Dr. Jibril's

24  specialty is, if any?

25     A.  In?



Page 60

```
 1              V. VILLETTI
 2      Q.  She's a medical doctor?
 3      A.  Yes, she is a medical doctor.
 4  I believe she has a specialty in
 5  OBGYN.
 6      Q.  For which expert network did
 7  Dr. Jibril work?
 8      A.  I don't know the name.
 9      Q.  How did you come to learn
10  of -- strike that.
11          What did HR send you,
12  materials, concerning Dr. Jibril's
13  candidacy?
14      A.  Her resumé.
15      Q.  Anything else?
16      A.  Initially, no.
17      Q.  You reviewed that resumé?
18      A.  Yes.
19      Q.  You talked about it with
20  Bouker?
21      A.  Yes.
22      Q.  What were the next steps you
23  took?
24      A.  They scheduled her for an
25  interview.
```



Page 61

1                    V. VILLETTI

2        Q.   When did this occur?

3        A.   I'm not sure.

4        Q.   Did you ultimately interview

5    Dr. Jibril?

6        A.   Yes.

7        Q.   Did anyone else interview her?

8        A.   Yes.

9        Q.   Who was that?

10       A.   Bouker Pool and Justin Rouise

11   and Priscilla, I believe.

12       Q.   What role was Justin playing

13   in this interview?

14       A.   He was a member of the

15   content team.

16       Q.   We talked about the, sort of,

17   scheduling of the interview.  Do you

18   recall when the actual interview of

19   Dr. Jibril occurred?

20       A.   No.

21       Q.   Did she have one interview?

22   more than one?

23       A.   I only interviewed her once,

24   but I'm not sure how many interviews

25   she had in total.



Page 62

```
 1                V. VILLETTI

 2      Q.  What was your impressions of

 3   Dr. Jibril during your interview with

 4   her?

 5      A.  She was extremely sharp and

 6   knowledgeable and qualified and would

 7   have made a great addition to the

 8   team.

 9      Q.  Did you have an opportunity to

10   talk about her interview with Bouker,

11   Priscilla, and Justin?

12      A.  Yes.

13      Q.  What was Bouker's impression

14   of Dr. Jibril?

15      A.  He had a similar impression to

16   mine and there was a consensus that

17   she was extremely qualified and a

18   great fit.

19      Q.  And Priscilla felt the same

20   way?

21      A.  I did not speak to Priscilla.

22      Q.  Did you speak to Justin

23   about --

24      A.  Yes, Justin and Bouker Pool.

25      Q.  You spoke to Justin and Bouker
```



Page 63

```
 1              V. VILLETTI
 2   about Dr. Jibril's candidacy?
 3      A.  Yes.
 4      Q.  What did Justin have to say
 5   about Dr. Jibril's candidacy?
 6      A.  He agreed with my assessments.
 7      Q.  What next steps did you take
 8   in terms of Dr. Jibril's candidacy
 9   application for working at Guidepoint
10   after her interview?
11      A.  Someone from HR was handling
12   it, a recruiter, a lateral recruiter.
13   But she did, at some point, produce
14   samples of her work and provided
15   references, I believe.  And I
16   reviewed her work.
17      Q.  This was a lateral recruiter
18   inhouse at Guidepoint?
19      A.  Yes.
20      Q.  And who was that?
21      A.  I don't know his name.
22      Q.  It is a "him"?
23      A.  Yes, I believe.
24      Q.  Was Priscilla also involved,
25   in terms of HR at this point?
```



Page 64

                    V. VILLETTI

1
2     A.  Yes.
3     Q.  What sort of work samples did
4  you review from Dr. Jibril?
5     A.  I don't remember.
6     Q.  You, at some point, were given
7  a list of her references?
8     A.  No.
9     Q.  Were you made aware that she
10  had provided a list of references?
11     A.  Yes.
12     Q.  Did you reach out to any of
13  her references?
14     A.  No, HR was handling that.
15     Q.  Did HR report to you on its
16  research -- sorry -- reaching out to
17  the references for Dr. Jibril?
18     A.  I don't recall.
19     Q.  Okay.  So, you interviewed
20  her, you spoke with the recruiter,
21  there were work samples and
22  references.  What were your next
23  steps concerning Dr. Jibril?
24     A.  Bouker and I agreed that we
25  should extend her an offer.  And we



Page 65

                    V. VILLETTI

1

2    had been designated the hiring

3    managers, so we had the authority to

4    do so.  And it was just a matter of

5    negotiation concerning her salary.

6        Q.  And, again, that designation

7    of you as hiring manager was made by

8    Bouker, correct?

9        A.  Yes.

10       Q.  Do you know who designated

11   Bouker?

12       A.  Albert Sebag.

13       Q.  How did you know that?

14       A.  Bouker relayed that

15   information.

16       Q.  What were the components of

17   the offer that you contemplated to

18   Dr. Jibril?

19       A.  I was not involved with the

20   details.

21       Q.  But you and Bouker agreed that

22   an offer should be made?

23       A.  Yes.

24       Q.  Was an offer ultimately made

25   to Dr. Jibril?



MAGNA
LEGAL SERVICES

Page 66

```
 1              V. VILLETTI
 2      A.  No.
 3      Q.  Why not?
 4      A.  Because Albert Sebag
 5  intervened.
 6      Q.  How did Mr. Sebag intervene?
 7      A.  He prevented us from extending
 8  her an offer.
 9      Q.  What was Albert's involvement
10  in the Dr. Jibril application, up
11  until this point?
12      A.  Nothing.
13      Q.  At what point in time did he
14  become involved?
15      A.  When we were prepared to
16  extend her an offer, to my knowledge.
17      Q.  To your knowledge, why did
18  Albert prevent Guidepoint from
19  extending an offer to Dr. Jibril?
20      A.  Because he was not a
21  hedge fund guy.
22      Q.  Because Albert is not a
23  hedge fund guy?
24      A.  Because Dr. Jibril is not a
25  hedge fund guy.
```



1        V. VILLETTI

2    Q.  Dr. Jibril has no hedge fund

3  background?

4    A.  Yes.

5    Q.  Albert does?

6    A.  No.

7    Q.  Did you have conversations

8  with Albert about Dr. Jibril's

9  candidacy?

10    A.  No.

11    Q.  How did you come to this

12  conclusion that it was this

13  hedge fund issue that caused Albert

14  to prevent the offer extension?

15    A.  Bouker Pool relayed that

16  information.

17    Q.  Did Bouker have conversations

18  with Albert about Dr. Jibril?

19    A.  Yes.

20    Q.  If Albert doesn't have

21  hedge fund background, why was he

22  concerned whether Dr. Jibril did?

23    A.  I don't know.

24    Q.  Was that a requirement of the

25  position?



Page 68

```
1                    V. VILLETTI
2        A.  Not until that point.
3        Q.  How many other candidates did
4    you interview for the Healthcare
5    Content Specialist that you had hoped
6    to offer Dr. Jibril?
7        A.  She was the first one.
8        Q.  Had you interviewed
9    any -- strike that.
10            Had you received any
11   applications for the position of your
12   associate?
13       A.  Yes.
14       Q.  How many applications have you
15   received or did Guidepoint receive?
16       A.  I don't know.
17       Q.  Did you ever interview anyone
18   for that position?
19       A.  Yes.
20       Q.  Who did you interview for that
21   position?
22       A.  An internal candidate named
23   Liana (phonetic) Yamin.
24       Q.  Do you know the spelling of
25   the last?
```



```
 1                    V. VILLETTI
 2        A.   I believe it's Y-A-M-I-N.
 3        Q.   Ms. Yamin, what was her
 4   position at Guidepoint at the time
 5   she was applying for your
 6   associate position?
 7        A.   She was a junior person.  I
 8   don't know, exactly, her title.
 9        Q.   And you interviewed her for
10   the associate position?
11        A.   Yes.
12        Q.   Did you interview anyone else?
13        A.   Yes.
14        Q.   Who did you interview, other
15   than Ms. Yamin?
16        A.   I don't remember the name.
17   Another internal candidate.
18        Q.   Male or female?
19        A.   Female.
20        Q.   Anyone else?  You had two
21   interviews.  Was there a third?
22        A.   No, not to my knowledge.
23        Q.   Would anyone else have been
24   interviewing someone for your
25   associate position?
```



Page 70

```
 1              V. VILLETTI
 2      A.  HR was helping, so it's
 3  possible that they had.
 4      Q.  Was anyone else present during
 5  your interview with Ms. Yamin?
 6      A.  No.
 7      Q.  The other female candidate, we
 8  can't recall the name, did you
 9  interview her by yourself, as well?
10      A.  Yes.
11      Q.  Did there come a point in time
12  when you extended an offer to either
13  of those candidates for the position?
14      A.  Yes, to Liana.
15      Q.  What was the result of that
16  offer being extended?
17      A.  She transferred from her team
18  to our team.
19      Q.  When did that -- let's start
20  with the transfer:  When did that
21  transfer occur?
22      A.  I don't remember.
23      Q.  Did it occur before or after
24  or during your dialogue with
25  Dr. Jibril?
```



```
 1                    V. VILLETTI
 2      A.  Before.
 3      Q.  So at the time that you and
 4 Bouker wanted to extend the offer to
 5 Dr. Jibril, Ms. Yamin was already on
 6 your team?
 7      A.  I believe she had left.
 8      Q.  She had joined the team and
 9 then left, all within that same time
10 period?
11      A.  She had left Guidepoint.
12      Q.  Do you know the circumstances
13 of her departure?
14      A.  She received a better offer
15 elsewhere that had a more competitive
16 salary.
17      Q.  So how long did Ms. Yamin
18 serve as your associate?
19      A.  I don't remember, but a few
20 months.
21      Q.  Was the position you were
22 seeking to put Dr. Jibril in
23 ultimately filled?
24      A.  Yes.
25      Q.  Do you know who it was filled
```



Page 72

                    V. VILLETTI

1

2    by?  Who took the position?

3        A.   I don't know the name.

4        Q.   It's your understanding that

5    it's one person?

6        A.   I believe it's multiple people

7    that were hired.

8        Q.   And since we are talking about

9    gender discrimination, do you know

10   the gender or breakdown of the people

11   that were hired?

12       A.   I believe they are men.

13       Q.   All?

14       A.   No.

15       Q.   When you say "multiple," do

16   you have an idea of a number?

17       A.   No.

18       Q.   Is it your understanding that

19   half are men?  majority are men?

20   What is your understanding of the

21   breakdown?

22       A.   I don't know.

23       Q.   Do you know if there are any

24   women that came in to fill that

25   position?



Page 73

```
 1                V. VILLETTI
 2      A.  There may be women on the team
 3  now.  I don't know.
 4      Q.  Do you know in what capacity
 5  that woman is on the team?
 6      A.  No.
 7      Q.  What leads you to believe that
 8  Guidepoint terminated your employment
 9  because of your gender?
10      A.  Because of the pattern I
11  noticed at Guidepoint.
12      Q.  What was that pattern?
13      A.  The demotion and firing of
14  women.
15      Q.  When you speak of demotion,
16  you're talking about Ashlee?
17      A.  Yes.
18      Q.  And there was another --
19      A.  No.  Jessica.
20      Q.  I'm sorry; Jessica.  Jessica
21  went out on maternity leave and was
22  demoted?
23      A.  Yes.
24      Q.  And who was the fired woman
25  that we're talking about?
```


MAGNA
LEGAL SERVICES

Page 74

```
 1              V. VILLETTI
 2      A.  Ashlee.
 3      Q.  Ashlee, okay.
 4      A.  And then my inability to hire
 5   Ms. Jibril.
 6      Q.  What part of the demotion of
 7   Jessica led you to believe that it
 8   was based upon her gender?
 9      A.  She was on maternity leave.
10      Q.  And what part of Ashlee's
11   firing did you believe was based upon
12   her gender?
13      A.  The fact that it was done
14   without speaking to her subordinates
15   right before the holidays.
16      Q.  We talked about Albert's
17   intervention and not wanting to hire
18   Dr. Jibril because she had no
19   hedge fund experience.  In what
20   capacity does her gender -- in what
21   way does her gender play a role in
22   that?
23      A.  She was not a hedge fund guy.
24      Q.  You had "guy", specifically,
25   before?
```



1                    V. VILLETTI

2         A.   Yes.

3         Q.   Albert is not a hedge fund guy

4    either, right?

5         A.   No.

6         Q.   Were there other hedge fund

7    guys at Guidepoint?

8         A.   No.  I don't know at

9    Guidepoint.  On our team, no.

10        Q.   Who is Rutwik, R-U-T-W-I-K?

11        A.   I don't know what his position

12   is now.

13        Q.   What is your -- who is Rutwik,

14   as far as you know?

15        A.   He was a friend of Albert.

16        Q.   How did you come to know

17   Rutwik?

18        A.   I saw him in the office.

19        Q.   Doing what?

20        A.   I don't know.

21        Q.   Did Rutwik work for

22   Guidepoint?

23        A.   Not to my knowledge.

24        Q.   Do you know what Rutwik's

25   background is?



Page 76

```
 1              V. VILLETTI
 2      A.  He was a hedge fund guy.
 3      Q.  What were your dealings with
 4  Rutwik, while you were at Guidepoint?
 5      A.  I was initially told that he
 6  was there as a friend of Albert to
 7  provide some consulting services, as
 8  I recall.
 9      Q.  Who told you that?
10      A.  Bouker Pool.
11      Q.  When did Rutwik first begin
12  his involvement with Guidepoint?
13      A.  I don't know.
14      Q.  Was he still with Guidepoint
15  in March of 2018?
16      A.  Yes.
17      Q.  Did you have an opportunity to
18  work with Rutwik during your time at
19  Guidepoint?
20      A.  Yes.
21      Q.  In what way?
22      A.  He inserted himself into our
23  team.
24      Q.  The Healthcare Content Team?
25      A.  Yes.
```



```
 1                    V. VILLETTI
 2       Q.   How so?
 3       A.   He began commenting on
 4  teleconferences that we were
 5  planning.
 6       Q.   That you and Bouker were
 7  planning?
 8       A.   That me -- that I was
 9  planning; me and the logistics team.
10       Q.   What were his comments?
11       A.   He had opinions on what we
12  should and shouldn't do.
13       Q.   What were those opinions?
14       A.   I don't recall.
15       Q.   How many conferences would
16  Rutwik have offer his opinions about?
17       A.   I don't remember.
18       Q.   Do you recall having an
19  exchange with Rutwik about his
20  opinions, about your conferences?
21       A.   Many exchanges, yes.
22       Q.   How many exchanges would you
23  say?
24       A.   I don't remember the exact
25  number.
```



MAGNA ▶
LEGAL SERVICES

Page 78

                    V. VILLETTI

1

2       Q.  Were these in person?

3       A.  In person and on the phone and

4    on e-mail.

5       Q.  Did you agree with his

6    opinions?  disagree?

7       A.  I don't remember details.  You

8    would have to be specific.

9       Q.  What was the first conference

10   Rutwik offered his opinion about?

11      A.  I don't remember.

12      Q.  What was the last conference

13   Rutwik offered his opinion about?

14      A.  I don't remember.

15      Q.  Do you recall getting into an

16   argument about Rutwik, about his

17   opinions about a conference?

18      A.  Yes.

19      Q.  What conference was that?

20      A.  I don't remember details.

21      Q.  Do you recall one argument or

22   multiple arguments?

23      A.  Multiple arguments.

24      Q.  Do you recall any of the

25   conferences that those multiple



                         V. VILLETTI
1
2    arguments were about?
3        A.   I can't remember off the top
4    of my head.
5        Q.   Okay.  Apart from the
6    conference, itself, what was the
7    nature of your arguments with Rutwik?
8        A.   We were told to hear out his
9    views on what we should and shouldn't
10   do, and he increasingly started
11   acting like a manager, when he was
12   not an employee.
13       Q.   Who told you that you should
14   hear his views out?
15       A.   Bouker Pool.
16       Q.   And it's your understanding
17   that was from Albert?
18       A.   Yes.
19       Q.   Was Bouker also functioning
20   under the assumption that he had to
21   hear out Rutwik?
22       A.   I don't know.
23       Q.   Did Rutwik offer his opinions
24   or ask to be heard out, in other
25   teams?


MAGNA
LEGAL SERVICES

Page 80

```
 1                    V. VILLETTI
 2        A.   Yes.
 3        Q.   And what other teams?
 4        A.   I believe he also interacted
 5   with the data team and sales team.
 6   I don't remember the details.
 7        Q.   How did you learn that he was
 8   interacting with the data team?
 9        A.   I believe it came up in
10   speaking to Bouker.
11        Q.   How did you learn that Rutwik
12   was involved with the sales team?
13        A.   Same.
14        Q.   Through Bouker?
15        A.   Yes.   I should say, business
16   development, not sales.
17        Q.   The business development team?
18        A.   Yes.
19        Q.   Is Bouker still with
20   Guidepoint?
21        A.   No.
22        Q.   What were the circumstances of
23   his separation?
24        A.   He filed a complaint several
25   days after I filed a complaint, and
```



```
 1                V. VILLETTI
 2    he was also retaliated against by
 3    Guidepoint.
 4        Q.  What was the nature of
 5    Bouker's complaint?
 6        A.  He complained about Rutwik
 7    creating a hostile environment for
 8    the team.
 9        Q.  For Bouker's team?
10        A.  Yes.
11        Q.  When did Bouker file his
12    complaint?
13        A.  Some time in March.
14        Q.  And when did you file yours?
15        A.  Three or four days before he
16    did.
17        Q.  Who was on the Healthcare
18    Content Team in March of 2018?
19        A.  I was.
20        Q.  Along with Bouker?
21        A.  Bouker was my boss.  He was
22    not a healthcare person.
23        Q.  What about the subordinates
24    that transferred over?  Were they
25    still part of the team?
```



Page 82

```
 1                  V. VILLETTI
 2       A.  There was only one; and no,
 3   she had left.
 4       Q.  Was this Ms. Yamin or was this
 5   somebody else?
 6       A.  Ms. Yamin.
 7       Q.  She had left at this point?
 8       A.  Yes.
 9       Q.  So when we're saying
10   Healthcare Content Team in March of
11   2018, we're talking about you?
12       A.  Yes.
13       Q.  So Bouker complained that
14   Rutwik was creating a hostile work
15   environment for you?
16       A.  For me, as well as the
17   logistics teams, which reported to
18   him.
19       Q.  The logistics team also
20   reported to Bouker?
21       A.  Yes.  I should say, the
22   events team, but it's the same thing.
23       Q.  We've been talking
24   interchangeably, the events and
25   logistics team, right?
```


MAGNA
LEGAL SERVICES

Page 83

1                     V. VILLETTI

2        A.  Yes.

3        Q.  Jessica was on the

4    events/logistics team; that's who we

5    are talking about?

6        A.  Yes.  And Sara, Gabby,

7    Amrutha.

8        Q.  Right.  These are subordinates

9    that were transferred over?

10       A.  Yes, and Kendall.

11       Q.  And Kendall?

12       A.  Yes.

13       Q.  Was it your opinion that

14   Rutwik created a hostile work

15   environment for you?

16       A.  Yes.

17       Q.  How so?

18       A.  He raised his voice at

19   inappropriate times.  He contacted us

20   on our cells.  He was a menacing

21   figure.

22       Q.  Physically?

23       A.  He would show up in our area.

24       Q.  Had you shared these concerns

25   with Bouker?



Page 84

1                    V. VILLETTI

2        A.  It had come up in team

3    discussions.

4        Q.  And by "team discussions," you

5    mean a conversation between you and

6    Bouker?

7        A.  As well as the

8    events/logistics team.

9        Q.  In what ways did you learn if

10   Rutwik was creating a hostile work

11   environment for the events team?

12       A.  He was doing something similar

13   to them that I was experiencing.

14       Q.  And witnessing?

15       A.  Yes.

16       Q.  Raising his voice?

17       A.  Yes.

18       Q.  Being a menacing figure?

19       A.  Yes.  Contacting people on

20   their cell phones.

21       Q.  Was the concern there that it

22   was on the cell phone or that was it

23   outside of business hours?

24       A.  Outside of business hours.

25       Q.  Did you have a Guidepoint



Page 85

1            V. VILLETTI

2    cell phone or did you have a

3    personal cell phone?

4        A.   A personal cell phone.

5        Q.   There was no Guidepoint-issued

6    cell phone?

7        A.   I don't believe so.

8        Q.   So you used your personal

9    cell phone while at Guidepoint, for

10   Guidepoint and personal purposes?

11       A.   I don't remember.

12       Q.   Did you have conversations

13   with anyone in the events team about

14   Rutwik's behavior?

15       A.   In team meetings, yes.

16       Q.   Who shared with you this

17   hostile-work-environment concern with

18   you in the events team?

19       A.   Jessica, Sarah, Gabby, I

20   believe.

21       Q.   And since Bouker had filed a

22   complaint, did you understand that

23   Bouker felt he was subject to the

24   hostile work environment, as well?

25       A.   I don't know.



Page 86

```
 1                 V. VILLETTI

 2      Q.  What was the nature of your

 3   complaint, in March of 2018?

 4      A.  What do you mean?

 5      Q.  How did you make the

 6   complaint?

 7      A.  I sent an e-mail to Priscilla.

 8      Q.  This is Priscilla in HR?

 9      A.  Yes.

10      Q.  And when did you send the

11   e-mail?

12      A.  I don't remember the exact

13   date.

14      Q.  It's within March of 2018?

15      A.  Yes.

16      Q.  Prior to Bouker's?

17      A.  Yes.

18      Q.  What do you recall saying to

19   Priscilla in that e-mail?

20      A.  I voiced my concerns around

21   Rutwik's behavior and the treatment

22   of other women at Guidepoint.

23      Q.  What were you referring to

24   when you said, "treatment of other

25   women" in this complaint to
```



Page 87

```
 1              V. VILLETTI
 2    Priscilla?
 3        A.   The treatment of Jessica,
 4    Ashlee and Dr. Faiza Jibril.
 5        Q.   What happened with respect to
 6    that complaint, after you sent the
 7    e-mail to Priscilla?
 8        A.   I met with her in her office.
 9        Q.   When did you meet with
10    Priscilla?
11        A.   Shortly after the e-mail.
12        Q.   So we're still in March of
13    2018?
14        A.   I believe so.
15        Q.   What did you and Priscilla
16    talk about in her office at this
17    meeting?
18        A.   I relayed my concerns as
19    expressed in the e-mail about
20    sex-based discrimination at
21    Guidepoint and Rutwik.
22        Q.   Was it your impression that
23    Rutwik was only raising his voice to
24    women?
25        A.   It appeared so.
```



Page 88

```
                    V. VILLETTI

 1

 2       Q.  And it was your impression

 3    that he was only calling women

 4    outside of business hours on their

 5    cell phones?

 6       A.  I believe so.

 7       Q.  What was Priscilla's response

 8    after you relayed these concerns

 9    during this meeting?

10       A.  I don't remember.

11       Q.  Did she say whether that

12    Guidepoint would start an

13    investigation?

14       A.  She may have.

15       Q.  Was an investigation

16    ultimately conducted?

17       A.  I don't know.

18       Q.  Did Priscilla identify what

19    the next steps would be after your

20    meeting with her?

21       A.  I don't remember.

22       Q.  Did she say, "I'll get back to

23    you at a certain period of time with

24    certain information"?

25       A.  I don't remember.
```



Page 89

```
 1              V. VILLETTI
 2     Q.  What was the next steps
 3  concerning your complaint after this
 4  meeting with Priscilla?
 5     A.  What do you mean by "next
 6  steps"?
 7     Q.  Did anything else happen
 8  concerning your complaint, the
 9  e-mailed to Priscilla, after your
10  meeting with her in March in her
11  office?
12     A.  I don't know.
13     Q.  Who is James Lukban,
14  L-U-K-B-A-N?
15     A.  I don't remember.
16     Q.  Does he have some connection
17  to Guidepoint or this case?
18     A.  I don't know.
19     Q.  Who is Jenna Applebaum
20  (phonetic)?
21     A.  I don't know.
22     Q.  I'll have to spell this one:
23  Who is Manoj Garg?  M-A-N-O-J; second
24  name, G-A-R-G.
25     A.  He is my former supervisor at
```



MAGNA
LEGAL SERVICES

Page 90

```
 1              V. VILLETTI

 2   ABR Healthco.

 3      Q.  What is MBO Partners?

 4      A.  I don't know.

 5      Q.  Does MBO Partners have any

 6   correction with PWC?

 7      A.  They may.

 8      Q.  Do you know what that

 9   connection is?

10      A.  I believe they may handle some

11   processing and things like that for

12   them.

13      Q.  Have you had conversation with

14   anyone -- communications with anyone

15   from MBO Partners concerning your

16   work with PWC?

17      A.  Yes.

18      Q.  What sort of communication?

19      A.  Calls and e-mails.

20      Q.  Concerning what?

21      A.  The project I was doing for

22   PWC.

23      Q.  The project we talked about

24   before?

25      A.  Yes.
```



MAGNA
LEGAL SERVICES

Page 91

1                    V. VILLETTI

2        Q.   After March of 2018, and the

3    separation from Guidepoint, have you

4    applied for employment positions?

5        A.   No.

6        Q.   Why not?

7        A.   Because I was focused on the

8    startup.

9        Q.   Kioko?

10       A.   Yes.

11       Q.   Do you recall having

12   conversations with Bouker about your

13   job performance?

14       A.   I may have.

15       Q.   And it's your understanding

16   that your performance was great,

17   correct?

18       A.   Yes.

19       Q.   Do you think Bouker would have

20   shared that assessment?

21       A.   I don't know.

22       Q.   Did Albert?

23       A.   Yes.

24       Q.   What conversations did you

25   have with Albert about your -- what



Page 92

```
 1                V. VILLETTI
 2    communications did you have with
 3    Albert about your job performance?
 4        A.  He had relayed positive
 5    feedback to Bouker Pool, and I also
 6    saw him in the office and he said, "I
 7    listened to one of your calls.  Great
 8    job."
 9        Q.  Do you recall what call --
10    what that was?
11        A.  No.
12        Q.  Do you recall when that
13    positive feedback was relayed to you?
14        A.  No.
15        Q.  Do you recall the content of
16    the call that Albert complimented?
17        A.  No.
18        Q.  Any other communications that
19    made their way to you from Albert
20    about your job performance?
21        A.  About my job performance,
22    specifically?
23        Q.  Correct.
24        A.  No.
25        Q.  How many times have you met in
```



Page 93

1                    V. VILLETTI

2   person with Albert?

3        A.  As in, been in a meeting with

4   him?

5        Q.  As in, been in his physical

6   presence?

7        A.  Dozens of times.

8        Q.  How many meeting would you say

9   that constitutes?

10       A.  One or two.

11       Q.  What would you have had

12  in-person meetings with Albert about?

13       A.  Well, one was when I was

14  interviewing.

15       Q.  Did Albert interview you?

16       A.  Yes.

17       Q.  I believe we talked earlier

18  that you had met with Priscilla and

19  Bouker, right?  When you were

20  interviewing?

21       A.  Yeah, also Albert.

22       Q.  Was that the same interview or

23  was there a second round with Albert?

24       A.  I don't remember.  It may have

25  been a second round.



Page 94

                    V. VILLETTI

1

2      Q.   Perhaps, a better way to ask:

3   How many interviews did you have with

4   Guidepoint in your application

5   process?

6      A.   I really don't remember.   One

7   or two.

8      Q.   One included Priscilla and

9   Bouker?

10     A.   Yes.

11     Q.   Was Albert with them?

12     A.   I don't remember.

13     Q.   You may have had another

14  interview with Albert?

15     A.   Yes.

16     Q.   In person?

17     A.   Yes.

18     Q.   Was anyone else present during

19  that interview?

20     A.   No.

21     Q.   Would your interview with

22  Albert have happened after your

23  interview with Priscilla and Bouker?

24     A.   Likely so.

25     Q.   Do you recall when that



Page 95

```
 1                  V. VILLETTI
 2   happened?
 3        A.   No.
 4        Q.   What did you and Albert talk
 5   about during your interview?
 6        A.   My resumé and likely some
 7   healthcare topics.
 8        Q.   And you would've had occasion
 9   to have another meeting with Albert
10   during your employment with
11   Guidepoint?
12        A.   I may have been in another
13   meeting that he was in.
14        Q.   What was the nature of that
15   meeting?
16        A.   I don't remember.
17        Q.   When did that occur?
18        A.   I don't remember.
19        Q.   Who else was in attendance?
20        A.   It would have been a group
21   meeting.
22        Q.   With the healthcare team?
23        A.   And others.
24        Q.   The events team?
25        A.   I don't remember.
```



Page 96

```
                    V. VILLETTI
 1
 2      Q.  Bouker?
 3      A.  Don't remember.
 4      Q.  Other than this meeting and
 5  the interview with Albert, had you
 6  had any other in-person meetings with
 7  Albert?
 8      A.  No other meetings.
 9      Q.  Tell me about the
10  Boston conference.
11      A.  What would you like to know?
12      Q.  What was the topic or topics
13  to be discussed at the Boston
14  conference?
15      A.  I don't remember the
16  specifics.
17      Q.  Do you recall when the -- when
18  I say "Boston conference," you know
19  what I'm talking about right?
20      A.  The Boston Client Meeting.
21      Q.  Alright.  When did this occur?
22      A.  Some time in March.
23      Q.  Of 2018?
24      A.  Yes.
25      Q.  How many client meetings did
```



Page 97

                    V. VILLETTI
1

2    you attend in person when you were at

3    Guidepoint?

4         A.   I don't remember.

5         Q.   One?  two?  dozens?  hundreds?

6         A.   Dozens or less -- a dozen or

7    less.

8         Q.   And I misspoke before if I

9    said conference.  What is the

10   difference between a conference and a

11   client meeting at Guidepoint?

12        A.   I can't speak, generally.  I

13   can speak specifics.

14        Q.   For the healthcare team?

15        A.   So, conference meetings were

16   client meetings with experts that

17   were held adjacent to conferences.

18             So there would be a medical

19   conference and there would be a

20   meeting adjacent to it that we would

21   hold with a number of clients and an

22   advisor.

23             A client meeting would have

24   been be meeting organized

25   independently of any medical



Page 98

```
 1              V. VILLETTI
 2    conference.
 3       Q.  So that was what was to happen
 4    in Boston in March of 2018, was a
 5    client meeting, separate and apart
 6    from a conference with an advisor?
 7       A.  Yes.  This meeting had an
 8    advisor, but it was not related to a
 9    conference.
10       Q.  Okay.  And you worked out of
11    Guidepoint's New York City offices,
12    correct?
13       A.  Yes.
14       Q.  In the dozen or less client
15    meetings that you attended at
16    Guidepoint, how many were outside of
17    New York City?
18       A.  I don't remember.
19       Q.  You attended the one in
20    Boston, though?
21       A.  Yes.  And there were others
22    outside of New York.
23       Q.  That you did attend?
24       A.  Yes.
25       Q.  Outside of New York City or
```



Page 99

1                    V. VILLETTI

2    outside of New York State?

3        A.  New York State.

4        Q.  What states did you travel to

5    attend Guidepoint Client Meetings,

6    other than Massachusetts?

7        A.  I could recall one in

8    California.

9        Q.  And this was also a client

10   meeting?

11       A.  This was a conference.

12       Q.  Okay.  Anywhere else?

13       A.  I don't remember off the top

14   of my head.

15       Q.  Did you have to seek anyone's

16   approval to attend the Boston Client

17   Meeting?

18       A.  I was approached about the

19   Boston Client Meeting.

20       Q.  By who?

21       A.  By a member of the sales team.

22       Q.  That's the same Business

23   Development Team we were talking

24   about before?

25       A.  Yes.


MAGNA
LEGAL SERVICES

Page 100

                    V. VILLETTI

1          Q.  Who on that team approached

2      you?

3          A.  I don't remember his name.

4          Q.  What did you guys talk about

5      concerning the Boston Client Meeting?

6          A.  That they were trying to sign

7      on BlackRock as a client and wanted

8      to have a meeting in Boston to move

9      them.

10         Q.  What is BlackRock?

11         A.  That is a financial

12     institution.

13         Q.  What did you understand your

14     role to be in blooming BlackRock?

15         A.  I was to set up and attend the

16     meeting.

17         Q.  Would this have been something

18     you spoke about with Bouker?

19         A.  Yes, Bouker and Mike

20     Ferrari (phonetic), the head of

21     Business Development, were both

22     aware.

23         Q.  Was Mike Ferrari the

24     business development team member that



1          V. VILLETTI

2    you spoke with or it was someone

3    else?

4        A.  Someone else.

5        Q.  Someone on his team?

6        A.  Yes.

7        Q.  Did Bouker or Mike attend the

8    Boston meeting?

9        A.  No.

10       Q.  Did anyone else from

11   Guidepoint attend the Boston meeting?

12       A.  Yes.

13       Q.  Who?

14       A.  I don't remember.

15       Q.  One person?  more than one?

16       A.  One or two.

17       Q.  Do you recall what teams they

18   represented?

19       A.  I don't remember.

20       Q.  Were you the only one from the

21   Healthcare Content Team?

22       A.  Yes.

23       Q.  Was anyone else from

24   Business Development there?

25       A.  I don't remember.


MAGNA
LEGAL SERVICES

Page 102

                    V. VILLETTI

1

2        Q.   Would you have had to have

3    sort Bouker's authorization to attend

4    the client meeting in Boston?

5        A.   Yes.

6        Q.   Did you?

7        A.   Yes.

8        Q.   And what did Bouker say?

9        A.   "Yes.  Help Mike Ferrari."

10       Q.   Approved?

11       A.   Yes.

12       Q.   At some point in time, you

13   learned that Albert did not want you

14   at the Boston conference; is that

15   correct -- the Boston meeting?

16       A.   Yes.

17       Q.   And how did you learn of that?

18       A.   He called my cell phone that

19   morning.

20       Q.   While you were in Boston?

21       A.   Yes.

22       Q.   How long was the Boston Client

23   Meeting intended to last?

24       A.   Just a day.

25       Q.   So he called you that morning?


MAGNA
LEGAL SERVICES

```
 1                V. VILLETTI
 2      A.  Yes.
 3      Q.  Did you take the call?  Did it
 4  go to voicemail?
 5      A.  I took the call.
 6      Q.  Okay.  And what did Albert say
 7  on that call?
 8      A.  He yelled at me that I should
 9  be in New York and I should leave the
10  meeting as soon as it's over and
11  return to New York.
12      Q.  Had Albert ever called you on
13  your cell phone before?
14      A.  No.
15      Q.  What did you say in response
16  to Albert when he said that you
17  should be in New York and you need to
18  leave the meeting as soon as
19  possible?
20      A.  "Okay."
21      Q.  And did you?
22      A.  Yes.
23      Q.  Had you flown up to Boston or
24  driven?  How did you get there?
25      A.  I don't remember.
```



**MAGNA**
LEGAL SERVICES

Page 104

```
 1                V. VILLETTI
 2     Q.  How did you get home?
 3     A.  I don't remember.
 4     Q.  At Guidepoint, did you need to
 5  submit expense reports for your
 6  traveling?
 7     A.  Yes.
 8     Q.  Did you submit an expense
 9  report for the Boston Client Meeting?
10     A.  I'm sure I did.
11     Q.  Was it paid?
12     A.  Bouker would have approved it.
13     Q.  Do you recall being reimbursed
14  for your expenses for the Boston
15  trip?
16     A.  Yes.
17     Q.  So, Albert says, "You should
18  be in New York.  I want you to leave
19  the Boston meeting as soon as you
20  can."  And you say, "okay".
21         Did you have any other
22  conversations with Albert about the
23  Boston Client Meeting?
24     A.  Beyond the phone call?
25     Q.  Yes.
```



Page 105

```
 1                V. VILLETTI
 2      A.   No.
 3      Q.   E-mail?
 4      A.   Yes.
 5      Q.   What did you say to Albert by
 6   e-mail?
 7      A.   He repeated what he had said
 8   on the phone, and I said, "okay".
 9      Q.   In the call or the e-mail, did
10   Albert explain why you should be in
11   New York City and that you needed to
12   leave the Boston meeting?
13      A.   I don't recall.
14      Q.   Did you share with Albert that
15   you had talks with Business
16   Development and Bouker about you
17   attending the Boston meeting?
18      A.   Yes.
19      Q.   And what did you tell him?
20      A.   That the trip had been
21   approved.
22      Q.   What was Albert's response to
23   that?
24      A.   I don't remember.
25      Q.   You mentioned another trip to
```



Page 106

```
 1              V. VILLETTI
 2   California, correct?
 3      A.  Yes.
 4      Q.  And that was for a conference?
 5      A.  Yes.
 6      Q.  Would you have had to seek
 7   anyone's approval to attend that
 8   conference?
 9      A.  Bouker Pool.
10      Q.  I'm assuming you flew to
11   California?
12      A.  Yes.
13      Q.  When did the California
14   conference occur, in relation to the
15   Boston meeting?
16      A.  Before.
17      Q.  Do you recall when it
18   occurred?
19      A.  No.
20      Q.  Did you have any conversations
21   with Albert about your attendance at
22   the California conference?
23      A.  No.
24      Q.  What was the nature of the
25   California conference?
```



```
 1                  V. VILLETTI
 2      A.  I don't remember.
 3      Q.  Are you seeking reinstatement
 4  with Guidepoint?
 5      A.  Yes.
 6      Q.  Why?
 7      A.  I like my job and I'm good at
 8  it.
 9      Q.  Who is running the
10  Healthcare Content Team now?
11      A.  I believe Rutwik.
12      Q.  So you would want to go back
13  and work with Rutwik?
14      A.  Yes.
15      Q.  And you would want to go back
16  and work for Albert?
17      A.  Yes.
18          MR. GRECH:  It's 12:00
19      now.  I could keep going, but
20      if anyone needs a break -- a
21      five-minute break?
22          MR. LICHTEN:  How much
23      longer do you think you have?
24          MR. GRECH:  Until 2:00.
25          MR. LICHTEN:  So I think w
```



MAGNA
LEGAL SERVICES

Page 108

```
                    V. VILLETTI
 1
 2        should just go now, right?  Do
 3        you need a break?
 4             THE WITNESS:  No.
 5             MS. SMITH:  I need a
 6        break.
 7             MR. GRECH:  Okay.  Let's
 8        take five minutes.
 9             (Whereupon, a recess was
10        taken at this time.)
11             MR. GRECH:  Can you read
12        back the last question and
13        answer, please?
14             (Whereupon, the record was
15        read by the reporter.)
16        Q.  Ms. Villetti, have you
17   experienced hostile work environments
18   in any of your other places of
19   employment?
20        A.  No.
21        Q.  Any gender discrimination in
22   any of your other places of
23   employment?
24        A.  No.
25        Q.  Have you ever commenced a
```



```
 1              V. VILLETTI
 2    litigation against a prior employer?
 3      A.  No.
 4      Q.  As cofounder of Kioko, do you
 5    have, say, an ownership interest in
 6    the company?
 7      A.  Yes.
 8      Q.  Do you earn a portion of
 9    profits?
10      A.  There are no profits, but yes.
11      Q.  Just asking, how are you
12    supporting yourself in the time
13    period between the Guidepoint
14    separation and to date?
15      A.  Savings.
16      Q.  We talked about Justin Rouise
17    before, remember?
18      A.  Yes.
19      Q.  Did he work with Rutwik?
20      A.  I don't know.
21      Q.  Did you have talks with Justin
22    about Rutwik?
23      A.  Possibly.
24      Q.  What would you have talked
25    about?
```



MAGNA
LEGAL SERVICES

Page 110

```
 1              V. VILLETTI
 2      A.  His behavior and demeanor.
 3      Q.  Rutwik's yelling and calling
 4   people and menacing behaviors?
 5      A.  Yes.
 6      Q.  And you spoke about that with
 7   Justin?
 8      A.  Perhaps, yes.
 9      Q.  Did Justin have a similar
10   impression of Rutwik?
11      A.  I don't know.
12      Q.  Did Justin tell you he was --
13   that Rutwik was doing the same things
14   to him?
15      A.  I don't recall.
16      Q.  And, again, what was Justin's
17   title at Guidepoint?
18      A.  I don't know.
19      Q.  Would he have reported to
20   Bouker?
21      A.  Yes.
22      Q.  So when Bouker says, I'm
23   complaining on behalf of my team, is
24   he also complaining on behalf of
25   Justin?
```



```
 1              V. VILLETTI
 2     A.  I don't know.
 3     Q.  But you understood Bouker's
 4  complains to be on behalf of his
 5  team, correct?
 6     A.  Yes.
 7     Q.  And his team would have been
 8  you?
 9     A.  Yes.
10     Q.  And maybe at that time
11  Ms. Yamin?
12     A.  No.  Ms. Yamin was gone.
13     Q.  Gone?  Okay.  On behalf of the
14  events and logistics team?
15     A.  Yes.
16     Q.  And on behalf of Justin?
17     A.  I don't know, but, yes,
18  likely.
19     Q.  Were there any other
20  individuals or teams that Bouker
21  would have been responsible for?
22     A.  I don't believe so.
23     Q.  Any male members of the
24  events/logistics team at the time?
25     A.  No.
```



Page 112

```
 1              V. VILLETTI
 2      Q.  What did Justin do?
 3      A.  He produced content for other
 4   sectors, including consumer and tech.
 5      Q.  So is there a consumer
 6   contents team or is there just an
 7   other content team at your time
 8   there?
 9      A.  There was one content team.
10   People just covered different
11   verticals.
12      Q.  Was there a vertical for
13   consumer and tech or was there
14   healthcare and then everything else?
15      A.  I don't know.
16      Q.  Do you know if Guidepoint
17   consulted with any members of your
18   team, prior to termination?
19      A.  I don't know.
20      Q.  Did anyone consult with you,
21   prior to Guidepoint separating from
22   Bouker?
23      A.  No.  I don't remember.
24      Q.  When did Bouker separate from
25   Guidepoint?
```



Page 113

```
 1                    V. VILLETTI
 2      A.   The same day I did.
 3      Q.   Do you know if anyone else was
 4  consulted regarding Bouker's
 5  termination?
 6      A.   I don't know.
 7      Q.   Who terminated Bouker?
 8      A.   I believe Albert.
 9      Q.   And who made the decision to
10  terminate your employment with
11  Guidepoint?
12      A.   I was told about the decision
13  by Priscilla.   I don't know who made
14  the decision.
15      Q.   How did Priscilla tell you
16  about that decision?
17      A.   She called me into her office.
18      Q.   When did this occur?
19      A.   I don't remember the exact
20  date.
21      Q.   After your e-mail to
22  Priscilla?
23      A.   Yes.
24      Q.   After your meeting with
25  Priscilla about your e-mail?
```



Page 114

                    V. VILLETTI

1

2      A.  Yes.

3      Q.  Some time in March of 2018?

4      A.  Likely, yes.

5      Q.  What did you and Priscilla

6  talk about during that meeting?

7      A.  We talked about the sex

8  discrimination that I was observing

9  at Guidepoint.

10     Q.  Was this in the meeting in

11  which she conveyed the decision to

12  terminate?

13     A.  No.

14     Q.  So you had sent Priscilla an

15  e-mail?

16     A.  Yes.

17     Q.  And you had a meeting with

18  Priscilla about the e-mail?

19     A.  Yes.

20     Q.  Some time after that,

21  Priscilla calls you in that office?

22     A.  A few days after, yes.

23     Q.  So in that meeting a few days

24  after, what did you and Priscilla

25  talk about?



```
 1                    V. VILLETTI
 2        A.  She simply relayed that I was
 3   being terminated.
 4        Q.  Do you have an Employment
 5   Contract with Guidepoint?
 6        A.  I believe I did.
 7        Q.  Did you understand that to be
 8   at-will employment?
 9        A.  Yes.
10        Q.  Did Priscilla share with you
11   any reasons for the termination?
12        A.  I don't remember.
13        Q.  Did you ask her why you were
14   being terminated?
15        A.  I may have.
16        Q.  What did you ask her?
17        A.  I don't remember.
18        Q.  Did Priscilla give you an idea
19   of when your last, effective date of
20   employment would be?
21        A.  I believe it was that day.
22        Q.  Do you recall what day of the
23   week that was?
24        A.  No.
25        Q.  How were you paid by
```



Page 116

                        V. VILLETTI

1                        V. VILLETTI

2     Guidepoint?  Was it every two weeks?

3     once a month?

4         A.  I believe every two weeks,

5     direct deposit.

6         Q.  Were you paid for all the work

7     that you had done for Guidepoint?

8         A.  Yes.

9         Q.  Did you discuss anything else

10    with Priscilla in that meeting?

11        A.  Which meeting?

12        Q.  The meeting in which you were

13    terminated.

14        A.  No.  She said it had been a

15    pleasure to work with me.

16        Q.  What did you do after you had

17    this meeting with Priscilla?

18        A.  I believe it was at the end of

19    the day, so I packed my stuff and

20    left.

21        Q.  Did you talk about this with

22    Bouker?

23            MR. LICHTEN:  That day?

24            MR. GRECH:  Fair.

25        Q.  After your meeting with



                    V. VILLETTI

1

2   Priscilla, the end of the day you

3   packed up.  That day, did you speak

4   with Bouker?

5       A.  I don't think so.

6       Q.  Did there come a point in time

7   that you did speak with Bouker about

8   your termination?

9       A.  I believe I called him maybe a

10  few weeks after.

11      Q.  That was the first time you

12  spoke to Bouker about your

13  termination?

14      A.  Yes.

15      Q.  And he had already been

16  terminated at that point, as well?

17      A.  We were terminated

18  simultaneously.

19      Q.  Right.  So when did you learn

20  that Bouker had also been terminated?

21      A.  When I walked back to my desk

22  to pack my things, Justin had

23  informed me that Bouker had also been

24  terminated.

25      Q.  Did you talk with Justin about



Page 118

                        V. VILLETTI
1
2    your termination?
3        A.   Not in detail, no.
4        Q.   What did you talk about with
5    Justin?
6        A.   That day?
7        Q.   About your termination that
8    day, yes.
9        A.   I just told him that I've been
10   terminated.
11       Q.   What did he say?
12       A.   "That is awful."
13       Q.   Did Justin give you a reason
14   or his understanding of the reason
15   why Bouker was terminated?
16       A.   No.
17       Q.   And you mentioned you had a
18   desk in Guidepoint's office?
19       A.   Yes.
20       Q.   Did Justin also have a desk?
21       A.   Yes.
22       Q.   Was it near yours?
23       A.   Yes.
24       Q.   Was it near Bouker's?
25       A.   Yes.



```
1              V. VILLETTI
2         Q.   Other than Justin that day,
3    did you speak with anyone else at
4    Guidepoint about your termination?
5         A.   No.
6         Q.   Between that day and your talk
7    with Bouker a few weeks later, did
8    you speak with anyone else at
9    Guidepoint about your termination?
10        A.   No.
11        Q.   And I'm sorry, you called
12   Bouker or he called you?
13        A.   I don't remember.
14        Q.   You guys spoke on the phone a
15   few weeks after you were both
16   terminated?
17        A.   Yes.
18        Q.   And what did you talk about?
19        A.   Just that we've both been
20   terminated and asked him how he was
21   doing.
22        Q.   Okay.  Did Bouker share with
23   you any reasons why he felt he was
24   terminated?
25        A.   Yes.   He was terminated in
```



Page 120

```
                    V. VILLETTI
 1
 2    retaliation for the letter he
 3    submitted under the Discrimination
 4    and Harassment Policy at Guidepoint.
 5        Q.  Bouker said that to you in
 6    this conversation?
 7        A.  I was aware of the letter,
 8    yes.
 9        Q.  Bouker said, "I was fired in
10    retaliation from my letter"?
11        A.  Yes.
12        Q.  Did you talk with Bouker about
13    the reasons you felt you were
14    terminated?
15        A.  I believe so, yes.
16        Q.  What did you share those
17    reasons -- what were those reasons
18    that you shared with Bouker?
19        A.  That I had filed a complaint
20    about sex-based discrimination at
21    Guidepoint and because I'm a woman.
22        Q.  Did Bouker sue Guidepoint?
23        A.  I don't know.
24           MR. GRECH:  Off the record
25        for a second, please.
```



Page 121

1              V. VILLETTI

2          (Whereupon, a discussion was

3      held off the record.)

4      Q.  Ms. Villetti, had you ever

5  complained about Bouker Pool to

6  Guidepoint?

7      A.  Yes.

8      Q.  What was the nature of that

9  complaint?

10      A.  He had long absences from the

11  office.

12      Q.  Did you have a set schedule at

13  Guidepoint, when you were expected to

14  be in the office?

15      A.  Yes.

16      Q.  What was that schedule?

17      A.  I don't remember the

18  specifics.

19      Q.  You were Monday through

20  Friday?

21      A.  Yes.

22      Q.  9:00 to 5:00?  10:00 to 6:00?

23      A.  Something along those lines.

24      Q.  And I'm sure because of the

25  type of work that you did, you would



Page 122

```
 1                V. VILLETTI
 2    have work outside of those hours too,
 3    as well?
 4        A.  Lots of work outside those
 5    hours.
 6        Q.  You're not collecting overtime
 7    at Guidepoint?
 8        A.  No.
 9        Q.  What were -- what hours were
10    Bouker -- during which hours was
11    Bouker expected to be at Guidepoint?
12        A.  I don't know.
13        Q.  But you observed his long
14    absences from the office?
15        A.  Yes.
16        Q.  And why was that of certain?
17        A.  What do you mean?
18        Q.  You had made a complaint about
19    it?
20        A.  Yes.
21        Q.  To whom?
22        A.  To Priscilla and to
23    John Campanella (phonetic) who is
24    CFO.
25        Q.  And Priscilla is HR that we
```



```
1                    V. VILLETTI
2    talked about before?
3        A.  Yes.
4        Q.  How did you make this
5    complaint about Bouker to Priscilla
6    and John?
7        A.  In, mostly, verbal
8    discussions.
9        Q.  When did these discussions
10   occur?
11       A.  I don't remember.
12       Q.  What did you tell them?
13       A.  That Bouker was frequently
14   absent in the office and he had long
15   vacations.
16       Q.  Did you take vacations when
17   were you at Guidepoint?
18       A.  I don't recall doing so.  I
19   may have.
20       Q.  I'm assuming the point here
21   was that Bouker's absence was
22   affecting your work; is that correct?
23       A.  Affecting the teams work.
24       Q.  How so?
25       A.  The team was lacking
```



Page 124

```
1                V. VILLETTI
2    leadership.
3       Q.  Who was on the team at the
4    time of Bouker's extended absence?
5       A.  Myself, Justin Rouise,
6    Jessica, and then Kendall, Gabby,
7    Sara and Amrutha.
8       Q.  So we're talking content and
9    we're talking logistics?
10      A.  Yes.
11      Q.  And Justin would have fallen
12   under the contents team, although not
13   healthcare?
14      A.  Yes.
15      Q.  Did you have talks with any of
16   those other team members about
17   Bouker's long absences?
18      A.  Justin.
19      Q.  What did you talk about with
20   Justin concerning Bouker's absences?
21      A.  That it was not great for the
22   team.
23      Q.  Did you have any other reason
24   to complain about Bouker to Priscilla
25   and John, other than this attendance
```



Page 125

```
 1                    V. VILLETTI
 2   and absence issue?
 3      A.  I don't remember.
 4      Q.  Did you complain about Bouker
 5   to anyone else at Guidepoint for any
 6   other reason?
 7      A.  I don't remember.
 8      Q.  What, if anything, did
 9   Priscilla and John say to you in
10   response to this complaint about
11   Bouker's long absences?
12      A.  I don't recall.
13      Q.  Do you recall any changes in
14   Bouker's attendance after this
15   meeting or this conversation?
16      A.  I don't believe so.
17      Q.  Do you recall Bouker's
18   attendance being affected by these
19   long absences through, say, March of
20   2018?
21      A.  Yes.
22      Q.  Did you confer with Bouker
23   about work-related issues while he
24   was on these long absences?
25      A.  I would say, we tried to get a
```



Page 126

```
 1              V. VILLETTI
 2    hold of him.
 3        Q.  You tried, meaning it was not
 4    always successfully?
 5        A.  Yes.
 6        Q.  Was he supposed to be
 7    available to you by cell phone or
 8    e-mail?
 9        A.  He had expressed that he would
10    try to be available, but he was
11    sometimes off the grid.
12        Q.  On how many occasions do you
13    recall Bouker being off the grid?
14        A.  Several occasions.
15        Q.  While at Guidepoint, were you
16    excepted to maintain a call schedule?
17        A.  What do you mean?
18        Q.  How did you reach out to
19    potential clients?
20        A.  How did I reach out to
21    clients?
22        Q.  Yes.  Was there an expectation
23    that you made a certain number of
24    calls or certain number of e-mails
25    per day?
```



V. VILLETTI

1

2    A.   There was no certain number or

3    metric, no.

4    Q.   Would you have had a call

5    scheduled with Guidepoint that Bouker

6    managed for you?

7    A.   The calls went into a schedule

8    as we scheduled them, which was then

9    communicated with the clients, so we

10   can RSVP.

11   Q.   Was Bouker responsible for

12   managing that call schedule or did it

13   sort of just happen on its own?

14   A.   We had weekly meetings where

15   we discussed what everyone was doing.

16   Q.   And who had these weekly

17   meetings?

18   A.   The logistics and contents

19   team.

20   Q.   So Bouker is running these

21   meetings?

22   A.   Yes.

23   Q.   What did you discuss about the

24   calls or call scheduling during these

25   meeting?



Page 128

                    V. VILLETTI

1

2       A.   We discussed potential topics,

3   potential advisors, the scheduling

4   timeframe, and who would be assigned

5   to cover them from the logistics

6   team.

7       Q.   We had talked about your

8   e-mail to Priscilla about Rutwik and

9   the hostile work environment.  Have

10  you made any other complaints about

11  similar matters while you were at

12  Guidepoint?

13      A.   About Rutwik or about --

14      Q.   Let's start with Rutwik.  Have

15  you made any other complaints about

16  Rutwik, other than your e-mail to

17  Priscilla?

18      A.   Yes.

19      Q.   And what was that?  How was

20  that complaint made?

21      A.   I had verbally complained to

22  Bouker Pool and to Priscilla.

23      Q.   Was this before or after your

24  e-mail to Priscilla about Rutwik?

25      A.   Before.


MAGNA
LEGAL SERVICES

1               V. VILLETTI

2       Q.   And this was to Bouker and

3    Priscilla together or separate?

4       A.   Separate.

5       Q.   Was there anyone else that you

6    made verbal complaints about Rutwik

7    to?

8       A.   We had discussions about him

9    in the team.

10      Q.   Would Rutwik attend the team

11   meetings?

12      A.   Not generally, no.

13      Q.   On occasion, he would?

14      A.   He may have sat in one or two.

15      Q.   Probably not the ones you were

16   complaining about him, though?

17      A.   Likely not.

18      Q.   What did you explain in

19   conversation to Bouker and Priscilla

20   about Rutwik and your concerns with

21   him?

22      A.   That his role was unclear and

23   that he seemed to overstep

24   boundaries, frequently.

25      Q.   What sort of boundaries would



Page 130

                    V. VILLETTI

1
2    Rutwik overstep?
3        A.   Boundaries of professional
4    conduct and his role as an advisor,
5    not as a manager.
6        Q.   What, if anything, did Bouker
7    or Priscilla say to you in these
8    conversations about Rutwik?
9        A.   Bouker agreed.  I don't recall
10   what the conversation with Priscilla
11   would have been.  Likely, that she
12   would look into it.
13       Q.   And these would have been
14   separate conversations with Bouker,
15   separate from Priscilla about Rutwik?
16       A.   Yes.
17       Q.   Did you ever speak to Rutwik,
18   himself, about this behavior of
19   overstepping boundaries?
20       A.   Yes.
21       Q.   How did you have those
22   communications with Rutwik?
23       A.   I politely voiced by concerns
24   both by e-mail and in person.
25       Q.   To Rutwik?



Page 131

1                    V. VILLETTI

2      A.  Yes.

3      Q.  Do you recall when you would

4  have spoken to Rutwik in person about

5  your concerns about his behavior?

6      A.  I don't exactly know.

7      Q.  On how many occasions would

8  you have spoken to Rutwik about this

9  issue?

10     A.  Two or three times, at least.

11     Q.  And you also sent him e-mails

12  about this issue?

13     A.  Yes, I consider that a part of

14  the two to three times.

15     Q.  Okay.  So two to three total

16  in-person conversations and e-mails?

17     A.  Yes.

18     Q.  Do you recall when you would

19  have sent an e-mail to Rutwik?

20     A.  I don't remember, exactly.

21     Q.  Would this have been e-mailed

22  directly to Rutwik or copied to

23  someone else?

24     A.  Directly to Rutwik.

25     Q.  Speaking first about the



Page 132

```
                    V. VILLETTI
 1
 2    in-person meetings, what was Rutwik's
 3    response when you raised these
 4    concerns with him?
 5      A.  He said that he was the boss
 6    of me and everyone else there.
 7      Q.  Okay.  Did he say anything
 8    else?
 9      A.  I am to do what he tells me to
10    bleeping do, when he tells me to
11    bleeping do it.
12      Q.  Does the bleeping start with
13    an F?
14      A.  Yes.
15      Q.  Would Rutwik often speak in
16    profanities in the office?
17      A.  When he lost his temper.
18      Q.  How often would Rutwik lose
19    his temper?
20      A.  I don't know.
21      Q.  Did he lose it with you?
22      A.  Yes.
23      Q.  On what occasions?
24      A.  On several occasions.
25      Q.  Had he used profane language
```



MAGNA
LEGAL SERVICES

Page 133

```
 1                 V. VILLETTI
 2    with you, other than this instance
 3    that we've just talked about?
 4        A.  He may have.
 5        Q.  Do you recall when?
 6        A.  No.
 7        Q.  In what circumstance?
 8        A.  In-person conversations.
 9        Q.  And so the communication that
10    he was the boss of you and everyone
11    and you were to do what he bleeping
12    says, that was in person?
13        A.  Yes.
14        Q.  Okay.  And what was your
15    response to that?
16        A.  I believe I was in shock, so
17    I'm not sure what I responded.
18        Q.  After Rutwik had made that
19    communication to you, did you follow
20    up with anyone about your concerns
21    with his role and seeking clarity on
22    that?
23        A.  Yes.
24        Q.  Who did you speak with?
25        A.  Bouker.
```



Page 134

```
              V. VILLETTI
```

1                V. VILLETTI

2      Q.   And what did you and Bouker

3    talk about concerning Rutwik's role?

4      A.   That neither of us really knew

5    what he was doing there.

6      Q.   Did Bouker tell you he would

7    look into it?  What was supposed to

8    be the next steps with that concern?

9      A.   I imagine so.

10     Q.   You imagine that he would have

11   said that?

12     A.   I imagine he would have looked

13   into it.

14     Q.   And it's your understanding

15   that Rutwik is still at Guidepoint

16   today?

17     A.   Yes.

18     Q.   Okay.  So we have talked about

19   some complaints about Rutwik.  Let's

20   now focus about, sort of, other

21   component of your complaint to

22   Priscilla in the e-mail, which was

23   hostile work environment or maybe

24   even gender-based discrimination.

25          Did you have any other



Page 135

                    V. VILLETTI

1
2    complaints of gender-based
3    discrimination while at Guidepoint?
4        A.   What do you mean?
5        Q.   In your e-mail to Priscilla,
6    you spoke about the treatment of the
7    play on maternity leave, you talked
8    about termination, and you talked
9    about Dr. Jibril?
10       A.   Yes.
11       Q.   Prior to that, had you voiced
12   any gender-based discrimination
13   complaints to anyone at Guidepoint?
14       A.   Yes, to Bouker Pool.
15       Q.   Okay.  And when did you do
16   that?
17       A.   I did it when each of those
18   incidents occurred.  I complained
19   when Jessica was on maternity leave
20   and they did what they did -- when
21   Guidepoint what they did.
22            I complained when they fired
23   Ashlee.  And I complained when they
24   wouldn't allow me to hirer
25   Dr. Jibril.



**MAGNA ›**
LEGAL SERVICES

Page 136

                    V. VILLETTI

1

2      Q.  So you made these complaints,

3    sort of, contemporaneously to Bouker?

4      A.  Yes.

5      Q.  All right.  Let's talk about

6    Jessica first:  What was Bouker's

7    response when you voiced your

8    concerns about Jessica?

9      A.  That he agreed.

10     Q.  With what?

11     A.  With the fact that she was

12   being mistreated because she was on

13   maternity leave.

14     Q.  And did Bouker tell you he

15   would take any steps after you shared

16   that complaint with him --

17     A.  I don't remember.

18     Q.  -- concerning Jessica?

19     A.  I don't remember.

20     Q.  Well, Jessica came back,

21   right?

22     A.  She did.

23     Q.  Then she was still on a team

24   that reported to Bouker?

25     A.  Yes.



```
 1              V. VILLETTI

 2      Q.  Did she experience any

 3  decrease in compensation that you are

 4  aware of?

 5      A.  I heard that she had not been

 6  given her bonus or it had been

 7  reduced.

 8      Q.  And you talked with Bouker

 9  about your concerns about Ashlee?

10      A.  Yes.

11      Q.  What was his response to those

12  concerns?

13      A.  That it was entirely Albert's

14  decision.

15      Q.  To terminate Ashlee?

16      A.  In each of those instances.

17      Q.  So stepping back, it was

18  Albert's -- Bouker told you that it

19  was Albert's decision to demote

20  Jessica?

21      A.  Yes, he was in meetings when

22  that was discussed.

23      Q.  Bouker was in meetings,

24  presumingly, with Albert when this

25  was discussed?
```



Page 138

```
 1              V. VILLETTI
 2      A.  Yes.
 3      Q.  And Bouker also shared with
 4   you that it was Albert's decision to
 5   terminate Ashlee?
 6      A.  Yes.
 7      Q.  Did Bouker share with you
 8   Albert's reasons?
 9      A.  They told me I was to take
10   over everything from Ashlee.  That is
11   all I knew.
12      Q.  So when you had spoken to
13   Bouker about your concerns about
14   Ashlee's termination, one of Bouker's
15   responses to you was that you were
16   going to take over Ashlee's work; is
17   that correct?
18      A.  Yes.  They said that they
19   would fire her as soon as I was ready
20   to take over everything, and I voiced
21   a great discomfort with that.
22      Q.  Who told you that they were
23   going to fire Ashlee as soon as you
24   were ready?
25      A.  Bouker Pool.
```



Page 139

V. VILLETTI

1

2      Q.   And Bouker said they would

3  fire Ashlee as soon as you were

4  ready?

5      A.   Yes.  Albert would fire Ashlee

6  as soon as I was ready to take over.

7      Q.   Did you understand what they

8  meant by "ready to take over"?

9      A.   Yes.

10      Q.   What was your understanding?

11      A.   That I had a good grasp on the

12  conferences and teleconferences, part

13  of what she was handling when I got

14  there.

15      Q.   When did you feel you required

16  that good grasp?

17      A.   A few months after I got

18  there.

19      Q.   And when was Ashlee let go?

20      A.   I believe in December.

21      Q.   Around the holidays, right,

22  you had said?

23      A.   Yes.

24      Q.   And you also spoke with Bouker

25  about your concerns about Dr. Jibril?



Page 140

```
               V. VILLETTI
 1
 2      A.  Yes.
 3      Q.  And it was your belief that an
 4  offer was not extended because of
 5  Dr. Jibril's gender?
 6      A.  Yes.
 7      Q.  And you shared that with
 8  Bouker?
 9      A.  Yes.
10      Q.  And what did Bouker say?
11      A.  He agreed with that
12  assessment.
13      Q.  Based upon what you said
14  before, I'm assuming Bouker also said
15  that it was Albert's decision not to
16  hire Dr. Jibril?
17      A.  Correct.
18      Q.  What else, if anything, did
19  Bouker say at that time about the
20  decision not to hire Dr. Jibril?
21      A.  That he was upset about the
22  decision.
23      Q.  Bouker was upset?
24      A.  Yes, because Dr. Jibril would
25  have made a fantastic addition to the
```



1                    V. VILLETTI

2    team.

3         Q.   Who coined the term "hedge

4    fund guy"?  Was that a Bouker term?

5         A.   Albert term.

6         Q.   That's an Albert term?   Does

7    Albert use that term with you about

8    describing people?

9         A.   I haven't had that

10   conversation with him.   It was

11   discussed with Bouker Pool.

12        Q.   That Albert would describe

13   certain people as or not a hedge fund

14   guy?

15        A.   Yes.

16        Q.   So you spoke with Bouker about

17   your concerns about Jessica, Ashlee,

18   and Dr. Jibril?

19        A.   Yes.

20        Q.   Did you speak with anyone else

21   about those concerns, other than

22   Bouker?

23        A.   With Justin.

24        Q.   Okay.  About those three

25   instances, you spoke about it with



Page 142

                    V. VILLETTI

1

2    Justin?

3        A.   I believe so, yes.

4        Q.   Okay.   And when did you speak

5    with Justin?   Let's take Jessica

6    first.

7        A.   When it was occurring.

8        Q.   Okay.   When she was out on

9    leave?

10       A.   Yes.

11       Q.   How was that communication

12   made known to you when Ashlee [sic]

13   was out on leave when she would be

14   demoted on her maternity?

15       A.   Jessica.

16       Q.   Jessica told you?

17       A.   No, you're mixing up Jessica

18   and Ashlee.

19       Q.   Oh, I'm sorry.   How was the

20   communication made known to you that

21   Jessica would be demoted when Jessica

22   was out?

23       A.   Bouker Pool communicated that.

24       Q.   And around that time, you had

25   a conversation with Justin?



1                    V. VILLETTI

2      A.   Yes.

3      Q.   Okay.   What did you and Justin

4  talk about concerning Jessica?

5      A.   That we were uneasy with how

6  they were handling that.

7      Q.   And Justin was also uneasy?

8      A.   I believe so.

9      Q.   Did you share with him your

10  impression that this was because

11  Jessica was on maternity leave?

12      A.   It was clear that it was

13  because Jessica was on

14  maternity leave.

15      Q.   And you made that clear

16  assumption known to Justin?

17      A.   Yes.

18      Q.   Did he share that assumption?

19      A.   Yes.   It was relayed by Bouker

20  that that was the reason.

21      Q.   Bouker believed that Jessica

22  was demoted because she took

23  maternity leave?

24      A.   Bouker heard that from Albert.

25      Q.   Other than Jessica, how many



Page 144

```
 1            V. VILLETTI
 2    employees went out on maternity leave
 3    while you were at Guidepoint?
 4        A.  There was also someone named
 5    Alyssa (phonetic), I believe, or
 6    Alisa (phonetic).  She was doing
 7    PR market work for Guidepoint.
 8        Q.  And you worked for Guidepoint
 9    around the same time as Alyssa or
10    Alisa?
11        A.  Yes.
12        Q.  And you understand that she
13    went out on maternity leave?
14        A.  Yes.
15        Q.  Did she come back?
16        A.  She did and then left.
17        Q.  Does Jessica still work for
18    Guidepoint?
19        A.  I don't believe so.  I think
20    she left shortly after we did.
21        Q.  "We" meaning you and Bouker?
22        A.  Correct.
23        Q.  Did you have any conversations
24    with Jessica about her maternity
25    leave and demotion?
```



MAGNA
LEGAL SERVICES

```
 1                  V. VILLETTI
 2        A.  No.  We had very little time
 3   in person.
 4        Q.  And why was that?
 5        A.  She was mostly working
 6   remotely.  I believe she was in
 7   Philadelphia, where her husband was.
 8   So she would come to the office one
 9   day or two days a week.
10        Q.  Did you have occasion to work
11   with Alyssa or Alisa?
12        A.  We met a couple of times.
13        Q.  What was your impression of
14   her?
15        A.  What do you mean?
16        Q.  In Guidepoint.
17        A.  Her impression?
18        Q.  What was your impression?  She
19   was in the PR department?
20        A.  Yes.
21        Q.  And you met her a few times?
22        A.  Yes.
23        Q.  What was your impression about
24   her?
25        A.  She was smart, competent, good
```



Page 146

```
 1              V. VILLETTI
 2    at her job.
 3       Q.  Would there have been a
 4    PR team or PR Department that Alyssa
 5    or Alisa reported to?
 6       A.  I believe she was in charge of
 7    PR, and there were others reporting
 8    to her.
 9       Q.  And you also spoke with Justin
10    about -- I'm going to try to get it
11    right -- about Ashlee, right?
12       A.  Yes.
13       Q.  About Ashlee's termination?
14       A.  Yes.
15       Q.  And it was your belief that
16    Ashlee was terminated because of her
17    gender?
18       A.  Yes.
19       Q.  And you shared that with
20    Justin?
21       A.  Yes.
22       Q.  What was his response?
23       A.  I believe he agreed.
24       Q.  And you also spoke with Justin
25    about Dr. Jibril?
```



Page 147

1                    V. VILLETTI

2        A.  Yes.

3        Q.  Justin interviewed Dr. Jibril,

4    right?

5        A.  Yes.

6        Q.  And you shared your concerns

7    with Justin that Dr. Jibril -- that

8    an offer was not extended to

9    Dr. Jibril because of her gender?

10       A.  Yes.

11       Q.  What was Justin's opinion?

12       A.  He agreed.

13       Q.  Does Justin still work for

14   Guidepoint?

15       A.  I believe so.

16       Q.  Okay.  So you've had

17   conversations with Bouker and Justin

18   about your concerns of

19   gender discrimination.  Did you speak

20   with anyone else?

21       A.  I don't remember.  I may have.

22       Q.  Was there a reporting

23   procedure at Guidepoint about

24   discrimination complaints?

25       A.  I'm sure there was.



Page 148

                    V. VILLETTI

1

2      Q.  Was there an employee manual

3   policy?

4      A.  Yes.

5      Q.  Did you receive a copy of it?

6      A.  I believe so.

7      Q.  Do you recall anything in

8   there about the reporting procedures

9   for discrimination complaint?

10     A.  I don't remember.

11     Q.  Can you tell me what buy-side

12  or sell-side experience is in your

13  field, in the healthcare field?

14     A.  The buy-side manages money and

15  the sell-side does not.

16     Q.  Was either one of those

17  buy-side or sell-side experience a

18  requirement for the position you were

19  looking to put Dr. Jibril in?

20     A.  I believe it was preferred,

21  but not required.

22     Q.  Which experience?

23     A.  Either.

24     Q.  Was there a job description

25  for the position that Dr. Jibril was



1                V. VILLETTI

2    going to fill?

3        A.   I believe so.

4        Q.   Did you have a role in

5    drafting the job description?

6        A.   I believe so.

7        Q.   And it's your recollection

8    that it was a preference for either

9    buy-side or sell-side experience?

10       A.   Yes, a preference, not a

11   requirement.

12       Q.   Did you speak with Dr. Jibril

13   about buy-side or sell-side

14   experience?

15       A.   Likely so.

16       Q.   At her interview did

17   Dr. Jibril have either?

18       A.   She did not.

19       Q.   I believe we spoke earlier

20   about hires to fill the position that

21   you had wanted for Dr. Jibril,

22   correct?

23       A.   Yes.

24       Q.   And there were multiple hires?

25       A.   I believe so.



Page 150

                    V. VILLETTI

1

2      Q.  Did they have buy-side or

3   sell-side experience?

4      A.  I believe so, but I'm not

5   sure.

6      Q.  When would those hires have

7   been made?

8      A.  After Bouker and I had left.

9      Q.  So how is it that you know the

10  experience about the hires post your

11  termination?

12     A.  I had looked at the website.

13     Q.  You are seeking monetary

14  damages from Guidepoint; is that

15  correct?

16     A.  That is correct.

17     Q.  What amount?

18     A.  It is my backpay.

19     Q.  What do you understand the

20  amount of your backpay of the claim

21  to be?

22     A.  My salary, plus bonus.

23     Q.  Running from what period of

24  time?

25     A.  From the time I was hired



Page 151

1               V. VILLETTI

2    until now.

3        Q.   And do you have a sense of

4    what that amount might be?

5        A.   I don't off the top of my

6    head.

7        Q.   Okay.

8             MR. GRECH:  I need to take

9         a five minute break to find a

10        document.

11            MR. LICHTEN:  Okay.

12            (Whereupon, a recess was

13        taken at this time.)

14            MR. GRECH:  Can you mark

15        that as Defendant's Exhibit A,

16        please.

17            (Whereupon, Defendant

18        Guidepoint Global, LLC's First

19        Set of Interrogatories was marked

20        as  Defendant's Exhibit A for

21        identification as of this date.)

22        Q.  Ms. Villetti, we're showing

23    you what's been marked as Defendant's

24    Exhibit A. (Handing)

25        A.  Okay.



Page 152

                    V. VILLETTI

1

2      Q.  If you could take a moment to

3   look at that document, which I will

4   represent to you is Defendant's First

5   Set of Interrogatories to Plaintiff

6   in this action.

7      A.  Okay.

8      Q.  Have you had the chance to

9   look at the document?

10     A.  This document?

11     Q.  Yes.

12     A.  Have I seen it before?

13     Q.  That's a great question.  Have

14  you ever seen that document before?

15     A.  I may have.  I don't remember.

16  Yes, I think I have.  I don't know.

17          MR. GRECH:  Can you mark

18      this as Defendant's Exhibit B,

19      please.

20          (Whereupon, Plaintiffs'

21      Response to Defendants First Set

22      of Interrogatories was marked as

23      Defendant's Exhibit B for

24      identification as of this date.)

25     Q.  Ms. Villetti, we are now



Page 153

                        V. VILLETTI

1
2    showing you what's been marked as
3    Defendant's Exhibit B, which we will
4    represent is Plaintiff' response to
5    Defendant's first set of
6    interrogatories as received from your
7    Counsel by my office.
8            If you could take a moment,
9    just look at Exhibit B and see if you
10   recognize that document.
11       A.  Okay.
12       Q.  Do you recognize Exhibit B?
13       A.  No.
14       Q.  Do you recognize Exhibit A?
15       A.  I believe so.
16       Q.  Do you recognize Exhibit A to
17   be Guidepoint's interrogatories to
18   you in this litigation?
19       A.  Yes.
20       Q.  Did you participate in the
21   crafting of the responses to those
22   interrogatories?
23       A.  Yes.
24       Q.  Are those responses reflected
25   in Exhibit B?



Page 154

```
 1              V. VILLETTI

 2     A.  The responses I gave?

 3     Q.  Yes.

 4     A.  These are your objections.

 5     Q.  No, Exhibit B should be --

 6     A.  Oh yes, okay yes, yes.

 7     Q.  Plaintiffs' Exhibit B?

 8     A.  Yes.

 9     Q.  And have you seen Exhibit B

10   before today?

11     A.  I believe so, yes.

12     Q.  And since these work as sort

13   of question and answer, if I can

14   refer you to in Exhibit A,

15   Interrogatory Number 1, on Page 5.

16     A.  (The witness complies).

17     Q.  And then in Exhibit B,

18   Plaintiffs' Response, Page 1,

19   Response 1.

20     A.  (The witness complies.)  Okay.

21     Q.  And I believe we had talked

22   before about a Jenna Applebaum.  Do

23   you see Ms. Applebaum's name in

24   Response 1?

25     A.  Yes.
```



Page 155

```
 1                    V. VILLETTI
 2       Q.   Does that refresh your
 3   recollection as to who Ms. Applebaum
 4   might be?
 5       A.   No.
 6       Q.   I believe we had some of
 7   the same concerns with Mr. Lukban; is
 8   that correct?  Do you know who
 9   Mr. Lukban is?
10       A.   Was he in HR?  He sounds
11   familiar.
12       Q.   Familiar in terms of
13   Guidepoint HR?
14       A.   I don't know.
15       Q.   Ms. Villetti, if I could have
16   you look at Interrogatory 11 on
17   Page 9, and then Plaintiffs'
18   Response, Response Number 11, it's
19   the third page in.
20       A.   (The witness complies.)
21       Q.   Interrogatory 11:  Inquires
22   this to each and every measure of
23   damages sought in the complaint and
24   Plaintiffs' Response at 11 in
25   Exhibit B is, "Valletti is owned
```



Page 156

```
 1              V. VILLETTI

 2    $334,000 in backpay."  There is

 3    another amount for Plaintiff Jibril.

 4         "Plaintiffs are also seeking

 5    reinstatement, punitive damages,

 6    attorney's fees, costs,

 7    disbursements, and interest.

 8    Plaintiffs are not seeking

 9    compensation for medical and

10    emotional distress."

11         Do you see that Ms. Villetti?

12    A.   Yes.

13    Q.   Is that a fair statement of

14    the damages you were seeking in this

15    case?

16    A.   Yes.

17    Q.   Can you explain how you arrive

18    at the $334,000 in backpay?

19    A.   It's the calculation of what I

20    would have made, had I been at

21    Guidepoint.

22    Q.   And you're also seeking

23    reinstatement?  We discussed that

24    before?

25    A.   Yes.
```



Page 157

```
 1                V. VILLETTI
 2       Q.   And you're also seeking
 3   punitive damages?
 4       A.   Yes.
 5       Q.   Do you know what punitive
 6   damages are?
 7       A.   Do I know what I'm seeking or
 8   what they are?
 9       Q.   Yes, in general, do you know
10   what punitive damages are?   What is
11   your understanding of what
12   punitive damages are?
13       A.   It's damages owed by the
14   company, in response to their
15   actions.
16       Q.   Okay, and punitive having a
17   punishment context to --
18       A.   Yes.
19       Q.   And in what respect do you
20   think that Guidepoint should be
21   assessed punitive damages in this
22   case?
23       A.   Because of their mistreatment
24   of women on basis of gender,
25   repeatedly.
```



Page 158

                    V. VILLETTI

1

2        Q.   When we say repeatedly, we've

3    talked about Jessica and Ashlee and

4    Dr. Jibril, correct?

5        A.   Yes.

6        Q.   Are there other instances of

7    mistreatment of women at Guidepoint?

8        A.   There may be, yes.

9        Q.   That you are aware of?

10       A.   Yes.

11       Q.   What are they?

12       A.   The person I referred to

13   earlier, who is involved with PR and

14   marketing, who was on maternity

15   leave, also left Guidepoint feeling

16   that she had been pressured because

17   she was on maternity leave.

18       Q.   Alyssa or Alisa?

19       A.   Yes.

20       Q.   Anyone else?

21       A.   There was someone in HR whose

22   name I don't recall.  We can get back

23   to you on that.

24       Q.   That you understood to also

25   have experienced gender



Page 159

1                    V. VILLETTI

2    discrimination at Guidepoint?

3        A.  Yes.

4        Q.  Ms. Villetti, do you know the

5    individual sitting to my right?

6        A.  Yes.

7        Q.  Who is she?

8        A.  She is Counsel for Guidepoint.

9        Q.  Do you know her as

10   Catherine Smith?

11       A.  Yes.

12       Q.  Was Ms. Smith Counsel for

13   Guidepoint for your entire

14   employment?

15       A.  I believe so.

16       Q.  We talked early about your

17   looking at Guidepoint's website.  Was

18   Guidepoint's management team

19   portrayed on the website?

20       A.  Likely so, yes.

21       Q.  Speaking now for the time you

22   were there, who were the members of

23   Guidepoint's management team?

24       A.  My recollections are there was

25   Albert Sebag as CEO; there was


MAGNA
LEGAL SERVICES

Page 160

```
                    V. VILLETTI
 1

 2    John Campanella, CFO; there was

 3    Mike Ferrari as head of development;

 4    and then there was a

 5    Stacey (phonetic), I don't know what

 6    she -- she's business development and

 7    sales; and then Catherine Smith was

 8    legal.

 9        Q.  Is Priscilla the head of HR?

10        A.  Yes.

11        Q.  Ms. Villetti, if I could ask

12    you to look, again, back and forth in

13    Exhibit A, Page 11, Number 23, and

14    your Plaintiffs' Response is -- Item

15    23, the last page of the document.

16        A.  Mm-hmm.

17        Q.  Interrogatory 23:  "Identify

18    all individuals with knowledge

19    relating to any effort made by

20    Guidepoint to recruit you for

21    employment."

22            At 23, Plaintiffs object, but

23    then notwithstanding the objections

24    respond Villetti, Craig,

25    Jethanandani, Jibril, Lukban, and
```



Page 161

                         V. VILLETTI
 1
 2    Applebaum; do you see that?
 3        A.  Yes.
 4        Q.  Mr. Craig mentioned in that
 5    response, the recruiter that we
 6    talked about before?
 7        A.  Yes, Chirag.
 8        Q.  Chirag.
 9              MR. GRECH:  Mark this as
10        Exhibit C, please.
11              (Whereupon, Defendant
12        Guidepoint Global, LLC's First
13        Set of Requests for Admission to
14        Plaintiffs Valerie Villetti and
15        Faiza Jibril, M.D. was marked as
16        Defendant's Exhibit C for
17        identification as of this date.)
18        Q.  Ms. Villetti, we're showing
19    you what's been marked as Defendant's
20    Exhibit C for the purposes of today's
21    deposition (handing).
22              I'm going to represent to you
23    that it's Guidepoint's request for
24    Admission to Plaintiffs in this case,
25    as indicated in the caption, the



Page 162

                    V. VILLETTI

1

2    first page.

3          Ms. Villetti, if I can just

4    ask you to review that document.

5    A.  Okay.

6    Q.  Do you recognize that

7    document?

8    A.  I've seen it before, yes.

9          MR. GRECH:  You can mark

10      this as Exhibit D, please.

11          (Whereupon, Plaintiffs'

12      Response to Defendant's First Set

13      of Requests for Admissions was

14      marked as Defendant's Exhibit D

15      for identification as of this

16      date.)

17   Q.  Ms. Villetti, we are now

18   showing you what's been marked as

19   Defendant's Exhibit D (handing).

20          For the purposes of today's

21   deposition, I'll represent to you

22   that it's Plaintiffs' Response to

23   Defendant's First Set of Requests for

24   Admissions, as received by my office

25   from your Counsel.



Page 163

1        V. VILLETTI

2        If you can just take moment to

3    look at that document, please.

4        A.   Okay.

5        Q.   Do you recognize Exhibit D?

6        A.   Yes.

7        Q.   Did you participate in the

8    preparation of the responses included

9    in Exhibit D?

10       A.   Yes.

11       Q.   Exhibits C and D sort of work

12   the same as A and B.  If I could ask

13   you to look at Exhibit C, Page 5,

14   Number 26, along with Plaintiffs'

15   Response, which is at the last page

16   of that document, Number 26.

17       A.   (The witness complies.)

18       Q.   A request for Admission from

19   Defendant Number 26 asks, "Following

20   the decision not to hire Jibril,

21   Guidepoint hired approximately 15

22   individuals to create content of

23   either buy-side or sell-side

24   experience and Plaintiffs' Response

25   is, at 26, "admit".  Do you see that,



Page 164

```
1                V. VILLETTI
2    Ms. Villetti?
3       A.  Yes.
4       Q.  First, does that refresh your
5    recollection as to how many
6    individuals were hired to fill the
7    position that you wanted Dr. Jibril
8    to fill?
9       A.  Yes.
10      Q.  Is it your testimony that all
11   of those 15 are men?
12      A.  I don't know.
13      Q.  Do you know what the gender
14   composition of those 15 individuals
15   are?
16      A.  No.
17      Q.  Ms. Villetti, when you were
18   employed by Guidepoint, was there an
19   investigation done of the Healthcare
20   Content team?
21      A.  Could you define
22   "investigation"?
23      Q.  Did you meet with Priscilla as
24   part of an investigation by
25   Guidepoint of the Healthcare team?
```



1                    V. VILLETTI

2       A.   I met with Priscilla following

3    my complaint.

4       Q.   Is that the meeting that you

5    have discussed before after you sent

6    the e-mail to Priscilla?

7       A.   Yes.

8       Q.   After that e-mail complaint,

9    do you know if Priscilla met with

10   anyone else?

11      A.   I don't know.

12      Q.   Do you know if she met with

13   Bouker?

14      A.   I don't know.

15      Q.   Did you ever meet with

16   Ms. Smith?

17      A.   No.

18      Q.   Did you meet with anyone other

19   than Priscilla, regarding your

20   complaint?

21      A.   No.

22      Q.   Ms. Villetti, if you could

23   look back at Exhibit C, Page 3.

24      A.   Okay.

25      Q.   Are you aware of any colleague



Page 168

                    V. VILLETTI

1

2    remotely to be one of the reasons why

3    she was demoted?

4        A.  No.

5        Q.  When you made your complaint

6    to Priscilla, and we talked about

7    Rutwik, were you also complaining

8    about Albert?

9        A.  Yes.

10       Q.  In what respect?

11       A.  In respect to him calling me

12   when I was in Boston.

13       Q.  Okay.  And that is in keeping

14   with your complaint about what --

15   hostile work environment?

16       A.  Yes.

17       Q.  And in what way did Albert's

18   calling you at the client meeting

19   involvement make it a hostile work

20   environment for you?

21       A.  I did not report to Albert.

22   Albert did not have to approve my

23   travel.  That was all done by my

24   supervisor, Bouker Pool, who had

25   already done all of those.



Page 169

                    V. VILLETTI

1

2       Q.   Was there anything in your

3   conversations with Albert about your

4   attendance in Boston that made you

5   feel that he was acting that way

6   because of your gender?

7       A.   He was very disrespectful and

8   demeaning.

9       Q.   Had you heard of occasions

10  where other specialists had there

11  attendance at meetings questioned?

12      A.   No.

13      Q.   Did you have conversations

14  with other specialists about

15  attending meetings?

16      A.   I may have.  I don't recall.

17      Q.   When you got back from Boston,

18  did you speak with anyone and say,

19  "Albert just did this to me; has

20  anyone else experience this?"

21      A.   Yes.

22      Q.   Who did you speak to?

23      A.   I spoke with Bouker, with

24  Priscilla, and with Justin.

25      Q.   Okay.  And let's start with



Page 170

```
                    V. VILLETTI
 1
 2   Justin, first.  In his role that
 3   you're aware of, would he have also
 4   traveled to attend client meetings
 5   and conferences?
 6       A.  Yes.
 7       Q.  And you shared with him what
 8   Albert had said to you about your
 9   trip to Boston?
10       A.  Yes.
11       Q.  And what was Justin's
12   response?
13       A.  I don't recall.
14       Q.  Correct me if I'm wrong:
15   Would there have been occasion for
16   Bouker to also travel for conferences
17   and meetings?
18       A.  I don't know.
19       Q.  Did you share with Bouker what
20   Albert had said to you about your
21   trip to Boston?
22       A.  Yes.
23       Q.  What did Bouker say in
24   response?
25       A.  He said that he had run into
```



1          V. VILLETTI

2     Albert while they were both skiing,

3     and Albert had been unhappy to see

4     him on the slopes, and that he likely

5     called me to put his anger and

6     frustration on me.

7          Q.   Okay.  So Albert and Bouker

8     were skiing somewhere together or not

9     together, somewhere, at the same

10    time?

11         A.   Yes.

12         Q.   Bouker's impression was that

13    Albert was upset to see him skiing --

14         A.   That's what he had said.

15         Q.   -- and not at work?

16         A.   Yes.

17         Q.   And that it was Bouker's

18    impression that he took that anger --

19    Albert took the anger at Bouker out

20    on you?

21         A.   Yes.

22         Q.   Has Albert ever done that

23    before?

24         A.   Apparently so.

25         Q.   To you?



Page 172

```
 1                    V. VILLETTI
 2        A.  To others.
 3        Q.  Who?
 4        A.  I don't know, but I also had a
 5   conversation with Priscilla.
 6        Q.  About the conversations with
 7   Albert about Boston?
 8        A.  About that and Albert's known
 9   outbursts.
10        Q.  Okay.  But you certainly
11   talked to Priscilla about the Boston
12   exchange?
13        A.  Yes.
14        Q.  What did you tell Priscilla?
15        A.  What had occurred.
16        Q.  I can't imagine Priscilla's
17   role calls for her to travel to
18   client meetings or conferences; is
19   that correct?
20        A.  Yes.
21        Q.  Did she share with you any
22   other stories of specialists being
23   called back for meetings or told that
24   they weren't approved to go to
25   meetings, anything like that?
```



Page 173

1                   V. VILLETTI

2      A.  No.

3      Q.  What response did she have for

4  you, at all, about your sharing this

5  with her?

6      A.  She said that the response may

7  have had something to do with Albert

8  being frustrated in some other area.

9      Q.  Why would Albert be upset with

10  Bouker for skiing, that you know?

11      A.  That's me speculating about

12  Albert's state of mine.

13      Q.  Don't speculate.  How was the

14  healthcare team performing during

15  this time period?

16      A.  We had increased our output as

17  it had been requested by Rutwik.  So

18  we were producing more calls, and

19  this was despite the faculty

20  shortages where we weren't allowed to

21  hire people, and I didn't have an

22  associate anymore.

23      Q.  Because Ms. Yamin left?

24      A.  Yes.

25      Q.  Was there any effort to



Page 174

```
 1                 V. VILLETTI

 2     replace her?

 3         A.  Yes.

 4         Q.  What happened with those

 5     efforts?

 6         A.  We hadn't hired someone yet.

 7         Q.  At the time of your

 8     termination?

 9         A.  Yes.

10         Q.  Well, how is it that you were

11     interviewing for a position to be

12     filled by Dr. Jibril and then it was

13     ultimately filled by 15 people?

14         A.  You would have to ask Rutwik

15     about that.

16         Q.  Was it your understanding that

17     the work that Dr. Jibril would

18     perform could be performed by one

19     person or she would have been the

20     first of many to follow?

21         A.  The first of many to follow.

22         Q.  Was there a communication from

23     management that they wanted an

24     increase in the number of

25     conferences?
```



1                  V. VILLETTI

2        A.   Yes.

3        Q.   And who made that

4   communication?

5        A.   Bouker.

6        Q.   And he shared that with you?

7        A.   I don't understand the

8   question.

9        Q.   Bouker understood that

10   management wanted an increase in

11   conferences; is that correct?

12        A.   Correct.

13        Q.   Did Bouker tell you that?

14        A.   Yes.  He told all of us.

15        Q.   In what circumstances did he

16   tell you this?

17        A.   In a group meeting.

18        Q.   What was your understanding as

19   to how management wanted the

20   conferences to increase?

21        A.   We were to -- at what point,

22   because it changed?

23        Q.   Did it have anything to do

24   with the need to hire an associate

25   and the position that Dr. Jibril



Page 176

                    V. VILLETTI

1    would fill?

2    A.   Yes.

3    Q.   So at that point, when you

4    decided we should hire an associate

5    and we should hire another content

6    specialist, were there communications

7    from management that the conference

8    number should increase?

9    A.   If by "conference number," you

10   mean general output, yes.

11   Q.   Okay.  What else is included

12   in general output?

13   A.   Teleconferences.

14   Q.   Okay.  So when I say

15   "conferences," you understand that to

16   mean in-person conferences?

17   A.   Yes.

18   Q.   Was the understanding that

19   management wanted an increase in just

20   telephone conferences or all

21   conferences?

22   A.   All.

23   Q.   Was there a particular number

24   that they wanted per week, per month,



```
 1                    V. VILLETTI
 2    from the healthcare team?
 3        A.  No.  There were no metrics.
 4        Q.  But the interviewing and the
 5    application for the associate and
 6    Dr. Jibril was part of that effort to
 7    meet the increase in output?
 8        A.  Yes.
 9        Q.  If you had hired Dr. Jibril,
10    how many more candidates would you
11    have looked to hire for your team?
12        A.  We didn't have a set number at
13    that point.  We just knew that the
14    people would be expanding.
15        Q.  But you certainly weren't
16    going to stop at one?
17        A.  No.
18        Q.  Was it going to be ten?
19    twenty?
20        A.  We have not discussed that,
21    so.
22        Q.  So there was an overlap with
23    your work and Ashlee's; is that
24    correct?
25        A.  Yes.
```



Page 178

                    V. VILLETTI

1        Q.  What was your impression of

2    how Ashlee performed her work?

3        A.  She was experienced and

4    knowledgeable.

5        Q.  And did you interact with

6    Ashlee or did you sort of keep your

7    clients and matters separate?

8        A.  No, I was instructed to talk

9    to her and learn whatever I could.

10       Q.  What were your impressions of

11   Ashlee, sort of as a colleague?

12       A.  She was friendly and helpful.

13       Q.  Did you express a concern

14   about not meeting with Ashlee during

15   your interview process?

16       A.  Yes.

17       Q.  Why was that a concern?

18       A.  I felt I was mislead.

19       Q.  In what respect?

20       A.  I was told that this was a new

21   team.

22       Q.  You were told that the

23   Healthcare Content Team was a new

24   team?



Page 179

                              V. VILLETTI

1

2       A.  Yes.

3       Q.  Who told you that?

4       A.  Several people during the

5   interview process.

6       Q.  Bouker?

7       A.  Sure.

8       Q.  Priscilla?

9       A.  Sure.

10      Q.  And were you brought in as a

11  Senior Content Strategist, correct?

12      A.  Yes.  I was practically the

13  head of healthcare content.

14      Q.  And you were mislead in that

15  it was not a new team?

16      A.  Yes, and that there was

17  someone performing that function.

18      Q.  Ashlee?

19      A.  Yes.

20      Q.  And if I recall what we

21  discussed earlier, it was your

22  understanding that once you got a

23  good grasp, you were to take over for

24  Ashlee?

25      A.  Yes.



Page 180

```
 1              V. VILLETTI

 2     Q.  So then why would Ashlee have

 3  interviewed you?

 4     A.  Because she had been there for

 5  a long time with experience, and knew

 6  what would go into being a good

 7  content specialist for healthcare.

 8     Q.  And it was your impression

 9  that she had what it took to be a

10  good content specialist for

11  healthcare?

12     A.  Yes.

13     Q.  Was that Bouker's opinion?

14     A.  I don't know.

15          MR. LICHTEN:  Could we go

16     off the record for a second,

17     please?

18          (Whereupon, a discussion was

19     held off the record.)

20          MR. GRECH:  It's 1:57.  I

21     understand that Ms. Villetti is

22     here today with a hard stop at

23     2:00, which we are going to

24     respect.  I have a couple of

25     discreet questions that I would
```



1                    V. VILLETTI

2         like to ask you now we will end

3         at 2:00.

4              There may be another line

5         of questioning that I will

6         reserve time to perhaps call

7         you for another deposition or

8         not.  I will speak to your

9         Counsel about that, but I do

10        want to respect your 2:00 hard

11        stop today.

12        Q.  Ms. Villetti, if I can ask you

13   to look back at one of the exhibits

14   we had marked, Exhibit B, and

15   particularly we had looked at it

16   before, Item 11 or Response 11.

17             In that, your Interrogatory

18   Response is that, you, Villetti, are

19   owned $334,000 in backpay; do you see

20   that?

21        A.  Yes.

22        Q.  We've talked about backpay

23   before.  What is your understanding

24   of -- it's really a legal concept --

25   of backpay?



Page 182

                    V. VILLETTI

1

2        A.   On the basis that I was

3    dismissed due to discrimination and

4    retaliation, I am owed the money I

5    would have made, have I still been in

6    the position.

7        Q.   So backpay as a concept would

8    mean that a Plaintiff if terminated

9    from an unlawful reason would be

10   entitled to his or her compensation

11   from the date of that termination to

12   date or resolution?

13       A.   As I understand it.

14       Q.   Does your understanding of

15   backpay include anything else, about

16   obligations upon a Plaintiff to be

17   entitled to backpay?

18       A.   I don't know.

19       Q.   Do you understand that a

20   plaintiff must seek to mitigate

21   damages; are you familiar with that

22   expression?

23       A.   No.

24       Q.   Is it your understanding that

25   a plaintiff must seek subsequent



```
1              V. VILLETTI

2    employment in order to be entitled to

3    the full amount of backpay?

4         A.  I don't know.

5         Q.  Have you sought subsequent

6    employment since being terminated by

7    Guidepoint?

8         A.  I have been employed.

9         Q.  For Kioko?

10        A.  Yes.

11        Q.  And we talked earlier -- have

12   you submitted applications to any

13   other employer?

14        A.  No.

15        Q.  And you worked for PWC for the

16   project?

17        A.  Yes.

18             MR. GRECH:  I wanted to

19        just, in this remaining moment,

20        talk more about Alyssa or

21        Alisa.

22             For one, I'd like to -- if

23        we can just leave a blank in

24        there for clarification, if

25        it's Alyssa or Alisa.
```



MAGNA
LEGAL SERVICES

Page 184

```
 1              V. VILLETTI

 2          THE WITNESS:  Yes.

 3  (INSERT)_____

 4      Q.  She was also out on maternity

 5  leave?

 6      A.  Yes.

 7      Q.  How did you come to learn that

 8  she was experiencing gender-based

 9  discrimination?

10      A.  She left Guidepoint after I

11  did when she returned her maternity

12  leave, and I spoke with her,

13  subsequently.

14      Q.  What did you and Alyssa speak

15  about concerning your impression that

16  she was perhaps subject to

17  gender-based discrimination?

18      A.  We spoke about Guidepoint's

19  pattern of discrimination against

20  women.

21      Q.  And Alyssa ultimately left

22  Guidepoint?

23      A.  Yes.

24      Q.  Where is Alyssa now?

25      A.  I don't know.
```



Page 185

V. VILLETTI

1

2    Q.  Did Alyssa give you any

3    examples of this pattern that she was

4    experiencing or had observed, rather?

5    A.  No.  We discussed her,

6    specifically.

7    Q.  Okay.  And in what respect did

8    Alyssa feel that she was the subject

9    of gender-based discrimination?

10    A.  You'd have to ask her, but

11    what I recall from the conversation

12    is that she felt that when she

13    returned, the position had changed

14    and there were new constraints that

15    would interfere with her ability to

16    also be a mother to her child.

17    Q.  And it was your understanding

18    that Alyssa was the head of the

19    PR Department?

20    A.  Yes.

21    Q.  Okay.

22        MR. GRECH:  All right.

23    It's 2:01, so I would like to

24    stop now subject to what we

25    talked about earlier.  I do



Page 186

```
1                    V. VILLETTI
2        want to respect Ms. Villetti's
3        hard stop of 2:00.   Thank you.
4             THE WITNESS:   Thank you.
5             MR. LICHTEN:   Thank you.
6          (Time noted:   2:01 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 187

1

2                    INSTRUCTIONS TO WITNESS

3

4           Please read your deposition over

5    carefully and make any necessary corrections.

6    You should state the reason in the appropriate

7    space on the errata sheet for any corrections

8    that are made.

9           After doing so, please sign the

10   errata sheet and date it.

11          You are signing same subject to the

12   changes you have noted on the errata sheet,

13   which will be attached to your deposition.

14          It is imperative that you return the

15   original errata sheet to the deposing attorney

16   within thirty (30) days of receipt of the

17   deposition transcript by you.  If you fail to

18   do so, the deposition transcript may be deemed

19   to be accurate and may be used in court.

20

21

22

23

24

25



Page 188

```
 1
 2              I N D E X   O F   W I T N E S S E S
 3   WITNESS:   VALENTIA VILLETTI
 4   EXAMINATION BY                      PAGE
 5   MR. GRECH                            6
 6
               I N D E X   O F   E X H I B I T S
 7
     EXHIBIT              DESCRIPTION       PAGE
 8
 9   A                    Defendant        151*
10                        Guidepoint Global,
11                        LLC's First Set of
12                        Interrogatories
13   B                    Plaintiffs'      152*
14                        Response to
15                        Defendants First
16                        Set of
17                        Interrogatories
18   C                    Defendant        161*
19                        Guidepoint Global,
20                        LLC's First Set of
21                        Requests for
22                        Admission to
23                        Plaintiffs Valerie
24                        Villetti and Faiza
25                        Jibril, M.D.
```



Page 189

```
 1
 2    D                  Plaintiffs'          162*
 3                       Response to
 4                       Defendant's First
 5                       Set of Requests
 6                       for Admissions
 7
 8    (*Indicates exhibit(s) retained by counsel)
 9
10          I N D E X   R E Q U E S T S
11    DESCRIPTION                          PAGE
12    contract                             42
13    total compensation from PWC          43
14    Alyssa or Alisa                      184
15
16
17    PAGE    LINE    QUESTIONING ATTORNEY
18    39      25      MR. GRECH
19
20
21
22
23
24
25
```



Page 190

```
 1
 2                    -  -  -  -  -  -

                    E R R A T A
 3                    -  -  -  -  -  -

 4   PAGE   LINE   CHANGE
 5   ____   ____   _____
 6   ____   ____   _____
 7   ____   ____   _____
 8   ____   ____   _____
 9   ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23   ____   ____   _____
24   ____   ____   _____
25   ____   ____   _____
```


MAGNA ▶
LEGAL SERVICES

Page 191

1

2              A C K N O W L E D G E M E N T

3   STATE OF NEW YORK)

4                        :SS

5   COUNTY OF _____)

6      I, VALENTIA VILLETTI, hereby certify that I

7   have read the transcript of my testimony taken

8   under oath on October 1st, 2019, that the

9   transcript is a true, complete and correct

10   record of what was asked, answered and said

11   during my testimony under oath, and that the

12   answers on the record as given by me are true

13   and correct, except for the corrections or

14   changes in form or substance, if any, noted in

15   the attached Errata Sheet.

16

17   _____

18   VALENTIA VILLETTI

19

20   Signed and subscribed to

21   before me, this _____ day

22   of _____, _____.

23

24   _____

25   Notary Public



Page 192

1

2                    C E R T I F I C A T E

3       I, SALVATRICE MANNINO, a shorthand reporter

4    and Notary Public within and for the State of

5    New York, do hereby certify:

6       That the Witness(es) whose testimony is

7    hereinbefore set forth was duly sworn by me,

8    and the foregoing transcript is a true record

9    of the testimony given by such Witness(es).

10       I further certify that I am not related to

11    any of the parties to this action by blood or

12    marriage, and that I am in no way interested

13    in the outcome of this matter.

14

15

16

17

18

19

20

21          *Salvatrice Mannino*

22

23

24                Salvatrice Mannino, a Court

                  Reporter and Notary Public

25                Date: October 11th, 2019



Page 193

1

2                              LAWYER'S NOTES

3    PAGE/LINE    NOTE

4    _____    _____

5    _____    _____

6    _____    _____

7    _____    _____

8    _____    _____

9    _____    _____

10   _____    _____

11   _____    _____

12   _____    _____

13   _____    _____

14   _____    _____

15   _____    _____

16   _____    _____

17   _____    _____

18   _____    _____

19   _____    _____

20   _____    _____

21   _____    _____

22   _____    _____

23   _____    _____

24   _____    _____

25   _____    _____

