UNITED STATES DISTRICT COURT
SOUTHER DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

VALENTIA VILLETTI and FAIZA JIBRIL, M.D.,

Plaintiffs,

Index No.
18 Civ. 10200 (VSB)

-against-

GUIDEPOINT GLOBAL, LLC,

Defendant.

- - - - - - - - - - - - - - - - - x

One Battery Park Plaza
New York, New York

November 14, 2019
2:16 p.m.

CONTINUED EXAMINATION BEFORE TRIAL of VALENTIA VILLETTI, a Plaintiff herein, taken by DAVID J. GRECH, in the above-entitled action, held at the above time and place, pursuant to Order, taken before LEAH MILLER, a Shorthand Reporter and Notary Public within and for the State of New York.

MAGNA
LEGAL SERVICES



A P P E A R A N C E S:

LICHTEN & BRIGHT, P.C.
Attorneys for Plaintiffs
387 Park Avenue South
5th Floor
New York, New York 10016
646-588-4872
BY: STUART LICHTEN, ESQ.
slichten@lichtenandbright.com

GORDON & REES SCULLY MANSUKHANI
Attorneys for Defendant
One Battery Park Plaza
28th Floor
New York, New York 10004
212-453-0702
BY: DAVID J. GRECH, ESQ.
dgrech@gordanrees.com

GUIDEPOINT GLOBAL, LLC
Attorneys for Defendant
675 Avenue of the Americas
2nd Floor
New York, New York 10010
212-812-9511
BY: CATHERINE SMITH, ESQ.
csmith@guidepoint.com

ALSO PRESENT:

DAHN LEVINE - LAW FIRM ASSOCIATE

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court and that a copy of this examination shall be furnished without charge to the attorney representing the witness testifying herein.

V A L E N T I A V I L L E T T I, the Witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION

BY MR. GRECH:

Q. State your name for the record, please.
A. Valentia Villetti.
Q. State your address for the record, please.
A. 162 East 61st Street, Unit 1B, New York, New York 10065.
Q. Good afternoon, Ms. Villetti.
A. Good afternoon.
Q. It's been a while. So I'm just going to go through our instructions again. Same rules apply. If you have any questions about the instructions or as we go along, just ask me, ask Stuart, and we will stop and address it.
Again, David Grech with the law

firm of Gordon & Rees. We represent Guidepoint Global in this action.
As far as the instructions, you know, this is, again, a question-and-answer session. So we are going to ask you some questions.
We may show you some -- we showed you some documents last time. We may show you some more documents today regarding your employment with Guidepoint and this lawsuit.
If you don't understand any of those questions we might ask you, please ask me to rephrase it, and I will do my best to do so.
Your responses must be verbal. No nodding, no gestures. Because the reporter must take down all of your responses for the transcript.
On that point, so that the record and the transcript is clear, even if you can, sort of, guess what the rest of my question might be, just for the sake of the purity of the



V. VILLETTI

transcript, just let me finish the question and then you can respond.

If you need a break at any time, just let us know, let me know, let Mr. Lichten know, and we will accommodate that. All that we would ask is that if there is a question pending at that point, that you answer the question and then we will move on and take your break.

Do you have any questions about the questions --

A. No.

Q. -- about the instructions, rather. Okay. All right.

MR. GRECH: Could we mark this as H, please?

\- - -

(Whereupon, Defendant's Exhibit H, an employee agreement, was marked for identification.)

\- - -

Q. Ms. Villetti, I'm showing you what's been marked as Defendant's

V. VILLETTI

Exhibit H for purposes of these depositions. If you could just take a moment to look at Exhibit H. And let us know when you have had that opportunity (handing).

A. (Witness complied).

Q. You had a chance to look at H?

A. Yes.

Q. Do you know what H is?

A. Yes.

Q. You recognize it?

A. Yes.

Q. And what is it?

A. It's the employment agreement that I signed with Guidepoint.

Q. And this was the agreement you signed effective September 11, 2017?

A. Correct.

Q. And on the last page of the agreement, it was signed on behalf of Guidepoint by Albert Sebag?

A. Yes.

Q. Ms. Villetti, if we could turn to page 2 of the employment agreement,

V. VILLETTI

specifically Article 5, Section A, nondisclosure.

And, Ms. Villetti, were you aware that during your employment with Guidepoint and for a period thereafter, you would be prohibited from disclosing certain information as set forth in Article 5?

A. Yes.

Q. And were you aware during the course of your employment and for some time thereafter, your use of proprietary information of Guidepoint would be limited, as provided in this contract?

A. Yes.

Q. On page three, Article 7, same question: You are aware during the course of your employment with Guidepoint and for two years thereafter, you're under an obligation not to disparage Guidepoint?

A. Yes.

Q. Do you recall a conversation you

V. VILLETTI

had with Dr. Jibril after your termination from Guidepoint?

A. You would have to be more specific.

Q. Immediately after your termination from Guidepoint, your first conversation with Dr. Jibril after your termination from Guidepoint.

A. I can't recall the specifics.

Q. You recall speaking to her about Albert and his girlfriend?

A. I can't recall.

Q. Do you recall speaking to her about the hierarchy of the company?

A. I can't recall.

Q. Do you recall speaking to her at that point about how the hierarchy of the company mistreated women?

A. I don't recall.

Q. One of your allegations in this case is that Guidepoint, as a company, mistreated you based upon your gender, correct?

A. Correct.



V. VILLETTI

Q. And specifically Mr. Sebag?
A. Yes.
Q. Mr. Sebag signed your employment agreement on behalf of the company, correct?
A. Yes.
Q. In September 2017, when he signed that agreement, did he express to you anything that you might interpret as being discriminatory against women?
A. I don't understand the question.
Q. September 2017 --
A. Uh-huh.
Q. -- when you're first coming on board to Guidepoint --
A. Yes.
Q. -- did Mr. Sebag do anything that made you feel that he had animus towards women?
A. I don't recall.
Q. Okay.
MR. GRECH: Can we mark this as I, please?

V. VILLETTI

- - -

(Whereupon, Defendant's Exhibit I, employment policies, was marked for identification.)

- - -

(Whereupon, Defendant's Exhibit J, a receipt for employee handbook, was marked for identification.)

- - -

Q. Ms. Villetti, we are showing you what's been marked --

- - -

(Whereupon, a discussion was held off the record.)

- - -

Q. We are showing you what's been marked as Defendant's Exhibits both I and J for the purposes of these depositions. If you could just -- and they work together.
So if you could just look at I and J together and let me know when you have had a chance to do so (handing).

V. VILLETTI

A. (Witness complied).
Q. Have you had a chance to review Exhibit I?
A. Yes.
Q. And do you recognize it?
A. Yes.
Q. And what is it?
A. It's an employment handbook.
Q. Is it Guidepoint's employment handbook?
A. It appears so, yes.
Q. Do you recall receiving this handbook when you were employed by Guidepoint?
A. Not exactly. But, yes, I'm sure I did.
Q. Okay. And if we can look at Exhibit J. Take a moment to look at J.
A. (Witness complied).
Q. Do you recognize J?
A. Yes.
Q. What's J?
A. It's a receipt for the employee handbook.

V. VILLETTI

Q. It's an acknowledgement that you received the employee handbook?
A. Yes, correct.
Q. Okay. And in -- the text in Exhibit J, the receipt, you see the caution there that I understand that Guidepoint is an at-will employer. And as such, employment with Guidepoint is not for a fixed term or definite period and may be terminated at the will of either party with or without cause and without prior notice.
Do you see that?
A. Yes.
Q. And you were aware when you came on board with Guidepoint that your employment was at will?
A. Yes.
Q. And do you recall your testimony during the first part of your deposition where one of your concerns had been that an employee was let go without consulting with her team; do you remember that?



V. VILLETTI

A. Yes.
Q. Was that included in any of the guidance given to you in the employee handbook that your termination was dependant upon consulting with your team?
A. No.
Q. If you could go back to Exhibit I, please, the employment policies. And specifically, it's page 11 of the document, the section entitled procedures for reporting harassment or discrimination.
Do you see that section?
A. Yes.
Q. Paragraph 1 reads Guidepoint encourages but does not require individuals who believe they are being harassed or are subjected to discrimination or who are aware of such conduct to promptly tell the offender that his or her behavior is unwelcome and then ask that it's stopped.
Do you see that?

V. VILLETTI

A. Yes.
Q. And you're aware of that procedure when you worked at Guidepoint?
A. I can't recall.
Q. You can't recall if you were aware of it?
A. At the time, yes.
Q. You cannot recall if you were aware at the time?
A. Yes.
Q. Okay. Thank you.
And you have made allegations of gender discrimination here, correct?
A. Yes.
Q. And who would be the offenders of the gender discrimination that's against you at Guidepoint?
A. It would be Mr. Sebag and Rutwik Ghodadra.
\- - -
(Whereupon, a discussion was held off the record.)
\- - -

V. VILLETTI

Q. And did you ever tell Mr. Rutwik that certain behavior of his you had considered harassing or discriminatory?
A. Yes.
Q. And did you ever tell Mr. Sebag the same thing? Did you tell him that you had considered any of his conduct harassing or discriminatory?
A. I didn't have the chance.
Q. And why did you not?
A. The CEO's often not in the office. And when he is, he is not readily available to employees. So I did that through my supervisor.
Q. And who was your supervisor again?
A. Bouker Pool.
Q. So you told Mr. Pool that certain conduct of Mr. Sebag you considered harassing or discriminatory?
A. Yes.
Q. And do you recall what you specifically reported to Bouker; what was the conduct that you complained

V. VILLETTI

about about Mr. Sebag?
A. We had several conversations about this as it pertained to Ashlee, as it pertained to Jessica, as well as about Dr. Jibril, and then myself, when I came back from Boston.
Q. And you considered Mr. Sebag's conduct towards you during the Boston trip and thereafter discriminatory or harassing?
A. Yes.
Q. In what respects?
A. I felt that his behavior would not have been the same had I been a man.
Q. And what behavior was he engaging in with you that made you come to that conclusion?
A. He called me on my cell and was very demeaning.
Q. And was this the call when you were in Boston when he called you on your cell?
A. Yes.



V. VILLETTI

Q. Okay. And in what ways was his conversation demeaning to you?
A. He was loud and had a very condescending tone and did not give me any opportunity to explain the context, just talked down at me.
Q. And it's your belief that he would not have had such conversations were you a man?
A. Yes.
Q. Had you ever had the occasion to listen to Mr. Sebag talk to a male employee under similar circumstances?
A. No.
Q. And why, again, was Mr. Sebag concerned about your presence in Boston?
A. You would have to ask him.
Q. What did he express to you was his concern about why you were in Boston?
A. That I was -- I had not consulted him prior to the trip.
Q. And you recall your testimony

V. VILLETTI

last time of concerns you believe Mr. Sebag had about Mr. Pool's vacationing and absences?
A. Yes.
Q. Were you ever witness to Mr. Sebag counseling Mr. Pool about his vacations and absences?
A. No.
Q. Did Mr. Pool share any of that with you; that Albert had said certain things to him about absences or vacations?
A. Yes.
Q. And what did Bouker say?
A. Bouker said that while he was on the ski slope, he encountered Mr. Sebag. And Mr. Sebag expressed a great deal of frustration with him being on the slope and asked him what he was doing there. To which he responded he was on vacation. And Mr. Sebag expressed that he had not authorized it. And Bouker said that he had. And they went back and forth.

V. VILLETTI

Q. In this conversation that Bouker had with you relating this exchange with Albert, did Bouker express to you he felt demeaned during this conversation?
A. No.
Q. Or that Mr. Sebag was condescending to him?
A. No.
Q. Did Bouker tell you that Albert raised his voice to him on the slopes?
A. I don't recall.
Q. If we could look back at Exhibit I, the second paragraph in procedures for reporting harassment and discrimination. It's on page 11.
The paragraph reads whether or not an individual chooses to confront the offender directly, the individual should promptly notify his or her supervisor or human resources and submit an employee complaint form, which can be found on Guidepoint's internet and in human resources at any

V. VILLETTI

time.
Do you see that, Ms. Villetti?
A. Yes.
Q. Were you aware of the existence of such an employee complaint form when you were with Guidepoint?
A. No.
Q. Did you ever submit an employee complaint form to your supervisor?
A. No.
Q. And your supervisor would have been Bouker?
A. Yes.
Q. Did you ever submit an employee complaint form to HR?
A. No.
Q. You did make a complaint to HR, though, right?
A. Yes.
Q. And if you see the next section, it's an investigation of complaints section.
You see that section?
A. Yes.



V. VILLETTI

Q. And what is your knowledge of the investigation of your complaint to HR?
A. I don't know.
Q. You don't know what your knowledge is of the complaint?
A. I don't know what the extent of the investigation was, if any.
Q. Was your complaint investigated?
A. I don't know.
Q. Who did you make the complaint to?
A. Priscilla.
Q. Separate and apart from your complaint, when you were at Guidepoint, were you ever asked to participate in an investigation?
A. I can't recall.
MR. GRECH: Could we mark this as K?
- - -
(Whereupon, Defendant's Exhibit K, an e-mail exchange, was marked for identification.)

V. VILLETTI

- - -
Q. Ms. Villetti, we are showing you what's been marked as Defendant's Exhibit K. If you could take a moment to look at that, please (handing).
A. (Witness complied).
Q. Ms. Villetti, you have had a chance to review Exhibit K?
A. Yes.
Q. Do you recognize it?
A. Yes.
Q. And what is it?
A. It's an e-mail complaint that I sent to Priscilla requesting a meeting to discuss what I perceived to be continuous mistreatment of women at Guidepoint.
Q. And Exhibit K is an e-mail exchange or e-mail chain between you and Priscilla?
A. Yes.
Q. And it -- the first e-mail in time in Exhibit K is your e-mail to Priscilla dated March 12, 2018 at

V. VILLETTI

9:23 a.m.; is that correct?
A. Yes.
Q. And this is what you are deeming your complaint, correct?
A. Yes.
Q. And thereafter, there is an exchange between you and Priscilla, correct?
A. Yes.
Q. All right. So if we could look first at your first e-mail on March 12th. In the second paragraph, you make reference to over the past several months that you had brought management issues and toxic work environment in our team to the attention of both you, meaning Priscilla and John.
Who is John?
A. John Campanella who is the CFO.
Q. So over the past several months, when was the first time you brought management issues and toxic work environment to Priscilla's attention?

V. VILLETTI

A. I don't recall the specifics. But I had several conversations with her about this.
Q. Had you documented your concerns prior to this e-mail?
A. In writing, no.
Q. And when did you first speak with John about management issues and toxic work environment?
A. I don't recall the exact dates.
Q. Did you document any of those complaints to John?
A. In writing, no.
Q. Did you document it in any other way?
A. No. I had spoken conversations with him.
Q. With John and Priscilla?
A. Yes.
Q. Predating this e-mail complaint?
A. Yes.
Q. And at the time you were writing this e-mail, what management issues did you have in mind?



V. VILLETTI

A. I think one of the main concerns I had at the time was that Rutwik, who was not even an employee of Guidepoint, was appearing to take a management role at my team. And we had not had any communication from HR otherwise about him being an employee or us reporting to him otherwise.

Q. And how did you know that Rutwik was or was not a Guidepoint employee?

A. He was a consultant in the system.

Q. Were there other consultants in the system at the time?

A. I don't know. I wasn't interacting with them.

Q. And a consultant is not an employee?

A. I don't know.

Q. In what ways was Rutwik attempting to take management of your team?

A. He felt he could dictate what each member of the team was to do, when

V. VILLETTI

they were do it. And he felt he could call us, e-mail us at all hours demanding things, pull us into meetings.

Q. Was Rutwik behaving the same way toward Bouker?

A. No.

Q. Was Rutwik behaving that way toward anyone other than yourself?

A. To my knowledge, he was also doing that to Jessica.

Q. Anyone else?

A. I don't know.

Q. What about Justin?

A. Not to my knowledge.

Q. Any other management issues that were of concern to you on March 12, 2018?

A. There were issues with Bouker being absent frequently. And, you know, the lack of clarification surrounding my performance metrics, which I had sought clarification on. I saw that as a management failing.

V. VILLETTI

Q. Any other management issues? We will discuss them in detail. But were there any more on the list?

A. Our inability to hire the staff needed to perform our job.

Q. And you had communicated your concern about Bouker's absences with Priscilla before?

A. Yes.

Q. And you had communicated them -- your concern about Bouker's absences with John before?

A. I don't know.

Q. And what was your concern about Bouker's absences?

A. I felt that his frequent absences created a leadership vacuum and led to chaos.

Q. All right. We talked about the management issue, focused on Rutwik.

In what way, if any, did that demonstrate to you discrimination based on your gender?

A. I don't understand the question.

V. VILLETTI

Q. We talked about Rutwik dictating what team members were going to do and calling them and e-mailing them and calling meetings, right?

A. Yes.

Q. What, if any, part of that made you feel he was doing that to you because you were a woman?

A. He was doing that to me and to Jessica.

Q. Okay.

A. And not to anyone else.

Q. Who else was on the team to do that to?

A. There was Justin. There was Bouker.

Q. And what did you mean by toxic work environment in your complaint?

A. Rutwik's presence, for one.

Q. How long had Rutwik been there at this time?

A. For several months, as I recall.

Q. Any other components of the toxic work environment other than



V. VILLETTI

Rutwik's presence?
A. I can't recall.
Q. And you talked briefly earlier about performance metrics. And you specifically mentioned that next or you said you sought clarification on your performance metrics and bonus structure repeatedly since last December with no resolve.
And what was your specific concern there?
A. I was not given any guidelines or structure about how my performance was being measured or my bonus was being decided.
Q. And last December would have been 2017, correct?
A. Correct.
Q. And when did you start with Guidepoint?
A. In September.
Q. So had you ever received a bonus from Guidepoint?
A. I believe so. There was one

V. VILLETTI

bonus which came for 2017, for the end.
Q. And what was your understanding of what your performance metrics were?
A. I don't have an understanding of it.
Q. Who did you expect to give you that understanding?
A. I sought it from multiple sources. No one gave me a clear understanding.
Q. Did you seek it from Bouker?
A. Yes.
Q. And the result was?
A. I don't think he knew.
Q. But he was your supervisor?
A. Yes.
Q. Did you seek it from Rutwik?
A. I don't recall.
Q. Did you seek it from John?
A. Yes.
Q. And in what way? Did you talk to him, call him, e-mail about your performance metrics?
A. In-person meeting.

V. VILLETTI

Q. Okay. And what did you and John talk about concerning your performance metrics?
A. I sought clarification.
Q. And John's response was?
A. He didn't provide any clarification.
Q. What was John's role with the company again?
A. CFO.
Q. Did you speak to Albert about your performance metrics?
A. No.
Q. Other than Bouker and John, did you speak with anyone else about your performance metrics?
A. Priscilla.
Q. Okay. And when did you and Priscilla talk about your performance metrics?
A. I don't recall the specifics.
Q. Was it an in-person conversation?
A. Yes.

V. VILLETTI

Q. And you asked her for clarification on your performance metrics?
A. Yes.
Q. And what was her response?
A. She didn't provide any clarification.
Q. Okay. Do you feel that the lack of clarification on your performance metrics was based in any way on your gender?
A. I don't know.
Q. What was your bonus structure when you were at Guidepoint?
A. There was no structure.
Q. You received a bonus based upon 2017?
A. Yes.
Q. How much was the bonus?
A. I don't remember. You can find it in the numbers.
Q. What was it based upon?
A. It was an agreed-upon amount prior to my joining the firm.



V. VILLETTI

Q. And who made the agreement?

A. Bouker and Priscilla.

Q. We also talked about an inability to hire staff.

And your complaint continues furthermore, I have performed under a staff shortage and the routine absence by my manager.

I assume we are talking about Bouker here?

A. Yes.

Q. Including his most three-week break.

And what staff shortage were you experiencing as reflected in your March complaint?

A. My associate Liana Yamin had left at that point. And I was also instructed to increase the output of the healthcare content and simultaneously unable to hire people to do so.

Q. And in what way did this staff shortage reflect, in your opinion,

V. VILLETTI

gender discrimination by Guidepoint?

A. Well, I was taught that I had a mandate and I was able to hire. But when I wanted to hire Dr. Jibril, I was prevented from doing so.

Q. And was there anything about Ms. Yamin's departure that would lead you to the conclusion that it was based on gender discrimination?

A. No. She left for another role. Because she wouldn't get a pay increase that was -- that would have been required for her to stay.

Q. Okay. In the next paragraph, you say that instead, after talking about some acknowledgements, that you have endured being continuously dismissed and belittled.

Do you see that?

A. Yes.

Q. And who dismissed and belittled you?

A. Rutwik and Albert.

Q. Rutwik in the same ways we have

V. VILLETTI

discussed before?

A. Yes.

Q. And Albert on the call when you were at Boston?

A. Yes.

Q. Was Albert dismissive or belittling of you at any other time other than his call to you when you were at Boston?

A. No. I don't recall.

Q. The same paragraph, we are continuing on, your complaint reads the increasing aggression, abusive language, and unjustified deterioration of my role has led to serious anxiety, stress-induced physical pain, and difficulty sleeping for me.

Do you see that?

A. Yes.

Q. And who was being increasingly aggressive toward you?

A. Rutwik.

Q. And Rutwik would use abusive language with you?

V. VILLETTI

A. Yes.

Q. How so? I mean, do you have an example?

A. Yes. When he shouted at me I am the boss of you and boss of everybody else here, there were several F bombs.

Q. Gotcha.

Is that the way Rutwik speaks normally?

A. No.

Q. Had you ever heard Rutwik drop F bombs when speaking with someone else?

A. No.

Q. Did Albert ever use abusive language?

A. Arguably, on the call that he made to me.

Q. There is a, sort of, broad interpretation of abusive language.

Did Albert utter any profanities to you on the call?

A. No. But his tone was hostile and demeaning.

Q. Okay. In what way was Albert's



V. VILLETTI

tone on the call then abusive?
A. He shouted at me that I was not to speak and he was to talk at me essentially.
Q. And this was during the telephone call while you were in Boston?
A. Yes.
Q. Okay. And had Albert ever displayed aggression toward you?
A. No. I didn't interact with Albert.
Q. Other than the call in Boston?
A. Yes. And another interaction I had with him in a kitchen.
Q. Okay. Was he aggressive or abusive in that interaction?
A. No.
Q. In what ways was Rutwik aggressive with you?
A. As I mentioned before, he felt he could call us, e-mail, pull us into meetings, yell at us of what we should do or shouldn't do.

V. VILLETTI

Q. And you also experienced a deterioration of your role?
A. Yes.
Q. In what way?
A. When Albert called me, he said that I was not allowed to travel anymore for my role and I was essentially not allowed to do anything without his explicit permission. And being the head of healthcare content, that had not been a part of the arrangement when I took the job.
Q. And do you go into that in more detail in this next paragraph here where you say Albert effectively changed my role abruptly and taken over my leadership over the conferences?
A. Yes.
Q. And now seemingly any agency over teleconferences, barred me from traveling, which is essential for me to perform my job.
Do you see that?
A. Yes.

V. VILLETTI

Q. How many trips had you taken for Guidepoint during your tenure there?
A. I don't recall the specifics.
Q. Do you have an estimate?
A. Three, I believe.
Q. Including Boston?
A. Yes.
Q. Did you take any trips to -- for Guidepoint work after Boston?
A. No.

\- - -

(Whereupon, a discussion was held off the record.)

\- - -

Q. And here your complaint was that Albert had abruptly taken away your leadership of the conferences, correct?
A. Yes.
Q. And in what ways were you established as a leader of conferences?
A. That was a part of my role.
Q. What role did Bouker have with the conferences?
A. Bouker just approved things at

V. VILLETTI

the late stage of a decision.
Q. Did Rutwik have any role at the conferences?
A. No.
Q. And when we -- and we talked about this last time; conferences versus teleconferences.
When we say conferences here, these are events that you would travel to?
A. Not just travel to. Some were in New York. It was in-person meetings.
Q. In-person meetings, thank you.
Separate and apart from a teleconference, correct?
A. Yes.
Q. Okay. And so you would also have leadership over healthcare content teleconferences?
A. Yes.
Q. How many teleconferences would you have conducted while you were at Guidepoint?



V. VILLETTI

A. Many.

Q. Was there a frequency in which they occurred? Was it once a week? A couple times a -- how many -- how would you say in terms of frequency?

A. It varied from once a week to three times a week.

Q. And Boston was an in-person conference, correct, it wasn't a teleconference?

A. Yes.

Q. Did you have any teleconferences for Guidepoint after your Boston trip?

A. Yes.

Q. How many?

A. I don't recall exactly. Probably two or three.

Q. Did you have to seek Albert's approval for those two to three teleconferences?

A. I had to seek Rutwik's.

Q. Had you had to seek Rutwik's approval prior to these two to three conferences?

V. VILLETTI

A. Approval, no.

Q. What did you have to seek from Rutwik?

A. I didn't have to seek anything. I was told that I should consult him.

Q. And who told you you should consult with Rutwik about teleconferences?

A. Bouker.

Q. And when did Bouker tell you that?

A. Around the time he showed up.

Q. Pre Boston or post Boston?

A. Pre Boston.

Q. After your telephone call with Albert when you were in Boston, did you have any other communications with Albert?

A. No.

Q. Going on in your complaint, you see the paragraph that starts I was sought out and recruited?

A. Yes.

Q. You were sought out and

V. VILLETTI

recruited in 2017 to serve as a subject matter expert who would lead the HLC --

What does HLC stand for?

A. Healthcare.

Q. -- portion of the business in my group. And I accepted this position in good faith. I was also told I was joining a start-up where I would help build the team.

This has all proved to be highly misleading. And I have since observed my own employment trajectory following a familiar pattern at Guidepoint.

Do you see that portion of your complaint?

A. Yes.

Q. And who communicated to you that you were, by joining Guidepoint, joining a start-up?

A. Bouker.

Q. And when did he do that?

A. When I was being interviewed.

Q. In what respects did Bouker tell you Guidepoint was a start-up?

V. VILLETTI

A. He never said Guidepoint was a start-up. He said the content team was like a start-up, hence the quotation marks.

Q. Okay. How many other content teams were at Guidepoint when you were interviewing?

A. We were the content team.

Q. If that team was a start-up, what other teams were there?

A. At Guidepoint as a whole?

Q. Correct.

A. As I recall, there was the main business line, which was one-on-one client calls. There was a data team. There was a surveys team.

Q. And was it your impression that those other teams were established and not, quote, start-ups?

A. Yes.

Q. And here you say that your employment trajectory is following a familiar pattern at Guidepoint.

What was -- first, what was the



V. VILLETTI

trajectory?
A. That I was brought on under the premise that I was going to be effectively a leader in that particular segment of the business. And then over a period of time, my role gradually deteriorated.
Q. Deteriorated in the way that we have talked about before?
A. Yes.
Q. And what was the familiar pattern at Guidepoint that you were referencing here?
A. The familiar pattern is how they treated women.
Q. And which women did you have in mind when you wrote familiar pattern?
A. Ashlee and Jessica.
Q. Which makes sense. Because then you start talking about Ashlee in your complaint, right?
A. Yes.
Q. And here you say you spoke with Ashlee's team following her departure,

V. VILLETTI

correct?
A. Yes.
Q. And that no one had -- that the team had informed you that no one had sought their opinion and notified them and Ashlee was, in fact, a great leader.
Do you see that?
A. Yes.
Q. And who was -- who were the members of Ashlee's team that you spoke with?
A. I don't recall their names.
Q. How many people?
A. I talked to three or four of them.
Q. Men? Women?
A. Women.
Q. All women?
A. Yes.
Q. And then your complaint continues and you talk about Jessica. We have talked about Jessica before, correct?

V. VILLETTI

A. Yes.
Q. And your complaint also talks about Faiza. And that's Dr. Jibril, correct?
A. Yes.
Q. You said you were not permitted to discuss or defend the choice, the choice being to hire Dr. Jibril, and that you don't believe Albert even met her.
As you sit here today, do you know whether Dr. Jibril ever met with Albert?
A. Not to my knowledge.
Q. You interviewed Dr. Jibril, correct?
A. Yes.
Q. Did anyone else interview Dr. Jibril?
A. Yes.
Q. Who?
A. Bouker Pool, Justin Ruiz, Priscilla, and there was another guy in HR that I don't remember the name of.

V. VILLETTI

James, James something.
Q. That you know, is Priscilla still an employee of Guidepoint?
A. Currently?
Q. Yes.
A. I believe so.
Q. Other than Dr. Jibril, had you made any other recommendations for hire at Guidepoint?
A. No.
Q. You talked about your associate leaving, right?
A. Yes.
Q. Were there efforts to replace her?
A. Yes.
Q. And what were those efforts?
A. We -- I created a listing for the job. It was to be posted internally and externally.
Q. Did that lead to any interviews?
A. I was supposed to interview people. But it never happened.
Q. Did anyone else interview anyone



V. VILLETTI

to fill the position of your associate?
A. My associate specifically, no.
Q. So was there ever an occasion where you would have recommended someone to replace your departing associate?
A. No.
Q. The last paragraph in your complaint, you said that you appreciate the rapport between yourself and Priscilla and genuinely hope that we can find an amicable resolution here.
Do you see that?
A. Yes.
Q. You have a good relationship with Priscilla?
A. Very good relationship.
Q. And you felt comfortable bringing this complaint to her attention?
A. Yes.
Q. And she was head of HR at that point, so the proper person to bring the complaint to?

V. VILLETTI

A. Yes.
Q. If you could just turn back to the first page --
\- - -
(Whereupon, a discussion was held off the record.)
\- - -
Q. -- Exhibit K. And here there's Priscilla's reply, where she asks does 3 o'clock work for you today -- to discuss today. And then your response: Yes, I will come by your office at that time. Thank you.
Do you see that?
A. Yes.
Q. And you ultimately had a meeting with Priscilla about your complaint?
A. Yes.
Q. During that meeting, did Priscilla tell you what the next steps would be concerning your complaint?
A. I don't recall.
Q. Were any steps taken regarding your complaint following your meeting

V. VILLETTI

with Priscilla?
A. I don't know.
Q. Did anyone else speak to you concerning your complaint after your March 12th meeting with Priscilla?
A. I may have spoken to Priscilla again about it.
Q. You had another meeting with Priscilla?
A. I believe so.
Q. And when did that occur?
A. I don't know exactly.
Q. After March 12th, though?
A. Yes.
Q. Okay. Was it just that one more meeting?
A. I believe so.
Q. And do you recall what you talked about with Priscilla at that second meeting?
A. I don't recall.
Q. Other than Priscilla, did you speak about your complaint with anyone else?

V. VILLETTI

A. No.
MR. GRECH: Can you mark this as L, please?
\- - -
(Whereupon, Defendant's Exhibit L, an e-mail exchange, was marked for identification.)
\- - -
Q. Ms. Villetti, we are showing you what's been marked as Defendant's Exhibit L. If you could take a moment to look that over, please (handing).
A. Okay.
Q. Have you had a chance to look at Exhibit L?
A. Yes.
Q. Do you recognize it?
A. Yes.
Q. What is it?
A. It is an e-mail from my boss, Bouker Pool, to Priscilla regarding Rutwik's inappropriate behavior and him leading to a threatening and hostile work environment.



V. VILLETTI

Q. Had you seen this e-mail before today?

A. Yes.

Q. And what were the circumstances of you seeing this e-mail before today?

A. The day my boss was filing this, he called me and he read the e-mail to me. And just said I want you to be aware I'm filing this complaint.

Q. It was your understanding that Bouker called you and read the contents of this e-mail before he clicked send to Priscilla?

A. I don't know the timing.

Q. Did Bouker communicate to you that this is an e-mail I'm about to send or that I have sent to Priscilla?

A. I don't recall.

Q. But he read you the contents of what he explained was an e-mail complaint?

A. Yes.

Q. And it appears to be that complaint here?

V. VILLETTI

A. Yes.

Q. And why did Bouker tell you he wanted you to know?

A. As a member of his team, he would communicate something like that.

Q. And Bouker read to you. And you see now that he reported to Priscilla that he was compelled to elevate the matter to a formal notification to HR, because members of his team, both verbally and via written communiqué, are complaining of threatening language and actions creating a hostile work environment.

Do you see that?

A. Yes.

Q. This is all in reference to Rutwik?

A. Yes.

Q. Is any of Bouker's complaint here based upon Albert's actions or is it all Rutwik?

MR. LICHTEN: I'm going to object, because it's speculating.

V. VILLETTI

But you can answer.

A. I don't know.

Q. When Bouker called you to say this is the content of my e-mail complaint, did he tell you who he was complaining about?

A. I don't recall.

Q. In the first paragraph, it mentions Rutwik by name?

A. Yes.

Q. Is Albert mentioned anywhere in this e-mail?

A. Doesn't appear to be.

Q. When you spoke to Bouker about the e-mail, did he say I'm filing the complaint about Albert?

A. I don't recall him mentioning that.

Q. Who were the members of Bouker's team on March 16, 2018?

A. Would have been me, Justin, Jessica, and the four girls that reported to Jessica prior to being transferred to reporting to Bouker.

V. VILLETTI

Q. And we talked about that on your first day, right?

A. Yes.

Q. Had you sent any written communications to Bouker about your hostile work environment complaints concerning Rutwik?

A. I'm sorry?

Q. Sure.

Did you send Bouker anything in writing complaining that Rutwik was creating a hostile work environment?

A. I believe I had complained about Rutwik's behavior several times to Bouker.

Q. In writing?

A. I don't recall the specifics, but likely so.

MR. GRECH: We will review the production from plaintiffs. But to the extent that it's not in there, we are calling for the production of any written communiqué from Ms. Villetti to



V. VILLETTI

Bouker complaining about the hostile work environment created by Rutwik. I'll follow up in writing.

Q. Ms. Villetti, were you aware of any other written communications by any other members of your team to Bouker about a hostile work environment?

A. I wasn't aware. And also I don't have access to my Guidepoint e-mail --

Q. Sure.

A. -- inbox.

Q. Sure, understood.

At the time you were employed by Guidepoint, do you recall receiving a written communication from any of these team members about Rutwik creating a hostile work environment?

A. I can't recall.

Q. Did you have communications with Justin -- strike that.

Did you have conversations with Justin about Rutwik creating a hostile

V. VILLETTI

work environment?

A. As my teammate, I would imagine so.

Q. Do you recall specifically whether you did?

A. I don't recall the specifics, but I likely did.

Q. And did you have conversations with Jessica about Rutwik creating a hostile work environment?

A. I believe it was discussed in a team meeting.

Q. And when was this team meeting?

A. Sometime after the Boston trip.

Q. And who was at the meeting?

A. Actually, strike that.

Sometime before or after the Boston meeting, but in that period.

Q. Sometime early March of 2018?

A. I would say around then. It was one of the last team meetings we had prior to me being let go.

Q. Okay. And who was at the meeting?

V. VILLETTI

A. It would have been the team.

Q. You, Bouker, Justin, and Jessica?

A. And the --

Q. Four girls --

A. -- four girls.

Q. -- that had reported to Jessica but then reported to Bouker?

A. Yes.

Q. All right. And what was discussed during that -- well, was Rutwik at the meeting?

A. I don't believe so, no.

Q. And what about hostile work environment was discussed at this team meeting?

A. I don't recall the specifics. But I remember a conversation surrounding his behavior towards the various team members.

Q. And in that meeting, Bouker shared with the team that he felt Rutwik was creating a hostile work environment?

V. VILLETTI

A. I don't recall.

Q. Who on the team mentioned their concern about Rutwik's behavior during this team meeting?

A. Jessica, as well as the other girls, the four girls.

Q. Did Bouker?

A. No.

Q. Did Justin?

A. No, not to my knowledge.

Q. When Bouker called you to tell you about this e-mail, did you tell him that you had, a few days prior, done the same thing?

A. I may have. I don't remember.

Q. Before you sent your e-mail to Priscilla, did you speak with Bouker --

A. No.

Q. -- about your e-mail?

A. No.

Q. In the last paragraph in Bouker's e-mail, it says he's informed to his direct reports that he has filed a formal complaint, so they are aware



V. VILLETTI

he's advocating on their behalf for a positive work environment.
Do you see that?
A. Yes.
Q. Did Bouker have any direct reports other than the team members that we talked about?
A. I don't -- not to my knowledge. I don't know.
Q. During the team meeting, did Bouker say to the team all right, I'm going to report this to Priscilla?
A. I don't remember.
Q. Did you tell the team that you were going to report to Priscilla?
A. No.
Q. Before sending the e-mail to Priscilla, did you tell anyone that you were going to file a complaint?
A. No.
Q. Did anyone in human resources approach you about Bouker's complaint?
A. I don't remember. But it's possible that the follow-up meeting I

V. VILLETTI

had with Priscilla discussed that.
Q. The second meeting we talked about after your complaint?
A. Yes.
Q. Do you know if anyone communicated with Rutwik concerning Bouker's complaint?
A. I don't know.
Q. Do you know if anyone communicated with Justin about Bouker's complaint?
A. I don't know.
Q. What about Jessica?
A. I don't know.
MR. GRECH: Can we mark this as M, please?
- - -
(Whereupon, Defendant's Exhibit M, an e-mail exchange, was marked for identification.)
- - -
Q. Ms. Villetti, we are showing you what's been marked as Defendant's Exhibit M. If you could take a moment

V. VILLETTI

to look at that, please (handing).
A. (Witness complied).
Q. Ms. Villetti, have you had a chance to look at Exhibit M?
A. Yes.
Q. Do you recognize it?
A. Yes.
Q. And what is it?
A. It is an e-mail communication regarding the Boston trip between myself and Albert.
Q. And this would have been around the time you had a telephone conversation with Albert about Boston?
A. Yes. It appears it was right before and then right after.
Q. Okay. If you could look at page 1 of Exhibit M, Albert's March 1st e-mail at 12:04 p.m.
Can you see that?
A. Yes.
Q. From now on, your focus is one hundred percent on teleconferences. Someone else will take over in-person

V. VILLETTI

events. Clear?
Do you see that?
A. Yes.
Q. Who took over the in-person events after this e-mail communication?
A. I don't know.
Q. Was there any in-person events held after March 1st but before your separation from Guidepoint?
A. I don't recall.
Q. And Albert told you that your focus would be 100 percent on teleconferences, correct?
A. Yes.
Q. And in what way did that make you feel he was taking over your agency over telephone conferences?
A. I don't believe he was taking over my agency over teleconferences.
Q. Can you look back at your e-mail to Priscilla, second page of that exhibit, first full paragraph, there is a parenthetical on the third line. Now seemingly any agency overtake



V. VILLETTI

teleconferences.
A. Well, I was primarily referring to -- so if you read the full sentence there, Albert has effectively changed my role, abruptly taken away my leadership over the conferences, and now seemingly any agency over teleconferences.
So that's discussing a full range of events that occurred.
Q. And by agency over telephone conferences in your e-mail to Priscilla, you mean your leadership or control over teleconferences?
A. Sure.
Q. Okay. And back to the e-mail from Albert where he says your focus is one hundred percent on teleconferences, in that statement itself, was there anything in there that led you to believe you would have a deteriorated role concerning teleconferences?
A. This was in conjunction with Rutwik's overreach into the

V. VILLETTI

teleconferences.
Q. The statement to Priscilla about you seemingly losing agency over teleconferences, that was meant to reflect Rutwik's resurping that role?
A. Yes. It wasn't just referencing the call and e-mail from Albert, it was referencing the interference from Rutwik.
Q. Okay. And there is at least two e-mails in this exchange with Albert where he sends you nothing but question marks.
Do you see that?
A. Yes.
Q. And Albert was your boss at the time, correct, one of your bosses?
A. Albert was my boss's boss.
Q. Right.
So I would imagine seeing an e-mail like that from Albert would have caused some anxiety, correct?
A. Yes. It's unstable.
Q. Right.

V. VILLETTI

Is there anything in this exchange, other than maybe causing anxiety about seeing this sort of e-mail from your boss's boss, that would have made you think that Albert was acting this way because you are a woman, in this exchange, Exhibit M?
A. I don't know. I haven't seen his exchanges with other women or men.
Q. Did you talk to Bouker about his e-mail communications with Albert?
A. Did I talk to Bouker --
Q. About Bouker's e-mail communications with Albert?
A. No.
Q. Bouker never said to you, in effect, Albert can be pretty nasty in e-mails or something like that?
A. No.
Q. This March 1st exchange with Albert, did you speak with Albert again about Boston?
A. No. I wasn't afforded the opportunity to.

V. VILLETTI

Q. And did you seek out that opportunity?
A. I was told that there would be a meeting arranged.
Q. This would be a meeting between you and Albert?
A. Yes.
Q. And who told you that there would be a meeting?
A. I believe Albert did.
Q. And how did he tell you that?
A. On the call.
Q. So March 1st, you had both e-mail and telephone communications with Albert?
A. Yes.
Q. And during one of those telephone communications, Albert told you that, essentially, when you got back to New York, you would have a meeting?
A. Yes.
Q. And did he give you an idea of when that meeting would occur?



V. VILLETTI

A. No.

Q. Did he give you a sense of anyone else might be attending that meeting?

A. No.

Q. And did that meeting ultimately ever occur?

A. No.

Q. When you returned to New York, did you inquire about having the meeting?

A. I may have.

Q. And who did you ask?

A. I would have asked Daniella likely who was the scheduler.

Q. And what response did Daniella give you?

A. I don't know.

Q. Did you speak with Bouker about your exchange with Albert concerning Boston?

A. Yes.

Q. And how did you have that communication with Bouker?

V. VILLETTI

A. I had a conversation with him when he was back.

Q. When Bouker returned to the office?

A. Yes.

Q. And when did that occur?

A. Sometime after the Boston trip.

Q. Anything more specific?

A. I don't remember details.

Q. And you spoke with Bouker in person?

A. Yes. Yes, I spoke to him in person.

Q. And what did you tell Bouker about your exchange with Albert concerning Boston?

A. Actually, I also spoke to him by e-mail I believe.

Q. Okay. So you had communications with Bouker about your experiences with Albert concerning the Boston trip, correct?

A. Yes.

Q. And what did you express to

V. VILLETTI

Bouker?

A. That Albert didn't seem to have the context for the trip.

Q. As to why your presence was necessary?

A. Yes.

Q. And in your 11:28 a.m. e-mail in Exhibit M, you attempted to give him that context?

A. Yes.

Q. And his reply was still from now on your focus is a hundred percent on teleconferences, correct?

A. Yes.

Q. When you spoke to Bouker about your exchange with Albert, did you express to Bouker any concerns that Albert's conduct reflected gender discrimination?

A. Could you --

Q. Sure.

You and Albert had this e-mail exchange March 1st?

A. Yes.

V. VILLETTI

Q. Sometime thereafter, you talked to Bouker about it?

A. Yes.

Q. When you talked to Bouker about it, did you tell Bouker I think Albert did this to me because I'm a woman or something to that effect?

A. I don't recall.

Q. Do you have a last name for Daniella?

A. No.

Q. And she is a scheduler?

A. She was an assistant/scheduler.

Q. Whose assistant was she?

A. I don't know. I imagine Albert's.

Q. Other than Daniella, did you speak with anyone else about having a meeting with Albert?

A. I don't remember.

Q. Did you -- before you sent the e-mail to Priscilla, did you speak with Priscilla about your exchange with Albert on Boston?

V. VILLETTI

A. Yes.
Q. Okay. When did you speak with Priscilla?
A. I spoke with her immediately after I spoke with Albert.
Q. And how did you speak with Priscilla?
A. On the phone.
Q. And what did you tell Priscilla?
A. I just told her what had occurred.
Q. And what did Priscilla have to say in response?
A. That it was not uncommon for Albert to misplace his anger.
Q. Do you know what she meant by that?
A. I don't.
Q. Was it your understanding that Albert was angry at someone other than yourself?
A. Yes. At Bouker.
Q. And Albert was, at least in Priscilla's opinion, taking it out on

V. VILLETTI

you?
A. Yes.
Q. And why would Albert have been mad at Bouker?
A. Because he was skiing.
Q. When you were in Boston, where was Bouker?
A. Bouker was skiing.
Q. Coincidentally with Albert; was that the same ski trip?
A. Yes.
MR. GRECH: N, please.
\- - -
(Whereupon, Defendant's Exhibit N, an e-mail exchange, was marked for identification.)
\- - -
Q. Ms. Villetti, we are showing you what's been marked as Defendant's N. If you could take a moment to look at that, please (handing).
A. (Witness complied).
Q. Ms. Villetti, have you ever seen Defendant's Exhibit N before?

V. VILLETTI

A. Yes.
Q. You have, okay.
And under what circumstances?
A. My attorney showed me a copy.
Q. Prior to your attorney showing you a copy, had you ever seen the e-mail exchange depicted in Exhibit N before?
A. No.
Q. Were you aware that that e-mail exchange had occurred?
A. No.
Q. This being your second time seeing it, what do you understand Exhibit N to be?
A. Jessica seems to have some issue with me and she is discussing that with Bouker.
Q. Was Jessica a supervisor of yours or were you considered on the same level?
A. The same level.
Q. And Jessica's concern here to Bouker is first about reportedly your

V. VILLETTI

absence from the office?
A. Appears so.
Q. And she said I'm sure you have also noticed, to Bouker, that she's barely done any work too.
Would Jessica have had any way to review your work?
A. No.
Q. Would Bouker?
A. Yes.
Q. Jessica continues: Ms. Villetti has also taken upon herself to plan to attend just about any and all healthcare events. And this e-mail was March 1st.
MR. LICHTEN: Is it March 1st?
MR. GRECH: I'm sorry. Forgive me. February 28th.
Thank you, Stuart.
Q. This statement is in an e-mail dated February 28th.
Either when you first saw Exhibit N or now, which healthcare



V. VILLETTI

events did you think Jessica was referring to?

A. I don't know.

Q. Was the Boston trip coming up shortly after this February 28th e-mail?

A. Yes.

Q. And in the e-mail, Jessica says she just left at 3:00 p.m. today to take a flight to Boston for this one lunch meeting at 12:00 p.m. tomorrow.

You see that?

A. Yes.

Q. Was this lunch meeting in Boston the same subject of your e-mail exchange with Albert?

A. Yes.

Q. Who is Nick Smith?

A. He would have been a Guidepoint employee in Boston.

Q. Guidepoint has a Boston office or had a Boston office in February 2018?

A. I believe so.

V. VILLETTI

Q. What other Guidepoint employees were at the Boston meeting?

A. I don't remember.

Q. Was it just you?

A. No. There was one or two other people.

Q. And you don't remember who they were?

A. No.

Q. Were those one to two others from the New York office or the Boston office?

A. The Boston office.

Q. And Jessica continues, just to keep Bouker in the loop, Ms. Villetti completely demoralized Justin in front of the whole team. It was uncalled for and rude. And I think it really hurt Justin.

Do you see that?

A. Yes.

Q. Is that Justin Ruiz?

A. Yes.

Q. Do you know what Jessica is

V. VILLETTI

referring to there?

A. No idea.

Q. Have you ever had an exchange with Justin where you felt you were rude to him?

A. Justin is one of my best friends.

Q. Still?

A. Yes.

Q. Did Justin ever come to you and say you were rude and demoralized him in front of Guidepoint employees?

A. Never.

Q. You maintain a friendship with Justin today?

A. Yes.

Q. When was the last time you spoke to Justin?

A. He recently got engaged, so I congratulated him for that.

Q. And when did you congratulate him?

A. Sometime in the last couple of weeks.

V. VILLETTI

Q. And you have maintained communications with Justin since your separation from Guidepoint?

A. Periodically, yes.

Q. And Justin is still with Guidepoint?

A. I believe so.

Q. In what capacity?

A. He is creating content.

Q. Healthcare content?

A. No.

Q. Do you know what kind of content?

A. When I was there, he covered a variety of sectors; consumer, tech, gaming, other areas.

Q. And Bouker replies to this e-mail from Jessica saying thanks, disappointed, but not surprised.

Do you see that?

A. Yes.

Q. Before February 28th of 2018, had Bouker ever brought to you concerns that employees had thought you had been



V. VILLETTI

rude or demoralizing to them?
A. I don't recall.
Q. Did you have conversations with anyone at Guidepoint about you being rude or demoralizing to other employees?
A. I don't recall having any conversations with anyone about that.
Q. Do you recall having conversations in which you were rude or demoralizing to an employee?
A. I can't think of specific instances. But I know that if I had done such a thing, I would have apologized for it.
Q. And Bouker says that he will deal with it.
Did Bouker bring this concern of Jessica's to your attention?
A. No.
Q. And Jessica's reply is can I suggest we slap her with a PIP and please take away her privilege to travel, at least temporarily, until she

V. VILLETTI

gets her performance up.
Do you see that?
A. Yes.
Q. Ms. Villetti, do you know what a PIP is?
A. No.
Q. Have you ever heard of a performance improvement plan?
A. Yes.
Q. Okay. Do they do performance improvement plans at Guidepoint?
A. Not to my knowledge.
Q. Were you ever placed on a performance improvement plan at Guidepoint?
A. No.
Q. Was there ever a threat to place you on a performance improvement plan at Guidepoint?
A. No.
Q. Would Jessica have the authority to put you on a performance improvement plan?
A. No.

V. VILLETTI

Q. Would Bouker?
A. Yes.
Q. Would Jessica have had the authority to take away your travel privileges?
A. No.
Q. Would Bouker?
A. Yes.
Q. And here Jessica's condition is until you get your performance up.
Do you see that?
A. Yes.
Q. How was your performance in late February, early March of 2018?
A. It was -- I was performing well.
Q. And Bouker's reply is how do we document this and do the right way.
Do you see that?
A. Yes.
Q. And it appears --
MR. LICHTEN: That's not a reply to --
MR. GRECH: I'm sorry. Fair enough.

V. VILLETTI

Q. The next e-mail that appears on this Exhibit N is an e-mail from Bouker to Priscilla.
Do you see that?
A. Yes.
Q. And here it's forwarding the prior exchange?
A. Yes.
Q. And this is Bouker asking Priscilla how do we document this and do the right way.
Do you see that?
A. Yes.
Q. Did you ever have any conversations with Priscilla about Jessica's concerns?
A. No.
Q. Did you ever have any conversations with Priscilla about you being placed on a performance improvement plan?
A. No.
Q. Did you ever have any conversations with Priscilla about your



V. VILLETTI

performance?

A. No.

Q. That you are aware of, were any of Jessica's concerns ever documented as Bouker requested?

A. I don't know.

Q. And this is the same Jessica that you felt was mistreated based upon her gender, correct?

A. Yes.

MR. GRECH: O.

\- - -

(Whereupon, Defendant's Exhibit O, an e-mail exchange, was marked for identification.)

\- - -

(Whereupon, a recess was taken at this time.)

\- - -

Q. Ms. Villetti, can you just look back at Exhibit M, please, the e-mail exchange with Albert?

A. Yes.

Q. Page 2 in that exchange,

V. VILLETTI

Bates-stamped page 16, there is an e-mail from Albert to you and Priscilla dated March 1st at 11:11 a.m.

You see that?

A. Yes.

Q. And Albert writes that -- I see he misspelled your name there -- Valentina, Valentia, will be finishing up meetings in Boston and will be in the New York office tomorrow to work on teleconferences. The goal is 1.5 to 2 teleconferences per week in healthcare.

Do you see that?

A. Yes.

Q. Did you meet that goal when you returned from Boston?

A. Yes.

Q. Did you understand that to be one of your performance metrics?

A. At that moment, yes.

Q. Okay. And we had talked before about your difficulties in getting clarification on your performance metrics, right?

V. VILLETTI

A. Yes.

Q. What other performance metrics were you given?

A. I wasn't given any.

Q. And when we were talking about Exhibit N, which was Jessica's e-mail, right?

A. Yes.

Q. And she had said we have to get Valentia's performance up.

Do you recall that?

A. Yes.

Q. And you had said your performance was good, right?

A. Yes.

Q. And how were you measuring your performance at that point?

A. How was I measuring my own performance?

Q. Correct. To come to the opinion that it was good.

A. The numbers spoke for themselves.

Q. And what numbers in particular?

V. VILLETTI

A. The number of attendees I had on my teleconferences and the feedback I was getting from the teleconferences.

Q. When Albert said the goal is 1.5 to 2 teleconferences per week in healthcare, was that meant to measure your performance or the entire team?

A. I don't know. I took it to mean mine.

Q. And how many teleconferences were you conducting per week before the Boston trip?

A. I would say it averaged to around there.

Q. 1.5 to 2?

A. Per week, yeah.

Q. Ms. Villetti, I'm going to show you what's been marked as Defendant's Exhibit O (handing).

Have you had a chance to look at Defendant's O -- please take a chance to look at -- please take an opportunity to look at Defendant's O.

A. Yes.



V. VILLETTI

Q. All right. Do you recognize it?
A. No.
Q. Have you ever seen it before?
A. No.
Q. What does it appear to be?
A. It appears to be a letter from Jessica complaining about me on the day I was fired.
Q. And this is the same Jessica that had the e-mail we talked about before?
A. Yes.
Q. And the same Jessica you felt that was mistreated because of her gender?
A. Yes. Those two things are not related.
Q. And she wrote an e-mail to Priscilla on March 19th, which was the date of your termination, correct?
A. Yes.
Q. And the e-mail reads I cannot work with Valentia anymore. She leaves early, comes in late practically every

V. VILLETTI

day. She has every excuse in the book for why she's not doing her work. She creates so much more drama among the team. She is just so awful to work with.
I am begging you to please let this woman go. I am practically doing all of her work as it is. If she doesn't leave soon, I can guarantee a lot of my team will quit.
Do you at least see where it says that there?
A. Yes.
Q. Okay. Had Jessica ever raised with you her concerns about your leaving early?
A. Jessica was not even working primarily in the New York office.
Q. And where --
A. So I interacted with her maybe once a week, twice a week.
Q. And how would you have those interactions? Were they in-person in the office?

V. VILLETTI

A. Not really.
Q. And how --
A. I had one in-person meeting with her a week when she was in the office with the team.
Q. Did Jessica have any authority to set your schedule?
A. Absolutely not.
Q. Who did?
A. Bouker.
Q. And Albert?
A. By extension, yes.
Q. Anybody else?
A. Not to my knowledge.
Q. Did Jessica ever raise any concerns with you about you're not doing your work?
A. After I returned from Boston, there was quite a bit of chaos in the team. She was bickering with me as well as with everyone else. And I was just told that she was quote, unquote freaking out.
Q. And who else was Jessica having

V. VILLETTI

these exchanges with other than yourself?
A. She was freaking out at everyone on the team.
Q. Everyone on the team?
A. Yes.
Q. And who coined the phrase freaking out for Jessica?
A. I don't remember who initiated it. But I heard that phrase several times.
Q. And what was your understanding as to why Jessica was freaking out?
A. I was told that she had been subject to Albert's wrath before. And that when Albert would zoom on a group, she would freak out.
Q. Did Jessica explain to you how she had been subject to Albert's wrath before?
A. I don't recall.
Q. Who told you that Jessica had been subject to Albert's wrath before?
A. It came up in conversations



V. VILLETTI

around the office.

Q. With whom?

A. I can't tell you.

Q. What were the circumstances in which Jessica had previously experienced Albert's wrath?

A. I don't know the specifics.

Q. Did you understand Jessica's concern to be since Albert got mad at you in Boston that he was then going to take it out on the team?

A. Yes. Albert was not just mad at me. He was also mad at Bouker.

Q. For catching him skiing?

A. Yes.

Q. So he was mad at the two heads of the team?

A. Appears so.

Q. And there was freaking out among the team members that there would be fallout from that?

A. One would imagine.

Q. Did any of those conversations where there was team chaos after Boston

V. VILLETTI

focus specifically on your work?

A. No. There was a team meeting where we discussed everyone's role and how the expectation was for everyone to produce more.

Q. And is this the same team meeting when we were talking about your e-mail with Albert?

A. Sorry?

Q. Correct me if I'm wrong. After -- when we were talking about the e-mail exchange with Albert in Boston --

A. Yes.

Q. -- you said you had conversations with team members after that, correct?

A. Yes.

Q. Is this the same team meeting?

A. Possibly.

Q. Had you ever been accused of creating drama among the team?

A. No.

Q. Were you aware that Jessica

V. VILLETTI

eventually asked Priscilla to fire you?

A. No.

Q. Did Priscilla ever bring these concerns of Jessica to your attention?

A. I don't recall.

Q. And you see Jessica's statement, I'm practically doing all of her work as it is?

You at least see that statement?

A. Yes.

Q. Okay. Were there instances in which Jessica was doing your work?

A. No. Jessica could not do my work.

Q. And why not?

A. She is not a healthcare specialist.

Q. And what role did Jessica fill?

A. She was a logistics and events manager.

Q. Was it ever brought to your attention that anyone else other than Jessica was doing your work?

A. No.

V. VILLETTI

Q. And you see here where Jessica says if she, meaning you, doesn't leave soon, Jessica can guarantee a lot of my team will quit.

Who was part of Jessica's team at that point?

A. I assume she is referencing the four girls who technically reported to Bouker.

Q. Had any of those girls come to you with complaints about your conduct?

A. No.

Q. And who were these four girls?

A. There was Sarah, Amrutha, Gabby, and Kendall. None of whom are still there.

MR. LICHTEN: Are they older than 18?

THE WITNESS: Yes.

MR. LICHTEN: So then can we refer to them as women?

MR. GRECH: That's fair.

Q. The four women on Jessica's team?

LEGAL SERVICES



V. VILLETTI
A. Yes.
Q. Other than the women themselves, had anyone brought a complaint on their behalf to you?
A. Not that I recall, no.
Q. Jessica said they would quit. And you said they are not there anymore.
So why are they not there anymore?
A. They have either quit or been fired.
Q. Okay. Sarah, what happened to Sarah?
A. I don't know the specifics.
Q. Did she quit or was she fired?
A. I believe she quit.
Q. Do you know why?
A. No.
Q. Amrutha?
A. I don't know.
Q. Did she quit or was she fired?
A. Don't know.
Q. Gabby?

V. VILLETTI
A. Don't know.
Q. But not there anymore?
A. No.
Q. You don't know whether Gabby quit or was terminated?
A. No.
Q. What about Kendall?
A. Don't know. She is not there.
Q. Is Jessica still there?
A. No.
Q. Is there an events team that you are aware of?
A. Yes.
Q. Do you recall when we were talking about your e-mail complaint to Priscilla and you had a meeting with her that day?
A. Yes.
Q. And you had a second meeting with her that you remember?
A. Yes.
Q. Do you recall when that second meeting was?
A. No.

V. VILLETTI
Q. Do you recall what you talked about during that second meeting with Priscilla?
A. No.
Q. Did you talk about this complaint from Jessica?
A. Not to my recollection.
Q. Did you talk about work distribution within your team?
A. I don't recall the specifics of the conversation.
Q. Did you talk about concerns over your attendance?
A. Not that I recall.
Q. Did you talk about any concerns about you're creating drama in the team?
A. Not that I recall.
Q. Did Priscilla tell you during this meeting that there was a concern that team members were going to quit?
A. Not that I recall.
MR. GRECH: P, Exhibit P.
\- - -

V. VILLETTI
(Whereupon, Defendant's Exhibit P, plaintiff's October 27, 2018 letter was marked for identification.)
\- - -
Q. Ms. Villetti, we are showing you what's been marked as Defendant's Exhibit P, as in Peter, for the purposes of this deposition. You can just take an opportunity to look at that (handing).
A. Yes.
Q. Have you ever seen Exhibit P before?
A. Yes.
Q. And when did you see Exhibit P before?
A. Sometime after it was filed.
Q. Okay. And this was a letter sent by Mr. Lichten to the EEOC?
A. Appears to be, yes.
Q. And you see the reference in there, first paragraph, second sentence, to a companion charging



V. VILLETTI

parties case?
A. Uh-huh.
Q. Do you know who that companion party is?
A. That would be Dr. Jibril.
Q. Okay. And at what point did you and Dr. Jibril decide you would be companion parties in this litigation?
A. Sometime after I filed.
Q. After you filed what?
A. My complaint with the EEOC.
Q. Do you know whether your counsel received a case file from the EEOC in response to this request?
A. I don't know.
MR. GRECH: To the extent it hasn't been produced, we are going to follow up with a request in writing for the EEOC case file.
MR. LICHTEN: Okay. Anything I got I turned over.
MR. GRECH: Okay.
MR. LICHTEN: I don't know

V. VILLETTI

if I got one.
MR. GRECH: All right. We will follow up in writing.
Q.
- - -
(Whereupon, Defendant's Exhibit Q, a 1040 form, was marked for identification.)
- - -
Q. Ms. Villetti, we are showing you what's been marked as Defendant's Exhibit Q for this deposition (handing).
Do you recognize that document?
A. Yes.
Q. What is it?
A. It is my 2018 tax filing.
Q. And when were you separated from Guidepoint?
A. March of 2018.
Q. Did Guidepoint provide you with a W-2 form for the time that you worked for them in 2018?
A. Yes.

V. VILLETTI

Q. And here you identify your occupation as an entrepreneur; is that correct?
A. Yes.
Q. In what respects did you operate as an entrepreneur in 2018?
A. I was working on the company that I discussed before producing protein bars.
Q. That's KIOKO?
A. Yes.
Q. Did you serve as an entrepreneur in any other respects in 2018 or than of KIOKO?
A. No.
Q. And if, Ms. Villetti, you could look at the last page of Exhibit Q. It's a 1099-G form.
Do you see that?
A. Yes.
Q. Does this reflect your unemployment compensation?
A. Yes.
Q. And that amount was $10,005.

V. VILLETTI

Do you see that?
A. Yes.
Q. Is that an accurate reflection of the unemployment compensation you received in 2018?
A. Yes.
Q. And was that compensation given to you as a result of your termination from Guidepoint?
A. Yes.
Q. And, Ms. Villetti, if you could turn to the second page of the 1040 form, the main form?
A. Yes.
Q. Line Item 1, where it asks you to list your wages, salaries, tips, et cetera --
A. Yes.
Q. -- on the W-2 Form.
Can you see that amount?
A. Yes.
Q. $56,359?
A. Yes.
Q. And where did you acquire those

MAGNA LEGAL SERVICES

V. VILLETTI

wages, salaries, and tips in 2018?

A. Guidepoint.

Q. When you submitted your 2018 tax return, did it have a W-2 from Guidepoint attached to it?

A. Yes.

Q. Did it have any other 1099s in addition to the 1099-G from New York State Department of Labor Unemployment?

A. No.

Q. Ms. Villetti, if you could look at Form 1040, Schedule 1. It's the third page of Exhibit Q.

A. Yes.

Q. Line Item 17, additional income.

You see that?

A. Yes.

Q. It's showing a loss of $19,835.

You see that?

A. Yes.

Q. And this is for rental real estate, royalties, partnerships, S-corporations, trusts, et cetera?

A. Yes.

V. VILLETTI

Q. Can you explain the loss of $19,835 you experienced in 2009 -- 2018 in that category?

A. KIOKO is an S-corporation. Those are operating losses.

Q. That you claim on your personal tax returns?

A. Yes.

Q. And do you see in Line Item 17, they request any attachment of Schedule E?

A. Yes.

Q. Did your 2018 tax returns -- was it accompanied by a Schedule E?

A. Yes.

MR. GRECH: I'm going to call for production of the Schedule E.

Q. The $19,835 loss, that was attributed solely to KIOKO as an S-corporation?

A. KIOKO is the product. Yes. The corporation is called Kenko.

Q. I'm sorry.

V. VILLETTI

The corporation is called what?

A. Kenko, K-E-N-K-O.

Q. And KIOKO is the name of the product?

A. Yes.

Q. That's the protein bar?

A. Yes.

Q. So it's Kenko as the S-corporation?

A. Yes.

Q. And what is your status with Kenko?

A. I'm the CEO.

Q. Okay. The 19,835 loss, that's attributable solely to the Kenko operating losses, correct?

A. Yes.

Q. There are no rental real estate associated with that?

A. No.

Q. Royalties?

A. No.

Q. Partnerships?

A. No.

V. VILLETTI

Q. Trusts?

A. No.

Q. And you still work as the CEO of Kenko today?

A. Yes.

Q. And have there been any changes to your compensation as CEO of Kenko since our last meeting?

A. No.

Q. Kenko is still not profitable?

A. No.

Q. Are there any other officers of Kenko?

A. Yes. There is a CFO and a COO.

Q. And last time we had some concern about the other founders of Kenko, correct?

A. Yes.

Q. Are those other founders the other officers?

A. One of them is.

MR. GRECH: To the extent that there are confidentiality concerns, we are going to respect



V. VILLETTI

that. And we are going to ask for an identification in writing subject to confidentiality, as the court directed.

We will follow up in writing with a request for the identification of the officers of Kenko.

THE WITNESS: Yes.

Q. Does Kenko have any other employees?

A. No.

Q. Does Kenko have an IT department?

A. No.

Q. Does it sell its product on a website?

A. Yes. It's on Amazon Prime.

Q. How is the product manufactured?

A. There is a packaging -- there is a co-packer in Los Angeles.

Q. And Kenko -- did Kenko make sales of the KIOKO bars in 2018?

A. Yes.

V. VILLETTI

Q. And do you have a sense of the numbers, units sold?

A. Not off the top of my head.

Q. How long has Kenko been in operation?

A. Kenko was incorporated in 2016.

Q. Does Kenko have any business other than the sale of the KIOKO bars?

A. Not currently, no.

Q. Did it at any point?

A. No.

Q. Is there plans for it to have other businesses but the KIOKO bars?

A. Yes.

Q. And what are those other businesses?

A. Other nutritional products.

Q. And how far away is Kenko from offering these other nutritional products in terms of time?

A. We are still in R&D. I couldn't say.

Q. Would those also be available on Amazon Prime?

V. VILLETTI

A. Possibly. Or it will be directly on our own website.

Q. So you suffered $19,835 in operating losses attributed to Kenko in 2018?

A. Yes.

Q. And those -- and what were the makeup of those losses?

A. There is quite a bit of promotional and sampling and R&D in the early stages of a food company.

Q. And would the 19,835 reflect your expenses associated with those?

A. Yes.

Q. Promotions and sampling?

A. It would be sampling, R&D, marketing.

Q. Did Kenko file its own tax return in 2018?

A. Yes.

Q. Does Dr. Jibril have any affiliation with Kenko?

A. No.

MR. GRECH: I'm going to

V. VILLETTI

take a five-minute break.

\- - -

(Whereupon, a recess was taken.)

\- - -

MR. GRECH: And with that, Ms. Villetti, we are going to conclude your deposition. And I just want to thank you for your time for appearing and your answering our questions.

THE WITNESS: Thank you.

(Time noted: 4:48 p.m.)

MAGNA LEGAL SERVICES

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

\- - - - - -

E R R A T A

\- - - - - - -

PAGE LINE CHANGE

____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________
____ ____ ______________________________

A C K N O W L E D G E M E N T

STATE OF NEW YORK)
:SS
COUNTY OF _________)

I, VALENTIA VILLETTI, hereby certify that I have read the transcript of my testimony taken under oath on NOVEMBER 14, 2019, that the transcript is a true, complete and correct record of what was asked, answered and said during my testimony under oath, and that the answers on the record as given by me are true and correct, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____________________________
VALENTIA VILLETTI

Signed and subscribed to before me, this _____ day of ____________, _______.

__________________________
Notary Public

I N D E X O F W I T N E S S E S

WITNESS: VALENTIA VILLETTI

| EXAMINATION BY | PAGE |
| --- | --- |
| MR. GRECH | 4 |

I N D E X O F E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| H | EMPLOYEE AGREEMENT | 6 |
| I | EMPLOYMENT POLICIES | 11 |
| J | RECEIPT FOR EMPLOYEE HANDBOOK | 11 |
| K | E-MAIL EXCHANGE | 22 |
| L | E-MAIL EXCHANGE | 53 |
| M | E-MAIL EXCHANGE | 63 |
| N | E-MAIL EXCHANGE | 75 |
| O | E-MAIL EXCHANGE | 86 |
| P | PLAINTIFF'S OCTOBER 27, 2018 LETTER | 101 |
| Q | 1040 FORM | 103 |

I N D E X O F R E Q U E S T S

| DESCRIPTION | PAGE |
| --- | --- |
| ANY WRITTEN COMMUNIQUÉ FROM PLAINTIFF TO BOUKER COMPLAINING ABOUT HOSTILE WORK ENVIRONMENT CREATED BY RUTWIK | 57 |
| EEOC CASE FILE | 102 |
| SCHEDULE E ATTACHMENT | 107 |
| IDENTIFICATION OF THE OFFICERS OF KENKO IN WRITING SUBJECT TO CONFIDENTIALITY | 110 |



CERTIFICATE

I, LEAH MILLER, a shorthand reporter and Notary Public within and for the State of New York, do hereby certify:

That the Witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such Witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

L. Miller

Leah Miller, a Court Reporter and Notary Public

LAWYER'S NOTES

PAGE/LINE NOTE



**A**

**able** 35:4
**above-entitled** 1:17
**abruptly** 39:17
    40:17 66:6
**absence** 34:8 77:2
**absences** 19:4,8,12
    28:8,12,16,18
**absent** 27:21
**Absolutely** 92:9
**abusive** 36:14,24
    37:15,20 38:2,18
**accepted** 44:7
**access** 58:11
**accommodate** 6:7
**accompanied**
    107:15
**accurate** 105:4
    114:19
**accused** 95:22
**acknowledgement**
    13:2
**acknowledgements**
    35:17
**acquire** 105:25
**acting** 68:7
**action** 1:18 5:3
    118:11
**actions** 55:14,22
**addition** 106:9
**additional** 106:16
**address** 4:12,23
**administer** 3:16
**advocating** 62:2
**affiliation** 112:23
**afforded** 68:24
**afternoon** 4:16,17
**agency** 39:20 65:17
    65:20,25 66:8,12
    67:4
**aggression** 36:14
    38:11
**aggressive** 36:22
    38:17,21
**AGREED** 3:4,9,13

**agreed-upon** 33:24
**agreement** 6:21
    7:15,17,21,25
    10:5,9 34:2 117:9
**Albert** 7:22 9:12
    19:11 20:4,11
    32:12 35:24 36:4
    36:7 37:15,21
    38:10,13 39:6,16
    40:17 43:17,19
    48:10,14 56:12,17
    64:12,15 65:12
    66:5,18 67:8,12
    67:17,19,22 68:6
    68:12,15,18,22,22
    69:7,11,16,19
    70:21 71:16,22
    72:3,17,23 73:6
    73:20,25 74:6,16
    74:21,24 75:4,10
    78:17 86:23 87:3
    87:7 89:5 92:12
    93:17 94:10,13
    95:9,13
**Albert's** 37:25
    42:19 55:22 64:19
    72:19 73:17 93:16
    93:20,24 94:7
**allegations** 9:21
    15:14
**allowed** 39:7,9
**Amazon** 110:19
    111:25
**Americas** 2:16
**amicable** 50:13
**amount** 33:24
    104:25 105:21
**Amrutha** 97:15
    98:21
**Angeles** 110:22
**anger** 74:16
**angry** 74:21
**animus** 10:20
**answer** 6:9 56:2
**answered** 116:10
**answering** 113:12

**answers** 116:12
**anxiety** 36:16 67:23
    68:4
**Anybody** 92:14
**anymore** 39:8
    90:24 98:9,11
    99:3
**apart** 22:15 41:16
**apologized** 82:16
**appear** 56:14 90:6
**appearing** 26:5
    113:11
**appears** 12:12
    54:24 64:16 77:3
    84:21 85:2 90:7
    94:19 101:22
**apply** 4:20
**appreciate** 50:10
**approach** 62:23
**appropriate** 114:6
**approval** 42:20,24
    43:2
**approved** 40:25
**areas** 81:17
**Arguably** 37:17
**arranged** 69:5
**arrangement** 39:13
**Article** 8:2,9,18
**Ashlee** 17:4 46:19
    46:21 47:7
**Ashlee's** 46:25
    47:12
**asked** 19:20 22:17
    33:2 70:15 96:2
    116:10
**asking** 85:10
**asks** 51:10 105:16
**assistant** 73:15
**assistant/scheduler**
    73:14
**associate** 2:22
    34:18 49:12 50:2
    50:3,7
**associated** 108:20
    112:14
**assume** 34:10 97:8

**attached** 106:6
    114:13 116:15
**attachment** 107:11
    117:22
**attempted** 72:9
**attempting** 26:22
**attend** 77:14
**attendance** 100:14
**attendees** 89:2
**attending** 70:4
**attention** 24:18,25
    50:21 82:20 96:5
    96:23
**attorney** 3:20 76:5
    76:6 114:15
**attorneys** 2:4,10,16
    3:5
**attributable** 108:16
**attributed** 107:21
    112:5
**at-will** 13:8
**authority** 83:22
    84:5 92:7
**authorized** 3:15
    19:24
**available** 16:14
    111:24
**Avenue** 2:4,16
**averaged** 89:14
**aware** 8:5,11,19
    13:16 14:21 15:3
    15:8,11 21:5
    54:10 58:6,10
    61:25 76:11 86:4
    95:25 99:13
**awful** 91:5
**a.m** 24:2 72:8 87:4

**B**

**B** 117:7
**back** 14:9 17:7
    19:25 20:14 51:3
    65:21 66:17 69:21
    71:3 86:22
**bar** 108:7
**barely** 77:6

**barred** 39:21
**bars** 104:10 110:24
    111:9,14
**based** 9:23 28:23
    33:11,17,23 35:9
    55:22 86:9
**Bates-stamped**
    87:2
**Battery** 1:11 2:10
**begging** 91:7
**behalf** 7:21 10:5
    62:2 98:5
**behaving** 27:6,9
**behavior** 14:23
    16:3 17:14,17
    53:23 57:15 60:20
    61:4
**belief** 18:8
**believe** 14:19 19:2
    30:25 40:6 48:10
    49:7 52:11,18
    57:14 59:12 60:14
    65:19 66:22 69:11
    71:19 78:25 81:8
    98:18
**belittled** 35:19,22
**belittling** 36:8
**best** 5:16 80:7
**bickering** 92:21
**bit** 92:20 112:10
**blood** 118:11
**board** 10:17 13:17
**bombs** 37:7,13
**bonus** 30:8,15,23
    31:2 33:14,17,20
**book** 91:2
**boss** 37:6,6 53:21
    54:7 67:17,19
    68:5
**bosses** 67:18
**boss's** 67:19 68:5
**Boston** 17:7,9,23
    18:18,22 36:5,10
    38:8,14 40:7,10
    42:9,14 43:14,14
    43:15,17 59:15,19



64:11,15 68:23 70:22 71:8,17,22 73:25 75:7 78:5 78:11,15,21,22,23 79:3,12,14 87:10 87:17 89:13 92:19 94:11,25 95:14
**Bouker** 16:18,24 19:15,16,24 20:2 20:4,11 21:13 27:7,20 29:17 31:12 32:15 34:3 34:11 40:23,25 43:10,11 44:21,24 48:23 53:22 54:12 54:16 55:3,7 56:4 56:15,25 57:6,11 57:16 58:2,8 60:3 60:9,22 61:8,12 61:18 62:6,12 68:11,13,17 70:20 70:25 71:4,11,15 71:21 72:2,16,18 73:3,5,6 74:23 75:5,8,9 76:19,25 77:5,10 79:16 81:18,24 82:17,19 84:2,8 85:3,10 86:6 92:11 94:14 97:10 117:20
**Bouker's** 28:8,12 28:16 55:21 56:20 61:23 62:23 63:8 63:11 68:14 84:17
**break** 6:4,11 34:14 113:2
**briefly** 30:4
**BRIGHT** 2:3
**bring** 50:24 82:19 96:4
**bringing** 50:20
**broad** 37:19
**brought** 24:15,23 46:3 81:24 96:22 98:4
**build** 44:10
**business** 44:6 45:15 46:6 111:8
**businesses** 111:14 111:17

C

**C** 2:2 116:2 118:2,2
**call** 17:22 27:3 31:23 36:4,9 37:17,22 38:2,7 38:14,23 43:16 67:8 69:13 107:18
**called** 17:20,23 39:6 54:8,12 56:4 61:12 107:24 108:2
**calling** 29:4,5 57:23
**calls** 45:16
**Campanella** 24:21
**capacity** 81:9
**carefully** 114:5
**case** 9:22 102:2,14 102:20 117:21
**catching** 94:15
**category** 107:4
**CATHERINE** 2:18
**cause** 13:12
**caused** 67:23
**causing** 68:3
**caution** 13:7
**cell** 17:20,24
**CEO** 108:14 109:4 109:8
**CEO's** 16:12
**certain** 8:8 16:3,20 19:11
**certification** 3:7
**certify** 116:6 118:5 118:10
**cetera** 105:18 106:24
**CFO** 24:21 32:11 109:15
**chain** 23:20
**chance** 7:8 11:25 12:3 16:10 23:9
53:15 64:5 89:21 89:22
**CHANGE** 115:4
**changed** 39:17 66:5
**changes** 109:7 114:12 116:14
**chaos** 28:19 92:20 94:25
**charge** 3:19
**charging** 101:25
**choice** 48:8,9
**chooses** 20:19
**circumstances** 18:14 54:5 76:4 94:5
**Civ** 1:6
**claim** 107:7
**clarification** 27:22 27:24 30:7 32:5,8 33:3,8,10 87:24
**clear** 5:22 31:10 65:2
**clicked** 54:13
**client** 45:16
**Coincidentally** 75:10
**coined** 93:8
**come** 17:18 51:13 80:11 88:21 97:11
**comes** 90:25
**comfortable** 50:19
**coming** 10:16 78:5
**communicate** 54:16 55:6
**communicated** 28:7,11 44:18 63:7,11
**communication** 26:7 58:18 64:10 65:6 70:25
**communications** 43:18 57:6 58:7 58:22 68:12,15 69:15,19 71:20 81:3
**communiqué** 55:12
57:25
**COMMUNIQUÉ** 117:19
**companion** 101:25 102:4,9
**company** 9:15,19 9:22 10:5 32:10 104:8 112:12
**compelled** 55:9
**compensation** 104:23 105:5,8 109:8
**complained** 16:25 57:14
**complaining** 55:13 56:7 57:12 58:2 90:8 117:20
**complaint** 20:23 21:6,10,16,18 22:3,7,10,12,16 23:14 24:5 25:21 29:19 34:6,17 36:13 40:16 43:21 44:16 46:22 47:22 48:3 50:10,20,25 51:18,22,25 52:5 52:24 54:10,22,25 55:21 56:6,17 61:25 62:20,23 63:4,8,12 98:4 99:16 100:7 102:12
**complaints** 21:22 25:13 57:7 97:12
**complete** 116:9
**completely** 79:17
**complied** 7:7 12:2 12:20 23:7 64:3 75:23
**components** 29:24
**concern** 18:21 27:18 28:8,12,15 30:12 61:4 76:24 82:19 94:10 100:21 109:17
**concerned** 18:17
**concerning** 32:3 51:22 52:5 57:8 63:7 66:23 70:21 71:17,22
**concerns** 13:22 19:2 25:5 26:2 72:18 81:24 85:17 86:5 91:16 92:17 96:5 100:13,16 109:25
**conclude** 113:9
**conclusion** 17:19 35:9
**condescending** 18:5 20:9
**condition** 84:10
**conduct** 14:22 16:8 16:20,25 17:9 72:19 97:12
**conducted** 41:24
**conducting** 89:12
**conference** 42:10
**conferences** 39:18 40:18,21,24 41:4 41:7,9 42:25 65:18 66:7,13
**confidentiality** 109:24 110:4 117:23
**confront** 20:19
**congratulate** 80:22
**congratulated** 80:21
**conjunction** 66:24
**considered** 16:4,8 16:21 17:8 76:21
**consult** 43:6,8
**consultant** 26:12 26:18
**consultants** 26:14
**consulted** 18:24
**consulting** 13:24 14:6
**consumer** 81:16
**content** 34:21 39:11 41:20 45:3



45:6,9 56:5 81:10 81:11,14
**contents** 54:12,20
**context** 18:6 72:4 72:10
**CONTINUED** 1:15
**continues** 34:6 47:23 77:12 79:15
**continuing** 36:13
**continuous** 23:17
**continuously** 35:18
**contract** 8:16
**control** 66:15
**conversation** 8:25 9:8 18:3 20:2,6 32:24 60:19 64:15 71:2 100:12
**conversations** 17:3 18:9 25:3,17 58:24 59:9 82:4,9 82:11 85:16,20,25 93:25 94:24 95:17
**COO** 109:15
**copy** 3:18 76:5,7
**corporation** 107:24 108:2
**correct** 7:19 9:24 9:25 10:6 13:4 15:15 24:2,5,9 30:18,19 40:18 41:17 42:10 45:13 47:2,25 48:5,17 65:14 67:18,23 71:23 72:14 86:10 88:21 90:21 95:11 95:18 104:4 108:17 109:18 116:9,13
**corrections** 114:5,7 116:13
**counsel** 102:13
**counseling** 19:7
**COUNTY** 116:5
**couple** 42:5 80:24
**course** 8:12,20
**court** 1:2 3:18
110:5 114:19 118:22
**covered** 81:15
**co-packer** 110:22
**created** 28:18 49:19 58:3 117:21
**creates** 91:4
**creating** 55:14 57:13 58:19,25 59:10 60:24 81:10 95:23 100:17
**csmith@guidepo...** 2:19
**currently** 49:5 111:10

**D**

**D** 116:2 117:2,7,17
**DAHN** 2:22
**Daniella** 70:15,17 73:11,18
**data** 45:16
**date** 90:21 114:10
**dated** 23:25 77:23 87:4
**dates** 25:11
**David** 1:17 2:12 4:25
**day** 54:7 57:3 90:8 91:2 99:18 116:21
**days** 61:14 114:16
**deal** 19:19 82:18
**December** 30:9,17
**decide** 102:8
**decided** 30:16
**decision** 41:2
**deemed** 114:18
**deeming** 24:4
**defend** 48:8
**Defendant** 1:9 2:10 2:16
**Defendant's** 6:20 6:25 11:3,7,19 22:23 23:4 53:6 53:11 63:19,24 75:15,20,25 86:14
89:19,22,24 101:2 101:8 103:7,12
**definite** 13:10
**demanding** 27:4
**demeaned** 20:5
**demeaning** 17:21 18:3 37:24
**demonstrate** 28:23
**demoralized** 79:17 80:12
**demoralizing** 82:2 82:6,12
**departing** 50:6
**department** 106:10 110:15
**departure** 35:8 46:25
**dependant** 14:6
**depicted** 76:8
**deposing** 114:15
**deposition** 3:14 13:22 101:10 103:13 113:9 114:4,13,17,18
**depositions** 7:3 11:21
**DESCRIPTION** 117:8,18
**detail** 28:3 39:15
**details** 71:10
**deteriorated** 46:8,9 66:22
**deterioration** 36:15 39:3
**dgrech@gordanr...** 2:13
**dictate** 26:24
**dictating** 29:2
**difficulties** 87:23
**difficulty** 36:18
**direct** 61:24 62:6
**directed** 110:5
**directly** 20:20 112:3
**disappointed** 81:20
**disclosing** 8:7
**discrimination** 14:14,21 15:15,18 20:17 28:23 35:2 35:10 72:20
**discriminatory** 10:11 16:4,9,21 17:10
**discuss** 23:16 28:3 48:8 51:12
**discussed** 36:2 59:12 60:12,16 63:2 95:4 104:9
**discussing** 66:10 76:18
**discussion** 11:15 15:23 40:13 51:6
**dismissed** 35:19,22
**dismissive** 36:7
**disparage** 8:23
**displayed** 38:11
**distribution** 100:10
**DISTRICT** 1:2,2
**document** 14:12 25:12,15 84:18 85:11 103:15
**documented** 25:5 86:5
**documents** 5:9,10
**doing** 19:21 27:12 29:8,10 35:6 91:3 91:8 92:18 96:8 96:13,24 114:9
**Dr** 9:2,8 17:6 35:5 48:4,9,13,16,20 49:8 102:6,8 112:22
**drama** 91:4 95:23 100:17
**drop** 37:12
**duly** 4:3 118:7

**E**

**E** 2:2,2 4:2,2 107:12,15,19 115:2 116:2,2,2 117:2,2,2,7,7,17
117:17,17,22 118:2,2
**earlier** 30:4
**early** 59:20 84:15 90:25 91:17 112:12
**East** 4:14
**EEOC** 101:21 102:12,14,20 117:21
**effect** 3:17 68:18 73:8
**effective** 7:18
**effectively** 39:16 46:5 66:5
**efforts** 49:15,18
**either** 13:12 77:24 98:12
**elevate** 55:9
**employed** 12:14 58:16
**employee** 6:21 11:8 12:24 13:3,23 14:4 18:14 20:23 21:6,9,15 26:4,8 26:11,19 49:4 78:21 82:12 117:9 117:11
**employees** 16:14 79:2 80:13 81:25 82:7 110:12
**employer** 13:8
**employment** 5:11 7:15,25 8:5,12,20 10:4 11:4 12:9,10 13:9,18 14:10 44:13 45:23 117:9
**encountered** 19:17
**encourages** 14:18
**endured** 35:18
**engaged** 80:20
**engaging** 17:18
**entire** 89:8
**entitled** 14:12
**entrepreneur** 104:3 104:7,13

**environment** 24:17
24:25 25:10 29:19
29:25 53:25 55:15
57:7,13 58:3,9,20
59:2,11 60:16,25
62:3 117:20
**errata** 114:7,10,12
114:15 116:15
**ESQ** 2:6,12,18
**essential** 39:22
**essentially** 38:5
39:9 69:20
**established** 40:21
45:19
**estate** 106:23
108:19
**estimate** 40:5
**et** 105:17 106:24
**events** 41:10 65:2,6
65:8 66:11 77:15
78:2 96:20 99:12
**eventually** 96:2
**everybody** 37:6
**everyone's** 95:4
**exact** 25:11
**exactly** 12:16 42:17
52:13
**examination** 1:15
3:18 4:7 117:4
**examined** 4:5
**example** 37:4
**exchange** 20:3
22:24 23:20 24:8
53:7 63:20 67:12
68:3,8,21 70:21
71:16 72:17,24
73:24 75:16 76:8
76:12 78:17 80:4
85:8 86:15,23,25
95:13 117:11,12
117:12,13,13
**exchanges** 68:10
93:2
**excuse** 91:2
**exhibit** 6:21 7:2,4
11:4,8 12:4,19

13:6 14:9 20:14
22:24 23:5,9,19
23:24 51:9 53:7
53:12,16 63:20,25
64:5,19 65:23
68:8 72:9 75:16
75:25 76:8,16
77:25 85:3 86:15
86:22 88:7 89:20
100:24 101:3,9,14
101:17 103:8,13
104:18 106:14
117:8
**Exhibits** 11:19
**existence** 21:5
**expect** 31:7
**expectation** 95:5
**expenses** 112:14
**experienced** 39:2
94:7 107:3
**experiences** 71:21
**experiencing** 34:16
**expert** 44:3
**explain** 18:6 93:19
107:2
**explained** 54:21
**explicit** 39:10
**express** 10:9 18:20
20:4 71:25 72:18
**expressed** 19:18,23
**extension** 92:13
**extent** 22:8 57:22
102:17 109:23
**externally** 49:21
**e-mail** 22:24 23:14
23:19,20,23,24
24:12 25:6,21,24
27:3 31:23 38:23
53:7,21 54:2,6,8
54:13,17,21 56:5
56:13,16 58:12
61:13,17,20,23
62:18 63:20 64:10
64:20 65:6,21
66:13,17 67:8,22
68:5,12,14 69:15

71:19 72:8,23
73:23 75:16 76:8
76:11 77:15,22
78:7,9,16 81:19
85:2,3 86:15,22
87:3 88:7 90:11
90:19,23 95:9,13
99:16 117:11,12
117:12,13,13
**e-mailing** 29:4
**e-mails** 67:12 68:19

**F**

**F** 37:7,12 117:2,7
117:17 118:2
**fact** 47:7
**fail** 114:17
**failing** 27:25
**fair** 84:24 97:23
**faith** 44:8
**Faiza** 1:4 48:4
**fallout** 94:22
**familiar** 44:14
45:24 46:12,15,18
**far** 5:4 111:19
**February** 77:20,23
78:6,24 81:23
84:15
**feedback** 89:3
**feel** 10:20 29:8 33:9
65:17
**felt** 17:14 20:5
26:24 27:2 28:17
38:22 50:19 60:23
80:5 86:9 90:14
**file** 62:20 102:14,21
112:19 117:21
**filed** 61:24 101:19
102:10,11
**filing** 3:6 54:7,10
56:16 103:18
**fill** 50:2 96:19
**find** 33:21 50:13
**finish** 6:2
**finishing** 87:9
**fire** 96:2

**fired** 90:9 98:13,17
98:23
**firm** 2:22 5:2 33:25
**first** 4:3 9:7 10:16
13:21 23:23 24:12
24:12,23 25:8
45:25 51:4 56:9
57:3 65:23 76:25
77:24 101:24
**five-minute** 113:2
**fixed** 13:10
**flight** 78:11
**Floor** 2:5,11,17
**focus** 64:23 65:13
66:18 72:13 95:2
**focused** 28:21
**follow** 58:4 102:19
103:4 110:6
**following** 44:13
45:23 46:25 51:25
**follows** 4:6
**follow-up** 62:25
**food** 112:12
**force** 3:16
**foregoing** 118:8
**Forgive** 77:20
**form** 3:10 20:23
21:6,10,16 103:8
103:23 104:19
105:14,14,20
106:13 116:14
117:15
**formal** 55:10 61:25
**forth** 8:8 19:25
118:7
**forwarding** 85:7
**found** 20:24
**founders** 109:17,20
**four** 47:16 56:23
60:6,7 61:7 97:9
97:14,24
**freak** 93:18
**freaking** 92:24 93:4
93:9,14 94:20
**frequency** 42:3,6
**frequent** 28:17

**frequently** 27:21
**friends** 80:8
**friendship** 80:15
**front** 79:17 80:13
**frustration** 19:19
**full** 65:23 66:4,10
**furnished** 3:19
**further** 3:9,13
118:10
**furthermore** 34:7

**G**

**G** 116:2
**Gabby** 97:15 98:25
99:5
**gaming** 81:17
**gender** 9:23 15:15
15:18 28:24 33:12
35:2,10 72:19
86:10 90:16
**genuinely** 50:12
**gestures** 5:18
**getting** 87:23 89:4
**Ghodadra** 15:21
**girlfriend** 9:12
**girls** 56:23 60:6,7
61:7,7 97:9,11,14
**give** 18:5 31:7
69:24 70:3,18
72:9
**given** 14:4 30:13
88:4,5 105:8
116:12 118:9
**Global** 1:8 2:15 5:3
**go** 4:19,22 13:23
14:9 39:14 59:23
91:8
**goal** 87:12,16 89:5
**going** 4:19 5:7 29:3
43:21 46:4 55:24
62:13,16,20 89:18
94:11 100:22
102:19 107:17
109:25 110:2
112:25 113:8
**good** 4:16,17 44:8



50:16,18 88:15,22
**Gordon** 2:9 5:2
**Gotcha** 37:8
**gradually** 46:7
**great** 19:19 47:7
**Grech** 1:17 2:12 4:8,25 6:17 10:24 22:20 53:3 57:20 63:16 75:13 77:19 84:24 86:12 97:23 100:24 102:17,24 103:3 107:17 109:23 112:25 113:7 117:5
**group** 44:7 93:17
**guarantee** 91:10 97:4
**guess** 5:23
**guidance** 14:4
**guidelines** 30:13
**Guidepoint** 1:8 2:15 5:3,12 7:16 7:22 8:6,14,21,23 9:3,7,9,22 10:17 12:15 13:8,9,17 14:17 15:5,19 21:7 22:16 23:18 26:4,11 30:21,24 33:15 35:2 40:3 40:10 41:25 42:14 44:14,19,25 45:2 45:7,12,24 46:13 49:4,10 58:11,17 65:10 78:20,22 79:2 80:13 81:4,7 82:5 83:12,16,20 103:20,22 105:10 106:3,6
**Guidepoint's** 12:10 20:24
**guy** 48:24

**H**

**H** 6:18,21 7:2,4,8 7:10 117:7,9
**handbook** 11:9 12:9,11,14,25 13:3 14:5 117:11
**handing** 7:6 11:25 23:6 53:13 64:2 75:22 89:20 101:12 103:14
**happened** 49:24 98:14
**harassed** 14:20
**harassing** 16:4,9,21 17:11
**harassment** 14:13 20:16
**head** 39:11 50:23 111:4
**heads** 94:17
**healthcare** 34:21 39:11 41:20 44:5 77:15,25 81:11 87:13 89:7 96:17
**heard** 37:12 83:8 93:11
**held** 1:18 11:16 15:24 40:14 51:7 65:9
**help** 44:9
**hereinbefore** 118:7
**hierarchy** 9:15,18
**highly** 44:11
**hire** 28:5 34:5,22 35:4,5 48:9 49:9
**HLC** 44:3,4
**hope** 50:12
**hostile** 37:23 53:24 55:14 57:7,13 58:3,9,20,25 59:11 60:15,24 117:20
**hours** 27:3
**HR** 21:16,18 22:4 26:7 48:25 50:23 55:10
**human** 20:22,25 62:22
**hundred** 64:24 66:19 72:13
**hurt** 79:19

**I**

**idea** 69:24 80:3
**identification** 6:22 11:5,10 22:25 53:8 63:21 75:17 86:16 101:5 103:9 110:3,8 117:22
**identify** 104:2
**imagine** 59:3 67:21 73:16 94:23
**immediately** 9:6 74:5
**imperative** 114:14
**impression** 45:18
**improvement** 83:9 83:12,15,19,23 85:22
**inability** 28:5 34:5
**inappropriate** 53:23
**inbox** 58:14
**included** 14:3
**Including** 34:13 40:7
**income** 106:16
**incorporated** 111:7
**increase** 34:20 35:12
**increasing** 36:14
**increasingly** 36:21
**Index** 1:6
**individual** 20:19,20
**individuals** 14:19
**information** 8:8,14
**informed** 47:5 61:23
**initiated** 93:10
**inquire** 70:11
**instances** 82:14 96:12
**instructed** 34:20
**instructions** 4:19 4:21 5:4 6:15 114:2
**interact** 38:12
**interacted** 91:21
**interacting** 26:17
**interaction** 38:15 38:18
**interactions** 91:24
**interested** 118:12
**interference** 67:9
**internally** 49:21
**internet** 20:25
**interpret** 10:11
**interpretation** 37:20
**interview** 48:19 49:23,25
**interviewed** 44:23 48:16
**interviewing** 45:8
**interviews** 49:22
**investigated** 22:10
**investigation** 21:22 22:3,9,18
**in-person** 31:25 32:23 41:13,15 42:9 64:25 65:5,8 91:24 92:4
**issue** 28:21 76:17
**issues** 24:16,24 25:9,24 27:17,20 28:2
**Item** 105:16 106:16 107:10

**J**

**J** 1:17 2:12 11:8,20 11:24 12:19,19,21 12:23 13:6 117:10
**James** 49:2,2
**Jessica** 17:5 27:12 29:11 46:19 47:23 47:24 56:23,24 59:10 60:4,8 61:6 63:14 76:17,20 77:7,12 78:2,9 79:15,25 81:19 83:22 84:4 86:8 90:8,10,14 91:15 91:18 92:7,16,25 93:9,14,19,23 94:6 95:25 96:5 96:13,14,19,24 97:2,4 98:7 99:10 100:7
**Jessica's** 76:24 82:20,22 84:10 85:17 86:5 88:7 94:9 96:7 97:6,24
**Jibril** 1:4 9:2,8 17:6 35:5 48:4,9,13,16 48:20 49:8 102:6 102:8 112:22
**job** 28:6 39:13,23 49:20
**John** 24:19,20,21 25:9,13,19 28:13 31:20 32:2,15
**John's** 32:6,9
**joining** 33:25 44:9 44:19,20
**Justin** 27:15 29:16 48:23 56:22 58:23 58:25 60:3 61:10 63:11 79:17,20,23 80:5,7,11,16,19 81:3,6

**K**

**K** 22:21,24 23:5,9 23:19,24 51:9 116:2 117:11
**keep** 79:16
**Kendall** 97:16 99:8
**Kenko** 107:24 108:3,9,13,16 109:5,8,11,14,18 110:9,11,14,23,23 111:5,7,8,19 112:5,19,23 117:23
**kind** 81:13
**KIOKO** 104:11,15 107:5,21,23 108:4



110:24 111:9,14
**kitchen** 38:16
**knew** 31:15
**know** 5:5 6:5,5,6 7:5,10 11:24 22:5 22:6,8,11 26:10 26:16,20 27:14,22 28:14 33:13 48:13 49:3 52:3,13 54:15 55:4 56:3 62:10 63:6,9,10 63:13,15 65:7 68:9 70:19 73:16 74:17 78:4 79:25 81:13 82:14 83:5 86:7 89:9 94:8 98:16,19,22,24 99:2,5,9 102:4,13 102:16,25
**knowledge** 22:2,7 27:11,16 48:15 61:11 62:9 83:13 92:15
**K-E-N-K-O** 108:3

**L**

**L** 3:2 4:2,2,2 53:4,7 53:12,16 116:2 117:12
**Labor** 106:10
**lack** 27:22 33:9
**language** 36:15,25 37:16,20 55:13
**late** 41:2 84:14 90:25
**law** 2:22 4:25
**lawsuit** 5:12
**LAWYER'S** 119:2
**lead** 35:8 44:3 49:22
**leader** 40:21 46:5 47:8
**leadership** 28:18 39:18 40:18 41:20 66:7,14
**leading** 53:24
**Leah** 1:19 118:3,22
**leave** 91:10 97:3
**leaves** 90:24
**leaving** 49:13 91:17
**led** 28:19 36:16 66:21
**left** 34:19 35:11 78:10
**LEGAL** 1:24
**letter** 90:7 101:4,20 117:15
**level** 76:22,23
**LEVINE** 2:22
**Liana** 34:18
**Lichten** 2:3,6 6:6 55:24 77:17 84:22 97:18,21 101:21 102:22,25
**limited** 8:15
**line** 45:15 65:24 105:16 106:16 107:10 115:4
**list** 28:4 105:17
**listen** 18:13
**listing** 49:19
**litigation** 102:9
**LLC** 1:8 2:15
**logistics** 96:20
**long** 29:21 111:5
**look** 7:4,8 11:23 12:18,19 20:14 23:6 24:11 53:13 53:15 64:2,5,18 65:21 75:21 86:21 89:21,23,24 101:11 104:18 106:12
**loop** 79:16
**Los** 110:22
**losing** 67:4
**loss** 106:19 107:2 107:20 108:15
**losses** 107:6 108:17 112:5,9
**lot** 91:11 97:4
**loud** 18:4
**lunch** 78:12,15

**M**

**M** 63:17,20,25 64:5 64:19 68:8 72:9 86:22 116:2 117:12
**mad** 75:5 94:10,13 94:14,17
**MAGNA** 1:24
**main** 26:2 45:14 105:14
**maintain** 80:15
**maintained** 81:2
**makeup** 112:9
**male** 18:13
**man** 17:16 18:10
**management** 24:16 24:24 25:9,24 26:5,22 27:17,25 28:2,21
**manager** 34:9 96:21
**mandate** 35:4
**MANSUKHANI** 2:9
**manufactured** 110:20
**March** 23:25 24:13 27:18 34:16 52:6 52:14 56:21 59:20 64:19 65:9 68:21 69:14 72:24 77:16 77:18 84:15 87:4 90:20 103:21
**mark** 6:17 10:24 22:20 53:3 63:16
**marked** 6:22,25 11:5,9,13,19 22:25 23:4 53:8 53:11 63:21,24 75:17,20 86:16 89:19 101:4,8 103:9,12
**marketing** 112:18
**marks** 45:5 67:14
**marriage** 118:12
**matter** 44:3 55:10 118:13
**mean** 29:18 37:3 66:14 89:9
**meaning** 24:18 97:3
**meant** 67:5 74:17 89:7
**measure** 89:7
**measured** 30:15
**measuring** 88:17 88:19
**meet** 87:16
**meeting** 23:15 31:25 51:17,20,25 52:6,9,17,21 59:13,14,16,19,25 60:13,17,22 61:5 62:11,25 63:3 69:5,6,10,22,25 70:5,7,12 73:20 78:12,15 79:3 92:4 95:3,8,20 99:17,20,24 100:3 100:21 109:9
**meetings** 27:5 29:5 38:24 41:14,15 59:22 87:10
**member** 26:25 55:5
**members** 29:3 47:12 55:11 56:20 58:8,19 60:21 62:7 94:21 95:17 100:22
**men** 47:18 68:10
**mentioned** 30:6 38:22 56:12 61:3
**mentioning** 56:18
**mentions** 56:10
**met** 48:10,13
**metrics** 27:23 30:5 30:8 31:4,24 32:4 32:13,17,21 33:4 33:11 87:20,25 88:3
**Miller** 1:19 118:3 118:22
**mind** 25:25 46:18
**mine** 89:10
**misleading** 44:12
**misplace** 74:16
**misspelled** 87:8
**mistreated** 9:19,23 86:9 90:15
**mistreatment** 23:17
**moment** 7:4 12:19 23:5 53:12 63:25 75:21 87:21
**months** 24:15,22 29:23
**move** 6:10
**multiple** 31:9
**M.D** 1:4

**N**

**N** 2:2 3:2 4:2 75:13 75:16,20,25 76:8 76:16 77:25 85:3 88:7 116:2,2 117:2,2,7,13,17
**name** 4:9 48:25 56:10 73:10 87:8 108:4
**names** 47:14
**nasty** 68:18
**necessary** 72:6 114:5
**need** 6:4
**needed** 28:6
**never** 45:2 49:24 68:17 80:14
**New** 1:2,11,11,21 2:5,5,11,11,17,17 4:5,15,15 41:13 69:21 70:10 79:12 87:11 91:19 106:9 116:3 118:5
**Nick** 78:19
**nodding** 5:18
**nondisclosure** 8:3



**normally** 37:10
**Notary** 1:20 4:4
  116:25 118:4,22
**NOTE** 119:3
**noted** 113:14
  114:12 116:14
**NOTES** 119:2
**notice** 13:13
**noticed** 77:5
**notification** 55:10
**notified** 47:6
**notify** 20:21
**November** 1:12
  116:8
**number** 89:2
**numbers** 33:22
  88:23,25 111:3
**nutritional** 111:18
  111:20

**O**

**O** 3:2 86:12,15
  89:20,22,24 116:2
  117:2,7,13,17
**oath** 3:16 116:8,11
**object** 55:25
**objections** 3:10
**obligation** 8:22
**observed** 44:12
**occasion** 18:12 50:4
**occupation** 104:3
**occur** 52:12 69:25
  70:8 71:7
**occurred** 42:4
  66:11 74:12 76:12
**October** 101:3
  117:14
**offender** 14:22
  20:20
**offenders** 15:17
**offering** 111:20
**office** 16:13 51:13
  71:5 77:2 78:22
  78:23 79:12,13,14
  87:11 91:19,25
  92:5 94:2

**officer** 3:15
**officers** 109:13,21
  110:8 117:22
**okay** 6:16 10:23
  12:18 13:5 15:13
  18:2 29:12 32:2
  32:19 33:9 35:15
  37:25 38:10,17
  41:19 45:6 52:16
  53:14 59:24 64:18
  66:17 67:11 71:20
  74:3 76:3 83:11
  87:22 91:15 96:12
  98:14 101:20
  102:7,22,24
  108:15
**older** 97:18
**once** 42:4,7 91:22
**one-on-one** 45:15
**operate** 104:6
**operating** 107:6
  108:17 112:5
**operation** 111:6
**opinion** 34:25 47:6
  74:25 88:21
**opportunity** 7:6
  18:6 68:25 69:3
  89:24 101:11
**Order** 1:19
**original** 114:15
**outcome** 118:13
**output** 34:20
**overreach** 66:25
**overtake** 65:25
**o'clock** 51:11

**P**

**P** 2:2,2 3:2 100:24
  100:24 101:3,9,14
  101:17 117:14
**packaging** 110:21
**page** 7:20,25 8:18
  14:11 20:17 51:4
  64:18 65:22 86:25
  87:2 104:18
  105:13 106:14

115:4 117:4,8,18
**PAGE/LINE** 119:3
**pain** 36:17
**paragraph** 14:17
  20:15,18 24:13
  35:15 36:12 39:15
  43:22 50:9 56:9
  61:22 65:23
  101:24
**parenthetical** 65:24
**Park** 1:11 2:4,10
**part** 13:21 29:7
  39:12 40:22 97:6
**participate** 22:17
**particular** 46:5
  88:25
**parties** 3:6 102:2,9
  118:11
**partnerships**
  106:23 108:24
**party** 13:12 102:5
**pattern** 44:14
  45:24 46:13,15,18
**pay** 35:12
**pending** 6:9
**people** 34:22 47:15
  49:24 79:7
**perceived** 23:16
**percent** 64:24
  65:13 66:19 72:13
**perform** 28:6 39:23
**performance** 27:23
  30:5,8,14 31:4,24
  32:3,13,17,20
  33:3,10 83:2,9,11
  83:15,19,23 84:11
  84:14 85:21 86:2
  87:20,24 88:3,11
  88:15,18,20 89:8
**performed** 34:7
**performing** 84:16
**period** 8:6 13:10
  46:7 59:19
**Periodically** 81:5
**permission** 39:10
**permitted** 48:7

**person** 50:24 71:12
  71:14
**personal** 107:7
**pertained** 17:4,5
**Peter** 101:9
**phone** 74:9
**phrase** 93:8,11
**physical** 36:17
**PIP** 82:23 83:6
**place** 1:18 83:18
**placed** 83:14 85:21
**Plaintiff** 1:16
  117:20
**plaintiffs** 1:5 2:4
  57:21
**plaintiff's** 101:3
  117:14
**plan** 77:13 83:9,15
  83:19,24 85:22
**plans** 83:12 111:13
**Plaza** 1:11 2:10
**please** 4:10,13 5:15
  6:18 10:25 14:10
  23:6 53:4,13
  63:17 64:2 75:13
  75:22 82:24 86:22
  89:22,23 91:7
  114:4,9
**point** 5:21 6:9 9:18
  34:19 50:24 88:18
  97:7 102:7 111:11
**policies** 11:4 14:10
  117:10
**Pool** 16:18,19 19:7
  19:10 48:23 53:22
**Pool's** 19:3
**portion** 44:6,15
**position** 44:7 50:2
**positive** 62:3
**possible** 62:25
**Possibly** 95:21
  112:2
**post** 43:14
**posted** 49:20
**practically** 90:25
  91:8 96:8

**Pre** 43:14,15
**Predating** 25:21
**premise** 46:4
**presence** 18:17
  29:20 30:2 72:5
**PRESENT** 2:21
**pretty** 68:18
**prevented** 35:6
**previously** 94:6
**primarily** 66:3
  91:19
**Prime** 110:19
  111:25
**prior** 13:13 18:24
  25:6 33:25 42:24
  56:24 59:23 61:14
  76:6 85:8
**Priscilla** 22:14
  23:15,21,25 24:8
  24:19 25:19 28:9
  32:18,20 34:3
  48:24 49:3 50:12
  50:17 51:18,21
  52:2,6,7,10,20,23
  53:22 54:14,18
  55:8 61:18 62:13
  62:16,19 63:2
  65:22 66:14 67:3
  73:23,24 74:4,8
  74:10,13 85:4,11
  85:16,20,25 87:3
  90:20 96:2,4
  99:17 100:4,20
**Priscilla's** 24:25
  51:10 74:25
**privilege** 82:24
**privileges** 84:6
**Probably** 42:18
**procedure** 15:4
**procedures** 14:13
  20:15
**produce** 95:6
**produced** 102:18
**producing** 104:9
**product** 107:23
  108:5 110:17,20



**production** 57:21
  57:24 107:18
**products** 111:18,21
**profanities** 37:21
**profitable** 109:11
**prohibited** 8:7
**promotional**
  112:11
**Promotions** 112:16
**promptly** 14:22
  20:21
**proper** 50:24
**proprietary** 8:14
**protein** 104:10
  108:7
**proved** 44:11
**provide** 32:7 33:7
  103:22
**provided** 8:15
**Public** 1:20 4:4
  116:25 118:4,22
**pull** 27:4 38:23
**purity** 5:25
**purposes** 7:2 11:20
  101:10
**pursuant** 1:19
**put** 83:23
**P.C** 2:3
**p.m** 1:13 64:20
  78:10,12 113:14

**Q**

**question** 3:11 5:24
  6:3,8,10 8:19
  10:13 28:25 67:13
**questions** 4:21 5:7
  5:14 6:12,13
  113:12
**question-and-ans...**
  5:6
**quit** 91:11 97:5
  98:7,12,17,18,23
  99:6 100:22
**quite** 92:20 112:10
**quotation** 45:4
**quote** 45:20 92:23

**R**

**R** 2:2 115:2,2
  117:17 118:2
**raise** 92:16
**raised** 20:12 91:15
**range** 66:11
**rapport** 50:11
**read** 54:8,12,20
  55:7 66:4 114:4
  116:7
**readily** 16:14
**reads** 14:17 20:18
  36:13 90:23
**real** 106:22 108:19
**really** 79:19 92:2
**reason** 114:6
**recall** 8:25 9:10,11
  9:13,14,16,17,20
  10:22 12:13 13:20
  15:6,7,10 16:23
  18:25 20:13 22:19
  25:2,11 29:23
  30:3 31:19 32:22
  36:11 40:4 42:17
  45:14 47:14 51:23
  52:19,22 54:19
  56:8,18 57:18
  58:17,21 59:5,7
  60:18 61:2 65:11
  73:9 82:3,8,10
  88:12 93:22 96:6
  98:6 99:15,23
  100:2,11,15,19,23
**receipt** 11:8 12:24
  13:6 114:16
  117:10
**received** 13:3 30:23
  33:17 102:14
  105:6
**receiving** 12:13
  58:17
**recess** 86:18 113:4
**recognize** 7:12 12:6
  12:21 23:11 53:18
  64:7 90:2 103:15

**recollection** 100:8
**recommendations**
  49:9
**recommended** 50:5
**record** 4:9,13 5:22
  11:16 15:24 40:14
  51:7 116:10,12
  118:8
**recruited** 43:23
  44:2
**Rees** 2:9 5:2
**refer** 97:22
**reference** 24:14
  55:18 101:23
**referencing** 46:14
  67:7,9 97:8
**referring** 66:3 78:3
  80:2
**reflect** 34:25 67:6
  104:22 112:13
**reflected** 34:16
  72:19
**reflection** 105:4
**regarding** 5:11
  51:24 53:22 64:11
**related** 90:18
  118:10
**relating** 20:3
**relationship** 50:16
  50:18
**remember** 13:25
  33:21 48:25 60:19
  61:16 62:14,24
  71:10 73:21 79:4
  79:8 93:10 99:21
**rental** 106:22
  108:19
**repeatedly** 30:9
**rephrase** 5:15
**replace** 49:15 50:6
**replies** 81:18
**reply** 51:10 72:12
  82:22 84:17,23
**report** 62:13,16
**reported** 16:24
  55:8 56:24 60:8,9

97:9
**reportedly** 76:25
**reporter** 1:20 5:19
  118:3,22
**reporting** 14:13
  20:16 26:8 56:25
**reports** 61:24 62:7
**represent** 5:2
**representing** 3:20
**request** 102:15,19
  107:11 110:7
**requested** 86:6
**requesting** 23:15
**require** 14:18
**required** 35:14
**reserved** 3:11
**resolution** 50:13
**resolve** 30:10
**resources** 20:22,25
  62:22
**respect** 109:25
**respective** 3:5
**respects** 17:13
  44:24 104:6,14
**respond** 6:3
**responded** 19:22
**response** 32:6 33:6
  51:12 70:17 74:14
  102:15
**responses** 5:17,20
**rest** 5:24
**result** 31:14 105:9
**resurping** 67:6
**return** 106:5
  112:20 114:14
**returned** 70:10
  71:4 87:17 92:19
**returns** 107:8,14
**review** 12:3 23:9
  57:20 77:8
**right** 6:16 21:19
  24:11 28:20 29:5
  46:22 49:13 57:3
  60:11 62:12 64:16
  64:17 67:20,25
  84:18 85:12 87:25

88:8,15 90:2
  103:3
**role** 26:5 32:9
  35:11 36:16 39:3
  39:8,17 40:22,23
  41:3 46:7 66:6,23
  67:6 95:4 96:19
**routine** 34:8
**royalties** 106:23
  108:22
**rude** 79:19 80:6,12
  82:2,6,11
**Ruiz** 48:23 79:23
**rules** 4:20
**Rutwik** 15:20 16:2
  26:3,10,21 27:6,9
  28:21 29:2,21
  31:18 35:24,25
  36:23,24 37:9,12
  38:20 41:3 43:4,8
  55:19,23 56:10
  57:8,12 58:4,19
  58:25 59:10 60:13
  60:24 63:7 67:10
  117:21
**Rutwik's** 29:20
  30:2 42:22,23
  53:23 57:15 61:4
  66:25 67:6
**R&D** 111:22
  112:11,17

**S**

**S** 2:2 3:2,2 117:2,2
  117:2,7,17,17
**sake** 5:25
**salaries** 105:17
  106:2
**sale** 111:9
**sales** 110:24
**sampling** 112:11,16
  112:17
**Sarah** 97:15 98:14
  98:15
**saw** 27:25 77:24
**saying** 81:19



**says** 61:23 66:18 78:9 82:17 91:13 97:3
**schedule** 92:8 106:13 107:11,15 107:19 117:22
**scheduler** 70:16 73:13
**SCULLY** 2:9
**sealing** 3:6
**Sebag** 7:22 10:2,4 10:19 15:20 16:6 16:20 17:2 18:13 18:16 19:3,7,18 19:18,23 20:8
**Sebag's** 17:8
**second** 20:15 24:13 52:21 63:3 65:22 76:14 99:20,23 100:3 101:24 105:13
**section** 8:2 14:12 14:15 21:21,23,24
**sectors** 81:16
**see** 13:6,14 14:15 14:25 21:3,21,24 35:20 36:19 39:24 43:22 44:15 47:9 50:14 51:15 55:8 55:16 62:4 64:21 65:3 67:15 78:13 79:21 81:21 83:3 84:12,19 85:5,13 87:5,7,14 91:12 96:7,10 97:2 101:17,23 104:20 105:2,21 106:17 106:20 107:10
**seeing** 54:6 67:21 68:4 76:15
**seek** 31:12,18,20 42:19,22,23 43:3 43:5 69:2
**seemingly** 39:20 65:25 66:8 67:4
**seen** 54:2 68:9 75:24 76:7 90:4 101:14
**segment** 46:6
**sell** 110:17
**send** 54:13,18 57:11
**sending** 62:18
**sends** 67:13
**sense** 46:20 70:3 111:2
**sent** 23:15 54:18 57:5 61:17 73:22 101:21
**sentence** 66:4 101:25
**Separate** 22:15 41:16
**separated** 103:19
**separation** 65:10 81:4
**September** 7:18 10:8,14 30:22
**serious** 36:16
**serve** 44:2 104:13
**SERVICES** 1:24
**session** 5:6
**set** 8:8 92:8 118:7
**share** 19:10
**shared** 60:23
**sheet** 114:7,10,12 114:15 116:15
**shortage** 34:8,15,25
**shorthand** 1:20 118:3
**shortly** 78:6
**shouted** 37:5 38:3
**show** 5:8,10 89:18
**showed** 5:9 43:13 76:5
**showing** 6:24 11:12 11:18 23:3 53:10 63:23 75:19 76:6 101:7 103:11 106:19
**sign** 114:9
**signed** 3:14,17 7:16 7:18,21 10:4,9 116:20
**signing** 114:11
**similar** 18:14
**simultaneously** 34:22
**sit** 48:12
**ski** 19:17 75:11
**skiing** 75:6,9 94:15
**slap** 82:23
**sleeping** 36:18
**slichten@lichten...** 2:7
**slope** 19:17,20
**slopes** 20:12
**Smith** 2:18 78:19
**sold** 111:3
**solely** 107:21 108:16
**soon** 91:10 97:4
**sorry** 57:9 77:19 84:24 95:10 107:25
**sort** 5:23 37:19 68:4
**sought** 27:24 30:7 31:9 32:5 43:23 43:25 47:6
**sources** 31:10
**South** 2:4
**SOUTHER** 1:2
**space** 114:7
**speak** 25:8 32:12 32:16 38:4 52:4 52:24 61:18 68:22 70:20 73:19,23 74:3,7
**speaking** 9:11,14 9:17 37:13
**speaks** 37:9
**specialist** 96:18
**specific** 9:5 30:11 71:9 82:13
**specifically** 8:2 10:2 14:11 16:24 30:6 50:3 59:5 95:2
**specifics** 9:10 25:2 32:22 40:4 57:18 59:7 60:18 94:8 98:16 100:11
**speculating** 55:25
**spoke** 46:24 47:12 56:15 71:11,13,18 72:16 74:5,6 80:18 88:23
**spoken** 25:17 52:7
**SS** 116:4
**staff** 28:5 34:5,8,15 34:24
**stage** 41:2
**stages** 112:12
**stand** 44:4
**start** 30:20 46:21
**starts** 43:22
**start-up** 44:9,20,25 45:3,4,10
**start-ups** 45:20
**state** 1:21 4:4,9,12 106:10 114:6 116:3 118:4
**statement** 66:20 67:3 77:22 96:7 96:10
**STATES** 1:2
**status** 108:12
**stay** 35:14
**steps** 51:21,24
**STIPULATED** 3:4 3:9,13
**stop** 4:23
**stopped** 14:24
**Street** 4:14
**stress-induced** 36:17
**strike** 58:23 59:17
**structure** 30:8,14 33:14,16
**Stuart** 2:6 4:23 77:21
**subject** 44:2 78:16 93:16,20,24 110:4 114:11 117:23
**subjected** 14:20
**submit** 20:23 21:9 21:15
**submitted** 106:4
**subscribed** 116:20
**substance** 116:14
**suffered** 112:4
**suggest** 82:23
**supervisor** 16:15 16:16 20:22 21:10 21:12 31:16 76:20
**supposed** 49:23
**sure** 12:16 57:10 58:13,15 66:16 72:22 77:4
**surprised** 81:20
**surrounding** 27:23 60:20
**surveys** 45:17
**sworn** 3:15,17 4:4 118:7
**system** 26:13,15
**S-corporation** 107:5,22 108:10
**S-corporations** 106:24

**T**

**T** 3:2,2 4:2,2,2 115:2 116:2 117:2 117:7,17 118:2,2
**take** 5:19 6:11 7:3 12:19 23:5 26:5 26:22 40:9 53:12 63:25 64:25 75:21 78:11 82:24 84:5 89:22,23 94:12 101:11 113:2
**taken** 1:16,19 39:17 40:2,17 51:24 66:6 77:13 86:19 113:5 116:7
**talk** 18:13 31:22 32:3,20 38:4 47:23 68:11,13



100:6,9,13,16
**talked** 18:7 28:20 29:2 30:4 34:4 41:6 46:10 47:16 47:24 49:12 52:20 57:2 62:8 63:3 73:2,5 87:22 90:11 100:2
**talking** 34:10 35:16 46:21 88:6 95:8 95:12 99:16
**talks** 48:3
**taught** 35:3
**tax** 103:18 106:4 107:8,14 112:19
**team** 13:24 14:7 24:17 26:6,23,25 29:3,14 44:10 45:3,9,10,16,17 46:25 47:5,12 55:5,11 56:21 58:8,19 59:13,14 59:22 60:2,16,21 60:23 61:3,5 62:7 62:11,12,15 79:18 89:8 91:5,11 92:6 92:21 93:5,6 94:12,18,21,25 95:3,7,17,20,23 97:5,6,25 99:12 100:10,18,22
**teammate** 59:3
**teams** 45:7,11,19
**tech** 81:16
**technically** 97:9
**teleconference** 41:17 42:11
**teleconferences** 39:21 41:8,21,23 42:13,21 43:9 64:24 65:14,20 66:2,9,15,19,23 67:2,5 72:14 87:12,13 89:3,4,6 89:11
**telephone** 38:7
43:16 64:14 65:18 66:12 69:15,19
**tell** 14:22 16:2,6,7 20:11 43:11 44:24 51:21 55:3 56:6 61:12,13 62:15,19 69:12 71:15 73:6 74:10 94:4 100:20
**temporarily** 82:25
**tenure** 40:3
**term** 13:10
**terminated** 13:11 99:6
**termination** 9:3,7,9 14:5 90:21 105:9
**terms** 42:6 111:21
**testified** 4:5
**testifying** 3:20
**testimony** 13:20 18:25 116:7,11 118:6,9
**text** 13:5
**thank** 15:13 41:15 51:14 77:21 113:10,13
**thanks** 81:19
**thing** 16:7 61:15 82:15
**things** 19:12 27:4 40:25 90:17
**think** 26:2 31:15 68:6 73:6 78:2 79:19 82:13
**third** 65:24 106:14
**thirty** 114:16
**thought** 81:25
**threat** 83:18
**threatening** 53:24 55:13
**three** 8:18 40:6 42:8,18,20,24 47:16
**three-week** 34:13
**time** 1:18 3:11 5:9 6:4 8:13 15:9,11 19:2 21:2 23:24
24:23 25:23 26:3 26:15 29:22 36:8 41:7 43:13 46:7 51:14 58:16 64:14 67:18 76:14 80:18 86:19 103:23 109:16 111:21 113:11,14
**times** 42:5,8 57:15 93:12
**timing** 54:15
**tips** 105:17 106:2
**today** 5:11 48:12 51:11,12 54:3,6 78:10 80:16 109:5
**told** 16:19 43:6,7 44:8 65:12 69:4,9 69:19 74:11 92:23 93:15,23
**tomorrow** 78:12 87:11
**tone** 18:5 37:23 38:2
**top** 111:4
**toxic** 24:16,24 25:10 29:18,25
**trajectory** 44:13 45:23 46:2
**transcript** 5:20,22 6:2 114:17,18 116:7,9 118:8
**transferred** 56:25
**travel** 39:7 41:10 41:12 82:25 84:5
**traveling** 39:22
**treated** 46:16
**trial** 1:15 3:12
**trip** 17:10 18:24 42:14 59:15 64:11 71:8,22 72:4 75:11 78:5 89:13
**trips** 40:2,9
**true** 116:9,12 118:8
**trusts** 106:24 109:2
**turn** 7:24 51:3 105:13
**turned** 102:23
**twice** 91:22
**two** 8:21 42:18,20 42:24 67:11 79:6 79:11 90:17 94:17

**U**

**U** 3:2 117:17
**Uh-huh** 10:15 102:3
**ultimately** 51:17 70:7
**unable** 34:22
**uncalled** 79:18
**uncommon** 74:15
**understand** 5:13 10:13 13:7 28:25 76:15 87:19 94:9
**understanding** 31:3,5,8,11 54:11 74:20 93:13
**understood** 58:15
**unemployment** 104:23 105:5 106:10
**Unit** 4:14
**UNITED** 1:2
**units** 111:3
**unjustified** 36:15
**unquote** 92:23
**unstable** 67:24
**unwelcome** 14:23
**use** 8:13 36:24 37:15
**utter** 37:21

**V**

**V** 4:1,2,2 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1
**vacation** 19:22
**vacationing** 19:4
**vacations** 19:8,13
**vacuum** 28:18
**Valentia** 1:4,16 4:11 87:9 90:24 116:6,18 117:3
**Valentia's** 88:11
**Valentina** 87:9
**varied** 42:7
**variety** 81:16
**various** 60:21
**verbal** 5:17
**verbally** 55:12
**versus** 41:8
**Villetti** 1:4,16 4:1 4:11,16 5:1 6:1,24 7:1,24 8:1,4 9:1



10:1 11:1,12 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1,3 22:1 23:1,3,8 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1,10 54:1 55:1 56:1 57:1,25 58:1,6 59:1 60:1 61:1 62:1 63:1,23 64:1,4 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1,19 75:24 76:1 77:1 77:12 78:1 79:1 79:16 80:1 81:1 82:1 83:1,5 84:1 85:1 86:1,21 87:1 88:1 89:1,18 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1,7 102:1 103:1,11 104:1,17 105:1,12 106:1,12 107:1 108:1 109:1 110:1 111:1 112:1 113:1 113:8 116:6,18 117:3
**voice** 20:12
**VSB** 1:6

**W**

**W** 116:2 117:2
**wages** 105:17 106:2
**waived** 3:8
**want** 54:9 113:10
**wanted** 35:5 55:4
**wasn't** 26:16 42:10 58:10 67:7 68:24 88:5
**way** 25:16 27:6,9 28:22 31:22 33:11 34:24 37:9,25 39:5 46:9 65:16 68:7 77:7 84:18 85:12 118:12
**ways** 18:2 26:21 35:25 38:20 40:20
**website** 110:18 112:3
**week** 42:4,7,8 87:13 89:6,12,17 91:22,22 92:5
**weeks** 80:25
**went** 19:25
**witness** 3:20 4:3 7:7 12:2,20 19:6 23:7 64:3 75:23 97:20 110:10 113:13 114:2 117:3
**Witness(es)** 118:6,9
**woman** 29:9 68:8 73:7 91:8
**women** 9:19 10:12 10:21 23:17 46:16 46:17 47:18,19,20 68:10 97:22,24 98:3
**work** 11:22 24:16 24:24 25:10 29:19 29:25 40:10 51:11 53:25 55:14 57:7 57:13 58:3,9,20 59:2,11 60:15,24 62:3 77:6,8 87:11 90:24 91:3,5,9 92:18 95:2 96:8 96:13,15,24 100:9 109:4 117:20
**worked** 15:4 103:23
**working** 91:18 104:8
**wouldn't** 35:12
**wrath** 93:16,20,24 94:7
**writes** 87:7
**writing** 25:7,14,23 57:12,17 58:5 102:20 103:4 110:3,6 117:23
**written** 55:12 57:5 57:24 58:7,18 117:19
**wrong** 95:11
**wrote** 46:18 90:19
**www.MagnaLS.c...** 1:25
**W-2** 103:23 105:20 106:5

**X**

**x** 1:3,10 117:2,7,7 117:17

**Y**

**Yamin** 34:18
**Yamin's** 35:8
**yeah** 89:17
**years** 8:21
**yell** 38:24
**York** 1:2,11,11,21 2:5,5,11,11,17,17 4:5,15,15 41:13 69:21 70:10 79:12 87:11 91:19 106:9 116:3 118:5

**Z**

**zoom** 93:17

**$**

**$10,005** 104:25
**$19,835** 106:19 107:3,20 112:4
**$56,359** 105:23

**1**

**1** 14:17 64:19 105:16 106:13
**1B** 4:14
**1st** 64:19 65:9 68:21 69:14 72:24 77:16,18 87:4
**1.5** 87:12 89:5,16
**100** 65:13
**10004** 2:11
**10010** 2:17
**10016** 2:5
**10065** 4:15
**101** 117:14
**102** 117:21
**10200** 1:6
**103** 117:15
**1040** 103:8 105:13 106:13 117:15
**107** 117:22
**1099s** 106:8
**1099-G** 104:19 106:9
**11** 7:18 14:11 20:17 117:9,10
**11:11** 87:4
**11:28** 72:8
**110** 117:22
**12** 23:25 27:18
**12th** 24:13 52:6,14
**12:00** 78:12
**12:04** 64:20
**14** 1:12 116:8
**16** 56:21 87:2
**162** 4:14
**17** 106:16 107:10
**18** 1:6 97:19
**19th** 90:20
**19,835** 108:15 112:13

**2**

**2** 7:25 86:25 87:12 89:6,16
**2nd** 2:17
**2:16** 1:13
**2009** 107:3
**2016** 111:7
**2017** 7:18 10:8,14 30:18 31:2 33:18 44:2
**2018** 23:25 27:19 56:21 59:20 78:24 81:23 84:15 101:4 103:18,21,24 104:7,14 105:6 106:2,4 107:3,14 110:24 112:6,20 117:14
**2019** 1:12 116:8
**212-453-0702** 2:12
**212-812-9511** 2:18
**22** 117:11
**27** 101:4 117:14
**28th** 2:11 77:20,23 78:6 81:23

**3**

**3** 51:11
**3:00** 78:10
**30** 114:16
**387** 2:4

**4**

**4** 117:5
**4:48** 113:14

**5**

**5** 8:2,9
**5th** 2:5
**53** 117:12
**57** 117:19

**6**

**6** 117:9
**61st** 4:14
**63** 117:12
**646-588-4872** 2:6
**675** 2:16

**7**

**7** 8:18



**75** 117:13

**8**

**86** 117:13
**866)624-6221** 1:24

**9**

**9:23** 24:2

