UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------ x
VALENTIA VILLETTI and FAIZA JIBRIL, M.D.,

Plaintiffs, Case No.: 1:18-cv-10200-VSB-KNF

-against-

GUIDEPOINT GLOBAL, LLC,

Defendant.
------------------------------------------ x

One Battery Park Plaza
New York, New York

October 3, 2019
10:05 p.m.

EXAMINATION BEFORE TRIAL of the Plaintiff, FAIZA JABRIL, taken by the Defendant in the above-entitled action, held at the above time and place, pursuant to Case Management Plan, taken before Stephen P. Sudano, a shorthand reporter and Notary Public within and for the State of New York.

********************************************

Magna Legal Services
(866) 624-6221
www.MagnaLS.com



A P P E A R A N C E S:

LICHTEN & BRIGHT, P.C.
Attorneys for Plaintiffs
387 Park Avenue South
New York, New York 10016

BY: STUART LICHTEN, ESQ.

GORDON REES SCULLY MANSUKHANI, LLP
Attorneys for Defendant
1 Battery Park Plaza, 28th Floor
New York, New York 10004

BY: DAVID GRECH, ESQ.

ALSO PRESENT:
Catherine Smith, Esq., general counsel for Guidepoint Global, LLC.

S T I P U L A T I O N S:

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification, and the same are, hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to by an officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

xxxxx

F A I Z A J I B R I L, the witness herein, having been first duly sworn before a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. GRECH:

THE REPORTER: Please state your name for the record.

THE WITNESS: Faiza Jibril.

THE REPORTER: Do you presently reside at 1191 Ocean Avenue, PH4, Brooklyn, New York 11230?

THE WITNESS: Yes.

Q. Good morning, Dr. Jibril.

A. Good morning.

Q. My name is David Grech. I'm with the firm Gordon, Rees, Scully, Mansukhani, and I'm senior counsel in their employment group, and we represent Guidepoint Global, LLC.

I'm just going to give you a few instructions before we begin. If you have any questions about my instructions, just stop me and let me know, and I'll try to

better explain them.

A. Okay.

Q. This is a deposition. The expectation is that I ask questions with answers from you. The questions will be about the underlying lawsuit as against Guidepoint. If you don't understand not only just my instructions but any of the questions that I might ask as we go along, please say so, ask me to rephrase it, and I will attempt to do so.

We have a reporter with us here today, so I would ask that your responses be verbalized. No nodding or gestures because the reporter must take down your responses to create a record.

On that note, so that record is clear, if you can sort of guess where my question might be going or the end of it might be, I'll just ask you for the sake of the record, again, for me to finish it, and then you can respond.

If you need a break at any time, please just let me, let your counsel know,



F. JIBRIL, M.D.

and we'll accommodate you. The only condition on that is that if there's a question pending at that point, we'd just ask you to answer it and then we would take your break.

A. Okay.

Q. Do you have any questions about those instructions?

A. No.

Q. Do you have any instructions about this process at all?

A. No.

Q. Do you know why we're here today?

A. Yes.

Q. Okay.

Why do you believe we're here today?

A. We're here to -- as part of the proceedings in the lawsuit Ms. Valletti and I versus Guidepoint Global.

Q. Okay.

So you're suing Guidepoint Global.

A. Yes.

Q. Okay.

F. JIBRIL, M.D.

Why are you suing Guidepoint Global?

A. Failure to hire or hiring discrimination.

Q. Okay.

So it's your position that Guidepoint failed to hire you?

A. Yes.

Q. And Ms. Valletti has separate but related claims.

A. Yes.

Q. Why do you feel that Guidepoint failed to hire you?

A. Based on my gender.

Q. Okay.

What gives you that belief?

A. I believe that I was a well-qualified candidate for the position. The hiring managers at the time, Ms. Valletti and Bouker Pool were recommending me to be hired.

Q. Dr. Jibril, have you ever been deposed before?

A. No.

F. JIBRIL, M.D.

Q. Have you ever been party to a lawsuit before?

A. Divorce and custody proceedings.

Q. Okay.

Separate and apart from divorce and custody proceedings, have you ever been party to a lawsuit?

A. No.

Q. And I'm referring to as a doctor. You're an M.D.?

A. Yes.

Q. Can you tell us where you went to medical school?

A. I did my undergraduate at University of East Anglia and subsequently received my medical degree at ABU.

Q. What does ABU stand for?

A. Ahmadu Bayero University.

Q. Could you spell that for the reporter?

A. A-H-M-A-D-U B-A-Y-E-R-U [sic].

Q. And so you earned your medical degree from ABU.

A. Yes.

F. JIBRIL, M.D.

Q. And where is ABU located?

A. Zaria, Nigeria.

Q. And when did you graduate from ABU with your M.D.?

A. 2012.

Q. And what was the next step in the course of your medical education/profession after graduation in 2012?

A. So I did some training in obstetrics and gynecology at -- the name of the hospital is New Somerset Hospital in Cape Town.

Q. South Africa?

A. Yes.

Q. So you trained at New Somerset Hospital beginning in 2012, around about?

A. Around about.

Q. And how long did that training last?

A. A year.

Q. Okay.

And after your training in Cape Town, what was the next step in your medical education career?



F. JIBRIL, M.D.
A. I moved to the United States and shortly thereafter started working for my current employer, The Expert Institute.
Q. And -- I'm sorry, you moved to the United States.
Where were you born?
A. I was worn in Egypt.
Q. Had you lived in Africa since birth through medical school?
A. No, I -- my family traveled quite a lot, but I did most of my primary and secondary education in the UK, Scotland and England.
Q. And forgive me. The school you mentioned before ABU, what was that school?
A. University of East Anglia.
Q. And where is that located?
A. In Norwich, England.
Q. So schooling in Europe, UK, and Scotland, Nigeria for medical school?
A. Yes.
Q. South Africa for training?
A. Yes.
Q. And that brings you to 2013:

F. JIBRIL, M.D.
Moved to the United States.
A. Yes.
Q. And you now at that point started work for which entity?
A. The Expert Institute.
Q. And in what capacity did you begin working at Expert Institute? In around about 2013.
A. Initially, I worked part-time as part of the content team. I was working on marketing material.
Q. Okay.
And at some point, did your position at Expert Institute change?
A. Yes.
Q. And when did it first change?
A. About four months into my employment around April of 2013.
Q. I'm sorry. When you were working for Expert Institute, where were you located?
A. In Brooklyn -- I'm sorry. Can I clarify? You mean where was the company, or where did I live?

F. JIBRIL, M.D.
Q. Fair question because it was an awkward question from me.
Where were you working when you worked for Expert Institute?
A. I was working at their headquarters.
Q. Okay.
And where is they're headquarters located?
A. At the time, it was 75 Maiden Lane.
Q. In Manhattan?
A. Yes.
Q. And were you living in Brooklyn at that time?
A. Yes.
Q. Okay. Thank you.
And Expert Institute has its headquarters in New York City. Does it have other officers?
A. Yes.
Q. Okay.
Is it nationwide? International?
A. International.

F. JIBRIL, M.D.
Q. Is it sort of in the same sphere as Guidepoint? Doing the same sort of work?
A. No. So our clients are attorneys, law firms, litigators.
Q. You have a CLE department?
A. Some of our, um, webinars can be used for CLE credit depending on which state. We're not accredited for all states.
Q. Understood. Okay.
So then bringing -- going back to April 2013, you're at Expert Institute for about four months. You said your role there had changed?
A. Yes.
Q. How did your role change?
A. It expanded to working in the research team.
Q. Were you still part-time at this point?
A. I was now full-time.
Q. And you were now part of the research team?
A. Yes.
Q. And what was your compensation



F. JIBRIL, M.D.
starting in April 2013 when you became full-time?
A. $50,000 a year.
Q. Was that total or is that base?
A. Total.
Q. Okay.
So how long did you work full-time as part of Expert Institute's research team?
A. Um, roughly three years with promotions along the way.
Q. Could you walk us through those promotions, you know, in sequence?
A. Yep.
Q. And when they occurred?
A. Sure. So the rest of 2013, I was an associate on the research team. I was promoted to senior medical research associate by the end of 2013.
In 2014, I was overseeing the entire department.
Q. And which department is this, the research --
A. Medical research team.
Q. Medical research team.

F. JIBRIL, M.D.
And this is research to develop content for these presentations?
A. Part of it, but a diminishing part of it. The majority of my responsibilities was screening, vetting, and connecting our clients with medical experts for their cases. I was still developing content for webinars.
Q. And when you say experts for their cases, we're talking about expert witnesses for litigation and things of that nature?
A. Correct.
Q. All right, so that's in 2013.
How long did you serve in that capacity overseeing the medical research department?
A. I would say up in the end of 2016.
Q. Okay.
And what happened then?
A. I was promoted to a customer -- account management role, so being more client-facing, helping the sales team win new business.
Q. Forgive me. Going back to your

F. JIBRIL, M.D.
promotion to associate in the research department or from associate to senior medical research associate: How did that affect your compensation at Expert?
A. The first promotion, I think my base salary increased from $50- to $60- with --
Q. This is at senior -- when you became senior medical research associate?
A. Correct.
Q. Okay.
And I'm sorry. You're going to say?
A. And there were quarterly bonuses based on performance totaling around $5,000 by the end of 2014.
Q. $5,000 total for the year or for quarter?
A. For the year.
Q. And did you earn that bonus for 2014?
A. Yes.
Q. Okay.
And then if I have this right, you

F. JIBRIL, M.D.
were promoted to a capacity where you were overseeing the entire medical research department in 2014?
A. Yes.
Q. Did that come with a change in your compensation?
A. Yes, by that point, I was earning $70,000.
Q. Any bonus structure associated with that?
A. Again, quarterly bonuses.
Q. The same amounts, $5,000?
A. Uh-huh.
Q. And did you earn a bonus in your role as overseeing medical research department?
A. And just to clarify that role --
Q. Please.
A. -- was associate director of medical research.
Q. And you held that beginning in 2014?
A. 2016.
Q. Through 2016 or starting in 2016?



F. JIBRIL, M.D.
A. Starting in 2016, that's when my title changed to associate director.
Q. Okay.
And you helped -- was there a point when you were in the medical research department overseeing work there but not in the title of associate director?
A. Yes, informally.
Q. Okay.
A. As the team grew.
Q. Okay.
So at the end of -- you were senior medical research associate until the end of 2013?
A. 2014.
Q. Until the end of 2014, okay.
And then in 2014, you were overseeing the medical research department?
A. Yes.
Q. Informally at first?
A. Informally at first and --
Q. And then -- I'm sorry.
A. And then my title changed to associate director.

F. JIBRIL, M.D.
Q. Okay.
And when --
A. Of medical research.
Q. And when did that formal title change occur?
A. I believe toward the end of 2016.
Q. Okay.
So from 2014 through the end of 2016, you were overseeing the medical research department. But then at the end of 2016, you were the named associate director of medical research?
A. Yes.
Q. And then when did you take on the title of account manager?
A. It was never a formal title. I just started doing it, essentially, helping our business development team, and I did that as my sole responsibility for the beginning part of 2017.
Q. Did that affect your compensation?
A. No.
Q. So you were still at $70,000?
A. Yes.

F. JIBRIL, M.D.
Q. Okay.
What happened next in your career at Expert?
A. At around -- around April of 2017, I formally moved to the business development team.
Q. Did that come with a change in compensation?
A. It did. So my base salary stayed the same, but I then was earning commissions based on my performance.
Q. Okay.
How long did you stay part of the business development team, which started in April 2017?
A. I am still currently on the business development team.
Q. Okay.
Do you have a title?
A. My current title is vice president of enterprise.
Q. And what's your current compensation as vice president of enterprise for Expert?

F. JIBRIL, M.D.
A. It will be, or should be, about $333,000 by end of year.
Q. By end of 2019?
A. Yes.
Q. And I'm sorry. You said, "should be"? Why is that?
A. If I hit all my quotas.
Q. The commissions?
A. Exactly.
Q. Do you have a base?
A. Yes.
Q. What's your base?
A. Current base is $140,000.
Q. So from 2017 to date, you're part of the business development team?
A. Yes, but I did not enter the role of vice president until the beginning of 2019, so January of 2019.
Q. Thank you. That was going to be my next question.
A. That is when my base was increased to $140,000.
Q. Could you just walk us through April 2017 through your promotion to vice



F. JIBRIL, M.D.

president and then --

(Whereupon, an employee of Gordon & Rees, LLP entered the room, and a discussion was held off the record at this time.)

Q. From 2017 -- could you walk us through 2017 in April to January 2019, any changes in compensation --

A. Yes.

Q. -- or titles?

A. So I started on the business development team Q2 of 2017, so right around April. Um, from April to June, I met my performance quota, and so my base was increased to $87,500.

Q. So based on meeting that quota, you would have earned a bonus --

A. So --

Q. -- prior?

A. Initially, I -- I didn't earn a bonus --

Q. Okay.

A. -- so by base compensation was $87 --

F. JIBRIL, M.D.

Q. Okay.

A. -500.

THE REPORTER: Wait, wait, wait. Can you repeat your base?

A. My base, when I first joined the business development team was $70,000. It was increased June of 2017 to $87,500.

Q. Thank you.

And correct me if I'm wrong. I thought you said because you had met your quotas, that your base was increased $87,500; is that correct?

A. Correct.

Q. And was your base at $70- accompanied by performance-based bonuses?

A. No, not at that time --

Q. Okay.

A. -- because it was a trial period, essentially --

Q. Okay.

A. -- to see if the business development role would be a good fit.

Q. All right.

So it sounds like it was a good

F. JIBRIL, M.D.

fit? And then in June 2017, your base was increased to $87,500.

A. Correct.

Q. Were there any commissions associated with that?

A. Not at that time.

Q. All right, so that's your base.

A. Yes.

Q. All right.

What happened next in your progression in compensation at Expert?

A. So I continued to meet my performance quotas. Um, I received a performance bonus of about $10,000 that year.

Q. In 2017?

A. In 2017.

Q. Okay.

A. And then in 2018, I began earning commissions for my sales.

Q. And your base was then -- was your base then still $87,5-?

A. Yes, my base --

Q. So --

F. JIBRIL, M.D.

A. Sorry. Go ahead.

Q. No, no. Go ahead.

A. My base stayed $87,5- until, I believe, June of 2018.

Q. And from the beginning of 2018 through June of 2018, your base was $87,5- plus commissions.

A. Yes.

Q. And then what happened in June of 2018?

A. My base was increased to $100,000.

Q. Also with the opportunity for commissions?

A. With the opportunity for commissions.

Q. Okay.

How long did you stay at the $100,000-plus-commissions level?

A. Until January of 2019.

Q. And was that when you were promoted to VP?

A. Correct.

Q. And your base then increased to $140-?



F. JIBRIL, M.D.

A. Yes.

Q. Also with the opportunity for commissions?

A. Yes.

Q. Would you believe might lead to approximately $200,000 in bonuses for this year?

A. Correct.

Q. It's a good year.

A. Yeah.

Q. Okay.

So at what part in time did you seek employment with Guidepoint?

A. Toward the end of 2017, I believe, a recruiter reached out to me from Guidepoint.

Q. Okay.

And who was that recruiter?

A. I don't recall his name.

Q. James?

A. Yes, James Lipkin [sic].

Q. Lukban?

A. Lukban.

Q. L-U-K-B-A-N.

F. JIBRIL, M.D.

A. Thank you.

Q. So James reached out to you. You understood that he was from Guidepoint?

A. Yes.

Q. And what did James have to say?

A. He reached out to me on LinkedIn and said that there was a role for content manager or content strategist that would appear to be a good fit for my background.

I had an initial conversation with him, and he then scheduled an in-person meeting, interview, with several employees of Guidepoint.

Q. Now, were you looking to change employment at this point?

A. No, but I was open to opportunities.

Q. Okay.

And you said these conversations with James were the end of 2017?

A. I believe so.

Q. And you went into Guidepoint for an in-person interview?

A. Yes.

F. JIBRIL, M.D.

Q. And when did that happened?

A. Again, I think it was around the end of 2017, beginning of 2018.

Q. And this was in Guidepoint's offices?

A. Yeah.

Q. New York City offices?

A. Yes.

Q. And who did you meet with?

A. I met with Valentia Valletti; Bouker Pool; James, the recruiter; and two other employees of that team.

Q. Do you remember their names?

A. I don't.

Q. How did that interview go?

A. I thought it went very well. I was very interested in the role. I did make it clear that I didn't have financial industry experience. I was told that wouldn't be an issue given my other experience and background.

Q. Well, how did the issue of financial experience come up? Was it a requirement? A preference? How did come

F. JIBRIL, M.D.

up?

A. I was told that it was not a requirement, which is why they had reached out to me, but it came up because I said that my only concern in the role, the only thing that would limit me was the fact that I did not have buy side or sell side experience.

Q. And who in the group responded to you on that issue, on the buy side/sell side experience?

A. I believe I spoke with all the interviewers about that, and they all told me the same, that it wasn't an issue for them.

Q. And what do you understand buy side/sell side to be? Experience in those.

A. Financial terms. My understanding is Guidepoint's employees -- sorry. Customer, clients, are financial industry analysts who are looking to due diligence, potential investments, and those are terms associated.

And my understanding was from my



F. JIBRIL, M.D.
interviews that that would be experience that I would gain along the role and that it wasn't essential to starting in the role.
Q. So your understanding was that you didn't need to have that walking in the door; you would sort of develop that in the role.
A. Correct.
Q. Did you have talks about what the compensation for this content strategist position would be?
A. I did with James, the recruiter. I told him what I was currently making and what I would leave for.
Q. And you were currently making $87,5-?
A. Yes.
Q. And did you have those conversations with James before the interview?
A. I had it with him during the phone interview, phone screening, to make sure that, you know, we weren't wasting each other's time and again at the end of the

F. JIBRIL, M.D.
four interviews that I had with the hiring manager and then the two employees.
Q. I'm sorry. You had four in-person interviews?
A. Correct, all in quick successions.
Q. Okay.
A. Same day.
Q. Oh, same -- all right, so let's walk through that again.
So it's the end of 2017, early 2018. You go into Guidepoint for interviews?
A. Yes.
Q. With Ms. Valletti, Mr. Pool, Mr. Lukban, and two others?
A. Two other employees, yes.
Q. Were they all at the same time, or did you meet with them separately?
A. All in succession.
Q. Okay.
So can you walk us through sort of the first interview? Who did you meet with first?
A. The first interview was an

F. JIBRIL, M.D.
employee of the content team. She was a direct report to Valentia, and she told me a little bit more about the day-to-day of her role. I discussed my background with her, why I was interested in the role.
The second employee had, um, sort of a tangential role as compared to Valentia. His background was less on the medical health care side of things and more on the products. I think he talked to me about wearable technology.
Q. Okay.
If I said Ms. Yamin, Leona Yamin, does that refresh your recollection as to who may have met with?
A. Actually, I just don't recall the name.
Q. Okay.
If I said the name Justin Ruiz, does that refresh your recollection about who you might have met with?
A. Potentially. I really couldn't say with certainty.
Q. Okay. All right.

F. JIBRIL, M.D.
So your first interview as with a female employee who was a direct report to Ms. Valletti.
A. Yes.
Q. The second interview was with a male employee, worked with content but not necessarily health care.
A. Yes.
Q. And he talked to you about wearable technology.
A. Yes.
Q. Okay.
And then who did you meet with?
A. Then I met with Valentia.
Q. So that was your third interview that day.
A. Yes.
Q. How long are these interviews lasting?
A. The first two, probably not much longer than 30 minutes, 45 minutes. The interview with Valentia was about just over an hour, I think.
Q. Okay.



F. JIBRIL, M.D.

And what did you and Valentia talk about?

A. Talked about the role. We talked about why they were potentially interested in me specifically. She talked about her vision for the team.

I have to note that the two interviews before her spoke very highly of her and how she was very enthusiastic and bringing a lot of expertise to the role, so it -- it was a productive conversation.

Q. And just curious: How would that have come up, you know, if the interviewers were asking you questions about your background, that they would have talked about the third person you were going to interviewer that day?

A. I asked. I asked about the team dynamics.

Q. Okay.

A. I definitely wanted to find out about -- about the company itself, what it would be like to work there, so I asked just as many questions as they asked me.

F. JIBRIL, M.D.

Q. Okay.

So you were asking about the team and the personnel on the team.

A. Yes.

Q. Okay.

Would this have been a position where you would have reported to Ms. Valletti?

A. Correct.

Q. And did she make that clear to you in this interview?

A. Yes.

Q. What, if anything, did Ms. Valletti share with you during the interview about her hiring authority?

A. She let me know that she was the hiring manager, that Bouker was also part of the decision making process, but that he was deferring to her to make a decision.

I also just addressed that with Bouker in my interview with him. I asked him about --

Q. And I'm sorry. That would have been your fourth? You would have

F. JIBRIL, M.D.

interviewed with Bouker next?

A. Yes.

Q. So that's your fourth interview?

A. Yes.

Q. I'm sorry.

And then if you could tell us where you were going to go then. You addressed that with Bouker?

A. Yes, so at the end of my interview with Bouker, he certainly that said that, you know, hiring decision was Valentina's.

I asked about next steps, if there was anyone else that I would be interviewing with. And he said, "No, the only person more senior than me would be the CEO, Albert," and that he wouldn't be part of the decision.

Q. Okay.

So your battery of interviews ended. What were your next steps in your candidacy with Guidepoint?

A. Just to be complete, I did have one last touch point with James --

Q. Sure.

F. JIBRIL, M.D.

A. -- the recruiter where we discussed salary, and he made it clear that, um, the next step would be someone from HR -- he made it clear that the next step would be HR reaching out about an offer.

Q. And when you had a conversation with James about salary what amounts or ranges were you talking about?

A. We were talking about $140- to $160-.

Q. And that would be base?

A. Yes.

Q. All right.

Did they take about any bonuses associated with that?

A. No, but I did know that Valentia earned bonuses.

Q. And how did you learn that?

A. Though my interview.

Q. With her?

A. Yes.

Q. Was it your understanding that you also would be earning bonuses, or there was at least that potential?



F. JIBRIL, M.D.
A. My inference was that there was a potential.
Q. Had you met Ms. Valletti before this?
A. No, the interview was my first time meeting her.
Q. All right.
So you had conversations with James where he told you the salary range for the position would be $140- to $160-?
A. Well, he asked me what my salary expectations --
Q. Oh, okay.
And you said $140- to $160-.
A. And he said that that was -- yes, and he said that would be within the range.
Q. Okay.
Was there any other follow-up had with James --
A. Yes.
Q. -- about the position?
What was that follow-up?
A. I sent thank you emails to the interviewers. He asked me for writing

F. JIBRIL, M.D.
samples, which I provided him.
Q. References?
A. And references.
My references were interviewed.
Q. How many references?
A. Two.
Q. And when you say they were interviewed, what do you mean?
A. They spoke with James.
Q. James reached out to your references?
A. Yes.
(Whereupon, a discussion was held off the record at this time.)
Q. After you provided your references to James and he -- you understood he spoke with your references, what was the next step in your candidacy with Guidepoint?
A. My expectation was that I would hear back with an offer.
Q. And did that in fact happen?
A. No.
Q. What did you hear from Guidepoint after providing James your references?

F. JIBRIL, M.D.
A. Radio silence for a few weeks. I did send him a follow-up email, asked if there was any additional information that he needed from me. I didn't hear back until February.
Q. Of 2018.
A. Yes.
Q. So James responds to you in February of 2018?
A. Yes.
Q. And what does James say?
A. He asked me for my availability for a call. We scheduled a phone call, and he lets me know that I would not be offered the position. He said that Bouker and Valentia, to quote him directly, went to bat for me but that Albert, the CEO, vetoed me being employed.
Q. Had you met Albert?
A. No.
Q. Had you ever spoken to Albert?
A. No.
Q. Did James tell you why Albert vetoed extending an offer to you?

F. JIBRIL, M.D.
A. I don't believe he did.
Q. Did you have any conversations with James after that?
A. No, but during that same conversation, he mentioned that there might be some other roles at the company that might be a good fit for me, and he also mentioned that he knew a recruiter at another company that might be interested in hiring me.
Q. So there were other roles at Guidepoint that James had in mind for you?
A. Yes.
Q. And I guess he had a colleague doing the same sort of work in another company that he was going to refer you to?
A. Yes.
Q. Did he refer you to another recruiter?
A. No.
Q. Did he have any follow-up with you about other potential roles at Guidepoint?
A. No.
Q. How many times have you applied



F. JIBRIL, M.D.

for employment with Guidepoint?

A. I think -- I didn't apply for this role. Um, I applied for a role I think back in 2014.

Q. So that was in the application to Guidepoint in 2014?

A. Yes.

Q. And what role was that for?

A. Research analyst.

Q. And what happened with that application?

A. I don't believe I heard back.

Q. And then you were in the process of -- or applying to become the content strategist in the end of 2017, early 2018?

A. Yes.

Q. So that's the second application to Guidepoint?

A. Yes, call it that.

Q. Have you had any other applications for employment with Guidepoint?

A. I think late in 2018 -- it might have been early 2019 -- another recruiter reached out to me from Guidepoint about a

F. JIBRIL, M.D.

role on the business development team, and then -- and -- and she was an employee of Guidepoint.

And then later that same year, a third-party recruiter reached out to me. He didn't make mention of the company initially, um, but I believe it was the same role, reached out to me about it.

Q. Okay.

So who from Guidepoint reached out to you late 2018, early 2019?

A. Off the top of my head, I couldn't tell you.

Q. Jenna?

A. That sounds familiar.

Q. And Jenna let you know that Guidepoint was looking to place someone in a business development role?

A. Yes.

Q. And then around the same time, you heard from a third-party recruiter?

A. Yes.

Q. With information that led you to believe that it was for the same role?

F. JIBRIL, M.D.

A. Yes.

Q. And what happened with that role?

A. So I actually had a phone interview with him and --

Q. I'm sorry. With whom, the third-party recruiter?

A. With the third-party recruiter.

Q. And who was that?

A. I can't recall his name.

Q. Do you recall who he worked for?

A. No.

Q. About when would you have had this phone interview with a third-party recruiter?

A. It was in May of this year, I believe.

Q. May of 2019?

A. Yes.

Q. Okay.

And what did you talk about during that interview?

A. We talked in very general terms about the role, what it involved. And then when we got pretty specific about, you know,

F. JIBRIL, M.D.

who it was for, he said that Guidepoint was the employer, and I told him that, "I've already had this conversation with someone."

Q. Okay.

So you were able to confirm with the third-party recruiter that he was seeking employees for Guidepoint.

A. Yes.

Q. And you told him that you had already spoken with who we believe to be Jenna --

A. Yes.

Q. -- at Guidepoint?

A. Uh-huh.

Q. Okay.

And what did the recruiter have to say in response to that?

A. He said, "If someone at Guidepoint has already reached out to you, than the conversation a moot."

Q. Okay.

Did you have any other further conversations -- well, strike that.

Did you have any other further



Page 46

F. JIBRIL, M.D.

conversations with that third-party recruiter about this position?

A. No.

Q. Did you have any further conversations with Guidepoint about this position?

A. No.

Q. So the last communication you would have had about this business development team would have been with the third-party recruiter?

A. Yes.

Q. You never spoke with Jenna again?

A. No, I gave her my availability for a phone interview and then did not hear back.

Q. Had Jenna asked for your availability for a phone interview?

A. Yes, I believe we may have scheduled one, and she missed it.

Q. And when was that supposed to have occurred?

A. I can't recall off the top of my head. It was before I heard from the

Page 47

F. JIBRIL, M.D.

third-party recruiter.

Q. Would we still be in May of 2019? April of --

A. I think it was much earlier than that.

Q. Okay.

So you were scheduled to speak with the Guidepoint recruiter before you ultimately spoke with the third-party recruiter.

A. Yes.

Q. After you spoke with the third-party recruiter, did you follow up with Guidepoint and give your availability for a phone interview again?

A. No.

Q. Was your communication with the third-party recruiter sort of the end of the process for that position?

A. Yes.

Q. All right.

So if that's your third -- I don't know about application, but third interaction with Guidepoint, has there been

Page 48

F. JIBRIL, M.D.

a fourth?

A. No.

Q. When you were talking with the third-party recruiter and Guidepoint about the business development team, were you looking to leave Expert?

A. I'm always open to hearing about other opportunities.

Q. Did you have occasion to talk to either Guidepoint or the third-party recruiter about the compensation for the business development team role?

A. No.

Q. Okay.

If we could just go back to your talks with James about the vetoing of the offer to you. Did you have talks with James about any other roles at Guidepoint?

A. No, he alluded to other roles that might be a good fit, but that was the final time I spoke with him. There was no follow-up.

Q. Final time you spoke with James at all?

Page 49

F. JIBRIL, M.D.

A. Yes.

Q. After James told you that an offer would not be extended, did you speak to anyone else at Guidepoint about the content strategist position?

A. A few months later, I did -- Valentia reached out to me. She was no longer at Guidepoint.

Q. So this would be a few months after February 2018?

A. Yes, I believe it was around June.

Q. June of 2018, Valentia reaches out to you?

A. I believe so.

Q. How so?

A. She messaged me on LinkedIn.

Q. Had you ever directly communicated with Valentia before?

A. No, other than my interview, post-interview email.

Q. You sent her a thank you email.

A. Yes.

Q. Had you had any communications since that until your June 28 [sic]



F. JIBRIL, M.D.
LinkedIn --
A. No.
Q. June 2018 LinkedIn connection. Okay.
What did Valentia tell you in the June 2018 connection?
A. She said she had been meaning to reach out to me and asked for my availability for a call.
Q. And you knew at that time she wasn't with Guidepoint?
A. I only knew because I looked at her LinkedIn profile and saw she had left.
Q. Did Valentia give you a reason why she wanted to speak with you?
A. Not at that time.
Q. Did you eventually set a time to speak with her?
A. Yes.
Q. Okay.
And what was that?
A. So she told me that she had been fired from Guidepoint, she and Bouker Pool shortly after my interview. She sided

F. JIBRIL, M.D.
that -- she told me that she had written a formal complaint about gender discrimination at the company and sited my lack of hiring as an example of it.
Q. And how did you have this conversation with Valentia?
A. Over the phone.
Q. And when did this phone conversation occur?
A. About a week after she reached out to me.
Q. So we might still be in June of 2018?
A. Possibly.
Q. What else did Valentia have to say about Guidepoint in that call?
A. Um, she told me that there were a lot of problems at Guidepoint, um, with gender-based discrimination.
Q. Had you experienced anything related to gender-based discrimination in your dealings with Guidepoint?
A. I had very limited interaction. It was that one day that I was at the

F. JIBRIL, M.D.
office.
Q. Okay.
Anything in your application for research analyst that would have led you to believe that the decision was gender-based?
A. Well, I never heard back about that application.
Q. Anything in the conversations about the business development team role that would lead you to believe that it was gender-based?
A. No.
Q. Okay.
So Valentia told you that she was let go from Guidepoint. She had made a complaint. She cited again gender-based discrimination problems.
What else did Valentia have to say?
A. I think at that time she told me that she was taking legal action in the form of an EEOC filing.
Q. And on what basis did she say she was filing with the EEOC?

F. JIBRIL, M.D.
A. Gender discrimination.
Q. Prior to speaking with Valentia, did you ever consider filing a charge yourself?
A. I -- I -- I didn't consider filing a charge, but I did consider reaching out to the hiring managers or HR for more description or a better explanation as to why I was not hired.
Q. You would have sought an explanation as to why Albert vetoed the extension of the offer?
A. Yes.
Q. Did you ultimately do that, reach out to HR?
A. No.
Q. Or the hiring managers?
A. No.
Q. All right.
So Valentia tells you she's considering legal action, likely an EEOC filing, and what's the next thing you guys talk about?
A. She tells me that I'm mentioned in



F. JIBRIL, M.D.

her complaint and that she believed that the decision not to hire me was directly because of my gender.

She, I believe, had already spoken with an employment discrimination attorney at that time, and we met and decided to retain an attorney together.

Q. All right.

So after you spoke with Valentia over the phone in June, you then had an in-person meeting with her?

A. Yes.

Q. And when did that occur?

A. Around September of the same year.

Q. Between June and September of 2018, had you had communications with Valentia?

A. Yes.

Q. Okay.

And what were the nature of those communications?

A. Discussing the case against Guidepoint.

Q. Prior to speaking with Valentia in

F. JIBRIL, M.D.

June of 2018, did you have any reason to believe that the vetoing of the extension of the offer to you was gender-based?

A. I had a feeling. My references were interviewed. And my understanding, that is a final step. Bouker and Valentia as good as told me that I was hired during the interview process as did James. My references told me that the conversation that they had with James was very positive. And I -- I wouldn't believe that they would speak to my references if there wasn't a real consideration of me as a candidate.

When James told me that I was not hired, he made it very clear that it was a decision by Albert, not the hiring managers.

Q. Did your references say that James spoke to them about the buy side/sell side issue?

A. No.

Q. Do you know how many content strategist positions Guidepoint was looking to fill when it was interviewing you?

A. I was told that there was one open

F. JIBRIL, M.D.

position. I asked very specifically about the structure of the team, how many people were being hired, why the position was open.

Q. And who did you ask those questions of?

A. Valentia and Bouker.

Q. And Valentia and Bouker told you that it was one position?

A. Yes.

Q. So it would be a surprise to you if I told you they hired 15 people for that position.

A. I did know that before today.

Q. So better question: Was it a surprise when you learned that 15 people were hired for that position?

A. Not necessarily. I think that with Bouker and Valentia no longer at the firm, surely there was some restructuring and reorganizing.

Q. I know you're not with Guidepoint, but do you have any idea of the gender makeup to the 15 content strategists that were ultimately hired?

F. JIBRIL, M.D.

A. No.

Q. Do you think they're all men?

A. I don't know.

Q. Did you ultimately file a charge with the EEOC?

A. I did.

Q. And what was the basis of that charge?

A. Failure to hire based on gender.

Q. And what was the determination at the EEOC?

A. (No verbal response given.)

Q. Strike that.

What happened with the filing of your EEOC charge?

A. I believe that they chose not to take action.

Q. And what did you next do in terms of pursuing you legal rights against Guidepoint after you learned the EEOC was not going to take further action?

A. I retained an attorney, Mr. Lichten.

Q. And a complaint was filed, and



F. JIBRIL, M.D.

we're here today.

A. Yes.

Q. Okay.

Did you speak with Bouker after you learned that the offer was not going to be extended?

A. No.

Q. Other than James and Valentia, did you speak to anyone else at Guidepoint after you learned that the officer was not going to be extended?

A. No, other than the recruiter that reached out to me.

Q. Sorry, right.

A. Yes.

Q. About the content strategist position.

A. No, I did not speak with anyone else.

Q. But we talked about your application for the business development team.

A. Yes.

Q. Which occurred later.

F. JIBRIL, M.D.

A. Yes.

MR. GRECH: Okay.

Let me just take a five-minute break. I got to get a document.

(Whereupon, a recess was taken at this time.)

(Whereupon, three black-and-white documents were marked as Defendant's Exhibits E, F, AND G for identification as of this date.)

Q. Dr. Jibril, showing you what's been marked for today's purposes as Defendant's Exhibit E (handing).

A. (Perusing.)

Q. And I'm also going to show you what's been marked as Defendant's F (handing).

A. (Perusing.)

Q. I'm sorry. If we could start with F first. If you could just take a moment to look at Exhibit F and let me know when you've had that opportunity.

A. (Perusing.)

Okay, yep.

F. JIBRIL, M.D.

Q. And do you recognize Defendant's F?

A. Yes.

Q. And what is it?

A. Guidepoint Global, LLC.

Q. Defendant's F is?

A. You're asking for the defendants on Exhibit F?

Q. No, I'm sorry. I'm sorry.

The document that's been marked as Defendant's Exhibit F, what is that document?

A. That is the EEOC filing, Charge of Discrimination.

Q. And you recognize that as a Charge of Discrimination?

A. Yes.

Q. Is that your Charge of Discrimination?

A. Yes.

Q. The charge alleges discrimination based on sex; is that correct?

A. Yes.

Q. And the particulars given in the

F. JIBRIL, M.D.

charge are -- I'll just read it:

"In December 2017, a recruiter from Guidepoint Global, LLC contacted me regarding the position of health care content strategist.

"After several days of interviews and discussions, the company's hiring managers for the position told me that they wanted to hire me.

"Chief Executive officer, Albert Sebag, without ever meeting me, vetoed my appointment. The company informed me of its decision on February 1, 2018. A male was ultimately hired for the position.

"I believe the company did not offer me the position because of my sex."

First, is that an accurate reading of the charge?

A. Yes.

Q. And you swore to that charge.

A. Yes.

Q. And this charge was filed July 9th of 2018; is that correct?

A. Yes.



F. JIBRIL, M.D.
Q. Why did you wait from February 1st to July 9th to file a charge with the EEOC?
A. I was not sure, 100 percent certain, that I was not offered the position because of my sex. It was not until the hiring manager, Valentia, reached out to me in June to tell me that was the case.
Q. Okay.
And just going through the particulars of your charge here, the recruiter referenced in there, that's James?
A. Yes.
Q. The company's hiring managers, those would have been Valentia and Bouker?
A. Yes.
Q. The allegation there that, "CEO, Albert Sebag, without even meeting me, vetoed my appointment," you learned that from James?
A. Yes.
Q. The company informed you of its decision on February 1, 2018. That would have been through James?
A. Yes.

F. JIBRIL, M.D.
Q. The next allegation is that a male was ultimately hired for the position; is that correct?
A. That was to my -- to my knowledge at the time, yes.
Q. And who gave you that knowledge?
A. Valentia.
Q. When did she give you that knowledge?
A. When I spoke with her in June.
Q. When did you learn that they ultimately hired 15 people?
A. When that was included in one of the documents as part of this proceeding.
Q. In the litigation.
A. Yes.
Q. And the final allegation is you believe the company did not offer you the position because of your sex.
A. Yes.
Q. Did you change that belief when you learned that they hired 15 people?
A. No.
Q. Why not?

F. JIBRIL, M.D.
A. Because at the time I was interviewing for a position that was open to one person.
Q. And if you had thought that you were -- offer was voted because of your gender, why would you have even entertained the thought of the business development team position?
A. Again, I had a preliminary conversation with the recruiter. She did not follow up with me. Not sure why. But I'm always open to listening to other opportunities.
Q. If a recruiter from Guidepoint called you today, would you entertain that offer?
A. I would speak with the recruiter, yes. I speak with multiple recruiters from multiple companies pretty regularly.
Q. Are you looking to leave Expert?
A. Not actively, no.
Q. So the same position, you'll listen to opportunities?
A. Yes.

F. JIBRIL, M.D.
Q. And I believe you had said earlier that you retained counsel after you learned the decision from the EEOC?
A. No. Before.
Q. Okay.
And Ms. Valletti has the same counsel?
A. Yes.
Q. At the time you spoke to Ms. Valletti in June of 2018, did she indicated that she had already retained counsel?
A. I believe so. I believe that she had already retained counsel to file the EEOC complaint.
Q. And we spoke earlier about swearing to the charge. At the bottom left-hand corner, where it says charging party's signature, doctor, is that your signature?
A. Yes.
Q. And the language used in the particulars section, who drafted that language?



Page 66

F. JIBRIL, M.D.
A. Myself and my attorney, Mr. Lichten.
Q. So you filed this charge, and ultimately you heard from the EEOC that it wasn't going to pursue it any further.
A. Yes.
Q. All right.
So if we could now look at Defendant's E.
A. (Perusing.)
Q. And Dr. Jibril, if you could just take a moment to review that and let us know if you're familiar with it.
A. (Perusing.)
Yes, I'm familiar with this document.
Q. All right.
So Dr. Jibril, you're familiar with Defendant's Exhibit E?
A. Yes.
Q. And what do you recognize that to be?
A. This is the Complaint filed by myself and Ms. Valletti against Guidepoint

Page 67

F. JIBRIL, M.D.
Global.
Q. And in Paragraph 1, the allegation is that you've brought this action to remedy discrimination on the basis of sex; is that correct?
A. Yes.
Q. If, Dr. Jibril, we could refer to Paragraph 8, it's Page 2.
A. (Perusing.)
Q. There, the allegation is in December 2017, Guidepoint actively recruited Jibril for the position of health care content strategist. Do you see that allegation?
A. Yes.
Q. Do you agree with that allegation?
A. Yes.
Q. And this was the recruitment for the health care content position that we were talking about before?
A. Yes.
Q. Were you actively being recruited by others at -- during that time in December 2017?

Page 68

F. JIBRIL, M.D.
A. Yes.
Q. What others were actively recruiting you at that time?
A. Um, there was a law firm that was -- had reached out to me.
Q. Which firm was that?
A. I don't recall the name.
Q. Reached out to you to fill what role?
A. It was a business development role.
Q. And where was the firm located?
A. In New Jersey.
Q. And did you pursue that recruitment?
A. I had initial conversations but no in-person interview.
Q. Who did you have initial conversations with?
A. The recruiter.
Q. And who was the recruiter?
A. Anna Kogut.
Q. And who does -- who did Ms. Kogut work for?

Page 69

F. JIBRIL, M.D.
A. I don't remember the name of the law firm.
Q. But she was the recruiter for the firm?
A. Yeah, she worked in the HR department.
Q. And you had initial conversations with Ms. Kogut about the position at the firm.
A. Yes.
Q. Okay.
And when did you have those initial conversations?
A. Probably before James had reached out to me.
Q. And what did you talk about with Ms. Kogut?
A. She told me about the opening to see if it would be a good fit for me. I was not interested at the time.
Q. But you were still willing to listen to opportunities?
A. Yes.
Q. And what made you determine that



Page 70

F. JIBRIL, M.D.
it was not a good fit?
A. The job was located in New Jersey, and I did not want to commute.
Q. So did it proceed beyond any of the initial conversations with Ms. Kogut?
A. No.
Q. And you gave her the sense that it was not going to be something you would pursue?
A. Yes.
Q. Was any other entity actively recruiting you in or around December of 2017?
A. Not in December.
Q. When, then?
A. Throughout the year.
Q. Throughout 2017?
A. Throughout 2017.
Q. Okay.
So other than this law firm and Guidepoint, who else was recruiting you in 2017?
A. I heard from various employers.
Q. And obviously you didn't take

Page 71

F. JIBRIL, M.D.
those positions, but how far along -- what was the furthest you have gotten along in those processes?
A. The furthest was with Guidepoint.
Q. Had you had interviews with other entities regarding a new position?
A. Phone screenings. No in-person interviews.
Q. And who did you have phone screenings with?
A. Recruiters.
Q. Which recruiters?
A. I couldn't tell you their names.
Q. Other than Guidepoint and the law firm, how many phone screenings with recruiters did you have in 2017?
A. I would say about four.
Q. And there was nothing in the talks with Ms. Kogut that led you to believe the position was not going to be offered because of a gender reason, right?
A. No.
Q. It was commuting.
A. Yes.

Page 72

F. JIBRIL, M.D.
Q. Was there anything that was shared with you in the phone screening with the other four recruiters that gave you the sense that those employers would have been making decisions on a gender basis?
A. No.
Q. So those processes didn't proceed past the phone screening with the recruiter.
A. Correct.
Q. And what areas were these positions?
A. One that I recall specifically was a language translation service.
Q. And in what position?
A. Business development.
Q. Okay.
I believe you had said four. Do you recall any of the other three?
A. No, not specifically.
Q. Would these have all been in business development positions?
A. Mostly, yes.
Q. Did you have conversations with any of these four recruiters about

Page 73

F. JIBRIL, M.D.
compensation levels?
A. No.
Q. Did you have conversations with Ms. Kogut about a compensation level?
A. No.
Q. Dr. Jibril, could you turn to Allegation 13? It's on Page 3.
A. (Perusing.)
Q. Paragraph 13 reads:
"In December 2017, lateral recruiter, James Lukban, contacted Jibril to see if she would be interested in the position of health care content strategist.
"On January 22nd" -- it says 1018, but I assume it's 2018 -- "after several days of interviews and discussions, Lukban informed Jibril that," quote, "as a final step in the process, Guidepoint wished to conduct a reference check. Later that day, Jibril provided the requested references."
Do you see that, Dr. Jibril?
A. Yes.
Q. And that allegation is true?
A. Yes.



F. JIBRIL, M.D.

Q. The allegation here about several days of interviews, did you go to Guidepoint on more than one day for interviews?

MR. LICHTEN: I object.

It doesn't say several days of interviews.

It's several days of interviews and discussions.

MR. GRECH: Fair.

Q. You see where it says, "several days of interview and discussions"?

A. Yes.

Q. Did you have several days of interviews with Guidepoint or one?

A. I had one initial conversation with a recruiter, so that would be one day. I had a subsequent conversation with the HR department to schedule an in-person meeting. On January 22nd, I attended four in-person interviews. And I had subsequent discussions with James Lukban regarding my references and additional information that he asked for.

Q. Fair enough.

F. JIBRIL, M.D.

So you visited Guidepoint one time.

A. Yes.

Q. Okay.

And it says here that, "Later that day, Jibril provided the requested references." Those are references we discussed earlier?

A. Yes.

Q. And it's your understanding that James reached out to those references?

A. Yes.

Q. And you spoke with those references thereafter?

A. Yes.

Q. Who were those references?

A. I was requested to provide a current client. Her name was Lisa Van Essendelft.

I'll spell that: E-S-S-E-N-D-E-L-F-T.

And the other reference requested was the direct supervisor. I gave our vice president of business development and

F. JIBRIL, M.D.

account management. His name is Dave Glynn, G-L-Y-N-N.

Q. Is and Mr. Glynn worked at Expert at that time?

A. At Expert Institute? Yes.

Q. And you're okay with giving an Expert employee as a reference in your job search to leave Expert?

A. It was requested, and I was confidant at the time that I was being offered the position.

Q. And you spoke with Lisa about her talks with James?

A. Yes.

Q. And you spoke with Dave about his talks with James.

A. Yes.

Q. Do you still work with Dave?

A. I do.

Q. Do you still work with Lisa?

A. Yes.

Q. When you spoke with Lisa about her talks with James, did Lisa give you any reason to reconsider your application to

F. JIBRIL, M.D.

Guidepoint?

A. No.

Q. Did Lisa give you any reason to consider that perhaps as a woman you shouldn't be applying to Guidepoint?

A. No.

Q. When you spoke with Dave, did he give you any reason to reconsider your application at Guidepoint?

A. Only that he did not want me to leave The Expert Institute.

Q. Sure.

Did he give you any reason to believe that as a woman you should not be applying to Guidepoint?

A. No.

Q. Allegation 14: "Guidepoint designated Valletti and her supervisor, director of content strategist, Bouker Pool, as the company's hiring managers for the position of health care content strategist, which meant that Valletti and Pool possessed full and final authorization to hire a candidate for the position. Valletti and



F. JIBRIL, M.D.
Pool decided to hire Jibril."
Do you see that allegation, doctor?
A. Yes.
Q. And do you agree with that allegation?
A. Yes.
Q. And you understood Pool to be Valletti's supervisor.
A. Yes.
Q. Buy your testimony earlier was that Valletti was the ultimate authority on your hire?
A. Yes.
Q. And that Bouker would defer to her.
A. Yes.
Q. And Valletti and Bouker told you that.
A. Yes.
Q. It says here that Valletti and Pool decided to hire you.
A. Yes.
Q. Is that correct?

F. JIBRIL, M.D.
Um, how did they communicate to you that they had made the decision to hire you?
A. They let me know at the end of my interview that the HR department would be reaching out to me for final steps.
Q. Well, if there were final steps to take, was it your understanding that you had been hired?
A. My understanding was pending a reference check, than an offer would be extended.
Q. And Lisa said she spoke with James at Guidepoint?
A. Yes.
Q. Did Lisa say she spoke with anyone else at Guidepoint?
A. No.
Q. And Dave spoke with James.
A. Yes.
Q. Did Dave say he spoke with anyone else at Guidepoint?
A. No.
Q. If you could look, the next page

F. JIBRIL, M.D.
is Paragraph 15.
A. (Perusing.)
Q. "Guidepoint chief executive officer, Albert Sebag, without ever meeting Jibril, voted her hire. Guidepoint ultimately hired a man for that position."
Do you see that allegation, doctor?
A. Yes.
Q. And do you agree with that allegation?
A. Yes.
Q. And it was James that told you that Albert had vetoed your hire?
A. Yes.
Q. And you had never met Albert.
A. Yes.
Q. And to this day, you've never met Albert.
A. Yes.
Q. Have you ever spoken with Albert?
A. No.
Q. Any communications with Mr. Sebag at all?
A. No.

F. JIBRIL, M.D.
Q. And who told you that Guidepoint ultimately hired a man for that position?
A. Valentia.
Q. During your June 2018 call?
A. I believe so.
Q. And you, again, came to learn later that there were multiple people hired for that position?
A. Yes.
Q. Did Valentia identify the man that was hired for the position as alleged in Paragraph 15?
A. I believe she did.
Q. And who was that person?
A. I don't recall. I believe she told me that it was someone who had a personal connection to Albert Sebag.
Q. And that person was hired for the position that you were applying for.
A. Yes.
Q. Paragraph 16: In a meeting on March 12, 2018 -- "In a memorandum dated March 12, 2018, Valletti detailed her allegations of discrimination to the



F. JIBRIL, M.D.

director of human resources, Priscilla Gulino. Valletti included the company's failure to hire Jibril, who Valletti described as extremely qualified female candidate, following a severe personal intervention by Sebag. Valletti stated that Guidepoint refused to allow her to discuss or defend the choice of Jibril."

Do you see that, doctor?

A. Yes.

Q. Do you agree with those allegations?

A. Yes.

Q. And this memorandum, was this the complaint that Ms. Valletti was talking to you about on your call?

A. No, this was an email that she had sent I believe to the HR department when she was still at Guidepoint.

Q. Okay.

So the memorandum mentioned in Paragraph 16 you understand to be an email from Valentia to HR.

A. Yes.

F. JIBRIL, M.D.

Q. And Valletti let you know that there was also a complaint?

A. I believe she told me that there was an EEOC complaint, yes.

Q. Valletti told you that she had filed an EEOC complaint?

A. Yes.

Q. In your talking with Valletti in June of 2018, did she mention something along the lines of a severe personal intervention by Sebag?

A. Yes.

Q. And how did she describe that intervention?

A. She said that when he learned that, um, they had planned to hire a female candidate for the role, he immediately began to complain and say that it would not happen.

Q. And who did he make those complaints to?

A. Valentia and Bouker.

Q. And you interviewed in person with four people when you visited Guidepoint?

F. JIBRIL, M.D.

A. Yes.

Q. And two of them are woman?

A. Yes.

Q. Including Ms. Valletti.

A. Yes.

Q. Who told you that Albert told her that he would not hire a female.

A. Yes.

Q. There -- and it also alleges that Valletti stated that "Guidepoint refuses to allow her to discuss or defend the choice of Jibril." Do you see that?

A. Yes.

Q. Do you believe that allegation?

A. I do.

Q. Do you recall your testimony earlier where James said that Valletti and Pool had gone to bat for you?

A. Yes.

Q. And how would you reconcile that testimony with that allegation?

A. I wasn't there, but that is the exact language that James communicated to me on that phone call. He said that they went

F. JIBRIL, M.D.

to bat for me for the decision to hire me.

Q. Did you ever have occasion to meet Ms. Gulino?

A. No.

Q. If you could look at Page 8, doctor.

A. (Perusing.)

Q. Paragraph D. Section D.

A. (Perusing.)

Q. Here, the plaintiff's, being you and Ms. Valletti, ask for direction to defendant to place Plaintiff's in the position they would have continued to occupy but for Defendant's discriminatory and retaliatory treatment of them and make them whole for all earnings they would have received but for Defendant's discriminatory and retaliatory treatment including but not limited to wages, bonuses, pensions, and other lost benefits. Do you see that?

A. Yes.

Q. And do you agree with that request for relief?

A. I do.



F. JIBRIL, M.D.

Q. Would you accept an employment position from Guidepoint if one were offered to you today?

A. Yes.

Q. Why?

A. Because I think that I would be a great fit for that role.

Q. And if that role offered $140,000 base with no chance for bonus, you would accept that position?

A. Yes.

Q. Why?

A. Because it is a role that uses my experience very well and broadens what I do. One of the reasons why I was interested in the role was being able to have access to financial industry clients.

Q. Walk me through how your daily functions at Expert differ from what you understood the health care content strategist to be.

A. Well, currently at the Expert Institute, what I do is business development. I'm prospecting and pitching

F. JIBRIL, M.D.

clients. Very limited usage of my health care background.

The role that I was interviewing for was health care content strategist, which is how I started my career at The Expert Institute using health care knowledge and applying it in a different way.

Q. And your base at Expert is now $140-.

A. Yes.

Q. And you understood the salary range for the position you were interviewing at Guidepoint to be between $140- and $160-.

A. Yes.

Q. And at Expert, you're entitled to bonuses that might raise your compensation is to $333,000.

A. Yes.

Q. And it was your understanding that you would not be earning bonuses when you first began at Guidepoint.

A. That wasn't explicitly discussed, but I was willing to take a role for base pay.

F. JIBRIL, M.D.

Q. Valentia told you that she earned bonuses.

A. Yes.

Q. And it was your understanding that bonuses might be in your future if you joined Guidepoint.

A. Yes.

Q. And the position you were interviewing for was subordinate to Ms. Valletti.

A. Yes.

Q. In the allegation here to make you whole for all earnings you would have received but for Defendant's discriminatory treatment, Dr. Jibril, how have you been damaged financially by Guidepoint's refusal to hire you?

A. At the time that I was interviewing with Guidepoint, my salary was $87,500, so the role at Guidepoint would have been a significant increase in that.

There was a period of time where I would demonstrate a loss. By June of that year, I did receive a raise to $100,000, so

F. JIBRIL, M.D.

that's where the damages would end, at that point.

Q. And then your base increased to $140- at Expert.

A. Yes, the following year.

Q. Dr. Jibril, I'm going to show you what's been marked as Defendant's Exhibit G (handing).

A. (Perusing.)

Q. Doctor, if you could just review Defendant's G and let us know when you've had an opportunity to do that.

A. (Perusing.)

Yes.

Q. You've had an opportunity to review G?

A. I have.

Q. Do you recognize G?

A. I have not seen this document before.

Q. I'll represent to you that it's a letter my office received from your counsel as part of this litigation.

Doctor, if I could refer you to



F. JIBRIL, M.D.

that bulleted list, 3B.

A. Uh-huh.

Q. "Valletti has lost $165,000 in backpay damages, and Jibril has lost $61,900 in backpay damages. Plaintiffs are also seeking damages for emotional distresses, punitive damages, attorney fees, costs, and disbursements."

You see that doctor?

A. Yes.

Q. Doctor, were your damages as of February 20, 2019, the date of this letter, $61,900?

A. I believe so.

Q. And how did you calculate that?

A. Lost earnings between the time when my salary was $87,500 up until the time six months later it was increased to $100,000, and then the subsequent six months before it was increased again to $140-.

Q. So as of the date of this February 20, 2019, letter you're already in a position as VP at Expert?

A. No -- yes, I was.

F. JIBRIL, M.D.

Q. And you have a base of $140-.

A. Yes.

Q. And do you know what compensation level for the position at Guidepoint was used to calculate the $61,900?

A. I believe it was based on salary $140- to $160,000.

Q. And you agree with that calculation, $61,900?

A. Yes.

Q. And that would have been the difference between what you would have earned at Guidepoint in or about February of 2018 to date?

A. Yes.

Q. Less what you have earned at Expert.

A. Yes.

Q. As reflected in your promotions in that period of time.

A. Correct.

Q. I'm going to show -- doctor, I'm going to show you what's been previously marked as Defendant's Exhibits A and B

F. JIBRIL, M.D.

(handing). They work together, so we could look at them together. If you could just look at them sort of at the same time and let us know when you've had a chance to do that, please.

A. Okay (perusing).

I have had an opportunity to take a look at the exhibits.

Q. Okay.

And in speaking first about Exhibit A, do you recognize Exhibit A?

A. Yes.

Q. And what do you recognize Exhibit A to be?

A. This is the defendant's first set of interrogatories.

Q. Have you seen this document before today?

A. Yes.

Q. Same questions about Exhibit B: Do you recognize Exhibit B?

A. Yes.

Q. And what do you recognize Exhibit B to be?

F. JIBRIL, M.D.

A. The plaintiffs' response to the defendant's interrogatories.

Q. And have you seen Exhibit B before?

A. Yes.

Q. And you understand Exhibit B to be your answer to the questions in Exhibit A as part of this litigation.

A. Yes.

Q. Doctor, if you could turn in Exhibit A to Page 7, Interrogatory Number 5.

A. (Perusing.)

Q. Interrogatory Number 5 asks with respect to you employment history for the five years prior to your employment with Guidepoint to the present identify (A) your employer's and the date during which you were employed, (B) your supervisors, and (C) any person performing any evaluation, formal/informal of your work performance.

Do you see that.

A. Yes.

Q. And I think we have done a good job of covering your employment during that



F. JIBRIL, M.D.
time period.
Doctor, who is your current supervisor at Expert?
A. Joaquin Santos.
Q. And what is Mr. Santos' position?
A. He's a senior vice president of business development.
Q. Do you have any other supervisors other than Mr. Santos?
A. No.
Q. And going sort of back in time before you become vice president of enterprise and you are on the business development team, who was your supervisor then?
A. Dave Glynn.
Q. Did you have any other supervisors at the time?
A. No.
Q. And what was Dave's title at that time?
A. Vice president of business development.
Q. Did you have a different manager

F. JIBRIL, M.D.
when you had started performing more of the account management roles?
A. No.
Q. Sorry. Did you have a different supervisor?
A. I didn't.
Q. Was it still Mr. Glynn?
A. Yes.
Q. And when you were the associate director of the medical research department, who was your supervisor then?
A. Zachary Baretto, Z-A-C-H-A-R-Y B-A-R-E-T-T-O.
Q. And what was Mr. Baretto's title at that time?
A. Vice president of research.
Q. And in your position as senior medical research associate, who was your supervisor then?
A. Zachary Baretto.
Q. Was he still -- was he at that time VP of research?
A. Yes.
Q. And when you first began at

F. JIBRIL, M.D.
Expert, who was your supervisor?
A. Michael Morgenstern.
Q. And what was Mr. Morgenstern's tile then?
A. Then, it was vice president of marketing.
Q. Now, did these supervisors have occasion to perform evaluations of your work performance?
A. The only supervisor that gave me evaluations was Zachary Baretto in my role on the research team.
Q. Sort of beginning of your tenure at Expert?
A. When I became full-time at Expert Institute.
Q. And do you recall the content of those evaluations?
A. Yes, they were largely positive.
Q. Do you have copies of those evaluations?
A. No.
Q. Doctor, if you could look at Interrogatory Number 7.

F. JIBRIL, M.D.
A. (Perusing.)
Q. Interrogatory 7 asks if you have made an application or inquiry for employment to any person or entity since your separation or rejection of employment from Guidepoint, and then it's asked that Plaintiffs identify certain factors, elements.
Doctor, we spoke about your conversations for the Guidepoint business development team in the spring of this year, correct?
A. Yes.
Q. And we talked about your recruitment by others in 2017; is that correct?
A. Yes.
Q. Could you walk us through any applications for employment you have made in 2018?
A. I did not make any applications.
Q. Did you receive inquiries for employment during 2018?
A. Yes.



F. JIBRIL, M.D.

Q. And how many inquiries?

A. I think roughly four.

Q. And who were those received from?

A. I can't recall all the employers. The one that does come to mind is the translation and interpretation service.

Q. So is there some overlap between this and the 2017 recruiters we talked about before?

A. I'm sorry. You're referring to 2018?

Q. Just 2018 --

A. Okay.

Q. -- alone.

A. Then no.

Q. So in 2018, you receive no inquiries for employment.

A. I did speak with Anna Kogut at the end of 2018.

Q. And Anna, is that the law firm?

A. Yes.

Q. Is that the same position we talked about before?

A. Yes.

F. JIBRIL, M.D.

Q. All right.

So are those 2017 recruiter talks really 2018, or was there some overlap?

A. No, I spoke with her in 2018 and 2017.

Q. For the same position?

A. Yes, though higher ranking.

Q. What was the difference in the positions that Ms. Kogut was bringing to your attorney?

A. Seniority. This would be a position -- the second time she reached out to me would be a position that was directly reporting to the COO.

Q. So when Ms. -- you and Ms. Kogut spoke in 2017, it was about one position, and when you spoke in 2018, it was about a more senior position?

A. Yes.

Q. And how did those talks about the senior position go?

A. They were -- they went a lot further this time. I interviewed in person at their New Jersey office.

F. JIBRIL, M.D.

Q. And this position would still require you to commute to New Jersey?

A. Yes, although they did inform me that they were opening a Manhattan office, so that would be a potential.

Q. Okay.

And who did you interview with at the law firm?

A. The COO, the, um, firm administrator, and the recruiter.

Q. Ms. Kogut?

A. Yes.

Q. And do you recall the name of the COO?

A. I don't.

Q. Do you recall the name of the firm admin?

A. I don't.

Q. And when did you have this interview?

A. It was right before the holidays in December of 2018.

Q. And what was the result of those -- that interview.

F. JIBRIL, M.D.

A. They extended an offer.

Q. And what was the nature of the offer?

A. I believe it was a base -- the initial offer was $180- base, and after negotiation, it was $210- base. Bonus potential was not defined.

Q. And when was the officer extended?

A. In December.

Q. And what would this title have been?

A. I believe it would have been director of business development.

Q. And you would have reported directly to COO?

A. Yes.

Q. And they're initial officer was $180-?

A. Yes.

Q. Were you represented by another recruiter in these negotiations, or you're representing yourself?

A. I represented myself.

Q. And you negotiated up to $210-?



F. JIBRIL, M.D.

A. Yes.

Q. And they ultimately did not accept that offer, correct?

A. They did -- oh, I did not.

Q. Sorry.

You ultimately did not accept that offer, correct?

A. Yes.

Q. And why not?

A. When I reached out to the CEO, CTO, and CMO of my current employer to let them know there was a very attractive offer on the table for me, they were very sad to see me go. We had a lunch meeting, and we discussed my future at the company.

Given that I'm one of the more tenured employees, we discussed the future of the company, and they raised my salary and title. And though it was significantly less in base, um, I enjoy my work, and I saw a potential in a new role that they gave me, so I decided to stay.

Q. So that is what led to your January 2019 promotion to vice president and

F. JIBRIL, M.D.

the bump in base salary?

A. Correct.

Q. Okay.

And I assume you ultimately declined the offer from the firm?

A. Yes.

Q. In 2018, did you receive any other inquiries for employment other than that law firm?

A. Yes, but, again, I can't recall and none of those discussions went beyond initial phone screenings.

Q. Again, we're talking just 2018.

A. Yes.

Q. And how many inquiries would you say in 2018?

A. Roughly four.

Q. All right.

Let's talk about 2019, then. Had you made any applications for employment in 2019?

A. Two recruiters from -- on behalf of Guidepoint reached out to me.

Q. And we talked about that earlier.

F. JIBRIL, M.D.

A. Yea.

Q. Right.

A. And a recruiter from LinkedIn reached out about a business development role.

Q. And correct me if I'm wrong. Were there two recruiters from Guidepoint, or is it one Guidepoint and the third party?

A. One Guidepoint and one third-party recruiter.

Q. And they ended up talk about the same position.

A. Yes.

Q. Okay.

And the recruiter from LinkedIn, what did they, he or she, reach out to you about?

A. She reached out about a business development role, as well.

Q. Okay.

Where was that role?

A. At their headquarters in Manhattan.

Q. And this was an in-house

F. JIBRIL, M.D.

recruiter?

A. Yes.

Q. And what sort of business?

A. So it was gaining -- reaching out to corporate clients, not on the member side of things.

Q. And I'm sorry. In what capacity to corporate clients?

A. So LinkedIn has an arm of their business where they're reaching out to corporations selling their services.

Q. Oh, I see. All right. So the recruiter was from LinkedIn.

A. Oh, yes.

Q. Okay. It wasn't --

A. She reached out to me on LinkedIn, but the role was at --

Q. I see.

A. -- LinkedIn.

Q. A communication through LinkedIn about LinkedIn.

A. Yes.

Q. Okay.

That was a position to be at

MAGNA LEGAL SERVICES

Page 106

F. JIBRIL, M.D.

LinkedIn.

A. Yes.

Q. Okay.

Did you have talks with that recruiter about that potential compensation?

A. Yes.

Q. And what was that compensation?

A. I told her what my potential earnings for 2019 was, and we immediately saw that the role was not a good fit.

Q. It wouldn't have matched your compensation at Expert?

A. Exactly.

Q. So 2019, we've talked about Guidepoint. We've talked about LinkedIn. Any other employment opportunities in 2019?

A. No.

Q. Interrogatory 8: If you've received any offers of employment since the date of your separation or rejection of employment from Guidepoint, and then it asks to identify in more specificity.

So Dr. Jibril, your -- we'll call it rejection of employment from Guidepoint

Page 107

F. JIBRIL, M.D.

was in February of 2018, correct?

A. Yes.

Q. And what offers for employment have you received since February of 2018?

A. The one that we discussed at the end of 2018 from the law firm.

Q. Doctor, if you could look at Interrogatory 10.

A. (Perusing.)

Q. State whether you have received any unemployment benefits, Social Security benefits, disability benefits, workers' compensation benefits, or any other types of government benefits since the date of your separation from Guidepoint. If so, identify the type of benefit, the date the benefit was received and the total amount of the benefit. Do you see that question?

A. Yes.

Q. Dr. Jibril, you've had no break in employment since school, correct?

A. Yes.

Q. Okay.

Continuing onto Interrogatory 11:

Page 108

F. JIBRIL, M.D.

Doctor, it asks, with respect to each and every measure of damages sought in the Complaint, including but not limited to economic losses, emotional pain and suffering, and punitive damages, and then again it asks for identity of certain specifications.

With this question, if I could also ask you to refer to Exhibit B, which are Plaintiffs' responses to the interrogatories, specifically Response 11, and that is responsive to Question 11.

And at -- do you have Response 11?

A. Yes.

Q. And in Response 11, it reads: "Valletti is owed $334,000 in backpay, and Jibril is owed $48,000 in backpay. Plaintiffs are also seeking reinstatement, punitive damage, attorneys' fees, costs, disbursements, and interests.

"Plaintiffs are not seeking compensation for mental and emotional distress." Do you see that?

A. Yes.

Page 109

F. JIBRIL, M.D.

Q. And do you agree with that response?

A. Yes.

Q. And how are we calculating $48,000 in backpay now?

A. The numbers are the same. I was earning $87,500 at the time when I was rejected the role at Guidepoint, and up until June or July of 2018, I was making $87,500; that was increased to $100,000, and then again by the end of the year, $140-.

Q. And if I could ask you: At the time we're looking at this Exhibit B to also refer back to Exhibit G.

A. (Perusing.)

Q. And in Exhibit G, we talked about the calculation of your damages at $61,900, correct?

A. Yes.

Q. And could you explain to us the difference in the calculation reflected in Exhibit G and then reflected in Exhibit B?

A. One may be an error, but the calculations for backpay are based on my

MAGNA LEGAL SERVICES

F. JIBRIL, M.D.

salary at the various times between the rejection and to this date.

Q. Your salary at Expert has also increased during that period of time, correct?

A. Correct, and so there is a cut-off point for the damages.

Q. And what do you understand that cut-off point to be?

A. January of 2019 when my base pay was increased to $140,000.

Q. So your backpay period would be from February 2018 to January of 2019?

A. Yes.

Q. What is your understanding of the request here for punitive damages?

A. I'm sorry. Could you clarify that question?

Q. Do you understand what punitive damages are?

A. Yes.

Q. What are punitive damages?

A. Damages assessed on a defendant based on discriminatory behavior in this

F. JIBRIL, M.D.

instance or other negligence in other types of litigation.

Q. And do you believe the conduct you've alleged against Guidepoint warrants the imposition of punitive damages?

A. I do.

Q. How so?

A. I think that denying someone employment based on their sex is unacceptable and illegal.

Q. And it was Ms. Valletti that told you that she believed you were not extended the offer because of your gender, correct?

A. Correct.

Q. And it was Ms. Valletti that told you that it was ultimately a man that was fired for that position; is that correct?

A. Correct.

Q. And you later learned that it was 15 individuals hired for that position.

A. Yes.

Q. And you understood that at the time Ms. Valletti was terminated, Mr. Pool was also terminated; is that correct?

F. JIBRIL, M.D.

A. Yes.

Q. In Exhibit B, Dr. Jibril, can you turn to the first page, Response 1?

A. (Perusing.)

Q. Do you see Response 1?

A. Yes.

Q. Certain names are listed there?

A. Yes.

Q. Do you know who Jessica Kagan Trupia [phonetic] is?

A. No.

Q. Do you know who Jenna Applebaum is?

A. No.

Q. Ashley Dunston is?

A. No.

Q. Have you come to learn of any other individuals that have applied for employment with Guidepoint?

A. No.

Q. In your talks with Ms. Valletti, did she say that in her application for employment with Guidepoint, she experienced gender-based discrimination?

F. JIBRIL, M.D.

A. No.

Q. Do you have any idea of the senior management structure at Guidepoint?

A. I do not.

Q. Would it surprise you to learn that there are two female members of that senior management team?

A. How many members total are there?

Q. Five.

A. Okay.

I -- I was not aware of the structure.

Q. If I make the representation that two of the five members of Guidepoint senior management team are female, would that come as a surprise to you?

A. Yes.

Q. And why would that be surprising?

A. Given what I know about the company and its treatment of female employees, at least during the time that Valentia was employed and the time that I was interviewing.

Q. So Valentia shared with you her



F. JIBRIL, M.D.

impressions of how she was treating, correct?

A. Correct.

Q. Did Valentia share with you of how any other female employees were treated?

A. Yes.

Q. And which employees?

A. She made mention of the person who preceded her in her role. She said that that employee was terminated during maternity leave or their role was severely diminished when they returned from maternity leave. And she made reference of other individuals who had been treated unfairly on the basis of their sex.

Q. When did Ms. Valletti share this with you?

A. In June of 2017.

Q. Or was it --

A. Sorry. 2018, yes.

Q. And did just provide any more details other than the employee on maternity leave, these other individuals that she believes were discriminated against?

F. JIBRIL, M.D.

A. Yes, I think there were more than just two examples. She let me know that there was conduct by some of the senior management that was problematic in regards to treatment of female employees, displays of, you know, interpersonal relationships in the office. Things of that nature.

Q. And Ms. Valletti shared all of this with you on that call of June of 2018?

A. Yes, or if not all during that call, then subsequent conversations.

Q. When you later met with her in person?

A. Yes.

MR. GRECH: Take a five-minute break, please?

(Whereupon, a recess was taken at this time.)

Q. Dr. Jibril, before the break, you had mentioned that Ms. Valletti shared with you some concerns she had about senior management at Guidepoint; is that correct?

A. Yes.

Q. And what concerns did Ms. Valletti

F. JIBRIL, M.D.

share with you?

A. She said that female employees were treated unfairly, including the employee that we mentioned whose employment was -- status was reduced after coming back from maternity leave.

She also told me that the CEO was in a relationship with one of the employees and would bring her, the secretary, to business trips inappropriately, and, um, act inappropriately in the office, which made people uncomfortable, herself included.

Q. And you had no personal knowledge of this employee on maternity leave, right?

A. No.

Q. And you had no personal knowledge of any secretaries at Guidepoint, correct?

A. No.

Q. Did Ms. Valletti tell you who the secretary was?

A. She probably did mention her name, but I don't recall it.

Q. Are there any allegations in your complaint about Mr. Sebag's relationship

F. JIBRIL, M.D.

with the secretary or acting inappropriately?

A. I don't believe so.

Q. Ms. Valletti believed this was further evidence of gender discrimination at Guidepoint?

A. I think it's further evidence of improper conduct.

Q. Is it further evidence of gender discrimination?

A. I think you could argue that, yes.

Q. Are you arguing that?

A. Yes.

Q. But you've never met Mr. Sebag.

A. No.

Q. You have no knowledge of his relationships with anybody.

A. No.

Q. Or taking anyone on business trips.

A. Correct.

Q. Anything else that Ms. Valletti shared with you in terms of senior management and interpersonal relationships



F. JIBRIL, M.D.

that she felt was evidence of gender discrimination?

A. She felt that she was treated unfairly by Mr. Sebag.

Q. How so?

A. That he would have outbursts in her presence at her frequently.

Q. And Ms. Valletti shared this with you in June 2018?

A. Yes, and in subsequent conversations.

Q. I'm assuming she didn't share any of this during her interview, correct?

A. Correct.

Q. This would have been something you would have wanted to know when you're asking about this new employer and this team?

A. Yes, cultural fit is important.

Q. And knowing this, at least knowing this through Ms. Valletti, you're still of the opinion that you would like to work for Guidepoint?

A. Yes.

Q. We spoke earlier about what you

F. JIBRIL, M.D.

had planned your response to be when you learned that your offer had been vetoed and that you had thought about reaching out to HR, correct?

A. Yes.

Q. But you did not ultimately do that.

A. Correct.

Q. What were you going to ask HR?

A. I would have asked for specific feedback on my candidacy, what was lacking, and why the decision was made to interview a current client of mine and a current direct supervisor of mine for a role that I was not ultimately going to be offered.

Q. And this would have been response to you learning of the veto in February 2018.

A. Yes.

Q. At that point, did you believe that officer wasn't extended because you were a woman?

A. I had no idea why it wasn't extended at that time.

F. JIBRIL, M.D.

Q. When did you first get that idea?

A. When Valentia, the hiring manager, told me I was not hired because of my sex.

Q. And that happened in June.

A. Yes.

Q. In your conversations with Ms. Valletti in June of 2018, did she ask you to essentially join her lawsuit against Guidepoint?

A. No, she did not.

Q. But you ultimately did, both, sue Guidepoint.

A. Yes.

Q. And you both submitted charges to the EEOC.

A. Yes.

Q. Do you still speak with Ms. Valletti today?

A. Yes.

Q. How frequently?

A. Maybe once every few months as relates to the litigation.

Q. Do you have occasion to speak with Ms. Valletti outside of talks of the

F. JIBRIL, M.D.

litigation?

A. No.

Q. Do you consider her a friend?

A. By -- I would say yes, we're friendly.

Q. Do you go out on social events together?

A. No.

Q. Have dinner together?

A. No.

Q. Meet for coffee?

A. Yes, we have.

Q. And this has been between February 2018 and date --

A. Yes.

Q. Strike that.

Has this been since June 2018 to present?

A. Correct. Yes.

Q. Dr. Jibril, if I could ask you to look at -- back at Defendant's Exhibit B for a moment.

A. (Perusing.)

Q. And specifically Response Number

MAGNA LEGAL SERVICES

F. JIBRIL, M.D.

11.

A. (Perusing.)

Yes.

Q. The description of the damages for which Plaintiffs are seeking relief. We discussed reinstatement. We discussed punitive damages. It also itemizes attorneys' fees. Do you see that?

A. Yes.

Q. And have you incurred attorneys' fees as a result of this litigation?

A. Not yet.

Q. Why not yet?

MR. LICHTEN: I'd object. What is the relevance of the agreement with her attorney?

MR. GRECH: You're seeking attorneys' fees in damages.

MR. LICHTEN: Yeah, under the Lodestar -- it doesn't really matter when they first actually paid and what they actually owe. That's not how fees are calculated in this case.

MR. GRECH: That's in your

F. JIBRIL, M.D.

application for fees should you prevail.

MR. LICHTEN: Correct.

MR. GRECH: Okay.

MR. LICHTEN: That's all we're asking for.

MR. GRECH: Okay.

Q. Dr. Jibril, is it your understanding that your attorneys' fees would be paid by Guidepoint should you prevail in this lawsuit?

A. That's what we are seeking.

Q. How soon after you spoke with Ms. Valletti in June of 2018 did you file your charge with the EEOC?

A. It was a few weeks later.

Q. Did you get the impression from Ms. Valletti -- strike that.

What did Ms. Valletti say to you, if anything, about her charge with the EEOC at that time?

A. She let me know that immediately upon raising to HR her concerns about gender-based discrimination, she was

F. JIBRIL, M.D.

terminated from employment.

Q. Okay.

And you ultimately filed a charge of discrimination with the Equal Employment Opportunity Commission.

A. Yes.

Q. Did Ms. Valletti tell you that she had done the same?

A. Yes.

Q. And she told you that in June of 2018?

A. Yes.

Q. So it had already been done, presumably.

A. Yes.

Q. Did she tell you when she did it?

A. No.

Q. And we spoke earlier that your charge was -- the EEOC decided not to further pursue your charge; is that correct?

A. Yes.

Q. And did you have talks with Ms. Valletti about that?

A. Yes.

F. JIBRIL, M.D.

Q. And did you know what came of Ms. Valletti's charge with the EEOC?

A. No. Actually, I don't.

Q. Okay.

Did you have conversations with Ms. Valletti about joining in a lawsuit with her against Guidepoint at that time?

A. Yes.

Q. Why?

A. Because I had been denied employment based on my sex.

Q. We've talked about a number of recruiter reaching out to you, a number of applications, some offers.

Prior to speaking with Valentia in June of 2018, what in your experience with Guidepoint made you think that their decision was gender-based?

A. I really, prior to speaking with Valentia, was perplexed. I had no idea why they had chosen not to move forward. I thought potentially it might be based on my gender, but I didn't -- I had no concrete answers from anyone.

MAGNA LEGAL SERVICES

F. JIBRIL, M.D.

Q. Did anyone you interviewed with for that position let you know that they were interviewing other applicants?

A. No.

Q. Did you sit with other applicants in the lobby that day?

A. No.

MR. GRECH: Take a 30-second break, please.

(Whereupon, a recess was taken at this time.)

MR. GRECH: Dr. Jibril, thank you. And with that, we've concluded your deposition.

THE WITNESS: Thank you.

(Time noted: 12:50 p.m.)

____________________________
Faiza Jibril

Subscribed and sworn to before me this _____ day of _______________, 20__.

_________________________
Notary Public

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Faiza Jibril | Mr. Grech | 4 |

EXHIBITS

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| E | Nine-page black-and-white Complaint | 59 |
| F | One-page black-and-white Charge of Discrimination | 59 |
| G | One-page letter from Plaintiffs' Counsel | 59 |

C E R T I F I C A T E

I, STEPHEN P. SUDANO, a Notary Public in and for the State of New York, do hereby certify:

THAT the witness, FAIZA JIBRIL, whose testimony is herein before set forth, was duly sworn by me; and

THAT the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related, either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd of October 2019.

________________________
STEPHEN P. SUDANO

ERRATA SHEET

CASE NAME: VALENTIA VILLETTI and FAIZA JIBRIL, M.D. V. GUIDEPOINT GLOBAL, LLC

DATE OF DEPOSITION: October 3, 2019

WITNESS' NAME: Faiza Jibril

PAGE/LINE CORRECTIONS (NOW READS/SHOULD READ/REASON)

______ ________________________________
______ ________________________________
______ ________________________________
______ ________________________________
______ ________________________________
______ ________________________________
______ ________________________________
______ ________________________________
______ ________________________________
______ ________________________________
______ ________________________________

__________________
Faiza Jibril

SUBSCRIBED AND SWORN TO BEFORE ME THIS ____ DAY OF ____, 20___.

______________ ________________
NOTARY PUBLIC MY COMMISSION EXPIRES:



**A**

**able** 45:6 86:17
**above-entitled** 1:14
**ABU** 8:17,18,24 9:2 9:4 10:16
**accept** 86:2,11 102:3,7
**access** 86:17
**accommodate** 6:2
**accompanied** 23:16
**account** 15:22 19:16 76:2 95:3
**accredited** 13:9
**accurate** 61:18
**act** 116:11
**acting** 117:2
**action** 1:14 52:22 53:22 57:18,22 67:4 128:14
**actively** 64:22 67:12,23 68:3 70:12
**additional** 40:4 74:23
**addressed** 35:21 36:9
**admin** 100:18
**administer** 3:16
**administrator** 100:11
**affect** 16:5 19:22
**Africa** 9:14 10:9,23
**agree** 67:17 78:6 80:10 82:12 85:23 91:9 109:2
**AGREED** 3:3,9,14
**agreement** 122:17
**ahead** 25:2,3
**Ahmadu** 8:19
**Albert** 36:17 40:18 40:20,22,24 53:12 55:17 61:11 62:18 80:5,14,16,19,21 81:18 84:7
**allegation** 62:17 63:2,18 67:3,11 67:15,17 73:8,24 74:2 77:18 78:3,7 80:8,11 84:15,22 88:13
**allegations** 81:25 82:13 116:24
**alleged** 81:12 111:5
**alleges** 60:22 84:10
**allow** 82:8 84:12
**alluded** 48:20
**amount** 107:18
**amounts** 17:13 37:8
**analyst** 42:10 52:5
**analysts** 29:22
**Anglia** 8:16 10:17
**Anna** 68:23 98:19 98:21
**answer** 6:5 93:8
**answers** 5:6 125:25
**anybody** 117:18
**apart** 8:6
**appear** 27:10
**Applebaum** 112:13
**applicants** 126:4,6
**application** 42:6,12 42:18 47:24 52:4 52:8 58:22 76:25 77:10 97:4 112:23 123:2
**applications** 42:22 97:20,22 103:21 125:15
**applied** 41:25 42:4 112:19
**apply** 42:3
**applying** 42:15 77:6,16 81:20 87:8
**appointment** 61:13 62:19
**approximately** 26:7
**April** 11:19 13:12 14:2 20:5,16 21:25 22:8,14,14 47:4
**areas** 72:11
**argue** 117:12
**arguing** 117:13
**arm** 105:10
**Ashley** 112:16
**asked** 34:19,19,24 34:25 35:22 36:13 38:12,25 40:3,13 46:18 50:9 56:2 74:24 97:7 119:11
**asking** 34:15 35:3 60:8 118:17 123:7
**asks** 93:14 97:3 106:22 108:2,7
**assessed** 110:24
**associate** 14:17,19 16:2,3,4,10 17:20 18:3,8,14,25 19:12 95:10,19
**associated** 17:10 24:6 29:24 37:16
**assume** 73:16 103:5
**assuming** 118:13
**attempt** 5:12
**attended** 74:20
**attorney** 54:6,8 57:23 66:2 90:8 99:11 122:17
**attorneys** 2:4,9 3:4 13:4 108:20 122:9 122:11,19 123:10
**attractive** 102:13
**authority** 35:16 78:13
**authorization** 77:24
**authorized** 3:16
**availability** 40:13 46:15,19 47:15 50:10
**Avenue** 2:5 4:12
**aware** 113:12
**awkward** 12:3
**A-H-M-A-D-U** 8:22

**B**

**B** 4:2 91:25 92:21 92:22,25 93:4,7 93:19 108:10 109:14,23 112:3 121:22
**back** 13:11 15:25 39:21 40:5 42:4 42:13 46:17 48:16 52:7 94:12 109:15 116:6 121:22
**background** 27:10 28:22 32:5,9 34:16 87:3
**backpay** 90:5,6 108:17,18 109:6 109:25 110:13
**Baretto** 95:13,21 96:12
**Baretto's** 95:15
**base** 14:5 16:7 20:10 21:11,13,14 21:22 22:15,24 23:5,6,12,15 24:2 24:8,22,23,24 25:4,7,12,24 37:12 86:10 87:9 87:24 89:4 91:2 101:5,6,7 102:21 103:2 110:11
**based** 7:15 16:16 20:12 22:17 57:10 60:23 91:7 109:25 110:25 111:10 125:12,23
**basis** 52:24 57:8 67:5 72:6 114:16
**bat** 40:17 84:19 85:2
**battery** 1:8 2:10 36:20
**Bayero** 8:19
**began** 24:20 83:18 87:22 95:25
**beginning** 9:17 17:22 19:21 21:18 25:6 28:4 96:14
**behalf** 103:23
**behavior** 110:25
**belief** 7:17 63:22
**believe** 6:17 7:18 19:7 25:5 26:6,15 27:22 29:13 41:2 42:13 43:8,25 44:17 45:11 46:20 49:12,15 52:6,11 54:5 55:3,12 57:17 61:16 63:19 65:2,14,14 71:20 72:18 77:15 81:6 81:14,16 82:19 83:4 84:15 90:15 91:7 101:5,13 111:4 117:4 119:21
**believed** 54:2 111:13 117:5
**believes** 114:25
**benefit** 107:17,17 107:19
**benefits** 85:21 107:12,13,13,14 107:15
**better** 5:2 53:9 56:15
**beyond** 70:5 103:12
**birth** 10:10
**bit** 32:4
**black-and-white** 59:8 127:8,10
**blood** 128:13
**bonus** 16:21 17:10 17:15 22:18,22 24:15 86:10 101:7
**bonuses** 16:15 17:12 23:16 26:7 37:15,18,24 85:20 87:17,21 88:3,6
**born** 10:7
**bottom** 65:18



**Bouker** 7:21 28:12 35:18,22 36:2,9 36:11 40:16 50:24 55:7 56:7,8,19 58:5 62:15 77:20 78:16,19 83:23
**break** 5:24 6:6 59:5 107:21 115:17,20 126:10
**BRIGHT** 2:4
**bring** 116:10
**bringing** 13:11 34:11 99:10
**brings** 10:25
**broadens** 86:15
**Brooklyn** 4:13 11:23 12:15
**brought** 67:4
**bulleted** 90:2
**bump** 103:2
**business** 15:24 19:19 20:6,15,18 21:16 22:12 23:7 23:22 43:2,19 46:10 48:6,13 52:10 58:22 64:8 68:11 72:16,22 75:25 86:24 94:8 94:14,23 97:11 101:14 104:5,19 105:4,11 116:11 117:20
**buy** 29:8,11,17 55:19 78:12
**B-A-R-E-T-T-O** 95:14
**B-A-Y-E-R-U** 8:22

**C**
**C** 2:2 93:19 128:2,2
**calculate** 90:16 91:6
**calculated** 122:24
**calculating** 109:5
**calculation** 91:10 109:18,22

**calculations** 109:25
**call** 40:14,14 42:20 50:10 51:17 81:5 82:17 84:25 106:24 115:10,12
**called** 64:16
**candidacy** 36:22 39:19 119:12
**candidate** 7:19 55:14 77:25 82:6 83:18
**capacity** 11:7 15:16 17:2 105:8
**Cape** 9:13,23
**care** 32:10 33:8 61:5 67:13,20 73:14 77:22 86:21 87:3,5,7
**career** 9:25 20:3 87:6
**case** 1:4,15 54:23 62:8 122:24 129:3
**cases** 15:8,11
**Catherine** 2:15
**CEO** 36:16 40:18 62:17 102:11 116:8
**certain** 62:5 97:8 108:7 112:8
**certainly** 36:11
**certainty** 32:24
**certification** 3:6
**certify** 128:5,12
**chance** 86:10 92:5
**change** 11:15,17 13:16 17:6 19:6 20:8 27:15 63:22
**changed** 13:14 18:3 18:24
**changes** 22:9
**charge** 53:4,7 57:5 57:9,16 60:14,16 60:19,22 61:2,19 61:21,23 62:3,11 65:18 66:4 123:16 123:21 124:4,20

124:21 125:3 127:10
**charges** 120:15
**charging** 65:19
**check** 73:20 79:12
**chief** 61:11 80:4
**choice** 82:9 84:12
**chose** 57:17
**chosen** 125:22
**cited** 52:17
**City** 12:20 28:8
**claims** 7:11
**clarify** 11:24 17:18 110:18
**CLE** 13:6,8
**clear** 5:19 28:19 35:11 37:3,5 55:16
**client** 75:19 119:14
**clients** 13:4 15:7 29:21 86:18 87:2 105:6,9
**client-facing** 15:23
**CMO** 102:12
**coffee** 121:12
**colleague** 41:15
**come** 17:6 20:8 28:24,25 34:14 98:6 112:18 113:16
**coming** 116:6
**Commission** 124:6 129:23
**commissions** 20:11 21:9 24:5,21 25:8 25:14,16 26:4
**communicate** 79:2
**communicated** 49:18 84:24
**communication** 46:9 47:18 105:21
**communications** 49:24 54:17,22 80:23
**commute** 70:4 100:3

**commuting** 71:24
**companies** 64:20
**company** 11:24 34:23 41:7,10,17 43:7 51:4 61:13 61:16 62:22 63:19 102:16,19 113:21
**company's** 61:8 62:14 77:21 82:3
**compared** 32:8
**compensation** 13:25 16:5 17:7 19:22 20:9,24 22:9,24 24:12 30:11 48:12 73:2 73:5 87:17 91:4 106:6,8,13 107:14 108:23
**complain** 83:19
**complaint** 51:3 52:17 54:2 57:25 65:16 66:24 82:16 83:3,5,7 108:4 116:25 127:9
**complaints** 83:22
**complete** 36:23
**concern** 29:6
**concerns** 115:22,25 123:24
**concluded** 126:14
**concrete** 125:24
**condition** 6:3
**conduct** 73:20 111:4 115:4 117:9
**confidant** 76:11
**confirm** 45:6
**connecting** 15:6
**connection** 50:4,7 81:18
**consider** 53:4,6,7 77:5 121:4
**consideration** 55:14
**considering** 53:22
**contacted** 61:4 73:12

**content** 11:11 15:3 15:8 27:8,9 30:11 32:2 33:7 42:15 49:5 55:22 56:24 58:17 61:6 67:14 67:20 73:14 77:20 77:22 86:21 87:5 96:18
**continued** 24:13 85:14
**Continuing** 107:25
**conversation** 27:11 34:12 37:7 41:6 45:4,21 51:7,10 55:10 64:11 74:16 74:18
**conversations** 27:20 30:20 38:9 41:3 45:24 46:2,6 52:9 68:17,20 69:8,14 70:6 72:24 73:4 97:11 115:12 118:12 120:7 125:6
**COO** 99:15 100:10 100:15 101:16
**copies** 96:21
**corner** 65:19
**corporate** 105:6,9
**corporations** 105:12
**correct** 15:13 16:11 23:10,13,14 24:4 25:23 26:9 30:9 31:6 35:10 60:23 61:24 63:4 67:6 72:10 78:25 91:22 97:13,17 102:4,8 103:3 104:7 107:2 107:22 109:19 110:6,7 111:14,15 111:18,19,25 114:3,4 115:23 116:18 117:22 118:14,15 119:5,9 121:20 123:4



124:21
**CORRECTIONS** 129:6
**costs** 90:8 108:20
**counsel** 2:15 4:19 5:25 65:3,8,13,15 89:23 127:12
**course** 9:8
**Court** 1:2 3:18
**covering** 93:25
**create** 5:17
**credit** 13:8
**CTO** 102:12
**cultural** 118:19
**curious** 34:13
**current** 10:4 20:21 20:23 21:14 75:19 94:3 102:12 119:14,14
**currently** 20:17 30:14,16 86:23
**custody** 8:4,7
**customer** 15:21 29:21
**cut-off** 110:7,10

**D**

**D** 85:9,9 127:2
**daily** 86:19
**damage** 108:20
**damaged** 88:17
**damages** 89:2 90:5 90:6,7,8,12 108:3 108:6 109:18 110:8,17,21,23,24 111:6 122:5,8,19
**date** 21:15 59:11 90:13,22 91:15 93:18 106:21 107:15,17 110:3 121:15 129:4
**dated** 81:23
**Dave** 76:2,16,19 77:8 79:20,22 94:17
**Dave's** 94:21
**David** 2:11 4:17
**day** 31:8 33:17 34:18 51:25 73:20 74:4,17 75:7 80:18 126:7,22 129:21
**days** 61:7 73:17 74:3,6,8,12,14
**day-to-day** 32:4
**dealings** 51:23
**December** 61:3 67:12,25 70:13,15 73:11 100:23 101:10
**decided** 54:7 78:2 78:23 102:23 124:20
**decision** 35:19,20 36:12,18 52:6 54:3 55:17 61:14 62:23 65:4 79:3 85:2 119:13 125:19
**decisions** 72:6
**declined** 103:6
**defend** 82:9 84:12
**defendant** 1:7,14 2:9 85:13 110:24
**defendants** 60:8
**defendant's** 59:9 59:14,17 60:3,7 60:12 66:10,20 85:15,18 88:15 89:8,12 91:25 92:16 93:3 121:22 127:7
**defer** 78:16
**deferring** 35:20
**defined** 101:8
**definitely** 34:22
**degree** 8:17,24
**demonstrate** 88:24
**denied** 125:11
**denying** 111:9
**department** 13:6 14:21,22 15:17 16:3 17:4,17 18:7 18:19 19:11 69:7 74:19 79:6 82:19 95:11
**depending** 13:8
**deposed** 7:24
**deposition** 3:15 5:4 126:15 129:4
**describe** 83:14
**described** 82:5
**description** 53:9 122:5 127:7
**designated** 77:19
**detailed** 81:24
**details** 114:23
**determination** 57:11
**determine** 69:25
**develop** 15:2 30:7
**developing** 15:8
**development** 19:19 20:6,15,18 21:16 22:13 23:7,23 43:2,19 46:11 48:6,13 52:10 58:22 64:8 68:11 72:16,22 75:25 86:25 94:8,15,24 97:12 101:14 104:5,20
**differ** 86:20
**difference** 91:13 99:9 109:22
**different** 87:8 94:25 95:5
**diligence** 29:22
**diminished** 114:13
**diminishing** 15:4
**dinner** 121:10
**direct** 32:3 33:3 75:24 119:14
**direction** 85:12
**directly** 40:17 49:18 54:3 99:14 101:16
**director** 17:20 18:3 18:8,25 19:12 77:20 82:2 95:11 101:14
**disability** 107:13
**disbursements** 90:9 108:21
**discriminated** 114:25
**discrimination** 7:5 51:3,20,22 52:18 53:2 54:6 60:15 60:17,20,22 67:5 81:25 112:25 117:6,11 118:3 123:25 124:5 127:11
**discriminatory** 85:15,18 88:15 110:25
**discuss** 82:8 84:12
**discussed** 32:5 37:3 75:9 87:23 102:16 102:18 107:6 122:7,7
**Discussing** 54:23
**discussion** 22:5 39:14
**discussions** 61:8 73:17 74:9,12,22 103:12
**displays** 115:6
**distress** 108:24
**distresses** 90:7
**DISTRICT** 1:2,2
**divorce** 8:4,6
**doctor** 8:10 65:20 78:4 80:8 82:10 85:7 89:11,25 90:10,12 91:23 93:11 94:3 96:24 97:10 107:8 108:2
**document** 59:5 60:11,13 66:17 89:20 92:18
**documents** 59:9 63:15
**doing** 13:3 19:18 41:16
**door** 30:7
**Dr** 4:15 7:23 59:12 66:12,19 67:8 73:7,22 88:16 89:7 106:24 107:21 112:3 115:20 121:21 123:9 126:13
**drafted** 65:24
**due** 29:22
**duly** 4:3 128:8
**Dunston** 112:16
**dynamics** 34:20

**E**

**E** 2:2,2 59:10,14 66:10,20 127:2,8 128:2,2
**earlier** 47:5 65:2,17 75:9 78:12 84:18 103:25 118:25 124:19
**early** 31:11 42:16 42:24 43:12
**earn** 16:21 17:15 22:21
**earned** 8:23 22:18 37:18 88:2 91:14 91:17
**earning** 17:8 20:11 24:20 37:24 87:21 109:8
**earnings** 85:17 88:14 90:17 106:10
**East** 8:16 10:17
**economic** 108:5
**education** 9:25 10:13
**education/profes...** 9:8
**EEOC** 52:23,25 53:22 57:6,12,16 57:21 60:14 62:3



65:4,16 66:5 83:5
  83:7 120:16
  123:16,21 124:20
  125:3
**effect** 3:17
**Egypt** 10:8
**either** 48:11 128:13
**elements** 97:9
**email** 40:3 49:21,22
  82:18,23
**emails** 38:24
**emotional** 90:7
  108:5,23
**employed** 40:19
  93:19 113:23
**employee** 22:3 32:2
  32:7 33:3,7 43:3
  76:8 114:11,23
  116:5,15
**employees** 27:13
  28:13 29:20 31:3
  31:17 45:8 102:18
  113:22 114:6,8
  115:6 116:3,9
**employer** 10:4 45:3
  102:12 118:18
**employers** 70:24
  72:5 98:5
**employer's** 93:18
**employment** 4:19
  11:19 26:14 27:16
  42:2,22 54:6 86:2
  93:15,16,25 97:5
  97:6,20,24 98:18
  103:9,21 106:17
  106:20,22,25
  107:4,22 111:10
  112:20,24 116:5
  124:2,5 125:12
**ended** 36:21 104:12
**England** 10:14,19
**enjoy** 102:21
**enter** 21:17
**entered** 22:4
**enterprise** 20:22,24
  94:14

**entertain** 64:16
**entertained** 64:7
**enthusiastic** 34:10
**entire** 14:21 17:3
**entities** 71:7
**entitled** 87:16
**entity** 11:5 70:12
  97:5
**Equal** 124:5
**ERRATA** 129:2
**error** 109:24
**Esq** 2:6,11,15
**Essendelft** 75:20
**essential** 30:4
**essentially** 19:18
  23:20 120:9
**Europe** 10:20
**evaluation** 93:20
**evaluations** 96:9,12
  96:19,22
**events** 121:7
**eventually** 50:18
**evidence** 117:6,8,10
  118:2
**exact** 84:24
**Exactly** 21:10
  106:14
**EXAMINATION**
  1:12 4:6 127:3
**examined** 4:4
**example** 51:5
**examples** 115:3
**executive** 61:11
  80:4
**Exhibit** 59:14,22
  60:9,12 66:20
  89:8 92:12,12,15
  92:21,22,25 93:4
  93:7,8,12 108:10
  109:14,15,17,23
  109:23 112:3
  121:22
**exhibits** 59:10
  91:25 92:9 127:6
**expanded** 13:17
**expectation** 5:5

39:20
**expectations** 38:13
**experience** 28:20
  28:22,24 29:9,12
  29:18 30:2 86:15
  125:17
**experienced** 51:21
  112:24
**expert** 10:4 11:6,8
  11:15,21 12:5,19
  13:12 14:9 15:11
  16:5 20:4,25
  24:12 48:7 64:21
  76:4,6,8,9 77:12
  86:20,23 87:7,9
  87:16 89:5 90:24
  91:18 94:4 96:2
  96:15,16 106:13
  110:4
**expertise** 34:11
**experts** 15:7,10
**EXPIRES** 129:24
**explain** 5:2 109:21
**explanation** 53:9
  53:12
**explicitly** 87:23
**extended** 49:4 58:7
  58:12 79:13 101:2
  101:9 111:13
  119:22,25
**extending** 40:25
**extension** 53:13
  55:3
**extremely** 82:5
**E-S-S-E-N-D-E-...**
  75:22

**F**

**F** 4:2 5:1 6:1 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1

30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1
  51:1 52:1 53:1
  54:1 55:1 56:1
  57:1 58:1 59:1,10
  59:17,21,22 60:1
  60:3,7,9,12 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1 100:1
  101:1 102:1 103:1
  104:1 105:1 106:1
  107:1 108:1 109:1
  110:1 111:1 112:1
  113:1 114:1 115:1
  116:1 117:1 118:1
  119:1 120:1 121:1
  122:1 123:1 124:1
  125:1 126:1
  127:10 128:2
**fact** 29:7 39:22
**factors** 97:8
**failed** 7:8,14
**failure** 7:4 57:10
  82:4
**Fair** 12:2 74:10,25
**Faiza** 1:3,13 4:10
  126:19 127:4
  128:6 129:3,5,19
**familiar** 43:16
  66:14,16,19

**family** 10:11
**far** 71:2
**February** 40:6,10
  49:11 61:14 62:2
  62:23 90:13,23
  91:14 107:2,5
  110:14 119:18
  121:15
**feedback** 119:12
**feel** 7:13
**feeling** 55:5
**fees** 90:8 108:20
  122:9,12,19,23
  123:2,10
**felt** 118:2,4
**female** 33:3 82:5
  83:17 84:8 113:7
  113:16,21 114:6
  115:6 116:3
**file** 57:5 62:3 65:15
  123:15
**filed** 57:25 61:23
  66:4,24 83:7
  124:4
**filing** 3:5 52:23,25
  53:4,6,23 57:15
  60:14
**fill** 55:24 68:9
**final** 48:21,24 55:7
  63:18 73:18 77:24
  79:7,8
**financial** 28:19,24
  29:19,21 86:18
**financially** 88:17
**find** 34:22
**finish** 5:22
**fired** 50:24 111:18
**firm** 4:18 56:20
  68:5,7,13 69:3,5
  69:10 70:21 71:16
  98:21 100:9,10,17
  103:6,10 107:7
**firms** 13:5
**first** 4:3 11:17 16:6
  18:21,22 23:6
  31:23,24,25 33:2



33:21 38:6 59:21 61:18 87:22 92:11 92:16 95:25 112:4 120:2 122:22
**fit** 23:23 24:2 27:10 41:8 48:21 69:20 70:2 86:8 106:11 118:19
**five** 93:16 113:10 113:15
**five-minute** 59:4 115:16
**Floor** 2:10
**follow** 47:14 64:12
**following** 82:6 89:6
**follows** 4:5
**follow-up** 38:19,23 40:3 41:22 48:23
**force** 3:17
**forgive** 10:15 15:25
**form** 3:10 52:22
**formal** 19:5,17 51:3
**formally** 20:6
**formal/informal** 93:21
**forth** 128:7
**forward** 125:22
**four** 11:18 13:13 31:2,4 71:18 72:4 72:18,25 74:20 83:25 98:3 103:18
**fourth** 35:25 36:4 48:2
**frequently** 118:8 120:21
**friend** 121:4
**friendly** 121:6
**full** 77:24
**full-time** 13:21 14:3,8 96:16
**functions** 86:20
**further** 3:9,14 45:23,25 46:5 57:22 66:6 99:24 117:6,8,10 124:21 128:12
**furthest** 71:3,5
**future** 88:6 102:16 102:18

**G**

**G** 59:10 89:8,12,17 89:19 109:15,17 109:23 127:12
**gain** 30:3
**gaining** 105:5
**gender** 7:15 51:3 53:2 54:4 56:23 57:10 64:7 71:22 72:6 111:14 117:6 117:10 118:2 125:24
**gender-based** 51:20,22 52:6,12 52:17 55:4 112:25 123:25 125:19
**general** 2:15 44:23
**gestures** 5:15
**give** 4:22 47:15 50:15 63:9 76:24 77:4,9,14
**given** 28:21 57:13 60:25 102:17 113:20 128:10
**gives** 7:17
**giving** 76:7
**Global** 1:6 2:16 4:20 6:21,23 7:3 60:6 61:4 67:2 129:3
**Glynn** 76:2,4 94:17 95:8
**go** 5:10 25:2,3 28:16 31:12 36:8 48:16 52:16 74:3 99:22 102:15 121:7
**going** 4:22 5:20 13:11 15:25 16:13 21:20 34:17 36:8 41:17 57:22 58:6 58:11 59:16 62:10 66:6 70:9 71:21 89:7 91:23,24 94:12 119:10,16
**good** 4:15,16 23:23 23:25 26:10 27:10 41:8 48:21 55:8 69:20 70:2 93:24 106:11
**Gordon** 2:9 4:18 22:3
**gotten** 71:3
**government** 107:15
**graduate** 9:4
**graduation** 9:9
**great** 86:8
**Grech** 2:11 4:7,17 59:3 74:10 115:16 122:18,25 123:5,8 126:9,13 127:4
**grew** 18:11
**group** 4:20 29:10
**guess** 5:19 41:15
**Guidepoint** 1:6 2:16 4:20 5:8 6:21 6:23 7:2,8,13 13:3 26:14,17 27:4,14 27:23 31:12 36:22 39:19,24 41:13,23 42:2,7,19,22,25 43:4,11,18 45:2,8 45:14,19 46:6 47:9,15,25 48:5 48:11,19 49:5,9 50:12,24 51:17,19 51:23 52:16 54:24 55:23 56:22 57:21 58:10 60:6 61:4 64:15 66:25 67:12 70:22 71:5,15 73:19 74:3,15 75:2 77:2,6,10,16 77:18 79:15,18,23 80:4,6 81:2 82:8 82:20 83:25 84:11 86:3 87:14,22 88:7,20,21 91:5 91:14 93:17 97:7 97:11 103:24 104:8,9,10 106:16 106:22,25 107:16 109:9 111:5 112:20,24 113:4 113:15 115:23 116:18 117:7 118:23 120:10,13 123:11 125:8,18 129:3
**Guidepoint's** 28:5 29:20 88:17
**Gulino** 82:3 85:4
**guys** 53:23
**gynecology** 9:11
**G-L-Y-N-N** 76:3

**H**

**hand** 128:18
**handing** 59:14,18 89:9 92:2
**happen** 39:22 83:20
**happened** 15:20 20:3 24:11 25:10 28:2 42:11 44:3 57:15 120:5
**head** 43:13 46:25
**headquarters** 12:7 12:9,20 104:23
**health** 32:10 33:8 61:5 67:13,20 73:14 77:22 86:21 87:2,5,7
**hear** 39:21,24 40:5 46:16
**heard** 42:13 43:22 46:25 52:7 66:5 70:24
**hearing** 48:8
**held** 1:14 17:22 22:5 39:14
**helped** 18:5
**helping** 15:23 19:18
**hereunto** 128:17
**higher** 99:8
**highly** 34:9
**hire** 7:4,8,14 54:3 57:10 61:10 77:24 78:2,14,23 79:3 80:6,14 82:4 83:17 84:8 85:2 88:18
**hired** 7:22 53:10 55:8,16 56:4,12 56:17,25 61:15 63:3,13,23 79:10 80:7 81:3,8,12,19 111:21 120:4
**hiring** 7:4,20 31:2 35:16,18 36:12 41:11 51:4 53:8 53:18 55:17 61:8 62:7,14 77:21 120:3
**history** 93:15
**hit** 21:8
**holidays** 100:22
**hospital** 9:12,12,17
**hour** 33:24
**HR** 37:5,6 53:8,16 69:6 74:18 79:6 82:19,24 119:5,10 123:24
**human** 82:2

**I**

**idea** 56:23 113:3 119:24 120:2 125:21
**identification** 59:10
**identify** 81:11 93:17 97:8 106:23 107:16
**identity** 108:7
**illegal** 111:11
**immediately** 83:18 106:10 123:23
**important** 118:19
**imposition** 111:6



**impression** 123:18
**impressions** 114:2
**improper** 117:9
**inappropriately** 116:11,12 117:3
**included** 63:14 82:3 116:13
**including** 84:5 85:19 108:4 116:4
**increase** 88:22
**increased** 16:7 21:22 22:16 23:8 23:12 24:3 25:12 25:24 89:4 90:19 90:21 109:11 110:5,12
**incurred** 122:11
**indicated** 65:12
**individuals** 111:21 112:19 114:15,24
**industry** 28:20 29:21 86:18
**inference** 38:2
**inform** 100:4
**informally** 18:9,21 18:22
**information** 40:4 43:24 74:23
**informed** 61:13 62:22 73:18
**initial** 27:11 68:17 68:19 69:8,14 70:6 74:16 101:6 101:18 103:13
**initially** 11:10 22:21 43:8
**inquiries** 97:23 98:2,18 103:9,16
**inquiry** 97:4
**instance** 111:2
**Institute** 10:4 11:6 11:8,15,21 12:5 12:19 13:12 76:6 77:12 86:24 87:7 96:17
**Institute's** 14:9
**instructions** 4:23 4:24 5:9 6:9,11
**interaction** 47:25 51:24
**interested** 28:18 32:6 34:5 41:10 69:21 73:13 86:16 128:15
**interests** 108:21
**International** 12:24 12:25
**interpersonal** 115:7 117:25
**interpretation** 98:7
**interrogatories** 92:17 93:3 108:12
**Interrogatory** 93:12,14 96:25 97:3 106:19 107:9 107:25
**intervention** 82:7 83:12,15
**interview** 27:13,24 28:16 30:21,23 31:23,25 33:2,6 33:16,23 35:12,16 35:22 36:4,10 37:20 38:6 44:5 44:14,22 46:16,19 47:16 49:20 50:25 55:9 68:18 74:12 79:6 100:8,21,25 118:14 119:13
**interviewed** 36:2 39:5,9 55:6 83:24 99:24 126:2
**interviewer** 34:18
**interviewers** 29:14 34:14 38:25
**interviewing** 36:14 55:24 64:3 87:4 87:13 88:10,20 113:24 126:4
**interviews** 30:2 31:2,5,13 33:19 34:9 36:20 61:7 71:6,9 73:17 74:3 74:4,7,8,15,21
**investments** 29:23
**involved** 44:24
**in-house** 104:25
**in-person** 27:12,24 31:4 54:12 68:18 71:8 74:19,20
**issue** 28:21,23 29:11,15 55:20
**itemizes** 122:8

**J**

**J** 4:2
**JABRIL** 1:13
**James** 26:21,22 27:3,6,21 28:12 30:13,20 36:24 37:8 38:10,20 39:10,11,17,25 40:9,12,24 41:4 41:13 48:17,18,24 49:3 55:9,11,15 55:18 58:9 62:12 62:20,24 69:15 73:12 74:22 75:12 76:14,17,24 79:14 79:20 80:13 84:18 84:24
**January** 21:19 22:8 25:20 73:15 74:20 102:25 110:11,14
**Jenna** 43:15,17 45:12 46:14,18 112:13
**Jersey** 68:14 70:3 99:25 100:3
**Jessica** 112:10
**Jibril** 1:3 4:10,15 5:1 6:1 7:1,23 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1,12 60:1 61:1 62:1 63:1 64:1 65:1 66:1,12 66:19 67:1,8,13 68:1 69:1 70:1 71:1 72:1 73:1,7 73:12,18,21,22 74:1 75:1,7 76:1 77:1 78:1,2 79:1 80:1,6 81:1 82:1,4 82:9 83:1 84:1,13 85:1 86:1 87:1 88:1,16 89:1,7 90:1,5 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1,24 107:1,21 108:1,18 109:1 110:1 111:1 112:1,3 113:1 114:1 115:1,20 116:1 117:1 118:1 119:1 120:1 121:1 121:21 122:1 123:1,9 124:1 125:1 126:1,13,19 127:4 128:6 129:3 129:5,19
**Joaquin** 94:5
**job** 70:3 76:8 93:25
**join** 120:9
**joined** 23:6 88:7
**joining** 125:7
**July** 61:23 62:3 109:10
**June** 22:14 23:8 24:2 25:5,7,10 49:12,13,25 50:4 50:7 51:13 54:11 54:16 55:2 62:8 63:11 65:11 81:5 83:10 88:24 109:10 114:19 115:10 118:10 120:5,8 121:18 123:15 124:11 125:17
**Justin** 32:20

**K**

**Kagan** 112:10
**knew** 41:9 50:11,13
**know** 4:25 5:25 6:14 14:13 30:24 34:14 35:17 36:12 37:17 40:15 43:17 44:25 47:24 55:22 56:14,22 57:4 59:22 66:13 79:5 83:2 89:12 91:4 92:5 102:13 112:10,13 113:20 115:3,7 118:17 123:23 125:2 126:3
**knowing** 118:20,20
**knowledge** 63:5,7 63:10 87:7 116:14 116:17 117:17
**Kogut** 68:23,24 69:9,18 70:6 71:20 73:5 98:19 99:10,16 100:12

**L**

**L** 3:2 4:2
**lack** 51:4
**lacking** 119:12
**Lane** 12:12
**language** 65:23,25



72:14 84:24
**largely** 96:20
**lasting** 33:20
**late** 42:23 43:12
**lateral** 73:11
**law** 13:5 68:5 69:3 70:21 71:15 98:21 100:9 103:9 107:7
**lawsuit** 5:7 6:20 8:3 8:8 120:9 123:12 125:7
**lead** 26:6 52:11
**learn** 37:19 63:12 81:7 112:18 113:6
**learned** 56:16 57:21 58:6,11 62:19 63:23 65:3 83:16 111:20 119:3
**learning** 119:18
**leave** 30:15 48:7 64:21 76:9 77:12 114:12,14,24 116:7,15
**led** 43:24 52:5 71:20 102:24
**left** 50:14
**left-hand** 65:19
**legal** 1:19 52:22 53:22 57:20
**Leona** 32:14
**letter** 89:23 90:13 90:23 127:12
**let's** 31:9 103:20
**level** 25:19 73:5 91:5
**levels** 73:2
**Lichten** 2:4,6 57:24 66:3 74:5 122:15 122:20 123:4,6
**limit** 29:7
**limited** 51:24 85:20 87:2 108:4
**lines** 83:11
**LinkedIn** 27:7 49:17 50:2,4,14
104:4,16 105:10 105:14,17,20,21 105:22 106:2,16
**Lipkin** 26:22
**Lisa** 75:19 76:13,21 76:23,24 77:4 79:14,17
**list** 90:2
**listed** 112:8
**listen** 64:24 69:23
**listening** 64:13
**litigation** 15:12 63:16 89:24 93:9 111:3 120:23 121:2 122:12
**litigators** 13:5
**little** 32:4
**live** 11:25
**lived** 10:9
**living** 12:15
**LLC** 1:6 2:16 4:21 60:6 61:4 129:3
**LLP** 2:9 22:4
**lobby** 126:7
**located** 9:2 10:18 11:22 12:10 68:13 70:3
**Lodestar** 122:21
**long** 9:19 14:8 15:15 20:14 25:18 33:19
**longer** 33:22 49:9 56:19
**look** 59:22 66:9 79:25 85:6 92:3,4 92:9 96:24 107:8 121:22
**looked** 50:13
**looking** 27:15 29:22 43:18 48:7 55:23 64:21 109:14
**loss** 88:24
**losses** 108:5
**lost** 85:21 90:4,5,17
**lot** 10:12 34:11
51:19 99:23
**Lukban** 26:23,24 31:16 73:12,17 74:22
**lunch** 102:15
**L-U-K-B-A-N** 26:25

**M**

**Magna** 1:19
**Maiden** 12:11
**majority** 15:5
**makeup** 56:24
**making** 30:14,16 35:19 72:6 109:10
**male** 33:7 61:14 63:2
**man** 80:7 81:3,11 111:17
**management** 1:16 15:22 76:2 95:3 113:4,8,16 115:5 115:23 117:25
**manager** 19:16 27:9 31:3 35:18 62:7 94:25 120:3
**managers** 7:20 53:8,18 55:17 61:9 62:14 77:21
**Manhattan** 12:13 100:5 104:24
**Mansukhani** 2:9 4:18
**March** 81:23,24
**marked** 59:9,13,17 60:11 89:8 91:25
**marketing** 11:12 96:7
**marriage** 128:13
**matched** 106:12
**material** 11:12
**maternity** 114:12 114:13,23 116:7 116:15
**matter** 122:21 128:16
**mean** 11:24 39:9
**meaning** 50:8
**meant** 77:23
**measure** 108:3
**medical** 8:14,17,23 9:8,24 10:10,21 14:18,24,25 15:7 15:16 16:4,10 17:3,16,21 18:6 18:14,19 19:4,10 19:13 32:10 95:11 95:19
**meet** 24:13 28:10 31:19,23 33:14 85:3 121:12
**meeting** 22:17 27:13 38:7 54:12 61:12 62:18 74:19 80:5 81:22 102:15
**member** 105:6
**members** 113:7,9 113:15
**memorandum** 81:23 82:15,22
**men** 57:3
**mental** 108:23
**mention** 43:7 83:10 114:9 116:22
**mentioned** 10:16 41:6,9 53:25 82:22 115:21 116:5
**messaged** 49:17
**met** 22:14 23:11 28:11 32:16,22 33:15 38:4 40:20 54:7 80:16,18 115:13 117:15
**Michael** 96:3
**mind** 41:13 98:6
**mine** 119:14,15
**minutes** 33:22,22
**missed** 46:21
**moment** 59:21 66:13 121:23
**months** 11:18
13:13 49:7,10 90:19,20 120:22
**moot** 45:21
**Morgenstern** 96:3
**Morgenstern's** 96:4
**morning** 4:15,16
**move** 125:22
**moved** 10:2,5 11:2 20:6
**multiple** 64:19,20 81:8
**M.D** 1:3 5:1 6:1 7:1 8:1,11 9:1,5 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1



107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 129:3

**N**

**N** 2:2 3:2 127:2
**name** 4:9,17 9:11
26:20 32:18,20
44:10 68:8 69:2
75:19 76:2 100:14
100:17 116:22
129:3,5
**named** 19:12
**names** 28:14 71:14
112:8
**nationwide** 12:24
**nature** 15:12 54:21
101:3 115:8
**necessarily** 33:8
56:18
**need** 5:24 30:6
**needed** 40:5
**negligence** 111:2
**negotiated** 101:25
**negotiation** 101:7
**negotiations** 101:22
**never** 19:17 46:14
52:7 80:16,18
117:15
**new** 1:2,9,9,18 2:5
2:5,10,10 4:4,13
9:12,16 12:20
15:24 28:8 68:14
70:3 71:7 99:25
100:3 102:22
118:18 128:4
**Nigeria** 9:3 10:21
**Nine-page** 127:8
**nodding** 5:15
**Norwich** 10:19
**Notary** 1:17 4:3
126:24 128:3

129:23
**note** 5:18 34:8
**noted** 126:17
**number** 93:12,14
96:25 121:25
125:13,14
**numbers** 109:7

**O**

**O** 3:2
**oath** 3:17
**object** 74:5 122:15
**objections** 3:10
**obstetrics** 9:11
**obviously** 70:25
**occasion** 48:10 85:3
96:9 120:24
**occupy** 85:14
**occur** 19:6 51:10
54:14
**occurred** 14:15
46:23 58:25
**Ocean** 4:12
**October** 1:10
128:18 129:4
**offer** 37:6 39:21
40:25 48:18 49:3
53:13 55:4 58:6
61:17 63:19 64:6
64:17 79:12 101:2
101:4,6 102:4,8
102:13 103:6
111:14 119:3
**offered** 40:15 62:5
71:21 76:12 86:3
86:9 119:16
**offers** 106:20 107:4
125:15
**office** 52:2 89:23
99:25 100:5 115:8
116:12
**officer** 3:16 58:11
61:11 80:5 101:9
101:18 119:22
**officers** 12:21
**offices** 28:6,8

**oh** 31:9 38:14 102:5
105:13,15
**okay** 5:3 6:7,16,22
6:25 7:6,16 8:5
9:22 11:13 12:8
12:18,23 13:10
14:7 15:19 16:12
16:24 18:4,10,12
18:17 19:2,8 20:2
20:13,19 22:23
23:2,18,21 24:19
25:17 26:12,18
27:19 31:7,21
32:13,19,25 33:13
33:25 34:21 35:2
35:6 36:19 38:14
38:18 43:10 44:20
45:5,16,22 47:7
48:15 50:5,21
52:3,14 54:20
58:4 59:3,25 62:9
65:6 69:12 70:20
72:17 75:5 76:7
82:21 92:7,10
98:14 100:7 103:4
104:15,21 105:16
105:24 106:4
107:24 113:11
123:5,8 124:3
125:5
**once** 120:22
**One-page** 127:10
127:12
**open** 27:17 48:8
55:25 56:4 64:3
64:13
**opening** 69:19
100:5
**opinion** 118:22
**opportunities**
27:18 48:9 64:14
64:24 69:23
106:17
**opportunity** 25:13
25:15 26:3 59:23
89:13,16 92:8

124:6
**other's** 30:25
**outbursts** 118:7
**outcome** 128:16
**outside** 120:25
**overlap** 98:8 99:4
**overseeing** 14:20
15:16 17:3,16
18:7,19 19:10
**owe** 122:23
**owed** 108:17,18

**P**

**P** 1:16 2:2,2 3:2
128:3,22
**page** 67:9 73:8
79:25 85:6 93:12
112:4 127:3,7
**PAGE/LINE** 129:6
**paid** 122:22 123:11
**pain** 108:5
**Paragraph** 67:3,9
73:10 80:2 81:13
81:22 82:23 85:9
**Park** 1:8 2:5,10
**part** 6:19 11:11
13:22 14:9 15:4,4
19:21 20:14 21:15
26:13 35:18 36:17
63:15 89:24 93:9
**particulars** 60:25
62:11 65:24
**parties** 3:5 128:14
**party** 8:2,8 104:9
**party's** 65:20
**part-time** 11:10
13:19
**pay** 87:25 110:11
**pending** 6:4 79:11
**pensions** 85:20
**people** 56:3,12,16
63:13,23 81:8
83:25 116:13
**percent** 62:4
**perform** 96:9
**performance** 16:16

20:12 22:15 24:14
24:15 93:21 96:10
**performance-bas...**
23:16
**performing** 93:20
95:2
**period** 23:19 88:23
91:21 94:2 110:5
110:13
**perplexed** 125:21
**person** 34:17 36:15
64:4 81:15,19
83:24 93:20 97:5
99:24 114:9
115:14
**personal** 81:18
82:6 83:11 116:14
116:17
**personnel** 35:4
**perusing** 59:15,19
59:24 66:11,15
67:10 73:9 80:3
85:8,10 89:10,14
92:7 93:13 97:2
107:10 109:16
112:5 121:24
122:3
**phone** 30:22,23
40:14 44:4,14
46:16,19 47:16
51:8,9 54:11 71:8
71:10,16 72:3,9
84:25 103:13
**phonetic** 112:11
**PH4** 4:12
**pitching** 86:25
**place** 1:15 43:18
85:13
**Plaintiff** 1:13
**plaintiffs** 1:4 2:4
90:6 93:2 97:8
108:11,19,22
122:6 127:12
**plaintiff's** 85:11,13
**Plan** 1:16
**planned** 83:17


MAGNA
LEGAL SERVICES

119:2
**Plaza** 1:8 2:10
**please** 4:8 5:11,25 17:19 92:6 115:17 126:10
**plus** 25:8
**point** 6:4 11:4,14 13:20 17:8 18:6 27:16 36:24 89:3 110:8,10 119:21
**Pool** 7:21 28:12 31:15 50:24 77:20 77:23 78:2,9,23 84:19 111:24
**position** 7:7,19 11:15 30:12 35:7 38:11,22 40:16 46:3,7 47:20 49:6 56:2,4,9,13,17 58:18 61:5,9,15 61:17 62:5 63:3 63:20 64:3,9,23 67:13,20 69:9 71:7,21 72:15 73:14 76:12 77:22 77:25 80:7 81:3,9 81:12,20 85:14 86:3,11 87:13 88:9 90:24 91:5 94:6 95:18 98:23 99:7,13,14,17,19 99:22 100:2 104:13 105:25 111:18,21 126:3
**positions** 55:23 71:2 72:12,22 99:10
**positive** 55:11 96:20
**possessed** 77:23
**Possibly** 51:15
**post-interview** 49:21
**potential** 29:23 37:25 38:3 41:23 100:6 101:8 102:22 106:6,9
**potentially** 32:23 34:5 125:23
**preceded** 114:10
**preference** 28:25
**preliminary** 64:10
**presence** 118:8
**present** 2:14 93:17 121:19
**presentations** 15:3
**presently** 4:11
**president** 20:21,24 21:18 22:2 75:25 94:7,13,23 95:17 96:6 102:25
**presumably** 124:15
**pretty** 44:25 64:20
**prevail** 123:3,12
**previously** 91:24
**primary** 10:12
**prior** 22:20 53:3 54:25 93:16 125:16,20
**Priscilla** 82:2
**probably** 33:21 69:15 116:22
**problematic** 115:5
**problems** 51:19 52:18
**proceed** 70:5 72:8
**proceeding** 63:15
**proceedings** 6:20 8:4,7
**process** 6:12 35:19 42:14 47:20 55:9 73:19
**processes** 71:4 72:8
**productive** 34:12
**products** 32:11
**profile** 50:14
**progression** 24:12
**promoted** 14:18 15:21 17:2 25:22
**promotion** 16:2,6 21:25 102:25
**promotions** 14:11 14:13 91:20
**prospecting** 86:25
**provide** 75:18 114:22
**provided** 39:2,16 73:21 75:7
**providing** 39:25
**Public** 1:18 4:4 126:24 128:3 129:23
**punitive** 90:8 108:6 108:20 110:17,20 110:23 111:6 122:8
**purposes** 59:13
**pursuant** 1:15
**pursue** 66:6 68:15 70:10 124:21
**pursuing** 57:20
**P.C** 2:4
**p.m** 1:10 126:17

**Q**

**qualified** 82:5
**quarter** 16:19
**quarterly** 16:15 17:12
**question** 3:11 5:20 6:4 12:2,3 21:21 56:15 107:19 108:9,13 110:19
**questions** 4:24 5:5 5:6,10 6:8 34:15 34:25 56:6 92:21 93:8
**quick** 31:6
**quite** 10:11
**quota** 22:15,17
**quotas** 21:8 23:12 24:14
**quote** 40:17 73:18
**Q2** 22:13

**R**

**R** 2:2 4:2 128:2
**Radio** 40:2
**raise** 87:17 88:25
**raised** 102:19
**raising** 123:24
**range** 38:10,17 87:13
**ranges** 37:9
**ranking** 99:8
**reach** 50:9 53:15 104:17
**reached** 26:16 27:3 27:7 29:4 39:11 42:25 43:6,9,11 45:20 49:8 51:11 58:14 62:7 68:6,9 69:15 75:12 99:13 102:11 103:24 104:5,19 105:17
**reaches** 49:13
**reaching** 37:6 53:7 79:7 105:5,11 119:4 125:14
**read** 61:2
**reading** 61:18
**reads** 73:10 108:16
**READS/SHOULD** 129:6
**READ/REASON** 129:6
**real** 55:14
**really** 32:23 99:4 122:21 125:20
**reason** 50:15 55:2 71:22 76:25 77:4 77:9,14
**reasons** 86:16
**recall** 26:20 32:17 44:10,11 46:24 68:8 72:13,19 81:16 84:17 96:18 98:5 100:14,17 103:11 116:23
**receive** 88:25 97:23 98:17 103:8
**received** 8:17 24:14 85:18 88:15 89:23 98:4 106:20 107:5 107:11,18
**recess** 59:6 115:18 126:11
**recognize** 60:2,16 66:22 89:19 92:12 92:14,22,24
**recollection** 32:15 32:21
**recommending** 7:22
**reconcile** 84:21
**reconsider** 76:25 77:9
**record** 4:9 5:17,18 5:22 22:5 39:15 128:10
**recruited** 67:12,23
**recruiter** 26:16,19 28:12 30:13 37:2 41:9,20 42:24 43:6,22 44:7,8,15 45:7,17 46:3,12 47:2,9,11,14,19 48:5,12 58:13 61:3 62:12 64:11 64:15,18 68:21,22 69:4 72:9 73:12 74:17 99:3 100:11 101:22 104:4,11 104:16 105:2,14 106:6 125:14
**recruiters** 64:19 71:12,13,17 72:4 72:25 98:9 103:23 104:8
**recruiting** 68:4 70:13,22
**recruitment** 67:19 68:16 97:16
**reduced** 116:6
**Rees** 2:9 4:18 22:4
**refer** 41:17,19 67:8 89:25 108:10 109:15
**reference** 73:20 75:23 76:8 79:12



114:14
**referenced** 62:12
**references** 39:3,4,5 39:6,12,16,18,25 55:5,10,13,18 73:21 74:23 75:8 75:8,12,15,17
**referring** 8:10 98:11
**reflected** 91:20 109:22,23
**refresh** 32:15,21
**refusal** 88:17
**refused** 82:8
**refuses** 84:11
**regarding** 61:5 71:7 74:22
**regards** 115:5
**regularly** 64:20
**reinstatement** 108:19 122:7
**rejected** 109:9
**rejection** 97:6 106:21,25 110:3
**related** 7:11 51:22 128:12
**relates** 120:23
**relationship** 116:9 116:25
**relationships** 115:7 117:18,25
**relevance** 122:16
**relief** 85:24 122:6
**remedy** 67:4
**remember** 28:14 69:2
**reorganizing** 56:21
**repeat** 23:5
**rephrase** 5:11
**report** 32:3 33:3
**reported** 35:8 101:15
**reporter** 1:17 4:8 4:11 5:13,16 8:21 23:4
**reporting** 99:15
**represent** 4:20 89:22
**representation** 113:14
**represented** 101:21 101:24
**representing** 101:23
**request** 85:23 110:17
**requested** 73:21 75:7,18,23 76:10
**require** 100:3
**requirement** 28:25 29:4
**research** 13:18,23 14:9,17,18,23,24 14:25 15:2,16 16:2,4,10 17:3,16 17:21 18:6,14,19 19:4,11,13 42:10 52:5 95:11,17,19 95:23 96:13
**reserved** 3:11
**reside** 4:12
**resources** 82:2
**respect** 93:15 108:2
**respective** 3:4
**respond** 5:23
**responded** 29:10
**responds** 40:9
**response** 45:18 57:13 93:2 108:12 108:14,16 109:3 112:4,6 119:2,17 121:25
**responses** 5:14,16 108:11
**responsibilities** 15:5
**responsibility** 19:20
**responsive** 108:13
**rest** 14:16
**restructuring** 56:20
**result** 100:24 122:12
**retain** 54:8
**retained** 57:23 65:3 65:12,15
**retaliatory** 85:16 85:19
**returned** 114:13
**review** 66:13 89:11 89:17
**right** 15:14 16:25 22:13 23:24 24:8 24:10 31:9 32:25 37:14 38:8 47:22 53:20 54:9 58:15 66:8,18 71:22 99:2 100:22 103:19 104:3 105:13 116:15
**rights** 57:20
**role** 13:13,16 15:22 17:16,18 21:17 23:23 27:8 28:18 29:6 30:3,4,8 32:5 32:6,8 34:4,11 42:4,4,9 43:2,9,19 43:25 44:3,24 48:13 52:10 68:10 68:12 83:18 86:8 86:9,14,17 87:4 87:24 88:21 96:12 102:22 104:6,20 104:22 105:18 106:11 109:9 114:10,12 119:15
**roles** 41:7,12,23 48:19,20 95:3
**room** 22:4
**roughly** 14:10 98:3 103:18
**Ruiz** 32:20

**S**

**S** 2:2 3:2,2
**sad** 102:14
**sake** 5:21
**salary** 16:7 20:10 37:3,8 38:10,12 87:12 88:20 90:18 91:7 102:19 103:2 110:2,4
**sales** 15:23 24:21
**samples** 39:2
**Santos** 94:5,6,10
**saw** 50:14 102:21 106:11
**says** 65:19 73:15 74:11 75:6 78:22
**schedule** 74:19
**scheduled** 27:12 40:14 46:21 47:8
**school** 8:14 10:10 10:15,16,21 107:22
**schooling** 10:20
**Scotland** 10:13,21
**screening** 15:6 30:23 72:3,9
**screenings** 71:8,11 71:16 103:13
**Scully** 2:9 4:18
**sealing** 3:5
**search** 76:9
**Sebag** 61:12 62:18 80:5,23 81:18 82:7 83:12 117:15 118:5
**Sebag's** 116:25
**second** 32:7 33:6 42:18 99:13
**secondary** 10:13
**secretaries** 116:18
**secretary** 116:10 116:21 117:2
**section** 65:24 85:9
**Security** 107:12
**see** 23:22 67:14 69:20 73:13,22 74:11 78:3 80:8 82:10 84:13 85:21 90:10 93:22 102:15 105:13,19 107:19 108:24 112:6 122:9
**seek** 26:14
**seeking** 45:8 90:7 108:19,22 122:6 122:18 123:13
**seen** 89:20 92:18 93:4
**sell** 29:8
**selling** 105:12
**send** 40:3
**senior** 4:19 14:18 16:3,9,10 18:14 36:16 94:7 95:18 99:19,22 113:3,8 113:15 115:4,22 117:24
**Seniority** 99:12
**sense** 70:8 72:5
**sent** 38:24 49:22 82:19
**separate** 7:10 8:6
**separately** 31:19
**separation** 97:6 106:21 107:16
**September** 54:15 54:16
**sequence** 14:13
**serve** 15:15
**service** 72:14 98:7
**services** 1:19 105:12
**set** 50:18 92:16 128:7,17
**severe** 82:6 83:11
**severely** 114:12
**sex** 60:23 61:17 62:6 63:20 67:5 111:10 114:16 120:4 125:12
**share** 35:15 114:5 114:17 116:2 118:13
**shared** 72:2 113:25 115:9,21 117:24 118:9



**SHEET** 129:2
**shorthand** 1:17
**shortly** 10:3 50:25
**show** 59:16 89:7 91:23,24
**showing** 59:12
**sic** 8:22 26:22 49:25
**side** 29:8,8,11,18 32:10 55:19 105:6
**sided** 50:25
**side/sell** 29:11,18 55:19
**signature** 65:20,21
**signed** 3:15,18
**significant** 88:22
**significantly** 102:20
**silence** 40:2
**sit** 126:6
**sited** 51:4
**six** 90:19,20
**Smith** 2:15
**social** 107:12 121:7
**sole** 19:20
**Somerset** 9:12,16
**soon** 123:14
**sorry** 10:5 11:20,23 16:13 18:23 21:6 25:2 29:20 31:4 35:24 36:6 44:6 58:15 59:20 60:10 60:10 95:5 98:11 102:6 105:8 110:18 114:21
**sort** 5:19 13:2,3 30:7 31:22 32:7 41:16 47:19 92:4 94:12 96:14 105:4
**sought** 53:11 108:3
**sounds** 23:25 43:16
**South** 2:5 9:14 10:23
**SOUTHERN** 1:2
**speak** 47:8 49:4 50:16,19 55:13 58:5,10,19 64:18 64:19 98:19 120:18,24
**speaking** 53:3 54:25 92:11 125:16,20
**specific** 44:25 119:11
**specifically** 34:6 56:2 72:13,20 108:12 121:25
**specifications** 108:8
**specificity** 106:23
**spell** 8:20 75:21
**sphere** 13:2
**spoke** 29:13 34:9 39:10,17 46:14 47:10,13 48:22,24 54:10 55:19 63:11 65:10,17 75:14 76:13,16,23 77:8 79:14,17,20,22 97:10 99:5,17,18 118:25 123:14 124:19
**spoken** 40:22 45:11 54:5 80:21
**spring** 97:12
**stand** 8:18
**start** 59:20
**started** 10:3 11:4 19:18 20:15 22:12 87:6 95:2
**starting** 14:2 17:25 18:2 30:4
**state** 1:18 4:4,8 13:9 107:11 128:4
**stated** 82:7 84:11
**states** 1:2 10:2,6 11:2 13:9
**status** 116:6
**stay** 20:14 25:18 102:23
**stayed** 20:10 25:4
**step** 9:7,24 37:4,5 39:18 55:7 73:19
**Stephen** 1:16 128:3 128:22
**steps** 36:13,21 79:7 79:8
**STIPULATED** 3:3 3:9,14
**stop** 4:25
**strategist** 27:9 30:11 42:16 49:6 55:23 58:17 61:6 67:14 73:14 77:20 77:22 86:22 87:5
**strategists** 56:24
**strike** 45:24 57:14 121:17 123:19
**structure** 17:10 56:3 113:4,13
**STUART** 2:6
**submitted** 120:15
**subordinate** 88:10
**Subscribed** 126:21 129:20
**subsequent** 74:18 74:21 90:20 115:12 118:11
**subsequently** 8:16
**succession** 31:20
**successions** 31:6
**Sudano** 1:17 128:3 128:22
**sue** 120:12
**suffering** 108:6
**suing** 6:23 7:2
**supervisor** 75:24 77:19 78:10 94:4 94:15 95:6,12,20 96:2,11 119:15
**supervisors** 93:19 94:9,18 96:8
**supposed** 46:22
**sure** 14:16 30:23 36:25 62:4 64:12 77:13
**surely** 56:20
**surprise** 56:11,16 113:6,17
**surprising** 113:19
**swearing** 65:18
**swore** 61:21
**sworn** 3:15,18 4:3 126:21 128:8 129:20

**T**

**T** 3:2,2 128:2,2
**table** 102:14
**take** 5:16 6:5 19:15 37:15 57:18,22 59:4,21 66:13 70:25 79:9 87:24 92:8 115:16 126:9
**taken** 1:13,16 59:6 115:18 126:11
**talk** 34:2 44:21 48:10 53:24 69:17 103:20 104:12
**talked** 32:11 33:10 34:4,4,6,16 44:23 58:21 97:15 98:9 98:24 103:25 106:15,16 109:17 125:13
**talking** 15:11 37:9 37:10 48:4 67:21 82:16 83:9 103:14
**talks** 30:10 48:17 48:18 71:19 76:14 76:17,24 99:3,21 106:5 112:22 120:25 124:23
**tangential** 32:8
**team** 11:11 13:18 13:23 14:9,17,24 14:25 15:23 18:11 19:19 20:7,15,18 21:16 22:13 23:7 28:13 32:2 34:7 34:19 35:3,4 43:2 46:11 48:6,13 52:10 56:3 58:23 64:8 94:15 96:13 97:12 113:8,16 118:18
**technology** 32:12 33:11
**tell** 8:13 36:7 40:24 43:14 50:6 62:8 71:14 116:20 124:8,17
**tells** 53:21,25
**tenure** 96:14
**tenured** 102:18
**terminated** 111:24 111:25 114:11 124:2
**terms** 29:19,23 44:23 57:19 117:24
**testified** 4:5
**testimony** 78:12 84:17,22 128:7,10
**thank** 12:18 21:20 23:9 27:2 38:24 49:22 126:13,16
**thing** 29:7 53:23
**things** 15:12 32:10 105:7 115:8
**think** 16:6 28:3 32:11 33:24 42:3 42:4,23 47:5 52:21 56:18 57:3 86:7 93:24 98:3 111:9 115:2 117:8 117:12 125:18
**third** 33:16 34:17 47:23,24 104:9
**third-party** 43:6,22 44:7,8,14 45:7 46:2,12 47:2,10 47:14,19 48:5,11 104:10
**thought** 23:11 28:17 64:5,8 119:4 125:23
**three** 14:10 59:8 72:19
**tile** 96:5
**time** 1:15 3:11 5:24



7:20 12:11,16 22:6 23:17 24:7 26:13 30:25 31:18 38:7 39:15 43:21 48:22,24 50:11,17 50:18 52:21 54:7 59:7 63:6 64:2 65:10 67:24 68:4 69:21 75:3 76:5 76:11 88:19,23 90:17,18 91:21 92:4 94:2,12,19 94:22 95:16,23 99:13,24 109:8,14 110:5 111:24 113:22,23 115:19 119:25 123:22 125:8 126:12,17
**times** 41:25 110:2
**title** 18:3,8,24 19:5 19:16,17 20:20,21 94:21 95:15 101:11 102:20
**titles** 22:11
**today** 5:14 6:14,18 56:14 58:2 64:16 86:4 92:19 120:19
**today's** 59:13
**told** 28:20 29:3,14 30:14 32:3 38:10 45:3,10 49:3 50:23 51:2,18 52:15,21 55:8,10 55:15,25 56:8,12 61:9 69:19 78:19 80:13 81:2,17 83:4,6 84:7,7 88:2 106:9 111:12,16 116:8 120:4 124:11
**top** 43:13 46:24
**total** 14:5,6 16:18 107:18 113:9
**totaling** 16:16
**touch** 36:24
**Town** 9:13,24
**trained** 9:16
**training** 9:10,19,23 10:23
**transcript** 128:9
**translation** 72:14 98:7
**traveled** 10:11
**treated** 114:6,15 116:4 118:4
**treating** 114:2
**treatment** 85:16,19 88:16 113:21 115:6
**trial** 1:12 3:12 23:19
**trips** 116:11 117:21
**true** 73:24 128:9
**Trupia** 112:11
**try** 4:25
**turn** 73:7 93:11 112:4
**two** 28:12 31:3,16 31:17 33:21 34:8 39:7 84:3 103:23 104:8 113:7,15 115:3
**type** 107:17
**types** 107:14 111:2

**U**

**U** 3:2
**Uh-huh** 17:14 45:15 90:3
**UK** 10:13,20
**ultimate** 78:13
**ultimately** 47:10 53:15 56:25 57:5 61:15 63:3,13 66:5 80:7 81:3 102:3,7 103:5 111:17 119:7,16 120:12 124:4
**um** 13:7 14:10 22:14 24:14 32:7 37:4 42:4 43:8 51:18,19 68:5 79:2 83:17 100:10 102:21 116:11
**unacceptable** 111:11
**uncomfortable** 116:13
**undergraduate** 8:15
**underlying** 5:7
**understand** 5:8 29:17 82:23 93:7 110:9,20
**understanding** 29:19,25 30:5 37:23 55:6 75:11 79:9,11 87:20 88:5 110:16 123:10
**understood** 13:10 27:4 39:17 78:9 86:21 87:12 111:23
**unemployment** 107:12
**unfairly** 114:15 116:4 118:5
**United** 1:2 10:2,6 11:2
**University** 8:16,19 10:17
**usage** 87:2
**uses** 86:14

**V**

**V** 129:3
**Valentia** 1:3 28:11 32:3,9 33:15,23 34:2 37:17 40:17 49:8,13,19 50:6 50:15 51:7,16 52:15,19 53:3,21 54:10,18,25 55:7 56:7,8,19 58:9 62:7,15 63:8 81:4 81:11 82:24 83:23 88:2 113:23,25 114:5 120:3 125:16,21 129:3
**Valentina's** 36:12
**Valletti** 6:20 7:10 7:21 28:11 31:15 33:4 35:9,15 38:4 65:7,11 66:25 77:19,23,25 78:13 78:19,22 81:24 82:3,4,7,16 83:2,6 83:9 84:5,11,18 85:12 88:11 90:4 108:17 111:12,16 111:24 112:22 114:17 115:9,21 115:25 116:20 117:5,23 118:9,21 120:8,19,25 123:15,19,20 124:8,24 125:7
**Valletti's** 78:10 125:3
**Van** 75:19
**various** 70:24 110:2
**verbal** 57:13
**verbalized** 5:15
**versus** 6:21
**veto** 119:18
**vetoed** 40:18,25 53:12 61:12 62:19 80:14 119:3
**vetoing** 48:17 55:3
**vetting** 15:6
**vice** 20:21,24 21:18 21:25 75:24 94:7 94:13,23 95:17 96:6 102:25
**VILLETTI** 1:3 129:3
**vision** 34:7
**visited** 75:2 83:25
**voted** 64:6 80:6
**VP** 25:22 90:24 95:23

**W**

**wages** 85:20
**wait** 23:4,4,4 62:2
**waived** 3:7
**walk** 14:12 21:24 22:7 31:10,22 86:19 97:19
**walking** 30:6
**want** 70:4 77:11
**wanted** 34:22 50:16 61:10 118:17
**warrants** 111:5
**wasn't** 29:15 30:4 50:12 55:13 66:6 84:23 87:23 105:16 119:22,24
**wasting** 30:24
**way** 14:11 87:8 128:15
**wearable** 32:12 33:11
**webinars** 13:7 15:9
**week** 51:11
**weeks** 40:2 123:17
**well-qualified** 7:19
**went** 8:13 27:23 28:17 40:17 84:25 99:23 103:12
**weren't** 30:24
**we'll** 6:2 106:24
**we're** 6:14,17,19 13:9 15:11 58:2 103:14 109:14 121:5 123:6
**we've** 106:15,16 125:13 126:14
**WHEREOF** 128:17
**willing** 69:22 87:24
**win** 15:23
**wished** 73:19
**witness** 4:2,10,14 126:16 127:3 128:6,11,17 129:5
**witnesses** 15:11



**woman** 77:5,15
84:3 119:23
**work** 11:5 13:3
14:8 18:7 34:24
41:16 68:25 76:19
76:21 92:2 93:21
96:9 102:21
118:22
**worked** 11:10 12:5
33:7 44:11 69:6
76:4
**workers** 107:13
**working** 10:3 11:8
11:11,20 12:4,6
13:17
**worn** 10:8
**wouldn't** 28:21
36:17 55:12
106:12
**writing** 38:25
**written** 51:2
**wrong** 23:10 104:7
**www.MagnaLS.c...**
1:20

**X**
**x** 1:3,8 127:2
**xxxxx** 3:19

**Y**
**Yamin** 32:14,14
**Yea** 104:2
**Yeah** 26:11 28:7
69:6 122:20
**year** 9:21 14:4
16:18,20 21:3
24:16 26:8,10
43:5 44:16 54:15
70:17 88:25 89:6
97:12 109:12
**years** 14:10 93:16
**yep** 14:14 59:25
**York** 1:2,9,9,18 2:5
2:5,10,10 4:4,13
12:20 28:8 128:4

**Z**
**Z** 4:2
**Zachary** 95:13,21
96:12
**Zaria** 9:3
**Z-A-C-H-A-R-Y**
95:13

**$**
**$10,000** 24:15
**$100,000** 25:12
88:25 90:20
109:11
**$100,000-plus-co...**
25:19
**$140** 25:25 37:10
38:11,15 87:10,14
89:5 90:21 91:2,8
109:12
**$140,000** 21:14,23
86:9 110:12
**$160** 37:11 38:11
38:15 87:14
**$160,000** 91:8
**$165,000** 90:4
**$180** 101:6,19
**$200,000** 26:7
**$210** 101:7,25
**$333,000** 21:3
87:18
**$334,000** 108:17
**$48,000** 108:18
109:5
**$5,000** 16:16,18
17:13
**$50** 16:7
**$50,000** 14:4
**$60** 16:7
**$61,900** 90:5,14
91:6,10 109:18
**$70** 23:15
**$70,000** 17:9 19:24
23:7
**$87** 22:25
**$87,5** 24:23 25:4,7
30:17

**$87,500** 22:16 23:8
23:13 24:3 88:21
90:18 109:8,11

**1**
**1** 2:10 61:14 62:23
67:3 112:4,6
**1st** 62:2
**1:18-cv-10200-V...**
1:5
**10** 107:9
**10:05** 1:10
**100** 62:4
**10004** 2:10
**10016** 2:5
**1018** 73:15
**11** 107:25 108:12
108:13,14,16
122:2
**11230** 4:13
**1191** 4:12
**12** 81:23,24
**12:50** 126:17
**13** 73:8,10
**14** 77:18
**15** 56:12,16,24
63:13,23 80:2
81:13 111:21
**16** 81:22 82:23

**2**
**2** 67:9
**20** 90:13,23 126:22
129:21
**2012** 9:6,9,17
**2013** 10:25 11:9,19
13:12 14:2,16,19
15:14 18:15
**2014** 14:20 16:17
16:22 17:4,23
18:16,17,18 19:9
42:5,7
**2016** 15:18 17:24
17:25,25 18:2
19:7,10,12
**2017** 19:21 20:5,16

21:15,25 22:7,8
22:13 23:8 24:2
24:17,18 26:15
27:21 28:4 31:11
42:16 61:3 67:12
67:25 70:14,18,19
70:23 71:17 73:11
97:16 98:9 99:3,6
99:17 114:19
**2018** 24:20 25:5,6,7
25:11 28:4 31:12
40:7,10 42:16,23
43:12 49:11,13
50:4,7 51:14
54:17 55:2 61:14
61:24 62:23 65:11
73:16 81:5,23,24
83:10 91:15 97:21
97:24 98:12,13,17
98:20 99:4,5,18
100:23 103:8,14
103:17 107:2,5,7
109:10 110:14
114:21 115:10
118:10 119:19
120:8 121:15,18
123:15 124:12
125:17
**2019** 1:10 21:4,19
21:19 22:8 25:20
42:24 43:12 44:18
47:3 90:13,23
102:25 103:20,22
106:10,15,17
110:11,14 128:18
129:4
**22nd** 73:15 74:20
**28** 49:25
**28th** 2:10

**3**
**3** 1:10 73:8 129:4
**3B** 90:2
**3rd** 128:18
**30** 33:22
**30-second** 126:9

**387** 2:5

**4**
**4** 127:4
**45** 33:22

**5**
**5** 93:12,14
**500** 23:3
**59** 127:8,10,12

**6**
**624-6221** 1:20

**7**
**7** 93:12 96:25 97:3
**75** 12:11

**8**
**8** 67:9 85:6 106:19
**866** 1:20

**9**
**9th** 61:23 62:3

