UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

VALENTIA VILLETTI and FAIZA JIBRIL, M.D.,

        Plaintiff,                           18 Civ. 10200 (MKV)(KNF)

    - against -

GUIDEPOINT GLOBAL LLC,

        Defendant.

------------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LICHTEN & BRIGHT, P.C.
Attorneys for Plaintiffs
1115 Broadway - 11th Floor
New York, New York 10010
(646) 588-4872

TABLE OF CONTENTS

Table of Authorities.................................................................................................. i

FACTS....................................................................................................................... 2

ARGUMENT............................................................................................................. 5

    I. STANDARD OF REVIEW............................................................................ 5

    II. DEFENDANT HAS NOT SHOWN THAT A REASONABLE
        JUROR COULD NOT FIND RETALIATION.......................................... 6

    III. DEFENDANT HAS NOT SHOWN THAT A
         REASONABLE JUROR COULD NOT FIND DISCRIMINATION....... 8

    IV. PLAINTIFFS HAVE VALID DAMAGE CLAIMS...................................... 10

CONCLUSION.......................................................................................................... 13

TABLE OF AUTHORITIES

Adickes v. Kress & Co., 398 U.S. 144 (1970).................................................................. 5

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)..................................................... 5

Brooks v. Woodline Motor Freight, Inc., 852 F.2d 1061 (8th Cir. 1988)......................... 11

Dailey v. Societe Generale, 108 F.3d 451 (2d Cir. 1997)................................................ 10

DeCintio v. Westchester Cty. Med. Ctr., 821 F.2d 111 (2d Cir. 1987) ............................ 6

Gallo v. Prudential Residential Svcs, 22 F.3d 1219 (2d Cir. 1994)................................. 5

Grant v. Bethlehem Steel Corp., 622 F.2d 43 (2d Cir. 1980)........................................... 6

Gueye v. Air Afrique, 1995 WESTLAW 234711 (S.D.N.Y. Apr. 20, 1995).................... 10

Littlejohn v. City of New York, 795 F.3d 297 (2d Cir. 2015) .......................................... 6

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).............................................. 5

Reilly v. Cisneros, 835 F. Supp. 96 (W.D.N.Y. 1993),
    aff'd, 44 F.3d 140 (2d Cir. 1995)............................................................................... 11

Spulak v. K Mart Corp., 894 F.2d 1150 (10th Cir. 1990)................................................. 11

Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981)............................... 6

Thomas v. Pillow Kingdom, Inc. 2008 WESTLAW 1924977,
    at *16 (D. Colo. Apr. 30, 2006).................................................................................. 10

United States v. Diebold, Inc., 369 U.S. 654 (1962)......................................................... 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

VALENTIA VILLETTI and FAIZA JIBRIL, M.D.,

        Plaintiff,                                                18 Civ. 10200 (MKV)(KNF)

        - against -

GUIDEPOINT GLOBAL LLC,

        Defendant.

-----------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

        Plaintiffs Valentia Villetti ("Villetti") and Faiza Jibril, M.D. ("Jibril"), submit this memorandum of law in opposition to the summary judgment motion of defendant Guidepoint Global LLC ("Guidepoint"). Villetti submitted a written complaint to Guidepoint's Human Resources Department ("HR") opposing several instances of sex discrimination, including the last-second reversal of a decision to hire Jibril on the ground that she was not a "hedge fund guy." The company's response to Villetti's complaint, and to her direct supervisor's formal discrimination complaint, was a simultaneous dismissal of both of them. Plaintiffs commenced this action pursuant to Title VII of the Civil Rights Act of 1964, 42 USC §2000e et seq. ("Title VII"), and the New York State and City Human Rights Laws. Guidepoint's motion should be denied.

FACTS

Guidepoint, a provider of experts in various subject matter areas, hired Villetti effective September 11, 2017, as a Senior Healthcare Content Strategist. Defendant's Local Rule 56.1 Statement of Material Facts ("Def. 56.1 St.") ¶ 2. In that role, Villetti, among other responsibilities, was to lead conference calls and in-person roundtables, interact with clients, and attend conferences in various cities. Declaration of Valentia Villetti ("Villetti Dec.") ¶¶ 2-3, Ex. A. Villetti performed all of her responsibilities in an outstanding manner, with Chief Executive Officer Albert Sebag relaying positive feedback to Director of Content Bouker Pool, Villetti's direct supervisor, and telling Villetti directly that she was doing "a great job." Declaration of David Grech ("Grech Dec."), Ex. D ("Villetti Dep. I"), at 91-92. Guidepoint awarded Villetti a "discretionary" bonus at the end of 2017. Id., Ex. E ("Villetti Dep. II"), at 33, 35.

In late 2017, Guidepoint authorized Villetti and Pool to expand their team by hiring a Healthcare Content Specialist who would report to Villetti. Villetti Dep. II, at 58-59. James Lukban, a Recruiter employed by Guidepoint, contacted Jibril and informed her that "there was a role for content manager or content strategist that would appear to be a good fit for [Jibril's] background." Grech Dec., Ex. L ("Jibril Dep."), at 26-27. Lukban reiterated that Guidepoint was hiring one Content Strategist. Declaration of Faiza Jibril ("Jibril Dec.") ¶ 2.

Jibril is a native of Egypt. Jibril Dep., at 10. She attended primary and secondary schools in Scotland and England. Id. She earned her undergraduate degree at the University of East Anglia, in Norwich, England, and her medical degree from Ahmadu Bayero University in Zaria,

Nigeria. Id., at 8-10. Jibril completed one year of training in obstetrics and gynecology at New Somerset Hospital in Cape Town, South Africa. Id., at 9.

Jibril's first job after training was a marketing position at the Expert Institute in New York, a firm that provides experts to attorneys. Id., at 11-12. After about four months, in April 2013, Jibril's role expanded to include research. Id., at 13. At the end of 2013, the Expert Institute promoted Jibril to Senior Medical Research Associate. In 2014, the company promoted her to informally oversee the entire medical research team, which included the provision of experts to the firm's clients, while still developing content. Id., at 14-15. In 2016, Jibril became Associate Director for Medical Research. In 2017, she joined the business development team, and in January 2019 the Expert Institute appointed Jibril to Vice President of Enterprise, her current title. Id., at 19-21.

Lupkan set up four separate interviews on January 18, 2018, for Jibril at Guidepoint's offices in New York, with team members Justin Ruiz and Leona Yamin, Villetti, and Pool. Id., at 31-33. Jibril interviewed with the two associates for 30 to 45 minutes, and with Villetti for approximately one hour. Id., at 33. At her final interview, Pool told Jibril that the hiring decision was Villetti's, and that Sebag, the only person senior to Pool, would not participate in the decision. Id., at 36. On her way out, Lupkan advised Jibril that an HR representative would contact Jibril concerning an offer. Id., at 36-37. Lukban asked Jibril for references, which she provided. Lukban spoke with both references. Id., at 39.

After the interviews with Jibril, Pool informed Villetti that he believed "there was a consensus that [Jibril] was extremely qualified and a great fit." Villetti Dep. I, at 62. Pool and Villetti agreed to extend Jibril an offer. Id., at 64. Sebag, however, intervened to prevent the

3

offer because Jibril was "not a hedge fund guy." Id., at 66-68, 74-75. In February 2018, Lukban called Jibril to inform her that Pool and Villetti "went to bat" for Jibril, but that Sebag had vetoed her employment by Guidepoint. Jibril Dep., at 40-41.

On March 12, 2018, Villetti sent an e-mail to HR Director Priscilla Gulino, asking for a meeting. In the letter, Villetti referred to several instances of what Villetti believed to be sex discrimination. She wrote of Events Manager Jessica Kagin-Tropea, who Viletti alleged suffered a loss of seniority, demotion, and a reduction in bonus during her maternity leave. Villetti mentioned her predecessor Ashlee Dunston, who was discharged even though her team thought she was a "great leader." Finally, she advised Gulino of Jibril, whom Villetti described as an "extremely qualified female candidate." Grech Dec., Ex. I. Villetti followed up her letter with a discussion with Gulino later that day, in which she provided additional details of the discrimination. Villetti Dep., at 87-88; Villetti Dec, at ¶¶ 9-10. On March 19, 2018, Guidepoint fired Viletti with no explanation. Grech Dec., Ex. C. In their last meeting, Gulina merely said that "it had been a pleasure to work with" Villetti. Villetti Dep. I, at 115-16.

On March 16, 2018, Pool also sent an e-mail to Gulino, which Pool described as a "formal complaint per the Guidepoint Employee Handbook—-'Non-Discrimination and Harassment Policy'." Pool corroborated Viletti's complaints. Grech Dec., Ex. J. On March 19, 2018, Guidepoint fired Pool as well as Villetti. Ex. D, at 117.

Soon after, another Recruiter from Guidepoint, unaware of previous attempts to recruit Jibril, sent her an e-mail trying to bring her to the company, stating, "I think it could be a great fit, and would love to chat further." Jibril Dec., Ex. A.

4

ARGUMENT

I.  STANDARD OF REVIEW

Guidepoint now moves for summary judgment. The Second Circuit has written, "Considering how often we must reverse a grant of summary judgment, the rules for when this provisional remedy may be used apparently need to be repeated." Gallo v. Prudential Residential Svcs, 22 F.3d 1219, 1223 (2d Cir. 1994). Summary judgment cannot be granted unless the movant can "show that there is no genuine issue as to any material fact . . . ." Fed. R. Civ. Pro. 56(c). The burden is on the movant. Adickes v. Kress & Co., 398 U.S. 144, 157 (1970). All ambiguities must be resolved and all inferences drawn in favor of the nonmovant. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

A discrimination claim, where the decisionmaker's state of mind usually poses the crucial question, is particularly inhospitable to summary treatment. "[W]hen deciding whether this drastic provisional remedy should be granted in a discrimination case, additional considerations should be taken into account. . .. Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers," the Court "must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." Gallo, 22 F.3d, at 1224. "Summary judgment will not lie . . . if the evidence is such that a reasonable jury can return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Analysis of employment discrimination cases begins with McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In that case, the Supreme Court held that "in the initial phase of the case, the plaintiff can establish a prima facie case without evidence sufficient to show

discriminatory motivation." Littlejohn v. City of New York, 795 F.3d 297, 307-08 (2d Cir. 2015). Plaintiff need only present "some minimal evidence suggesting an inference that the employer acted with discriminatory motivation." Id. This prima facie burden is "not onerous." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).

Once a prima facie case is established, the burden shifts to the employer to present evidence of its justification for the adverse action. The plaintiff then is afforded the opportunity to demonstrate that the employer's proffered reason was not the sole reason for the employment decision. Littlejohn, 795 F.3d, at 307-08.

II. DEFENDANT HAS NOT SHOWN THAT A REASONABLE JUROR COULD NOT FIND RETALIATION.

The framework in retaliation cases is similar. To establish a prima facie case of retaliation under Title VII, the plaintiff must show: protected participation or opposition under Title VII known by the alleged retaliator; an employment action disadvantaging the person engaged in the protected activity; and a causal connection between the protected activity and the disadvantageous employment action. Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir. 1980). "Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . ." DeCintio v. Westchester Cty. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987) (emphasis omitted).

Villetti here engaged in two protected activities of which Guidepoint obviously was aware: the March 12, 2018, complaint, and the follow-up discussion the same day.

6

Defendant claims that at least the written complaint was not protected retaliation because it does not "specify any protected category upon which a claim of retaliation could be based." Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def. Mem.") 10. The letter to Gulino, however, cited the mistreatment of three women aside from Villetti over the previous six months. Villetti included accounts of a woman being unfairly discharged, "followed by the negative changes affecting" another woman on maternity leave, culminating in the rejection of "an extremely qualified female candidate (Faiza)." The use of the adjective "female" in that context can only indicate an allegation of sex discrimination underlying the decision not to hire Jibril. Otherwise, there would be no need to specify the prospective employee's sex. Grech Dec., Ex. I, at 3. In the discussion between Villetti and Gulino held on the afternoon of March 12, Villetti detailed tbe sex discrimination in the office to a much greater extent, and specifically emphasized that a pattern of sex discrimination existed at the company. Villetti Dep., at 87; Villetti Dec., at ¶¶ 9-10.

Guidepoint contends "that the decision to terminate [Villetti's] employment was made after a series of complaints about Villetti from her colleagues," citing two e-mails from Kagin-Tropea, one of which was sent after Villetti's discharge. Def. Mem., at 11 (citing Grech Dec. Ex. G and H). But Kagin-Tropea, an employee at Villetti's level in another part of the company, took no part in the decision to dismiss Villetti. Furthermore, Guidepoint dismissed Kagin-Tropea shortly after Villetti and Pool. Villetti Dec., at ¶ 7.

It is undisputed that Sebag made the decision to terminate Villetti's employment. Def. Mem., at 4. However, when asked about that decision at his deposition, the following occurred:

Q: Did you play any role in the discharge of Ms. Villetti?

7

A: I don't recall.

Sebag Dep., at 32. Given Guidepoint's factual representation that Sebag made this critical decision, and given Sebag's inability to remember even whether he participated in that decision, defendant cannot advance a rationale for that decision by working backwards from some e-mails. Sebag was the decisionmaker, not Gulino, not Guidepoint's attorneys, and certainly not Kagin-Tropea. Nor can defendant simply rely on some "same actor" rule, Def. Mem., at 5, since the protected activity was an intervening event. If Sebag cannot proffer a reason for Villetti's discharge, Guidepoint may well have to stand "silent in the face of the presumption [of unlawful discrimination]." Burdine, 450 U.S., at 255. In any event, Sebag's inability to advance a rationale for Villetti's discharge certainly would justify a reasonable juror in finding retaliation and discrimination to be the genuine explanation for that decision.

Villetti and Pool were discharged less than a week after they both submitted Sdiscrimination complaints to HR. The odds of a purely coincidental simultaneous discharge, so soon after similar complaints, are astronomical. It is much more likely that Guidepoint intended to crush all dissent by firing any whistleblowers.

III. DEFENDANT HAS NOT SHOWN THAT A REASONABLE JUROR COULD NOT FIND DISCRIMINATION.

Guidepoint claims that Jibril cannot establish a prima facie case. Def. Mot., at 9. Yet Guidepoint actually rejected Jibril because she was not a "hedge fund guy." Rejection for a position because you are not a "guy" would certainly seem to constitute circumstances that give rise to an inference of invidious sex discrimination.

8

For his part, Sebag again claimed memory failure with respect to Jibril's rejection.

Q: Do you know who Faiza Jibril is?

A: No.

Q: Have you ever been told that Ms. Jibril was about to be hired by Guidepoint Global?

A: No.

Q: Did you ever veto Dr. Jibril's hire?

A: I don't recall.

. . .

Q: Did you ever veto a recommendation that a person be hired to report directly to Ms. Villetti?

A: I don't recall such an incident.

Sebag Dep., at 38-39.

Guidepoint, notwithstanding its decisionmaker drawing a blank, now claims that Jibril "was not suitable for the position" because she lacked "buy and sell side experience." Def. Mem., at 10. Such experience was expressly not required for this position. Villetti Dec., Ex. A. During her interviews, Jibril was told that such experience "was not a requirement," and that financial industry experience "wouldn't be an issue given [her] other experience and background." Jibril Dep., at 28. "[Jibril's] understanding was from [her] interviews that that would be experience that [Jibril] would gain [along] with the role and that it wasn't essential starting in the role." Id., at 29-30.

Guidepoint also contends that "Villetti's insubordinate action of unilaterally deciding to attend an out of state meeting" contributed to Villetti's dismissal. Def. Mem., at 9. It is hard to

9

see how such activity can be "insubordinate" when it is contained with Villetti's job specifications. The description of Villetti's position states that some of her "key responsibilities" would be to: "Create, lead and moderate conference calls and in-person roundtables with industry experts for clients and client events," and "Manage relationships and maintain knowledge of travel schedules with key industry advisers to book hosted events in various cities." Villetti Dec., Ex. A. Furthermore, Guidepoint never spoke to Villetti about either her supposed complaints from colleagues or her "insubordination." Villetti Dec., at ¶¶ 5-6. These rationales smack of after-the-fact pretext fabrication.

IV.   PLAINTIFFS HAVE VALID DAMAGE CLAIMS.

Defendant argues that Villetti "has utterly failed to meet her obligation to mitigate her damages." Def. Mem., at 11-12. Under the present circumstances, on the contrary, Villetti has made rational, good-faith choices concerning her career path.

The duty to mitigate "is not onerous, and does not require [the claimant] to be successful in mitigation." Dailey v. Societe Generale, 108 F.3d 451, 456 (2d Cir. 1997). The "employer must establish that the course of conduct plaintiff actually followed was so deficient as to constitute an unreasonable failure to seek employment." Gueye v. Air Afrique, 1995 WESTLAW 234711, at *9 (S.D.N.Y. Apr. 20, 1995). "Such an employee 'need only make a reasonable and good faith effort, and is not held to the highest standards of diligence.'" Thomas v. Pillow Kingdom, Inc. 2008 WESTLAW 1924977, at *16 (D. Colo. Apr. 30, 2006), quoting Spulak v. K Mart Corp., 894 F.2d 1150, 1158 (10th Cir. 1990)). "The burden is on the defendant

to show that the plaintiff did not exercise reasonable diligence in seeking to mitigate damages." Reilly v. Cisneros, 835 F. Supp. 96, 99 (W.D.N.Y. 1993), aff'd, 44 F.3d 140 (2d Cir. 1995).

In Brooks v. Woodline Motor Freight, Inc., 852 F.2d 1061, 1065 (8th Cir. 1988)(citations omitted), the plaintiff, a trucker, decided to use his own savings to start a businesss. "About six or eight weeks after [his dismissal], he did receive a job offer from another trucking company, which he considered and refused in order to pursue his own business venture and protect his investment." Brooks, at 1066. The appellate court held that the district court did not err by sending the mitigation issue to the jury.

After Guidepoint discharged Villetti, she worked as the Chief Executive Officer of Kenko, Inc., a packaged food startup. Villetti Dep. I, at 108. In that position, Villetti oversees research and development and operations. Villetti Dep. II, at 40. Kenko sells a protein bar, called Kioko, but has never earned any profits. Id., at 39. Villetti has earned no compensation from the company. Id., at 40-41. Villetti has also earned thousands of dollars from consulting projects for PricewaterhouseCoopers. Id., at 41-43.

Villetti has not failed to mitigate her damages. Given that 30 million people have been dismissed in the last six months, U.S. Department of Labor (May 29, 2020), attempting to start one's own enterprise is a rational response to the worst economy since the Great Depression. The startup has not earned any profits yet, but it does have revenues and seems to be following a sensible business plan. This issue is plainly for the jury.

Guidepoint also contends that because Jibril "can" earn more per year than what she would have earned at Guidepoint, then it follows that "she has not suffered any economic damages." Def. Mem., at 12. But Jibril could not always earn more at her current job.

11

If Guidepoint had hired Jibril, her annual salary would likely have been approximately $160,000. Her Expert Institute salary in February 2018 was $87,500, which was raised in or about May 2018 to $100,000. Jibril Dec., at ¶ 5. Therefore, from February to May 2018, Jibril lost approximately $18,000, and from June to December 2018 she lost approximately $30,000, for a total of $48,000. At that point, her damages stopped, and she is now seeking $48,000 in backpay damages.

Plaintiffs are plainly very talented, and will undoubtedly go very far in their chosen professions. But the early roadblocks in their career path were erected by stubborn sex discrimination, entitling them to compensation. Villetti was discharged days after she opposed discrimination, simultaneously with her supervisor, who had also opposed discrimination. Jibril's job offer was intercepted at the last second by a CEO who preferred a hedge fund guy. Certainly, plaintiffs have produced enough evidence to go before the jury.

## CONCLUSION

For all of the foregoing reasons, plaintiffs respectfully request that the Court deny defendant's motion.

Dated: New York, New York
October 1, 2020

_____
Stuart Lichten (SL-1258)
LICHTEN & BRIGHT, P.C.
Attorneys for Plaintiffs
1115 Broadway - 11th Floor
New York, New York 10010
(646) 588-4872

13