UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

| | |
|---|---|
| VALENTIA VILLETTI and FAIZA JIBRIL, M.D., | 1:18-cv-10200-MKV-KNF |
| Plaintiffs, | |
| - against - | PLAINTIFFS'S LOCAL RULE 56.1 COUNTERSTATEMENT |
| GUIDEPOINT GLOBAL, LLC, | |
| Defendant. | |

------------------------------------------------------------------ X

Pursuant to Rule 56.1 of the Joint Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York and Section 5(C) of this Court's Individual Rules of Practice in Civil Cases, plaintiffs Valentia Villetti ("Villetti") and Faiza Jibril, M.D. ("Jibril"), by their attorneys, respond to the Local Rule 56.1 statement of defendant Guidepoint Global LLC ("Guidepoint"), as follows:

1. Plaintiffs Valentia Villetti ("Villetti") and Faiza Jibril, M.D. ("Jibril") (collectively "Plaintiffs") bring this action pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 290, *et seq.*, and the Administrative Code of the City of New York, § 8-101 *et seq.* ("Administrative Code"), alleging that Guidepoint engaged in unlawful employment discrimination against Plaintiffs on the basis of their gender and retaliated against Villetti for complaining about discrimination. *See* Complaint dated November 5, 2018, Exhibit A.[1]

1. Admit

---
[1] Unless otherwise noted, all references to "Exhibit" are to the exhibits that are annexed to the Declaration of David J. Grech, executed on September 14, 2020.

1

2. Villetti was employed by Guidepoint from September 11, 2017 until March 18, 2018 in the position of Senior Healthcare Content Strategist. *See* Complaint at ¶¶ 7, 18. *See also* Villetti's Offer Letter, Exhibit B and Villetti's Termination Letter, Exhibit C.

2. Admit

3. Villetti was paid a base annual salary of $180,000.00 with the prospect of a $15,000.00 annual discretionary bonus and a $5,000.00 signing bonus. *See* Excerpts from Villetti's Deposition Testimony, taken on October 1, 2019 ("Villetti Dep. I") at 31:14-21, Exhibit D.

3. Admit

4. At the time Villetti was hired, Bouker Pool ("Pool"), Director of Content, led the content team. *See id.* at 21:20-25; 25:3-9.

4. Admit

5. Villetti was interviewed by Albert Sebag ("Sebag"), Guidepoint's Chief Executive Officer, prior to her hire. *See id.* at 93:15-16.

5. Admit

6. Sebag signed Villetti's employment agreement on behalf of Guidepoint. *See* Excerpts from Villetti's Deposition Testimony, taken on November 14, 2019 ("Villetti Dep. II") at 10:3-7, Exhibit E; *see also,* Exhibit C.

6. Admit

7. Villetti worked with the events team at Guidepoint, including Jessica Kagin-Tropea ("Kagin"), Kendall Fries, Amrutha Sridhar, Gabrielle Kallmeyer, and Justin Ruiz. *See* Villetti Dep. I at 45:3-46:2.

7. Admit

8. The individuals on the events team provided logistics for Guidepoint. *See id*.

8. Admit

9. The events and content teams worked together by collaborating on events for Guidepoint. *See id.* at 52:18-21.

9. Admit

10. While Villetti was employed by Guidepoint, her employment overlapped with Ashlee Dunston ("Dunston") from Villetti's hire until the end of 2017. *See id.* at 46:3-25.

10. Admit

11. Villetti cannot recall any conversation with a particular employee who informed her that it was Guidepoint's policy to consult with team members prior to terminating someone, including Dunston. *See id.* at 47:18-50:21.

11. Admit

12. No guidance was given to Villetti in the employee handbook that Villetti's termination was dependent upon consultation with her team. *See* Villeti Dep. II at 14:3-8.

12. Admit

13. Villetti's work hours at Guidepoint were either 9:00 a.m. to 5:00 p.m. or 10:00 a.m. 6:00 p.m. Monday through Friday, and Villetti was expected to work outside of those hours. *See* Villetti Dep. I at 121:16-122:5.

13. Admit

14. Villetti was responsible for arranging healthcare content in-person meetings by selecting the advisors and setting the agendas. *See id.* at 51:24-53:4. 15.

14. Admit, but Villetti's responsibilities were greater than that. Villetti Dec., Ex. A

15. Villetti cannot recall when she received positive feedback about her employment, and cannot remember by whom the feedback was given. *See id.* 92:12-17.16.

15. Denies. Sebag gave Villetti positive feedback. Villetti Dep. I, at 91-92.

16. Villetti engaged in multiple arguments with a consultant of Guidepoint, Rutwik Ghodadra ("Ghodadra") during her employment. *See id.* at 78:15-23.17.

16. Admit

17. The basis of the arguments between Villetti and Ghodadra was Villetti's objecting to Ghodadra's request that the Healthcare Content Team, of which Villetti was a part, listen to his opinions and views. *See id.* at 79:5-15.18.

17. The general basis of many of the arguments was Ghodara's desire to be a manager, and to give direction to employees

18. Pool instructed Villetti to listen to Ghodadra. *See id.* at 79:13-15. 19.

18. Admit

19. Ghodadra also offered his opinions to other teams in addition to the Healthcare Content Team. *See* Villetti Dep. at 79:23-80:6.20.

19. Admit

20. Villetti met with Sebag once during her employment with Guidepoint, at her interview, and possibly once more during a group meeting; although Villetti cannot remember whether the second meeting occurred. *See id.* at 95:8-96:8.21.

20. Admit

21. In March 2018, Villetti attended a meeting in Boston without Sebag's authorization. *See id.* at 103:8-11; *see also,* Villetti Dep. II at 17:20-24; *see also* Email from Sebag to Villetti, Exhibit F.

21. Deny. Conferences were part of Villetti's job, and she did not need specific authorization from Sebag. Villetti Dep. I, at 102.

4

22. Villetti was the only member of the Healthcare Content Team to attend the meeting in Boston. *Id.* at 100:20-22.23.

22. Admit

23. Sebag communicated with Villetti regarding his concerns about her attending the Boston conference and instructed her to return to New York City. *See id.*

23. Admit

24. Sebag informed Villetti that he was concerned Villetti had not consulted with him prior to her trip to Boston. *See* Villetti Dep. II at 17:16-24.25.

24. Admit

25. Co-workers complained to Human Resources about Villetti's conduct and performance. *See* Emails (2) from Kagin to Human Resources, Exhibits G and H.

25. Deny. Villetti is aware of only one coworker who sent negative e-mails to HR. Villetti Dep. I, at 94-98.

26. Villetti's coworkers complained that Villetti hardly did any work, was frequently absent, and demoralized her colleagues, among other complaints. *See, id.*

26. Deny. Villetti is aware of only one coworker who sent negative e-mails to HR. Villetti Dep. I, at 94-98

27. When Villetti returned from Boston, Sebag reminded Villetti of her required goal to schedule 1.5 to 2 teleconferences per week. *See* Villetti Dep. II at 87:7-21.

27. Admit

28. Like Villetti, her predecessor at Guidepoint was a woman. *See* Villetti Dep. at 138:9-21.29.

28. Admit

29. Villetti believed that she was discriminated against based upon a "pattern" of demotion and termination of women at Guidepoint. *See id.* at 73:7-14.30.

29. Admit

30. Villetti identified Kagin as the woman who was demoted and Dunston and a woman named "Alyssa" as the women who were terminated. *See id.* and 141:3-15. 31.

30. Admit

31. Villetti identified the offenders of gender discrimination against her at Guidepoint as Sebag and Ghodadra. *See* Villeti Dep. II at 15:17-21.32.

31. Plaintiffs do not know what "offenders of gender discrimination" means.

32. Villetti believed that the reason Kagin was demoted was her gender and that the reason Kagin was terminated was because she was on maternity leave at the time. *See* Villetti Dep. at 74:6-9.33.

32. Deny. Villetti believed the reasn why Kagin-Tropea was demoted was because she as on maternity leave at the time. Kagin-Tropea was dismissed after Villetti.

33. Villetti believed that Dunston's termination was based upon gender because Dunston's subordinates were not consulted prior to Dunston's termination. *See id.* at 74:10-15.34.

33. Deny. Villetti believed that Dunston was dismissed for a variety of reasons, including sex discrimination.

34. Villetti, a woman, replaced Dunston. *See id.* at 139:2-9.35. Villetti believed that "Alyssa" was terminated following a maternity leave. *See id.* at 183:7-21.36.

34. Admit

35. Additionally, Villetti identified Guidepoint's decision not to hire Jibril as a reason she believes Guidepoint discriminated against women. *See id.* at 74:4-5. 37.

35. Admit

36. Pool was terminated on the same day as Villetti by Sebag. *See id.* at 113:24-113:8.38.

36. Admit

37. The behavior by Sebag that Villetti characterized as discriminatory was his calling her on her cell phone in a tone she deemed demeaning during her trip to Boston. *See id.* at 17:17-25.

37. Deny. Villetti believed much of Sebag's behavior was due to sex discrimination. Villetti Dep. I. at 168-169; Villetti Dep. II, at 16-21.

38. Villetti believes that Sebag would not have talked to a male in the same way. *See* Villetti Dep. II at 18:8-15.

38. Admit

39. Villetti never witnessed a conversation between Sebag and a male employee under circumstances similar to Villetti's trip to Boston. *See id.*

39. Admit

40. Villetti never told Sebag that she believed his behavior was harassing or discriminatory. *See id.* at 16:6-10.42.

40. Admit

41. Villetti does not recall Sebag doing anything that made her feel that he had *animus* toward women. *See id.* at 10:14-23.

41. Deny. Villetti saw numerous actions taken by Sebag that Villetti believed constituted sex discrimination. Villetti Dep. I. at 168-169; Villetti Dep. II, at 16-21.

42. The only time Villetti believed Sebag was dismissive or belittling of her was on his call to her while she was in Boston. *See id.* at 36:7-38:13.

42. Admit

7

43. Priscilla Gullino ("Gulino") of Human Resources informed Villetti that it was not uncommon for Sebag to misplace his anger. *See id.* at 74:10-19.

    43. Admit

44. Villetti believed that Ghodadra's conduct of dictating what team members should do and manner of communicating with them constituted gender discrimination. *See id.* at 29:2-17.

    44. Admit

45. Two men were on Villetti's team. *See id.*

    45. Admit

46. Villetti considered Ghodadra's presence in the Guidepoint work environment to be toxic. S*ee id.* at 28:18-29:3.

    46. Admit

47. At the time of the Boston trip, Villetti believed that Sebag was angry with Pool as well as with her. *See id.* at 74:20-23.

    47. Admit

48. On March 12, 2018, Villetti sent an email to Guidepoint's Human Resources Department. *See* Villetti Dep. I at 86:2-13.

    48. Admit

49. In that email, Villetti voiced concerns about Ghodadra's and Sebag's behaviors, which she deemed to be hostile. *See* March 12, 2018 email from Villetti to Priscilla Gulino, Exhibit I.

    49. Admit

50. Villetti complained about Sebag's contacting her while she was in Boston, expressing her belief that she did not report to him and that he did not have to approve her travel. *See* Villetti Dep. I at 166:5-25.

50. Admit

51. Shortly after receiving Villetti's email, Guidepoint's Human Resources Department met with Villetti to discuss the issues raised therein. *See id.* at 87:5-21.52.

51. Admit

52. A few days later, Pool sent an email about Ghodadra's creating a hostile work environment for the Healthcare Content and Logistic Teams at Guidepoint. *See id.* at 82:9-18.53; *see also,* Pool's Email to Gulino, Exhibit J.

52. Admit

53. Pool's complaint was on behalf of the events and logistics teams at Guidepoint, which included at least one male. *See id.* at 111:13-18.54.

53. Deny. Pool's complaint also covered the Healthcare Content team. Grech Dec. Ex. J

54. Villetti believed Ghodadra created a hostile work environment by raising his voice and contacting team members on their cell phones. *See id.* at 83:13-23.

54. Admit

55. Villetti had concerns about Ghodadra's contacting employees on their cell phone outside of business hours. *See id.* at 83:21-24.56.

55. Admit

56. Villetti believed Sebag created a hostile work environment for her because he called her while in Boston and she did not believe she reported to him. *See id.* at 166:5-25.57.

9

56. Deny. Villetti believed Sebag created a hostile work environment of sex discrimination. Villetti Dep I., at 168-69.

57. Villetti believed that the reason Sebag called her while she was in Boston was that he was frustrated with Pool's excessive vacations. *See id.* at 169:7-21.58.

57. Deny. Villetti believed Sebag created a hostile work environment of sex discrimination. Villetti Dep I., at 168-69.

58. Villetti told Pool and Human Resources that Ghodadra's role with Guidepoint was unclear and that he seemed to have more authority than an advisor. *See id.* at 129:18-130:5.59.

58. Admit

59. Separately, Villetti expressed concern about the separation of her predecessor from employment with Guidepoint. *See id.* at 137:8-138:11.60.

59. Admit

60. At the time she was writing her March 12, 2018 email, Villetti's main concern was Ghodadra's appearing to take on a management role on her team. *See* Villetti Dep. II at 25:23-26:9.61.

60. Deny. Villetti's main concern was sex discrimination. Villetti Dec, at ¶¶ 9-10.

61. Villetti complained about Pool's excessive absences. *See* Villetti Dep. at 123:12-23.62.

61. Admit

62. Villetti was concerned about Pool's frequent absences, the lack of metrics surrounding her performance, and her team's inability to hire additional staff. *See id.* at 26:16-27:6.63.

62. Admit

63. Villetti's employment with Guidepoint was terminated effective March 18, 2018. *See* Exhibit C.

63. Admit

64. Pool's employment with Guidepoint was also terminated. *See* Villetti Dep. I at 119:22-120:4.

64. Admit

65. Villetti has not applied for any employment since her separation from Guidepoint in March 2018. *See id.* at 36:11-37:16; 91:2-9.

65. Admit

66. The reason that Villetti did not apply for employment is that she was instead focusing on her start-up company, Kioko, in which she was a co-founder. *See id.*

66. Admit

67. Kioko produces packaged foods. *See id.* at 37:14-21.

67. Admit

68. Villetti earns no income from her role in her start-up company. *See id.* at 40:24-41:2.

68. Deny. Villetti has not yet earned income from her role in her startup company.

69. Villetti was engaged in one (1) paid healthcare consulting project in 2018 for three (3) months at $200.00 per hour, following her termination from Guidepoint. *See id.* at 42:12-24; 43:20-44:8.

69. Admit

70. In addition, Villetti performed approximately three (3) to four (4) unpaid informal consulting projects following her termination from Guidepoint (starting in March 2018). *See id.* at 42:12-24; 43:20-44:8.

70. Admit

71. Villetti is seeking reinstatement to employment with Guidepoint. *See id.* at 107:3-8.

71. Admit

72. Villetti is aware that Ghodadra is running the Healthcare Content Team and still wishes to return to Guidepoint and to work with him. *See id.* at 107:9-14.

72. Admit

73. Villetti is also aware that Sebag is still the CEO of Guidepoint. *See id.* at 107:15-17.

73. Admit

74. Jibril applied for the position of Healthcare Content Strategist at Guidepoint in December 2017. *See* Complaint at ¶ 8.

74. Admit

75. Villetti interviewed Jibril. *See* Villetti Dep. I at 57:23-58:6.79.

75. Admit

76. "Buy side" or "sell side" experience was preferred for this position. *See* Villetti Dep. I at 148:16-23.

76. Admit

77. Jibril did not have either "buy side" or "sell side" experience. *See id.* at 149:16-18.

77. Admit

78. At the time Jibril applied for the position, two (2) other women interviewed for the same position. *See id.* at 58:20-59:22.

78. Admit

79. One of these women was offered and accepted the role. *See id.* at 70:11-18.

12

79.     Admit

80.     Ultimately, fifteen (15) individuals (including both men and women) were hired to fill the position sought by Jibil. *See* Response to Request to Admit #26, Exhibit K.

80.     Deny. Fifteen individuals were hired to perform aspects of the position sought by Jibril. Villetti Dep. I, at 148- 150.

81.     The individuals hired to fill the position for which Jibril applied had "buy side" and/or "sell side" experience. *See* Villetti Dep. I at 148:24-150:3.

81. Deny. Some of the individuals hired to be Healthcare Content Strategists had "buy side" or "sell side" experience. Id.

82.     Jibril for the first time considered that her gender played a role in Guidepoint's decision not to extend an employment offer to her only after speaking with Villetti following Villetti's termination from Guidepoint. *See* Excerpts from the Deposition Transcript of Faiza Jibril dated October 3, 2019 ("Jibril Dep.") at 51:18-52:14; 53:3-10, Exhibit L.

82.     Admit

83.     In 2019, Jibril inquired about/applied for another position with Guidepoint, specifically a business development role. *See id.* at 103:20-104:106:11.

83.     Deny. In 2019, Jibril inquired about another position with Guidepoint, specifically a business development role. Id.

84.     Jibril would accept a position at Guidepoint if the opportunity presented itself. *See id.* at 118:20-24.

84.     Admit

85. At the time of her applications for employment with Guidepoint, Jibril was employed by The Expert Institute. *See id.* at 106:9-14.

85. Admit

86. During this litigation, Jibril held the title of Vice President at The Expert Institute. *See id.* at 20:2-22.

86. Admit

87. In this position, Jibril was paid a $140,000.00 annual base salary. *See id.* at 20:23-21:14.

87. Admit

88. In this position, with commissions, Jibril could earn a total of $330,000.00 annually. *See id.*

88. Admit

89. The starting compensation for the position at Guidepoint for which Jibril applied in December 2017 was $140,000.00. *See id.* at 37:7-13.

89. Admit

90. The compensation earned by Jibril at The Expert Institute exceeds the compensation she would have earned had she been hired by Guidepoint. *See id.* at 20:23-21:14; 37:7-13.

90. Jibril is only seeking backpay damages from February through November 2018, a period in which she would have earned $48,000 more at Guidepoint. Jibril. Dep, at 20-21, 37

91. During the course of discovery, Guidepoint requested certain materials from Plaintiffs concerning any alleged emotional distress damages. *See e.g.* Guidepoint First Requests to Plaintiffs for Production of Documents at Requests 1–2, Exhibit M.

91. Admit

92. Plaintiffs objected to these requests and did not disclose these requested materials to Guidepoint. *See* Plaintiffs' Response to Defendant's First Requests for Production of Documents at Responses 1–2, Exhibit N.

92. Admit

93. Plaintiffs proffered as the basis of this objection that "[P]laintiffs are not seeking damages for their mental and emotional distress." *Id.*

93. Admit

94. Guidepoint maintains an employee handbook. *See* Guidepoint Employee Handbook, Exhibit O; *see also,* Villetti Dep. I at 148:2-4.

94. Admit

95. Guidepoint maintains written policies prohibiting discrimination and retaliation. *See* Exhibit O.

95. Admit

96. Guidepoint employees are required to submit acknowledgments of the employee handbook. *See* Exhibit P and Villetti Dep. I at 148:2-6.

96. Admit

97. Guidepoint maintains a policy for reporting discrimination and harassment in the workplace. *See* Exhibit O and Villetti Dep. I at 147:22-25.

97. Admit

98. Guidepoint maintains an internal procedure to be utilized when an employee lodges a complaint of discrimination. *See* Exhibit O.

98. Admit

99. Employee complaints of discrimination are investigated by Guidepoint. *See id.*

99. Admit that according to the handbook, Guidepoint is supposed to investigate complaints. Id.

100. Villetti did not utilize the policy set forth in Guidepoint's employee handbook governing complaints about discrimination. *See id.*; *see also,* Exhibit I; *see also,* Villetti Dep. I at 148:2-10.

100. Deny. Villetti submitted an employee complaint to Human Resources. Grech Dec., Ex. C.

101. Villetti never submitted an employee complaint to her supervisor or Human Resources pursuant to Guidepoint's handbook. *See* Villetti Dep. II at 21:9-17.

101. Deny. Villetti submitted an employee complaint to Human Resources. Grech Dec., Ex. C.

Dated:   New York, New York
         October 1, 2020

                                                Stuart Lichten (SL-1258)
                                                LICHTEN & BRIGHT, P.C.
                                                Attorneys for Plaintiffs
                                                1115 Broadway, 11th Floor
                                                New York, NY 10010
                                                (646) 588- 4872